# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AMPEX CORPORATION, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | C.A. No. 04-1373-KAJ |
|  | ) | |
| EASTMAN KODAK COMPANY, | ) | |
| ALTEK CORPORATION and CHINON | ) | |
| INDUSTRIES, INC., | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |

## DEFENDANTS' COMPENDIUM OF UNREPORTED OPINIONS

**OF COUNSEL:**

S. Calvin Walden
Paul B. Keller
Rebecca M. McCloskey
WILMER CUTLER PICKERING
 HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 230-8888

William F. Lee
Donald R. Steinberg
Michael J. Summersgill
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Date: February 22, 2006

PAUL M. LUKOFF (I.D. No. 96)
DAVID E. BRAND (I.D. No. 201)
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500

*Attorneys for Defendants*



Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
ALLERGAN INC. and Allergan Sales, Inc.,
Plaintiffs,
v.
PHARMACIA CORPORATION, Pharmacia AB,
Pharmacia Enterprises S.A. and Pharmacia & Upjohn
Company, Defendants,
and THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK,
Additional Defendant on Counterclaim in Reply.
**No. Civ.A.01-141-SLR.**

May 17, 2002.

MEMORANDUM ORDER

ROBINSON, J.
*1 At Wilmington this 17th day of May, 2002,
having reviewed the various pending discovery
motions and the papers submitted in connection
therewith;

IT IS ORDERED that:

1. Columbia's motion for a protective order
precluding plaintiffs from deposing and obtaining
documents from John P. White, Esquire (D .I. 77) is
granted.

a. Plaintiffs have subpoenaed Columbia's lead trial
counsel, Mr. White, to appear for a deposition on the
issue of inventorship of U.S. Patent No. 4,599,353
("the '353 patent"). More specifically, plaintiffs
contend "that the inventor of the '353 patent, with
Columbia's full knowledge and participation through
its attorneys, failed to credit one or more co-inventors
who collaborated in and contributed to the conception
and reduction to practice of the '353 invention." (D.I.
87 at 4) Plaintiffs argue that Mr. White has relevant
information based on an amendment filed by Mr.
White wherein he declares that "[a]pplicant is the
sole inventor of the invention described and claimed
in the subject application." (*Id.*, Ex. 2 at 4) The
amendment reflects facts as averred by the inventor
in his declaration. (*Id.*, Ex. 3)

b. As a general principle, depositions of trial counsel

are limited to those circumstances where "the party
seeking to take the deposition has shown that (1) no
other means exist to obtain the information than to
depose opposing counsel; (2) the information sought
is relevant and nonprivileged; and (3) the information
is crucial to the preparation of the case." *Shelton v.
Am. Motors Corp.,* 805 F.2d 1323, 1327 (8th
Cir.1987) (internal citation omitted). *Cf., Environ
Prods., Inc. v. Total Containment, Inc.,* 41
U.S.P.Q.2d 1302, 1306 (E.D.Pa.1996) ("Impressions
protected by the work-product doctrine may be
discovered when directly relevant to the litigation and
when the need for production is compelling."); *Bio-
Rad Labs., Inc. v. Pharmacia, Inc.,* 130 F . R.D. 116,
122 (N.D.Cal.1990) ("[A]n attorney's opinion work
product is discoverable where such information is
directly at issue and the need for production is
compelling."). Moreover, absent a *prima facie*
showing of fraud, an allegation of inequitable
conduct, in and of itself, does not vitiate the attorney-
client privilege or the protections of the attorney
work product doctrine. *See In re Spalding Sports
Worldwide, Inc.,* 203 F.3d 800, 806-07
(Fed.Cir.2000).

c. The court concludes that plaintiffs have not met
their burden to demonstrate a compelling need for the
requested discovery. Plaintiffs apparently contend, in
support of their inequitable conduct contentions, that
Mr. White knew or should have known that one or
more co-inventors collaborated in and contributed to
the conception and reduction to practice of the
patented invention and was obligated to so inform the
PTO. The court suggests that until such time as
plaintiffs have demonstrated the truth of the matters
asserted (i.e., there were co-inventors), Mr. White's
knowledge is irrelevant. Because the issue of
inequitable conduct is a matter for the court to
determine, and because the factual predicate to the
issue of inventorship can be pursued independent of
Mr. White's testimony (through the depositions of the
inventor and alleged co-inventors and through access
to the documents that reflect the inventive process),
the court declines to permit the deposition of Mr.
White at this time.

*2 2. Defendants' motion to compel the production of
documents (D.I.82) is granted to the extent explained
below.

a. Defendants have moved to compel plaintiffs to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

produce "all documents relating to the subject matter of three opinion letters provided by their counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP ("Finnegan, Henderson"), and to permit questioning of Allergan witnesses regarding the subject matter of those opinion letters." (*Id.* at 1) By way of background, plaintiffs have chosen to rely upon the opinions written by Finnegan, Henderson in defense of the claim of willful infringement. Plaintiffs have produced the three opinion letters and drafts thereof, and "all communications between Allergan and Finnegan regarding those letters as well as all of the materials that Allergan considered in connection with its reliance on the letters." Defendants seek, in addition to the above, "documents relating to [Allergan's] other infringement and validity analyses of the patents." (*Id.* at 3)

b. From the court's perspective, the question posed by this discovery dispute is whether the scope of a party's voluntary waiver is defined by the course of conduct between the party and its opinion counsel, or whether it is defined by the subject matter discussed in the opinion letters. The court concludes that it is the latter.

c. It is undisputed that,

[w]hen an alleged infringer decides to respond to a claim of willful infringement by offering evidence that he or she reasonably and in good faith relied on advice of counsel in making, using or selling the allegedly infringing device, then the advice becomes relevant and admissible. Documents and testimony relating to that advice are relevant in that they are probative of the alleged infringer's intent. They are admissible because the alleged infringer has waived the privilege as to the subject matter of the advice.

*Thorn EMI North Am., Inc. v. Micron Tech., Inc.,* 837 F.Supp. 616, 621 (D.Del.1993). In order to determine whether the alleged willful infringer "reasonably and in good faith relied on" the advice rendered by opinion counsel, it is appropriate to test the knowledge of the alleged willful infringer concerning the subject matter of the opinion. *Cf. id.* (the patentee should be entitled to discover facts relating to what the alleged willful infringer "knew and had concluded about the credibility, value and reasonableness of the opinions.").

d. Consistent with the above reasoning, the court concludes that the only equitable way for a patentee to test the knowledge of an alleged willful infringer (so as to test the reasonableness of its evaluation of

counsel's opinions) is for the alleged willful infringer to disclose all of the information it possessed prior to or at the time it obtained opinions of counsel as to the subject matters discussed in such opinions. [FN1]

> [FN1] The court recognizes that the scope of discovery allowed at bar is relatively broad and potentially prejudicial to plaintiffs. Therefore, rather than requiring disclosure consistent with this order at this time, the court will bifurcate the issue of willfulness, stay discovery relating to willfulness, and conduct a separate trial with a new jury in the event plaintiffs are found to infringe valid patents. *See Novartis Pharms. Corp. v. Eon Labs Mfg., Inc.,* No. 00-800-JJF, 2002 WL 576088, at *3 n. 2 (D.Del. Mar. 28, 2002).

3. Plaintiffs' motion to compel the production of documents withheld under the common legal interest doctrine (D.I.99) is denied as untimely. The parties agreed to exchange their privilege logs on January 23, 2002. By stipulation filed on March 11, 2002, the discovery cutoff date was extended to March 15, 2002. Plaintiffs filed the instant motion on April 8, 2002. Motions that relate to fact discovery must be filed during fact discovery, especially where, as here, the underlying facts relating to the motion were known to plaintiffs in January 2002. Therefore, the court declines to address the motion on its merits.

*3 4. Plaintiffs' motion for leave to file a sur-reply brief (D.I.96) is denied as moot.

D.Del.,2002.
Allergan Inc. v. Pharmacia Corp.
Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:01CV00141 (Docket) (Mar. 01, 2001)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21557632 (N.D.Ill.)
**(Cite as: 2003 WL 21557632 (N.D.Ill.))**

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
APTARGROUP, INC., Plaintiff,
v.
OWENS-ILLINOIS, INC. and Armin Tool and
Manufacturing Co., Defendants.
**No. 02 C 5058.**

July 3, 2003.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.

**\*1** Defendants move to bifurcate the issues of liability and willfulness for purposes of discovery and trial. That motion is granted.

The parties agree on one thing: bifurcation is within the sound discretion of the court. Each marshalls a number of cases in support of its opposing position, with defendants seeking bifurcation and plaintiff opposing it. A review of those cases discloses such varied circumstances that an extended analysis of each case serves little purpose. A few observations will suffice. The Federal Circuit encourages bifurcation when a party is faced with what has come to be known as the "Quantum dilemma": a choice between the lawful assertion of the attorney-client privilege and avoidance of a willfulness finding if infringement is found. *Quantum Corp. v. Tandon Corp., 940 F.2d 642 (Fed.Cir.1991).* The support from some of the professional literature is even stronger. The district courts are reluctant to bifurcate, however, if there is not a good reason to bifurcate damages as well, or it is uncertain that the party faces the "Quantum dilemma," or legal advice becomes relevant for other reasons, or prior rulings establish that the patent holder has a strong liability case (although this last reason appears to be somewhat of a make-weight). They divide as to whether or not intent can ever be relevant to a non-infringement defense.

Here the "Quantum dilemma" is raised by the submission of attorney opinion letters *in camera.* The issue of damages has already been bifurcated, there appears to be no reason why legal advice would be relevant to any issue other than willfulness, and plaintiff's liability case has taken a real hit from this court's *Markman* construction. Finally, we think there is a basis for believing that an "intent" issue mixed up with an infringement issue will have a tendency to confuse and possibly prejudice the jury, without any real relevant evidence benefit.

**Motions, Pleadings and Filings** (Back to top)

• 2003 WL 23419339 (Trial Motion, Memorandum and Affidavit) Agreed Motion for Disposition of Restricted Documents (Oct. 06, 2003)

• 2003 WL 23419335 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Motion to Set A Scheduling Order (Jul. 08, 2003)

• 2003 WL 23419336 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Motion to Strike Defendants' Affirmative Defenses (Jul. 08, 2003)

• 2003 WL 23419333 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Support of Motion to Bifurcate Issues of Liability and Willfulness (Jun. 04, 2003)

• 2003 WL 23419334 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Brief Opposing Bifurcation of Willfulness from Liability (Jun. 04, 2003)

• 2003 WL 23816942 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Support of Motion to Bifurcate Issues of Liability and Willfulness (Jun. 04, 2003)

• 2003 WL 23816944 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Brief Opposing Bifurcation of Willfulness From Liability (Jun. 04, 2003)

• 2003 WL 23816940 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply in Support of Its Motion to Compel Disclosure of Valve Measurement Data (May. 19, 2003)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 2003 WL 21557632 (N.D.Ill.)
**(Cite as: 2003 WL 21557632 (N.D.Ill.))**

- 2003 WL 23419330 (Trial Motion, Memorandum and Affidavit) Agreed Motion and Proposed Order Moving by One Day the Time to File Status Reports, and to Reschedule the Status Hearing (May. 02, 2003)

- 2003 WL 23419323 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Reply Brief on Claim Construction (Feb. 25, 2003)

- 2003 WL 23419327 (Trial Motion, Memorandum and Affidavit) Defendants' Response Brief Regarding Claim Construction (Feb. 25, 2003)

- 2003 WL 23816934 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Reply Brief on Claim Construction (Feb. 25, 2003)

- 2003 WL 23816935 (Trial Motion, Memorandum and Affidavit) Defendants' Response Brief Regarding Claim Construction (Feb. 25, 2003)

- 2003 WL 23419318 (Trial Motion, Memorandum and Affidavit) Defendants' Initial Brief Regarding Claim Construction (Feb. 04, 2003)

- 2003 WL 23419320 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Opening Brief on Claim Construction (Feb. 04, 2003)

- 2002 WL 32674603 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Response to Defendants' Status Report (Dec. 02, 2002)

- 2002 WL 32452958 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Compel Production of 30(b)(6) Witnesses (Oct. 25, 2002)

- 2002 WL 32674594 (Trial Pleading) Armin Tool and Manufacturing Co.'s Answer and Affirmative Defenses (Aug. 27, 2002)

- 2002 WL 32674587 (Trial Pleading) Owens-Illinois, Inc.'s Answer and Affirmative Defenses (Aug. 21, 2002)

- 2002 WL 32674578 (Trial Pleading) Complaint for Patent Infringement (Jul. 17, 2002)

- 1:02CV05058 (Docket) (Jul. 17, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 WL 335607                                                                                          Page 1
--- F.3d ----, 2006 WL 335607 (Fed.Cir.)
**(Cite as: 2006 WL 335607 (Fed.Cir.))**

**H**
Only the Westlaw citation is currently available.

United States Court of Appeals,
Federal Circuit.
GOLDEN BLOUNT, INC. Plaintiff-Appellee,
v.
ROBERT H. PETERSON CO., Defendant-Appellant.
**No. 04-1609, 05-1141, 05-1202.**

Feb. 15, 2006.

Appealed from: United States District Court for the Northern District of Texas. Senior Judge Jerry Buchmeyer.

Charles W. Gaines, Hitt Gaines, P.C., of Richardson, Texas, argued for plaintiff-appellee. With him on the brief was Greg H. Parker. Of counsel on the brief was William D. Harris, Jr., Schultz & Associates, of Dallas, Texas.

Leland W. Hutchinson, Jr., Freeborn & Peters, of Chicago, Illinois, argued for defendant-appellant. With him on the brief were Jennifer L. Fitzgerald and David S. Becker.

Before MICHEL, Chief Judge, LOURIE, and LINN, Circuit Judges.

LINN, Circuit Judge.

*1 Robert H. Peterson Co. ("Peterson") appeals from final orders finding that Peterson willfully infringed U.S Patent No. 5,988,159 ("the '159 patent"), and awarding Golden Blount damages and attorney fees. *Golden Blount, Inc. v. Robert H. Peterson Co.,* No. 3-01-CV-0127-R (N.D.Tex. Dec. 15, 2004) (Final Judgment); *Golden Blount, Inc. v. Robert H. Peterson Co.,* No. 3:01-CV-0127-R (N.D.Tex. Nov. 15, 2004) (Attorney Fees Order); *Golden Blount, Inc. v. Robert H. Peterson Co.,* No. 3-01-CV-0127-R (N.D.Tex. Sept. 2, 2004) (Infringement Order). Because the district court did not clearly err in finding that Peterson willfully infringed the '159 patent, we affirm the district court's judgment of willful infringement and the award of attorney fees based principally thereon. However, because the district court did not address certain returned units in its calculation of damages, we vacate the damages award and remand

that limited aspect of the case to the district court with instructions to reexamine the number of products sold and, if necessary, re-compute damages and enter judgment thereon consistent with this opinion.

**I. BACKGROUND**

On January 18, 2001, Golden Blount filed suit against Peterson for infringement of the '159 patent, which relates to fireplace burners and associated equipment. Beginning on July 29, 2002, the district court held a bench trial. On August 9, 2002, the district court found willful infringement, held that the claims were not invalid, awarded damages and attorney fees, and granted an injunction. Peterson appealed to this court and, in April 2004, we construed certain claims of the '159 patent, affirmed the validity determination, vacated the judgment as to infringement, and remanded for specific factual findings. *See Golden Blount, Inc. v. Robert H. Peterson Co.,* 365 F.3d 1054 (Fed.Cir.2004) ("*Golden Blount I* "). Because we vacated the judgment with respect to all issues of infringement, we also vacated and remanded the judgment as to willfulness, the exceptional nature of the case, and damages. *Id.* at 1061.

In the district court on remand, both parties filed proposed findings of fact. On June 22, 2004, the district court adopted Peterson's proposed findings of non-infringement. On July 6, 2004, Golden Blount filed a motion under Rule 52(b) of the Federal Rules of Civil Procedure ("Rule") to amend the judgment, and alternatively, a Rule 59 motion for a new trial. On August 8, 2004, the district court granted Peterson's petition for attorney fees. However, on August 18, 2004, the district court heard oral argument on Golden Blount's Rule 52(b) motion and decided that "[it] made a mistake" in adopting Peterson's findings. From the bench, the district court vacated Peterson's findings and the award of attorney fees, and requested that Golden Blount provide "the necessary findings and necessary final judgment."

On August 31, 2004, Golden Blount submitted another set of proposed findings, which the district court adopted and entered on September 2, 2004. The district court found that Peterson both directly and indirectly infringed the '159 patent and that infringement was willful. The district court calculated lost-profit damages to be $429,256, trebled the award

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to $1,287,766, and awarded Golden Blount attorney fees and post-judgment interest.

**\*2** On September 8, 2004, Golden Blount filed a formal application for attorney fees. On September 17, 2004, Peterson lodged an appeal from the August 18, 2004 order. On November 15, 2004, the district court calculated the amount of attorney fees to be $622,015. On December 9, 2004, Peterson appealed from the award of attorney fees. On December 15, 2004, the district court entered final judgment, and, on January 14, 2005, Peterson appealed from that order. On February 15, 2005, we consolidated the appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION
### A. Preliminary Matters

Peterson argues that the district court clearly erred in vacating *all* of its June 22, 2004 findings because Golden Blount's Rule 52(b) motion only sought amendment of *some* of the findings and Golden Blount did not file another Rule 52(b) motion after August 18, 2004. Alternatively, Peterson argues that the district court lacked jurisdiction to enter the September 2, 2004 findings because the August 18, 2004 Minute Order was an appealable judgment that Golden Blount did not seek to amend within ten days as required by Rule 52(a). Peterson adds that, even if this court does not strike the September 2, 2004 findings, it should apply greater scrutiny than "clear error" review because the district court adopted Golden Blount's findings verbatim.

Golden Blount counters that it need not have filed another Rule 52(b) motion with its August 31, 2004 proposed findings because its original Rule 52(b) motion was adequate and because it was complying with the district court's August 18, 2004 order. Golden Blount adds that the district court had jurisdiction to enter the September 2, 2004 findings because the August 18, 2004 order was not an appealable judgment and did not start the ten-day clock. Alternatively, Golden Blount asserts that the district court retained jurisdiction to change its judgment under Rule 60(b)(6). Golden Blount maintains that even if this court reviews the findings very closely because they were adopted verbatim, the standard that the court must apply is that of "clear error." We agree with Golden Blount.

Because the issue of whether the district court properly granted a Rule 52(b) motion to amend its findings is not unique to patent law, we apply regional circuit law, here, that of the Fifth Circuit.

See *Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1574-75 (Fed.Cir.1984), *overruled on other grounds by Richardson-Merrell Inc. v. Koller,* 472 U.S. 424 (1985). Although we could find no Fifth Circuit decision setting out the standard of review that is applied in that circuit to a district court's decision to amend its findings, we believe it reasonable to conclude that the Fifth Circuit would apply the abuse of discretion standard. 9 James Wm. Moore et al., *Moore's Federal Practice* ¶ 52.60[2], at 130 (3d ed. 2005) ("*Moore's* ") ("The decision of whether to grant or deny a motion to amend or enlarge the findings is within the discretion of the trial court."); *see Weatherchem Corp. v. J.L. Clark, Inc.,* 163 F.3d 1326, 1336 (Fed.Cir.1998) (finding no abuse of discretion in the denial of a Rule 52(b) motion).

**\*3** Rule 52(b) provides that "[o]n a party's motion filed no later than 10 days after entry of judgment, the court may amend its findings--or make additional findings--and may amend the judgment accordingly." Fed.R.Civ.P. 52(b). "[A] party may move to amend the findings of fact even if the modified or additional findings in effect reverse the judgment. If the trial court has entered an erroneous judgment, it should correct it." *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir.1986) (internal quotations omitted); *accord Nat'l Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc.,* 899 F.2d 119, 123 (1st Cir.1990); 9 *Moore's* ¶ 52.60[1], at 130. Golden Blount filed its Rule 52(b) motion within 10 days of the entry of the June 22, 2004 findings, and called for the court to accept its "Amended Findings of Fact and Conclusions of Law," which were in most respects contrary to those made by the district court. Because the district court may reverse any or all of its findings in acting on a Rule 52(b) motion, *see Fontenot,* 791 F.2d at 1219; *Nat'l Metal,* 899 F.2d at 123, and because a Rule 52(b) motion provides the district court discretion to amend any of its own findings, *see* 9 *Moore's* ¶ 52.60[2], at 130-31, it matters not that Peterson's Rule 52(b) motion did not request all of the changes effected by the September 2, 2004 findings. The district court did not abuse its discretion in amending its findings and modifying its judgment accordingly. The cases to which Peterson cites are not germane.

Peterson's jurisdictional challenge also fails. The district court invited Golden Blount to submit additional findings and did not intend for the August 18, 2004 Minute Order to dispose of the pending Rule 52(b) motion. *See McLaughlin v. Mississippi Power Co.,* 376 F.3d 344, 350-51 (5th Cir.2004)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(finding that a district court order was not a final judgment because the district court did not intend to end the litigation with its order and continued to issue orders in the case); _Pandrol USA, LP v. Airboss Ry. Prods._, 320 F.3d 1354, 1362-63 (Fed.Cir.2003) (noting that "whether an order constitutes a final judgment depends upon whether the judge has or has not clearly declared his intention in this respect in his opinion" (internal quotations omitted)). Thus, the Minute Order was not a final, appealable order. As a result, the district court retained jurisdiction to enter the September 2, 2004 findings. _See_ 9 _Moore's_ ¶ 52.62[1]-[2], at 139-40 (noting that the district court retains jurisdiction while a timely-filed Rule 52(b) motion is pending). The fact that the Rule 59 motion for a new trial remained pending until December 15, 2004 further supports this conclusion. While Peterson is correct that under Rule 58(a)(1)(B), a "separate document" is not required for an order to constitute a final judgment, that presupposes that the court, by the Minute Order, had disposed of the Rule 52(b) motion. Here, the district court did not dispose of the motion as it had requested and was awaiting Golden Blount's additional findings before entering judgment.

**\*4** We reject Peterson's argument that Golden Blount should have submitted another Rule 52(b) motion after the August 18, 2004 hearing. Because the original Rule 52(b) motion was a sufficient basis on which the court could effect the changes in its findings, and because the Minute Order did not dispose of that motion, the submission of another Rule 52(b) motion with the August 31, 2004 proposed findings was unnecessary. [FN1]

FN1. Alternatively, the district court on its own motion could have granted relief from judgment under Rule 60(b)(6). _See, e.g., Fort Knox Music, Inc. v. Baptiste_, 257 F.3d 108, 111 (2d Cir.2001) (noting that "nothing forbids the court to grant such [Rule 60(b) ] relief _sua sponte_ "); _McDowell v. Celebrezze_, 310 F.2d 43, 44 (5th Cir.1962) (recognizing that Rule 60(b) relief can be granted _sua sponte_ ).

Finally, we reject Peterson's argument concerning the standard of review. While the district court's verbatim adoption of Golden Blount's factual findings may result in our close scrutiny, it does not affect our application of the clear error standard of review. _See Anderson v. City of Bessemer City_, 470 U.S. 564, 572 (1985) ("[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.").

### B. Infringement

The '159 patent relates to a fireplace assembly that
is the combination of an inexpensive primary gas logs burner assembly [14] in gas flow communication with a secondary coals- and embers-burner tube [104] positioned forward and below the primary burner which operates to enhance the natural draft of the fireplace to improve efficiency of burn and aesthetic appeal of the gas-fired artificial logs, coals- and embers-burner assembly.

'159 patent, col. 3, ll. 54-60. Figure 2, below, illustrates the assembly.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 335607                                                                Page 4
--- F.3d ----, 2006 WL 335607 (Fed.Cir.)
**(Cite as: 2006 WL 335607 (Fed.Cir.))**



FIG. 2

In *Golden Blount I*, we concluded that the "raised level" limitation in claim 1 refers to the top of the primary burner tube and requires that the top of the primary tube be above the top of the secondary burner tube. 365 F.3d at 1059-60. Likewise, we concluded that the "below" limitation in claim 17 required that the top of the secondary burner tube be below the top of the primary burner tube. *Id.*

Although Peterson sells its secondary burner (the "EMB") to distributors packaged separately from the primary burner, the district court found that Peterson both directly infringed claims 1, 15, and 17 of the '159 patent, by assembling the entire apparatus itself on a number of occasions, and indirectly infringed, by selling the EMB with instructions leading end-users to assemble the device into the claimed configuration. To make these findings, the district court concluded that Golden Blount had proven by a preponderance of the evidence that the "raised level" limitation of claim 1 and the "below" limitation of claim 17 read on devices assembled both by Peterson and the end-users.

In support, the district court observed plaintiff's exhibit 4A ("PX4A"), a device assembled by Golden Blount to be representative of the combined Peterson primary burner and EMB. This exhibit showed that the top of the primary burner was raised relative to the EMB. The district court also referred to testimony of William McLaughlin ("McLaughlin"), Peterson's

outside patent counsel, and Leslie Bortz ("Bortz") and Tod Corrin ("Corrin"), Peterson employees, that in view of defendant's exhibits 31 and 32 ("DX31" and "DX32") which together formed a device representative of Peterson's entire burner assembly, the top of the EMB is below the top of the primary burner. The court relied on defense exhibit 34 ("DX34"), an instruction sheet packaged with each EMB that tells owners "to tighten the ... ember burner so that the valve faces forward and flush with the burner pan"; testimony of Bortz that normally the valve rests on the fireplace floor; and an observation that when the valve of the PX4A rested on a table flush with the pan, the top of the primary burner was above the top of the EMB. The district court also cited defense exhibit 30 ("DX30"), instructions which Peterson admits show the top of the primary burner to be above the top of the EMB. The court explained that "[t]here has been no reasons given ... why Peterson didn't assemble these devices in accordance with its own instructions." The district court concluded that Peterson assembled the claimed apparatus to show distributors, and sold several pre-assembled units with a primary burner "substantially identical" to those sold individually to distributors. The district court also concluded that end-users assembled the device into the claimed configuration. The court reasoned that Peterson supplied the EMB with instructions, explaining that "when instructions are provided ... it can be circumstantially inferred that the customer follows those instructions with respect

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to the accused device."

**\*5** As to contributory infringement, the district court found that Peterson knew that the combination for which its components were especially made was patented as of December 1999. The court found that the EMB had no non-infringing uses, that the EMB was not a staple article, and thus that Peterson was a contributory infringer. As to inducement of infringement, the court found that because Peterson knew about the patent as of December 1999, and because Peterson provided instructions to its customers on how to configure the components, Peterson knew or should have known that it was inducing infringement. The court cited to demonstrations that Peterson provided its distributors as evidence of inducement, and concluded that Peterson was an inducer.

On appeal, Peterson argues that even though it did not object at trial to the admission of PX4A, the exhibit is not entitled to weight because it is not authentic, and thus that the district court erred in relying on it. Peterson also asserts that neither DX30 nor DX34 proves that either Peterson or its customers made the infringing apparatus. As to the instruction sheet, DX34, Peterson asserts that it does not lead to the formation of an infringing configuration. As to the additional instruction sheet, DX30, Peterson argues that it was not distributed to all end-users, and thus cannot evidence infringement on the part of those end-users who did not receive it. Alternatively, Peterson asserts that these instructions do not apply to the devices that it sold pre-assembled because the primary burner on those devices is different than the primary burner reflected in the instruction sheets. As to contributory infringement, Peterson argues that Golden Blount admitted that the apparatus can be configured in a non-infringing manner and thus that there can be no contributory infringement. As to inducement, Peterson asserts that cases that have relied on instructions as evidence of third party-infringement have found that following the instructions must result in infringement, and that infringement in this case is not a foregone conclusion based on the instructions. Finally, Peterson argues that it held a good-faith belief that neither it nor its customers were infringing, and thus that it did not have the requisite intent to induce. Golden Blount counters that the infringement findings were not clearly erroneous. We agree with Golden Blount.

Infringement is a question of fact reviewed for clear error. _Golden Blount I, 365 F.3d at 1058._ A factual finding is clearly erroneous when, despite some

supporting evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made. _United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)._

The parties disagree on whether following the instructions would lead to the formation of an infringing configuration. Instruction sheet DX34, which was packaged with the EMB, instructs the user to install the valve flush with the burner pan. Bortz testified that the valve sits on the fireplace floor and the valve supports the EMB. Viewing the device that Peterson assembled for trial (the combined DX31 and DX32), McLaughlin and Bortz testified that the top of the primary burner was raised relative to the top of the EMB when the valve rested on the table (shown to be a flat surface). [FN2] Moreover, Corrin admitted that instruction sheet DX30, which was offered to customers who requested it, illustrates an assembly with the top of the primary burner above the top of the EMB. Presented with this evidence, we conclude that the district court did not clearly err in finding that both DX34 and DX30 taught the infringing configuration. We reject Peterson's arguments to the contrary.

> FN2. On appeal, Peterson vigorously challenges the authenticity of exhibit PX4A, presumably because it believes that the district court relied on PX4A in finding infringement. However, the citations to the trial transcript provided by the district court in its opinion indicate that the district court was, in fact, relying on Golden Blount's demonstration of DX31 and DX32. Nonetheless, we reject Peterson's argument that we should accord PX4A no weight. Under Fifth Circuit law, in the absence of an authenticity objection, exhibits may be admitted and considered by the trier of fact for such probative value as they may have. _Permian Petroleum Co. v. Petroleos Mexicanos, 934 F.2d 635, 647 (5th Cir.1991)._ We may review the decision to admit the exhibit only for plain error. _Id. at 648._ There is no plain error in the district court's decision to admit exhibit PX4A. The testimony of Golden Blount's Golden Blount ("Blount") and Peterson's Vincent Jankowski ("Jankowski") identified the device shown in PX4A as Peterson's assembled product, and the district court was entitled to give the exhibit probative weight.

2006 WL 335607                                                                                    Page 6

--- F.3d ----, 2006 WL 335607 (Fed.Cir.)
**(Cite as: 2006 WL 335607 (Fed.Cir.))**

**\*6** Next, the parties dispute whether direct infringement by Peterson can be inferred from Peterson's assembly of eleven units in light of both instruction sheets, and whether direct infringement by customers can be inferred from sales of the EMB packaged with DX34, and with DX30 available upon request. Circumstantial evidence can support a finding of infringement. *See Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed.Cir.1986) (holding that circumstantial evidence of extensive sales and dissemination of an instruction sheet can support a finding of direct infringement by the customer); *Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1502-03 (Fed.Cir.1986) ( "Although the evidence of infringement is circumstantial, that does not make it any less credible or persuasive."). Peterson does not dispute that it assembled eleven devices itself and that each end-user that purchased an EMB attached it to a primary burner (or had an installer do it). In light of the concession that each EMB was attached to a primary burner; and given the evidence showing that DX34 was packaged with each EMB, that both the DX30 and DX34 instruction sheets teach an infringing configuration, and that the demonstration device assembled by Peterson at trial exemplified an infringing configuration, we conclude that the district court did not clearly err in finding that more likely than not, each time an EMB was attached to a primary burner by either Peterson or an end-user, the combination was infringing. *See Moleculon*, 793 F.2d at 1272. *See also Metabolite Labs., Inc. v. Lab. Corp.*, 370 F.3d 1354, 1364-65, *cert. granted in part*, 126 S.Ct. 601 (2005) (holding that circumstantial evidence was sufficient to show that a method step was carried out by the direct infringer, even in the absence of direct evidence for each direct infringer).

We reject Peterson's argument that Golden Blount could not rely on the instruction sheets to prove acts of direct infringement by end-users. As for instruction sheet DX34, the argument is based on the premise that DX34 does not teach the infringing configuration. That premise is not valid, as we have concluded *supra*, the finding that DX34 taught the infringing configuration was not clearly erroneous. As for instruction sheet DX30, the degree to which DX30 was disseminated--which is debatable on this record--is immaterial given the instructions set forth in DX34 and provided to each customer. Moreover, contrary to the view advanced by Peterson, it matters not that the assembled device can be manipulated into a non-infringing configuration, because the instructions packaged with each device teach the infringing configuration and nothing in the record suggests that either Peterson or any end-user ignored the instructions or assembled the burners in a manner contrary to the instructions so as to form a non-infringing configuration. *See Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed.Cir.2001) ("[T]ests of an accused device under unusual conditions are not necessarily relevant to an infringement analysis."); *cf. High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555-56 (Fed.Cir.1995) (finding that a device does not infringe if it does not infringe in its normal configuration, even if it may be altered into an infringing configuration under unusual circumstances). [FN3]

> FN3. We also reject the argument that the instructions cannot serve as evidence of infringement for the devices that Peterson sold pre-assembled. Based on Corrin's testimony, the district court did not err in finding that the burner depicted in the instruction sheet and the burners in the pre-assemblies were "substantially identical ."

**\*7** The next issue before us is whether Golden Blount carried its burden of proving that there were no substantial non-infringing uses of the EMB, and thus that Peterson was a contributory infringer under § 271(c). *See Golden Blount I*, 365 F.3d at 1061 (holding that the burden of persuasion is on the plaintiff). Relying on Peterson's admission that the EMB was not a staple article of commerce and was especially made or adapted for use with a primary burner, and evidence that the instruction sheets taught only the infringing configuration, the district court had ample basis to conclude that Golden Blount had made out a *prima facie* showing that Peterson's product was not "suitable for substantial non-infringing use," thus shifting the burden of **production** to Peterson. *See Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575-76 (Fed.Cir.1991) (explaining that once the patentee makes out a *prima facie* showing of infringement, the defendant can counteract it by cross-examining the patentee's evidence or putting on its own defense). We reject Peterson's argument that *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 674-75 (Fed.Cir.1990), disposed of Peterson's burden to come forward with rebuttal evidence. In *C.R. Bard*, we reversed a district court's grant of a motion for summary judgment of contributory infringement, reasoning that the device at issue, in theory, could be used in a way so as not to infringe the asserted method claim *and* that the record did not foreclose a reasonable fact-finder from concluding that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 335607                                                                                    Page 7
--- F.3d ----, 2006 WL 335607 (Fed.Cir.)
(Cite as: 2006 WL 335607 (Fed.Cir.))

device was actually used in the non-infringing way. *Id.* In this case, which was decided not on summary judgment but after a bench trial, Golden Blount made out a *prima facie* showing that the EMB had no non-infringing use. The burden of **production** then shifted to Peterson to introduce some evidence that end-users actually assembled the burners in a non-infringing way. Having introduced no evidence that anyone actually made or used the assembly in a manner contrary to the instructions so as to form a non-infringing assembly, Peterson cannot complain that the district court found that the EMB was not "suitable for substantial non-infringing use." Thus, we conclude that the district court did not clearly err in finding that Peterson acted as a contributory infringer each time it sold an EMB that was ultimately assembled into an infringing device.

Finally, Peterson cites to *Moba, B.V. v. Diamond Automation, Inc.,* 325 F.3d 1306, 1318 (Fed.Cir.2003), *Hewlett-Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1469 (Fed.Cir.1990), and *Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544, 553-54 (Fed.Cir.1990), and argues that it held a good-faith belief that its instruction sheets would not lead to infringement based on opinions of counsel, and that, as a matter of law, it lacked the intent necessary to find inducement. [FN4] In both *Moba* and *Hewlett-Packard,* we explained that "the only intent required of [defendant] is the intent to cause the acts that constitute infringement." *Moba,* 325 F.3d at 1318 (citing *Hewlett-Packard,* 909 F.2d at 1469). In this case, Peterson intended to cause the acts that led to infringement because Peterson packaged its DX34 instruction sheet with the EMB and intended to have customers assemble the apparatus in accordance with the instructions. Thus, the inducement finding is consistent with *Moba* and *Hewlett-Packard.* In *Manville Sales,* we reversed a finding of inducement because the alleged inducer did not have notice of the patent until after suit was filed and the infringing acts only continued after the alleged inducers acquired a " 'good faith belief,' based on advice of counsel, that [the] product did not infringe." 917 F.2d at 553-54; *see supra* note 4. Although Peterson argues that it acted in good faith and cites several oral opinions of counsel, we conclude for the reasons discussed *infra* Part II.C, that the district court did not clearly err in dismissing those opinions as incompetent and in finding that Peterson's assertions of good faith ring hollow. The inducement finding is not inconsistent with *Manville Sales.* Moreover, Peterson's argument that it could not have induced the infringement of those customers who did not receive the instruction sheet DX30 is of

no moment as it is based on the erroneous premise that instruction sheet DX34, which was included with each product sold to all customers, does not lead to an infringing configuration.

FN4. The district court required that Golden Blount prove that Peterson knew or should have known that it was inducing infringement, a standard which Golden Blount has not challenged. It should be noted that "there is a lack of clarity concerning whether the required intent must be merely to induce the specific acts [of infringement] or additionally to cause an infringement." *MercExchange, L.L.C. v. eBay, Inc.,* 401 F.3d 1323, 1332 (Fed.Cir.2005) (citing *Insituform Techs., Inc. v. CAT Contracting, Inc .,* 385 F.3d 1360, 1378 (Fed.Cir.2004)), *cert. granted in part,* 126 S.Ct. 733 (2005); *see Manville Sales,* 917 F.2d at 553 ("The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements." (emphasis in original)). *But see Hewlett-Packard,* 909 F.2d at 1469 ("[P]roof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement."). We need not resolve that ambiguity in this case, however, because it is undisputed that Peterson had notice of the patent following a December 1999 letter and that Peterson provided the DX34 instruction sheet to customers directing them to perform specific acts leading to the assembly of infringing devices, from which the district court could draw an inference of intent sufficient to meet either standard. *See MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1378-80 & n. 4 (Fed.Cir.2005); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 125 S.Ct. 2764, 2779-83 (2005) (drawing on the inducement of infringement standard long applied in the patent law context and "holding that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 335607                                                          Page 8
--- F.3d ----, 2006 WL 335607 (Fed.Cir.)
(Cite as: 2006 WL 335607 (Fed.Cir.))

**\*8** For the foregoing reasons, we find no reversible error in the district court's findings that claims 1, 15, and 17 of the '159 patent were infringed.

### C. Willfulness

The district court considered the following evidence in finding that Peterson willfully infringed the '159 patent. On December 10, 1999, Golden Blount sent a letter to Peterson stating that the '159 patent had "issued," that Peterson was marketing a device that is "substantially similar to the burner assembly that is claimed in each of the claims of the subject patent," that Golden Blount would "take whatever steps are reasonable and necessary to prevent infringement," and that Peterson should alert Golden Blount of its "intentions" by January 14, 2000. On December 17, 1999, Corrin sent McLaughlin the "infringement letter" and a copy of "instructions and working drawings," and told him that "[w]e have been selling this product since May 1999." McLaughlin discussed the matter with Bortz over the phone. Bortz testified that he had looked at the drawings and told McLaughlin that "for 20 years or more, the whole industry has been making things like this." McLaughlin testified that he gave Bortz an oral opinion that "if we can prove that what the Peterson Company was doing with the present product, the ember flame booster for 20 or 30 years, then either they would not infringe any claim ... or ... that claim would be invalid." At the time, McLaughlin did not possess the accused device, the file wrapper, or any prior art.

On December 30, 1999, Corrin sent a letter to Golden Blount, acknowledging receipt of the December 10, 1999, letter and stating that Peterson would "try to get back to [them] as soon as possible," but that January 10, 2000, is "unreasonable." Bortz testified that "[i]t was around Christmas time," and "[they] were trying to determine what the patent meant because [they] didn't see anything in the patent that wasn't things [they] had done for many years." On May 3, 2000, Golden Blount sent a letter to Peterson stating that it had not received a "response" from Peterson, that it had "inspected [the] EMB Series Ember Flame Booster and find [the EMB] to be clearly within the scope of at least some of the claims of the subject patent," and that it "will take necessary steps to stop any such infringement." On May 16, 2000, Peterson sent a letter to Golden Blount in reply, which stated, in pertinent part:

[Y]ou are correct in that we have not yet responded.

Our lack of response has been due to at least in part to our inability to understand what you want. Your December 10, 1999 letter states that your client has informed you that the Robert H. Peterson Company is "marketing a device that is substantially similar to the burner assembly that is claimed in each of the claims of the subject patent." We very much disagree with this statement.

Your letter of May 3, 2000 states, "We have inspected your EMB Series Ember Flame Booster and find it to be clearly within the scope of at least some of the claims of the subject patent."

**\*9** Please explain to us, in detail, the basis upon which you believe that we are infringing on your client's patent.

McLaughlin testified that he thought it reasonable under the circumstances to ask for a more detailed explanation because he would respond to such letters "[u]sually by providing a more detailed explanation," which would be a "[c]ross reference [of] the elements of the claim to the accused products."

There was no further communication by either party until January 18, 2001, when Golden Blount filed suit. McLaughlin testified that after suit was filed, Bortz asked McLaughlin for another opinion of counsel, in part, because Bortz had heard that an opinion could help avoid a charge of willful infringement. The following is Bortz' trial testimony regarding his conversation with McLaughlin:

Q What was the other part of the conversation?
A Well, I couldn't understand the basis of the suit, the financial basis of the suit. And I just didn't see it all [sic] that there would be a reason to pursue. I didn't see any financial basis. So during the course of that conversation I did say [that] I have heard or have been told that in patent suits, if you lose, you may be required to pay fees of the other side.
Q And your concern, then, was over what could amount to those very large patent lawyer fees that you were talking about earlier. Your concern was about that rather than the fact that you might lose a rather small lawsuit; is that right?
A (no response)
Q Isn't that fair? That's what you told me, isn't it?
A Well, I didn't understand the financial basis of the lawsuit.
Q What do you mean by that, sir?
A What you've brought up today. Excuse me, yesterday. I'm sorry.
Q You were of the opinion, were you not, sir, that the maximum that you might have to pay would be tied in to just the little ember booster item itself?
A That was my own thought process.
Q And that wasn't really much worth messing with, was it?
A On a financial basis, that is correct.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 335607 (Fed.Cir.)
**(Cite as: 2006 WL 335607 (Fed.Cir.))**

McLaughlin testified that he gave his client two additional oral opinions, one in February 2001 and another in May 2001, both after suit had been filed. According to McLaughlin's testimony, in the February opinion, he stated that based on a picture and a drawing of the accused device, he did not believe that the EMB literally infringed any claim of the '157 patent, and that at least some of the claims were invalid. In the May opinion, after reviewing the file wrapper for the first time, but still not having viewed the accused device, he concluded that none of the claims were literally infringed, that claims 1 through 18 were not infringed under the doctrine of equivalents, and that the remaining claims were invalid. McLaughlin testified that what he gleaned from an eventual inspection of the accused product, that he did not glean from the drawings, was insight into the "relative position" of the device.

In explaining its willfulness finding, the district court stated that in the two and one-half years after Peterson received notice of the patent, Peterson never obtained a written opinion of counsel and that the oral opinions obtained by Peterson were rendered without counsel having examined either the patent's prosecution history or the accused device, and were thus incompetent. The district court criticized Peterson for relying on an opinion of counsel based on the unproven representation of Bortz that the invention had been around for 20 to 30 years. The district court found that "Peterson made no further efforts to determine whether it was truly infringing or not, until after suit was filed," and that Peterson then sought another opinion in order to avoid a willfulness finding and liability for attorney fees. The district court also found that Peterson was not concerned about paying infringement damages because, according to Peterson, "the suit was not a very meaningful case 'dollarwise.' " The district court found that the opinions were "to be used only as an illusory shield against a later charge of willful infringement, rather than in a good faith attempt to avoid infringing another's patent." The district court found that Peterson's continued infringement through May 16, 2000, and through the trial proceedings was particularly egregious. As to Peterson's explanation that it did not garner a more expansive opinion early on because it was awaiting "additional information or further explanation [of the infringement charge] from Blount's attorney," the district court found that "Blount did not, after sending multiple notice of infringement letters ... owe Peterson any obligation with regard to advising Peterson how they actually were infringing."

\*10 Peterson challenges the district court's willfulness finding on two grounds. First, Peterson argues that the district court drew an inference of the type prohibited by _Knorr-Bremse Systeme Fuer Nutzfahrzeuge GMBH v. Dana Corp., 383 F.3d 1337 (Fed.Cir.2004)_ (en banc). Peterson asserts that it had no duty to seek an opinion of counsel (let alone a competent opinion), and that the district court could not consider whether it obtained an opinion of counsel in evaluating whether it discharged its duty of due care. Peterson argues that while the lack of a competent opinion might leave it at a disadvantage in attempting to disprove willfulness, the lack of a competent opinion cannot help Golden Blount make out its _prima facie_ case that Peterson acted willfully. Peterson asserts that because the district court must disregard the opinion-related evidence, the only affirmative evidence of willfulness--that Peterson sought to avoid paying attorney fees--does not amount to reckless conduct and thus the district court clearly erred in finding willfulness. Second, Peterson argues that even in the absence of a formal opinion of counsel, because it held a reasonable, good-faith belief that it did not directly infringe and that its instructions did not induce its customers to infringe, it did not act in reckless disregard of the patent and thus the willfulness finding was clearly erroneous. Peterson asserts that this good-faith belief was based on the facts that it was not regularly selling a two-burner apparatus to distributors and that it thought that it was recommending to customers that the EMB be installed "level" with the primary burner, not "below" it.

Golden Blount counters that Peterson's understanding of the _Knorr-Bremse_ decision is wrong and that _Knorr-Bremse_ only addressed adverse inferences and merely eliminated the ability of the trier of fact to infer from the absence of an opinion letter that such an opinion, if rendered, would have been unfavorable to the potential infringer. Golden Blount further argues that the adverse inference holdings of _Knorr-Bremse_ do not apply to this case because Peterson did not assert a privilege and "offered up" the opinions of counsel as a defense against the charge of willful infringement. Golden Blount asserts that the incompetent opinions, taken together with the other evidence presented, supports the finding of willfulness and that, based on all of the evidence, the district court's willfulness determination was not clearly erroneous.

Willfulness is a question of fact reviewed for clear error. _Slimfold Mfg. Co. v. Kinkead Indus., Inc., 932_

F.2d 1453, 1459 (Fed.Cir.1991). "The extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts, or other manifestations of unethical or injurious commercial conduct, may provide grounds for a finding of willful infringement ...." *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1583 (Fed.Cir.1996). In this regard, "there continues to be 'an affirmative duty of due care to avoid infringement of the known patent rights of others.' " *Knorr-Bremse,* 383 F.3d at 1345-46 (quoting *L.A. Gear Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1127 (Fed.Cir.1993)).

*11 The patentee bears the burden of persuasion and must prove willful infringement by clear and convincing evidence. *Comark Commc'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1190 (Fed.Cir.1998). "There is no evidentiary presumption that every infringement is willful." *Norian Corp. v. Stryker Corp.,* 363 F.3d 1321, 1332 (Fed.Cir.2004). "Willful infringement is not established by the simple fact of infringement," even where the accused has knowledge of the patents. *Id.; accord Ajinomoto Co. v. Archer-Daniels-Midland Co.,* 228 F.3d 1338, 1351-52 (Fed.Cir.2000). "The patentee must present threshold evidence of culpable behavior" before the burden of **production** shifts to the accused to put on evidence that it acted with due care. *Norian,* 363 F.3d at 1332 ("[A]bsent an initial presentation of evidence ... this burden of coming forward in defense [does] not arise."). That threshold showing cannot be satisfied merely by proof that the accused is asserting the attorney-client privilege to withhold an opinion of counsel. As we explained in *Knorr-Bremse,* this court's precedent had (until that point) aided the patentee in making its case on willfulness by permitting the trier of fact to infer from an alleged infringer's failure to **produce** an opinion letter that such an opinion, if rendered, was or would have been unfavorable to the alleged infringer. 383 F.3d at 1343. *See also Fromson v. W. Litho Plate & Supply Co.,* 853 F.2d 1568 (Fed.Cir.1988). We overruled this precedent and held that "[t]he adverse inference that an opinion was or would have been unfavorable, flowing from the infringer's failure to obtain or **produce** an exculpatory opinion of counsel, is no longer warranted." *Knorr-Bremse,* 383 F.3d at 1344 (emphasis added); *accord Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH,* 408 F.3d 1374, 1378 (Fed.Cir.2005) ("In that case, the affirmative duty of due care to avoid infringement was reiterated, but it was found no longer appropriate to draw an adverse inference with respect to willful infringement from failure to obtain legal advice." (citing *Knorr-*

*Bremse,* 383 F.3d at 1345-46)); *Insituform Techs., Inc. v.. CAT Contracting, Inc.,* 385 F.3d 1360, 1377 (Fed.Cir.2004) (" '[T]he failure to obtain an exculpatory opinion of counsel shall no longer provide an adverse inference or presumption that such an opinion would have been unfavorable." ' (quoting *Knorr-Bremse,* 383 F.3d at 1346)).

On the other hand, if the privilege is not asserted, the patentee in making its threshold showing of culpable conduct is free to introduce as evidence whatever opinions were obtained and to challenge the competence of those opinions in satisfaction of the patentee's burden on willfulness. Nothing in *Knorr-Bremse* precludes a patentee from attempting to make such a showing. *See nCUBE Corp. v. Seachange Int'l, Inc.,* No. 03-1341, 03-1366, 2006 WL 39053, at *5 (Fed.Cir. Jan. 9, 2006) (following jury verdict of willfulness, affirming the denial of a motion for JMOL where infringer received notice of the patent when suit was filed and obtained an incompetent opinion upon which the infringer relied in continuing to infringe); *Knorr-Bremse,* 383 F.3d at 1346-47; *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 828-31 (Fed.Cir.1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370 (1996) (explaining that willfulness may be found in cases in which opinions are incompetent, such as where an attorney does not examine necessary facts, or where the analysis is superficial).

*12 We reject Peterson's argument that the district court drew an inference of the type prohibited by *Knorr-Bremse* from the fact that Peterson failed to obtain a competent opinion of counsel. The district court did not infer that if Peterson had obtained a competent opinion regarding the '159 patent, the opinion would have been unfavorable to Peterson. That would have been an improper basis upon which to rest a willfulness finding. *See Insituform,* 385 F.3d at 1377 (vacating the district court's finding of willfulness for drawing the type of negative inference prohibited by *Knorr-Bremse* ). Instead, the district court considered all of the facts presented in assessing whether Peterson acted in reckless disregard of Golden Blount's patent rights after receiving notice of the '159 patent. Here, Peterson did not assert the attorney-client privilege and Golden Blount offered up as evidence in its case on willfulness, *inter alia,* the legal infirmities of the several oral opinions that Peterson obtained. The competence of those opinions and the facts surrounding Peterson's obtaining of those opinions were relevant to the willfulness issue and properly

were considered by the district court, along with all of the other evidence presented, both in assessing whether Golden Blount made out its *prima facie* case, *see Norian,* 363 F.3d at 1332-33, and in deciding whether Peterson's infringement was willful, *see Insituform,* 385 F.3d at 1377; *Read,* 970 F.2d at 828-31. *See also nCUBE Corp.,* 2006 WL 39053, at *5. Therefore, Peterson's first argument to overturn the willfulness finding is without merit.

We also reject Peterson's second argument. The district court did not clearly err in dismissing Peterson's asserted good-faith belief in non-infringement, and thus in finding willfulness. Peterson made little-to-no effort to assess whether it infringed or whether the patent was invalid after receiving notice of the patent. The district court did not clearly err in according little weight to the first two oral opinions rendered by McLaughlin in light of the fact that McLaughlin did not have, and therefore could not have considered, the prosecution history or the accused device when the opinions were given. McLaughlin's admission that he was able to better assess the "relative position" of the device when he was finally able to view the accused device illustrates the importance of possessing the accused device to the performance of an infringement analysis in this case. The district court also did not clearly err in criticizing Peterson's reliance on the representation of Bortz that the invention had been around for 20 to 30 years. Although the naked reliance on such a representation might have been reasonable if the accused product had been on the market for 20 to 30 years, the EMB in this case had only been on the market a short period of time and Peterson made little effort to uncover prior art until after suit was filed. Furthermore, the district court did not clearly err in dismissing Peterson's assertions that it could not directly infringe because it sold the EMB alone to distributors and that it could not induce infringement because it was recommending a "level" installation. As to the first argument, Peterson ignores the fact that its sales of components presented questions of contributory and induced infringement. As to the second argument, Peterson relies on testimony interpreting the instructions given to customers and testimony about how Peterson's burners ideally are positioned relative to one another. However, the district court had before it the actual instruction sheets, DX30 and DX34, which taught the infringing configuration, and evidence that at least DX34 was contained in the package given to each end-user. Finally, the district court did not clearly err in inferring that Peterson demonstrated a cavalier attitude toward Golden Blount's patent rights from the facts that Peterson did not respond substantively to Golden Blount's notice letters and that it only sought a thorough opinion of counsel after suit was filed, and then only out of a concern to avoid a willfulness finding and a possible judgment for attorney fees. Although other inferences may be drawn from these facts, we do not have "a definite and firm conviction" that a mistake has been made. Given all of the evidence, Peterson's assertions that it subjectively did not believe it was infringing are insufficient to rebut the inference of reckless conduct adequately supported by the facts presented.

### D. Damages

*13 The district court applied the test outlined in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir.1978), relied upon the largely un-impeached testimony of Blount and Corrin, and found that there was sufficient demand for the product for the period in question, that there were no acceptable non-infringing substitutes, and that Golden Blount had enough manufacturing and marketing capacity to promote the device. Based on Golden Blount's testimony that Peterson and Golden Blount controlled 95% of the market, the district court found that there was a two-supplier market and that " 'but for' Peterson's infringing activities, Blount would have made the sales it normally would have made." The district court noted that "[t]o determine the actual damage amount in a lost profit case, [it had to] multiply Blount's per unit profit [on the lost sale] times the number of infringing devices that Peterson sold." The district court found that Golden Blount had established two alternative bases from which to conclude that it would have lost the sale of the entire burner assembly, the grate, and a full set of artificial logs. The district court explained that the first basis was Peterson's infringement of claim 15, which positively claims the burner assembly positioned underneath the artificial logs and a grate-support means. The district court explained that the second basis was the entire-market-value rule, finding that "the ember burner is the basis for the customer's demand" and that "the elements of independent claims 1 and 17 [*i .e.,* the burner assembly] constitute a functional unit with the artificial logs and the grate support." The district court cited the testimony of Charlie Hanft ("Hanft"), a third-party retailer, that 97.5% of the time he sells an ember burner, he sells an entire burner assembly and log set with it, noted that Peterson offered no numerical evidence on how often the EMB is sold with the entire burner assembly and log set, and concluded that Golden Blount had proven the "standard practice in the industry." As a result, the district court found that

2006 WL 335607                                                                                                                 Page 12
--- F.3d ----, 2006 WL 335607 (Fed.Cir.)
(Cite as: 2006 WL 335607 (Fed.Cir.))

97.5% of the time that Peterson sold an EMB, Golden Blount lost the sale of its entire burner assembly and a full set of logs, and that 2.5% of the time, Golden Blount lost the sale of its ember burner alone. Based on those percentages, the fact that Peterson sold 3,723 [FN5] EMBs during the period in question, and the fact that Golden Blount's per unit profit was $117.92 and $14.09 on its entire burner assembly and log set, and its ember burner alone, respectively, the district court calculated total damages at $429,256. Based on the willfulness finding, the district court trebled the award to $1,287,766.

> FN5. In its August 9, 2002 decision, the district court found that Peterson sold 3,689 EMBs during the period in question. Both parties sought to amend the district court's finding. In an August 22, 2002 motion Peterson sought to reduce the number of EMBs sold by 288 units, because Peterson had sold those units prior to receiving the December 10, 1999 notice letter. In an August 23, 2002 motion Golden Blount sought to increase the number of EMBs in the damages calculation to account for EMBs sold by Peterson that had been previously unreported because they had been sold between the date of Peterson's last sales report (April 30, 2002) and the judgment date (August 9, 2002).
>
> In turn, in a September 19, 2002 motion, Peterson reported that it sold 322 EMBs between April 30 and September 19, 2002 but that it had received returns of 802 units between May 1, 2002 and September 19, 2002 (the majority of which presumably coming after entry of judgment). Peterson argued that it typically sells EMBs to distributors, that the distributors sells EMBs to retailers, and that the retailers assemble the EMB to the primary burner. Peterson asserted that the 802 returned units never made it to retailers and thus never became part of a directly infringing configuration. Because the 802 units never led to a direct infringement, according to Peterson, Peterson could not be liable for contributory or induced infringement and the 802 units could not be included in the damages award. In a September 23, 2002 response, Golden Blount stated its agreement that the 288 units sold prior to the notice letter had to be subtracted from the damages calculation. In an October 4, 2002 response, Golden Blount stated its agreement that 322 units were to

be added the damages award to account for sales between April 30 and August 8, 2002 bringing the total number of EMBs sold to 3,723. However, Golden Blount objected to reducing the figure by 802 units, arguing that Peterson could not "un-infringe" by withdrawing the products that it had sold to distributors. In a February 6, 2003 order, the district court ruled that "[t]he figures will not take into account any returns." Its March 7, 2003 final judgment and its September 2, 2004 findings used the 3,723 figure.

On appeal, Peterson argues that Golden Blount failed to prove that the parties were competing for sales of two-burner installations, and thus that Golden Blount was required to (but failed to) show that it could retrofit the Golden Blount ember burner to existing Peterson primary burners. Peterson asserts that it had no obligation to put on evidence about how it sold its EMBs because Golden Blount did not make out a *prima facie* showing that Peterson's EMBs were sold with the entire assembly. Peterson also argues that the margin calculus for Golden Blount's profit should include several additional expenses, and adds that the damages award should not include 802 EMBs that it bought back from distributors because those units never led to the formation of infringing devices. Golden Blount responds that the damage calculation was not clearly erroneous.

**\*14** The district court's choice of a damages theory is reviewed for abuse of discretion while factual findings concerning damages are reviewed for clear error. *See In re Cambridge Biotech Corp., 186 F.3d 1356, 1369 (Fed.Cir.1999)*. Any trebling of damages based on a finding of willfulness is reviewed for abuse of discretion. *See Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 183 (Fed.Cir.1994)*.

"To recover lost profits damages, the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." *Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1545 (Fed.Cir.1995)* (en banc). The patentee may rely upon the four-factor test articulated in *Panduit* to prove entitlement to lost profits damages. *Id.* "The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit it would have made." *Id.* (citing *Panduit, 575 F.2d at 1156)*.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 335607                                                                                                Page 13
--- F.3d ----, 2006 WL 335607 (Fed.Cir.)
**(Cite as: 2006 WL 335607 (Fed.Cir.))**

For the most part, we find no clear error in the district court's application of *Panduit* and calculation of lost-profit damages. Golden Blount proffered sufficient evidence from which the district court could find that "but for" Peterson's sale of the EMB, which enabled the end-user to make the product covered by the '159 patent, the end-user would have turned to Golden Blount to satisfy its demand for the patented product. We reject Peterson's argument that the district court clearly erred in finding that the parties competed for sales of two-burner installations. Peterson stipulated that the EMB is made to be attached to Peterson's primary burner. A properly configured assembly infringes regardless whether the primary burner was bought years earlier or on the same day as the secondary burner. Moreover, based on the testimony of Hanft, who had sold some Peterson products in the past, the district court found that it was "standard practice in the industry" to sell the ember burner as part of the purchase of the entire burner assembly. [FN6] Although this evidence was not irrefutable, it was sufficient to shift the burden of **production** to Peterson. *See id.* at 1545 ("The patentee need only show that there was a reasonable probability that the sales would have been made 'but for' the infringement .... The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales ."). By coming forward with no quantitative evidence to rebut this testimony, Peterson left itself open to the inferences reasonably drawn by the district court. We also reject Peterson's arguments regarding the profit margins on each lost sale. The district court based its findings on both documentary and testimonial evidence, and Peterson has failed to convince us that these findings were clearly erroneous.

    FN6. In a September 19, 2002 motion, Peterson conceded that "retail stores ... put the ember flame boosters together with the [primary] burners," which further supports the standard industry practice finding.

**\*15** However, as to the 802 EMBs allegedly returned to Peterson before being assembled into an infringing configuration, there is evidence that Peterson did receive 802 EMBs as returns from distributors, but the district court made no findings as to those returns. *See supra* note 5. If the 802 EMBs were returned before having been sold to retailers and thereafter assembled into an infringing configuration, they should not have been included in the damages calculus. Golden Blount begs to differ, arguing that once the district court found one act of direct infringement by a Peterson customer, the district court could presume that each sale of an EMB to a distributor constituted one additional act of contributory or induced infringement, which in turn gave rise to a cognizable lost sale. However, it is horn-book law that "[l]iability for either active inducement of infringement or contributory infringement is dependent upon the existence of direct infringement." *Joy Techs., Inc. v. Flakt, Inc.,* 6 F.3d 770, 774 (Fed.Cir.1993). In applying this rule to the damages issue in this case, *Standard Havens Products, Inc. v. Gencor Industries, Inc.,* 953 F.2d 1360, 1372-74 (Fed.Cir.1991), is instructive.

In *Standard Havens,* Gencor appealed a jury verdict finding that it had contributed to and induced infringement of a patent by selling asphalt plants that would lead to infringement of asserted method claims, and awarding lost profits covering the sales of ten asphalt plants. *Id.* at 1365. Reviewing this award, we noted that for three of the sales, although Gencor bid for the sale by advertising its infringing plant, the plants actually delivered were, in fact, non-infringing. *Id.* at 1374. Standard Havens argued that the "bait and switch" tactic caused it to lose sales of its own plants. However, we sided with Gencor and remanded for the district court to recalculate the award based on three fewer infringing plants, explaining that "because a contributorily infringing counterflow plant was not actually sold in those three instances, there was no direct infringement of the '938 patent and, thus, no contributory infringement." *Id.*

We believe that Peterson's shipping an EMB to its distributor but later receiving it as a return before it was assembled into an infringing combination is analogous to *Standard Havens.* Although the patentee in each case argues that there is a lost sale on which it is entitled to a lost profit, there can be no cognizable lost sale on which to base a damages award under the patent laws without an act of infringement to warrant it. *See id.* at 1374; *see also* 35 U.S.C. § 284 (2000) ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate *for the infringement* ...." (emphasis added)); *Rite-Hite,* 56 F.3d at 1545 (recognizing that the loss of a sale must be caused by an infringing act). If 802 EMBs were returned before assembly into an infringing configuration, there would be 802 fewer acts of direct infringement and Peterson would be liable for 802 fewer acts of contributory or inducing infringement. If there were 802 fewer acts of contributory or inducing infringement, Golden Blount would have lost 802 fewer sales.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 335607                                                                                      Page 14
--- F.3d ----, 2006 WL 335607 (Fed.Cir.)
(Cite as: 2006 WL 335607 (Fed.Cir.))

**\*16** Because the district court failed to address the 802 EMBs allegedly returned to Peterson in its September 2, 2004 findings of fact, we vacate the damages award and remand for the limited purpose of determining whether the 802 EMBs were in fact returned to Peterson by Peterson's distributors before having been assembled into an infringing configuration. If the 802 EMBs were so returned, then the damages award should be recomputed using the reduced number of units sold to distributors. If the 802 EMBs were not in fact returned or were assembled into an infringing configuration prior to being returned, the original damage award should be reinstated. We have considered the remaining arguments and find them to be without merit.

### E. Attorney fees

Based on the finding of willfulness, the district court found the case exceptional and awarded Golden Blount attorney fees in the amount of $622,015. Peterson argues that the district court clearly erred in marking the case exceptional because it clearly erred in its willfulness finding. Peterson also asserts that the district court clearly erred in granting attorney fees because the application was submitted on September 8, 2004, and "[t]ime for further post trial motions expired on September 1, 2004."

An exceptional case finding is one of fact reviewed for clear error. *Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1370 (Fed.Cir.1999). Once a case is deemed exceptional, any award of attorney fees is reviewed for abuse of discretion. *Id.*

Because Peterson's challenge to the attorney-fees award was based on its argument that the district court clearly erred in finding willfulness, an argument we have rejected, we have no reason to disturb the district court's exceptional case determination or its award of attorney fees. Peterson's argument that Golden Blount filed its motion for attorney fees out of time also lacks merit. As discussed *supra* Part II.A, the August 18, 2004 Minute Order was not a final judgment and thus the fourteen-day period specified in Rule 54(d)(2)(B) did not begin running on that date. The application for attorney fees was timely filed within fourteen days after entry of the September 2, 2004 findings.

### III. CONCLUSION

Because the district court did not clearly err in finding that Peterson willfully infringed the '159 patent, we affirm the district court's judgment of willful infringement and the award of attorney fees

based principally thereon. However, because the district court failed to address whether the 802 EMBs allegedly repurchased by Peterson should have been included in the calculation of damages, we vacate the damages award and remand that limited aspect of the case to the district court for further proceedings consistent with this opinion.

### AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED
### IV. COSTS

No costs.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 U.S. Dist. LEXIS 25479, *

LEXSEE 2001 US DIST LEXIS 25479

**LEAR CORPORATION, Plaintiff, vs. BERTRAND FAURE TECHNICAL CENTER, INC., Defendant.**

**Case No. 00-CV-72895**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2001 U.S. Dist. LEXIS 25479*

**September 4, 2001, Decided**
**September 4, 2001, Filed**

**SUBSEQUENT HISTORY:** Stay granted by *Lear Corp. v. Bertrand Faure Tech. Ctr., Inc., 2002 U.S. Dist. LEXIS 26866 (E.D. Mich., Jan. 7, 2002)*

**PRIOR HISTORY:** *Lear Corp. v. Bertrand & Faure Tech. Ctr., 2000 U.S. Dist. LEXIS 22525 (E.D. Mich., Oct. 10, 2000)*

**DISPOSITION:** [*1] Defendant BFTC's motion to bifurcate discovery and trial on the issues of liability from damages and willful infringement granted. Discovery on issue of Defendant BFTC's alleged willful infringement stayed until second damages phase of this litigation.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporation moved to bifurcate discovery and trial on the issues of patent infringement and validity from discovery and trial on the issues of willfulness and damages in plaintiff corporation's patent infringement action.

**OVERVIEW:** Plaintiff filed a patent infringement action against defendant. Plaintiff alleged that the infringement was willful. Consequently, plaintiff sought declaratory and injunctive relief, treble damages, and a determination that the infringement was deliberate and willful. Defendant moved to bifurcate discovery and trial on the issues of patent infringement and validity from discovery and trial on the issues of willfulness and damages. The court found that the factors of convenience, minimal prejudice to the parties, the expeditious and economic resolution of the matter, the significantly different issues of patent liability and wilful infringement, the significantly different evidence required to develop each issue, and the potential for jury confusion that might arise from addressing willful infringement in the initial damages phase weighed in favor of bifurcating the lawsuit into a liability phase and damages phase, with discovery on the issue of willfulness stayed until the second damages phase of the litigation. Delaying discovery and trial on the willful infringement issue until the second damages phase would not confer an unfair advantage upon defendant.

**OUTCOME:** The court granted defendant's motion to bifurcate discovery and trial on the issues of patent infringement and validity from discovery and trial on the issues of willfulness and damages. Discovery on the issue of defendant's alleged willful infringement was stayed until the second damages phase of the litigation.

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Separate Trials*
[HN1] Fed. R. Civ. P. 42(b) authorizes a district court to bifurcate trial on separate issues in furtherance of convenience, to avoid prejudice, or when separate trials will be conducive to expedition and economy. Whether to try issues separately under Rule 42(b) is within a district court's discretion. The party seeking bifurcation has the burden of demonstrating judicial economy would be promoted and that no party would be prejudiced by separate trials. Factors to be considered include: (1) convenience; (2) prejudice; (3) expedition; (4) economy; (5) whether the issues sought to be tried separately are significantly different; (6) whether they are triable by jury or the court; (7) whether discovery has been directed to a single trial of all issues; (8) whether the evidence required for each issue is substantially different; (9) whether one party would gain some unfair advantage from separate trials; (10) whether a single trial of all issues would create the potential for jury bias or confusion;

and (11) whether bifurcation would enhance or reduce the possibility of a pretrial settlement.

*Civil Procedure > Trials > Separate Trials*
[HN2] In general, patent cases often lend themselves to bifurcation. In the normal case, separate trial of issues is seldom required, but in a patent infringement suit, considerations exist that suggest that efficient judicial administration would be served by separate trials on the issues of liability and damages. The trial of the damages question in such a suit is often difficult and expensive, while being easily severed from the trial of the questions of validity and infringement of the patent. A preliminary finding on the question of liability may well make unnecessary the damages inquiry, and thus result in substantial saving of time of the court and counsel and reduction of expenses to the parties. Moreover, a separate trial of the issue of liability may present counsel the opportunity to obtain final settlement of that issue or appeal without having reached the often time-consuming and difficult damages question.

*Evidence > Privileges > Attorney-Client Privilege*
*Legal Ethics > Client Relations > Attorney-Client Privilege*
*Patent Law > Remedies > Collateral Assessments > Increased Damages*
[HN3] A finding of wilful patent infringement permits a court to award up to three times the amount of proven damages. *35 U.S.C.S. § 284.* As a defense to wilful infringement, the alleged infringer is entitled to assert that it relied in good faith upon the advice of its counsel. If the defendant raises this good faith defense, but refuses to waive the attorney-client privilege by disclosing counsel's opinions, an adverse inference may be drawn against the defendant. The defendant is left to chose whether to waive the attorney-client privilege or forego the good faith defense.

*Evidence > Privileges > Attorney-Client Privilege*
*Civil Procedure > Trials > Separate Trials*
*Legal Ethics > Client Relations > Attorney-Client Privilege*
[HN4] Proper resolution of the dilemma of an accused infringer who must choose between the lawful assertion of the attorney-client privilege and avoidance of a willfulness finding if infringement is found is of great importance not only to the parties but to the fundamental values sought to be preserved by the attorney-client privilege. An accused infringer, therefore, should not, without the trial court's careful consideration, be forced to choose between waiving the privilege in order to protect itself

from a willfulness finding, in which case it may risk prejudicing itself on the question of liability, and maintaining the privilege, in which case it may risk being found to be a willful infringer if liability is found. Trial courts should give serious consideration to a separate trial on willfulness whenever the particular attorney-client communications, once inspected by the court in camera, reveal that the defendant is indeed confronted with this dilemma. While refusal of a separate trial will not require reversal in every case involving attorney client communications bearing on willfulness, courts suggest the advisability of separate trials in appropriate cases. Considerations of economy, convenience, and expediency have been cited as reasons for staying discovery on the issue of willfulness until a second damages phase of litigation.

*Civil Procedure > Trials > Separate Trials*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN5] Guided by the factors in Fed. R. Civ. P. 42(b), a court has the discretion to determine whether evidence on willfulness in a patent infringement action will be heard with liability or damages. In exercising its discretion, a court must consider the concerns of the parties in relationship to the Rule 42(b) factors of prejudice, economy, convenience, and expediency.

*Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Civil Procedure > Trials > Separate Trials*
[HN6] Whether patent infringement is willful is a question of fact. A willfulness determination, that is, the defendant's state of mind when it infringed the patent, is a finding of fact inextricably bound to the facts underlying the alleged infringement. In reaching a willfulness determination, a trial court weighs evidence of the totality of the surrounding circumstances in order to ascertain the infringer's good faith or its willfulness. Factors considered include: the infringer's deliberate copying of the ideas or designs of the inventor, the infringer's knowledge of the inventor's patent rights, any good faith belief of invalidity or non-infringement formed by the infringer after an investigation of the inventor's patent rights, and the infringer's behavior as a litigant. Undoubtedly, because willfulness is determined from the totality of the circumstances, it is the reason why some courts prefer to include the issue of willfulness with the liability phase of a bifurcated trial.

2001 U.S. Dist. LEXIS 25479, *

*Civil Procedure > Trials > Separate Trials*
[HN7] Bifurcation issues must be decided in a trial court's discretion on a case-by-case basis.

*Patent Law > Infringement Actions > Infringing Acts > Make*
*Patent Law > Infringement Actions > Infringing Acts > Sale*
*Patent Law > Infringement Actions > Infringing Acts > Use*
[HN8] Patent infringement generally requires proof that an individual or entity, without authority, makes, uses, offers to sell, sells, or imports a patented invention within the United States, its territories, or its possessions during the term of the patent. *35 U.S.C.S. § 271*(a). A determination of willful infringement focuses on the intent of the infringer. Hence, in assessing liability for the principal offense of patent infringement, courts need not conduct an in-depth analysis of the accused infringer's state of mind.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN9] In determining whether or not infringement exists, the desire or intent to infringe a patent is irrelevant.

*Evidence > Privileges > Attorney-Client Privilege*
*Legal Ethics > Client Relations > Attorney-Client Privilege*
*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
[HN10] The situation in which a patent defendant improperly uses the attorney-client privilege as both "a sword and a shield" arises when the defendant relies upon the advice of its counsel to negate the willfulness element of willful infringement while hiding the basis of its good faith belief, the actual opinion, behind the attorney-client privilege.

*Evidence > Privileges > Attorney-Client Privilege*
*Civil Procedure > Trials > Separate Trials*
*Legal Ethics > Client Relations > Attorney-Client Privilege*
[HN11] Delaying an adjudication on willfulness, even absent a specific showing of a threat to the attorney-client privilege, avoids even the possibility of prejudice to a patent defendant's litigation rights.

**COUNSEL:** For Lear Corporation, PLAINTIFF: John M Halan, Ginta D Kukainis, Brooks & Kushman, Southfield, MI USA.

For Lear Corporation, PLAINTIFF: Kevin D Hogg, Marshall, Gerstein, Chicago, IL USA.

For Bertrand Faure Technical Center, Incorporated, DEFENDANT: Stewart L Mandell, Dykema Gossett, Ann Arbor, MI USA.

**JUDGES:** GEORGE CARAM STEEH, United States District Judge.

**OPINIONBY:** GEORGE CARAM STEEH

**OPINION:**

OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO BIFURCATE DISCOVERY AND TRIAL ON THE ISSUES OF LIABILITY AND DAMAGES, WITH DISCOVERY ON THE ISSUE OF WILFULNESS STAYED UNTIL THE SECOND DAMAGES PHASE

In this patent infringement case, defendant Bertrand Faure Technical Center, Inc. ("BFTC") moves to bifurcate discovery and trial on the issues of liability from the issues of damages and wilful infringement. Pursuant to E.D. Mich. Local R. 7.1(e)(2), it is ORDERED that the motion be resolved without oral argument. For the reasons set forth [*2] below, defendant's motion to bifurcate will be GRANTED, with discovery on the issue of wilfulness stayed until the second damages phase.

**I. Background**

Plaintiff Lear Corporation filed a First Amended Complaint on October 31, 2000 alleging it is the owner of *United States Patent No. 5,795,019* ("019 Patent"). Lear alleges defendant BFTC has known of the patent since at least April 2000. Lear continues by alleging:

14. [BFTC] has made, used, offered for sale, and/or sold in the United States certain vehicle seat and headrest arrangements and, as an allegation likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, Lear asserts that such arrangements include an arrangement known as the Spinal CARE System (R).

15. As an allegation likely to have evidentiary support after a reasonable opportunity for further investigation or discovery,

Lear asserts that [BFTC] has offered for sale, to at least one original equipment manufacturer (OEM) of motor vehicles in the United States, the Spinal CARE System (R).

16. As an allegation likely to have evidentiary support after a reasonable opportunity for further investigation [*3] or discovery, Lear asserts that [BFTC] has offered the Spinal CARE System (R) for sale in the United States through promotion and marketing materials distributed or disseminated in the United States.

17. As an allegation likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, Lear asserts that at least one OEM of motor vehicles in the United States has contracted with [BFTC] for the purchase of the Spinal CARE System (R) whether by itself or in conjunction with other products.

October 31, 2000 First Amended Complaint, at 3-4. In Count I, Lear alleges BFTC is infringing the 019 Patent "by making, using, offering for sale, or selling in the United States certain vehicle seat and headrest arrangements, including without limitation the Spinal CARE System (R)." Id, P 19, at 4. Lear also alleges in Count I that "such infringement by [BFTC] has been and/or is willful." Id, P 20, at 4. Lear seeks declaratory and injunctive relief, damages, and "a determination that the infringement has been and is deliberate and willful, and that damages awarded to Lear be trebled or otherwise increased[.]" Id, at 5.

On November 20, 2000, defendant [*4] BFTC filed its Answer To First Amended Complaint and Counterclaim. By way of affirmative defenses, BFTC alleges it cannot be held liable for patent infringement due to: laches; patent invalidity; estoppel based on prosecution history, prior art history, or possible representations, misrepresentations or omissions; licenses retained by the General Motors Corporation, and; noncompliance with 35 U.S.C. § 287 (patent notice and disclosure). By way of counterclaim, defendant BFTC seeks a declaration that the 019 Patent is invalid and unenforceable, as well as a declaration that Lear is enjoined from asserting the 019 Patent against BFTC and BFTC's actual or potential customers and suppliers. Defendant BFTC further seeks attorney fees consistent with a finding that this litigation is "exceptional." See 35 U.S.C. § 285 (permitting court to award attorney fees to prevailing party in exceptional cases).

On June 15, 2001, defendant BFTC moved to bifurcate discovery and trial on the issues of patent infringement and validity from discovery and trial on the issues of willfulness and damages. BFTC's argument for bifurcation was based in part on [*5] the fact that discovery was scheduled to close on August 31, 2001. On July 2, 2001, plaintiff Lear filed its response, opposing ceratin factual assertions made by BFTC, but "not presently opposing bifurcating the liability and damages phases of discovery and trial." Lear July 2, 2001 Response, at 2. As a result, the court conducted a July 11, 2001 scheduling conference. At the conference, Lear and BFTC disagreed whether the issue of willful infringement should be the subject of discovery and trial in the initial liability phase of a bifurcated lawsuit, or in the second damages phase of the litigation. The parties were invited to file supplemental briefs on the issue.

## II. Motion to Bifurcate

Federal Rule of Civil Procedure 42(b) [HN1] authorizes a district court to bifurcate trial on separate issues in furtherance of convenience, to avoid prejudice, or when separate trials will be conducive to expedition and economy. Whether to try issues separately under Rule 42(b) is within the district court's discretion. Yung v. Raymark Industries, Inc., 789 F.2d 397, 400 (6th Cir. 1986); Moss v. Associated Transport, Inc., 344 F.2d 23, 25 (6th Cir. 1965). [*6] "The party seeking bifurcation has the burden of demonstrating judicial economy would be promoted and that no party would be prejudiced by separate trials." Princeton Biochemicals, Inc. v. Beckman Instruments, Inc., 180 F.R.D. 254, 256 (D. N.J. 1997).

Factors to be considered include (1) convenience; (2) prejudice; (3) expedition; (4) economy; (5) whether the issues sought to be tried separately are significantly different; (6) whether they are triable by jury or the court; (7) whether discovery has been directed to a single trial of all issues; (8) whether the evidence required for each issue is substantially different; (9) whether one party would gain some unfair advantage from separate trials; (10) whether a single trial of all issues would create the potential for jury bias or confusion; and (11) whether bifurcation would enhance or reduce the possibility of a pretrial settlement.

*THK America, Inc. v. NSK Co., Ltd., 151 F.R.D. 625, 632 (N.D. Ill. 1993).* [HN2] In general, patent cases often lend themselves to bifurcation:

> In the normal case separate trial of issues is seldom required, but in a patent infringement suit considerations [*7] exist which suggest that efficient judicial administration would be served by separate trials on the issues of liability and damages. The trial of the damages question in such a suit is often difficult and expensive, while being easily severed from the trial of the questions of validity and infringement of the patent. A preliminary finding on the question of liability may well make unnecessary the damages inquiry, and thus result in substantial saving of time of the Court and counsel and reduction of expenses to the parties. Moreover, separate trial of the issue of liability may present counsel the opportunity to obtain final settlement of that issue or appeal without having reached the often time-consuming and difficult damages question.

*Acme Resin Corp. v. Ashland Oil, Inc., 689 F. Supp. 751, 753 (S.D. Ohio 1987) (quoting Swofford v. B & W. Inc., 34 F.R.D. 15, 19-20 (S.D. Texas 1963), aff'd, 336 F.2d 406 (5th Cir. 1964), cert. denied, 379 U.S. 962, 13 L. Ed. 2d 557, 85 S. Ct. 653 (1965)).*

Although Lear and BFTC agree that the instant patent litigation should be bifurcated into separate liability and damages [*8] phases, the parties adamantly disagree whether the issue of BFTC's alleged willful infringement should be addressed in the liability or damages phase of this lawsuit. BFTC argues that deferring discovery and trial on the issue of willful infringement until the second damages phase will eliminate the potential for protracted discovery disputes, avoid a premature waiver of its attorney-client privilege with respect to opinions of counsel, and prevent the unnecessary disclosure of commercially sensitive information. Lear counters that BFTC's alleged willful infringement should be the subject of the initial liability phase because the proofs going to infringement liability and willful infringement overlap and are inextricably bound. Lear also argues that delaying disclosure of BFTC's opinions of counsel until the second damages phase would unfairly permit BFTC to use its attorney-client privilege as both a sword and a shield.

[HN3] A finding of wilful patent infringement permits a court to award up to three times the amount of proven damages. See *35 U.S.C. § 284.* As a defense to wilful infringement, the alleged infringer is entitled to assert that it relied in good [*9] faith upon the advice of its counsel. See *Novopharm Ltd. v. Torpharm, 181 F.R.D. 308, 311 (E.D. N.C. 1998);* Flex Products Inc. v. BASF, No. 97-CV-60211-AA, 1998 U.S. Dist. LEXIS 22028, 1998 WL 425475, 47 U.S.P.Q.2d 1380, *1381 (E.D. Mich. 1998) (citing *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1580 (Fed. Cir. 1992); Thorn EMI N. Am., Inc. v. Micron Tech, Inc., 837 F. Supp. 616, 620-621 (D. Del. 1993)).* If the defendant raises this good faith defense, but refuses to waive the attorney-client privilege by disclosing counsel's opinions, an adverse inference may be drawn against the defendant. *Flex Products,* 47 U.S.P.Q.2d at *1381 (citing *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1056-57 (Fed. Cir. 1994)).* The defendant is left to chose whether to waive the attorney-client privilege or forego the good faith defense.

> [HN4] Proper resolution of the dilemma of an accused infringer who must choose between the lawful assertion of the attorney-client privilege and avoidance of a willfulness finding if infringement is found, is of [*10] great importance not only to the parties but to the fundamental values sought to be preserved by the attorney-client privilege. An accused infringer, therefore, should not, without the trial court's careful consideration, be forced to choose between waiving the privilege in order to protect itself from a willfulness finding, in which case it may risk prejudicing itself on the question of liability, and maintaining the privilege, in which case it may risk being found to be a willful infringer if liability is found. Trial courts thus should give serious consideration to a separate trial on willfulness whenever the particular attorney-client communications, once inspected by the court in camera, reveal that the defendant is indeed confronted with this dilemma. While our court has recognized that refusal of a separate trial will not require reversal in every case involving attorney client communications bearing on willfulness, we have suggested the advisability of separate trials in appropriate cases. See *Fromson v. Western Litho Plate & Supply*

*Co., 853 F.2d 1568, 1572, 7 USPQ2d 1606, 1611 (Fed. Cir. 1988)* ("That approach may be useful in meeting the attorney-client privilege [*11] problem.").

*Quantum Corp. v. Tandon Corp., 940 F.2d 642, 643-644 (Fed. Cir. 1991).* Considerations of economy, convenience and expediency have been cited as reasons for staying discovery on the issue of willfulness until a second damages phase of litigation. See *Rohm and Haas Co. v. Mobil Oil Corp., 654 F. Supp. 82, 86 (D. Del. 1987)* (ruling that the overall efficiency and expediency of the case would be achieved by precluding "discovery involving privileged evidence and the depositions of attorneys ... during the liability phase for the purpose of establishing willfulness.").

Notwithstanding these considerations, courts have differed whether willful infringement should nonetheless be tried in the liability phase of a bifurcated proceeding due to a potential overlap of evidence. Reasoning that the issue of willfulness should be tried in the damages phase, one federal district court reasoned:

> ... We agree with the Fifth Circuit when it stated,"... We cannot think of an instance in a patent action where the damage issue is so interwoven with the other issues that it cannot be submitted to the jury independently of the others without [*12] confusion and uncertainty, which would amount to a denial of a fair trial." *Swofford v. B & W, Inc., 336 F.2d 406, 415, [142 U.S.P.Q. (BNA) 291] (5th Cir. 1964).*

Before closing our discussion on bifurcation, we must determine whether the issue of willfulness will be heard with liability or damages. This issue is relevant to all three cases currently before us.

[HN5] Guided by the factors in *Rule 42(b), Fed. R. Civ. P.*, the Court has the discretion to determine whether evidence on willfulness will be heard with liability or damages. See *Rohm and Haas Co. v. Mobil Oil Corp., 654 F. Supp. 82 [3 USPQ2d 1619] (D. Del. 1987).* In exercising our discretion, we must consider the concerns of the parties in relationship to the *Rule 42(b)* factors of prejudice, economy, convenience and expediency.

In defending a willfulness charge, a party may choose to rely on prelitigation opinion letters of counsel regarding the patents in suit. Such reliance will involve the production of documents otherwise protected by the attorney-client privilege. Lilly and Genentech are concerned that compelling them to determine their defense strategy to [*13] the willfulness charge and to produce opinion letters at this stage would prejudice the two companies in their liability defense. Specifically, Lilly argues that revealing such opinion letters could be "... tantamount to providing the foundation of a party's whole litigation strategy to its opponent." Lilly Br. at 14-15.

After consideration of the parties' viewpoints, we believe that the issue of willfulness should be tried as part of the damages trial. See *Rohm, 654 F. Supp. at 86* (holding that for reasons of economy, convenience and expediency, willfulness would be heard in the damages phase). Such construction will avoid the prejudice to Lilly and Genentech that could result if they were forced to provide their opposition with a "detailed 'work product' road map" to arguments Lilly and Genentech desire to use in the liability trial.

*In re Recombinant DNA Tech. Patent & Contract Litig., 1993 U.S. Dist. LEXIS 20474, MDL Docket No. 912, 1994 WL 270712, at * 1900 (S.D. Ind. Dec. 22, 1993).* See also *Princeton Biochemicals, Inc., 180 F.R.D., at 258* (finding that the overlap of evidence on issues of willfulness and commercial success was insignificant, [*14] and holding that "the more recent case law ... holds that willful infringement is more appropriately determined after liability has been established, thereby avoiding even the possibility of prejudice to a patent defendant's litigation rights."); *Novopharm Ltd., 181 F.R.D., at 312* (holding that delaying an adjudication of willfulness avoids the possibility of prejudicing a patent defendant's litigation rights even absent a showing of a threat to the attorney-client privilege).

Conversely, another federal district court concluded:

> [HN6] Whether infringement is willful is a question of fact. A willfulness determination, that is, the defendant's state of mind when it infringed the patent, is a

finding of fact inextricably bound to the facts underlying the alleged infringement. In reaching a willfulness determination, a trial court weighs evidence of the totality of the surrounding circumstances in order to ascertain the infringer's good faith or its willfulness. Factors considered include: the infringer's deliberate copying of the ideas or designs of the inventor, the infringer's knowledge of the inventor's patent rights, any good faith belief of invalidity or non-infringement [*15] formed by the infringer after an investigation of the inventor's patent rights, and the infringer's behavior as a litigant. Undoubtedly, because willfulness is determined from the totality of the circumstances, it is the reason why some courts prefer to include the issue of willfulness with the liability phase of a bifurcated trial.

*THK America, Inc.*, 151 F.R.D., at 629-630. See also *Foseco, Inc. v. Consolidated Aluminum Corp.*, 851 F. Supp. 369, 370-371 (E.D. Mo. 1991) (reasoning that "in a majority of cases the willfulness issue has generally been developed during the liability phase of a bifurcated trial", and concluding that discovery as to damages should be conducted at the same time as discovery as to liability issues in order to facilitate settlement negotiations); *Kimberly-Clark Corp. v. James River Corp. of Virginia*, 131 F.R.D. 607, 609 (N.D. Ga. 1989) (holding that "the willfulness determination, i.e., the defendant's state of mind when it infringed the patent, is a finding of fact inextricably bound to the facts underlying the infringement"); *Intellectual Property Development Corp, v. UA-Columbia Cablevision of Westchester Inc.*, 1995 U.S. Dist. LEXIS 2264, No. 94 Civ. 6296, 1995 WL 81276, [*16] at * 1607 (S.D.N.Y. Feb. 28, 1995) (holding that the patent infringement's "request for a stay of discovery of privileged information related to willfulness until after the liability trial is impracticable, as the issues of liability and willfulness closely intertwine"). n1

n1 See also Eric M. Dobrusin & Katherine E. White, Intellectual Property Litigation § 7.06[B], at 7-24, 25 (2d ed. 1999) ("At the district level, several courts have bifurcated the willfulness issue from liability issues. However, despite a growing trend toward bifurcation of the willfulness issue, courts still have denied a request to bifurcate or have treated willfulness with liability issues rather than damages.") (footnotes and case cites omitted).

One rule is consistent throughout the case law: [HN7] bifurcation issues must be decided in the trial court's discretion on a case-by-case basis. See *Yung, 789 F.2d, at 400*; *Moss, 344 F.2d at 25*; *Acme Resin Corp., 689 F. Supp., at 752*; *Princeton Biochemicals, 180 F.R.D., at 256*; [*17] *Intellectual Property Development Corp., 1995 U.S. Dist. LEXIs 2264, 1995 WL 81276*, at * 1606. It is undisputed by Lear and BFTC that bifurcating this litigation into separate liability and damage phases will promote judicial economy and expedite this matter by deferring potentially difficult and expensive damages issues until a an initial liability phase is first completed. See *Moss, 344 F.2d at 25*; *Acme Resin Corp., 689 F. Supp., at 753*. Additional considerations of economy and expediency favor staying discovery and trial on the willfulness issue until the second discovery phase. See *Rohm and Haas Co., 654 F. Supp., at 86*. The potential prejudice to defendant BFTC's litigation rights, should BFTC now be required to chose between waiving its attorney-client privilege or risk a finding of liability arising from an evidentiary adverse inverse, also weighs in favor of addressing the willfulness issue in the second liability phase. See *Quantum Corp., 940 F.2d, at 643-644*; *Rohm and Haas Co., 654 F. Supp., at 86*; *In re Recombinant DNA, 1993 U.S. Dist. LEXIS 20474, 1994 WL 270712*, at * 1900; *Princeton Biochemicals, Inc., 180 F.R.D., at 258*. [*18]

The court is not persuaded that the asserted overlap of issues relating to liability and willful infringement is significant enough to tip the scales in favor of addressing willful infringement in the initial liability phase. In rejecting the argument that evidence of copying creates an evidentiary overlap favoring a determination of willful infringement in the initial liability phase of a bifurcated proceeding, one court reasoned:

> Indeed, [HN8] patent infringement generally requires proof that an individual or entity, without authority makes, uses, offers to sell, sells or imports the patented invention within the United States, its territories, or its possessions during the term of the patent, see *35 U.S.C. § 271(a)*, while a determination of willful infringement focuses on the intent of the infringer. Hence, in assessing liability for the principal offense of patent infringement, courts need not conduct an in-depth analysis of the accused infringer's state of mind. Plaintiff, however, seeks to bridge a nexus between these two distinct causes of action by suggesting that there is an overlap. Plaintiff has characterized the inter-relationship as follows: [*19] defen-

dant has challenged the validity of the patent in suit as "obvious" and therefore invalid. Thus, since the Supreme Court and the Federal Circuit have held that copying (or, as plaintiff concludes, willful infringement) is strong evidence of non-obviousness, willful infringement is inter-twined with the liability issues in question. See Plaintiff's Brief at 12-13 citing *Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 441, 31 S. Ct. 444, 55 L. Ed. 527, 1911 Dec. Comm'r Pat. 538 (1911)* and *Panduit Corp. v. Dennison Mfg. Co., 774 F.2d 1082, 1099 (Fed.Cir. 1985)*. However, plaintiff's inference that copying is synonymous with willful infringement, is erroneous. Instead, copying is merely evidence of willful infringement. See Herbert F. Schwartz, Patent Law and Practice at 120 n. 654 (2d ed. 1995). Consequently, plaintiff may pursue a "copying" defense to non-obviousness and indeed, a determination on this issue in this liability case could be a finding which need not be proven and presented to a jury a second time at a willfulness trial.

*Princeton Biochemicals, Inc., 180 F.R.D., at 258 n.3.* Similarly, the record here supports [*20] a finding that, while some overlap of proofs is possible, Lear's proofs relating to copying do not warrant a more detailed and time consuming inquiry into the willfulness issue in the first stage of this litigation. *Id. at 258.* n2 The same holds true for Lear's argument that evidence of BFTC's lack of good faith in investigating the 019 Patent, and the "closeness of the case", warrant addressing the willful infringement issue in the initial liability phase. [HN9] "In determining whether or not infringement exists, the desire or intent to infringe a patent is irrelevant." *THK America, Inc., 151 F.R.D., at 629.* It is the court's opinion that the advantages of bifurcating this litigation into a liability phase and damages phase would be significantly diminished if discovery and trial on the issue of BFTC's intent and alleged willful infringement were addressed in the initial liability phase.

n2 One commentator suggests that allegations of willful infringement should be subject to the "particularity" requirements of *Federal Rule of Civil Procedure 9(b)*, reasoning that "neither willfulness nor inequitable conduct should be pled unless and until there is evidence that *prima facie* supports such charges. Discovery should be

permitted to determine whether such evidence exists, and it should not be a basis for resisting such discovery that the allegations have not yet been made. If willfulness is properly alleged, it should be bifurcated and its consideration should be deferred until after liability is established. Any discovery directed to advice given by counsel, or in any other way concerning privileged information should also be deferred to post-liability proceedings." James M. Amend, Patent Law A Primer For Federal District Court Judges, 1998, at 9-10.

[*21]

The court is not persuaded that BFTC gains an unfair advantage by deferring its decision whether to waive its attorney-client privilege until the second damages phase of this litigation. [HN10] The situation in which a patent defendant improperly uses the privilege as both "a sword and a shield" arises when the defendant relies upon the advice of its counsel to negate the willfulness element of willful infringement (the "sword") while hiding the basis of its good faith belief, the actual opinion, behind the attorney-client privilege (the "shield"). See *Avery Dennison Corp. v. UCB Films Inc., 1998 U.S. Dist. LEXIS 15727,* No. 95 C 6351, *1998 WL 70346,* at *4(N.D. Ill. Sept. 30, 1998).* Deferring discovery and trial on the willful infringement issue until the second damages phase will not confer such an unfair advantage upon BFTC; BFTC need not waive its privilege until the second damages phase of this litigation. As stated by one court:

[HN11] Delaying an adjudication on willfulness, even absent a specific showing of a threat to the attorney-client privilege, avoids "even the possibility of prejudice to a patent defendant's litigation rights." *Princeton Biochemicals, 180 F.R.D. at 258.* [*22] Thus, like the court in Princeton Biochemicals, this Court finds that, "having already determined that the instant case should be bifurcated, and thereby finding that there is no significant overlap between issues of liability for patent infringement and willfulness, the issues pertaining to willful infringement are logically reserved for adjudication after liability has been determined. Consequently, this Court need not decide whether there is a Quantum dilemma." *180 F.R.D. at 260.* The Court therefore finds that the issue of willful infringement

should be tried during the damages stage of this matter.

*Novopharm Ltd., 181 F.R.D., at 312.*

In summary, the court concludes that the factors of convenience, minimal prejudice to the parties, the expeditious and economic resolution of this matter, the significantly different issues of patent liability and wilful infringement, the significantly different evidence required to develop each issue, and the potential for jury confusion that might arise from addressing willful infringement in the initial damages phase, weigh in favor of bifurcating this lawsuit into a liability phase and damages phase, [*23] with discovery on the issue of wilfulness stayed until the second damages phase of litigation. *THK America, Inc., 151 F.R.D., at 632.* Accordingly,

BFTC's motion to bifurcate discovery and trial on the issues of liability from the issues of damages and wilful infringement is hereby GRANTED. Discovery on the issue of BFTC's alleged wilful infringement is hereby STAYED until the second damages phase of this litigation.

SO ORDERED.

GEORGE CARAM STEEH

United States District Judge

Dated: 04 SEP 2001

Detroit, Michigan.