# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMPEX CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>EASTMAN KODAK COMPANY,<br>ALTEK CORPORATION and CHINON<br>INDUSTRIES, INC.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)    C.A. No. 04-1373-KAJ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' COMPENDIUM OF UNREPORTED OPINIONS

**OF COUNSEL:**

William F. Lee
Donald R. Steinberg
Michael J. Summersgill
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
Tel: (617) 526-6000
Fax: (617) 526-5000
March 6, 2006

S. Calvin Walden
WILMER CUTLER PICKERING
HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 230-8888
Date:  March 6, 2006

PAUL M. LUKOFF (I.D. No. 96)
DAVID E. BRAND (I.D. No. 201)
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500


*Attorneys for Defendants*

19660.3\297820v1

LEXSEE

**BRISTOL-MYERS SQUIBB COMPANY, Plaintiff, - against - RHONE-POULENC RORER, INC., CENTRE NATIONAL DE LA RECHERCHE SCIENTIFIQUE, and RHONE-POULENC RORER, S.A., Defendants.**

**95 Civ. 8833 (RPP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2000 U.S. Dist. LEXIS 321**

**January 14, 2000, Decided**
**January 20, 2000, Filed**

**DISPOSITION:** [*1] Court disqualified Dr. McGuire from presenting expert testimony on behalf of RPR in this case.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff moved by letter dated November 22, 1999 for an order disqualifying an oncology consultant and expert witness for defendant where the expert had a prior non-testimonial relationship with the opposing party.

**OVERVIEW:** Plaintiff argued that defendant's expert witness engaged in substantial activities relating to plaintiff's development and marketing activities for its oncology products. The expert stated that none of the services he performed for plaintiff had any relationship to his anticipated services on behalf of defendant. The declarations of witnesses showed that plaintiff had a substantial relationship with the expert over the years. Plaintiff demonstrated that it was objectively reasonable for plaintiff to conclude that a confidential relationship existed with the expert. The expert was a consultant to plaintiff pertaining principally to the appropriate use of a drug for treating cancer. Plaintiff showed that it has disclosed to the expert its judgments to what degree, in what areas, and when certain regiment may be used in treating ovarian cancer. There was no showing that the expert was a testimonial expert witness who was being deprived of his pursuit of his professional calling.

**OUTCOME:** The expert witness was disqualified from presenting expert testimony on behalf of defendant; plaintiff demonstrated that it was objectively reasonable for plaintiff to conclude that a confidential relationship existed with the expert.

**CORE TERMS:** cancer, ovarian, testifying, etoposide, confidential information, clinical trial, confidential, declaration, consulting, clinical, disqualification, confidentiality, oncologist, confidence, consultant, confidential relationship, substantial relationship, regimens, first line, chemotherapy, investigator, oncology, disqualify, objectively reasonable, patent, longstanding, presentation, anticipated, marketing, compounds

**LexisNexis(R) Headnotes**

*Evidence > Witnesses > Expert Testimony*
[HN1] Under the substantial relationship test, if the court finds that a substantial relationship existed, the court must balance the interests and motivations of the attorney and the client and the public's interest in assessing whether disqualification is merited.

*Evidence > Witnesses > Expert Testimony*
[HN2] Attorney conflict standards do not summarily apply to experts who, unlike attorneys, serve generally as sources of information and not necessarily as recipients of confidences. Expert witnesses in the majority of cases are testifying experts who have not been the recipient of confidential information from any party to the case and have not had any prior relationship with any party to the case, although they may have been witnesses in other litigations involving one of the attorneys. Accordingly, cases that grant disqualification of testifying experts are rare.

*Evidence > Witnesses > Expert Testimony*

[HN3] In some cases, however, the testifying expert has had a prior non-testimonial relationship with the opposing party. The two-prong test is: First, was it objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the expert?

**COUNSEL:** For Plaintiff: Thomas H. Beck, Esq., Fitzpatrick, Cella, Harper & Scinto, New York, NY.

For Defendants: Philip E. Roux, Esq., Rogers & Wells LLP, New York, NY.

**JUDGES:** ROBERT P. PATTERSON, JR., U.S.D.J.

**OPINIONBY:** ROBERT P. PATTERSON, JR.

**OPINION:**

**OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

Plaintiff Bristol-Myers Squibb Company ("Bristol") moves by letter dated November 22, 1999 for an order disqualifying Dr. William McGuire as an oncology consultant and expert witness for Rhone-Poulenc Rorer, Inc. ("RPR") in this litigation. Bristol describes Dr. McGuire as an independent consultant who has had a longstanding professional relationship with Bristol's oncology and clinical testing departments dating back to the early 1990's. In October 1998, Dr. McGuire entered into an agreement with Bristol to act as an outside consultant for Bristol to provide services concerning the development of a Supplemental New Drug Application ("SNDA") for oral etoposide in the treatment of ovarian cancer (the "1998 Agreement") for submission to the Food and Drug Administration ("FDA"). The 1998 Agreement, [*2] which expired on September 30, 1999, contained a confidentiality obligation which extends to September 30, 2004 with respect to confidential materials and information of Bristol made available to Dr. McGuire "as a result of his Services regarding oral etoposide in ovarian cancer under this Agreement." (1998 Agreement P 6.) In support of its motion, Bristol attaches the Declaration of Jos Van Der Woert dated November 22, 1999 ("Van Der Woert Decl."), which states that Dr. McGuire was provided with confidential information relating to Bristol's clinical trial strategy in order to provide his comments to ensure a successful SNDA filing, and that in that connection "we discussed the future role of oral etoposide in the perspective of current and potential future chemotherapy regimens, which included the use of Taxol (R). In this context, Dr. McGuire provided his suggestions regarding Bristol's clinical trial strategies." (Van Der Woert Decl. P 5.)

Bristol also argues, based on the Declaration of Kathleen P. Deardorff dated November 22, 1999 ("Deardorff Decl."), that Dr. McGuire engaged in substantial activities relating to Bristol's development and marketing activities for its oncology [*3] products and, in particular, with regard to Taxol (R), i.e., (a) speaking throughout the 1990's on the use of Taxol (R) to treat ovarian cancer in the United States and overseas; (b) submitting a declaration to the Patent Office on June 23, 1999, relating to the clinical measurement of the synergistic effect of two compounds in support of a confidential patent application relating to Taxol (R); (c) consulting with Bristol's Japanese counsel in November 1997 with respect to clinical trial data submitted to the FDA; (d) acting as the principal investigator for the pivotal clinical trial submitted to the FDA in 1996-97 for approval of Taxol (R) and cisplatin in treatment of first line ovarian cancer; (e) acting as principal investigator for one of Bristol's pivotal clinical trials submitted to the FDA in 1992 for approval of Taxol (R) in the treatment of ovarian cancer; and (f) assisting Bristol in the 1992 presentation about Taxol (R) before the FDA's Oncology Drug Advisory Committee ("ODAC"). (Letter of 11/22/99 at 3.)

RPR, in a letter dated December 3, 1999, states that Dr. McGuire received no Bristol confidential testimony relevant to his consultancy for RPR in this case and [*4] that there is no relationship between Dr. McGuire's prior consulting activities for Bristol and his anticipated activities for RPR in this case, much less the substantial relationship that the law requires for disqualification (Letter of 12/3/99 at 1). RPR also states that, due to Bristol's dominance in the field, there are few medical oncologists who have not had a "longstanding" relationship with Bristol (Id.). Lastly, it argues that the nature of Bristol's longstanding relationship with Dr. McGuire is factually incorrect and misleading (Id.). For this purpose, it attaches Dr. McGuire's December 2, 1999 affidavit.

Dr. McGuire's December 2, 1999 affidavit states that he has been asked by RPR to provide testimony concerning the general practice of oncology as it relates to issues in this litigation and, additionally, to provide testimony about the extent that oncologists would use Taxotere (R) to treat ovarian cancer if Taxol (R) were unavailable, and that the substance of his testimony will relate to a comparison between Taxotere (R) and chemotherapy agents other than Taxol (R) since the testimony will be based on the assumption that Taxol (R) is unavailable. (Affidavit of [*5] William McGuire, M.D., dated December 2, 1999 ("McGuire Aff.") P 4.)

Dr. McGuire states that none of the services he has performed for Bristol in the past have any relationship to his anticipated services on behalf of RPR and that he has never received "confidential information from Bristol which would be relevant to my consulting for RPR in this case." (Id. P 6.) Specifically, he states that under his consultancy based on the 1998 Agreement he never received any confidential information from Bristol and only participated in a few telephone calls relative to the viability of oral etoposide in combination with Taxol (R) and carboplatin as a first line treatment for ovarian cancer. (Id. P 9.) He also makes the following points:

(a) In his speaking engagements regarding Taxol (R) and other treatments for ovarian cancer, he based his remarks on clinical data he had assembled and analyzed as an independent investigator or other published clinical data relating to Taxol (R) as a first line or salvage treatment for ovarian cancer and did not understand any of the information conveyed during the meetings to reflect Bristol confidences (McGuire Aff. P 11);

(b) with respect to [*6] his two-page declaration supporting a confidential patent application for Taxol (R), he states that his declaration solely related to whether two compounds act synergistically and how that can be perceived in terms of the therapeutic effect on cancer patients (McGuire Aff. P 12); n1

(c) his consultations with Bristol's Japanese counsel consisted only of explaining survival data in a particular Taxol (R) clinical trial (McGuire Aff. P 14);

(d) with respect to his involvement in the clinical trial submitted by Bristol to the FDA for approval of Taxol (R) in first line treatment for ovarian cancer, he states that he served as principal investigator responsible for the clinical trial, not under the sponsorship of Bristol, but of the Gynecologic Oncology Group (McGuire Aff. P 13);

(e) with respect to his involvement in the earlier clinical trial used by Bristol to obtain original FDA approval of Taxol (R) for treatment of ovarian cancer, he states that he acted not under the sponsorship of Bristol but of the National Cancer Institute (McGuire Aff. P 13); and

(f) with respect to the 1992 presentation on Taxol (R) before the FDA's ODAC, he states that he merely assisted Bristol by critiquing [*7] Bristol's proposed presentation to ODAC the night before (McGuire Aff. P 16).

n1 As drafted, Dr. McGuire's affidavit does not respond to the obvious question of whether prior to proffering that declaration he was privy to confidential clinical data relating to the two compounds and Taxol (R) provided by Bristol.

Dr. McGuire's affidavit suggests that he thinks that Bristol is claiming that he is their "kept" oncologist n2 which is not the nature of Bristol's claim. Bristol is asserting that, due to his considerable experience in reviewing and conducting clinical trials involving Taxol (R), he has necessarily been privy to confidential information relating to the potential for using Taxol (R) and etoposide alone, or in combination with other drugs such as cisplatin, in various aspects of the treatment of ovarian cancer.

n2 Dr. McGuire stresses that "I was **never** a 'Bristol' outside consultant; rather I have always served as an **independent** consultant for both Bristol as well as other pharmaceutical companies regarding, among other things, the treatment of ovarian cancer. As an independent consultant, I have always provided my unbiased, objective, scientific expertise on all matters for which I was hired." (McGuire Aff. P 7.)

[*8]

RPR's letter of December 3, 1999 argues that disqualification of experts is disfavored, citing Koch Refining Co. v. Jennifer L. Boudreaux, M.V., 85 F.3d 1178, 1181 (5th Cir. 1996) (which rather states that disqualification is rare), and argues that Bristol has not met the so-called "substantial relationship" test. See Stanford v. Kuwait Airways Corp., 1989 U.S. Dist. LEXIS 7633 (S.D.N.Y. July 10, 1989); Marvin Lumber & Cedar Co. v. Norton Co., 113 F.R.D. 588, 591 (D. Minn. 1986). [HN1] Under that test, if the court finds that a substantial relationship existed, the court must balance the interests and motivations of the attorney and the client and the public's interest in assessing whether disqualification is merited. See Arkansas v. Dean Foods Products Co., Inc., 605 F.2d 380, 383 (8th Cir. 1979), overruled on other

grounds by In re Multi-Piece Rim Products Liability Litigation, 612 F.2d 377 (8th Cir. 1980).

Secondly, RPR argues that Bristol has not met the confidentiality test set forth in In re Ambassador Group, Inc., 879 F. Supp. 237, 242 (E.D.N.Y. 1994).

RPR then argues that Bristol's [*9] "laundry list" of Dr. McGuire's prior relationships with Bristol is insufficient to establish grounds for disqualification under the substantial relationship test and the confidentiality test. (Letter of 12/3/99 at 2-3.) RPR states that Bristol has failed to show (1) that Dr. McGuire had access in the past to relevant Bristol confidences and (2) that Dr. McGuire's past consulting work for Bristol bears a substantial relationship to his anticipated consulting work for RPR in this case. (Letter of 12/3/99 at 2.) It states that Dr. McGuire would only testify as to whether and to what extent, in the absence of Taxol (R) from the market, Dr. McGuire and other medical oncologists would have used Taxotere (R) to treat cancer patients who would otherwise have been treated with Taxol (R). n3 (Id. at 4.)

n3 RPR does not limit Dr. McGuire's testimony to the treatment of ovarian cancer patients.

DISCUSSION

As was pointed out by Judge Broderick in EEOC v. Locals 14 and 15 Int'l Union of Operating Engineers, 1981 U.S. Dist. LEXIS 11194, 72 Civ. [*10] 2498 (VLB), 1981 WL163 at 3-4 (S.D.N.Y. Feb. 11, 1981), [HN2] attorney conflict standards do not summarily apply to experts who, unlike attorneys, serve generally as sources of information and not necessarily as recipients of confidences. Expert witnesses in the majority of cases are testifying experts n4 who have not been the recipient of confidential information from any party to the case and have not had any prior relationship with any party to the case, although they may have been witnesses in other litigations involving one of the attorneys. Accordingly, cases that grant disqualification of testifying experts are rare. See Koch Refining Co., 85 F.3d at 1181.

n4 This opinion uses the phrases "testifying expert" and "consulting expert" as they are defined in Black's Law Dictionary. See Black's Law Dictionary 600 (7th ed. 1999).

[HN3] In some cases, however, the testifying expert has had a prior non-testimonial relationship with the opposing party. In In re Ambassador Group, Inc., 879 F. Supp. at 242 [*11] (prior accounting services for state receiver did not disqualify accountant from performing accounting for defendant in an action by state receiver), Magistrate Judge Caden applied the following two-prong test:

First, was it objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed?

Second, was any confidential or privileged information disclosed by the first party to the expert?

This test has also been applied in several other cases. See Koch Refining Co., 85 F.3d 1178, 1181 (5th Cir. 1996) (disqualifying a testifying expert in view of a prior confidential business relationship); English Feedlot, Inc. v. Norden Laboratories, Inc., 833 F. Supp. 1498, 1502 (D. Colo. 1993) (no confidentiality expectation in testifying expert since opposing party waived confidentiality for that testifying expert in another case); Mayer v. Dell, 139 F.R.D. 1, 3 (D.D.C. 1991) (not reasonable for plaintiff to conclude a confidential relationship existed with potential testifying expert to preclude accountant from acting as defendants' consulting and testifying witness); Wang Laboratories, Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248 (E.D. Va. 1991) [*12] (testifying expert disqualified because other party had reason to believe confidential relationship existed and had disclosed work product to testifying expert).

Here, the declarations of Mr. Van Der Woert ("Van Der Woert") and Ms. Deardorff ("Deardorff") show that Bristol has had a substantial relationship with Dr. McGuire over the years. Balancing the other interests as required by the substantial relationship test is not necessary because, on Bristol's motion papers, Dr. McGuire should be disqualified under the confidentiality test.

Bristol has shown that it is objectively reasonable for Bristol to conclude that a confidential relationship existed with Dr. McGuire. Dr. McGuire was not a testifying expert, but rather, a consulting expert for Bristol pertaining principally to the appropriate use of its drug Taxol (R) for treating various types of ovarian cancer. Bristol's 1998 Agreement with Dr. McGuire contains a confidential provision extending to the year 2004. Furthermore, Bristol has shown that it has had a "substantial" confidential relationship with Dr. McGuire dating back to the 1990's relating to its confidential filings with the U.S. Patent Office and filings with the [*13] FDA relating to the development of proof to expand the use of Taxol (R) in various treatments of cancer. It is objectively reasonable for Bristol to conclude that it had related confidential information to Dr. McGuire during that period as to its plans for broadening the use of Taxol (R) and oral etoposide in the treatment of cancer.

Secondly, Van Der Woert in his declaration states that confidential information was disclosed to Dr.

McGuire concerning Bristol's judgment of "the future role of oral etoposide in the perspective of current and potential future chemotherapy regimens, which included the use of Taxol (R)" and that "Dr. McGuire provided his suggestions regarding Bristol's clinical trial strategies" to obtain the requisite FDA approval. (Van Der Woert Aff. P 5.) The discussion with Dr. McGuire of "the future role of oral etoposide in the perspective of current and potential future chemotherapy regimens, which included the use of Taxol (R)," (id.), invokes an analysis of the alternative treatments available and those to be available in the marketplace. n5 RPR does not contradict Van Der Woert's points. Dr. McGuire makes the conclusory statement that he had "never received [*14] confidential information from Bristol which would be relevant to my consulting for RPR in this case." n6 (McGuire Aff. P 6.)

n5 Van Der Woert states that Bristol's regulatory filing strategy, clinical trial strategy and marketing plans are essential to Bristol's business, and he states that the fact that Bristol was even considering the option of filing an SNDA for oral etoposide was important confidential business information relating to Bristol's marketing strategy. (Van Der Woert Decl. PP 6-7.)

n6 Dr. McGuire's conclusory statement raises the issue of whether he is cognizant of the breadth of the term "relevant" in the law as opposed to the scientific world.

Based on Van Der Woert's declaration, Bristol has shown that it has disclosed to Dr. McGuire its judgments to what degree, in what areas, and when oral etoposide and other regimens may be used in treating ovarian cancer. Dr. McGuire's proposed testimony about whether and to what extent, in the absence of Taxol (R), oncologists would have used or will [*15] use Taxotere, will necessarily involve a consideration of etoposide or other drugs available to treat ovarian cancer and would be substantially related to his prior discussions of these regi-

mens with Van Der Woert and raise the potential for breach of Bristol's confidences in those discussions.

In Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc., 709 F. Supp. 1279, 1989 WL 31514 (S.D.N.Y. 1989), Judge Lasker found that certain confidential information was not received by the expert in the context of the very case in which he was then named as an expert, but was so intertwined with that case as to make the confidential information relevant to his proposed testimony. Judge Lasker found that the potential of a breach of confidence was sufficient to disqualify the expert. This Court has undertaken the same analysis and reaches the same conclusion with respect to Dr. McGuire.

Lastly, although RPR points out that Bristol has used many oncologists in its clinical trials involving the treatment of cancer, it has not shown that there are not other experts in the treatment of ovarian cancer available to testify as independent experts for RPR. Furthermore, there [*16] is no showing that Dr. McGuire is a testimonial expert witness who is being deprived of his pursuit of his professional calling. See English Feedlot, Inc., 833 F. Supp. at 1505.

Review of the likelihood of other confidences of Bristol relating to the efficacy of Taxol (R) as set forth in the "pending patent application" or the previous applications for SNDAs for Taxol (R) is not necessary. Accordingly, after review of these legal precedents and weighing the equities, the Court disqualifies Dr. McGuire from presenting expert testimony on behalf of RPR in this case.

IT IS SO ORDERED.

Dated: New York, New York

January 14, 2000

Robert P. Patterson, Jr.

U.S.D.J.

LEXSEE

**EASTMAN KODAK COMPANY, Plaintiff, v. AGFA-GEVAERT N.V. and AGFA CORPORATION, Defendants.**

**02-CV-6564**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK**

**2003 U.S. Dist. LEXIS 23260**

**December 4, 2003, Decided**

**SUBSEQUENT HISTORY:** Partial summary judgment granted by, in part, Partial summary judgment denied by, in part  Eastman Kodak Co. v. Agfa-Gevaert N.V., 2004 U.S. Dist. LEXIS 12945 (W.D.N.Y., July 2, 2004)

**DISPOSITION:** [*1]  Plaintiff's motion to preclude disclosure of confidential material to defendant's expert granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder sued defendant competitor for patent infringement. The competitor served notice that it intended to disclose confidential and highly confidential information to a former patent holder employee who had been retained by the competitor as an expert. The patent holder objected and pursuant to Fed R. Civ. P. 26(c)(7), moved to preclude the competitor from disclosing confidential material to the former employee.

**OVERVIEW:** The competitor, in retaining the former employee, had assumed the risk that his knowledge of tabular grain technology was based, at least in part, on an 18 year career with the patent holder during which he was a member of a closed research group charged with developing new tabular grain film emulsions. The hearing testimony confirmed that the former employee was a member of the "silver curtain" research group, actively participated in the group's efforts to study and develop tabular grain film emulsion technology, and had access to and relied upon confidential information belonging to the patent holder pertaining to the patented technology. Moreover, there was a sufficient connection between the confidential information he had access to and the technology at issue in the patents to mandate the issuance of a protective order. In essence, the competitor would have gained an unfair advantage by providing the former employee access to confidential and highly confidential documents in order to render an expert opinion and allowing the former employee such access would have violated his confidentiality agreement with the patent holder.

**OUTCOME:** The motion to preclude the competitor from disclosing confidential information to the former employee was granted.

**CORE TERMS:** emulsion, patent, tabular, grain, confidential, technology, confidential information, research group, silver, film, disqualification, consultant, protective order, photographic, confidentiality, scientist, classified, pertaining, scientific, confidential relationship, former employer, disqualify, disclose, active member, training, curtain, microcrystals, retaining, patented, employment agreement

**LexisNexis(R) Headnotes**

*Civil Procedure > Disclosure & Discovery > Protective Orders*
*Evidence > Witnesses > Expert Testimony*
*Trade Secrets Law > Misappropriation Actions > Elements > Confidentiality*
[HN1] Federal courts have the inherent power to disqualify an expert from participating in litigation. Expert disqualification may be appropriate when a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of their employment. In determining whether to disqualify an expert based on a prior relationship with the adversary, a court must undertake the following two-step inquiry: (1) Did the adversary have a confidential relationship with the expert; (2) Did the adversary disclose confidential or privileged information to the expert

that is relevant to the current litigation? The burden is on the party who seeks disqualification of an expert to establish that a confidential relationship exists and that the confidentiality has not been waived.

**COUNSEL:** For Eastman Kodak Company, PLAINTIFF: Michael F Orman, Richard D Rochford, Nixon Peabody LLP, Rochester, NY USA.

For Agfa-Gevaert NV, Agfa Corp, DEFENDANTS: H Michael Hartmann, Jeffrey B Burgan, Jeremy C Lowe, Leydig, Voit & Mayer, Ltd, Chicago, IL USA.

For Agfa-Gevaert NV, Agfa Corp, DEFENDANTS: Stephen G Schwarz, Faraci & Lange LLP, Rochester, NY USA.

For Agfa Corp, Agfa-Gevaert NV, Counter CLAIMANTS: Stephen G Schwarz, Faraci & Lange LLP, Rochester, NY USA.

For Eastman Kodak Company, Counter DEFENDANT: Michael F Orman, Richard D Rochford, Nixon Peabody LLP, Rochester, NY USA.

**JUDGES:** JONATHAN W. FELDMAN, United States Magistrate Judge.

**OPINIONBY:** JONATHAN W. FELDMAN

**OPINION:**

### DECISION AND ORDER

Relevant Factual Background

This is a patent infringement case brought by Eastman Kodak Company ("Kodak") against Agfa-Gevaert ("Agfa"). Pursuant to a Stipulation and Protective Order agreed to by the parties, certain information produced during discovery may be designated as "Confidential" or "Highly Confidential." Under the terms of the stipulated agreement (Docket # 12), materials that are subject to this designation may not be disclosed [*2] to an outside expert or consultant without first identifying the expert or consultant to the other side and allowing opposing counsel the opportunity to object.

Agfa served notice on July 18, 2003 that it intended to disclose confidential and highly confidential information to Richard Hailstone, a former Kodak employee who has been retained by Agfa as a consultant for purposes of this litigation. Pursuant to the terms of the Stipulation and Protective Order, Kodak objected and brought the instant motion pursuant to <u>Federal Rule of Civil Procedure 26(c)(7)</u> seeking to preclude Agfa from disclosing confidential material to Hailstone.

Oral argument was heard on October 31, 2003 and following that proceeding, the parties requested an evidentiary hearing. The Court conducted a hearing on November 17, 2003. Thereafter, the parties submitted additional briefing. (Docket # # 22, 25). Having considered the testimony adduced at the hearing as well as the parties' respective submissions, I hereby **grant** Kodak's motion.

Discussion

[HN1] Federal courts have the inherent power to disqualify an expert from participating in litigation. n1 <u>Popular, Inc. v. Popular Staffing Servs. Corp., 239 F. Supp.2d 150, 152 (D.P.R. 2003).</u> [*3] Expert disqualification may be appropriate when "a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of their employment." Space Systems/Loral v. Martin Marietta Corp., 1995 U.S. Dist. LEXIS 22305, 1995 WL 686369 at *2 (N.D. Cal. Nov. 15, 1995). In determining whether to disqualify an expert based on a prior relationship with the adversary, a court must undertake the following two-step inquiry: (1) Did the adversary have a confidential relationship with the expert; (2) Did the adversary disclose confidential or privileged information to the expert that is relevant to the current litigation? <u>Greene, Tweed of Delaware v. DuPont Dow Elastomers, LLC, 202 F.R.D. 426, 428 (E.D. Pa. 2001).</u> The burden is on the party who seeks disqualification of an expert to establish that a confidential relationship exists and that the confidentiality has not been waived. <u>Id., 202 F.R.D. at 429</u> ("The party who seeks disqualification of an expert has the burden of showing the existence of confidentiality and its non-waiver").

---

n1 Kodak's moving papers do not expressly move to disqualify Hailstone as an expert but rather seek a protective order precluding confidential documents being disclosed to him. However, both Kodak and Agfa agree that the legal analysis applicable to expert disqualification controls the issuance of the protective order Kodak seeks here. Moreover, it seems apparent that, as a practical matter, an order precluding Hailstone from receiving confidential materials in this case would severely limit, if not nullify his usefulness as a consultant or expert to Agfa. Nevertheless, in it's post-hearing brief (Docket # 22), Kodak argued that "the lack of candor displayed by Mr. Hailstone in connection with this motion" requires his "complete disqualification" from this case. Because complete disqualification of Hailstone was not sought in Kodak's initial moving papers and is being raised for the first time in

Kodak's post-hearing brief, this Court declines to order such relief. If Kodak wants the Court to order the complete disqualification of Hailstone, it should file a supplemental motion and allow Agfa to properly respond.

[*4]

1. Existence of a Confidential Relationship: There is no question (and indeed the parties do not dispute) that the first element has been satisfied here. While Hailstone is currently an RIT professor, he previously worked at Kodak for eighteen (18) years during which time he unquestionably had access to confidential proprietary information belonging to Kodak. Thus, Kodak had a "confidential relationship" with Hailstone and, in fact, even today Hailstone is obligated to abide by the terms of an employment agreement he entered into with Kodak that prevents him from disclosing to the outside world any classified company confidential information acquired during his employment with Kodak. n2

n2 In his employment agreement, Hailstone promised, in relevant part, that "I will not, either during my employment by Kodak or thereafter, disclose to anyone or make any use of classified company information which I have acquired, or may acquire during my employment relating to any of the business of Kodak, except as such disclosure or use may be required in connection with my work as an employee of Kodak". See Exhibit A, Docket 15.

[*5]

2. Disclosure of Confidential Information Relevant to the Lawsuit: The critical question then is whether Hailstone received confidential information "that is relevant" to the current patent litigation during his lengthy employment with Kodak. See Wang Laboratories, Inc. v. CFR Assocs., 125 F.R.D. 10, 13 (D. Mass. 1989) (emphasis added). Without getting too technical, three of the patents at issue here, the '425, '426 and '520 patents, relate to tabular grain film emulsions. (For ease of reference, these patents will be referred to as the "T-Grain" patents). During the time period that Hailstone worked for Kodak, Kodak scientists were developing and perfecting film emulsions which utilized tabular microcrystals or tabular grains to absorb light during the film exposure process. The tabular shaped crystals had several advantages over other types of film emulsion grains including: (1) improved image quality, (2) better image sharpness in radiological films and (3) reduced production costs due the need for less silver in film coatings.

Kodak alleges that its research and development efforts resulted in obtaining the three T-Grain patents in 1982.

Hailstone worked [*6] at Kodak from 1972 to 1990. The portion of Hailstone's *Curriculum Vitae* ("CV") pertaining to his Kodak employment substantiates Kodak's claim that he was involved with the development of T-Grain technology. (Exhibit B, Docket # 15). According to his CV, between 1981 and 1982 Hailstone worked in Kodak's London, England laboratories conducting "studies of the mechanism of latent image formation in tabular photographic microcrystals." (emphasis added). Between 1982 and 1990; Hailstone's CV specifies that he was a Kodak senior scientist and was involved in evaluating "photographic emulsions having tabular microcrystals." (emphasis added). During his eighteen year career, Hailstone's CV asserts that he was involved with the issuance of "over 50 technical reports." Some of the reports Hailstone co-authored specifically pertained to silver halide tabular grain technology and, indeed, are among the confidential and highly confidential documents being produced by Kodak in response to Agfa's discovery requests.

Despite the foregoing, Agfa unshakably maintains that Hailstone "did not learn of confidential information pertaining to the patents in suit during his tenure at Kodak. [*7] " See Agfa's Memorandum of Law at page 2 (Docket # 17) (emphasis supplied). Hailstone himself submitted an affidavit in which he represented that "none of the work [he did during his eighteen years at Kodak] is the subject of any of the patents in suit." See Affidavit of Richard K. Hailstone (Docket # 18) at PP 14, 15, 16 and 19. Hailstone further stated that during his tenure with Kodak he "was not involved with or privy to any activity with respect to the patent application that resulted in the patents in suit". Id. at P 22. (emphasis added).

3. Summary of Hearing Testimony: In order to sort out these conflicting claims, a factual hearing was held on November 17, 2003. Hailstone testified, as did Robert Booms, one of the inventors of the '520 patent and a current director of research and development at Kodak. While much of the hearing testimony necessarily concerned technical aspects of tabular grain emulsions, as explained below, at the end of the day Agfa's insistence that Hailstone "did not learn of confidential information pertaining to the patents in suit during his tenure at Kodak" (Docket # 17 at page 2) was simply not credible.

During the [*8] mid 1970's, Kodak decided to pursue the development of high aspect ratio silver emulsions. A research group within Kodak consisting of approximately 100 scientists was formed to develop and test new film emulsions, including tabular silver halide emulsions. The research group was described by Booms

as a "closed community" within Kodak and there were "steep" confidentiality restrictions applicable to the work the research community performed. Those working in the group were known as "working behind the silver curtain." While the research group itself was very closed, there was "very open sharing within that community." (Tr. n3 At 77).

n3 Transcript of factual hearing held on November 17, 2003, Docket # 24.

Richard Hailstone was an active member of the "silver curtain" research group. Hailstone testified that at the time he began his tabular grain work at Kodak, he did not believe anyone had yet "developed a commercial tabular grain product." (Tr. 55). To be sure, Hailstone's primary responsibility was not in the [*9] creation of the emulsions, but rather in studying and measuring the efficiency of emulsions provided by other members of the research group. Nevertheless, the proof at the hearing demonstrated that as an active member of the research project, Hailstone had access to and received confidential scientific data from other members of the groups regarding the tabular grain emulsions he was testing, including information regarding the ingredients in the emulsions, the precipitation of the emulsions and the sensitization of the emulsions. Hailstone's access to Kodak's confidential scientific data regarding the particulars of the tabular grain emulsions directly contradicted Agfa's pre-hearing contention that Hailstone "was not privy to confidential information about how these [tabular grain] emulsions were made." See TOA n4 at 31.

n4 Transcript of October 31, 2003 oral argument.

Indeed, on cross-examination Hailstone was shown two confidential technical reports he authored concerning tabular grain emulsions. The [*10] first, prepared in March 1983, concerned emulsion studies Hailstone conducted in 1981 and 1982 while working at Kodak's Harrow Laboratory in England. One of the emulsions tested was precipitated by Francis Evans, one of the inventors of the '520 patent. (Tr. 58). Hailstone conceded that the report was classified at the highest level of confidentiality for emulsion research at Kodak and contained confidential details about Evans' prototype "T-Grain" emulsion. (Tr. 60-63). Hailstone also conceded that during the 1981-82 time period he was provided confidential information from Kodak about the size and coverage of the grains used in the "T-Grain" emulsions as well as confi-

dential information on how the emulsions were sensitized. (Tr. 67-68).

The second report was co-authored by Hailstone in 1985 and also was classified at Kodak's highest level of emulsion confidentiality. Hailstone's 1985 report concerned studies of two tabular grain emulsions and contained drawings, details and descriptions of some of the precipitation procedures used to make the "T-Grain" emulsions. (Tr. 64-67). Hailstone testified that during last six months he was employed at Kodak, he attended a training course [*11] and "learned about" Kodak's procedures to make emulsions, but the training concerned cubic grain and not tabular grain emulsions. (Tr. 53). Hailstone specifically denied that he "went through any type of training with regard to tabular grain emulsions" while employed by Kodak. (Tr. 42). However, Hailstone's testimony about his training was directly and credibly contradicted by Boom, who was the supervisor of the Kodak training course Hailstone took. Boom testified that the portion of the Kodak training program Hailstone attended provided "in depth" confidential information on Kodak's "T-Grain" emulsions, including laboratory work on actually creating tabular emulsions. (Tr. 81, 114).

4. The Need for a Protective Order: Relying on Greene, Tweed of Delaware v. Dupont Dow Elastomers, L.L.C., 202 F.R.D. 426 (E.D. Pa. 2001), Agfa argues that "everybody at Kodak" has some connection to photography and in order to be disqualified Kodak must do more than demonstrate that Hailstone had "general knowledge" of photographic science. (TOA at 32). This Court agrees. But the record here demonstrates far more than *ipse dixit* assertions by Kodak. Hailstone was not a part-time [*12] cashier in Kodak's company store. He was a senior scientist employed by Kodak for eighteen years who was an active member of a closed group of researchers charged with developing, creating and testing "T-Grain" photographic emulsions. The work of this research group involved the use and sharing of highly confidential information about high aspect ratio silver halide tabular grains and the utilization of such tabular grains in making photographic emulsions. The record here certainly supports a finding that the work of the "Silver Curtain" research group, of which Hailstone was a member, concerned "the specific technology at issue in this lawsuit," as the court in Greene demanded. Id. at 430 (internal citation omitted). See also Wang, 125 F.R.D. 10, 11 (D. Mass. 1989) (court barred defendant from retaining former Wang employee who had developed software covered by patent in issue); cf. Viskase Corp. v. W.R. Grace & Co., 1992 U.S. Dist. LEXIS 619, 1992 WL 13679 at *2-3 (N.D. Ill. January 24, 1992) (court refused to disqualify expert where he had general experience from working with defendant but no experience specific to the patented prod-

ucts or process). [*13] See generally, Brian Burke, Disqualifying an Opponent's Expert When the Expert is Your Client's Former Employee, 66 Def. Couns. J. 69, (January 1999) (Where the "consultant's expertise is based on information he gained during his employment and that information will be used to assist the adversary, the consultant should be enjoined ... from assisting any adversary in litigation of his former employer").

The development of the scientific technology that resulted in the "T-Grain" patents was not an instantaneous "eureka!" type discovery. Rather, as Boom's hearing testimony made clear, developing the T-Grain technology was an extended process involving a body of scientific work, with each research step providing a "building block" for the next. See generally Kofron and Boom, Kodak T-Grain Emulsions in Color Films, 49 J. Soc. Photographic Science Technology (1986) (Hearing Exhibit 9). Even after the "T-Grain" patents were applied, Kodak's "silver curtain" research group, including Hailstone, continued to study, test and analyze the tabular grains in order to improve upon this specific emulsion technology. As a member of the research group charged with developing "T-Grain" [*14] photographic emulsions, Hailstone had access to, knowledge of and training in many of the "building blocks" that produced Kodak's "T-Grain" patents. To expect Hailstone to somehow suppress that knowledge by not revealing confidential information encompassed by his employment agreement with Kodak when he has been retained by Agfa to evaluate the validity of patents pertaining to the specific technology he spent over a decade studying for Kodak is unworkable if not quixotic. Moreover, given Hailstone's extended participation in the research group that generated the tabular grain technology at issue in this action, allowing Hailstone current access to confidential Kodak information in order to evaluate the patents in issue would give an unfair advantage to Agfa.

That Hailstone's primary role within the research group was to test the performance of the "T-Grain" emulsions and not generate the emulsion itself, does not immunize him from having to account for the confidential nature of his work at Kodak. The issue in the present dispute is not whether Hailstone directly worked on the patents in issue or singlehandedly created the technology that was ultimately patented. This Court has no [*15] reason to doubt Hailstone's assertion that he never acquired sufficient confidential information while working for Kodak to "go into the laboratory and reproduce [a "T-Grain"] emulsion." (Tr. 61, 65). But the material questions are (1) whether Hailstone's work at Kodak involved confidential proprietary information that is relevant to the current litigation and (2) if so, whether use of that confidential knowledge would give him an unfair advantage in acting as a patent expert for Agfa? Based on the

testimony at the hearing, the credibility of the witnesses, the documents received in evidence as part of the record and giving deference to the legal standard as set forth in this Decision and Order, the Court finds Kodak to have met its burden on both issues. n5

n5 Agfa's claim that by granting Kodak's motion "scores" of people "who had any relationship whatsoever to T-grain technology at Kodak" would also be prevented from consulting with Agfa strikes this Court as a bit hyperbolic. See Agfa's Post-Hearing Memorandum of Law at page 10 (Docket # 22). This decision is, of course, fact specific. The Court's holding is limited to Agfa retaining a patent expert who (1) spent almost two decades working as a senior scientist for a litigation adversary; (2) signed a confidentiality agreement with his former employer promising never to "disclose" or "make any use" of classified company information acquired during his employment; (3) was an active member of a closed research group that was charged with developing, analyzing and testing a very specific scientific technology that ultimately resulted in that specific technology being patented; (4) was trained in, had access to and utilized confidential scientific information in performing his duties as part of the research group; and (5) now wants to serve as a patent consultant in litigation against his former employer with respect to issues relevant to the very technology he worked on for his former employer. The Court respectfully disagrees that such a holding would "be a major break from prior case law." Id.

[*16]

Conclusion

There is little doubt that Richard Hailstone would be a knowledgeable and valuable witness for Agfa with respect to the patents in suit involving Kodak's "T-Grain" film emulsions. But in retaining Hailstone, Agfa assumed the risk that his knowledge of tabular grain technology was based, at least in part, on an 18 year career with Kodak during which he was a member of a closed research group charged with developing new tabular grain film emulsions. The hearing testimony confirmed that Hailstone was a member of the "silver curtain" research group, actively participated in the group's efforts to study and develop tabular grain film emulsion technology and had access to and relied upon confidential information belonging to Kodak pertaining to "T-Grain" technology. While Hailstone may not have directly worked on the patents themselves, there is a sufficient connection be-

2003 U.S. Dist. LEXIS 23260, *

tween the confidential information Hailstone had access to and the technology at issue in the "T-Grain" patents to mandate the issuance of a protective order. Because I find that (1) Agfa would gain an unfair advantage by providing Hailstone access to confidential and highly confidential Kodak documents [*17] in order to render an expert opinion on the validity of the "T-Grain" patents, and (2) allowing Hailstone such access would vio-

late Hailstone's confidentiality agreement with Kodak, Kodak's motion to preclude is **granted.**

**IT IS SO ORDERED.**

JONATHAN W. FELDMAN

United States Magistrate Judge
Dated: December 4, 2003

LEXSEE

**DOUGLAS J. MICHELSON, Plaintiff, v. MERRILL LYNCH PIERCE FENNER & SMITH, INC., NELSON BUNKER HUNT, WILLIAM HERBERT HUNT, DOUGLAS HERBERT HUNT, LAMAR HUNT, INTERNATIONAL METALS INVESTMENT COMPANY, LTD., JOHN J. CONHEENEY, CONTI-COMMODITY SERVICES, INC., CONTI-CAPITAL MANAGEMENT, INC., CONTI-CAPITAL, LTD., NORTON WALTUCH, GILIAN FINANCIAL, ACLI INTERNATIONAL COMMODITY SERVICES, INC., BACHE HALSEY STUART SHIELD, INC., SHIEK MOHAMMED ABOUD AL AMOUDI, SHIEK ALI BIN MUSSALEM, MAHMOUD FUSTOK, PRINCE FAISAL BIN ABDULLAH, NAJI ROBERT NAHAS, BANQUE POPULAIRE SUISSE, ADVICORP ADVISORY AND FINANCIAL CORPORATION S.A., PLACID OIL COMPANY, COMMODITY EXCHANGE INC., THE CHICAGO BOARD OF TRADE, IRWIN N. SMITH, JOHN DOES NUMBER TWO TO TEN, Defendants**

**No. 83 Civ. 8898 (MEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1989 U.S. Dist. LEXIS 3013; 1989-1 Trade Cas. (CCH) P68,509; Comm. Fut. L. Rep. (CCH) P24,426**

**March 28, 1989, Decided**
**March 28, 1989, Filed**

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff individual alleged that defendant corporations conspired to manipulate the silver market during the fall of 1979 and the spring of 1980, causing the price to rise to an unprecedented high to his detriment. Plaintiff named an expert. Defendants moved to disqualify the expert, alleging that he received confidential information in a related action, also moved for sanctions. Plaintiff moved for an in camera hearing and for sanctions.

**OVERVIEW:** All of the parties contacted and interviewed the expert. Defendants argued that they gave the expert confidential information. The expert did not recall such information. The court reasoned that his conversations with various parties would subliminally affect his testimony and assessment of the facts. It was immaterial that defendants did not give him the confidential information in the context of the case in which he was named as an expert. The subject of the two cases were intertwined. The case law that addressed disqualification of witnesses who received confidential information from another party supported the decision to grant the motion to disqualify. However, the court qualified this decision with the caveat that if plaintiff's motion for partial summary judgment was granted, the expert could limit his testimony to an assessment of damages. The court denied the request for an in camera hearing because affidavits were sufficiently persuasive to show that confidential information was imparted to the expert. The court denied sanctions to plaintiff and awarded reduced sanctions to defendants.

**OUTCOME:** The court granted defendants' motion to disqualify the expert. The court granted defendants' motion for sanctions. The court denied plaintiff's motions for an in camera hearing and for sanctions.

**CORE TERMS:** conti, confidential information, stoller, motion to disqualify, confidence, silver, disqualification, expert witness, tampering, testifying, deposition, remember, in camera, imparted, appearance of impropriety, accusation, consultant, contacted, laboratory, consulted, fine, lack of personal jurisdiction, disqualified, conversations, resubmitted, disqualify, withdrawn, spent, financial resources, disclosure

1989 U.S. Dist. LEXIS 3013, *; 1989-1 Trade Cas. (CCH) P68,509;
Comm. Fut. L. Rep. (CCH) P24,426

**LexisNexis(R) Headnotes**

*Evidence > Witnesses > Exclusion & Sequestration of Witnesses*
[HN1] The rules governing disqualification of witnesses who have received confidential information are designed to protect against the potential breach of such confidences, even without any predicate showing of actual breach. The threat or potential threat that confidences may be disclosed is enough.

*Evidence > Witnesses > Exclusion & Sequestration of Witnesses*
*Evidence > Witnesses > Expert Testimony*
[HN2] Canon 4 of the American Bar Association Code of Responsibility, providing for preservation of a client's confidences and secrets, does not require disqualification of the expert, when there is no evidence that confidences have been divulged or "that protection against disclosures cannot be provided."

*Civil Procedure > Sanctions > Baseless Filings*
*Legal Ethics > Professional Conduct > Frivolous Claims*
[HN3] By its very language, Fed. R. Civ. P. 11 compels the imposition of sanctions where the papers submitted are found not to be well grounded in fact. By employing the imperative "shall," a court believes the drafters intended to stress the mandatory nature of the imposition of sanctions pursuant to this rule."

*Legal Ethics > Professional Conduct > Frivolous Claims*
*Civil Procedure > Sanctions*
[HN4] A court retains discretion to fashion the form and measure of sanctions, considering the gravity of the Fed. R. Civ. P. 11 violation, the circumstances of the violation within the context of the case, and the financial resources of the respective parties. The assessment of fees must be fair and reasonable, and made with an eye toward the equities of the case, including the financial resources of the parties.

**COUNSEL:** [*1]

DOUGLAS J. MICHELSON, ESQ., Albuquerque, New Mexico, Attorney Pro Se.

SHMUEL B. KLEIN, ESQ., Brooklyn, New York, Attorney for Plaintiff.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, ESQS., New York, New York, Attorneys for Defendants ContiCapital Management, Inc. and ContiCapital Limited, Of Counsel: RICHARD A. ROSEN, ESQ., MARY ANNE CASE, ESQ.

CURTIS, MALLET-PREVOST, COLT & MOSLE, ESQS., New York, New York, Attorneys for Defendant Mahmoud Fustok, Of Counsel: HERBERT STOLLER, ESQ., TURNER P. SMITH, ESQ.

**JUDGES:**

Morris E. Lasker, United States District Judge.

**OPINIONBY:**

LASKER

**OPINION:**

OPINION

MORRIS E. LASKER, UNITED STATES DISTRICT JUDGE

In this action, plaintiff Douglas Michelson contends that the defendants conspired to manipulate the silver market during the fall of 1979 and spring of 1980, thereby causing the price to rise to an unprecedented high to his detriment. Michelson's recent naming of Dr. Richard J. Teweles, a professor at California State University at Long Beach, as his expert has sparked the motions that are the subject of this decision.

Defendant Mahmoud Fustok moves, with the support of ContiCapital Management, Inc. ("CCM") and ContiCapital Limited ("CCL") n1 (collectively "defendants"), to disqualify Teweles because Teweles received confidential information [*2] from each of them when engaged in a related action, Fustok v. ContiCommodity Services, Inc., 82 Civ. 1538 (MEL), and in which he was disqualified from testifying as an expert.

> n1 CCM and CCL support this motion but are not moving parties because they believe their pending motions to dismiss for lack of personal jurisdiction will be granted. Their motions have in fact been granted in a separate decision issued this day.

This motion has sparked others: plaintiff Michelson moves for an in camera hearing to determine what, if any, confidential information defendants imparted to Teweles and for sanctions pursuant to Fed. R. Civ. P. 11 on the ground that the defendants' motion is baseless and harassing; defendants similarly seek sanctions against Michelson and his counsel on the ground that plaintiff's

1989 U.S. Dist. LEXIS 3013, *; 1989-1 Trade Cas. (CCH) P68,509;
Comm. Fut. L. Rep. (CCH) P24,426

motion was made in bad faith and without factual investigation or reasonable basis. n2

> n2 Plaintiff subsequently withdrew an additional motion for sanctions, filed in response to defendants' motion for sanctions.

The defendants' motion to disqualify Teweles is granted, as is their motion for sanctions. Michelson's motions for sanctions and for an in camera hearing are [*3] denied.

## I. BACKGROUND

There is no dispute that Dr. Teweles was contacted and interviewed by all of the parties involved in this motion. The facts recounted below, in chronological order, set forth the timing and substance of these contacts.

By letter of October 1, 1981, Michelson contacted Dr. Teweles, advising him of Michelson's assessment of the market, apprising Teweles of Michelson's developing trial strategy, and seeking advice. The letter indicates that Michelson sent Teweles a check to compensate him for his review of certain material.

In 1982, Fustok initiated Fustok v. ContiCommodity Services Inc., against, among others, ContiCommodity Services, Inc., CCM and CCL (collectively "Conti" or "Conti defendants"), whom Fustok maintained had engaged in unauthorized trading and had fraudulently allocated some of his silver contracts to his commodities trading account.

In September, 1982, Richard Rosen, of Paul, Weiss, Rifkind, Wharton & Garrison, as counsel for the Conti defendants, engaged Teweles as a consultant and expert witness for the Conti defendants in Fustok. According to his affidavit, Rosen subsequently imparted confidential information to Teweles about the defense [*4] case.

> We described to him major issues in the case, discussed our defenses to specific claims raised by Fustok, disclosed to him information that had not yet become available in the course of discovery, and disclosed certain of our assessments of the strengths and weaknesses of plaintiff's case and our own. n3

During the course of the year, Rosen specifically discussed with Teweles Fustok's allegations that Conti established Fustok's accounts without an initial margin, that his accounts at conti were improperly documented, and that losses were retroactively allocated to his accounts. n4

> n3 Notice of Motion of ContiCommodity Services, Inc. to Disqualify Teweles in Fustok v.

ContiCommodity Services, Inc. ("Conti Motion"), Annexed Affidavit of Richard A. Rosen at para. 2 (July 18, 1985) ("Rosen Affidavit of July 18, 1985") (resubmitted in support of Fustok's Motion to Disqualify Teweles in Michelson v. Merrill Lynch, Pierce, Fenner & Smith).

> n4 Rosen Affidavit of July 18, 1985 at paras. 9-11.

On March 11, 1983, Philip T. Powers, then Assistant Chief Counsel of ContiCommodity Services, Inc., met with Teweles for several hours. n5 Powers gave Teweles one dollar, which, [*5] according to Powers, Teweles agreed was sufficient as an initial retainer, to ensure confidentiality prior to discussing with him Fustok's arguments against the Conti and Conti's theories of defense. n6

> n5 Conti Motion, Exhibit C (Affidavit of Philip T. Powers at para. 8 (July 11, 1985)) ("Powers Affidavit").

> n6 Id. at para. 9. In his deposition, Teweles recalled receiving the dollar, but did not remember discussing confidentiality. He did state, however, that he would have assumed that any information he received from the defendants would not be used in any way to hurt them. Conti Motion, Exhibit C (Deposition of Teweles of June 19-20, 1985 at 249, 266, 270) ("Teweles Deposition").

On July 7, 1983, Michelson filed his complaint in this action, in which he alleged that the defendants, who included Fustok and the Conti defendants, n7 had conspired to manipulate the silver market in 1979 and 1980 and that their fraudulent behavior had caused him to lose substantial sums of money.

> n7 The claims against ContiCommodity Services, Inc. were subsequently dismissed for lack of personal jurisdiction. Michelson v. Merrill Lynch, Pierce, Fenner & Smith, 619 F. Supp. 727, 741-42 (S.D.N.Y. 1985).

[*6]

In January, 1984, in a letter to Rosen, Teweles acknowledged receipt of the decision denying defendants' motion for summary judgment in Fustok, as well as the underlying papers, and mentioned having spent several hours speaking with Philip Powers. n8 In the spring of 1984, Rosen advised Teweles that the defendants would not be using him as either a consultant or an expert witness; n9 this was reaffirmed in letters of July 5 and 13, 1984. n10

1989 U.S. Dist. LEXIS 3013, *; 1989-1 Trade Cas. (CCH) P68,509;
Comm. Fut. L. Rep. (CCH) P24,426

n8 Reply Affidavit of Richard A. Rosen in Fustok v. ContiCommodity Services, Inc. (July 29, 1985), Exhibit A (Letter of January 24, 1985 of Richard J. Teweles to Richard A. Rosen) (resubmitted in support of Fustok's Motion to Disqualify Teweles in Michelson v. Merrill Lynch, Pierce, Fenner & Smith).

n9 Rosen Affidavit of July 18, 1985 at para. 3.

n10 Fustok's Notice of Motion (January 14, 1988), Exhibit 2 (Letter of May 20, 1985 of Dr. Richard J. Teweles to Herbert Stoller).

On May 16, 1985 Herbert Stoller of Curtis, Mallet-Prevost, Colt & Mosle, counsel for Fustok, first approached Teweles as a possible expert for the trial of Fustok v. ContiCommodity Services, Inc.. After interviewing Teweles for two days, on [*7] May 20, 1985, Stoller retained him as a consultant and expert witness; according to Stoller, Teweles agreed to keep the information imparted to him confidential. Teweles advised Stoller in a letter of May 20, 1985 that, although he had spoken with Rosen and met with Philip Powers of Conti-Commodity Services, Inc., neither discussed legal theories or strategies concerning the case. n11 Teweles stated that he had no recollection of being given any facts about the case that were not reflected in public documents. n12

n11 Id.

n12 Id.

On May 31, 1985, when served with Fustok's pretrial order, Conti learned that Teweles was being designated as Fustok's expert in Fustok. On July 19, 1985, Conti moved to disqualify Teweles from testifying because he had received confidential information from Conti about the case; any role as an expert was argued to give Fustok an unfair advantage, to breach Teweles' duty to preserve Conti's confidences, and to create an appearance of impropriety. Fustok opposed the motion on the grounds that Teweles' previous conversations with Conti would not bear on his testimony and that Teweles represented that the information he had received was a [*8] matter of public record. Teweles stated in deposition that he was "absolutely positive" that he did not remember any confidential information and that he did not recall Conti giving him any confidential information. n13

n13 Teweles Deposition at 401-402.

On July 31, 1985, the court granted the motion to disqualify Teweles from testifying as an expert in Fustok. The motion was granted on the grounds that 1) even if Teweles could not remember what Rosen told him, he could be subliminally affected by the information, 2) permitting him to testify would create the dilemma whether Rosen should testify against him, and 3) his lack of objectivity made it inappropriate for him to appear as an expert. n14

n14 Transcript of Fustok v. ContiCommodity Services, Inc., 82 Civ. 1538 (MEL) at 36-37 (July 31, 1985).

All was quiet on the Teweles front until November 12, 1987, when Michelson advised defendants that Teweles would testify at trial "concerning conditions in the silver market and their effects on plaintiff's business," n15 which spawned the four motions that are the subject of this decision.

n15 Affidavit of Dr. Richard J. Teweles at para. 2 (November 5, 1987).

DISCUSSION [*9]

1. Disqualification

Fustok contends, and CCL and CCM agree, that Teweles should now be disqualified because of his conflict of interest, his duty to maintain confidences, and the appearance of impropriety that would result were he to testify as an expert. Michelson opposes the motion on the grounds that 1) Teweles knows of no confidence given him by either Stoller or Rosen, 2) Teweles' testimony at the Michelson trial will not address the alleged fraud by Conti of Fustok, the subject of the Fustok action, and 3) disqualification would prejudice the plaintiff. The factual context and arguments on this motion are not only reminiscent of, but also indistinguishable in any significant fashion, from those presented on the motion to disqualify Teweles in the Fustok action. Accordingly, as in Fustok, the motion to disqualify must be granted.

As was true in the Fustok action, the moving parties contend that they gave Teweles confidential information; Teweles now, as he did then, does not recall such information and is unsure if he even received any at any time. n16 However, as in Fustok, it does not follow that his testimony is appropriate simply because he cannot [*10] remember any information given to him by the moving party. His conversations with Rosen, Powers, and Stoller could subliminally affect his testimony and assessment of the facts. In addition, as was true in Fustok, if Teweles were to testify, counsel for the defendants would face the

1989 U.S. Dist. LEXIS 3013, *; 1989-1 Trade Cas. (CCH) P68,509;
Comm. Fut. L. Rep. (CCH) P24,426

dilemma of whether to testify as to their conversations with Teweles so as to impeach his credibility.

    n16 Michelson was instructed to submit an affidavit of Teweles. The affidavit was shown to the court, but not to the parties to this motion because Michelson contended it contained privileged information. For the same reason, the affidavit was not filed.

It is true that Fustok, CCM, and CCL did not hire or consult Teweles as an expert for the Michelson case. Thus, unlike in Fustok, they did not give him confidential information in the context of the very case in which he is now named as an expert. However, this distinction is not sufficiently significant, when considered in the factual context of this case, to compel a contrary result from that of Fustok. Although Michelson does not plan to question Teweles about Conti's alleged fraud of Fustok, the subject of the case is so intertwined [*11] with Michelson as to make the information about Fustok's transactions with Conti relevant. For example, the transactions at issue in Fustok are likely to be argued, as was true in the companion case of Minpeco v. ContiCommodity Services, Inc., 81 Civ. 7619 (MEL), to evidence the participation of Fustok in the alleged conspiracy. In fact, in Minneco, Fustok's primary defense at trial was that he had been cheated on various silver transactions and thus those transactions could not be construed to support a finding that he had participated in the conspiracy. Thus, the strategies of Fustok and Conti and their construction of these transactions, even if discussed with Teweles only in the context of the Fustok action, are likely to be relevant to Michelson.

In addition to the precedent of the decision of Fustok, the limited law addressing disqualification of witnesses who have received confidential information from another party supports the decision to grant the motion to disqualify. For example, in Marvin Lumber & Cedar Co. v. Norton Co., 113 F.R.D. 588 (D. Minn. 1986), the Magistrate granted the plaintiff's motion to disqualify an independent testing laboratory [*12] retained by the defendant from serving as its consultant or expert witness, because the plaintiff had previously used the laboratory to test its product. Plaintiff, a manufacturer of insulated windows, alleged in the underlying action that the defendant had injured plaintiff's commercial reputation because the sealant defendant manufactured and plaintiff used was defective. The laboratory contended that no conflict existed and that it had not and would not divulge to defendant any information it had received from plaintiff; defendant also stated that it had received no confidential information. Applying the standard applicable to attorney's faced with such a conflict, the Mag-

istrate found that [HN1] "[t]he rules governing disqualification are designed to protect against the potential breach of such confidences, even without any predicate showing of actual breach. . . . The threat or potential threat that confidences may be disclosed is enough." 113 F.R.D. at 591. Finding that the matters as to which the defendant sought the expert's testimony were substantially related to those for which it was consulted by the plaintiff, in that the factual contexts were similar or related, the court granted [*13] the motion to disqualify. Similarly, in the case at hand, the matters Fustok and Conti discussed with Teweles are substantially related to those that underlie Michelson's claims against them. Although Teweles may not have revealed confidences to the plaintiff, the potential exists.

The facts presented in the motion more closely resemble those of Marvin Lumber than of EEOC v. Locals 14 and 15, IOUE, 24 Fair Empl. Prac. Cas. (BNA) 1821 (S.D.N.Y. 1981), in which Judge Broderick denied a motion to disqualify an expert, retained by the plaintiff, whose partner had received confidential information when consulted by the defendants. Judge Broderick held that Canon 4 of the American Bar Association Code of Professional Responsibility, [HN2] providing for preservation of a client's confidences and secrets, did not require disqualification of the expert, because there was no evidence that confidences had been divulged or "that protection against disclosures cannot be provided." Id. at 1826.

In this case, while there is no evidence that confidential information has been disclosed, there is no way to protect against a potential future breach. In EEOC, the two parties had given the information [*14] to different individuals, who had separate offices and files. In this case, a single individual has all the information; try as he might, Teweles cannot possibly create separate spaces within his memory equivalent to the protective divisions in EEOC.

Of course, Michelson's argument that he will be prejudiced by disqualification of Teweles cannot be ignored. Unlike Fustok, who had spent 15-20 hours working with Teweles prior to his disqualification, Michelson contends that he has spent hundreds of hours with Teweles, time that he cannot afford to replicate with another expert. Whereas Teweles was one of three experts identified by Fustok, Michelson expresses serious doubt about his ability at this late date to find a satisfactory expert who has not been contacted by one or more of the defendants in the related silver actions. However, the prejudice to Michelson is not such that it overcomes the risk that Teweles will minimally be subconsciously affected by the information he received previously from defense counsel. Permitting him to testify would at best create an appearance of impropriety and at worst compromise the

1989 U.S. Dist. LEXIS 3013, *; 1989-1 Trade Cas. (CCH) P68,509;
Comm. Fut. L. Rep. (CCH) P24,426

proceedings by providing plaintiff with confidential information. [*15] Unlike Fustok, whose expert was disqualified a short time before trial, Michelson's case will not be tried in the near future; time remains for him to find and prepare a new expert.

However, because the prejudice is not negligible, the motion to disqualify is granted with one caveat. Should Michelson's pending motion for partial summary judgment against Fustok, as well as others, based on the collateral estoppel effect of the Minpeco verdict be granted, it is conceivable, as plaintiff suggests, that Teweles' testimony could be limited to damages. n17 Then and only then does it appear that Teweles' testimony might not pose the problems of an appearance of impropriety or disclosure of confidences discussed above. Thus, should the case take the posture described above, plaintiff may propose and defendant Fustok oppose Teweles' designation as an expert, with his testimony limited to an assessment of damages.

n17 Teweles' testimony would not prejudice CCL and CCM in light of the granting of their motions to dismiss the complaint against them for lack of personal jurisdiction.

* * * * *

As the above discussion indicates, I find it unnecessary to hold a hearing at which Rosen and [*16] Stoller must detail the confidential information they gave Teweles. Although Michelson contends that Teweles denies having ever received any confidential information, Teweles, in his deposition of 1985, did not flatly deny having received such information; he only stated that he did not remember any. Moreover, the affidavits submitted in context of the Fustok motion, which were resubmitted for this motion (and supplemented), were sufficiently persuasive to establish that confidential information had been imparted to Teweles and thus to make a hearing unnecessary. Accordingly, Michelson's motion for an in camera hearing is denied.

2. Sanctions

In answering papers to the motion, Michelson, first in his pro se papers and later in papers of counsel, accuses the defendants of witness tampering. According to Michelson, the defendants contacted Teweles not out of a desire to obtain his testimony, but simply to compromise Teweles and prevent him from testifying in any case related to the 1979-1980 events of the silver market. Michelson's counsel maintains that the defendants have no basis to preclude Teweles from testifying, other than that created by their own allegedly mischievous [*17] behavior, and thus are subject to Rule 11 sanctions. Defendants contend that the accusation of witness tamper-

ing is unfounded and merits sanctions against Michelson and his attorney. n18

n18 At a conference of November 18, 1988, defendants advised counsel for Michelson that they would move for sanctions if the accusation were not withdrawn. After considering the matter for ten days, the time allotted by the court, plaintiff's counsel reaffirmed the intent to press the accusation.

As the discussion above establishes, it cannot be said that the motion of Fustok, which CCM and CCL join, lacks foundation in either law or fact justifying Rule 11 sanctions. The affidavits of both Stoller and Rosen establish that they each respectively gave Teweles confidential information during the course of his contact with Teweles. Although each did so in the context of another case, the transactions at issue in Fustok are relevant in the case at hand. The law of Fustok, as well as of Marvin Lumber and EEOC, support the defendants' argument that their motion to disqualify is warranted with the meaning of Rule 11 by existing law.

Although there is no reason to believe that Michelson's [*18] opposition to the motion was not made in good faith, based on his representations that he would not elicit any confidential information and that he will be prejudiced by disqualification of Teweles, neither he nor his counsel have established that the claim of witness tampering was grounded in fact or supported by any investigation. Plaintiff's counsel contends that the deposition of Teweles, conducted by Rosen in the context of the Fustok case, indicates that "Mr. Rosen and Mr. Stoller each had actual knowledge of other silver litigants and the obvious conflicts which might arise in hiring Dr. Tewles [sic]. . . ." n19 The deposition established that Teweles acted frequently as an expert witness in commodity futures trading disputes. While this might well have prompted the defendants to ask Teweles if he had been retained in any related silver action, it does not constitute knowledge of the "obvious" conflicts posed by hiring Teweles. Moreover, it would have been reasonable for Stoller and Rosen to assume that, if Teweles had been retained by others whose interests conflicted with those of the clients of Stoller or Rosen, Teweles would have said so.

n19 Plaintiff's Response in Opposition to Motion to Impose Sanctions at para. 3 (January 27, 1989) (emphasis in the original).

[*19]

Furthermore, both Rosen and Stoller state in their affidavits that they did not know that Teweles had been

1989 U.S. Dist. LEXIS 3013, *; 1989-1 Trade Cas. (CCH) P68,509;
Comm. Fut. L. Rep. (CCH) P24,426

retained by Michelson until they received the notice of November 12, 1987. Rosen's affidavit, submitted in support of the motion to disqualify in this action, states,

Before Conti retained Professor Teweles as an expert witness in the Fustok action, we asked him about any potential conflicts that would disable him from serving as our expert. Professor Teweles represented to us that there were no such conflicts. I never knew that Professor Teweles had ever been retained as an expert by Michelson. n20

The correspondence from Teweles to Stoller indicates that Teweles advised Stoller of his work for Conti, but there is nothing of record to indicate that he was asked or offered information about his involvement in Michelson. Rosen's defense against the charge of witness tampering is further strengthened by the fact that he engaged Teweles almost a year before the Michelson action was filed. Thus, the evidence contradicts rather than supports the allegation that the defendants tampered with the witness.

n20 Affidavit of Richard A. Rosen at para. 2 (January 25, 1988).

[*20]

[HN3] By its very language, Rule 11 compels the imposition of sanctions where the papers submitted are found, as is true in this case, not to be well grounded in fact. Eastway Constr. Corp. v. New York, 762 F.2d 243, 254 n.7 (2d Cir. 1985) ("By employing the imperative 'shall,' we believe the drafters intended to stress the mandatory nature of the imposition of sanctions pursuant to this rule."), cert. denied, 108 S. Ct. 269 (1987). The defendants request that a fine of $ 10,000 be imposed; Fustok also asks that he be awarded costs of defending against the accusation and that counsel for Michelson be barred from further participation in this case.

[HN4] The court retains discretion to fashion the form and measure of sanctions, "consider[ing] the gravity of the Rule 11 violation, the circumstances of the violation within the context of the case, and the financial resources of the respective parties." Calloway v. Marvel Entertainment Group, 111 F.R.D. 637, 651 (S.D.N.Y. 1986). As Judge Weinfeld emphasized in Tedeschi v. Smith Barney, Harris Upham & Co., Inc., 579 F. Supp. 657, 664 (S.D.N.Y. 1984), aff'd, 757 F.2d 465 (2d Cir.), cert. denied, 474 U.S. 850 (1985), the assessment [*21] of fees must be fair and reasonable, and made with an eye toward the equities of the case, including the financial resources of the parties.

For several reasons, I decline to impose sanctions as harsh as those proposed by the defendants. Cf. Calloway, 111 F.R.D. at 650-51 (because primary pur-

pose of Rule 11 sanctions is to deter future pleadings lacking foundation, sanction need not compensate counsel for costs). First, this is the only instance in the six years of this litigation that a paper or pleading was found to lack a good faith basis. Second, the papers of defendants submitted in support of the request for sanctions were not lengthy nor did they confront complicated legal or factual arguments, thereby indicating that the burden of answering Michelson's allegation was not onerous. Third, although there is no evidence on the record of the financial condition of any of the parties, it is of some significance that Michelson has for five years proceeded in this action pro se whereas the moving defendants have consistently been represented by counsel. In addition, I believe that the purpose of sanctions -- to deter unfounded allegations and pleadings -- will be served by [*22] imposition of a smaller fine. Accordingly, Michelson and his counsel, both of whom were involved in the decision not to withdraw the allegation, n21 are jointly and severally responsible for payment of a sanction of $ 500 to Fustok and $ 500 to CCM and CCL jointly, unless upon competent evidence it is established that such a fine would be unduly burdensome. Cf. Farino v. Advest, Inc., 111 F.R.D. 345, 349-50 (E.D.N.Y. 1986) (imposing sanctions on attorney but not plaintiff because it was unclear whether and to what extent plaintiff participated in decision to pursue issue). It goes without saying that the penalty for future allegations lacking foundation, should they ever arise, would necessarily be more severe.

n21 The papers of both the plaintiff and later of counsel included allegations of witness tampering. Moreover, at the conference of November 18, 1988, counsel for Michelson indicated that he could not state whether the claim of witness tampering would be withdrawn without consulting with his client. Transcript of November 18, 1988 at 24-25. Counsel's letter to the court (dated November 2, 1988 although sent in response to matter discussed at the November 18 conference), stating that the allegation against Rosen and Stoller would not be withdrawn, indicates that counsel consulted with the plaintiff.

[*23]

* * * * *

The motion of defendants to disqualify Teweles is granted, with the one caveat noted above. Plaintiff's motion for an in camera hearing and for sanctions is denied. Pursuant to Rule 11, defendants are awarded the sanctions discussed above.

It is so ordered.

Dated: March 28, 1989

1989 U.S. Dist. LEXIS 3013, *; 1989-1 Trade Cas. (CCH) P68,509;
Comm. Fut. L. Rep. (CCH) P24,426

New York, New York

LEXSEE

**SPACE SYSTEMS/LORAL, Plaintiff, v. MARTIN MARIETTA CORPORATION, Defendant.**

**CIVIL NO. 95-20122 SW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**1995 U.S. Dist. LEXIS 22305**

**November 14, 1995, Decided**
**November 15, 1995, Filed**

**DISPOSITION:** [*1] Defendant's motion to disqualify certain expert witnesses and opposing counsel granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff satellite company sued defendant competing satellite company alleging patent infringement. Defendant moved to disqualify two of plaintiff's expert witnesses and certain attorneys from participating in the action.

**OVERVIEW:** At issue in the litigation was "attitude control" technology which enabled satellites to maintain a constant orientation towards the earth. To conduct its investigation, defendant's in-house patent counsel retained the services of two experts, both of whom had previously done work for defendant. There was no doubt that the expert who worked on the series of defendant's satellites at issue had to be disqualified as an expert witness. He was privy to substantial confidential information from defendant that was relevant to the issues in the case. He was also the named inventor of several of defendant's patents relating to attitude control. The second expert was in a different position as he did not work on the series at issue. The court agreed with the argument that he worked on "antiquated" technology and did not possess any confidential information relevant to the litigation. His disqualification would be extremely burdensome to plaintiff, but he was prohibited from disclosing to plaintiff or testifying about any knowledge he obtained while bound by his confidential disclosure agreements with defendant. The court found the request to disqualify the attorneys to be unjustified.

**OUTCOME:** The court disqualified the first expert, permitted limited testimony by the second expert, but it refused to disqualify the attorneys.

**CORE TERMS:** disqualification, confidential information, technology, satellite, confidential, disqualify, disclosure, patent, disqualified, consulting, expert witness, law firm, privileged information, testifying, disclose, motion to disqualify, patent infringement, filed suit, misappropriation, attorney-client, involvement, retention, customers, privy, disclosing, imputed, taint, factual information, injunctive relief, trade secrets

**LexisNexis(R) Headnotes**

*Evidence > Witnesses > Expert Testimony*
[HN1] Federal courts have the inherent power to disqualify expert witnesses in certain circumstances to protect the integrity of the adversary process and to promote public confidence in the legal system.

*Evidence > Witnesses > Expert Testimony*
[HN2] When determining whether to disqualify an expert witness, federal courts should balance the competing policy objectives. Policies favoring disqualification include ensuring fairness and preventing conflicts of interest. Policies militating against disqualification include guaranteeing that parties have access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional callings.

*Evidence > Privileges > Trade Secrets*
*Evidence > Witnesses > Expert Testimony*

[HN3] One situation where disqualification of an expert witness may be appropriate is when a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of their employment. To determine whether disqualification of an expert is warranted based on a prior relationship with the adversary, the court must undertake a two part inquiry: (1) Did the adversary have a confidential relationship with the expert?; and (2) Did the adversary disclose confidential information to the expert that is relevant to the current litigation?

### Civil Procedure > Counsel

[HN4] Courts should be extremely cautious when considering motions for disqualification of counsel both because of the immediate effect disqualification has on a client by separating him from his counsel of choice, and because such motions are often interposed for tactical reasons. Courts should hesitate to impose so drastic a measure as disqualification except when absolutely necessary.

**COUNSEL:** For SPACE SYSTEMS/LORAL, Plaintiff: James H. Wallace, Jr., Gregory Lyons, John B. Wyss, Wiley Rein & Fielding, Washington, DC.

For SPACE SYSTEMS/LORAL, Plaintiff: Edward V. King, Jr., Michael J. Higgins, King & Kelleher LLP, San Francisco, CA.

For LOCKHEED MARTIN CORPORATION, defendant: Cecilia O. Lofters, White & Case, Edward V. Filardi, Robert B. Smith, Skadden Arps Slate Meagher & Flom LLP, New York, NY.

For LOCKHEED MARTIN CORPORATION, defendant: Mary B. Cranston, Pillsbury Madison & Sutro LLP, Ellen M. King, White & Case LLP, Palo Alto, CA.

For LOCKHEED MARTIN CORPORATION, defendant: Roger P. Kennedy, Lockheed Martin Missiles and Space, Sunnyvale, CA.

For LOCKHEED MARTIN CORPORATION, Counter-claimant: Cecilia O. Lofters, White & Case, Edward V. Filardi, Robert B. Smith, Skadden Arps Slate Meagher & Flom LLP, New York, NY.

For LOCKHEED MARTIN CORPORATION, Counter-claimant: Mary B. Cranston, Pillsbury Madison & Sutro LLP, J. David Black, Ellen M. King, White & Case LLP, Palo Alto, CA.

For LOCKHEED MARTIN CORPORATION, Counter-claimant: [*2] Roger P. Kennedy, Lockheed Martin Missiles and Space, Sunnyvale, CA.

For SPACE SYSTEMS/LORAL, Counter-defendant: James H. Wallace, Jr., Gregory Lyons, John B. Wyss, Wiley Rein & Fielding, Washington, DC.

For SPACE SYSTEMS/LORAL, Counter-defendant: Edward V. King, Jr., Michael J. Higgins, King & Kelleher LLP, San Francisco, CA.

**JUDGES:** SPENCER WILLIAMS, United States District Judge.

**OPINIONBY:** SPENCER WILLIAMS

**OPINION:**

ORDER GRANTING IN PART AND DENYING IN PART MARTIN MARIETTA'S MOTION TO DISQUALIFY CERTAIN EXPERT WITNESSES AND OPPOSING COUNSEL

Plaintiff Space Systems/Loral, Inc. ("SSL") brought this action against Martin Marietta Corporation ("Martin Marietta") alleging patent infringement. Martin Marietta has now moved to disqualify two of SSL's expert witnesses and certain of SSL's attorneys. Based on the following, Martin Marietta's motion IS GRANTED IN PART and DENIED IN PART.

### BACKGROUND

SSL, Martin Marietta and Hughes Aircraft Company ("Hughes") are the major U.S. competitors in the communications satellite systems industry. The three companies regularly compete for the same contracts, customers, consultants and employees.

Over the last fifteen years, Martin Marietta has [*3] designed and manufactured a line of satellite systems called the Series 3000 (beginning in 1980), the Series 4000 (beginning in 1981), the Series 5000 (beginning in 1986), and the Series 7000 (beginning in 1988). Each series in the line has an ever-increasing payload capacity. Hughes has manufactured a similar line of satellites, the most recent of which is the HS-601.

In the summer of 1993, SSL began investigating possible infringement of two of its patents by Martin Marietta's Series 7000 and Hughes' HS-601 satellite technology. These patents, U.S. Patent No 4,767,084 (filed September 18, 1986) and U.S. Patent No. 5,100,084 (filed September 7, 1990), both cover "attitude control" technology which enables satellites to maintain a constant orientation towards the earth.

To conduct its investigation, SSL's in-house patent counsel, Anthony Karambelas, retained the services of Dr. Marshall Kaplan and Dr. Ludwig Muhlfelder, both of whom are independent experts in the field of satellite attitude control. Kaplan and Muhlfelder had both previously done work for Martin Marietta and Hughes. Karambelas also retained the Washington, D.C. law firm of Wiley, Rein & Fielding as outside counsel. [*4]

In late 1994, SSL's team concluded that Martin Marietta and Hughes were infringing SSL's patents. SSL thereafter informed Martin Marietta and Hughes of this determination. SSL filed suit against Hughes on December 6, 1994 n1 and against Martin Marietta on February 21, 1995.

n1 The Hughes case is currently pending before Judge Illston, is in active discovery, and has already had one summary judgment motion.

During the early stages of the current litigation, Martin Marietta learned that SSL had retained Kaplan and Muhlfelder. Martin Marietta immediately became concerned that these two former employees might have communicated confidential proprietary information to SSL. Consequently, in March 1995, Martin Marietta filed suit in federal district court in New Jersey against SSL alleging patent infringement and misappropriation of trade secrets. Martin Marietta Corporation v. Loral Corporation, C-95-1402 MTB (D.N.J. 1995). Martin Marietta sought immediate injunctive relief to prevent SSL from employing Kaplan [*5] and Muhlfelder. The New Jersey court denied injunctive relief, dismissed Martin Marietta's misappropriation claims for lack of subject matter jurisdiction and transferred the patent infringement claims to the Northern District of California.

Now Martin Marietta moves to disqualify Muhlfelder, Kaplan, Karambelas and the law firm of Wiley, Rein & Fielding from participation in this action.

## ANALYSIS

## I. SSL'S EXPERT WITNESSES

### A. Legal Standard

[HN1] Federal courts have the inherent power to disqualify expert witnesses in certain circumstances to protect the integrity of the adversary process and to promote public confidence in the legal system. Wang Laboratories, Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248 (E.D. Va. 1991). [HN2] When determining whether to disqualify an expert witness, courts should balance the competing policy objectives. English Feedlot, Inc. v. Norden Laboratories, Inc., 833 F. Supp. 1498, 1505 (D.

Colo. 1993). Policies favoring disqualification include ensuring fairness and preventing conflicts of interest. Id. Policies militating against disqualification include guaranteeing that parties have access to expert witnesses [*6] who possess specialized knowledge and allowing experts to pursue their professional callings. Id. at 1504-05.

[HN3] One situation where disqualification may be appropriate is when a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of their employment. See In re Data General Corporation Antitrust Litigation, 1986 U.S. Dist. LEXIS 22076, 5 Fed. R. Serv. 3d (Callaghan) 510 (N.D. Cal. 1986). To determine whether disqualification of an expert is warranted based on a prior relationship with the adversary, the court must undertake a two part inquiry: (1) Did the adversary have a confidential relationship with the expert?; and (2) Did the adversary disclose confidential information to the expert that is relevant to the current litigation? Toshiba, 762 F. Supp. at 1248.

### B. Muhlfelder

There is no doubt that Muhlfelder must be disqualified as an expert witness in this litigation. Muhlfelder was privy to substantial confidential information that is relevant to the issues in this case. He worked for Martin Marietta's predecessor from 1962-1991 as head of the group responsible for satellite [*7] navigation, guidance and control. During his employment, Muhlfelder had significant involvement in designing the attitude control systems for the Series 3000, 4000, 5000, and 7000 satellites. He was also the named inventor of several Martin Marietta patents relating to attitude control. After his retirement, Muhlfelder's consulting activities for Martin Marietta and its customers allowed him access to confidential attitude control technology until quite recently. Muhlfelder's employment and consulting activities for Martin Marietta required him to sign numerous confidentiality agreements promising not to disclose any trade secrets or other confidential information.

Perhaps realizing the weakness of its argument here, SSL does not strongly dispute the impropriety of using Muhlfelder as an expert witness in this case. In fact, SSL states than it intends to use Muhlfelder as an expert solely in its litigation with Hughes. Accordingly, Martin Marietta's motion to disqualify Muhlfelder is GRANTED.

### C. Kaplan

Kaplan's situation is not quite as clear. Kaplan consulted for Martin Marietta's predecessors in the area of satellite attitude control from 1974-1988. Prior to 1980, Kaplan collaborated [*8] with Muhlfelder on the attitude

control technology used in the Series 3000. Thereafter, from 1980-88, Kaplan was given access to confidential attitude control technology regarding the Series 4000 through his consulting activities for Martin Marietta customers. Kaplan also signed numerous confidentiality agreements with Martin Marietta.

Martin Marietta asserts that although Kaplan did not have access to the specific technology used in the Series 7000, he was involved in the development of the Series 3000 and 4000 attitude control systems which evolved into the system used in the Series 7000. Martin Marietta contends that Kaplan's intimacy with the Series 3000 and 4000 is crucial because the Series 7000 is based upon the earlier series and is "operationally similar". Martin Marietta also points out that Kaplan's knowledge is central to one of its defenses in this action: that SSL's patents are invalid because prior art existed in the form of the Martin Marietta's Series 3000 and 4000 systems.

SSL responds that the Series 3000 and 4000 technology is "antiquated" and bears little resemblance to that used in the Series 7000. Consequently, SSL contends that Kaplan does not possess any [*9] confidential information relevant to the current litigation. Furthermore, SSL argues that even if Kaplan has relevant factual information, Martin Marietta would have to produce this information during discovery anyway. Lastly, SSL distinguishes the cases upon which Martin Marietta relies by pointing out that nearly all of them involved situations where experts had obtained information directly related to the litigation, such as attorney work product or documents protected by the attorney-client privilege. Here, in contrast, Kaplan stopped consulting for Martin Marietta more than five years before this litigation commenced, and at least a year prior to the development of the technology at issue, the Series 7000.

The Court agrees with SSL. The relevant knowledge that Kaplan could have obtained through confidential means during his consulting at Martin Marietta is minimal at best. Kaplan's meaningful involvement with Martin Marietta ended after the development of the Series 3000 in 1980, over 15 years ago. Both parties agree that he possesses no confidential information concerning the Series 7000, the specific technology at issue in this lawsuit. The chance that Martin Marietta will [*10] be prejudiced by allowing SSL to continue its retention of Kaplan is therefore low.

In contrast, the hardship the SSL would suffer if the Court were to disqualify Kaplan is great. Kaplan is a renowned expert in the field of satellite attitude control. He has participated in this case from the beginning, since SSL's pre-filing investigation more than two years ago. Ordering his disqualification almost nine months after SSL filed suit would be extremely burdensome to SSL.

Moreover, SSL is correct that the cases upon which Martin Marietta relies are factually distinguishable. Some of them provide only that an adversary may not retain an expert who was personally involved in the preparation of the adversary's case. See, e.g., American Protection Ins. Co. v. MGM Grand Hotel - Las Vegas, Inc., 1986 U.S. Dist. LEXIS 28326, 1986 WL 57464 (D. Nev. Mar. 11 1986). Others merely forbid the retention of experts who have switched sides in the litigation after obtaining privileged information. See, e.g., Cordy v. Sherwin Williams, Co., 156 F.R.D. 575 (D.N.J. 1994); Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc., 709 F. Supp. 1279, 1989 U.S. Dist. LEXIS 3007, 1989 WL 31524 (S.D.N.Y. 1989); Toshiba, 762 F. Supp. at 1248. [*11] Even the case upon which Martin Marietta places the most reliance, Data General, is inapposite. In Data General, the court's decision to disqualify certain expert witnesses was based at least in part upon the fact that they had become privy to matters protected by the attorney-client and possibly work-product privileges. 1986 U.S. Dist. LEXIS 22076, 5 Fed. R. Serv. 3d at 513.

In sum, because there is little danger that Kaplan's participation as an expert will prejudice these proceedings, Martin Marietta's motion to disqualify Kaplan is DENIED. However, the Court finds that the approach taken by the court in the case of Wang Laboratories, Inc. v. CFR Associates, Inc., 125 F.R.D. 10 (D. Mass. 1989), would be appropriate here. In CFR Associates, the defendant hired an expert witness specifically because he had confidential knowledge pertaining to the patented technology at issue. The court decided that although total disqualification was not warranted, the expert would be limited to testifying based on information he obtained prior to or subsequent to his employment with the plaintiff. Id. at 14. Therefore, in this case, Kaplan is prohibited from disclosing [*12] to SSL or testifying about any knowledge he obtained while bound by his confidential disclosure agreements with Martin Marietta. Kaplan may, however, provide his expert opinion based on his independent research and expertise in the field of satellite attitude control.

## II. SSL'S ATTORNEYS

Martin Marietta also requests that the Court disqualify SSL's in-house counsel Karambelas and its outside law firm of Wiley, Rein & Fielding due to their retention of Muhlfelder and Kaplan. SSL responds that disqualification of its attorneys is unjustified.

In certain situations, courts have disqualified counsel who improperly retained experts possessing confidential information obtained from the opposing party. The justification for such disqualification is that the "taint" of the expert's illicit knowledge is imputed to the attorneys. See, e.g., American Protection, 1986 U.S. Dist. LEXIS

28326, 1986 WL 57464 at *2; MMR/Wallace Power & Industry, Inc. v. Thames Associates, 764 F. Supp. 712, 718 (D. Conn. 1991). However, [HN4] courts should be extremely cautious when considering motions for disqualification of counsel "both because of the immediate effect disqualification has on a client by [*13] separating him from his counsel of choice, and because such motions are often interposed for tactical reasons". MMR/Wallace Power, 764 F. Supp. at 718 ("courts should hesitate to impose so drastic a measure as disqualification except when absolutely necessary").

Here, Martin Marietta's request for disqualification is unwarranted for two reasons. First, Martin Marietta has not demonstrated that Kaplan or Muhlfelder have disclosed or are likely to disclose any confidential information to SSL's attorneys from which a taint can be imputed. Martin Marietta offers only unsubstantiated speculation that there is some risk of confidential disclosure. The Court therefore agrees with the New Jersey court's assessment of Martin Marietta's allegations: "It seems clear . . . that in any event there is no evidence that there has been any use or disclosure of the confidential information which underlies [Martin Marietta's misappropriation claims] . . . and no evidence that there is any real basis for believing that there will be use or disclosure in the future". Martin Marietta v. Loral Corp., Unpub. Opinion at 9.

Second, the cases upon which Martin Marietta relies again involve [*14] experts who were privy to an adversary's work product or attorney-client privileged information, not merely confidential factual material obtained outside the context of the litigation. See, e.g., American Protection, 1986 WL 57464 at *2; MMR/Wallace Power, 764 F. Supp. at 718; Shadow Traffic Network et al. v. Superior Court, 24 Cal. App. 4th 1067, 1070 (1994). The concerns raised by the disclosure of litigation-related, privileged information are naturally great, since the integrity of the adversary system could easily be undermined. In contrast, disclosure of independently obtained, factual information which is subject to discovery anyway does not raise the same level of concern.

In sum, Martin Marietta's motion to disqualify SSL's attorneys is DENIED. Martin Marietta has not demonstrated either that SSL's counsel acted unreasonably or that their continued involvement in this case poses any threat to the fairness of this litigation. See Marcum v. Channel Lumber Co., 1995 U.S. Dist. LEXIS 3799, 1995 WL 225708 at *2 (N.D. Cal. Mar. 24 1995) (commenting that disqualification is proper only if the attorneys' misconduct will have a "continuing [*15] effect on the judicial proceedings before the court").

**CONCLUSION**

Based on the foregoing, Martin Marietta's motion is GRANTED IN PART and DENIED IN PART. Muhlfelder is disqualified as an expert in this litigation. Kaplan is not disqualified, but he is prohibited from disclosing or testifying about any confidential information he obtained from Martin Marietta. Karambelas and the law firm of Wiley Rein & Fielding are not disqualified.

IT IS SO ORDERED.

DATE: 11/14/95

SPENCER WILLIAMS

United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2006, I electronically filed **DEFENDANTS' COMPENDIUM OF UNREPORTED OPINIONS** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899

I hereby certify that on March 6, 2006, I have forwarded the above-noted document to the following as noted below:

**VIA E-MAIL**                           **VIA E-MAIL & FEDERAL EXPRESS**

Jesse J. Jenner, Esquire                 Norman H. Beamer, Esquire
Ropes & Gray LLP                         Ropes & Gray LLP
1251 Avenue of the Americas              525 University Avenue
New York, NY 10020                       Palo Alto, California 94301

**VIA E-MAIL**

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899

PAUL M. LUKOFF (Bar I.D. #96)
DAVID E. BRAND (Bar I.D. #201)
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE  19899-1328
TEL: 302-888-6500
E-MAIL:  PMLukoff@prickett.com
         DEBrand@prickett.com