## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMPEX CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. 04-1373-KAJ |
| | ) |
| EASTMAN KODAK COMPANY, | ) |
| ALTEK CORPORATION and CHINON | )    **REDACTED** |
| INDUSTRIES, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

### REDACTED APPENDIX TO DEFENDANTS' OPENING BRIEF
### IN SUPPORT OF ITS MOTION TO DISQUALIFY ERIC ANDERSON
### AS AN EXPERT WITNESS

PAUL M. LUKOFF (I.D. No. 96)
DAVID E. BRAND (I.D. No. 201)
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500

**OF COUNSEL:**

William F. Lee
Michael J. Summersgill
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

*Attorneys for Defendants*

S. Calvin Walden
WILMER CUTLER PICKERING
HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 230-8888

Date: March 13, 2006

## Table of Contents

1. Email from Anderson to Ward of 12/26/96 ........................................................................ A-1

2. Email from Anderson to Saylor of 1/9/97........................................................................ A-3

3. Facsimile from Kodak copied to Eric Anderson (January 9, 1997) .................................. A-4

4. Email from Ward of 1/16/97............................................................................................ A-12

5. "Action Items from Sharing Camera Design Review" (Jan. 22, 1997)........................... A-14

6. Kodak SC Main Engineering Specification Document (Jan. 23, 1997)........................... A-16

7. Sanjeet Thadani Email of 2/19/97.................................................................................... A-38

8. Email from Anderson of 2/21/97 ..................................................................................... A-40

9. Email from Anderson of 2/21/97 (II)............................................................................... A-41

10. Kodak SC High Engineering Specification Document (Mar. 14, 1997) .......................... A-42

11. 1996-1997 Kodak camera block diagrams and specifications........................................... A-67

12. Email from Kyoichi of 3/27/97........................................................................................ A-73

13. Email from Ward of 4/3/97.............................................................................................. A-74

14. The SC Series Camera MPU Control Module Interface Specification for the FlashPoint
    Operating System.............................................................................................................. A-75

15. UI Change Requests.......................................................................................................... A-87

16. Anderson Laboratory Notebook ....................................................................................... A-89

17. Development Agreement ................................................................................................... A-135

18. First Amendment To Development Agreement................................................................. A-151

19. U.S. Patent Nos. 5,933,137 and 6,137,534 ..................................................................... A-157

20. Separation Certification Form........................................................................................... A-159

21. Employment, Confidential Information and Invention Assignment Agreement.............. A-160

22. Resume of Eric Anderson ................................................................................................. A-166

23. Initial Expert Report of Eric C. Anderson ...................................................................... A-179

24. ITC Order No. 19.............................................................................................................. A-184

25. Subpoena Duces Tecum .................................................................................. A-198

26. Report of James Storer ................................................................................... A-213

27. Earnings Statements for Eric Anderson ....................................................... A-222

28. Supplemental Expert Report of Dr. George T. Ligler ................................... A-224

29. Ligler Deposition Transcript .......................................................................... A-231

30. Declaration of Masaki Izumi ......................................................................... A-240

31. Declaration of Craig Smith ........................................................................... A-242

32. Declaration of Thomas Napoli ...................................................................... A-246

33. Ampex Corporation's Memorandum of Points and Authorities in Opposition to Respondent's Motion for Reconsideration of their Motion to Disqualify Eric Anderson as an Expert Witness ........................................................................................................ A- 249

34. ITC Hearing Transcript ................................................................................. A-255

35. Letter from Beamer to Summersgill of 2/22/06 ........................................... A-264

36. Ampex Corporation's Response to Defendant's Third Set of Interrogatories (No. 30) ... A-265

37. "Plaintiff's Exhibit 329" ............................................................................... A-276

38. Declaration of Heidi Martinez ...................................................................... A-277

39. Anderson Deposition Transcript ................................................................... A-278

40. Ampex's Second Amended Complaint .......................................................... A-295

41. Ampex's Requests for Admission [Nos. 1-100] ............................................ A-302

42. Haneda Development Schedule ...................................................................... A-305

43. "Ansel & Weston Concept" ........................................................................... A-307

44. DCS Pro Back Hardware Overview .............................................................. A-320

# A-1 – A-2

# Confidential Information Subject to Protective Order

# A-3

# Confidential Information Subject to Protective Order

A-4 – A-11

Confidential Information Subject to
Protective Order

# A-12 – A-13

# Confidential Information Subject to Protective Order

# A-14 – A-15

# Confidential Information Subject to Protective Order

A-16 – A-37

Confidential Information Subject to
Protective Order

# A-38 – A-39

# Confidential Information Subject to Protective Order

# A-40

# Confidential Information Subject to Protective Order

# A-41

# Confidential Information Subject to Protective Order

A-42 – A-66

Confidential Information Subject to
Protective Order

A-67 – A-72

Confidential Information Subject to
Protective Order

# A-73

# Confidential Information Subject to Protective Order

# A-74

# Confidential Information Subject to Protective Order

# A-75

# Confidential Information Subject to Protective Order

A-74

# Confidential Information Subject to Protective Order

A-75 – A-86

Confidential Information Subject to
Protective Order

A-87 – A-88

Confidential Information Subject to
Protective Order

A-89 – A-134

Confidential Information Subject to
Protective Order

# A-135 – A-151

# Confidential Information Subject to Protective Order

# A-152 – A-156

## Confidential Information Subject to Protective Order

US005933137A

# United States Patent [19]

## Anderson

[11] Patent Number: 5,933,137

[45] Date of Patent: Aug. 3, 1999

[54] **METHOD AND SYSTEM FOR ACCELERATING A USER INTERFACE OF AN IMAGE CAPTURE UNIT DURING PLAY MODE**

[75] Inventor: **Eric C. Anderson**, San Jose, Calif.

[73] Assignee: **Flashpoint Technology, Inc.**, San Jose, Calif.

[21] Appl. No.: **08/872,578**

[22] Filed: **Jun. 10, 1997**

[51] Int. Cl.$^6$ ........................................ G06F 3/00
[52] U.S. Cl. ............................ 345/328; 358/909.1
[58] Field of Search ........................ 345/328; 348/233;
358/909.1; 396/354

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,016,107 | 5/1991 | Sasson et al. | 358/209 |
| 5,164,831 | 11/1992 | Kuchta et al. | 358/209 |
| 5,341,466 | 8/1994 | Perlin et al. | 395/139 |
| 5,414,811 | 5/1995 | Parulski et al. | 395/162 |
| 5,434,969 | 7/1995 | Heilveil et al. | 395/166 |
| 5,493,335 | 2/1996 | Parulski et al. | 348/233 |
| 5,528,293 | 6/1996 | Watanabe | 348/233 |
| 5,576,757 | 11/1996 | Roberts et al. | 348/207 |

*Primary Examiner*—Mark K. Zimmerman
*Assistant Examiner*—David E. Brown
*Attorney, Agent, or Firm*—Sawyer & Associates

[57] **ABSTRACT**

A method and system for accelerating a user interface on a display of an image capture unit is disclosed. The image capture unit includes a plurality of image files for providing a plurality of images, the image capture unit further includes controls for allowing an image to be viewed on the display and for allowing navigation between the plurality of images. In a first aspect a method and system in accordance with the present invention comprises providing a low resolution image, medium resolution image and high resolution image within each image file and allowing the medium resolution image to be viewed on the display. In a second aspect a method for accelerating a user interface on a display of an image capture unit in accordance with the present invention includes a plurality of image files for providing a plurality of images, each image file includes a high resolution image therein. The image capture unit includes controls for allowing an image to be viewed on the display and for allowing navigation between the plurality of images. The method and system in accordance with the present invention comprises providing a low resolution image within each image file, the low resolution image being associated with the high resolution image within a particular image file, allowing the low resolution image to be viewed on the display and causing the high resolution image related to low resolution image to be displayed on top of the low resolution image dependent upon the quality of the low resolution image. The method and system also includes allowing for navigation between low resolution images based upon user interaction. Through the present invention the user interface allows a user to quickly review images in an image capture unit such as a digital camera or the like.

22 Claims, 17 Drawing Sheets



A-157

US006137534A

# United States Patent [19]
## Anderson

[11] Patent Number: **6,137,534**

[45] Date of Patent: **Oct. 24, 2000**

[54] **METHOD AND APPARATUS FOR PROVIDING LIVE VIEW AND INSTANT REVIEW IN AN IMAGE CAPTURE DEVICE**

[75] Inventor: **Eric C. Anderson**, San Jose, Calif.

[73] Assignee: **FlashPoint Technology, Inc.**, San Jose, Calif.

[21] Appl. No.: **08/890,896**

[22] Filed: **Jul. 10, 1997**

[51] Int. Cl.7 .................................... **H04N 5/228**
[52] U.S. Cl. ...................... **348/222; 348/207; 348/333**
[58] Field of Search .......................... 348/222, 231, 348/232, 233, 333, 376, 207; 358/906, 909.1

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,456,931 | 6/1984 | Toyoda et al. | 358/906 |
| 4,827,347 | 5/1989 | Bell | 358/906 |
| 5,043,816 | 8/1991 | Nakano et al. | 358/906 |
| 5,070,406 | 12/1991 | Kinoshita | 358/906 |
| 5,164,831 | 11/1992 | Kuchta et al. | 348/233 |
| 5,497,193 | 3/1996 | Mitsuhashi et al. | |
| 5,576,759 | 11/1996 | Kawamura et al. | 348/231 |
| 5,633,678 | 5/1997 | Parulski et al. | 348/232 |
| 5,724,579 | 3/1998 | Suzuki | 382/305 |
| 5,815,201 | 9/1998 | Hashimoto et al. | 348/232 |
| 5,845,166 | 12/1998 | Fellegara et al. | 348/64 |
| 5,949,950 | 9/1999 | Kubo | 348/207 |

Primary Examiner—Wendy Garber
Assistant Examiner—Aung S. Moe
Attorney, Agent, or Firm—Sawyer Law Group LLP

[57] **ABSTRACT**

A method and system for providing instant review of a last image in an image capture device is disclosed. The image capture device includes a viewfinder for displaying a live image and each image of a plurality of previously captured images. The method and system include selecting instant review of the last image captured by the image capture device, determining the status and location of the last image, and providing the last image to the viewfinder for display. Therefore, the image capture device is capable of displaying the last image substantially immediately after the last image has been captured. In another aspect, the image capture device contains an image processing system. In this aspect, the method and system include allowing a user to access a play mode and a review mode while the last image captured undergoes processing by the image processing system.

34 Claims, 10 Drawing Sheets

700



A -158

# A-159 – A-165

# Confidential Information Subject to
Protective Order

# Resume

### Last updated 12/29/03

---

**Eric C. Anderson**
**1382 Hastings Lane**
**Gardnerville, NV 89410**
**775-782-9662**
**email: eric@2live4.com**

---

## OBJECTIVE

I am available for consulting through Anderson Creations. My work is accomplished by telecommuting: I have clients in various locations in the USA.

I may be available for full-time work, if the "right" job comes my way. My preference is for Carson Valley area, but I am willing to consider relocation.

I have an excellent track record for rapid understanding of new technology, and can assist in product definitions, patent and invention process and discovery within your engineering organizations, as well as technology and system architecture evaluation and development. Additionally, I am available for the development of websites including dynamic pages using server-side scripting and databases.

## SKILLS

My specific skills include

- The ability to learn new technologies and product areas rapidly
- Ability to lead and nurture a superior engineering team
- A deep understanding of hardware and software architectural and integration issues
- The ability to ask the right questions to expose the critical issues
- An ability to make excellent engineering trade-offs resulting in cost and complexity reduction with minimum loss or even gain of functionality
- A deep understanding of real time and multiprocessing issues and concepts
- A visionary approach to product development
- An extensive understanding of Internet technology, including ASP, VBScript, ADO, HTML, and editing tools such as Photoshop, Image Composer, FrontPage, etc.

## EMPLOYMENT

**A -166**

Resume for Eric Anderson                                    Page 2 of 13

| June 2001 to Present | **Anderson Creations**: As of June 2001, I started a consulting company, originally based in San Jose, CA, but now located in Gardnerville, NV. Primary consulting areas include: website development and patent disclosure preparation. For more information, visit my business website at andersoncreations.net. |
|---|---|
| March 2001 to May 2001 | **Kesed Seminars, Inc.**: As a board member and webmaster, I created a state-of-the-art e-commerce website for this organization. I continue to function as the webmaster as a part time endeavor, and most recently I am building an eLearning system. View the website at www.whatgodintended.com. |
| August 1996 to February 2001 | **FlashPoint Technology, Inc.**: as *Chief Technology Officer*, my responsibilities included the development of the internet strategy roadmap and architecture for the company, including the recently announced Photivity wireless imaging service. In addition, I am responsible for technology evaluation for current and future planned directions for the company, and for intellectual property development and management. Over a period of 4 years, this included the filing of over 100 patent applications. At this time, approximately 30 of these have either issued or been allowed by the patent office.

In 1999, I enhanced my skill set to include Active Server Pages, Active Data Objects (ASP and ADO) and related dynamic web technology, and have built a number of data-based web sites using this technology. I also developed several Visual Basic applications for the PC.

Prior to the focus on the internet directions for the company, my responsibilities included the technology development for Digita™ OE (Operating Environment), which represents the core technology platform for the company. Additionally, I was extensive involved with customer programs to integrate their requirements into our overall direction without sacrificing the goal of a standard application development platform for digital cameras and related imaging devices. I successfully guided technology development with product shipments including the Kodak DC220, DC260, DC265, and DC290 digital cameras, the Minolta 1500-EX digital camera, and the Epson Print-On stand-alone digital image printer.

While at Apple, I played a significant role in defining the hardware reference platform for the Motorola MPC823 microprocessor, including image capture subsystem and power management gate arrays and sub-CPU's. I defined a new capture and image processing architecture, which is under |

**A -167**

Resume for Eric Anderson                                    Page 3 of 13

| | |
|---|---|
| | development at Motorola. More information on the successes of the technology I created can be found at http://www.flashpoint.com. |
| May 1996 to August 1996 | **Apple Computer, Inc. Imaging Group:** as *Image Capture Engineering Manager and Chief Architect*, my responsibilities expanded to include the Host software group, which includes both Macintosh and Windows programmers dedicated to the development of the Host components of QuickTime IC. I worked with external parties and Apple employees to create a spin-off from Apple to continue to develop the QuickTime IC a.k.a. FlashPoint/OS technology (this technology was renamed to Digita™ OE. The spin-off officially took place on November 15, 1996. Over 30 Apple patents were applied for during this period. |
| June 1994 to May 1996 | **Apple Computer, Inc. Imaging Group:** as *Chief Architect and Camera Software Manager*, my responsibilities included leading the development of a new platform – the Apple Image Capture Platform, and QuickTime IC (Image Capture). This technology involved dozens of inventions relating to the application of computer technology to digital cameras, and included the development of a Camera Hardware Reference Platform, an embedded real-time camera operating system called FlashPoint, a powerful command and control language and API sets, and a text-based scripting language for programmatic control of the camera. The technology was so well received by Motorola, Inc., that it changed the direction of its embedded PowerPC microprocessor development to match our requirements for a powerful camera processor. This resulted in the creation of the MPC823 microprocessor. <br><br> This well-received technology was presented to many camera and consumer electronics companies throughout the world in an attempt to establish a "de facto" standard by broad licensing. Other responsibilities included participation in product planning, technology acquisition, and business planning. At the end of this period, over 50 inventions still awaited patent application preparation. |
| August 1993 to May 1994 | **Apple Computer, Inc. Imaging Group:** as *Project and Technical Leader*, my responsibilities were to bring to market the development work that I accomplished while in the Advanced Technology Group. This includes building a team consisting of Apple employees, contractors, and employees of a major Japanese consumer electronics manufacturing company. During the first three months on the job, I successfully brought the relationship between Apple and this manufacturing partner to a final stage by making presentations to all levels of their management and |

**A -168**

| | |
|---|---|
| | engineering organization, including representatives of the Board, the President, and selected upper management members.<br><br>Once the team was in place, I developed the overall architecture for both hardware and software for Apple's next generation image capture product line. This architecture enabled product categories which up to that time had been dreamed about by marketing, but neither Apple or its partners were able to create at the required price point. With this architecture in hand, we were able to persuade key Apple partners to align with us in a completely new direction for future products.<br><br>During this period, I managed the Camera Architecture Group, which was responsible to deliver all core technologies, including in-camera operating software as well as hardware system integration and new technology acquisition. Finally, during this period I was responsible for the development of several key, patentable technologies. |
| October 1992 to August 1993 | **Apple Computer, Inc. Advanced Technologies Group**: as *Manager of the Media Devices Group*, I was responsible for building an engineering team to develop next-generation digital image capture PDA's. My functions include technical leadership, budget and schedule responsibility, technology and program presentations to peers and upper management, responsibility for system hardware and software architecture, and the development of selective technology vendor and partner relationships. The effort to develop a product plan, including technology partner selection, was successful, and the project was transferred to product development. |
| November 1988 to October 1992 | **Apple Computer, Inc. Advanced Technologies Group**: as *Manager of the Signal Processing and Sound Group*, I was responsible for developing *Apple's RealTime Architecture* (ARTA), shipped in the summer of 1993 on two separate Macintosh AV computers. This project included vendor and technology selection, contract management, system architecture development and design, processor architecture, and real time OS architecture. I functioned as the system architect, the software and hardware group manager, and provided visionary technical leadership, including support for multiprocessing.<br><br>I was directly responsible for the specifications and development of the Singer stereo audio codec (ITT and Crystal), the DSP3210 (AT&T), and the initial work on the Digital Multi-Standard Decoder (DMSD) from Phillips. These parts, or their direct descendants, are still in use today. In addition, I had |

A -169

| | |
|---|---|
| | significant input into the design and architecture of the audio/telecom I/O subsystem and bus arbiter ASIC's for the AV Macs. This project resulted in 10 patent applications on both software and hardware inventions. |
| September 1987 to November 1988 | **Apple Computer, Inc. CPU Engineering:** as *Project Leader*, I was responsible for the productization of the Apple II video overlay card, introduced in 1988. I was also responsible for developing a RISC-based version of the Apple II and IIgs. This project was canceled for political reasons (no commitment to Apple II line). I began my work on a multimedia computer, which included a video subsystem and signal processing subsystem. This work directly led to the following project. |
| June 1971 to August 1987 | **Clear Light, Inc., Pompano Beach, FL:** I started out in Clear Light as the chief engineer, and developed in technical experience and management until I reached the position of *Executive Vice President, Engineering & Manufacturing*. As the product line architect, I was responsible for the development of seven product families, and shipped over 55 products. The product lines were designed to provide computerized control of media devices, such as movie and slide projectors. I developed a real time operating system and programming environment for the Apple II computer. Using this technology, we provided interactive systems, including a police training simulator for the City of Miami. During the early years, I set up the manufacturing, purchasing, and quality control functions. I developed a complete inventory control data base, initially on the Apple II, and then with Omnis 3 on the Macintosh, including BOM management, forecasting, ABC analysis, etc. I was also involved in financial, marketing, and venture capital operations for the company. |
| September 1969 to January 1971 | **Electronic System Laboratory, MIT:** I developed a multiple font display terminal, which developed into my Master's Thesis. |
| September 1968 to August 1969 | **Project MAC (Machine Aided Cognition), MIT:** I designed language extensions for the AED (ALGOL Extended for Design) project. |
| June 1964 to August 1968 | **University of Rochester E. E. Department Computer Center, Rochester, NY:** I designed and implemented a FORTRAN IV compiler w/real time and EAI 680 Analog Computer control extensions, a symbolic assembler, and the run-time library for the IBM 7700 Data Acquisition System. |

**EDUCATION**

**A -170**

| 1968-1971 | **M.I.T., Cambridge, MA.** M.S. in Computer Science,. Thesis title: "Automatic Multiple Font Generation on CRT Computer Display Terminals." Also E.E. in Computer Science (equal to Ph.D. in course hours, but w/o doctoral thesis). Area of specialization: Artificial Intelligence. |
|---|---|
| 1964-1968 | **University of Rochester, Rochester, NY.** B.S. in Electrical Engineering. Graduated with High Honors (highest in Electrical Engineering). |

## AWARDS

| 2003 | I was nominated as **Inventor of the Year** by the **Silicon Valley Intellectual Property Law Association (SVIPLA):** <br><br>"Just about every digital camera on the market today includes one or more of Eric's inventions. The key invention was to make the digital camera a software device rather than a hardware device. This technology involved dozens of inventions relating to the application of computer technology to digital cameras." |
|---|---|
| 2000 | I was listed in **Strathmore's Who's Who** 2000 – 2001 Millennium directory |
| 1996 | I received an internal **Apple Computer** award for submitting 12 patent applications relating to digital image capture |
| 1995 | I received an internal **Apple Computer** award for submitting 3 patent applications relating to digital image capture |
| 1992 | I received an internal **Apple Computer** award for submitting 10 patent applications for AV Mac DSP inventions |
| 1986 | **The 1986 AMI/New England Chapter Award.** The Association for Multi-Image International, Inc. Designation: "For Advancing the Communications Medium of Multi-Image." |
| 1985 | **AMI Special Achievement Award.** The Association for Multi-Image International, Inc. Designation: "Distinguished and Pioneering Service Over a Period of Many Years." |

## PATENTS

There are over 50 patents pending, and 86 issued.  Of the 86 issued patents, 54 are assigned to **FlashPoint Technology, Inc.**, and 32 are assigned to **Apple Computer, Inc.**  Issued patents as of the date of this writing are listed below.  Patents listed in red-brown are related to the Apple Real Time Architecture (**ARTA**) DSP co-processing subsystem.

**A -171**

Many patents are linked to Adobe Acrobat (PDF) files. You can view the patents by clicking on the link. If you need the Acrobat reader, click on the button below to get it from the Adobe website.



| Date | Patent |
|---|---|
| May 13, 2003 | Patent 6,563,535: Image Processing System for High Performance Digital Imaging Devices (FlashPoint). |
| March 25, 2003 | Patent 6,538,698: Method and System for Sorting Images in an Image Capture Unit to Ease Browsing Access (FlashPoint). |
| March 11, 2003 | Patent 6,532,039: Method and System for Digital Image Stamping (FlashPoint). |
| February 26, 2003 | Patent D470,857: Display Screen for a Digital Imaging Device (FlashPoint). |
| January 28, 2003 | Patent 6,512,548: Method and Apparatus for Providing Live View and Instant Review in an Image Capture Device (FlashPoint). |
| January 14, 2003 | Patent 6,507,363: Method and System for Automatically Generating a Plurality of Folders for Multiple Devices and Multiple Sessions in a Digital Camera (FlashPoint). |
| January 7, 2003 | Patent 6,504,575: Method and System for Displaying Overlay Bars in a Digital Imaging Device (FlashPoint). |
| December 24, 2002 | Patent 6,499,016: Automatically Storing and Presenting Digital Images Using a Speech-Based Command Language (FlashPoint). |
| December 24, 2002 | Patent 6,498,623: System and Method for Generating Variable Length Timing Signals in an Electronic Imaging Device (FlashPoint). |
| December 10, 2002 | Patent 6,493,028: Method and System for Extending the Available Image File Formats in an Image Capture Device (FlashPoint). |
| November 26, 2002 | Patent 6,486,914: Method and System for Controlling User Interaction in a Digital Imaging Device Using Dynamic Overlay Bars (FlashPoint). |
| October 29, 2002 | Patent 6,473,123: Method and System for Organizing Data Transfers to Support Image Rotation (FlashPoint). |
| April 9, 2002 | Patent 6,370,282: Method and System for Advanced Text Editing in a Portable Digital Electronic Device Using a Button Interface (FlashPoint). |

**A -172**

| March 26, 2002 | Patent 6,362,850: Interactive Movie Creation from One or More Still Images in a Digital Still Camera (FlashPoint). |
| June 4, 2002 | Patent 6,400,471: Flexible Architecture for Image Processing |
| March 12, 2002 | Patent 6,356,357: Method and System for a Multi-Tasking Printer Capable of Printing and Processing Image Data (FlashPoint) |
| November 13, 2001 | Patent 6,317,141: Method and Apparatus for Editing Heterogeneous Media Objects in a Digital Imaging Device. (FlashPoint) |
| November 6, 2001 | Patent 6,313,877: Method and System for Automatically Managing Display Formats for a Peripheral Display Coupled to a Digital Imaging Device. (FlashPoint) |
| August 21, 2001 | Patent 6,278,447: Method and System for Accelerating a User Interface of an Image Capture Unit During Play Mode. (FlashPoint) |
| August 14, 2001 | Patent 6,275,260: Positioning Stamps in Images Captured in an Image Capture Unit. (FlashPoint) |
| July 17, 2001 | Patent 6,263,453: System and Method for Preventing Damage to Media Files Within a Digital Camera Device. [Apple] |
| July 17, 2001 | Patent 6,262,769: Method and System for Auto Rotating a Graphical User Interface for Managing Portrait and Landscape Images in an Image Capture Unit. (FlashPoint) |
| June 19, 2001 | Patent 6,249,316: Method and System for Creating a Temporary Group of Images on a Digital camera. (FlashPoint) |
| May 15, 2001 | Patent 6,233,016: System and Method for Managing Utilization of a Battery. [Apple] |
| April 24, 2001 | Patent 6,222,538: Directing Image Capture Sequences in a Digital Imaging Device Using Scripts. (FlashPoint) |
| April 10, 2001 | Patent 6,215,523: Method and System for Accelerating a User Interface of an Image Capture Unit During Review Mode. (FlashPoint) |
| April 3, 2001 | Patent 6,212,632: Method and System for Efficiently Reducing the RAM Footprint of Software Executing on an Embedded Computer System. (FlashPoint) |
| March 27, 2001 | Patent 6,208,429: Method and System for Band Printing of Rotated Digital Image Data. (FlashPoint) |
| January 23, 2001 | Patent 6,177,956: System and Method for Correlating Processing Data and Image Data Within a Digital Camera |

**A -173**

| | |
|---|---|
| | Device. (FlashPoint) |
| January 23, 2001 | Patent 6,177,957: System and Method for Dynamically Updating Features in an Electronic Imaging Device. (FlashPoint) |
| January 23, 2001 | Patent 6,177,958: System and Method for the Automatic Capture of Salient Still Images. (FlashPoint) |
| January 2, 2001 | Patent 6,169,575: Method and System for Controlled Time-Based Image Group Formation. (FlashPoint) |
| December 19, 2000 | Patent 6,163,816: System and Method for Retrieving Capability Parameters in an Electronic Imaging Device. (FlashPoint) |
| December 5, 2000 | Patent 6,157,394: Flexible Digital Image Processing via an Image Processing Chain with Modular Image Processors. [Apple] |
| November 28, 2000 | Patent 6,154,576: System and Method for Anti-Aliasing of Text Overlay on Electronic Images. (FlashPoint) |
| November 28, 2000 | Patent 6,154,210: Method and System for Implementing Button Interface Compatibility in Touch-Screen Equipped Digital Imaging Device. (FlashPoint) |
| October 31, 2000 | Patent 6,141,044: Method and System for Coherent Image Group maintenance in Memory. [Apple] |
| October 24, 2000 | Patent 6,137,534: Method and Apparatus for Providing Live View and Instant Review in an Image Capture Device. (FlashPoint) |
| October 17, 2000 | Patent 6,134,606: System/Method for Controlling Parameters in Hand-Held Digital Camera with Selectable Parameter Scripts, and with Command for Retrieving Capabilities and Associated Permissible Parameter Values. (FlashPoint) |
| October 3, 2000 | Patent 6,128,037: Method and System for Adding Sound to Images in a Digital Camera. (FlashPoint) |
| September 19, 2000 | Patent 6,122,003: Method and Apparatus for Changing Operating Modes of an Image Capture Device. (FlashPoint) |
| September 12, 2000 | Patent 6,118,480: Method and Apparatus for Integrating a Digital Camera User Interface Across Multiple Operating Modes. (FlashPoint) |
| August 1, 2000 | Patent 6,097,431: Method and System for Reviewing and Navigating Among Images on an Image Capture Unit. (FlashPoint) |
| July 25, 2000 | |

**A -174**

|  | Patent 6,094,221: System and Method for Using a Scripting Language to Set Digital Camera Device Features [FlashPoint] |
|---|---|
| April 18, 2000 | Patent 6,052,692: Method and System for Managing Image Related Events Without Compromising Image Processing. (FlashPoint) |
| February 29, 2000 | Patent 6,031,964: System and Method for using a Unified Memory Architecture to Implement a Digital Camera Device. [Apple] |
| February 22, 2000 | Patent 6,028,611: Modular Digital Image Processing via an Image Processing Chain. [Apple] |
| February 1, 2000 | Patent 6,020,920: Method and System for Speculative Decompression of Compressed Image Data in an Image Capture Unit. (FlashPoint) |
| January 11, 2000 | Patent D 418,826: Image for a Display Screen of a Digital Camera. (FlashPoint) |
| January 4, 2000 | Patent 6,011,585: Apparatus and Method for Rotating the Display Orientation of a Captured Image. [Apple] |
| December 14, 1999 | Patent 6,002,436: Method and System for Auto Wake-up for Time Lapse Image Capture in an Image Capture Unit. (FlashPoint) |
| November 23, 1999 | Patent 5,991,465: Modular Digital Image Processing via an Image Processing Chain with Modifiable Parameter Controls. [Apple] |
| November 16, 1999 | Patent 5,986,701: Method and System of Grouping Related Images Captured with a digital Image Capture Device. (FlashPoint) |
| October 26, 1999 | Patent 5,973,734: Method and Apparatus for Correcting Aspect Ratio in a Camera Graphical User Interface. (FlashPoint) |
| October 5, 1999 | Patent 5,963,255: System and Method for Managing Utilization of a Battery. [Apple] |
| September 7, 1999 | Patent 5,949,160: System and Method for Double Fault Protection within a Digital Camera Device. [Apple] |
| August 24, 1999 | Patent 5,943,093: Software Driver Digital Camera System with Image Storage Tags. (FlashPoint) |
| August 17, 1999 | Patent 5,938,766: System for Extending Functionality of a Digital ROM Using RAM/ROM Jump Tables and Patch Manager for Updating the Tables. [Apple] |
| August 10, 1999 |  |

**A -175**

|  | |
|---|---|
|  | Patent 5,935,259: System and Method for Preventing Damage to Media Files within a Digital Camera Device. [Apple] |
| August 3, 1999 | Patent 5,933,137: Method and System for Accelerating a User Interface of an Image Capture Unit During Play Mode. (FlashPoint) |
| July 6, 1999 | Patent 5,920,726: System and Method for Managing Power Conditions Within a Digital Camera Device. [Apple] |
| June 29, 1999 | Patent 5,917,488: System and Method for Displaying and Manipulating Image Data Sets. [Apple] |
| May 11, 1999 | Patent 5,903,309: Method and System for Displaying Images and Associated Multimedia types in the Interface of a Digital Camera. (FlashPoint) |
| February 2, 1999 | Patent 5,867,214: Apparatus and Method for Increasing a Digital Camera Image Capture Rate by Delaying Image Processing. [Apple] |
| January 19, 1999 | Patent 5,861,918: Method and System for Managing a Removable Memory in a Digital Camera. (FlashPoint) |
| December 8, 1998 | Patent 5,848,295: System for Allocating Common Memory in Cache such that Data is Maintained when Exiting First Programming Structure and Entering Second Programming Structure. [Apple] |
| September 29, 1998 | Patent 5,815,733: System for Handling Interrupts in a Computer System using ASIC Reset Input Line coupled to Set of Status Circuits for Presetting Values in the Status circuits. [Apple] |
| September 22, 1998 | Patent 5,812,736: Method and System for Creating a Slide-Show with a Sound Track in Real Time using a Digital Camera. (FlashPoint) |
| September 15, 1998 | Patent 5,809,178: Elimination of Visible Quantizing Artifacts in a digital image Utilizing a Critical Noise Quantization Factor. [Apple] |
| September 1, 1998 | Patent 5,802,550: Processor Having an Adaptable Mode of Interfacing with a Peripheral Storage Device. [Apple] |
| August 4, 1998 | Patent 5,790,878: System and Method for Recovering from a Power Failure Within a Digital Camera Device. [Apple] |
| August 4, 1998 | Patent 5,790,705: Compression Techniques for Substantially Lossless Digital Image Data Storage. [Apple] |
| July 21, 1998 | Patent 5,784,629: System and Method for Conserving Power Within a Backup Battery Device. [Apple] |

A -176

| June 2, 1998 | Patent 5,761,453: Method and System for Increasing the Throughput of Serial data in a Computer System. [Apple] |
| April 28, 1998 | Patent 5,745,175: Method and System for Providing Automatic Focus Control for a Still Digital Camera. (FlashPoint) |
| November 18, 1997 | Patent 5,689,534: Audio Functional Unit and System and Method for Configuring the Same. [Apple] |
| September 9, 1997 | Patent 5,666,569: System and Method for Detecting and Indicating Proper Focal Distance in a Fixed Lens Camera. (FlashPoint) |
| June 17, 1997 | Patent 5,640,635: System and Method for Automatic Engagement of a Close-Up Lens in a Fixed-Focus Camera. (FlashPoint) |
| May 6, 1997 | Patent 5,628,013: Apparatus and method for Allocating Processing time in a Frame-Based Computer System. [Apple] |
| December 3, 1996 | Patent 5,581,748: Phase Register for Synchronization of Multiple Signal Processors. [Apple] |
| November 19, 1996 | Patent 5,577,250: Programming Model for a Co-Processor on a Computer System. [Apple] |
| July 2, 1996 | Patent 5,532,556: Multiplexed Digital Audio and Control/Status Serial Protocol. [Apple] |
| March 5, 1996 | Patent 5,496,106: System and Method for Generating a Contrast Overlay as a Focus Assist for an Imaging Device. [Apple] |
| Sept 5, 1995 | Patent 5,448,735: Task Organization for Execution Using Linked Records Referencing Code Modules. [Apple] |
| Feb 7, 1995 | Patent 5,388,261: Apparatus and Method for Handling Frame Overruns in a Digital Signal Processing System. [Apple] |
| Jan 24, 1995 | Patent 5,384,890: Method and Apparatus for Providing Multiple Clients Simultaneous Access to a Sound Data Stream. [Apple] |

## INTERESTS

- Web Technology and publishing
- Computer technology
- Photography, focused on nature and panoramas
- Imaging and image processing
- Music and high fidelity
- Amateur radio (WA1PMF)

A -177

Resume for Eric Anderson                              Page 13 of 13

- Robotics (Lego Mindstorms)



Home  |  Panoramas  |  National Parks  |  California  |  Florida  |  Hawaii  |  Flowers  |  Contact Us
Copyright © 2002 Anderson Creations.  All Rights Reserved
*You are visitor number . Thank you for visiting!*



A -178

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.
Before the Honorable Robert L. Barton, Jr.
Administrative Law Judge

|  |  |
|---|---|
| In the Matter of | ) |
|  | ) |
| CERTAIN DIGITAL IMAGE | ) |
| STORAGE AND RETRIEVAL | ) |
| DEVICES | ) |

Investigation No. 337-TA-527

### INITIAL EXPERT REPORT OF ERIC C. ANDERSON

**I.    BACKGROUND**

1.      I have been retained by the law firm of Ropes & Gray on behalf of Complainant Ampex Corporation ("Ampex") as an independent expert and potential expert witness in this investigation.  I understand that this initial report is being submitted pursuant to an Order setting the procedural schedule in the investigation.

2.      I have worked extensively in the fields of digital electronics and computer science, including digital image processing, for over thirty years.  My expertise and experience include digital video technology, including digital cameras.

3.      I am currently a consultant, working for my own company, Anderson Creations.

4.      I received a B.S. in Electrical Engineering from the University of Rochester in 1968, and both an M.S. and an E.E. degree in Computer Science from MIT in 1971.

5.      While at MIT, I worked in the Electronic System Laboratory, and developed a multiple font display terminal, the development of which served as the basis for my master's thesis.

6.    From 1971 to 1987, I worked at Clear Light, Inc., as chief engineer and ultimately Executive Vice President of Engineering and Manufacturing. At Clear Light, I was responsible for the development of over 55 products in the area of computerized control of media devices.

7.    From 1987 to 1996, I was in various engineering management positions at Apple Computer, Inc., including work on developing digital cameras and other digital imaging products and applications. I was chief architect for a number of such projects.

8.    From 1996 to 2001, I was Chief Technology Officer of FlashPoint Technology, Inc., during which time I helped develop the Digita Operating System for digital still cameras, and helped a number of companies implement that technology into their cameras and photo printers. These companies included Hewlett Packard, Sharp, Konica, Minolta, Pentax, Epson, and Eastman Kodak.

9.    I have received over 86 patents, most of which relate to digital camera technology. I have received numerous awards, including being named Inventor of the Year in 2003 by the Silicon Valley Intellectual Property Law Association.

10.    My detailed qualifications and background are set forth in my resume, attached to this Report.

## II.    OPINIONS AND BASES THEREFORE

11.    I understand that I may be called by Ampex to testify as an expert witness in this investigation on technical issues, including the issue of whether the digital cameras imported and sold by Kodak infringe certain claims of Ampex's U.S. Patent 4,821,121 ("the '121 patent").

2

A -180

12.     I understand that the Respondents in this Investigation have moved to disqualify me as an expert, because of my work at Flashpoint which involved adopting the Digita technology into Kodak cameras, and that this motion is pending. Therefore, I have not been given access to any confidential information that has been produced in this investigation, and my discussions with Ampex's counsel have been confined to general discussions concerning my retention and the background technology of digital cameras. I have also seen the results of tests performed on Kodak cameras that have been conducted on behalf of Ampex. I understand that those tests are discussed and identified in a report being submitted by Dr. George Ligler, another expert retained by Ampex. Because that report contains confidential information, I have not seen the report, or been informed as to its contents, other than the aforementioned facts regarding the tests.

13.     Based on my review of the '121 patent, my general knowledge of digital camera technology, my familiarity as a user with Kodak digital cameras, and my knowledge of the test results conducted by Ampex referred to above, I believe that it is probable that the Kodak cameras contain each and every element, or perform each and every step, of one or more asserted claims of the '121 patent. However, I have not been able to finalize my opinion because I have not had access to the confidential documents that describe in detail the circuitry, software and operation of the Kodak cameras. Should I be permitted access to such information, I would then conduct further studies and analysis, in order to prepare a final opinion.

14.     If called upon to testify in this Investigation, I would testify, *inter alia*, that during my work with digital cameras, I became familiar with the user interface considerations that inform the design and implementation of digital cameras. One very important such consideration is the need for rapid, convenient, and expeditious system response

3

**A -181**

to user commands. One of the more important type of user command and commensurate system responses is the need to rapidly review the images that have been captured by the digital camera. To that end, digital camera manufacturers have implemented a feature, which Kodak calls "multi-up," which feature allows the user to review in an array, a number of thumbnail versions of the images that have been captured. This allows the user to quickly and efficiently review the images that have been captured. It is an important feature in many digital cameras, particularly so-called "high end" cameras. In my experience, the absence of such a feature would severely undercut the marketability of a digital still camera, in comparison with competing cameras that offered such a feature. In my opinion, the invention of the '121 patent is fundamental to this feature. Absent the contribution of the invention of the '121 patent, the ability to rapidly review the images captured by a digital still camera would be severely compromised.

15.     If called upon to testify in this action, I would testify that, based on my experience as the Image Capture Engineering Manager and Chief Architect of Digital Still Camera development at Apple Computer, Inc., the Chief Technology Officer of FlashPoint Technology, Inc., and in my subsequent work as a consultant and active participant in the digital still camera user community, I know that many owners and customers of digital still cameras, including the current Kodak product line of cameras, use and heavily rely on the feature of these cameras ("multi-up", in the case of Kodak's cameras) that, as discussed above, I believe probably use the inventions of the claims of the '121 patent.

## III.     COMPENSATION

16.     I am being compensated for my work on this matter at my usual consulting rate of $300 per hour.

4

A -182

**IV.    OTHER CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT AT TRIAL
OR BY DEPOSITION**

17.    I have not testified previously as an expert at trial or by deposition within the preceding four years.

**V.    EXHIBITS TO BE USED AT TRIAL**

18.    I have not yet selected or prepared any exhibits for use at trial. I may rely on one or more of the items described above, and/or that I understand are referenced in Dr. Ligler's statement, and other documents that are produced by Respondents that relate to the circuitry, software and operation of the Kodak cameras.

19.    The opinions expressed in this report will be supplemented at a later date, if the Court permits me to act as an expert, and after I have had the opportunity to review the confidential information and documents that would be available to me, and confer with Ampex's other outside experts and consultants. In addition, I may be asked to respond to opinions or issues raised by other experts. I reserve the right to amend or supplement this report under these conditions or other appropriate circumstances.

Date: 3/24/05            E C Anderson
                         Eric C. Anderson

5

A -183

A-184 – A-197

Confidential Information Subject to
Protective Order

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the Honorable Robert L. Barton
Administrative Law Judge

| | |
|---|---|
| In the Matter of )<br><br>CERTAIN DIGITAL IMAGE )<br>STORAGE AND RETRIEVAL )<br>DEVICES ) | Investigation No. 337-TA-527 |

## SUBPOENA DUCES TECUM

TO:    FlashPoint Technology, Inc.

Attention: Jens Hillen, Esq.

20 Depot Street, Suite 2A
Peterborough, NH 03458

**TAKE NOTICE:** By authority of Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), 5 U.S.C. § 556(c)(2), and pursuant to 19 C.F.R. § 210.32 of the Rules of Practice and Procedure of the United States International Trade Commission, and upon an application for subpoena made by Respondents EASTMAN KODAK COMPANY and ALTEK CORPORATION,

**YOU ARE HEREBY ORDERED** to produce at the offices of Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109, within ten (10) calendar days after the receipt hereof, or at such other time and place agreed upon, all of the documents and things in your possession, custody, or control that are listed and described in Attachment A hereto. Such production will be for the purpose of inspection and copying, as desired.

**A -198**

If production of any document listed and described in Attachment A hereto is withheld on the basis of a claim of privilege, each withheld document shall be separately identified in a privileged document list. The privileged document list must identify each document separately, specifying for each document at least: (1) the date; (2) author(s)/sender(s); (3) recipient(s), including copy recipients; and (4) general subject matter of the document. The sender(s) and recipient(s) shall be identified by position and entity (corporation or firm, etc.) with which they are employed or associated. If the sender or the recipient is an attorney or a foreign patent agent, he or she shall be so identified. The type of privilege claimed must also be stated, together with a certification that all elements of the claimed privilege have been met and have not been waived with respect to each document.

If any of the documents or things listed and described in Attachment A hereto is considered "confidential business information," as that term is defined in the Protective Order attached hereto, such documents or things shall be produced subject to the terms and provisions of the Protective Order.

Any motion to limit or quash this subpoena shall be filed within ten (10) days after the receipt hereof. At the time of filing of any motion concerning this subpoena, two courtesy copies shall be served on the Administrative Law Judge at his office.

IN WITNESS WHEREOF the undersigned of the United States International Trade Commission has hereunto set his hand and caused the seal of said United States International Trade Commission to be affixed at Washington, DC on this 4th day of May, 2005.

Robert L. Barton, Jr.
Administrative Law Judge
United States International Trade Commission

**A -199**

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### WASHINGTON, D.C.

### Before the Honorable Robert L. Barton, Jr.
### Administrative Law Judge

| | |
|---|---|
| In the Matter of )<br><br>CERTAIN DIGITAL IMAGE )<br>STORAGE AND RETRIEVAL )<br>DEVICES ) | Investigation No. 337-TA-527 |

## ATTACHMENT A
## DOCUMENTS AND THINGS TO BE PRODUCED

### Instructions

1.  This subpoena requires FlashPoint Technology, Inc. to produce all responsive documents in its actual or constructive possession, custody, or control.

2.  If multiple copies of a document exist, please produce every copy with notations or markings of any sort that do not appear on other copies.

3.  Please produce the documents as they are kept in the usual course of business, organized and labeled to correspond with the categories in this subpoena.

4.  This subpoena includes documents that exist in electronic form (including electronic mail, back-up tapes, magnetic tapes and diskettes).

5.  If any portion of any document or tangible thing is responsive to any production request herein, then the entire document or tangible thing must be produced. If any requested document or tangible thing cannot be produced in full, then you must produce that document or tangible thing to the greatest extent possible. Whenever a document or

**A -200**

tangible thing is not produced in full, or is produced in redacted form, you must indicate

such on the document or tangible thing produced.

6. If any writing requested was, but is no longer in your possession or subject to your

control, or is no longer in existence, state whether it:

    a. is missing or lost;

    b. has been destroyed;

    c. has been transferred, voluntarily or involuntarily, to others and state the

        identity of those persons to whom it has been transferred;

    d. has been otherwise disposed of, and in each instance explain the

        circumstances surrounding such disposition, state the date or approximate

        date thereof, and the identity of the persons with knowledge of such

        circumstances; or identify the writings that are missing, lost, destroyed,

        transferred, or otherwise disposed of, by author, date, subject matter,

        addressee and the number of pages.

7. These are continuing requests for the production of documents, and if additional writings

are received or discovered prior to the date of trial, a supplemental document production

should be made, providing such additional writing as promptly and as long as before trial

as possible.

## Definitions

1. "Document" shall be given the broadest meaning accorded to it by Fed. R. Civ. P. 34(a).

2. "Relating to" means, without limitation, directly or indirectly mentioning, discussing,

A -201

pertaining to, referring to, describing, evidencing, or constituting.

3.  "FlashPoint", "FlashPoint Technology", "you", "your", or "yours" as used herein shall mean, unless otherwise specified in a particular request, FlashPoint Technology, Inc. and includes all of its predecessors, successors, present and former partners, investors, corporate parents, affiliated companies or corporations, direct and indirect subsidiaries, officers, directors, employees, agents, attorneys, servants, representatives, and all other persons acting or purporting to act on its behalf.

4.  "Kodak" means the respondent Eastman Kodak Company and includes all of its predecessors, successors, present and former partners, investors, corporate parents, affiliated companies or corporations, direct and indirect subsidiaries, officers, directors, employees, agents, attorneys, servants, representatives, and all other persons acting or purporting to act on its behalf.

5.  "Eric Anderson," or "Anderson" as used herein shall mean, unless otherwise specified in a particular request, Eric C. Anderson, his agents, and attorneys.

6.  "Product, process, or technology" means any product, device, apparatus, process, method, act, or other instrumentality.

7.  The words "and" and "or" shall be construed conjunctively or disjunctively, whichever makes this subpoena more inclusive, and "any" shall mean each and every.

## Requests

1.  All documents constituting or concerning any agreement, contract, letter of intent, license, memorandum of understanding, or other agreement or materials evidencing,

3

*A -202*

discussing, memorializing or relating to Eric Anderson's relationship with, work for, or employment by FlashPoint including, without limitation, employment contracts, documents evidencing payment, consulting agreements, non-competition agreements, confidentiality agreements, and agreements requiring Mr. Anderson to maintain the confidentiality of client information.

2.  All documents constituting or concerning any agreement, contract, letter of intent, license, memorandum of understanding, or other agreement or materials evidencing, discussing, memorializing or relating to FlashPoint's relationship with Kodak between 1996 and 2000, including, without limitation, any development agreements and/or confidentiality agreements.

3.  All documents that were provided to Eric Anderson or to which Eric Anderson had access between 1996 and 2000, relating or referring to Kodak or Kodak products, processes or technologies including, but not limited to, any and all correspondence, specifications, schematics and other design and development materials.

4.  All documents relating to Eric Anderson's work regarding Kodak digital cameras including, but not limited to, lab notebooks, notes, memoranda, specifications, schematics, and confidentiality agreements.

4

A -203

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

In the Matter of

**CERTAIN DIGITAL IMAGE STORAGE
AND RETRIEVAL DEVICES**

Inv. No. 337-TA-527

## ORDER NO. 1:  PROTECTIVE ORDER

### (December 3, 2004)

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. § 210.5;

IT IS HEREBY ORDERED THAT:

1. Confidential business information is information which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, or other information of commercial value, the disclosure of which is likely to have the effect of either (i) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions; or (ii) causing substantial harm to the competitive position of the person, firm,

A -204

partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information. The term "confidential business information" includes "proprietary information" within the meaning of section 777(b) of the Tariff Act of 1930 (19 U.S.C. § 1677f(b)).

2. (a) Any information submitted, in pre hearing discovery or in a pleading, motion, or response to a motion either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business information shall be so designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall be segregated from other information being submitted. Documents shall be clearly and prominently marked on their face with the legend: "[supplier's name] CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER," or a comparable notice. Such information, whether submitted in writing or in oral testimony, shall be treated in accordance with the terms of this protective order.

(b) The Administrative Law Judge or the Commission may determine that information alleged to be confidential is not confidential, or that its disclosure is necessary for the proper disposition of the proceeding, before, during or after the close of a hearing herein. If such a determination is made by the Administrative Law Judge or the Commission, opportunity shall be provided to the supplier of such information to argue its confidentiality prior to the time of such ruling.

3. In the absence of written permission from the supplier or an order by the Commission or the Administrative Law Judge, any confidential documents or business information submitted in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than: (i) outside counsel for parties to this investigation, including necessary secretarial and support

-2-

A -205

personnel assisting such counsel; (ii) qualified persons taking testimony involving such documents or information and necessary stenographic and clerical personnel thereof; (iii) technical experts and their staff who are employed for the purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise affiliated with a non-governmental party, or are employees of any domestic or foreign manufacturer, wholesaler, retailer, or distributor of the products, devices or component parts which are the subject of this investigation); (iv) the Commission, the Administrative Law Judge, the Commission staff, and personnel of any governmental agency as authorized by the Commission; and (v) the Commission, its employees, and contract personnel who are acting in the capacity of Commission employees, for developing or maintaining the records of this investigation or related proceedings for which this information is submitted, or in internal audits and investigations relating to the programs and operations of the Commission pursuant to 5 U.S.C. Appendix 3.[1]

4. Confidential business information submitted in accordance with the provisions of paragraph 2 above shall not be made available to any person designated in paragraph 3(i) and (iii) unless he or she shall have first read this order and shall have agreed, by letter filed with the Secretary of this Commission: (i) to be bound by the terms thereof; (ii) not to reveal such confidential business information to anyone other than another person designated in paragraph 3; and (iii) to utilize such confidential business information solely for purposes of this investigation.

5. If the Commission or the Administrative Law Judge orders, or if the supplier and all parties to the investigation agree, that access to, or dissemination of information submitted as confidential business information shall be made to persons not included in paragraph 3 above, such

---

[1]      See Commission Administrative Order 97-06 (Feb. 4, 1997).

-3-

matter shall only be accessible to, or disseminated to, such persons based upon the conditions pertaining to, and obligations arising from this order, and such persons shall be considered subject to it, unless the Commission or the Administrative Law Judge finds that the information is not confidential business information as defined in paragraph 1 hereof.

6. Any confidential business information submitted to the Commission or the Administrative Law Judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under seal pursuant to paragraph 2 above. Any portion of a transcript in connection with this investigation containing any confidential business information submitted pursuant to paragraph 2 above shall be bound separately and filed under seal. When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "[supplier's name] CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER." Before a court reporter or translator receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof. Alternatively, he or she shall sign the agreement included as Attachment A hereto. Copies of each such signed agreement shall be provided to the supplier of such confidential business information and the Secretary of the Commission.

7. The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the Administrative Law Judge rules, after an opportunity for hearing, was publicly known at the time

-4-

A -207

it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

3.  The Commission, the Administrative Law Judge, and the Commission investigative attorney acknowledge that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 552(b)(4) and 18 U.S.C. § 1905, subject to a contrary ruling, after hearing, by the Commission or its Freedom of Information Act Officer, or the Administrative Law Judge.  When such information is made part of a pleading or is offered into the evidentiary record, the data set forth in 19 C.F.R. § 201.6 must be provided except during the time that the proceeding is pending before the Administrative Law Judge. During that time, the party offering the confidential business information must, upon request, provide a statement as to the claimed basis for its confidentiality.

9.  Unless a designation of confidentiality has been withdrawn, or a determination has been made by the Commission or the Administrative Law Judge that information designated as confidential, is no longer confidential, the Commission, the Administrative Law Judge, and the Commission investigative attorney shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above, including, without limitation:  (a) notifying the supplier promptly of (i) any inquiry or request by anyone for the substance of or access to such confidential business information, other than those authorized pursuant to this order, under the Freedom of Information Act, as amended (5 U.S.C. § 552) and (ii) any proposal to redesignate or make public any such confidential business information; and (b) providing the supplier at least seven days after receipt of such inquiry or request within which to take

-5-

A -208

action before the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge, or otherwise to preserve the confidentiality of and to protect its rights in, and to, such confidential business information.

10. If while an investigation is before the Administrative Law Judge, a party to this order who is to be a recipient of any business information designated as confidential and submitted in accordance with paragraph 2 disagrees with respect to such a designation, in full or in part, it shall notify the supplier in writing, and they will thereupon confer as to the status of the subject information proffered within the context of this order. If prior to, or at the time of such a conference, the supplier withdraws its designation of such information as being subject to this order, but nonetheless submits such information for purposes of the investigation, such supplier shall express the withdrawal, in writing, and serve such withdrawal upon all parties and the Administrative Law Judge. If the recipient and supplier are unable to concur upon the status of the subject information submitted as confidential business information within ten days from the date of notification of such disagreement, any party to this order may raise the issue of the designation of such a status to the Administrative Law Judge who will rule upon the matter. The Administrative Law Judge may sua sponte question the designation of the confidential status of any information and, after opportunity for hearing, may remove the confidentiality designation.

11. No less than 10 days (or any other period of time designated by the Administrative Law Judge) prior to the initial disclosure to a proposed expert of any confidential information submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in writing the name of such proposed expert and his or her educational and detailed employment history to the supplier. If the supplier objects to the disclosure of such confidential business information to such

-6-

A -209

proposed expert as inconsistent with the language or intent of this order or on other grounds, it shall notify the recipient in writing of its objection and the grounds therefor prior to the initial disclosure. If the dispute is not resolved on an informal basis within ten days of receipt of such notice of objections, the supplier shall submit immediately each objection to the Administrative Law Judge for a ruling. If the investigation is before the Commission the matter shall be submitted to the Commission for resolution. The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the Commission or the Administrative Law Judge. The terms of this paragraph shall be inapplicable to experts within the Commission or to experts from other governmental agencies who are consulted with or used by the Commission.

12. If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the Administrative Law Judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

13. Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge concerning the issue of the status of confidential business information.

14. Upon final termination of this investigation, each recipient of confidential business information that is subject to this order shall assemble and return to the supplier all items containing such information submitted in accordance with paragraph 2 above, including all copies of such

-7-

A-210

matter which may have been made. Alternatively, the parties subject to this order may, with the written consent of the supplier, destroy all items containing confidential business information and certify to the supplier (or his counsel) that such destruction has taken place. This paragraph shall not apply to the Commission, including its investigative attorney, and the Administrative Law Judge, which shall retain such material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy those additional copies in its possession which it regards as surplusage.

Notwithstanding the above paragraph, confidential business information may be transmitted to a district court pursuant to Commission Rule 210.5(c).

15. If any confidential business information which is supplied in accordance with paragraph 2. above is supplied by a nonparty to this investigation, such a nonparty shall be considered a "supplier" as that term is used in the context of this order.

16. Each nonparty supplier shall be provided a copy of this order by the party seeking information from said supplier.

17. The Secretary shall serve a copy of this order upon all parties.

Delbert R. Terrill, Jr.
Administrative Law Judge

-8-

A -211

## ATTACHMENT A

## NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____ , do solemnly swear or affirm that I will not divulge any information communicated to me in any confidential portion of the investigation or hearing in the matter of Certain Digital Image Storage and Retrieval Devices, Inv. No. 337-TA-527, except as permitted in the protective order issued in this case. I will not directly or indirectly use, or allow the use of such information for any purpose other than that directly associated with my official duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any person reveal the nature or content of any information communicated during any confidential portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation _____

-9-

A -212

A-213 – A-221

Confidential Information Subject to
Protective Order

A-222 – A-223

Confidential Information Subject to
Protective Order

# A-224 – A-230

## Confidential Information Subject to Protective Order

A-231 – A-239

Confidential Information Subject to
Protective Order

A-240 – A-241

Confidential Information Subject to
Protective Order

A-242 – A-245

Confidential Information Subject to
Protective Order

A-246 – A-248

Confidential Information Subject to
Protective Order

# A-249 – A-254

# Confidential Information Subject to Protective Order

1

THE UNITED STATES INTERNATIONAL TRADE COMMISSION

In the Matter of:                    )
                                     )
CERTAIN DIGITAL IMAGE                )   Investigation No.:
STORAGE AND RETRIEVAL                )   337-TA-527
DEVICES                              )

                            Wednesday,
                            July 20, 2005

                            International Trade Commission
                            Courtroom A
                            500 E Street, S.W.
                            Washington, D.C.

        The preliminary conference commenced, pursuant to

notice, at 9:01 a.m.

        BEFORE:   HONORABLE ROBERT L. BARTON
                  Judge

        APPEARANCES:

        For Complainant Ampex Corporation:

        BARBARA A. MURPHY, Esquire
        Adduci, Mastriani & Schaumberg, LLP
        1200 Seventeenth Street, N.W.
        Washington, D.C.

        NORMAN H. BEAMER, Esquire
        Ropes & Gray LLP
        525 University Avenue
        Palo Alto, California  94301

        JAMES HOPENFELD, Esquire
        Ropes & Gray LLP
        One Metro Center
        700 12th Street, N.W., Suite 900
        Washington, D.C.  20005

        SASHA RAU, Esquire
        Ropes & Gray LLP
        One Metro Center
        700 12th Street, N.W., Suite 900
        Washington, D.C.  20005

                Heritage Reporting Corporation
                      (202) 628-4888

2

APPEARANCES (CONT'D)

JOEL TALCOTT, Esquire
Ampex
1228 Douglas
Redwood City, CA 94063

On behalf of Respondents
Eastman Kodak Company and Chinon Industries, Inc.:

MICHAEL D. ESCH, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street, N.W.
Washington, D.C.  20037

WILLIAM P. DISALVATOE, Esquire
S. CALVIN WALDEN, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
199 Park Avenue
New York, New York  1022

DONALD STEINBERG, Esquire
MICHAEL J. SUMMERSGILL, Esquire
MONICA GREWAL, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109

On behalf of Staff:

SPENCE CHOBB
ERIN JOFFRE

A -256

3

| 1 | P R O C E E D I N G S |
| 2 | (9:01 a.m.) |
| 3 | THE CLERK:  All rise. |
| 4 | JUDGE BARTON:  Please be seated. |
| 5 | We are the record.  This is a conference in |
| 6 | the matter of Certain Digital Image Storage and |
| 7 | Retrieval Devices, Investigation No. 337-TA-527. |
| 8 | This is a conference that was set in |
| 9 | Order Number 29 issued on July 11, 2005. |
| 10 | Let me get the appearances for the parties. |
| 11 | First, for the Complainant? |
| 12 | MR. BEAMER:  Good morning, Your Honor. |
| 13 | Norman Beamer on behalf of Plaintiff, Ampex |
| 14 | Corporation. |
| 15 | With me is Barbara Murphy of the Adduci |
| 16 | Mastriani firm.  I'm with Ropes & Gray.  My partner |
| 17 | James Hopenfeld.  Sasha Rau, also of Ropes & Gray, and |
| 18 | Joel Talcott, General Counsel of Ampex. |
| 19 | JUDGE BARTON:  Okay.  And for Respondent? |
| 20 | MR. DISALVATOE:  Good morning, Your Honor. |
| 21 | I'm William DiSalvatoe, Wilmer Cutler Pickering Hale |
| 22 | and Dorr, on behalf of Respondents Eastman Kodak |
| 23 | Company and Chinon Industries Inc. |
| 24 | With me today is my partner Michael |
| 25 | Summersgill, Monica Grewal, Calvin Walden, Donald |

Heritage Reporting Corporation
(202) 628-4888

A-257

109

```
 1                    PUBLIC RECORD
 2           JUDGE BARTON:  I believe there's an
 3   outstanding motion for leave to file a reply by
 4   Respondents.  Normally I'm not going to allow replies,
 5   but I will allow it in this instance.  The reason I'm
 6   not going to allow it in most instances is it just
 7   simply takes more time than to get things resolved and
 8   then I end up with a reply and a surreply and so
 9   forth.  But in this instance I will allow the motion
10   for reply.
11           The first matter I want to address is the
12   legal standard.  In Order 19, issued on March 25,
13   2005, I said that the standard was one, did the
14   adversary have a confidential relationship with the
15   expert; and two, did the adversary disclose
16   confidential or privileged information to the expert
17   that is relevant to the current litigation?
18           I still think that's the proper standard,
19   and until the Commission tells me otherwise, that's
20   the standard I'm going to use.
21           Staff agrees with that standard, Respondents
22   agree with that standard, Ampex does not agree with
23   it.  However, I do not believe that that standard is
24   limited to situations in which an expert switches
25   sides.
```

Heritage Reporting Corporation
(202) 628-4888

A-258

110

1      Certainly when an expert switches sides

2  that's an egregious violation.  But there are cases

3  that applied that standard that do not involve experts

4  switching sides. .

5      To the extent there are any decisions, and

6  I'm not sure there are any because the staff did seek

7  to distinguish the Headboxes case, but to the extent

8  there are any decisions by other ALJs which do not use

9  that legal standard, the only thing I can say is that

10  reasonable judges can disagree and I believe that is

11  the correct standard.

12      Now when I issued Order 19 I applied that

13  standard but I found that utilizing that standard the

14  motion to disqualify Mr. Anderson should be denied.

15  The question is, using that same legal standard now

16  should I deny the motion again?

17      I rarely grant motions for reconsideration,

18  however in this instance Respondents' further

19  discovery has elicited important relevant information

20  concerning the issue of whether Anderson should be

21  disqualified and that is why I held oral argument on

22  the motion today.

23      That further discovery has elicited that he

24  had a further explicit written obligation to maintain

25  the confidentiality of Kodak confidential information

111

1   and he received Kodak confidential information

2   directly relevant to the current litigation including

3   Kodak's algorithm for processing thumbnail images used

4   in cameras accused of infringement.

5          I also take into account staff's position

6   here. Last time, of course, the staff also supported

7   the motion to disqualify and I didn't agree with them

8   at that time. However, I do take into account the

9   staff's position because the staff does not have, as

10  far as I'm concerned, any axe to grind in these

11  proceedings. They're seeking to present what they

12  believe is the public interest on these proceedings,

13  and therefore I give a good deal of deference and

14  consideration to what they say. Many times I don't

15  agree with the staff. But nevertheless, as I said,

16  they don't have an axe to grind here and they oppose

17  Ampex's use of Mr. Anderson in this proceeding and

18  have presented some pretty cogent reasons for granting

19  the motion to disqualify.

20         I would further state that although it is

21  not a basis for my ruling, I believe that Mr. Anderson

22  and Complainant were not candid and forthright about

23  his continuing relationship with Flashpoint in their

24  March 2005 opposition.

25         Ampex's statement that Anderson did not have

Heritage Reporting Corporation
(202) 628-4888

A-260

112

1    a "pertinent current relationship with Flashpoint" is
2    not the type of forthright and candid behavior that I
3    expect from counsel and a party.  I suppose the key
4    word there was pertinent, but to me, you have an
5    obligation to come forward and be forthright with me
6    and tell me that he continues to work with Flashpoint,
7    whether or not you think it's relevant or not.

8         Anderson did have a current relationship
9    with Flashpoint since October 2001 which I note his
10   resume did not disclose.  The word pertinent only
11   muddled this matter.

12        Anderson had an explicit duty in a signed
13   employment agreement to hold customer information,
14   including that of Kodak, in the strictest confidence
15   consistent with Flashpoint's agreements with such
16   third parties.  Flashpoint has produced documents
17   including employment and confidentiality agreement
18   obligating Anderson to maintain the confidentiality of
19   Flashpoint's customer's information as well as
20   notebooks concerning his work on Kodak digital
21   cameras.

22        Moreover, although this was not clear to me
23   when I issued Order 19, it appears that Mr. Anderson
24   was intricately involved in development of
25   technologies that are still used in Kodak cameras.  In

A-261

113

1    his resume Anderson asserts that as Chief Technology

2    Officer of Flashpoint he guided technology development

3    with product shipments concerning the DC line of Kodak

4    cameras.

5          The evidence also suggests that Anderson

6    worked closely with Kodak engineers to develop Kodak's

7    digital cameras, and I agree with staff that this is a

8    clear conflict of interest.

9          The evidence also shows that Anderson worked

10   on development of algorithms for generating

11   screennails used in Kodak DC cameras and that Kodak

12   shared detailed confidential information relating to

13   screennails with Anderson.

14         This is addressed by Respondents in their

15   memorandum at page 12.

16         According to an affidavit by Kodak's senior

17   principle engineer, the screennail images developed in

18   the DC cameras on which Anderson worked are in many

19   respects the same as what was implemented, what's been

20   implemented in the cameras accused of infringement in

21   this action.

22         Anderson also received confidential

23   information concerning the processing of images in

24   both the capture and review modes of the Kodak digital

25   cameras.  Anderson was provided detailed information

114

1    regarding processing of images and received

2    confidential specifications, engineering requirements,

3    schematics and block diagrams.

4         Anderson's notebook shows that he regularly

5    received information regarding Kodak's DX3900 camera

6    released in August of 2001, and Kodak notes that Ampex

7    has accused this camera of infringing a 121 patent in

8    a district court action.

9         With respect to the confidential

10   relationship, the development agreement between

11   Flashpoint and Kodak, the employee handbook, as well,

12   as Flashpoint's guidelines for its employees, all

13   impose a confidential relationship.

14        As far as the confidential information,

15   Anderson received Kodak's proprietary algorithm for

16   creating thumbnails.  He helped to develop this

17   information.  He received detailed confidential

18   information regarding image processing in the Kodak

19   cameras, and he regularly communicated with and met

20   with Kodak's engineers regarding his work on Kodak's

21   digital cameras.

22        I note that Anderson's resume even claims

23   that he guided technology development with products

24   including the Kodak DC line of cameras.

25        For all of these reasons I have decided that

A-263

115

1    I am going to grant Respondent's motion to disqualify

2    Mr. Anderson as an expert witness in this proceeding.

3            Now going back to the procedural schedule,

4    at least at this point I don't see any reason to

5    revise the procedural schedule unless a party wants to

6    be heard and can tell me why it's absolutely essential

7    that the procedural schedule be modified once again.

8            The only thing that was in there that I did

9    want to address, there was a paragraph nine set

10   September 7, 2005  as the date to identify all

11   exhibits including physical and demonstrative exhibits

12   intended for use in the tutorial on technology and to

13   submit and serve all such exhibits not previously

14   exchanged and an outline setting forth the subject

15   matter to be discussed in the tutorial with physical

16   and demonstrative exhibits not previously identified.

17           That date is fine.  I'll set that date as

18   the date for doing that.

19           As far as the other requested extensions,

20   I'm not granting that.

21           There are some other matters I did want to

22   cover with you.  These relate to pre-hearing

23   procedures and hearing procedures.  I particularly

24   want to go over the pre-hearing procedures, so --

25           MR. BEAMER:  Your Honor, may I ask a

**A-284**

 **FISH & NEAVE IP GROUP**

ROPES & GRAY LLP
525 UNIVERSITY AVENUE    SUITE 300    PALO ALTO, CA 94301-1917    650-617-4000    F 650-617-4090
BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

NORMAN H. BEAMER
DIRECT DIAL 650.617.4030
DIRECT FAX 650.566.4149
E-MAIL NORMAN.BEAMER@ROPESGRAY.COM

February 22, 2006

<u>**VIA E-MAIL (CONF. BY MAIL)**</u>

Michael J. Summersgill
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

*Ampex Corporation v. Eastman Kodak Company, et al.*

Dear Mr. Summersgill:

Pursuant to Paragraph 8 of the Protective Order For Confidentiality entered in this action, Ampex designates Eric C. Anderson as an expert to receive confidential information.  A copy of his CV is enclosed.

Very truly yours,

*Norman Beamer*

Norman H. Beamer

NHB:jss
Enclosure

cc:    William F. Lee, Esq.
       Paul M. Lukoff, Esq.
       Jack B. Blumenfeld, Esq.

**A-265**

A-266 – A-275

Confidential Information Subject to
Protective Order

A-276

Confidential Information Subject to
Protective Order

A-277

Confidential Information Subject to
Protective Order

A-278 – A-294

Confidential Information Subject to
Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMPEX CORPORATION, )<br><br>*Plaintiff,* )<br><br>v. )<br><br>EASTMAN KODAK COMPANY,<br>ALTEK CORPORATION, and CHINON<br>INDUSTRIES, INC., )<br><br>*Defendants.* ) | C.A. No. 04-1373 (KAJ)<br><br>(Jury Trial Demanded) |

## SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Ampex Corporation ("Ampex"), for and as its second amended complaint in this action for patent infringement, alleges and avers against Eastman Kodak Company ("Kodak"), Altek Corporation ("Altek") and Chinon Industries, Inc. ("Chinon"), collectively, "Defendants," as follows:

### NATURE OF THE ACTION

1.  This claim for patent infringement arises under the laws of the United States of America, 35 U.S.C. § 100 *et. seq.*

2.  Ampex is a developer and licensor of visual information technology. Ampex has developed substantial proprietary technology relating to the storage, retrieval and processing of data, including image data, and brings this action for damages and injunctive relief because of Defendants' past and ongoing infringement of Ampex's U.S. Patent No. 4,821,121 ("the '121 Patent"), which claims certain methods and apparatus for storing and retrieving full-size and corresponding reduced-size images.

3.     On information and belief, Defendants have infringed and continue to infringe the '121 Patent by manufacturing, using, selling, offering to sell and/or importing into the United States digital cameras, thereby violating Ampex's statutory patent rights and causing damage to Ampex.

## PARTIES

4.     Ampex is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business at 1228 Douglas Avenue, Redwood City, California 94063-3117.

5.     On information and belief, Kodak is a New Jersey corporation with a principal place of business at 343 State Street, Rochester, New York 14650.

6.     On information and belief, Altek is a corporation organized under the laws of Taiwan and has its principal place of business at 3F, No. 10, Li-Hsin Road Science-Based Industrial Park, Hsinchu, Taiwan.

7.     On information and belief, Chinon is a wholly-owned subsidiary of Kodak, and is a corporation organized under the laws of Japan and has its principal place of business at 23 11 Naka Oshio, Chino City, Nagano 391 0293, Japan.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 35 U.S.C. § 271 and 28 U.S.C. §§ 1331 and 1338(a).

A -296

9.    This Court has personal jurisdiction over Kodak because Kodak imports, markets, sells and offers to sell digital cameras that infringe the '121 Patent throughout the United States including in this District. Kodak solicits business and/or derives substantial revenue from the citizens of Delaware; regularly transacts business in this district; and/or has caused tortious injury to Ampex in this district. Kodak is registered to do business in Delaware and has a registered agent for service of process in Delaware.

10.    On information and belief, Altek and Chinon manufacture, or have manufactured, some of the digital cameras accused of infringement herein, and provide, or have provided, them to Kodak knowing that the digital cameras will enter the stream of commerce, and be sold, in the United States, including this District. Thus, the Court has personal jurisdiction over Altek and Chinon.

11.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1391(d), as well as 1400(b), because Defendants have committed acts of patent infringement in this district and are subject to personal jurisdiction in this district.

## CLAIM FOR RELIEF

12.    Ampex and its predecessors have been and Ampex presently is the owner by assignment of all right, title and interest in the '121 Patent, entitled "Electronic Still Store With High Speed Sorting and Method of Operation," which the United States Patent and Trademark Office issued on April 11, 1989. The '121 Patent claims are directed generally to methods and apparatus for storing and retrieving full-size and corresponding reduced-size images. A copy of the '121 Patent is attached hereto as Exhibit 1.

13.    On information and belief, Kodak manufactures, uses, sells, offers to sell and/or imports into the United States certain digital cameras, including without limitation Kodak's

CX4200, CX4210, CX4230, CX4300, CX4310, CX6200, CX6230, CX6330, CX6445, CX7220, CX7300, CX7310, CX7330, CX7430, CX7525, CX7530, DX3900, DX4900, DX6340, DX6440, DX6490, DX7440, DX7590, DX7630, LS420, LS443, LS743, LS753, Z700, Z730, Z740, Z760, Z7590, C300, C310, C330, C340, C360, V530, V550, Easyshare-One, DCS Pro 14n, DCS Pro SLR/c, DCS Pro SLR/n, DCS Proback Plus, and DCS Proback 645 cameras, that utilize patented methods and apparatus claimed by the '121 Patent for storing and retrieving full-size and corresponding reduced-size images. On information and belief, Altek and Chinon manufacture, or have manufactured, some of the digital cameras accused of infringement herein, and provide them, or have provided them, to Kodak to be sold under the "Kodak" brand name.

14.    Ampex has not, at any time, authorized any of the Defendants to make, import, use, sell, offer for sale, market or license digital cameras covered by the '121 Patent.

15.    On information and belief, Defendants have been and still are infringing the '121 Patent by making, using, selling, offering to sell, marketing or licensing; and/or inducing the making, using, selling, offering to sell, marketing or licensing; and/or contributing to the making, using, selling, offering to sell, marketing or licensing of products that utilize patented methods and apparatus for storing and retrieving full-size and corresponding reduced-size images claimed in the '121 Patent.

16.    On information and belief, the Defendants' officers, agents, employees and/or servants have been, and are, aware of the '121 Patent and are aware of the infringement complained of herein. For example, Ampex previously notified Kodak in writing of the existence of the '121 Patent and its claims related to digital cameras. Furthermore, Ampex offered to license, on reasonable terms, the '121 Patent to Kodak. However, to date, these efforts have not led to a license agreement with respect to such digital cameras. Nevertheless, even

though Defendants are aware of the '121 Patent, they have infringed and continue to infringe the '121 Patent, and will continue to do so unless enjoined by this Court. As a result, Defendants' infringement has been, and continues to be, willful and wanton, thus making this case exceptional as contemplated by the remedies provisions of the U.S. Patent Act, 35 U.S.C § 281 et. seq.

17.    On information and belief, Defendants' infringement has deprived, and will deprive, Ampex of royalties and other related revenue that Ampex would have made or would enjoy in the future, has injured Ampex in other respects, and will cause Ampex additional injury and damage, including loss of royalties, and other related revenue in the future, unless Defendants are enjoined from infringing the '121 Patent.

18.    On information and belief, by reason of Defendants' infringement of the '121 Patent, Ampex has been and will be damaged and is entitled to remedies provided under the Patent Act, 35 U.S.C. §§ 281-285, the amount and extent of such damages to be determined.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ampex requests judgment in its favor and against Defendants that:

     (a)    Ampex is the owner of the '121 Patent, and all rights of recovery under it;

     (b)    each Defendant has infringed the '121 Patent, directly, contributorily and by inducement;

     (c)    each Defendant has willfully infringed the '121 Patent;

     (d)    a permanent injunction be granted prohibiting each Defendant, its affiliates, officers, agents, servants, employees, attorneys and those persons in active concert or

A -299

participation with it, from infringing, contributorily infringing, and/or inducing infringement of the '121 Patent;

(e) Ampex be awarded compensatory damages, not less than a reasonable royalty, for each Defendant's infringement of the '121 Patent;

(f) Ampex be awarded treble damages as a result of Defendants' knowing and willful infringement, contributory infringement and inducement to infringe the '121 Patent;

(g) Ampex be awarded prejudgment interest;

(h) Ampex be awarded its costs of suit and attorneys' fees; and

(i) providing any and all other relief that the Court may deem just and appropriate.

A-300

**JURY DEMAND**

Plaintiff Ampex hereby demands a trial by jury on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Julia Heaney*
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jheaney@mnat.com
*Attorneys for Plaintiff Ampex Corporation*

OF COUNSEL:

Jesse J. Jenner
Sasha G. Rao
Ropes & Gray LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Norman H. Beamer
Gabrielle E. Higgins
Ropes & Gray LLP
525 University Avenue
Palo Alto, California 94301
(650) 617-4000

James B. Hopenfeld
Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Washington, DC 20005

September 8, 2005
482151

A -301

# A-302 – A-304

## Confidential Information Subject to Protective Order

# A-305 – A-306

# Confidential Information Subject to Protective Order

A-307 – A-319

Confidential Information Subject to
Protective Order

# A-320

# Confidential Information Subject to Protective Order

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2006, I electronically filed **DEFENDANTS' REDACTED APPENDIX TO ITS OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISQUALIFY ERIC ANDERSON** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899

I hereby certify that on March 13, 2006, I have forwarded the above-noted document to the following as noted below:

**VIA E-MAIL**

Jesse J. Jenner, Esquire
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020

**VIA E-MAIL & FEDERAL EXPRESS**

Norman H. Beamer, Esquire
Ropes & Gray LLP
525 University Avenue
Palo Alto, California 94301

**VIA E-MAIL**

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899

PAUL M. LUKOFF (Bar I.D. #96)
DAVID E. BRAND (Bar I.D. #201)
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899-1328
TEL: 302-888-6500
E-MAIL: PMLukoff@prickett.com
        DEBrand@prickett.com