## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMPEX CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 04-1373-KAJ |
| ) | |
| EASTMAN KODAK COMPANY, ) | |
| ALTEK CORPORATION and CHINON ) | |
| INDUSTRIES, INC., ) | **REDACTED** |
| ) | |
| Defendants. ) | |
| ) | |

## REDACTED APPENDIX TO DEFENDANTS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION TO BIFURCATE
## AND MOTION FOR PROTECTIVE ORDER

**OF COUNSEL:**

S. Calvin Walden
Paul B. Keller
Rebecca M. McCloskey
WILMER CUTLER PICKERING
 HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 230-8888

William F. Lee
Donald R. Steinberg
Michael J. Summersgill
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Date:  March 17, 2006

PAUL M. LUKOFF (I.D. No. 96)
DAVID E. BRAND (I.D. No. 201)
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500

*Attorneys for Defendants*

### Table of Contents

1.  Information Disclosure Statement For Consideration by the Office Under 37 C.F.R. 1.97-1.98, from Eastman Kodak Company to the U.S.P.T.O., 12/7/93, EKC005026769-71................. A-1

2.  Letter from Talcott to Palumbo of 8/29/01. ...................................................... A-4

3.  Letter from Crocker to Talcott of 9/14/01. ...................................................... A-6

4.  Letter from Talcott to Crocker of 5/26/04. ...................................................... A-7

5.  Letter from Crocker to Talcott of 6/18/04. ...................................................... A-18

6.  Donna Fuscaldo, Kodak Urges Camera-Phone Progress --- *CEO Warns Warns That Industry Won't Last Unless Quality of Products is Improved*, Wall St. J., March 15, 2005, at B4.......................................................................................................... A-19

7.  ITC Investigation No. 337-TA-527, 7/20/05 Prelim. Conference Tr. at 111-15. ......... A-20

8.  Plaintiff Ampex Corporation's First Set of Document Requests to Defendant Eastman Kodak Company (Nos. 1-70), Request No. 67. ............................................................ A-28

9.  Plaintiff Ampex Corporation's First Set of Document Requests to Defendant Altek Corporation (Nos. 1-47), Request No. 44. .................................................... A-40

10. Response of Eastman Kodak Company to Plaintiff Ampex Corporation's First Set of Document Requests (Nos. 1-70), Response to Request No. 67. .................................. A-52

11. Response of Altek Corporation to Plaintiff Ampex Corporation's First Set of Document Requests (Nos. 1-47), Response to Request No. 44. .................................... A-63

12. Plaintiff Ampex Corporation's Responses to Defendants' First Set of Interrogatories dated 11/7/05, Response to Interrogatory No. 1. ........................................... A-74

13. Plaintiff Ampex Corporation's Requests for Admission to Defendant Eastman Kodak Company (Nos. 1-100), Request Nos. 92-95.................................................... A-85

14. Plaintiff Ampex Corporation's Requests for Admission to Defendant Altek Corporation (Nos. 1-30 [sic]), Request Nos. 29-32. ...................................................... A-95

15. Plaintiff Ampex Corporation's Sixth Set of Document Requests to Defendant Eastman Kodak Company (Nos. 143-158), Request Nos. 145-147. .......................................... A-102

16. Plaintiff Ampex Corporation's Fourth Set of Document Requests to Defendant Altek Company [sic] (Nos. 86-153 [sic]), Request Nos. 155-157........................................ A-107

17. Defendant Eastman Kodak Company's Second Supplemental Response to Plaintiff's Interrogatory No. 2........................................................................... A-120

18.    Plaintiff Ampex Corporation's Second Supplemental Response to Defendants'
       Interrogatory No. 1 Re Willful Infringement.................................................................... A-134

19.    Letter from Talcott to Lee of 8/13/04. ........................................................................ A-143

# SEALED DOCUMENTS

# A-1 to A-3

Ampex Corporation
500 Broadway, M.S. 1101
Redwood City, California
94063-3199
Telephone 650 367/3330
Fax 650 367-3440
joel_talcott@ampex.com

Joel D. Talcott
Vice President - General Counsel & Secretary

**AMPEX** | Corporation

August 29, 2001

Mr. Daniel P. Palumbo
President, Consumer Imaging & Senior Vice President
Eastman Kodak Company
343 State Street
Rochester, NY 14650 USA

Dear Mr. Palumbo:

You may be aware that Ampex Corporation has made significant developments in
recording and video technologies since it was founded in 1944. Among these are the
world's first practical video tape recorder in 1956, color slow motion instant replay in
1967, and perspective digital special effects in 1981. Ampex's technical developments
have resulted in numerous patents, which Ampex has licensed to manufacturers of
electronic products throughout the world.

Among Ampex's developments was the electronic still store in 1976. This product
enabled television producers to store digital video images for later editing and broadcast.
An improved version of this product was introduced by Ampex in 1983. A significant
feature of the improved product was its ability, upon input of an original full spatial
resolution image, to create a corresponding reduced spatial resolution copy of the image
and to store both images. As a result, when an operator wished to view a set of reduced
spatial resolution images, or thumbnails, it was not necessary to wait as each of the set
was rendered from the original image as was previously the practice. Instead, the
thumbnails could be displayed on the screen almost instantaneously upon request. The
operator could selectively display on the screen either a set of thumbnails or a full spatial
resolution image.

This invention resulted in U.S. Patent 4,821,121 (the '121 patent) being issued to
Ampex. A copy of this patent is enclosed, along with a copy of the publication of
corresponding Japanese patent 1,672,380, which has a grant date of May 15, 1991, and
a list of corresponding patents issued in other countries of the world.

We have discovered that digital still cameras, such as the DC200 Plus digital camera
manufactured by Kodak, incorporate a feature wherein a set of thumbnails are stored in
memory of the camera along with storage of corresponding full spatial resolution images.
The operator can selectively display on the screen of the camera either a set of thumbnails
or a full spatial resolution image. We have concluded that cameras incorporating this
feature infringe at least claims 1, 7, 8, 10-12 and 13 of the '121 patent and at least claim 1
of the corresponding Japanese patent.

Mr. Daniel P. Palumbo
August 29, 2001
Page 2

We also have observed that some digital still cameras use Ampex's U.S. patent 4,734,791 in connection with the display of operating states of operating subsystems of the cameras. Copies of this patent, the corresponding Japanese patent and a list of corresponding issued patents in other countries also are enclosed. Ampex holds a number of other patents related to video technology which may be used or useful in digital still cameras. A list of selected U.S. patents is enclosed.

Ampex is offering a license at reasonable rates under these patents. We would like to meet with you to discuss the license in the near future, and we will contact you shortly to arrange a meeting. If you do not plan to deal with this matter personally, we would appreciate learning the contact information for the person in your organization with whom we should be meeting.

We look forward to your early reply.

Very truly yours,

Joel D. Talcott

Enclosures



September 14, 2001


Mr. Joel D. Talcott
Ampex Corporation
500 Broadway, M.S. 1101
Redwood City, California 94063-3199


Dear Mr. Talcott:

Your letter to Mr. Palumbo has been referred to the Patent Legal Staff for further
handling. We are investigating the matters that you raised in your letter with respect
to U.S. Patent Nos. 4,821,121 and 4,734,791, as well as the corresponding Japanese
Patents. In order to expedite our analysis, we ask that you provide us with claim
charts explaining how you believe your patents read on the identified Kodak products.

I will provide you with a prompt response upon completion of our analysis.

Regards,

*Pamela R. Crocker*

Pamela R. Crocker, Esq.
Patent Legal Staff

PRC:pw

cc:    T. Close
       J.J. Hawley

Ampex Corporation
1228 Douglas Ave.
Redwood City, California 94063-3117
Telephone 650 367-2011

**AMPEX** | Corporation

May 26, 2004

Ms. Pamela R. Crocker
Patent Legal Staff
Eastman Kodak Company
343 State Street
Rochester, NY  14650 USA

Dear Ms. Crocker:

This is further to our letter of August 29, 2001, informing Kodak that Ampex had concluded that Kodak's digital still camera products are covered by claims of Ampex's U.S. patent 4,821,121 (the '121 patent), as well as counterparts of the '121 patent issued in other countries, and offering a license at reasonable rates under these and other Ampex patents.

We are contacting you now to inform you that, on May 25, 2004, Ampex filed a complaint under 19 U.S.C. § 1337 in the United States International Trade Commission against Sanyo Electric Co., Ltd. ("Sanyo"), alleging that products such as digital still cameras imported into and sold in the United States by Sanyo infringe the '121 patent. The Complaint seeks, *inter alia*, issuance of a permanent exclusion order barring importation of infringing products into the United States.

Ampex has also filed a complaint against Sanyo in the United States District Court for the District of Delaware, alleging that Sanyo infringes the '121 patent and seeking appropriate damages, and injunctive and other relief.

Ampex also owns the rights to a large number of United States and other patents, including U.S. patent No. 4,734,791 (the '791 patent). Ampex believes that Kodak may be using the subject matter of one or more claims of the '791 patent, as well as other Ampex patents, in its digital still cameras.

Please take notice that Ampex believes that Kodak requires a license under the '121 patent, and possibly other United States patents owned by Ampex, for its importation and sale into the United States of its digital still camera products. A license under corresponding patents issued in other countries may also be required. Absent such license, Ampex reserves the right to seek the appropriate relief before the International Trade Commission, in the appropriate United States District Court, and/or elsewhere.

A-7

Eastman Kodak Company
May 26, 2004
Page 2

Ampex is prepared to offer Kodak a license for digital still cameras under patents, including the '121 and '791 patents, under advantageous terms for a limited time. The enclosed License Agreement covers only digital still cameras. If you have other products that incorporate digital still camera functions, such as mobile telephones or video tape recorders, it may be necessary to modify the enclosed License Agreement accordingly. If you decide to take a license under the Ampex patents, you should contact the undersigned within 30 days from the date of this letter. Ampex does not intend to offer these terms beyond that time.

Ampex urges Kodak to carefully consider Ampex's licensing offer, and further informs Kodak that the terms of any such license are subject to change, *inter alia*, as a result of the outcomes of ongoing litigation.

We look forward to hearing from you at your earliest convenience with a view towards Kodak entering into an appropriate licensing agreement. Please do not hesitate to contact me if you have any questions.

Very truly yours,

Joel D. Talcott
Vice President—General
Counsel & Secretary

Direct Line:　　(650) 367-3330
Facsimile:　　(650) 367-3440
Email:　　talcott@ampex.com

# LICENSE AGREEMENT

THIS LICENSE AGREEMENT made and entered into as of June 1, 2004 is between AMPEX CORPORATION, a corporation of Delaware, having a place of business at Redwood City, California ("LICENSOR"), and EASTMAN KODAK COMPANY, a corporation of _____, having a place of business at _____ ("LICENSEE").

## WITNESSETH:

WHEREAS, LICENSOR is the owner of patents and patent applications of the United States and other countries, useful in digital still cameras and has the right to grant licenses thereunder; and

WHEREAS, LICENSEE is desirous of having assurance that its digital still cameras may be manufactured, used and sold throughout the world, without risk of infringement of such patents of LICENSOR; and to that end, LICENSEE believes it appropriate to have, and is desirous of acquiring, and has requested LICENSOR to grant it, a non-exclusive license under patents and patent applications of LICENSOR which are useful in digital still cameras.

NOW, THEREFORE, in consideration of the foregoing and in consideration of the mutual terms hereinafter set forth, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1. "DIGITAL STILL CAMERA" means a device whose primary function includes the acquisition of information representing one or more discrete images, the conversion of the information representing each acquired image into a discrete set of digital data signals and the storage of the digital data signals on a storage medium.

Section 2. "REPLACEMENT PART" means a component or subassembly covered by a LICENSED PATENT or LICENSED PATENT APPLICATION for use in a DIGITAL STILL CAMERA previously sold or used by LICENSEE under this Agreement.

Section 3. "LICENSED PRODUCT" means a DIGITAL STILL CAMERA or REPLACEMENT PART covered by one or more of the claims of the LICENSED PATENTS.

Section 4. "LICENSED PATENTS" means the patents and utility models listed on the attached SCHEDULE A useful in DIGITAL STILL CAMERAS with respect to which LICENSOR shall have the right to grant licenses of the scope herein granted without the payment of royalties or other consideration to third parties, except for payments to an AFFILIATE of LICENSOR. LICENSOR represents that it has used its best efforts to list in attached SCHEDULE A all patents useful in DIGITAL STILL CAMERAS in the field of this license owned by it and issued or published prior to the date of this Agreement. In the event that any of such patents have been omitted, they will be added to SCHEDULE A at any time at the request of LICENSEE.

Section 5. "LICENSED PATENT APPLICATIONS" means all applications for patent and utility model of any country of the world useful in DIGITAL STILL CAMERAS having a filing date prior to January 1, 2002, and any counterpart patent applications of other countries, and any continuations, reissues or divisionals of such applications, regardless of filing date, which when issued or published will become "LICENSED PATENTS."

Section 6. "AFFILIATE," as used herein with reference to any party hereto, means any person, association, corporation or other legal entity in which such party owns, directly or indirectly, a beneficial interest of ten percent (10%) or more, or which, directly or indirectly, owns a beneficial interest of ten percent (10%) or more in such party, or which, directly or indirectly, controls, or is controlled by, or under common control with, such party. For the purpose of this definition, the terms "controls," "controlled by" or "under common control with," as used with respect to any person, firm, corporation or other legal entity means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, firm, corporation or other legal entity, whether through the ownership of voting securities, or by contract, or otherwise.

Section 7. "SUBSIDIARY," as used herein with reference to a party hereto, means a corporation or other legal entity, more than fifty percent (50%) of whose outstanding shares of stock or other securities entitled to vote for the election of directors or other managing authority (other than any shares of stock whose voting rights are subject to restriction) is owned or controlled by such party, directly or indirectly.

Section 8. "SYSTEM" means a combination of equipment, including one or more DIGITAL STILL CAMERAS.

Section 9. "NET INVOICE PRICE" shall, for the purpose of this Agreement, be determined as follows:

(a)(i)   in respect of a LICENSED PRODUCT which is sold separately in normal arm's length commercial transactions between parties which are not AFFILIATES, the NET INVOICE PRICE shall be the genuine selling price at which customers are billed in the usual course of business for such LICENSED PRODUCT, as packed for shipment, without any deductions other than commodity taxes, transportation charges, packing costs and insurance premiums for which LICENSEE invoices its customers;

(a)(ii)  in respect of a LICENSED PRODUCT sold otherwise than in normal arm's length commercial transactions between parties which are not AFFILIATES, the NET INVOICE PRICE shall be the genuine selling price of the same quantities of similar or substantially similar LICENSED PRODUCTS which are sold in normal arm's length commercial transactions between parties which are not AFFILIATES, without any deductions other than those stated in paragraph (a)(i) above, or, if there be no similar or substantially similar LICENSED PRODUCT so sold, then the fair market value of such LICENSED PRODUCT, without any deductions other than those stated in paragraph (a)(i) above;

(b)    in respect of a LICENSED PRODUCT which is used, leased or otherwise transferred by LICENSEE, the NET INVOICE PRICE shall be the NET INVOICE PRICE of a comparable device which is sold and shall be computed as in (a) above; or

(c)    in respect of a LICENSED PRODUCT which is (1) included in a SYSTEM used, sold, leased or otherwise transferred by LICENSEE, or (2) used, sold, leased or otherwise transferred by LICENSEE in conjunction with other apparatus as a package, the NET INVOICE PRICE shall be the usual NET INVOICE PRICE of a comparable device which is sold and shall be computed as in (a) above.

## ARTICLE II
## GRANT OF LICENSE

<u>Section 1.</u> LICENSOR hereby grants to LICENSEE a personal, non-exclusive, indivisible, non-transferable license under the LICENSED PATENTS and LICENSED PATENT APPLICATIONS to which reference is made in Section 4 and 5, respectively, of ARTICLE I hereof, to make, and use, sell, lease or otherwise transfer LICENSED PRODUCTS throughout the world. No license is granted hereunder to make, use, sell, lease or otherwise transfer components or subassemblies to be incorporated in a LICENSED PRODUCT and covered by any of the LICENSED PATENTS or LICENSED PATENT APPLICATIONS, with the sole exception of such components or subassemblies which are to be included in a DIGITAL STILL CAMERA made by LICENSEE or which are a REPLACEMENT PART for any DIGITAL STILL CAMERA made, used, sold, leased or otherwise transferred by LICENSEE.

## ARTICLE III
## TERM

<u>Section 1.</u> The term of the license herein granted shall commence as of the date first set forth above and shall continue as to each LICENSED PATENT for its life and as to each LICENSED PATENT APPLICATION for the life of any patents issuing thereon, unless this license is terminated sooner in accordance with the provisions of ARTICLE VI, hereof.

## ARTICLE IV
## PAYMENTS AND ROYALTIES

<u>Section 1.</u> LICENSEE hereby agrees to pay to LICENSOR _____ for use of LICENSED PATENTS prior to the effective date of this Agreement, the amount being calculated in accordance with Section 2 of this Article. Upon receipt of such payment LICENSOR shall waive any rights it may have arising out of past infringement of the LICENSED PATENTS and LICENSED PATENT APPLICATIONS.

<u>Section 2.</u> As to each LICENSED PRODUCT made, used, sold, leased or otherwise transferred by LICENSEE under this Agreement, LICENSEE agrees to pay to LICENSOR a royalty computed at the rate of three-eighths of one percent (0.375%) of the NET INVOICE PRICE.

Section 3. It is understood and agreed that all sums of money referred to in this Agreement as being payable by LICENSEE to LICENSOR shall be sums payable at a United States bank to be designated by LICENSOR, in United States dollars. The amount of United States dollar sums payable shall be determined by conversion of the foreign monetary sums due into United States dollars. Such conversion shall be at the rate of monetary exchange established by the authorized foreign exchange banks in LICENSEE's country in effect on the date that such payments are made. Any taxes, including turnover or sales taxes, exchange fees, bank or brokers' charges, shall be paid by LICENSEE. LICENSOR agrees to pay any taxes withheld in LICENSEE's country, and required by law to be assessed to LICENSOR in connection with payments made by LICENSEE as provided for in this Agreement.

Section 4. Royalties shall be paid for each LICENSED PRODUCT which during the term of this Agreement:
(a)  is manufactured in a country in which a LICENSED PATENT exists; or
(b)  is placed in use in a country in which a LICENSED PATENT exists; or
(c)  is sold, leased or otherwise transferred in a country in which a LICENSED PATENT exists; or
(d)  is imported into a country in which a LICENSED PATENT exists.

A LICENSED PRODUCT subject to royalties hereunder shall be considered manufactured on the date the final system test of such LICENSED PRODUCT is completed; shall be considered placed in use on the date such LICENSED PRODUCT is first placed in operation by or for LICENSEE; and shall be considered sold, leased, otherwise transferred or caused to be imported on the date such LICENSED PRODUCT is shipped or billed out, whichever comes first.

Section 5. Within sixty (60) days after March 31, June 30, September 30 and December 31 of each year, LICENSEE shall submit to LICENSOR an accurate written report, duly certified once a year by LICENSEE's chief financial officer, setting forth the number of LICENSED PRODUCTS, by model number or part number, used, sold, leased or otherwise transferred during the preceding quarter, and as to each such model number or part number shall set forth the actual invoice price thereof, the NET INVOICE PRICE, and the royalty payable. With respect to LICENSED PRODUCTS that are subject to royalties hereunder either by reason of the manufacture or the importation into a country in which a LICENSED PATENT exists, royalties shall become payable on the date they are used, sold, leased or otherwise transferred, whichever comes first. The report shall be accompanied by full payment of the royalty payable.

Section 6. It is understood and agreed that all sums of money referred to in this Agreement as being payable by LICENSEE to LICENSOR shall be sums payable in United States dollars at a United States bank to be designated by LICENSOR.

Section 7. Payments provided for in this Agreement shall, when delinquent, be subject to a late payment charge calculated at an annual rate of 3% over the prime rate or successive prime rates in effect in New York, New York, U.S.A. during the delinquency. However, if the rate of such late payment charge exceeds the maximum permitted by law, such charge shall be reduced to such maximum rate.

## ARTICLE V
## RECORDS

Section 1. LICENSEE will keep true records of account, including copies of invoices and other records, in sufficient detail to enable the royalties payable hereunder to be determined, and agrees to permit such invoices and records to be audited at any reasonable time during business hours by an independent certified public accountant selected by LICENSOR to the extent necessary to verify the royalty reports and payments herein provided for; provided, however, that said independent certified public accountant shall report no details of his audit unless the audit shows the reports to have been inaccurate. If such audit shows additional royalties to be due, LICENSEE shall within thirty (30) days from the date of the audit report either pay the additional amount to LICENSOR or object to such audit report, in which event the details of the audit shall be made available to both parties. If such audit report shows that excessive royalties have been paid, LICENSOR shall, prior to crediting such excess to further royalties, be entitled to review such audit details, unless LICENSEE shall waive the right to such credit. All audits shall be conducted at LICENSOR's expense; provided, however, that should any audit show additional royalties due in excess of ten percent of the amount of royalties paid by LICENSEE to LICENSOR during the period covered by the audit, the cost of such audit shall be borne by LICENSEE.

## ARTICLE VI
## TERMINATION

Section 1. Nothing in this Agreement is intended to or shall be construed to require LICENSEE to take a license under any LICENSED PATENT or LICENSED PATENT APPLICATION listed in SCHEDULE A, and any LICENSED PATENT or LICENSED PATENT APPLICATION may be deleted from such SCHEDULE upon thirty (30) days written notice prior thereto, thereby relinquishing the license thereunder. If, in accordance with the provisions of this Section, LICENSEE acts to delete all of the LICENSED PATENTS and LICENSED PATENT APPLICATIONS from SCHEDULE A, then this Agreement shall terminate automatically upon the effective date of such deletion.

Section 2. LICENSEE shall not withhold any royalty payments because of an alleged invalidity of any LICENSED PATENT, except as provided hereafter in this section with respect to LICENSED PATENTS of the United States. Royalty payments shall not be withheld by LICENSEE because of an alleged invalidity of a LICENSED PATENT of the United States unless LICENSEE gives LICENSOR thirty (30) days prior written notice of its intention and the basis of the alleged invalidity. If LICENSEE withholds royalties because of an alleged invalidity of a LICENSED PATENT of the United States, or gives notice of its intention to do so, or challenges the validity of any such LICENSED PATENT, LICENSOR shall have the right to unilaterally delete such LICENSED PATENT from SCHEDULE A of this Agreement thereby terminating all license privileges to LICENSEE thereunder, except as to any LICENSED PRODUCT in respect of which a royalty had previously been paid to LICENSOR pursuant to this Agreement. LICENSOR may exercise such right to delete by notice to LICENSEE at any time after the right to delete such LICENSED PATENT arises.

<u>Section 3.</u> If LICENSEE shall fail to render reports or make any payments as and when due hereunder or shall otherwise be in default of any obligation of this Agreement, LICENSOR shall have the right to give written notice thereof to LICENSEE, and, if within sixty (60) days after the date of such notice, LICENSEE shall not have cured such default, then LICENSOR may, at its option, cause this Agreement to terminate forthwith by giving written notice to that effect to LICENSEE.

<u>Section 4.</u> To the extent permitted by law, LICENSOR shall have the right to terminate this Agreement at any time upon or after the filing by LICENSEE of a petition in bankruptcy or insolvency, or upon or after the filing by LICENSEE of any petition or answer seeking reorganization, readjustment or rearrangement of the business of LICENSEE under any law or any government regulation relating to bankruptcy or insolvency, or upon or after the appointment of a receiver for all, or substantially all, of the property of LICENSEE, or upon or after the making by LICENSEE of any assignment or attempted assignment for the benefit of creditors, or upon or after the institution by LICENSEE of any proceedings for the liquidation or winding up of its business, or for the termination of its corporate charter; and upon the exercise of such right, this Agreement shall terminate fifteen (15) days after notice in writing, to that effect, has been given by LICENSOR to LICENSEE.

<u>Section 5.</u> This Agreement shall be automatically terminated, without notice, by the occurrence of any of the following:
(a) appropriation, physical or otherwise, of the premises of the business of LICENSEE by a government de facto or de jure having or claiming jurisdiction over LICENSEE or by a political organization of any kind which, with or without the consent of LICENSEE, forcibly seizes said premises or business; or
(b) prevention of payment by LICENSEE to LICENSOR for over three hundred and sixty (360) days of any payment required herein by a government or other political organization which, by reason of legal power or otherwise, has or asserts jurisdiction over LICENSEE; provided, however, LICENSOR may, at its option, reinstate this Agreement as of the date of any such automatic termination by written notice to that effect given within ninety (90) days of the date of said automatic termination.

<u>Section 6.</u> No failure or delay on the part of LICENSOR to exercise its right of termination hereunder for any one or more defaults shall be construed to prejudice its right of termination for such, or any other, or subsequent default.

<u>Section 7.</u> Any termination as provided herein shall not in any way operate to limit any of LICENSOR's rights or remedies, either at law or in equity, or to relieve LICENSEE of any obligation, accrued prior to such termination.

**ARTICLE VII**
**NOTICES**

<u>Section 1.</u> All notices and demands which shall or may be given or required pursuant to this Agreement shall be in writing and effective upon receipt. Any notice under this Agreement shall be addressed to the party to whom such notice is to be given as follows:

Page 6

**A-14**

LICENSOR:
Ampex Corporation
1228 Douglas Avenue
Redwood City, CA 94063
U. S. A.

Attn.: General Counsel

LICENSEE:
Eastman Kodak Company
343 State Street
Rochester, NY  14650 USA

Attn: _____

## ARTICLE VIII
## SUCCESSORS AND ASSIGNS

Section 1.  Neither this Agreement nor any of the rights and other benefits established by it shall be directly or indirectly assigned, transferred, divided or shared by LICENSEE to or with any person, association, corporation or other legal entity whatsoever, without prior written consent of LICENSOR, except to successors by merger or consolidation of, or to purchasers of, the entire business relating to the subject matter of this Agreement and associated goodwill of LICENSEE, and except as provided in Section 2 of this ARTICLE.

Section 2.  LICENSEE may, by thirty (30) days written notice to LICENSOR, extend the rights, benefits and obligations of this Agreement to any SUBSIDIARY of LICENSEE, but only for so long as it remains a SUBSIDIARY of LICENSEE.  Each notice shall state the name and address of such SUBSIDIARY.  Thereupon, this Agreement shall be binding upon and inure to the benefit of said SUBSIDIARY, but not its SUBSIDIARIES, successors, or assigns.  In the event of such extension by LICENSEE to a SUBSIDIARY, LICENSEE shall remain primarily liable for all obligations of such SUBSIDIARY under this Agreement.

Section 3.  This Agreement may be assigned by LICENSOR and shall inure to the benefit of such assigns and any successors of LICENSOR.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

Section 1.  It is the intention of the parties hereto that this Agreement shall be construed, interpreted and applied in accordance with the laws of the State of California, United States of America.

Section 2.  This Agreement sets forth the only agreement and understanding of the parties on the subject of DIGITAL STILL CAMERAS, merges all prior discussions between them, terminates and supersedes any prior negotiations, memoranda or agreements, whether oral or written, and

neither of the parties shall be bound by any conditions, definitions, warranties or representations other than as expressly provided in this Agreement, or as duly set forth on or subsequent to the date hereof in writing and signed by a proper and duly authorized officer of the party to be bound thereby.

Section 3. This Agreement has been prepared in the English language. It is understood that the English text of this Agreement shall be the official governing version of the Agreement. Each party will receive one English copy of this Agreement executed by all other parties.

Section 4. Nothing contained in this Agreement shall be construed as:
(a) conferring an obligation upon either LICENSOR or LICENSEE to bring or prosecute actions or suits against third parties for infringement; or
(b) an obligation by either party to furnish any technical information or know-how to the other party.

Section 5. It is understood and agreed that no representation is made and no warranty is given by LICENSOR that LICENSED PRODUCTS manufactured, used, sold, leased or otherwise disposed of by LICENSEE under the terms of this Agreement are free of claims of infringement of the patent rights of third parties.

Section 6. In the event LICENSOR shall hereafter grant any license under SCHEDULE A patents for monetary consideration including a royalty, at a rate more favorable than that provided herein, LICENSOR shall notify LICENSEE thereof and effective upon the date of such other license and for as long as such more favorable royalty rate is in effect, the royalty rate applicable to the license granted to LICENSEE herein shall be reduced to the royalty rate specified in such other license, but only if LICENSEE accepts any less favorable monetary and other terms that may be included in the agreement under which such other license is granted. This Section shall not apply in cases where LICENSOR receives in lieu of or in addition to a cash royalty, a grant of patent rights, a royalty-free or other license, or other considerations than that provided in this Agreement.

<u>Section 7.</u>  If any of the claims of a LICENSED PATENT shall be held to be invalid or limited as to scope by a court of last resort, or by a lower court of competent jurisdiction from whose decree no appeal is taken or certiorari granted, within the period allowed therefor, the construction placed upon the such LICENSED PATENT by the courts shall be followed from and after the date of entry of the decree of such court, and royalties shall thereafter be payable by LICENSEE only in accordance with such construction until the same shall be modified or reversed by a subsequent court decree, and with respect to claims which are by any such decree held to be invalid, LICENSEE shall be relieved of its obligation to make reports and to pay royalties on LICENSED PRODUCTS sold under and covered only by said claims, until the decision with respect to such claims shall be modified or reversed by a subsequent court decree.

**AMPEX CORPORATION**

By:_____

Title:_____

Date:_____

**EASTMAN KODAK COMPANY**

By:_____

Title:_____

Date:_____



June 18, 2004

Mr. Joel D. Talcott
Ampex Corporation
1228 Douglas Avenue
Redwood City, California 94063-2117

Dear Mr. Talcott:

We are in receipt of your letter dated May 26, 2004. Thank you for providing Kodak with an opportunity to license Ampex's U.S. Patent Nos. 4,821,121 and 4,734,791.

As previously requested in our letter to you dated September 14, 2001, we ask that you provide us with claim charts explaining how you believe these patents read on Kodak's products so that we can determine whether Kodak has any interest in Ampex's licensing offer.

We look forward to receiving your documentation.

Regards,

Pamela R. Crocker, Esq.

PRC:cjm

Pamela R. Crocker, Group Patent Counsel, Imaging Electronics Group
Telephone: (585) 477-0553; Facsimile (585) 477-4646; E-mail: pamela.crocker@kodak.com
EASTMAN KODAK COMPANY 343 STATE STREET ROCHESTER, NY 14650-2201

3 of 11 DOCUMENTS

Copyright 2005 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

(Copyright (c) 2005, Dow Jones & Company, Inc.)
The Wall Street Journal

March 15, 2005 Tuesday

**SECTION:** TECHNOLOGY; Pg. B4

**LENGTH:** 293 words

**HEADLINE:** Kodak Urges Camera-Phone Progress --- CEO Warns That Industry Won't Last Unless Quality Of Products Is Improved

**BYLINE:** By Donna Fuscaldo Dow Jones Newswires

**BODY:**

NEW ORLEANS -- Eastman Kodak Co. Chief Executive Dan Carp warned that camera phones could fade into niche obscurity if the industry doesn't improve the quality of the phones and the experience of using them.

The largest unmet needs of camera phones are in image quality, battery life and printing capabilities, Mr. Carp said during a keynote presentation at a trade show in New Orleans hosted by CTIA, a wireless industry group.

Many consumers find the camera-phone experience "less than satisfying," Mr. Carp said, noting that if the industry chooses to ignore consumer complaints and focuses on new features such as video, it could spell a lost opportunity.

He likened the situation to missteps **Kodak** made in its digital camera business. Although **Kodak** launched the **first digital** camera in 1975, Mr. Carp said it eventually lost its leadership position because it didn't listen to consumer complaints.

According to Mr. Carp, important to expanding the camera-phone market is to "satisfy the basic consumer needs." That, he said, will "increase consumption to levels never before experienced."

In recent years, the wireless handset market has had healthy growth, driven in part by camera phones. According to CTIA, 22 million subscribers were added in 2004, marking the second-largest growth year for the industry. Sales of camera phones, Mr. Carp said, citing industry data, have doubled every year since they were introduced.

As a result of the popularity of camera phones, Kodak unveiled a concept printer yesterday that has a docking station for a camera phone, allowing easy printing at the same time the cellphone is being charged.

In 4 p.m. composite trading on the New York Stock Exchange, Kodak shares were up 10 cents, or 0.3%, at $34.30.

**NOTES:**
PUBLISHER: Dow Jones & Company Inc.

**LOAD-DATE:** March 15, 2005

1

THE UNITED STATES INTERNATIONAL TRADE COMMISSION

In the Matter of:                 )
                                  )
CERTAIN DIGITAL IMAGE             )    Investigation No.:
STORAGE AND RETRIEVAL             )    337-TA-527
DEVICES                           )

                                  Wednesday,
                                  July 20, 2005

                                  International Trade Commission
                                  Courtroom A
                                  500 E Street, S.W.
                                  Washington, D.C.

        The preliminary conference commenced, pursuant to

notice, at 9:01 a.m.

        BEFORE:   HONORABLE ROBERT L. BARTON
                  Judge

        APPEARANCES:

        For Complainant Ampex Corporation:

        BARBARA A. MURPHY, Esquire
        Adduci, Mastriani & Schaumberg, LLP
        1200 Seventeenth Street, N.W.
        Washington, D.C.

        NORMAN H. BEAMER, Esquire
        Ropes & Gray LLP
        525 University Avenue
        Palo Alto, California  94301

        JAMES HOPENFELD, Esquire
        Ropes & Gray LLP
        One Metro Center
        700 12th Street, N.W., Suite 900
        Washington, D.C.  20005

        SASHA RAU, Esquire
        Ropes & Gray LLP
        One Metro Center
        700 12th Street, N.W., Suite 900
        Washington, D.C.  20005

                Heritage Reporting Corporation
                     (202) 628-4888

2

APPEARANCES (CONT'D)

JOEL TALCOTT, Esquire
Ampex
1228 Douglas
Redwood City, CA 94063

On behalf of Respondents
Eastman Kodak Company and Chinon Industries, Inc.:

MICHAEL D. ESCH, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street, N.W.
Washington, D.C.  20037

WILLIAM P. DISALVATOE, Esquire
S. CALVIN WALDEN, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
199 Park Avenue
New York, New York  1022

DONALD STEINBERG, Esquire
MICHAEL J. SUMMERSGILL, Esquire
MONICA GREWAL, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109

On behalf of Staff:

SPENCE CHOBB
ERIN JOFFRE

3

P R O C E E D I N G S

(9:01 a.m.)

THE CLERK:  All rise.

JUDGE BARTON:  Please be seated.

We are the record.  This is a conference in the matter of Certain Digital Image Storage and Retrieval Devices, Investigation No. 337-TA-527.

This is a conference that was set in Order Number 29 issued on July 11, 2005.

Let me get the appearances for the parties.

First, for the Complainant?

MR. BEAMER:  Good morning, Your Honor. Norman Beamer on behalf of Plaintiff, Ampex Corporation.

With me is Barbara Murphy of the Adduci Mastriani firm.  I'm with Ropes & Gray.  My partner James Hopenfeld.  Sasha Rau, also of Ropes & Gray, and Joel Talcott, General Counsel of Ampex.

JUDGE BARTON:  Okay.  And for Respondent?

MR. DISALVATOE:  Good morning, Your Honor. I'm William DiSalvatoe, Wilmer Cutler Pickering Hale and Dorr, on behalf of Respondents Eastman Kodak Company and Chinon Industries Inc.

With me today is my partner Michael Summersgill, Monica Grewal, Calvin Walden, Donald

111

1    and he received Kodak confidential information

2    directly relevant to the current litigation including

3    Kodak's algorithm for processing thumbnail images used

4    in cameras accused of infringement.

5            I also take into account staff's position

6    here.  Last time, of course, the staff also supported

7    the motion to disqualify and I  didn't agree with them

8    at that time.  However, I do take into account the

9    staff's position because the staff does not have, as

10   far as I'm concerned, any axe to grind in these

11   proceedings.  They're seeking to present what they

12   believe is the public interest on these proceedings,

13   and therefore I give a good deal of deference and

14   consideration to what they say.  Many times I don't

15   agree with the staff. But nevertheless, as I said,

16   they don't have an axe to grind here and they oppose

17   Ampex's use of Mr. Anderson in this proceeding and

18   have presented some pretty cogent reasons for granting

19   the motion to disqualify.

20           I would further state that although it is

21   not a basis for my ruling, I believe that Mr. Anderson

22   and Complainant were not candid and forthright about

23   his continuing relationship with Flashpoint in their

24   March 2005 opposition.

25           Ampex's statement that Anderson did not have

Heritage Reporting Corporation
(202) 628-4888

A-23

112

1    a "pertinent current relationship with Flashpoint" is

2    not the type of forthright and candid behavior that I

3    expect from counsel and a party.  I suppose the key

4    word there was pertinent, but to me, you have an

5    obligation to come forward and be forthright with me

6    and tell me that he continues to work with Flashpoint,

7    whether or not you think it's relevant or not.

8         Anderson did have a current relationship

9    with Flashpoint since October 2001 which I note his

10   resume did not disclose.  The word pertinent only

11   muddled this matter.

12        Anderson had an explicit duty in a signed

13   employment agreement to hold customer information,

14   including that of Kodak, in the strictest confidence

15   consistent with Flashpoint's agreements with such

16   third parties.  Flashpoint has produced documents

17   including employment and confidentiality agreement

18   obligating Anderson to maintain the confidentiality of

19   Flashpoint's customer's information as well as

20   notebooks concerning his work on Kodak digital

21   cameras.

22        Moreover, although this was not clear to me

23   when I issued Order 19, it appears that Mr. Anderson

24   was intricately involved in development of

25   technologies that are still used in Kodak cameras.  In

Heritage Reporting Corporation
(202) 628-4888

113

1    his resume Anderson asserts that as Chief Technology

2    Officer of Flashpoint he guided technology development

3    with product shipments concerning the DC line of Kodak

4    cameras.

5          The evidence also suggests that Anderson

6    worked closely with Kodak engineers to develop Kodak's

7    digital cameras, and I agree with staff that this is a

8    clear conflict of interest.

9          The evidence also shows that Anderson worked

10    on development of algorithms for generating

11    screennails used in Kodak DC cameras and that Kodak

12    shared detailed confidential information relating to

13    screennails with Anderson.

14          This is addressed by Respondents in their

15    memorandum at page 12.

16          According to an affidavit by Kodak's senior

17    principle engineer, the screennail images developed in

18    the DC cameras on which Anderson worked are in many

19    respects the same as what was implemented, what's been

20    implemented in the cameras accused of infringement in

21    this action.

22          Anderson also received confidential

23    information concerning the processing of images in

24    both the capture and review modes of the Kodak digital

25    cameras.  Anderson was provided detailed information

114

1   regarding processing of images and received

2   confidential specifications, engineering requirements,

3   schematics and block diagrams.

4        Anderson's notebook shows that he regularly

5   received information regarding Kodak's DX3900 camera

6   released in August of 2001, and Kodak notes that Ampex

7   has accused this camera of infringing a 121 patent in

8   a district court action.

9        With respect to the confidential

10  relationship, the development agreement between

11  Flashpoint and Kodak, the employee handbook, as well,

12  as Flashpoint's guidelines for its employees, all

13  impose a confidential relationship.

14       As far as the confidential information,

15  Anderson received Kodak's proprietary algorithm for

16  creating thumbnails.  He helped to develop this

17  information.  He received detailed confidential

18  information regarding image processing in the Kodak

19  cameras, and he regularly communicated with and met

20  with Kodak's engineers regarding his work on Kodak's

21  digital cameras.

22       I note that Anderson's resume even claims

23  that he guided technology development with products

24  including the Kodak DC line of cameras.

25       For all of these reasons I have decided that

Heritage Reporting Corporation
(202) 628-4888

**A-26**

115

1    I am going to grant Respondent's motion to disqualify

2    Mr. Anderson as an expert witness in this proceeding.

3         Now going back to the procedural schedule,

4    at least at this point I don't see any reason to

5    revise the procedural schedule unless a party wants to

6    be heard and can tell me why it's absolutely essential

7    that the procedural schedule be modified once again.

8         The only thing that was in there that I did

9    want to address, there was a paragraph nine set

10   September 7, 2005 as the date to identify all

11   exhibits including physical and demonstrative exhibits

12   intended for use in the tutorial on technology and to

13   submit and serve all such exhibits not previously

14   exchanged and an outline setting forth the subject

15   matter to be discussed in the tutorial with physical

16   and demonstrative exhibits not previously identified.

17        That date is fine.  I'll set that date as

18   the date for doing that.

19        As far as the other requested extensions,

20   I'm not granting that.

21        There are some other matters I did want to

22   cover with you.  These relate to pre-hearing

23   procedures and hearing procedures.  I particularly

24   want to go over the pre-hearing procedures, so --

25        MR. BEAMER:  Your Honor, may I ask a

Heritage Reporting Corporation
(202) 628-4888

**A-27**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMPEX CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1373-KAJ |
| | ) | |
| EASTMAN KODAK COMPANY, | ) | |
| ALTEK CORPORATION and CHINON | ) | |
| INDUSTRIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF AMPEX CORPORATION'S FIRST SET OF DOCUMENT REQUESTS TO DEFENDANT EASTMAN KODAK COMPANY (NOS. 1-70)

Pursuant to Rules 26 and 34, Fed. R. Civ. P., Plaintiff Ampex Corporation ("Ampex"), by its undersigned attorneys, hereby requests that Defendant Eastman Kodak Company ("Kodak") produce, within thirty days after service of these Requests, all documents and things in its possession, custody or control that are responsive to the requests listed below. Ampex requests that production be made at the offices of Ropes & Gray, 525 University Avenue, Palo Alto, California 94301, or at such other time and place as may be agreed upon by counsel for the parties.

The obligation imposed by these requests is continuing and, if after answering these requests Kodak acquires any additional or corrective information called for by these requests, Kodak must serve upon Ampex amended or supplemental responses promptly after Kodak becomes aware of such knowledge or information.

## INSTRUCTIONS

A.     These requests are addressed to Defendant Kodak and its:  (i) present or former directors, officers, employees, agents, representatives, accountants, investigators, consultants, attorneys, and predecessors or successors in interest and any parent, subsidiary or affiliated entities that were in existence during the applicable period of time covered by these requests; (ii) any other person or entity acting on Defendant's behalf or on whose behalf Defendant acted; and (iii) any other person or entity otherwise subject to Defendant's control, or which controls Defendant.

B.     In Kodak's responses to requests herein, unless the request specifies otherwise, if a copy of a document subject to such request was already provided to Ampex during the ITC Investigation, and if, by Order, stipulation or otherwise, Ampex may use such copy for all purposes in this litigation as if said document were produced in response to discovery requests in this action, it shall be a sufficient response to so represent that a copy has already been provided to Ampex during the ITC Investigation.

C.     Your answers must include all responsive information within your possession, custody or control, including, but not limited to, information within the possession, custody or control of your attorney(s), investigator(s), or other agent(s).

D.     If you cannot answer any request fully and completely after exercising due diligence to make inquiry and secure the necessary information, please so state and answer each such request to the fullest extent possible, specify the portion of each request that you are unable to answer fully and completely, state the facts upon which you rely to support your contention that you are unable to answer the request fully and completely, and state what knowledge, information or belief you have concerning the unanswered portion of each such request.

- 2 -

E.     If a document once existed and has subsequently been lost, destroyed, or is otherwise missing, please identify the document and state the details concerning the loss of such document.

F.     If you claim that the attorney-client privilege or any other privilege, protection or immunity is applicable to any written or electronic communication, you shall specify: (i) the name of each individual who signed it or under whose name it was issued, (ii) the name of each individual to whom it was addressed and the name of the individual who received it, (iii) the date the document bears, (iv) the title of the document, and (v) a description of the contents of the document. You shall also identify each and every person who prepared or participated in the preparation of the communication; state the present location of the communication and all copies thereof; identify each and every person having possession, custody or control of the document and all copies thereof; state the privilege or protection claimed; and provide sufficient further information concerning the communication and the circumstances thereof to explain the claim of privilege or protection and to permit the adjudication of the propriety of the claim.

## DEFINITIONS

As used herein, the following terms are intended to have the meanings indicated:

A.     "Kodak" refers to Defendant Eastman Kodak Company, and any and all of its: (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, partners, OEMs, predecessors-in-interest, successors-in-interest, or any other related or affiliated entities; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

- 3 -

**A-30**

B.     "Chinon" refers to Defendant Chinon Industries, Inc., and any and all of its: (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, partners, OEMs, predecessors-in-interest, successors-in-interest, or any other related or affiliated entities; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

C.     "Altek" refers to Defendant Altek Corporation, and any and all of its:  (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, partners, OEMs, predecessors-in-interest, successors-in-interest, or any other related or affiliated entities, including without limitation, Altek Lab, Inc.; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

D.     "Ampex" refers to Plaintiff Ampex Corporation, and any and all of its:  (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, affiliates, partners, predecessors-in-interest, successors-in-interest; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

E.     "Funai" refers to Funai Electric Company, Ltd., and any and all of its:  (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, partners, OEMs, predecessors-in-interest, successors-in-interest, or any other related or affiliated entities; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

F.    "TI" refers to Texas Instruments Inc., and any and all of its:   (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, affiliates, partners, predecessors-in-interest, successors-in-interest; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

G.    "Person" refers to natural persons and any and all other legal entities, including without limitation, individuals, corporations, companies, firms, partnerships, joint ventures, proprietorships, associations, governmental bodies or agencies, or other form of business enterprise.

H.    "Patent-In-Suit" refers to United States Patent No. 4,821,121 (the "'121 Patent").

I.    "Counterpart" of the '121 patent or "patent-in-suit" refers to all domestic and foreign, divisional, reissue, reexamination, continuation, or continuation-in-part patents (other than the '121 patent), and patent applications which claim the benefit of the filing date of the '121 patent or patent application or contain a majority of the disclosure of the '121 patent or patent application.

J.    "Digital Image Storage and Retrieval Device" means any digital electronic device that generates, stores and retrieves digital images, including without limitation, digital still cameras, personal digital assistants (PDAs), and camera phones and camcorders with digital still capabilities.

K.    "Kodak Device" means any Digital Image Storage and Retrieval Device, such as digital cameras and other digital electronic devices, that generates, stores and retrieves digital images, that has ever been made, sold or offered for sale in, or imported or sold for importation into the U.S., by or on behalf of Kodak, including without limitation, all versions of Kodak's

CX4200, CX4210, CX4230, CX4300, CX4310, CX6200, CX6230, CX6330, CX6445, CX7220, CX7300, CX7310, CX7330, CX7430, CX7525, CX7530, DX3900, DX4900, DX6340, DX6440, DX6490, DX7440, DX7590, DX7630, LS420, LS443, LS743, LS753, Z700, Z730, Z740, Z760, Z7590, C300, C310, C330, C340, C360, V530, V550, Easyshare-One, DCS Pro 14n, DCS Pro SLR/c, DCS Pro SLR/n, DCS Proback Plus, and DCS Proback 645 models.

L. "Exif" refers to any and all versions of the Exchangeable Image File Format standard for digital still cameras, as promulgated by the Japan Electronics and Information Technology Industries Association ("JEITA").

M. "DCF" refers to any and all versions of the Design Rule for Camera File system standard, as promulgated by the Japan Electronics Industry Development Association ("JEIDA").

N. "Thumbnail" refers to a reduced resolution reproduction of a digital image, such as described in JEITA CP-3451 (Exif Version 2.2), Section 4.5.5 and JEIDA-49-2-1998 (DCF Version 1.0), Section 3.5.

O. "Review mode", "Multi-up mode" and "Zoom mode" each refer to the so-named method of reviewing digital images as described, for example, at pages 28, 30 of the DX7630 User's Guide, and to any other corresponding similar, but other-named, methods of image review.

P. "TIFF" refers to any and all versions of the Tagged Image File Format or Tag Image File Format, a standard file format promulgated by Adobe Systems Incorporated.

Q. "JPEG" refers to any and all versions of the Joint Photographic Experts Group file format, an ISO/ITU standard established by the Joint Photographic Experts Group, as described in any and all revisions of ISO/IEC 10918, including ISO/IEC 10918-1.

- 6 -

R.    "RAW" refers to the file format for digital images as the data come directly off the electronic sensor, such as a Charge Coupled Device or Complimentary Metal Oxide Semiconductor sensor, with no in-camera processing performed.

S.    "ERI" refers to any and all versions of the Extended Range Imaging file format for digital images, an Exif-compliant file format proprietary to Kodak.

T.    "DCR" refers to any and all versions of the Digital Camera Raw file format for digital images, a file format proprietary to Kodak.

U.    "OEM" means Original Equipment Manufacturer and is a designation for companies that manufacture equipment that is then marketed and sold off to other companies under their own names.

V.    "ODM" means Original Design Manufacturer and is a designation for companies that manufacture products of its own designs, which are then sold under an OEM's brand name.

W.    "ITC Investigation" means International Trade Commission Investigation No. 337-TA-527.

X.    "Accessories" means bags, cases, batteries, chargers, power supplies, printers, paper, ink, docks, kits, lenses, memory cards, flash cards, SD and MMD cards, and any other products sold by Kodak, which function or are used with, or are intended to function or be used with, any of the Kodak Devices.

Y.    "Buffer for Clusters" refers to the data buffer in SDRAM identified during the deposition of Hiroshi Masuda (see, e.g., Masuda Tr., p. 25:9-26:1) into which data is written prior to that data being written onto an SD memory card or compact flash card.

Z.    "Source file" refers to the filename of a source code module within the source code for a Kodak Device.

AA.    "Line number(s)" refers to the line numbers included in a source file.

BB.    "CFA buffer" refers to the buffer or area in SDRAM into which CFA data is written during the capture of a still image (see, e.g., Plaintiff's Ex. 94, line 98).

CC.    "DSP" refers to the digital signal processor block included in the Texas Instruments TMS320DM270 or TMS320DSC25 processors employed in certain of the Kodak Devices, as well as the firmware and/or software used to operate that digital signal processor block.

DD.    "JPEG encoded data" is data that has been encoded in accordance with the Joint Photographic Experts Group file format as described in any and all revisions of ISO/IEC 10918, including ISO/IEC 10918-1.

EE.    "Primary Image" refers to a main body image as defined in JEITA CP-3451 (Exif Version 2.2), Sections 2 and 4.5.2.

FF.    "APP1 Segment" refers to the APP1 segment of an EXIF compliant file, as defined in JEITA CP-3451 (Exif Version 2.2), Section 4.5.4.

GG.    "EXIF module object" refers to the structure of an EXIF compliant file, as that term is used in the Budweiser Camera EXIF File Access Library Specification Version 0.05 (an example of which was produced in the ITC Investigation as document number EKCCCI002426, at Section 5.1.2).

HH.    "Compression Ratio" refers to the ratio of compression for a JPEG compressed file, as that term is used in the Easyshare DX7630 Digital Camera Engineering Requirements Specification Revision 1.1 (see, e.g., Plaintiff's Exhibit 118 at EKC001025716-17)

II.    "JPEG Buffer" refers to the buffer in SDRAM, as described during at least the deposition of Hideki Akiyama (see, e.g., Akiyama Tr. at 85:24-87:17, 92:17-18), to which a DSP writes JPEG encoded data.

JJ.    "Memory Card" refers to a Secure Digital ("SD"), Compact Flash ("CF"), or Multi Media Card ("MMC"), or other form of removable memory card.

KK.    "Most current version" means the final revision of a document, in terms of chronological order and/or revision number, that accurately describes the operation of the Kodak Device to which it relates.

LL.    "Any" and "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; and "and" should be understood to include and encompass "or."

MM.    "Documents" as used herein is used in their broadest sense contemplated by Rule 34 of the Federal Rules of Civil Procedure and include, without limitation, the original and all non-identical copies (including those with any notations) of the following items: agreements and contracts; assignments; licenses; correspondence; reports, notes and memoranda; summaries, minutes, notes and records of telephone conversations, meetings and conferences; reports and/or summaries of investigations; opinions and reports of experts and consultants; statements of persons having knowledge of relevant facts; cablegrams and telex messages; patents, registrations of service or trademarks, copyrights, and applications for each of them; opinions of counsel; sales records, including purchase orders, order acknowledgments and invoices; books of account; statements, bills, checks and vouchers; brochures, pamphlets, catalogs, sales literature and sales promotion material; advertisements; trade letters, notices and announcements, and press releases; specification sheets and diagrams; warranty forms; notebooks, data sheets,

microfilm, microfiche, photographic negatives, architectural diagrams, blueprints, schematics, hardware description language listings, block, logic and timing diagrams, pictures and photographs; all data or information stored on computer-readable media, such as electro-magnetic or other disks, diskettes, hard disk drives, tapes, cartridges, and CD-ROM, including, but not limited to, software, firmware, source code, and electronic mail.

NN.    "Communication" and "communications" means, unless otherwise specified, any of the following:   (i) any written letter, memorandum, e-mail or other document; (ii) any telephone call between two or more persons, whether or not such call was by chance or prearranged, formal or informal; and (iii) any conversation or meeting between two or more persons, whether or not such contact was by chance or prearranged, formal or informal.

OO.    "Relating to" or "as it relates to" means constituting, comprising, containing, consisting of, evidencing, setting forth, proposing, showing, disclosing, describing, discussing, explaining, summarizing, concerning, reflecting, authorizing, or referring to, directly or indirectly.

## DOCUMENT REQUESTS

### DOCUMENT REQUEST NO. 1

An electronically searchable copy of the most current version of the commented source code for each Kodak Device.

### DOCUMENT REQUEST NO. 2

The most current version of the User's Guide (an example of which was produced in the ITC Investigation as document number AX36394-460) for each Kodak Device.

### DOCUMENT REQUEST NO. 3

The most current version of the schematic diagrams for each Kodak Device.

- 10 -

**DOCUMENT REQUEST NO. 62**

All documents referring or relating to the validity or invalidity of the Patent-In-Suit, or any claim thereof, including without limitation, all prior art of which Kodak is aware relating to the Patent-In-Suit.

**DOCUMENT REQUEST NO. 63**

All documents referring or relating to the enforceability or unenforceability of the Patent-In-Suit, or any claim thereof.

**DOCUMENT REQUEST NO. 64**

All documents constituting, referring or relating to any joint defense agreement(s) that Kodak has entered into or participated in relating to the Patent-In-Suit.

**DOCUMENT REQUEST NO. 65**

All documents relating to the citation of the Patent-In-Suit in connection with the prosecution of the application leading to U.S. Patent No. 5,493,335 ("the '335 Patent"), or any other patent application.

**DOCUMENT REQUEST NO. 66**

To the extent not produced in response to other requests, all documents relating to the prosecution of the '335 Patent.

**DOCUMENT REQUEST NO. 67**

All documents constituting, referring or relating to any oral or written study, analysis or opinion made at any time by or for anyone with respect to the patentability, validity, enforceability or infringement of the Patent-In-Suit.

**DOCUMENT REQUEST NO. 68**

For any documents Kodak produces that include data, reports, or portions of an electronic database, documents sufficient to fully define all terms that are used therein.

- 21 -

**A-38**

**DOCUMENT REQUEST NO. 69**

All documents referred to, used in responding to, or identified in Kodak's responses to any of the First Set of Interrogatories served concurrently herewith.

**DOCUMENT REQUEST NO. 70**

For all documents produced or identified by Kodak which are written in a language other than English, all English translations thereof.

MORRIS, NICHOLS, ARSHT & TUNNELL

_Juli Heaney_

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

*Counsel for Plaintiff Ampex Corporation*

**OF COUNSEL:**
Jesse J. Jenner
Sasha G. Rao
Ropes & Gray LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Norman H. Beamer
Gabrielle E. Higgins
Ropes & Gray LLP
525 University Avenue
Palo Alto, California 94301
(650) 617-4000

James E. Hopenfeld
Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Washington, DC 20005

September 15, 2005
483446

- 22 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMPEX CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>EASTMAN KODAK COMPANY,<br>ALTEK CORPORATION and CHINON<br>INDUSTRIES, INC., )<br><br>Defendants. ) | C.A. No. 04-1373-KAJ |

## PLAINTIFF AMPEX CORPORATION'S FIRST SET OF
## DOCUMENT REQUESTS TO DEFENDANT ALTEK CORPORATION (NOS. 1-47)

Pursuant to Rules 26 and 34, Fed. R. Civ. P., Plaintiff Ampex Corporation ("Ampex"), by its undersigned attorneys, hereby requests that Defendant Altek Corporation ("Altek") produce, within thirty days after service of this Request, all documents and things in its possession, custody or control that are responsive to the requests listed below. Ampex requests that production be made at the offices of Ropes & Gray, 525 University Avenue, Palo Alto, California 94301, or at such other time and place as may be agreed upon by counsel for the parties.

The obligation imposed by these requests is continuing and, if after answering these requests Altek acquires any additional or corrective information called for by these requests, Altek must serve upon Ampex amended or supplemental responses promptly after Altek becomes aware of such knowledge or information.

## INSTRUCTIONS

A.      These requests are addressed to Defendant Altek and its:  (i) present or former directors, officers, employees, agents, representatives, accountants, investigators, consultants, attorneys, and predecessors or successors in interest and any parent, subsidiary or affiliated entities that were in existence during the applicable period of time covered by these requests; (ii) any other person or entity acting on Defendant's behalf or on whose behalf Defendant acted; and (iii) any other person or entity otherwise subject to Defendant's control, or which controls Defendant.

B.      In Altek's responses to requests herein, unless the request specifies otherwise, if a copy of a document subject to such request was already provided to Ampex during the ITC Investigation, and if, by Order, stipulation or otherwise, Ampex may use such copy for all purposes in this litigation as if said document were produced in response to discovery requests in this action, it shall be a sufficient response to so represent that a copy has already been provided to Ampex during the ITC Investigation.

C.      Your answers must include all responsive information within your possession, custody or control, including, but not limited to, information within the possession, custody or control of your attorney(s), investigator(s), or other agent(s).

D.      If you cannot answer any request fully and completely after exercising due diligence to make inquiry and secure the necessary information, please so state and answer each such request to the fullest extent possible, specify the portion of each request that you are unable to answer fully and completely, state the facts upon which you rely to support your contention that you are unable to answer the request fully and completely, and state what knowledge, information or belief you have concerning the unanswered portion of each such request.

2

E.    If a document once existed and has subsequently been lost, destroyed, or is otherwise missing, please identify the document and state the details concerning the loss of such document.

F.    If you claim that the attorney-client privilege or any other privilege, protection or immunity is applicable to any written or electronic communication, you shall specify:  (a) the name of each individual who signed it or under whose name it was issued, (b) the name of each individual to whom it was addressed and the name of the individual who received it, (c) the date the document bears, (d) the title of the document, and (e) a description of the contents of the document.  You shall also identify each and every person who prepared or participated in the preparation of the communication; state the present location of the communication and all copies thereof; identify each and every person having possession, custody or control of the document and all copies thereof; state the privilege or protection claimed; and provide sufficient further information concerning the communication and the circumstances thereof to explain the claim of privilege or protection and to permit the adjudication of the propriety of the claim.

## DEFINITIONS

As used herein, the following terms are intended to have the meanings indicated:

A.    "Kodak" refers to Defendant Eastman Kodak Company, and any and all of its:  (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, partners, OEMs, predecessors-in-interest, successors-in-interest, or any other related or affiliated entities; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

3

**A-42**

B.    "Chinon" refers to Defendant Chinon Industries, Inc., and any and all of its: (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, partners, OEMs, predecessors-in-interest, successors-in-interest, or any other related or affiliated entities; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

C.    "Altek" refers to Defendant Altek Corporation, and any and all of its: (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, partners, OEMs, predecessors-in-interest, successors-in-interest, or any other related or affiliated entities, including without limitation, Altek Lab, Inc.; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

D.    "Ampex" refers to Plaintiff Ampex Corporation, and any and all of its: (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, affiliates, partners, predecessors-in-interest, successors-in-interest; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

E.    "Funai" refers to Funai Electric Company, Ltd., and any and all of its: (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, partners, OEMs, predecessors-in-interest, successors-in-interest, or any other related or affiliated entities; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

4

F.    "TI" refers to Texas Instruments Inc., and any and all of its:   (i) divisions, departments, branches, domestic and foreign subsidiaries, business units, joint-venture entities, parents, affiliates, partners, predecessors-in-interest, successors-in-interest; (ii) its present and former officials, executives, directors, officers, agents, employees, consultants, attorneys; and (iii) all others acting or purporting to act on behalf of any of the foregoing.

G.    "Person" refers to natural persons and any and all other legal entities, including without limitation, individuals, corporations, companies, firms, partnerships, joint ventures, proprietorships, associations, governmental bodies or agencies, or other form of business enterprise.

H.    "Patent-In-Suit" refers to United States Patent No. 4,821,121 (the "'121 Patent").

I.    "Counterpart" of the '121 patent or "patent-in-suit" refers to all domestic and foreign, divisional, reissue, reexamination, continuation, or continuation-in-part patents (other than the '121 patent), and patent applications which claim the benefit of the filing date of the '121 patent or patent application or contain a majority of the disclosure of the '121 patent or patent application.

J.    "Digital Image Storage and Retrieval Device" means any digital electronic device that generates, stores and retrieves digital images, including without limitation, digital still cameras, personal digital assistants (PDAs), and camera phones and camcorders with digital still capabilities.

K.    "Kodak Device" means any Digital Image Storage and Retrieval Device, such as digital cameras and other digital electronic devices, that generates, stores and retrieves digital images, that has ever been made, sold or offered for sale in, or imported or sold for importation into the U.S., by or on behalf of Kodak, including without limitation, all versions of Kodak's

5

CX4200, CX4210, CX4230, CX4300, CX4310, CX6200, CX6230, CX6330, CX6445, CX7220, CX7300, CX7310, CX7330, CX7430, CX7525, CX7530, DX3900, DX4900, DX6340, DX6440, DX6490, DX7440, DX7590, DX7630, LS420, LS443, LS743, LS753, Z700, Z730, Z740, Z760, Z7590, C300, C310, C330, C340, C360, V530, V550, Easyshare-One, DCS Pro 14n, DCS Pro SLR/c, DCS Pro SLR/n, DCS Proback Plus, and DCS Proback 645 models.

 L.  "Altek-Kodak Device" means any Kodak Device manufactured by Altek.

 M.  "Exif" refers to any and all versions of the Exchangeable Image File Format standard for digital still cameras, as promulgated by the Japan Electronics and Information Technology Industries Association ("JEITA").

 N.  "DCF" refers to any and all versions of the Design Rule for Camera File system standard, as promulgated by the Japan Electronics Industry Development Association ("JEIDA").

 O.  "Thumbnail" refers to a reduced resolution reproduction of a digital image, such as described in JEITA CP-3451 (Exif Version 2.2), Section 4.5.5 and JEIDA-49-2-1998 (DCF Version 1.0), Section 3.5.

 P.  "Review mode", "Multi-up mode" and "Zoom mode" each refer to the so-named method of reviewing digital images as described, for example, at pages 28, 30 of the DX7630 User's Guide, and to any other corresponding similar, but other-named, methods of image review.

 Q.  "TIFF" refers to any and all versions of the Tagged Image File Format or Tag Image File Format, a standard file format promulgated by Adobe Systems Incorporated.

6

R.    "JPEG" refers to any and all versions of the Joint Photographic Experts Group file format, an ISO/ITU standard established by the Joint Photographic Experts Group, as described in any and all revisions of ISO/IEC 10918, including ISO/IEC 10918-1.

S.    "RAW" refers to the file format for digital images as the data come directly off the electronic sensor, such as a Charge Coupled Device or Complimentary Metal Oxide Semiconductor sensor, with no in-camera processing performed.

T.    "ERI" refers to any and all versions of the Extended Range Imaging file format for digital images, an Exif-compliant file format proprietary to Kodak.

U.    "DCR" refers to any and all versions of the Digital Camera Raw file format for digital images, a file format proprietary to Kodak.

V.    "OEM" means Original Equipment Manufacturer and is a designation for companies that manufacture equipment that is then marketed and sold off to other companies under their own names.

W.    "ODM" means Original Design Manufacturer and is a designation for companies that manufacture products of its own designs, which are then sold under an OEM's brand name.

X.    "ITC Investigation" means International Trade Commission Investigation No. 337-TA-527.

Y.    "Accessories" means bags, cases, batteries, chargers, power supplies, printers, paper, ink, docks, kits, lenses, memory cards, flash cards, SD and MMD cards, and any other products sold by Kodak, which function or are used with, or are intended to function or be used with, any of the Kodak Devices.

7

Z.    "Buffer for Clusters" refers to the data buffer in SDRAM identified during the deposition of Hiroshi Masuda (see, e.g., Masuda tr., p. 25, line 9-p. 26, line 1) into which data is written prior to that data being written onto an SD memory card or compact flash card.

AA.    "Source file" refers to the filename of a source code module within the source code for a Kodak Device.

BB.    "Line number(s)" refers to the line numbers included in a source file.

CC.    "CFA buffer" refers to the buffer or area in SDRAM into which CFA data is written during the capture of a still image (see, e.g.,  Plaintiff's Ex. 94, line 98).

DD.    "DSP" refers to the digital signal processor block included in the Texas Instruments TMS320DM270 or TMS320DSC25 processors employed in certain of the Current Kodak Devices, as well as the firmware and/or software used to operate that digital signal processor block.

EE.    "JPEG encoded data" is data that has been encoded in accordance with the Joint Photographic Experts Group file format as described in any and all revisions of ISO/IEC 10918, including ISO/IEC 10918-1.

FF.    "Primary Image" refers to a main body image as defined in JEITA CP-3451 (Exif Version 2.2), Sections 2 and 4.5.2.

GG.    "APP1 Segment" refers to the  APP1 segment of an EXIF compliant file, as defined in JEITA CP-3451 (Exif Version 2.2), Section 4.5.4.

HH.    "EXIF module object" refers to the structure of an EXIF compliant file, as that term is used in the Budweiser Camera EXIF File Access Library Specification Version 0.05 (an example of which was produced in the ITC Investigation as document number EKCCCI002426, at Section 5.1.2).

II.     "Compression Ratio" refers to the ratio of compression for a JPEG compressed file, as that term is used in the Easyshare DX7630 Digital Camera Engineering Requirements Specification Revision 1.1 (see, e.g., Plaintiff's Exhibit 118 at EKC001025716-17).

JJ.     "JPEG Buffer" refers to the buffer in SDRAM, as described during at least the deposition of Hideki Akiyama (see, e.g., Akiyama Tr. At 85:24-87:17, 92:17-18), to which a DSP writes JPEG encoded data.

KK.     "Memory Card" refers to a Secure Digital ("SD"), Compact Flash ("CF"), or Multi Media Card ("MMC"), or other form of removable memory card.

LL.     "Most current version" means the final revision of a document, in terms of chronological order and/or revision number, that accurately describes the operation of the Kodak Device to which it relates.

MM.     "Any" and "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; and "and" should be understood to include and encompass "or."

NN.     "Documents" as used herein is used in their broadest sense contemplated by Rule 34 of the Federal Rules of Civil Procedure and include, without limitation, the original and all non-identical copies (including those with any notations) of the following items:  agreements and contracts; assignments; licenses; correspondence; reports, notes and memoranda; summaries, minutes, notes and records of telephone conversations, meetings and conferences; reports and/or summaries of investigations; opinions and reports of experts and consultants; statements of persons having knowledge of relevant facts; cablegrams and telex messages; patents, registrations of service or trademarks, copyrights, and applications for each of them; opinions of counsel; sales records, including purchase orders, order acknowledgments and invoices; books of

9

account; statements, bills, checks and vouchers; brochures, pamphlets, catalogs, sales literature and sales promotion material; advertisements; trade letters, notices and announcements, and press releases; specification sheets and diagrams; warranty forms; notebooks, data sheets, microfilm, microfiche, photographic negatives, architectural diagrams, blueprints, schematics, hardware description language listings, block, logic and timing diagrams, pictures and photographs; all data or information stored on computer-readable media, such as electromagnetic or other disks, diskettes, hard disk drives, tapes, cartridges, and CD-ROM, including, but not limited to, software, firmware, source code, and electronic mail.

OO.    "Communication" and "communications" means, unless otherwise specified, any of the following:  (a) any written letter, memorandum, e-mail or other document; (b) any telephone call between two or more persons, whether or not such call was by chance or prearranged, formal or informal; and (c) any conversation or meeting between two or more persons, whether or not such contact was by chance or prearranged, formal or informal.

PP.    "Relating to" or "as it relates to" means constituting, comprising, containing, consisting of, evidencing, setting forth, proposing, showing, disclosing, describing, discussing, explaining, summarizing, concerning, reflecting, authorizing, or referring to, directly or indirectly.

## DOCUMENT REQUESTS

### DOCUMENT REQUEST NO. 1

An electronically searchable copy of the most current version of the commented source code for each Altek Kodak Device.

### DOCUMENT REQUEST NO. 2

The most current version of the User's Guide (an example of which was produced in the ITC Investigation as document number AX38005-59) for each Altek Kodak Device.

**DOCUMENT REQUEST NO. 39**

All documents constituting, referring or relating to communications with others concerning the Patent-In-Suit or any Counterpart to the Patent-In-Suit.

**DOCUMENT REQUEST NO. 40**

All documents referring or relating to Altek's infringement or non-infringement of the Patent-In-Suit, or any claim thereof.

**DOCUMENT REQUEST NO. 41**

All documents referring or relating to the validity or invalidity of the Patent-In-Suit, or any claim thereof, including without limitation, all prior art of which Altek is aware relating to the Patent-In-Suit.

**DOCUMENT REQUEST NO. 42**

All documents referring or relating to the enforceability or unenforceability of the Patent-In-Suit, or any claim thereof.

**DOCUMENT REQUEST NO. 43**

All documents referring or relating to any joint defense agreement(s) that Altek has entered into or participated in relating to the Patent-In-Suit.

**DOCUMENT REQUEST NO. 44**

All documents constituting, referring or relating to any oral or written study, analysis or opinion made at any time by or for anyone with respect to the patentability, validity, enforceability or infringement of the Patent-In-Suit.

**DOCUMENT REQUEST NO. 45**

For any documents Altek produces that include data, reports, or portions of an electronic database, documents sufficient to fully define all terms that are used therein.

17

**DOCUMENT REQUEST NO. 46**

All documents referred to, used in responding to, or identified in Altek's responses to any of the First Set of Interrogatories served concurrently herewith.

**DOCUMENT REQUEST NO. 47**

For all documents produced or identified by Altek which are written in a language other than English, all English translations thereof.

MORRIS, NICHOLS, ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

*Counsel for Plaintiff Ampex Corporation*

OF COUNSEL:
Jesse J. Jenner
Sasha G. Rao
Ropes & Gray LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Norman H. Beamer
Gabrielle E. Higgins
Ropes & Gray LLP
525 University Avenue
Palo Alto, California 94301
(650) 617-4000

James E. Hopenfeld
Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Washington, DC  20005

September 15, 2005
483451

18