# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AMPEX CORPORATION, | ) |
|  | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) C.A. No. 04-1373 (KAJ) |
|  | ) |
|  | ) **REDACTED VERSION** |
| EASTMAN KODAK COMPANY, | ) |
| ALTEK CORPORATION, and | ) |
| CHINON INDUSTRIES, INC., | ) |
|  | ) |
| *Defendants.* | ) |
|  | ) |

---

**DECLARATION OF GABRIELLE E. HIGGINS IN SUPPORT OF AMPEX
CORPORATION'S MOTION FOR SUMMARY JUDGMENT THAT THE
QUANTEL PAINTBOX IS NOT PRIOR ART UNDER 35 U.S.C. §102 (a) and § 102(b)**

OF COUNSEL:
Jesse J. Jenner
Sasha G. Rao
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 596-9000

Norman H. Beamer
Gabrielle E. Higgins
Ropes & Gray LLP
525 University Avenue
Palo Alto, CA 94301
(650) 617-4000

James E. Hopenfeld
Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Washington, DC 20005
(202) 508-4600

MORRIS NICHOLS ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julie Heaney (#3052)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com
*Attorneys for Plaintiff Ampex Corporation*

Original Filing Date: May 23, 2006
Redacted Filing Date: May 31, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMPEX CORPORATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1373-KAJ |
| | ) | |
| EASTMAN KODAK COMPANY, | ) | |
| ALTEK CORPORATION, and | ) | |
| CHINON INDUSTRIES, INC., | ) | |
| | ) | |
| *Defendants.* | ) | |

**DECLARATION OF GABRIELLE E. HIGGINS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT THAT THE QUANTEL PAINTBOX IS
NOT PRIOR ART UNDER 35 U.S.C. § 102(a) AND § 102(b)**

I am counsel with the law firm of Ropes & Gray LLP, attorneys for

plaintiff Ampex Corporation ("Ampex") in this action. I make this declaration in support

of Ampex's Motion for Summary Judgment That the Quantel PaintBox is Not Prior Art

Under 35 U.S.C. § 102(a) and § 102(b).

1.     Attached hereto as Exhibit 1 is a true and correct copy of selected

pages from the Initial Expert Report of Richard John Taylor, submitted in this action on

March 24, 2006.

2.     Attached hereto as Exhibit 2 is a true and correct copy of selected

pages from the Supplemental Expert Report of Richard John Taylor, submitted in the ITC

action on June 17, 2005.

3.     Attached hereto as Exhibit 3 are selected pages from the

Deposition of Richard J. Taylor, taken in the ITC action on June 6, 2005; selected pages

199098_1

from the Deposition of Richard J. Taylor, taken in the ITC action on June 7, 2005; and

selected pages from the Deposition of Richard J. Taylor, taken in this action on April 28,

2006.

   4.  Attached hereto as Exhibit 4 is a true and correct copy of a

document produced by defendant Kodak, bearing Bates numbers EKC001001541-547.

   5.  Attached hereto as Exhibit 5 is a true and correct copy of a

document entitled "Quantel DPB 7001 Paint Box User Guide," dated January 1983, and

bearing Bates numbers EK002000467-537.

   6.  Attached hereto as Exhibit 6 is a true and correct copy of pages

from the Quantel Limited DPB 7000/1 Operating and Service Manual, dated June 1984,

and bearing Bates numbers EKC002001646, EKC002001685-689, EKC002001730, and

EKC002001792.

   7.  Attached hereto as Exhibit 7 is a true and correct copy of selected

pages from the Deposition of Martin A. Holbrook, taken in this action on March 10,

2006.

   8.  Attached hereto as Exhibit 8 is a true and correct copy of

Complainant Ampex Corporation's Request to Respondent Eastman Kodak Company for

Inspection and Testing of Certain Devices, filed in the ITC action on April 18, 2005.

   9.  Attached hereto as Exhibit 9 is a true and correct copy of a letter

dated April 25, 2005 from Jordan L. Hirsch to Norman Beamer.

   10.  Attached hereto as Exhibit 10 is a true and correct copy of a letter

dated April 29, 2005 from Norman H. Beamer to Jordan L. Hirsch.

199098_1

11.    Attached hereto as Exhibit 11 is a true and correct copy of a letter dated May 6, 2005 from Jordan L. Hirsch to Norman Beamer.

12.    Attached hereto as Exhibit 12 is a true and correct copy of a draft brochure entitled "The PAINT BOX – Quantel's DPB 7000 Series Digital Paint Box," dated August 10, 1982 bearing Bates numbers EKC001018471-483.

13.    Attached hereto as Exhibit 13 is a true and correct copy of an Ampex interoffice memo dated May 18, 1982.

14.    Attached hereto as Exhibit 14 is a true and correct copy of a document entitled "The Digital Video Report No. 12," dated September 1, 1982, and bearing Bates numbers EKC001030479-482.

15.    Attached hereto as Exhibit 15 are true and correct copies of Weather Channel documents dated March, 1982, and bearing Bates numbers EKC002000538-539, EKC002000554-555.

16.    Attached hereto as Exhibit 16 is a true and correct copy of a document entitled "PRELIMINARY DESCRIPTION – The Quantel DPB 7000 Digital Paint Box," dated March 22, 1982, and bearing Bates numbers AMP012388-393.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 23, 2006 in Palo Alto, California.

Gabrielle E. Higgins

# EXHIBIT 1

Redacted

# EXHIBIT 2

Redacted

EXHIBIT 3

Redacted

EXHIBIT 4

Redacted

EXHIBIT 5

Redacted

EXHIBIT 6

Redacted

EXHIBIT 7

VOLUME: I

PAGES: 1-115

EXHIBITS: 1-7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - x

AMPEX CORPORATION,

                Plaintiff,

  v.                         Civil Action

EASTMAN KODAK COMPANY, ALTEK     No. 04-1373-KAJ

CORPORATION and CHINON

INDUSTRIES, INC.,

              Defendants.

- - - - - - - - - - - - - - - - x

**CERTIFIED COPY**

DEPOSITION of MARTIN A. HOLBROOK

March 10, 2006

9:44 a.m.

Ropes & Gray LLP

One International Place

Boston, Massachusetts

Reporter: Michael D. O'Connor, RPR



**LEGALINK**
A WORDWAVE COMPANY

LegaLink San Francisco
575 Market Street, 11th Floor
San Francisco, CA 94105

tel (415) 357-4300
tel (800) 869-9132
fax (415) 357-4301

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

MARTIN A. HOLBROOK    March 10, 2006

1    portion of your question as vague.

2        A.    I have not seen this document before.

3        Q.    When were you first contacted in connection

4    with -- you understand this is a patent infringement

5    suit between Ampex and Kodak?

6        A.    Yes.

7        Q.    When were you first contacted concerning

8    this lawsuit, to the best of your understanding?

9        A.    In the autumn of last year.

10       Q.    Who contacted you?

11       A.    Mr. Summersgill and Ms. Grewal.

12       Q.    Are they representing you, by the way, in

13    connection with this matter?

14            MR. SUMMERSGILL:  We are representing Mr.

15    Holbrook for the purposes of his deposition, yes.

16       Q.    Without going into the conversations, was

17    it a telephone call?

18       A.    A telephone call, yes.

19       Q.    Did you have a meeting with them after

20    that?

21       A.    Yes.

22       Q.    When was that?

23       A.    I would suppose in November of last year.

24       Q.    Was anyone else present besides the

MARTIN A. HOLBROOK    March 10, 2006

1    attorneys that you mentioned?

2        A.    My wife.

3        Q.    Have you talked with Richard Taylor about

4    this matter?

5        A.    No.  I haven't spoken to Richard Taylor for

6    many years.

7        Q.    When were you last at the Quantel facility?

8        A.    I paid a cursory visit, a social call in, I

9    suppose, approximately 1989.

10       Q.    After the meeting you just spoke of with

11   the attorneys, were there any subsequent meetings

12   prior to today?

13       A.    No.

14       Q.    Where was the meeting?

15       A.    The initial meeting?

16       Q.    Yes.

17       A.    In my house in France.

18       Q.    So they got a trip to France out of it?

19             MR. SUMMERSGILL:    Objection.

20       Q.    Any subsequent telephone calls?

21       A.    Telephones and e-mails, simply to arrange

22   this session today.

23       Q.    Did you have a meeting recently prior to

24   this deposition?

MARTIN A. HOLBROOK     March 10, 2006

1      A.    We've spoken in the last couple of days,

2  yes.

3      Q.    Meaning that you met at spoke?

4      A.    I'm sorry?

5      Q.    Meaning that you met and had a meeting or

6  what?

7      A.    Here in Boston.

8      Q.    Did you review documents?

9      A.    We did.

10      Q.    Do you recall which documents you reviewed?

11      A.    Mainly internal memoranda and sales

12  documents from Quantel and MCI.  And furthermore, I

13  should add, the operator's guide for the Paint Box

14  system.

15            MR. SUMMERSGILL:  Mr. Beamer, I can clarify

16  for you that all of the documents that Mr. Holbrook

17  was shown have been produced to you.

18      Q.    Did you review a tape or other recording of

19  a demonstration?

20      A.    I saw a short tape, yes.

21      Q.    Turning back to Page 8 of Exhibit 1, in the

22  second paragraph under this Quantel Paint Box

23  heading, it says, "The weather channel in Atlanta,

24  Georgia purchased the Quantel Paint Box on March 8,

MARTIN A. HOLBROOK    March 10, 2006

1  that Mr. Holbrook's deposition can proceed with the

2  necessity of him presenting identification.  Is that

3  sufficient?

4          MR. SUMMERSGILL:  Yes.

5          (Recess)

6      BY MR. BEAMER:

7      Q.   On Exhibit 1, Page 9, I think it's the

8  fourth sentence, the fourth and fifth sentence in

9  the first full paragraph, it says, "The Paint Box

10  could selectively generate a reduced-sized image.

11  At the user's option, the full-sized image could be

12  transferred from the disk data buffer directly to

13  the size reducer."

14          Are you sufficiently familiar with the

15  Paint Box circuitry to verify this statement?

16          MR. SUMMERSGILL:  Objection.  Compound.

17      A.   I'm not technically minded.

18      Q.   So you would not be able to say where in

19  memory or on disk a particular image is stored at a

20  particular point in time in the operation of the

21  Paint Box?

22      A.   You would be correct in saying that, yes.

23          MR. SUMMERSGILL:  Mr. Beamer, I just want

24  to clarify you're asking him about the fifth

36

MARTIN A. HOLBROOK    March 10, 2006

1    sentence, because you read two sentences, and then

2    asked him a question about one statement?

3          MR. BEAMER:   I was focusing on the fifth

4    sentence, yes.

5          MR. SUMMERSGILL:   Okay.

6       A.    Which sentence is that?

7       Q.    The sentence that says, "At the user's

8    option, the full-sized image could be transferred

9    from the disk data buffer directly to the size

10   reducer."

11      A.    That would smack of technical terminology

12   to me.

13      Q.    Were you familiar at all with the circuitry

14   or software of the Paint Box?

15      A.    Absolutely not.

16      Q.    When you worked with the engineers, did you

17   ever get into any details about architecture of the

18   Paint Box or algorithms for reducing the size of the

19   image, anything of that nature?

20          MR. SUMMERSGILL:   Objection.

21      A.    I didn't get involved in that sort of

22   detailed technology.  My interest was solely to

23   ensure that the user actually was not involved in

24   that sort of technology.  It was not necessary for

MARTIN A. HOLBROOK    March 10, 2006

1    the user to know this or should not be necessary for

2    a designer using the system to know this.

3        Q.    Were you familiar with something called

4    auto numbering in the context of saving and naming a

5    picture?

6        A.    That, I believe, is possible, yes.

7        Q.    What's your understanding of what that

8    refers to?

9        A.    I think it refers to the ability to store

10    images or parts of images in sequence, the machine

11    numbering as you go, as you store.

12        Q.    When was that feature first implemented in

13    Paint Box?

14        A.    I should imagine it was, from my memory,

15    probably have been in January of '82.

16        Q.    Do you remember that feature actually in

17    use, say, at NAB '82?

18        A.    I don't think I personally used it.

19        Q.    Do you know whether it was actually

20    available for use in NAB '82, in that model that was

21    at NAB '82?

22            MR. SUMMERSGILL:  Objection.  Asked and

23    answered.

24        A.    After this period of time, I couldn't be

MARTIN A. HOLBROOK     March 10, 2006

1    system.   This actually has been formalized in this

2    new menu.

3         Q.   When was it first implemented?   Does this

4    help you pin that down any better?

5         A.   This would be present in the NAB '82

6    machine, but not formalized as a menu item.

7         Q.   What do you base your answer on, that it

8    would have been present?   Did you discuss this with

9    counsel during lunch, this issue?

10        MR. SUMMERSGILL:   Objection.   I instruct

11   the witness not to answer that.

12        Q.   Did you discuss your questions and answers

13   during lunch?

14        A.   We had a general --

15        MR. SUMMERSGILL:   Objection.   I instruct

16   the witness not to answer.

17        Q.   Let me play for you a video segment that's

18   been provided to us by Kodak.

19        (Tape shown)

20        Q.   Did you have anything to do with preparing

21   this demonstration tape?

22        A.   No.

23        Q.   When did you first see it?

24        A.   Yesterday, I believe.

92

MARTIN A. HOLBROOK    March 10, 2006

1    corresponding numbers, right?

2            MR. SUMMERSGILL:  Objection.

3        Q.    Do you understand that's what was done

4    here?

5        A.    It appears to be what was done.

6        Q.    So my question is, did you ever do that,

7    that sequence of operations?

8        A.    My answer was, no, I didn't.

9        Q.    Do you see this green area of the menu,

10   xpos, some number in the 200s, and so on?

11       A.    I see that, yes.

12       Q.    Is that what we were looking at in Exhibit

13   6 on page -- actually, I think we were looking at

14   Exhibit 5.  Is that the same menu?  Do you recognize

15   that?

16       A.    This appears to be the same menu

17   substantially, yes.

18       Q.    So in NAB '82, the demo model would not

19   have shown this green portion of the menu, correct?

20       A.    It would not have shown the green portion

21   of the menu.

22       Q.    And over here do you see there's a stick

23   and a tack on the menu?

24       A.    Yes.

99

MARTIN A. HOLBROOK    March 10, 2006

1      Q.    The tack item would not have been in the

2    NAB '82 menu, correct?

3      A.    Tack was not present with '82.

4      Q.    So this tells you that this demonstration

5    is done with software that was dated after NAB '82,

6    correct?

7      A.    Yes.

8      Q.    And indeed, it was done some five years --

9    software dated some five years after NAB '82,

10    according to Exhibit 5, right?

11            MR. SUMMERSGILL:  Objection.

12      A.    I can't date it, because there are no dates

13    on this document.

14      Q.    It's some years after NAB '82 that these

15    two items were added to the menu, correct?

16      A.    Correct.

17      Q.    You mentioned you were involved with the

18    Graphic Paint Box.  Let me hand you what was marked

19    as Taylor Exhibit 23.  Do you recognize this

20    document?

21      A.    No.

22      Q.    Would this reference to high resolution

23    Graphics Paint Box be what you had mentioned that

24    you worked on towards the end of your tenure at

1    Q.    For your shorter hourly demos, did you

2    demonstrate the browsing of cutouts?

3    A.    Oh, yes, most certainly.

4    Q.    Did you demonstrate the saving of

5    reduced-sized cutouts?

6    A.    Yes.  It was a sequence.  You reduced the

7    size, you make it a cutout, you store it to the

8    disk, you can retrieve it by the browse or title.

9    All of that was demonstrated.

10    Q.    But you can't recall the specific nature of

11    the demo as to what image was being reduced or

12    saved; is that correct?  I'm talking now about the

13    hourly demo.

14          MR. SUMMERSGILL:  Objection.

15    A.    I mean, for the short demo, the hourly demo

16    we are talking, almost certainly the ball bearing

17    image.

18    Q.    So you're saying you saved the

19    reduced-sized ball bearing after you created the

20    image of the ball bearings orbiting one another?

21    A.    As a demonstration piece, yes.

22    Q.    In general, the term storing cutouts or

23    retrieving cutouts or browsing cutouts, that's not

24    necessarily referring to reduced-sized images, is

112

MARTIN A. HOLBROOK    March 10, 2006

1    it?

2         MR. SUMMERSGILL:  Objection.  You can

3    answer.

4         A.   It's a fine point.  It doesn't necessarily

5    refer to it, but I'm absolutely certain that it was

6    done, because it was fundamental to the way the

7    system works.

8         Q.   A cutout could be any portion of an image,

9    right, whether it's reduced or enlarged or rotated

10   or not?

11        A.   You're quite right.

12             MR. BEAMER:  Okay.  That's all.  Thanks.

13             MR. SUMMERSGILL:  Just give me two minutes.

14   I think I'm all set, but I want to consult with

15   people who are smarter than I am.

16             (Short recess)

17             MR. SUMMERSGILL:  I have nothing further.

18   Thank you, Mr. Holbrook.

19                  (Whereupon the deposition

20                  concluded at 1:59 p.m.)

21

22

23

24

113

# EXHIBIT 8

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.
Before the Honorable Robert L. Barton, Jr.
Administrative Law Judge

| | |
|---|---|
| In the Matter of )<br><br>CERTAIN DIGITAL IMAGE )<br>STORAGE AND RETRIEVAL )<br>DEVICES ) | Investigation No. 337-TA-527 |

## COMPLAINANT AMPEX CORPORATION'S REQUEST TO RESPONDENT EASTMAN KODAK COMPANY FOR INSPECTION AND TESTING OF CERTAIN DEVICES

Pursuant to 19 C.F.R. § 210.30, Complainant Ampex Corporation ("Ampex") serves its Request For Inspection And Testing Of Certain Devices on Respondent Eastman Kodak Company ("Kodak"), and requests that such request be answered in writing, within ten (10) days after service hereof, as mandated by 19 C.F.R. § 210.30(b)(2).

The obligation imposed by these requests is continuing and, if after answering these requests Kodak acquires any additional or corrective information called for by these requests, Kodak must serve upon Ampex amended or supplemental responses promptly after Kodak becomes aware of such knowledge or information pursuant to 19 C.F.R. § 210.27(c)(1).

## INSTRUCTIONS

Ampex hereby incorporates by reference the Instructions set forth in its First and Second Set of Document Requests to Respondent Kodak (Nos. 1-77).

## DEFINITIONS

Ampex hereby incorporates by reference the Definitions set forth in its First and Second Set of Document Requests to Respondent Kodak (Nos. 1-77).

## REQUEST FOR INSPECTION AND TESTING OF THINGS

Ampex requests that on Monday, May 2, 2005, it be provided the opportunity to inspect, at the offices of Wilmer Cutler Pickering Hale and Dorr LLP, 399 Park Avenue New York, NY 10022, or at such other time and location as agreed upon by the parties, the Quantel Paintbox system demonstrated in the video produced by Kodak at EKC002001284, the Digital Library Store 6000 ("DLS 6000") system that Kodak or its experts intend to demonstrate at trial, and any other device that Kodak or any of its experts intend to demonstrate or rely upon at trial, including without limitation, the Quantel Intellect; Harris Still Store IRIS II; ADDA Still Store System; AVA; ADO; SuperPaint; and Aurora/100 system. Pursuant to 19 C.F.R. § 210.30(b)(1), Ampex requests that a person competent to operate each said device, designated by Kodak, be made available at the inspection, with knowledge of the operation of the devices offered for inspection, who shall perform the following acts in the presence of Ampex's representative:

Navigation of the Quantel Paintbox system's menus and sub-menus and commands instantiated thereby, including PASTE UP and LIBRARY; operation of commands within PASTE UP, including without limitation, "cut", "cut picture", "cut all", "cutout", "paste", "paste stat", "paste original", the adjustment of size using a joystick and using "paste stat", "tack" and "stick"; operation of commands within LIBRARY, including without limitation, "find", "find picture", "save", "save picture", "save cutout", "directory", "browse", "titles", "escape"; all of the operations performed and/or demonstrated in the video produced by Kodak at EKC002001284; and all operations upon which Kodak or any of its experts intend to demonstrate or rely upon at trial;

Navigation of DLS 6000 library, menus, and submenus; operations to store images on disc, including without limitation, the generation and storage of "composite pictures" (as described in a document produced by Kodak at EKC000141907); operations to size reduce images, including

- 2 -

without limitation, "picture compression"; the access of images from disc; display of images;

display of 16 or 25 reduced size images at a time in browse, polyphoto, and/or any other mode;

operation of the browse and/or polyphoto display, including storage and later recall of the browse

and/or polyphoto display; and all operations upon which Kodak or any of its experts intend to

demonstrate or rely upon at trial; and

        For all other devices, all operations upon which Kodak or any of its experts intend to

demonstrate or rely upon at trial.

Dated: April 18, 2005                   _____

                                        Jesse J. Jenner
                                        Richard A. Inz
                                        Ropes & Gray LLP
                                        1251 Avenue of the Americas
                                        New York, NY 10020
                                        Phone No. (212) 596-9000

                                        Norman H. Beamer
                                        Gabrielle E. Higgins
                                        Ropes & Gray LLP
                                        525 University Avenue
                                        Palo Alto, CA 94301
                                        Phone No. (650) 617-4000

                                        James E. Hopenfeld
                                        Ropes & Gray LLP
                                        One Metro Center
                                        700 12th Street, NW, Suite 900
                                        Washington, DC 20005
                                        Phone No. (202) 508-4600

                                        Barbara A. Murphy
                                        Tom M. Schaumberg
                                        Adduci, Mastriani & Schaumberg, L.L.P.
                                        1200 Seventeenth Street, N.W.
                                        Washington, D.C. 20036
                                        Phone No. (202) 467-6300

                                        Attorneys for Complainant,
                                        Ampex Corporation

- 3

## CERTIFICATE OF SERVICE

I hereby certify that the **COMPLAINANT AMPEX CORPORATION'S REQUEST TO RESPONDENT EASTMAN KODAK COMPANY FOR INSPECTION AND TESTING OF CERTAIN DEVICES** was served on this day as follows:

Michael D. Esch, Esq.                          VIA E-MAIL
Wilmer Cutler Pickering Hale and Dorr LLP       (Extra copy to be sent via
1899 Pennsylvania Avenue, NW                    Federal Express for next-day
Washington, DC 20006                            delivery)

William P. DiSalvatore, Esq.                    VIA E-MAIL copy by U.S. Mail
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY 10022

William F. Lee, Esq.                            VIA E-MAIL copy by U.S. Mail
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

Erin Joffre, Esq.                               VIA E-MAIL
Office of Unfair Import Investigations          (Extra copy to be sent via
U.S. International Trade Commission             Federal Express for next-day
500 E Street, SW, Suite 401                     delivery)
Washington, DC 20436


April 18, 2005                    By _____
                                      Norman H. Beamer

- 4

# EXHIBIT 9

# WILMER CUTLER PICKERING
## HALE AND DORR ᴸᴸᴾ

April 25, 2005

Jordan L. Hirsch

60 STATE STREET
BOSTON, MA 02109
+1 617 526 6330
+1 617 526 5000 fax
jordan.hirsch@wilmerhale.com

Norman Beamer
Ropes & Gray LLP
525 University Avenue
Palo Alto, CA 94301

Re:    Certain Digital Image Storage & Retrieval Devices,
       USITC Inv. No. 337-TA-527

Dear Mr. Beamer:

This letter is in reply to Ampex's April 18, 2005 Notice of Examination of Eastman Kodak
Company and Request for Inspection and Testing of Certain Devices.

### The Notice of Examination

Ampex asks Kodak to designate a witness with knowledge of the Quantel Paint Box, the Quantel
DLS 6000, the Quantel Intellect, the Harris Still Store IRIS II, the ADDA Still Store System,
Superpaint, and the Aurora/100 System. None of these prior art devices are Kodak devices or
have ever been manufactured by Kodak. Respondents were able to identify these systems as
prior art not through the knowledge of a Kodak employee but through the experts Kodak has
identified throughout this Investigation. The only individuals Kodak can identify in response to
this Notice of Examination have thus already been designated as experts. It is premature for
Ampex to attempt to depose an expert as a fact witness before beginning expert depositions.

Nevertheless, Kodak does not seek to prevent Ampex from obtaining information relevant to the
prior art systems. Kodak's experts provided lengthy and detailed reports detailing the functions
of the prior art devices. The expert reports contained extensive claim charts comparing each of
the prior art systems to the '121 Patent. Kodak also expects that Ampex will take depositions of
the identified experts during the time set aside for expert discovery.

### The Request for Inspection and Testing of Certain Devices

#### The Quantel Paint Box

On March 25, 2005, we submitted a video of the Paint Box along with the expert report of
Richard Taylor. In Mr. Taylor's opinion, this video demonstrates all of the relevant features of
the Paint Box. The Paint Box used to make the video is located at Quantel's headquarters in
England. We do not have custody or control over the system and had to obtain Quantel's

BALTIMORE    BEIJING    BERLIN    BOSTON    BRUSSELS    LONDON
     MUNICH    NEW YORK    NORTHERN VIRGINIA    OXFORD    WALTHAM    WASHINGTON

US1DOCS 5076244v1

April 25, 2005
Page 2

permission before making the video. If Ampex is willing to inspect the Paint Box in England, we will work with Quantel to arrange a date on which the Paint Box will be available.

*The Quantel DLS 6000*

Neither Respondents nor its experts have relied on a physical device in describing the DLS 6000. We do not have control or custody of a Quantel DLS 6000 system. We are aware of a DLS 6030 in the possession of CBS in New York, New York but to the best of our knowledge that system is not currently operational.

*The Quantel Intellect*

Neither Respondents nor its experts have relied on a physical device in describing the Quantel Intellect. We do not have possession or control of an Intellect system and we do not know if a system exists. We will consult with Quantel and let you know if Quantel possess a system available for inspection in England.

*The Harris Still Store IRIS II*

Neither Respondents nor its experts have relied on a physical device in describing the Harris Still Store IRIS II. We do not have possession or control of a Harris Still Store IRIS II and we do not know if a system exists.

*The ADDA Still Store System*

Neither Respondents nor its experts have relied on a physical device in describing the ADDA Still Store System. We do not have possession or control of an ADDA Still Store System and we do not know if a system exists.

*The AVA and ADO*

The AVA and ADO are systems manufactured by Ampex. We have no knowledge of the whereabouts or existence of an AVA or ADO system.

*Superpaint*

Neither Respondents nor its experts have relied on a physical device in describing Superpaint. We do not have possession or control of a Superpaint system but we have learned that the Computer Museum in California is in possession of a Superpaint machine.

*The Aurora/100 System*

Neither respondents nor its experts have relied on a physical device in describing the Aurora/100 System. We do not have possession or control of an Aurora/100 System and we do not know if a system exists.

April 25, 2005
Page 3


As discovery proceeds, we will alert Ampex if we become aware of the existence or location of any prior art systems.


Sincerely yours,

Jordan L. Hirsch



cc:    Erin Joffre, Esq.
       Jesse J. Jenner, Esq.
       Barbara A. Murphy, Esq.

EXHIBIT 10



ROPES & GRAY LLP

525 UNIVERSITY AVENUE     SUITE 300     PALO ALTO, CA 94301-1917     650-617-4000     F 650-617-4090

BOSTON     NEW YORK     PALO ALTO     SAN FRANCISCO     WASHINGTON, DC     www.ropesgray.com

NORMAN H. BEAMER
DIRECT DIAL 650.617.4030
DIRECT FAX 650.566.4149
E-MAIL NORMAN.BEAMER@ROPESGRAY.COM

April 29, 2005

**VIA EMAIL (CONF. BY MAIL)**

Jordan L. Hirsch, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

*In the Matter of Certain Digital Image Storage and Retrieval Devices*
Inv. No. 337-TA-527

Dear Mr. Hirsch:

This is in response to your letter of April 25, 2005, objecting to Ampex's deposition notice regarding the operation of prior art devices, and the accompanying request for inspection of those devices. This also addresses the related issue of scheduling expert depositions, and in therefore in part addresses Erin Joffre's letter of yesterday.

**Deposition Notice**

As a threshold matter, if your letter was intended as a unilateral refusal to comply with Ampex's discovery requests, we believe it was improper. Absent a protective order, or agreement by the parties, discovery requests cannot simply be ignored. By your letter, Respondents admit that their hired experts are knowledgeable about the subjects of the deposition notice. Yet Respondents apparently have refused to designate them or anyone else to testify on their behalf for this deposition.

We would prefer to view your letter in a more constructive light — as a request by Respondents for Ampex to reconsider its approach to discovery. Accordingly, Ampex first addresses your suggestion that Ampex ask the experts, at their expert depositions, questions about the alleged prior art devices, concerning which they apparently have factual information. Ampex does not consider this a suitable substitute for the noticed deposition of Kodak. However, Ampex

Jordan L. Hirsch, Esq.
April 29, 2005
Page 2

is willing to postpone without date the deposition, reserving the right if necessary to seek an order compelling that it go forward at some later date, provided Respondents agree to the following conditions:

- notwithstanding that the expert depositions will be held after fact discovery cutoff, Respondents will not object to factual questions as untimely;

- sufficient time will be allocated for each witness to cover both his factual knowledge and to conduct expert discovery; for example, the schedule should allow two days for at least the depositions of Mr. Taylor, Mr. Herot and Dr. Myers;

- Respondents will not object to Ampex's experts supplementing its experts' rebuttal reports to take into account any additional factual information that is uncovered at these depositions.

In any event, Ampex will reassess the situation after expert depositions, and if necessary move for appropriate relief.

**Inspection Of Alleged Prior Art Devices**

Ampex understands your letter to be in lieu of a formal written response to the April 18, 2005 Request for Inspection.

In his expert report, Mr. Taylor refers to a video that he prepared that purports to demonstrate the alleged Paintbox prior art (¶ 57). He also states that he "may use at trial" a DLS6000 that he has access to (¶ 75). If Respondents intend to use the tape or either device in any way at trial, then Ampex insists on an inspection in the United States before the due date of the rebuttal reports. It should not be necessary for Ampex's counsel or the ITC staff to travel to the United Kingdom to inspect these devices, given that Mr. Taylor has reserved the right to use those devices, or videos thereof, at the hearing. Your explanation that Quantel is in possession of these devices fails to take into account that Mr. Taylor is Executive Chairman of Quantel. If Respondents do not comply with this reasonable request, Ampex will seek to compel discovery and/or to preclude Respondents from relying on this alleged art.

Ampex understands your letter to be a representation that Respondents do not intend to demonstrate any of the other alleged prior art devices at the hearing, nor do they intend to make use of any videos of same, other than what has already been produced. For example, Superpaint will remain undisturbed in the Computer Museum in California. Please advise if this understanding is incorrect in any way. Also please note that Ampex reserves the right to object to the admissibility of such videos.

Jordan L. Hirsch, Esq.
April 29, 2005
Page 3


**Expert Deposition Scheduling**

       Not counting Prof. Adelman, Respondents have designated ten experts, and Ampex three. At least four (Dr. Ligler and the three mentioned above) will require two days. In addition, Mr. Anderson has a long-scheduled trip outside of the country from May 26-June 10. Therefore, Ampex purposes that the parties seek leave of the Judge to extend the expert discovery period until June 17. Dr. Ligler is scheduled for June 1 and 2. We suggest Mr. Anderson for June 15, 16 or 17. We will check on Mr. Zaitlen's availability. Please provide suggested dates for Respondents' experts.

                                   Very truly yours,

                                   Norman H. Beamer


NHB:nhb

cc:      William P. DiSalvatore, Esq.
          William F. Lee, Esq.
          Barbara A. Murphy, Esq.
          Erin D.E. Joffre, Investigative Attorney

EXHIBIT 11

# WILMER CUTLER PICKERING
## HALE AND DORR LLP

May 6, 2005

Jordan L. Hirsch

60 STATE STREET
BOSTON, MA 02109
+1 617 526 6330
+1 617 526 5000 fax
jordan.hirsch@wilmerhale.com

Norman Beamer
Ropes & Gray LLP
525 University Avenue
Palo Alto, CA 94301

Re:     Certain Digital Image Storage & Retrieval Devices,
        USITC Inv. No. 337-TA-527

Dear Mr. Beamer:

This letter is in response to your April 29, 2005 letter regarding Ampex's request to depose
individuals with knowledge of the prior art devices and Ampex's request to inspect the prior art
devices.

**Deposition Notice**

We understand that Ampex does not intend to proceed with this deposition at this time, and that
you will reassess whether you believe it is necessary after expert depositions. You have asked
whether in return we will agree to three conditions. As to the conditions you suggest:

- We agree to not object during the expert depositions on the grounds that Ampex 's
  questions are factual questions related to the prior art.

- We agree to not object to Ampex's attempts to supplement its experts' rebuttal reports
  with new factual information revealed during the course of the expert depositions so long
  as the supplementation is limited to *legitimately new factual information* revealed during
  the depositions.

- We can make Mr. Taylor, Mr. Herot and Dr. Myers available for one-day depositions but
  we do not agree to two-day depositions. As you know, Mr. Taylor, Mr. Herot, and Dr.
  Myers' reports are limited to issues relating to the validity and enforceability of Ampex's
  patent. Ampex has agreed to produce its expert on infringement *and* invalidity, Dr.
  Ligler, for a total of two days, one day for infringement and one day for invalidity. We
  believe the same limits should apply to both parties' experts – that is, that each of our
  experts testifying on issues relating to invalidity should be made available for one day as
  well. Moreover, we disagree with your suggestion that you need extra time to question
  the experts because you need to make factual inquiries regarding the features and
  capabilities of the prior art systems. The primary subject matters of their expert reports

May 6, 2005
Page 2

are the features and capabilities of the prior art systems -- the expert and factual inquiries therefore overlap.


**Inspection of Prior Art Devices**

*The Quantel Paint Box*

In my April 25, 2005 letter, I indicated that we were willing to make the Quantel Paint Box available for inspection at Quantel's headquarters in England. There are a number of reasons for making it available for inspection in England rather than shipping it to the United States at this time. First, the system was built in the early 1980s; it is a sensitive and fragile system, and there is a risk that shipping may render the system inoperable. Second, the cost of shipping is significant; the system would have to be disassembled, special crates would have to be made for transfer, and arrangements would have to be made with an appropriate carrier. Finally, the cost of reassembling the machine upon arrival in the United States is also significant. At least three Quantel engineers would have to travel with the machine in order to reassemble and reboot it upon arrival in the United States. We estimate the total cost of shipping to the United States and reassembly to be 25,000 Pounds Sterling (this does not include the cost of shipping the system back to England).

If we decide to use the actual Paint Box system at trial, rather than just the video demonstration we have already provided to you, we would ship the system at the time of trial, directly to the ITC, and we would ask Quantel engineers to come to the United States only once. Shipping and reassembling the system now would require moving the system twice and would require Quantel engineers to travel to the United States twice. As a result, shipping it now could double the costs and risks. Moreover, it would also require the Paint Box to remain in the U.S., out of Quantel's possession, for more than four months.

Considering the significant cost and risks, we believe the better and cheaper option is inspection in England. If Ampex nevertheless insists on inspecting the Paint Box in the United States now, we can arrange for the system to be shipped if Ampex is willing to bear the costs of the shipping and reassembly of the system for inspection. If we later decide to use the Paint Box at trial, we will be responsible for all further shipping and reassembly costs (to the ITC and then back to England). If we do not, Ampex will have to cover the costs of shipping the system back to England. In short, we will ask Quantel to ship the system to the United States for inspection now as long as Ampex agrees to pay all costs above and beyond what Kodak would be required to cover if it brought the system over for trial. Please let us know how you would like to proceed.

*The Quantel DLS6000*

In my April 25, 2005 letter I also referenced the DLS6030 system in the possession of CBS in New York, New York. While that system is not currently operational, it is possible that

May 6, 2005
Page 3

Quantel engineers would be able to start the system for your inspection. If you are willing to pay to bring these engineers to New York, we can discuss this possibility further with Quantel.

*The Quantel Intellect, Harris Still Store IRIS II, ADDA Still Store, SuperPaint, Aurora, Ampex AVA and Ampex ADO*

As to the other prior art systems, your understanding that we do not currently intend to demonstrate the Quantel Intellect, Harris Still Store IRIS II, ADDA Still Store, SuperPaint or Aurora/100 systems is correct. We reserve the right to later decide to use one or more of these systems at trial and will inform Ampex if and when we do. We similarly reserve the right to use any videos of these systems at trial. As to the Ampex AVA and Ampex ADO, these are Ampex's own systems to which Ampex presumably has better access than does Kodak. We request therefore that Ampex make these systems available for Kodak's inspection. We similarly reserve the right to use AVA and ADO videos at trial.

Sincerely yours,

Jordan L. Hirsch

cc:    Erin Joffre, Esq.
       Jesse J. Jenner, Esq.
       Barbara A. Murphy, Esq.

EXHIBIT 12

Redacted

EXHIBIT 13

Redacted

EXHIBIT 14

Redacted

EXHIBIT 15

Redacted

EXHIBIT 16



Micro Consultants, Inc., P.O. Box 50810, Palo Alto, California 94303, Phone: (415) 856-6226, Telex: 334420

March 22, 1982                                      **NEWS**

## PRELIMINARY DESCRIPTION
## The Quantel DPB 7000 Digital Paint Box

### Introduction

Claims of 'breakthrough' and 'revolutionary approach' abound in the
broadcast equipment industry, but when Quantel unveiled the DPB 7000
Digital Paint Box at NAB 1981, it was universally agreed that the
machine did indeed represent a revolutionary approach to the electronic
generation of graphics, and, in terms of the fidelity of the images
produced was a genuine breakthrough.

### The Paint Box - A Complete Graphics Studio

The Paint Box is a multifaceted tool able to fulfill all the require-
ments of the graphics studio:  creating fine art free-hand drawing of
quite breathtaking fidelity; retouching real video pictures; offering
standard graphic routines for 'painting by numbers'; providing superb
quality fonts for character generation; containing its own library of
pictures; allowing composition of graphics by the assembly of several
different pictures    graphic primitives; repositioning, re-sizing and
re-orientating those pictures; producing soft blending of images;
building stencils; and allowing animation of portions of the pictures.

In fact the Paint Box does indeed offer all the tools normally found
in a complete Graphics Studio in one machine.

### The Paint Box - A Fine Art Device

Apart from the absence of a large computer, at first sight the DPB 7000
paint box hardware appears just like a first-generation paint system.
There is a touch tablet on which to draw with a stylus, a screen to
observe the results, a small box of electronics doing the work, and a
Winchester disk storing a library of pictures.

**AMP012388**

AX410769

When an artist starts to use the system, the differences between the Paint Box and first-generation equipment become quickly apparent. As he draws, the lines created are completely smooth, even those lying close to the horizontal. The familiar 'serrated' electronic lines are not visible - even in the seemingly impossible area of where lines of different colors overlap. All this is achieved with an image that is beautifully sharp and applies whatever saturation, hue and luminance level is used. The deceptively simple task of signing a name on the screen is so smooth and the realism so great, that the results are quite disarming.

However, perhaps the most striking operational difference with the Paint Box is that the stylus has 'feel' - it is pressure-sensitive. In a manner similar to a pencil, the harder the pressure on the stylus, the bolder the stroke; the lighter the pressure, the more delicate the shading. Areas covered several times with light pressure become progressively bolder - again, just like a pencil. Also, when painting, overlapping colors mix - just like oil or water color.

All functions of the Paint Box are controlled from the touch tablet. A stroke of the stylus sideways off the tablet brings up a selection menu. If painting is selected, a stroke down off the tablet with the stylus will bring up the palette. The palette consists of 20 preselect colors selected from a color bank at the start of a session, 12 empty paint pots which the artist can fill as he goes along, a color mixing area, a selection of four brush sizes and a type of brush selection.

The 20 or so basic colors on the palette are not sufficient for a full painting, so the artist has been provided with a means of mixing colors. If he dabs color onto the central area of the palette (the mixing area) then selects another color and applies a thin layer of that across the first color, the two will mix. The artist can then touch his stylus in the area where the two colors have mixed and pick up the mixed color. He can then paint with this color, or he may again apply it to the palette and mix it with another color, select the new mixture, and proceed to paint with that new color. In fact, there is no limit to the different colors which the artist may mix from the basic set. This method of color mixing applies to all brush sizes. Having mixed up a color which he likes, the artist may then put this into one of the empty paint pots for later use.

As well as being able to pick up colors mixed on the palette, the artist can also select colors from the picture itself. As the picture progresses, it becomes easier to pick up a color from the picture, perhaps modify it with some white or black to change its shade, and then continue painting in detail with this new color, while the paint pots are used less and less.

There are three modes of painting available on the system. The first operates like normal paint, in that it mixes with the base color when applied thinly and becomes completely opaque when applied thickly. The second is a form of water color. This can still be applied in a thick or thin film that always remains translucent, so that the

-2-

AMP012389

AX410770

underlying detail is not lost. It is used for laying down trans-
parent washes of color, either as a background, or for tinting and
shading detail already drawn. The third mode adds texture to the
brush in much the same way as chalk, allowing the artist to easily
achieve a slightly textured effect on paintings.

The artist has on the palette all the basic tools needed to do a
painting and can access them very simply. This allows him to concen-
trate on painting without having to think how he actually sets about
operating the system. Actually, the Paint Box behaves in exactly the
same way as all the elements that the artist is used to. The exercise
of painting or drawing, is really very unsurprising once having over-
come the initial shock that it is all done electronically, and is not
wet and sticky. This total cleanliness and ease of precisely matching
colors by being able to pick them up directly from the painting, in-
creases the speed of painting considerably.

A section enlargement facility allows any area of the picture to be
magnified to twice its size so that the artist can work in much greater
detail on particular parts of the picture if he so wishes.

The Paint Box - A Retoucher's Dream

Because the Paint Box operates as a full color machine with the entire
scope of the NTSC system available, it is able, in real time, to accept
any RGB or NTSC video feed. The artist may freeze the image at any time
and then retouch it, modify it, or augment it with graphics at will.

Since the Paint Box allows colors to be picked off the canvas as well
as the palette, retouching is a dream: perfect color match occurs auto-
matically by picking up color directly from areas adjacent to the one
to be retouched.

Now, with the Paint Box, video can be retouched or modified directly with-
out resort to the photographic process, and the quality of the resultant
image allows the artist to undertake work that would be virtually impossi-
ble in the photographic medium.

The Paint Box - An Automatic Graphics Designer

A full automatic graphics package is included in the Paint Box. Simple
routines allow straight lines, circles, elipses, boxes, etc., to be
drawn automatically and placed free-hand or against an invisible grid.
With the addition of automatic color fill routines and a smooth air brush,
all the normal day-to-day graphic aids an artist would want to use for
the generation of TV graphics are at his fingertips.

The Paint Box - A Superb Character Generator

Good pictures and graphics are of little use unless top quality fonts are
available for adding text.

The Paint Box has built into the library of routines available very high
quality fonts with characters that can only be compared against the

-3-

AMP012390


AX410771

finest of studio cameras viewing the best artwork.

Text may be generated in either of two ways depending on the artist's preference. Having chosen the font, he may position each character individually by means of the touch tablet (like letraset); or he may type a string of characters using the keyboard and then position this whole string with the stylus. In the former case, character spacing is entirely at the discretion of the artist; in the latter case, proportional spacing is automatic.

Many different fonts are available with the full range of colors and with or without drop shadow.

The Paint Box - A Picture Library

During a normal working day the artist will have many pictures to which he may wish to refer.

The Paint Box includes a Winchester disk able to hold 300 pictures or parts of pictures. To support this facility the system has full titling and title search by keyboard. The images themselves may be browsed through against a title keyboard, 12 at a time, to remind the artist of the contents of the disk. When he finds a picture he wants he merely touches it via the stylus and touch tablet and it appears full-size ready to be worked on.

In addition to the internal library, the Paint Box can be augmented by the DLS 6000 digital library system. The DLS 6000 can be connected directly to the Paint Box via a digital link, or connected via the tape back-up system for the 6000 carrying pictures on an ordinary U-Matic cassette but in slow digital format.

Also floppy disk storage is available on a one-picture-per-disk basis.

The Paint Box - A Perfect Picture Assembly Aid - Cut-and-Paste

The Paint Box has a unique facility of being able to join or fuse pictures together.

The artist is able to take images he has drawn free-hand or created using the graphic routines and create a mask or key by simply drawing around the part of the picture of interest. The quality of the mask drawn with the same brushes used for painting is as good as the original video. The shape of the mask can be as complex or as simple as desired. The smoothness of the edge will be the same as the original drawing.

Once the mask has been defined, the artist can pick up the cut image with the touch tablet stylus and move it around at will - actually seeing the image move in real time.

-4-

AMP012391

AX410772

If a different background picture is called up from the Paint Box library, then the cut image can act as foreground and move over the background just as if the cut image were against a chroma key area and keyed into the background in a switcher.

However, the magic of the Paint Box does not stop at just being able to move the cut video around. By means of a small joystick the artist is also able to change the size and aspect ratio of the cut image and rotate it.

In other words, it is as if the cut image is on a rostrum camera and the artist is able to reposition and re-orientate the artwork as well as play with the zoom lens. However, there is no camera, no zoom lens, and no artwork to curl up or get dirty.

Once the artist is happy that the position, size and orientation of the cut image is correct, he confirms that the two images are to be pasted (or fused) together. The cut image is then blended permanently into the background using the mask or key information.

Consider the preparation of standard television graphic, say a news item on the State of the Union Message. The artist could draw a free-hand sketch of the Capitol full size. He could also have in the library a real video picture of the President.

To compose the graphic he would choose a background color and the Paint Box will automatically flood the screen in this color. He then calls up the Capitol, draws around the outline he wishes to use (probably in this case with a broad soft brush to achieve a soft edge). He can reduce the size of the image, move it to a point that he likes, choose the correct orientation, and then tell the Paint Box to paste it into the background.

Next he does the same thing with the real picture of the President, noting that since the President is pasted last he can overlap the Capitol if required.

Finally, a font for the caption 'State of the Union' is chosen and the letters either pasted individually or as a complete string. The complete graphic can then be returned to the internal Paint Box library or sent to the DLS 6000 library system for on-air transmission.

An exotic use of the cut-and-paste routine is to accentuate the soft-edge mode to the point where the mask or key is not hard or solid at all. This will cause a mixing of the foreground object and the background instead of the 'fusion' described earlier.

An example of such a technique is the representation of a propeller on an airplane normally shown as semi-transparent swirls to indicate motion. Utilizing the soft key approach, the airplane itself can be cut as usual but the propeller swirls can be cut with a soft key. The resultant image when pasted up will show the airplane replacing the background. However,

-5-

AMP012392

AX410773

the background behind the propellors will still be visible through the swirls.

<u>The Paint Box - An Electronic Stencil</u>

A slightly unusual application of the mask, normally used for cut-and-paste is to utilize the mask as a stencil. Coupled with the air brush routine, the results are remarkable:  the exact electronic equivalent of a stencil and spray gun.

-6-

AMP012393


AX410774

## CERTIFICATE OF SERVICE

I, Julia Heaney, hereby certify that on May 31, 2006, I caused to be electronically

filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of

such filing(s) to the following:

> Paul M. Lukoff, Esquire
> David E. Brand, Esquire
> Prickett, Jones & Elliott, P.A.

and that I caused copies to be served upon the following in the manner indicated:

**BY HAND**

> Paul M. Lukoff, Esquire
> Prickett, Jones, Elliott, P.A.
> 1310 King Street
> Wilmington, DE  19899

**BY FEDERAL EXPRESS**

> Michael J. Summersgill, Esquire
> Wilmer Cutler Pickering Hale and Dorr LLP
> 60 State Street
> Boston, MA  02109

> */s/ Julia Heaney*
> Julia Heaney (#3052)