IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMPEX CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-1373-KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| EASTMAN KODAK COMPANY, ALTEK | ) | |
| CORPORATION and CHINON INDUSTRIES, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | **REDACTED** |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT OF INEQUITABLE CONDUCT**

PAUL M. LUKOFF (I.D. #96)
DAVID E. BRAND (I.D. #201)
1310 King Street
P. O. Box 1328
Wilmington, DE 19899
Tel. 302.888.6500
Fax: 302.888-6331
*Attorneys for Defendants*

**OF COUNSEL:**
William F. Lee
Donald R. Steinberg
Michael J. Summersgill
Jordan L. Hirsch
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

S. Calvin Walden
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230-8800

Date:  May 23, 2006

19660.3\304742v1

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS ................................................................1

SUMMARY OF ARGUMENT ........................................................................................1

STATEMENT OF UNDISPUTED FACTS .....................................................................2

I.   During Prosecution of the '121 Patent, Ampex Represented that the Prior Art "Fails to Teach" Direct Transfers from Disk to Random Access Memory.....................................................2

II.  Direct Transfer was Well Known in the Prior Art and Ampex's Own AVA System Had this Capability....................................................................................5

III. Individuals Involved in the Prosecution of the '121 Patent Were Aware of the Ability of the Prior Art, Including the AVA System, to Perform Direct Transfers............................8

       A.   Daniel Beaulier Knew that Direct Transfer was Well Known in the Prior Art....................................................................8

       B.   Gregory Roth Is Listed as a Prosecuting Attorney on the '915 Ampex Patent that Discloses Direct Transfer..................................................9

       C.   Joel Talcott Is Listed as a Prosecuting Attorney on the '915 Ampex Patent that Discloses Direct Transfer.................................................9

       D.   George Almeida Was the Patent Agent Responsible for the Division that Developed the AVA System.................................................10

ARGUMENT ...................................................................................................................11

I.   Ampex's Obligations to the PTO During Prosecution of the '121 Patent.....................................11

II.  Ampex's Failure to Disclose the Ability of the Prior Art to Perform Direct Transfers, Including the Direct Transfer Capability of Its Own AVA System, Constituted Inequitable Conduct....................................................................12

       A.   Summary Judgment of Inequitable Conduct is Appropriate Where, as in This Case, Undisputed Facts Establish Clear and Convincing Evidence of Inequitable Conduct..................................................12

       B.   The Ability of the Prior Art, Including the Ampex AVA System, to Perform Direct Transfers was Material........................................13

       C.   Individuals Involved in the Prosecution of the '121 Patent Were Well Aware of the Prior Art Ability to Perform Direct Transfers and That It was Material..................................................16

D.    The Applicant's Express Representation to the PTO that Direct Transfer Made the '121 Invention Patentable, Combined With the Failure to Disclose the Direct Transfer Feature of Ampex's Own System, Demonstrates Intent to Deceive. .......................................................17

CONCLUSION ...........................................................................................................................20

## TABLE OF AUTHORITIES

Federal Cases

Am. Standard, Inc. v. Pfizer, Inc.
    722 F.Supp. 86 (D. Del. 1989)............................................................................11, 15

Brasseler, U.S.A. I, L.P., v. Stryker Sales Corp.
    267 F.3d 1370 (Fed. Cir. 2001).....................................................................................16

Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.
    326 F.3d 1226 (Fed. Cir. 2003)....................................................................................17

Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.
    394 F.3d 1348 (Fed. Cir. 2005).....................................................................................13

Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.
    120 F.3d 1253 (Fed. Cir. 1997).....................................................................................17

CTS Corp. v. Piher Int'l Corp.
    527 F.2d 95 (7th Cir. 1975) .........................................................................................18

Dayco Prods., Inc. v. Total Containment, Inc.
    329 F.3d 1358 (Fed. Cir. 2003).....................................................................................14

Elk Corp. of Dallas v. GAF Building Materials Corp.
    168 F.3d 28 (Fed. Cir. 1999).........................................................................................17

eSpeed, Inc. v. Brokertec USA, L.L.C.
    417 F.Supp.2d 580 (D. Del. 2006)....................................................................15, 17, 19

Ferring B.V. v. Barr Labs., Inc.
    437 F.3d 1181 (Fed. Cir. 2006)................................................................................12, 13

FMC Corp. v. Manitowoc Co.
    835 F.2d 1411 (Fed. Cir. 1987).....................................................................................12

Fox Indus., Inc. v. Structural Preservation Sys.
    922 F.2d 801 (Fed. Cir. 1990).......................................................................................12

GFI, Inc. v. Franklin Corp.
    265 F.3d 1268 (Fed. Cir. 2001).....................................................................................17

Gilbarco, Inc. v. Octel Commc'ns Corp.
    No. C-94-20780-JW, 1996 WL 75304 (N.D. Cal. February 15, 1996) ..........................13

IDEC Pharm. v. Corixa Corp.
    No. 01-1637-IEC (RBB), 2003 WL 24147449 (S.D. Cal. October 14, 2003)..............13, 16, 18

LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n
    958 F.2d 1066 (Fed. Cir. 1992)..............................................................................11, 18, 19

Li Second Family Ltd. P'ship v. Toshiba Corp.
    231 F.3d 1373 (Fed. Cir. 2000)...........................................................................................11

Marlow Indus., Inc. v. Igloo Prods. Corp.
    65 Fed. Appx. 313 (Fed. Cir. 2003)............................................................................12, 13, 17

Mobil Oil Corp. v. Advanced Envtl. Recycling Techs., Inc.
    869 F.Supp.251 (D. Del. 1994)........................................................................................15, 16

Molins PLC v. Textron, Inc.
    48 F.3d 1172 (Fed. Cir. 1995)...............................................................................11, 14, 17

Novo Nordisk Pharm., Inc. v. Bio-Technology Gen. Corp.
    424 F.3d 1347 (Fed. Cir. 2005)............................................................................................12, 18

Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.
    984 F.2d 1182 (Fed. Cir. 1993)..........................................................................................12, 13

Pharmacia Corp. v. Par Pharm., Inc.
    417 F.3d 1369, 1374-5 (Fed. Cir. 2005). ...............................................................................11

<u>Federal Rules of Civil Procedure</u>

Fed. R. Civ. P. 56(c)..............................................................................................................12

<u>Federal Regulations</u>

37 C.F.R. § 1.56 ............................................................................................................11, 14

Defendants Eastman Kodak Company ("Kodak") and Altek Corporation ("Altek") respectfully submit this Opening Brief in Support of their Motion for Summary Judgment of Inequitable Conduct.

## NATURE AND STAGE OF PROCEEDINGS

On October 24, 2004, Ampex Corporation ("Ampex") filed complaints alleging infringement of U.S. Patent No. 4,821,121 ("the '121 patent") in the International Trade Commission ("ITC") and in this Court. This action was stayed pending the outcome of the ITC action. Ampex withdrew its ITC complaint on July 29, 2005.

Both parties have conducted extensive discovery. After litigating for ten months in the ITC, the parties engaged in seven additional months of fact and expert discovery in this action. To date, the Defendants have produced more than a million pages of documents and the parties have taken over one hundred depositions: seventy-three fact witness depositions, ten 30(b)(6) depositions, and twenty-four expert depositions. The record is settled and the case is ripe for summary judgment.

## SUMMARY OF ARGUMENT

The '121 patent relates to an electronic still store system used to store and output video images for use during television broadcasts. The patent describes a system that, among other operations, can save video images on disk for long-term storage, and transfer the images from disk to random access memory for display.

During prosecution of the '121 patent, Ampex represented to the United States Patent and Trademark Office ("PTO") that the invention of the '121 patent was patentable because the claimed system could transfer images from disk "directly" to random access memory. Specifically, Ampex stated that the prior art "fail[ed] to teach" such direct transfers:

> [The prior art] *fails to teach* the above features of storing both size images simultaneously in the random access memory, *the direct transfer of images between the disc storage and random access memory*, or the transfer of

images directly between the size reducer and only the random access memory.

'121 File History, at A-140 (emphasis added).

As those involved with the prosecution of the '121 patent were well aware, however, *Ampex's own undisclosed prior art system, the Ampex AVA system, was capable of transferring images from disk directly to random access memory.* Ampex engineers touted the AVA system's ability to make such direct transfers in articles describing the system. The very same attorneys involved in the prosecution of the '121 patent prosecuted an earlier patent, relating to the AVA system, that disclosed the direct transfer capability. Indeed, the sole inventor of the '121 patent admitted that, notwithstanding the express representations during the prosecution of the '121 patent, direct transfer was *a well known feature in electronic still stores at the time the application for the '121 patent was filed.*

Ampex's knowing failure to disclose the prior art capability of direct transfer -- including the capabilities of its own prior art system -- coupled with its false representation that the prior art failed to teach such direct transfers, constituted inequitable conduct that renders the '121 patent unenforceable.

## STATEMENT OF UNDISPUTED FACTS

I.    **During Prosecution of the '121 Patent, Ampex Represented that the Prior Art "Fails to Teach" Direct Transfers from Disk to Random Access Memory.**

The '121 patent is directed to an electronic still store that can store and output images for use during television broadcasts. (*See* '121 Patent, 1:11-21, at A-67.) The system disclosed by the patent includes, among other components, a video input circuit for receiving video images, random access memory -- sometimes referred to as a "frame store" -- for temporary storage of frames of video, a disk store for long-term storage of frames of video, a size reducer for generating reduced size images, and a computer for controlling the system. (*See* '121 Patent, 2:62 – 4:40, at A-67-8.) The system disclosed by the patent can accept

2

video images input from a television camera, transfer the images to the disk for storage, and later recall the images for use during a television broadcast. (*See* '121 Patent, 2:65-3:1, at A-67-8; '121 Patent, 4:16-57, at A-68.) The system can be used, for example, to store and output the images that appear over the shoulder of a television news anchor during a broadcast. (*See* '121 Patent, 1:23-6, at A-67.)

To display an image stored on disk, the system transfers the image from the disk to random access memory. (*See* '121 Patent, 3:44-52, at A-68 (frame store is random access memory and is coupled to the disk to receive images); '121 Patent, 4:41-44, at A-68 (frame store displays images).) Throughout this litigation and the ITC proceeding, Ampex has emphasized that the speed of this transfer from disk to random access memory is important for fast image recall. (*See* January 12, 2006 Technology Tutorial, at A-183 (D.I. 115) ("Basically, the invention is much faster than the prior art and that's the key."); '121 Patent, 2:32-51, at A-67 (describing the rapid output of reduced size images from disk).)

The initial application for the '121 patent was filed on April 8, 1983. The patent issued on April 11, 1989. Over the course of the six-year prosecution, Ampex disclosed only two prior art references: U.S. Patent No. 4,172,264 ("the '264 patent") and U.S. Patent No. 4,302,776 ("the '776 patent"). The only other prior art before the Examiner was an article by Hugh Boyd describing certain aspects of the Quantel DLS 6000 system ("the Boyd reference") that the Examiner located himself. The pending claims were rejected multiple times as indefinite, and as obvious and anticipated in light of the disclosed prior art. (*See, e.g.,* '121 File History, at A-75-93 (rejections in light of the Boyd reference); '121 File History at A-94-100, A-125-8 (rejections in light of the '776 patent).) In response, Ampex amended and abandoned pending claims and filed two continuation applications to overcome these indefiniteness and prior art problems.

3

In October 1988, after more than five years of prosecution, and in order to overcome an Examiner's rejection that the claims were anticipated by the '776 patent, Ampex asserted that its invention disclosed a novel way of transferring images from disk to random access memory. Specifically, Ampex argued to the PTO that its invention had the ability to make direct transfers from disk to random access memory and that the prior art "fails to teach" this direct transfer feature:

> [The prior art] *fails to teach* the above features of storing both size images simultaneously in the random access memory, *the direct transfer of images between the disc storage and random access memory*, or the transfer of images directly between the size reducer and only the random access memory.

'121 File History, at A-140 (emphasis added).

In conjunction with this argument, Ampex amended its claims to explicitly highlight the "direct transfer" of images from disk to random access memory. In particular, Ampex amended the claim that ultimately issued as claim 8 to add the word "directly" to the claim: "from said bulk storage memory *directly* into said random access memory means." (*See* '121 File History, at A-130-1; '121 File History, at A-109 (emphasis added) (addition to claim underlined).)[1] Ampex made nearly identical amendments to the claims that issued as claims 7 and 10. (*See* '121 File History, at A-131-2 (adding "directly" to claim 10 to describe the transfer of images from disk to random access memory); '121 File History, at A-129-30 (adding "direct transfer" to claim 7 to describe the transfer of images from disk to random access memory).)

Ampex defined "direct transfer," as used in these claims, as a transfer from disk to random access memory "with no other circuit therebetween." (*See* '121 File History, at A-

---

[1] Prior to this amendment, this element of the claim that ultimately issued as claim 8 read: "said control means further causing the transfer of the full size and reduced size video pixel data from said random access memory means to said bulk storage memory means for storage, and for causing the selective transfer *from said bulk storage memory into said random access memory means* of either said full size image at said first resolution or said reduced size image at said second lower resolution." (*See* '121 File History, at A-109 (emphasis added).)

4

139-40.)

REDACTED

Only a month after Ampex represented that direct transfer made its claims patentable,

the Examiner conducted a telephone interview and then allowed the claims of the '121

patent. (*See* '121 File History, at A-146-52.) Issued claims 7, 8, and 10 include the direct

transfer limitation. The last element of claim 8, for example, reads:

> said control means further causing the transfer of the full size and reduced
> size video pixel data from said random access memory means to said bulk
> storage memory for storage, and for causing the selective transfer from said
> bulk storage memory *directly* into said random access memory means of
> either said full size image at said first resolution or said reduced size image at
> said second lower resolution (emphasis added).

**II.      Direct Transfer was Well Known in the Prior Art and Ampex's Own AVA
         System Had this Capability.**

Daniel Beaulier, the sole inventor of the '121 patent, concedes that direct transfer was

well known in the art before the application for the '121 patent was filed:

> Q.     Did you invent the ability to directly transfer images from disk to frame
>        store?
> A.     Certainly not.
> Q.     Were you the first to do that?
> A.     No.
> ...
> Q.     As of the time that you were working on the [system described in the '121
>        patent], was that well known in the art?
> A.     Yes.
> Q.     As of the time you decided to include a direct transfer from disk to frame
>        store in the [system described in the '121 patent], was a direct transfer from
>        disk to frame store well known in the art?
> A.     Yes.

Beaulier Dep., at A-210-11.

5

Mr. Beaulier explained that direct transfers from disk to random access memory was "the fundamental way a still store works." (*See id.*, at A-210.)

**REDACTED**

Ampex's own expert confirmed that direct transfers were well known at the time the application for the '121 patent was filed:

> Q.    Did Dan Beaulier invent the ability to transfer images directly from disk to random access memory?
> A.    No, most certainly not.
> Q.    You agree that was well known at the time that Dan Beaulier filed his patent application?
> A.    Yeah.

Cavallerano Dep., at A-214

**REDACTED**

It is similarly undisputed that Ampex's own prior art system, the "Ampex Video Art" ("AVA") system, included the capability of transferring images from disk directly to random access memory. The AVA was first sold and demonstrated in the United States in 1980, three years before the application for the '121 patent was filed. (*See* Talcott ITC Dep. II, at A-167 (AVA sold to CBS in 1980);

**REDACTED**

Ampex's own expert confirmed that the AVA was capable of direct transfers from disk to random access memory:

6

Q.    And is it your understanding that the AVA system was capable of transferring image data directly from disk to the frame store, as Mr. Sheikh describes here?

A.    Yes, that's correct.

Cavallerano Dep., at A-217.

Ampex touted the AVA's direct transfer feature in technical and marketing materials as a way to quickly store and recall pictures. A 1981 article written by Junaid Sheikh, a former Ampex engineer who worked on the development of the AVA, highlighted the AVA's direct transfer capability as resulting in fast picture recall and storage:

> Unique features…include: …*Direct data transfers between frame store and computer disk drive* without any intervention from the CPU. This feature *facilitates fast picture storage and recall.*

Junaid Sheikh, "Ampex AVA Video Art System," <u>Video</u>, January 1981, at A-50-1 (emphasis added). (*See also* H.K. Regnier and Lawrence J. Evans, "Practical Computer Graphics for Television," <u>Ampex Horizons</u>, 1980, at A-46 (describing the AVA ability to perform "direct disk to frame store data transfer without computer intervention").)

**REDACTED**

Finally, Ampex also described direct transfer in a patent, filed in conjunction with the development of the AVA, that was prosecuted by the *same* Ampex attorneys who prosecuted the '121 patent, three years *before* the application for the '121 patent was filed. The application for U.S. Patent No. 4,564,915 ("the '915 patent") was filed on April 11, 1980 and

the patent issued on January 14, 1986.[2] (*See* '915 Patent, at A-1.)

REDACTED                                    the '915 patent describes a direct transfer

feature

> Disk file system 18 is then commanded to become bus master and perform a *direct memory access* by transferring the stated number of bytes of data from a designated disk file location to the PATI address which corresponds to the Y component 66 of frame store 50.

'915 Patent, 17:2-7, at A-21 (emphasis added).

**III.    Individuals Involved in the Prosecution of the '121 Patent Were Aware of the Ability of the Prior Art, Including the AVA System, to Perform Direct Transfers.**

REDACTED

**A.    Daniel Beaulier Knew that Direct Transfer was Well Known in the Prior Art.**

Daniel Beaulier, the sole inventor of the '121 patent, concedes that direct transfer was well known before the application for the '121 patent was filed. (*See* Beaulier 4/4/06 Dep., at A-210-11.) Mr. Beaulier also had firsthand knowledge of the AVA system.

REDACTED

---

[2] During prosecution of the '915 patent, Larry Evans filed a Declaration with the PTO in which he explained that the AVA embodied the '915 patent. (*See* '915 File History, at A-31.)

REDACTED

REDACTED

**B.    Gregory Roth Is Listed as a Prosecuting Attorney on the '915 Ampex Patent that Discloses Direct Transfer.**

Gregory Roth is a patent attorney who has prosecuted numerous patent applications for Ampex.

REDACTED

**C.    Joel Talcott Is Listed as a Prosecuting Attorney on the '915 Ampex Patent that Discloses Direct Transfer.**

Joel Talcott was Ampex's patent counsel and general counsel during the prosecution of the '121 patent and is listed as a prosecuting attorney on the '121 patent. (*See* Talcott Dep., at A-196-7; '121 Patent, at A-65; Talcott ITC Dep. I, at A-162-3 (Mr. Talcott supervised the personnel in the patent department).) Although he now denies having any

9

knowledge of the '915 patent, Mr. Talcott is also listed on the face of the '915 patent as a prosecuting attorney. (*See* '915 patent, at A-1 (listing Gregory Roth, Bradley A. Perkins and Joel D. Talcott).)  During prosecution of the '915 patent, Mr. Talcott was also appointed to transact all business with the PTO. (*See* '915 File History, at A-38-40.)

Mr. Talcott admits that members of the Ampex patent department were expected to be familiar with Ampex's products. (*See* Talcott Dep., at A-198 ("we were certainly familiar with our products").)  In particular, Mr. Talcott admitted that he was aware of the AVA before the application for the '121 patent was filed. (*See* Talcott ITC Dep. I, at A-164.)

### D.  George Almeida Was the Patent Agent Responsible for the Division that Developed the AVA System.

George Almeida was the Ampex patent agent who signed the October 1988 amendment in which direct transfer was added to the claims of the '121 patent. (*See* '121 File History, at A-141.)  The patent attorneys at Ampex were each assigned to particular engineering divisions for the purpose of ensuring that Ampex filed appropriate patent applications for products in that division. (*See* Talcott Dep., at A-199-203.)  The assigned attorney was expected to be familiar with the division's products. (*See* Talcott Dep., at A-203-4.)  In 1983, Mr. Almeida was responsible for the Audio Visual Systems Division, the Ampex engineering division that designed the system described in the '121 patent *and* the AVA system. (*See* Talcott Dep., at A-201-2, 204-5.)  Prior to his involvement in the '121 prosecution, Mr. Almeida had also been appointed as one of the Ampex agents to prosecute the '915 patent. (*See* '915 File History, at A-39-40.)

Despite their knowledge of the direct transfer capability of the prior art, including the direct transfer feature of Ampex's own AVA system, it is undisputed that none of those involved in the prosecution of the '121 patent ever disclosed the AVA system or its direct transfer capability to the PTO.

10

**ARGUMENT**

I.    **Ampex's Obligations to the PTO During Prosecution of the '121 Patent.**

Patent applicants have a duty "to prosecute patent applications in the PTO with candor, good faith, and honesty." *See Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed. Cir. 1995). An applicant violates this "duty of candor" and commits inequitable conduct when it: (i) fails to disclose material prior art or information; (ii) has knowledge of the prior art or information and its materiality; and (iii) has the intent to deceive the PTO by not disclosing the prior art or information. *See Am. Standard, Inc. v. Pfizer, Inc.,* 722 F. Supp. 86, 141 (D. Del. 1989); *Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1378 (Fed. Cir. 2000) (explaining that inequitable conduct occurs when applicant misrepresents material facts, fails to disclose material information, or submits false material information, with the intent to deceive); *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed. Cir. 1992) (finding inequitable conduct where applicant "with[held] its own known prior art devices and ... [made] an argument for patentability which could not have been made had the art been disclosed."). Inequitable conduct must be proven by clear and convincing evidence. *See Am. Standard,* 722 F. Supp. at 141.

A finding of inequitable conduct with respect to a single claim of the patent-in-suit renders all of the claims of the patent unenforceable. *See Pharmacia Corp. v. Par Pharm., Inc.,* 417 F.3d 1369, 1374-75 (Fed. Cir. 2005) ("This court has held that a finding of inequitable conduct in the acquisition of even a single claim of a patent renders the remaining claims of that patent unenforceable, even those without the taint of inequitable conduct.").

The duty to disclose material prior art and information to the PTO applies to patentees, their attorneys, each attorney or agent who prepares or prosecutes an application, and "every other individual who is substantively involved in the preparation or prosecution of the application." *See Molins,* 48 F.3d at 1178, n.6; 37 C.F.R. § 1.56 (2005). The knowledge

11

and actions of the attorneys involved in the prosecution are chargeable to the other

individuals bound by the duty of candor. *See FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411,

1415, n.8 (Fed. Cir. 1987). Similarly, the knowledge of the inventor is chargeable to the

other individuals involved in the prosecution. *See Novo Nordisk Pharm., Inc. v. Bio-*

*Technology Gen. Corp.*, 424 F.3d 1347, 1361-2 (Fed. Cir. 2005) (finding inequitable conduct

where attorneys fail to disclose material information known only to inventor). Courts

therefore refer to attorneys and other individuals involved in prosecution collectively as the

"applicant." *See FMC*, 835 F.2d at 1415, n.8 ("'Applicant' ... includes the patentee and the

attorney who prosecuted the application that resulted in the patent-in-suit, because the

knowledge and actions of the applicant's attorney are chargeable to the applicant.").

The obligation to disclose material prior art and information extends throughout the

entire prosecution of the patent. *See Fox Indus., Inc. v. Structural Preservation Sys., Inc.*,

922 F.2d 801, 803 (Fed. Cir. 1990).

**II.     Ampex's Failure to Disclose the Ability of the Prior Art to Perform Direct**
**         Transfers, Including the Direct Transfer Capability of Its Own AVA System,**
**         Constituted Inequitable Conduct.**

> **A.     Summary Judgment of Inequitable Conduct is Appropriate Where, as in**
> **        This Case, Undisputed Facts Establish Clear and Convincing Evidence of**
> **        Inequitable Conduct.**

Summary judgment is granted "where there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law." *See Marlow Indus., Inc. v. Igloo*

*Prods. Corp.*, 65 Fed. Appx. 313, 316 (Fed. Cir. 2003); *Paragon Podiatry Lab., Inc. v. KLM*

*Labs., Inc.*, 984 F.2d 1182, 1184 (Fed. Cir. 1993); Fed. R. Civ. P. 56(c).

Summary judgment of inequitable conduct is proper where undisputed facts establish

clear and convincing evidence of inequitable conduct. *See Ferring B.V. v. Barr Labs., Inc.*,

437 F.3d 1181, 1188-94 (Fed. Cir. 2006) (affirming summary judgment of inequitable

conduct where inventor failed to disclose prior relationship with individuals who submitted

declarations in support of patentability); *Paragon*, 984 F.2d at 1190-93 (affirming summary judgment of inequitable conduct where applicant fails to disclose material information); *Marlow*, 65 Fed. Appx. at 316-20 (same); *IDEC Pharm. v. Corixa Corp.*, No. 01-1637-IEG (RBB), 2003 WL 24147449, at *16-22 (S.D. Cal. Oct. 14, 2003) (granting summary judgment of inequitable conduct where the patentee failed to disclose prior art publications authored by the named inventors that disclosed an allegedly novel feature of the claimed invention); *Gilbarco, Inc. v. Octel Commc'ns Corp.*, No. C-94-20780-JW, 1996 WL 75304, at *3-6, (N.D. Cal. Feb. 15, 1996) (granting summary judgment of inequitable conduct where named inventor failed to disclose knowledge that the invention was offered for sale and described in a paper presented by the inventor more than one year before the filing date).

In *Ferring*, the Federal Circuit recently reaffirmed that inequitable conduct is an appropriate issue for summary judgment. The applicant in *Ferring* did not disclose to the PTO that it had a prior relationship with individuals who submitted declarations during prosecution. *See Ferring*, 437 F.3d at 1184-5. After finding withheld information material, the Court explained that summary judgment of inequitable conduct is warranted when:

> there has been a failure to supply highly material information and if the summary judgment record establishes that (1) the applicant knew of the information; (2) the applicant knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding.

*Id.* at 1191.

### B.    The Ability of the Prior Art, Including the Ampex AVA System, to Perform Direct Transfers was Material.

Prior art or information that refutes an applicant's arguments by disclosing a feature that the applicant argued is absent from the prior art is highly material. *See Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1353 (Fed. Cir. 2005) (holding that where applicant for patent covering a stairlift amended claims to add a

13

limitation requiring a seat with an off-center pivot, prior art that discloses an off-center pivot was material).

From 1983, when the application for the '121 patent was filed, through 1989, when the '121 patent was granted, prior art or information was considered material if "there [was] a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as patent." *See Molins*, 48 F.3d at 1179. In 1992, in what the Federal Circuit stated was "not intended to constitute a substantive break in the previous standard,"[4] the standard governing materiality was clarified to explain that prior art or information is material if it establishes a case of unpatentability or refutes an argument the applicant made to the PTO. *See* 37 C.F.R. § 1.56 (2005).

The undisclosed prior art capability of making direct transfers between disk and random access memory, including the undisclosed direct transfer capability of Ampex's own AVA system, was highly material. Ampex itself emphasized the materiality of this feature by arguing to the PTO that it made its invention unique:

> [The prior art] *fails to teach* the above features of storing both size images simultaneously in the random access memory, *the direct transfer of images between the disc storage and random access memory*, or the transfer of images directly between the size reducer and only the random access memory.

'121 File History, at A-140 (emphasis added).

Ampex could not have made this argument to the PTO if it had disclosed that:

- As Daniel Beaulier and Ampex's own expert admit, direct transfer was at that time a well known feature of electronic still stores. (*See* Beaulier Dep., at A-210-11; Cavallerano Dep., at A-214.);

---

[4] *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363-64 (Fed. Cir. 2003) (explaining that the 1992 standard "more narrowly defined materiality" but was "not intended to constitute a substantive break in the previous standard").

14

- Ampex's own AVA system had direct transfer capability. (*See* Cavallerano Dep. at A-215-7; Junaid Sheikh, "Ampex AVA Video Art System," <u>Video</u>, January 1981, at A-50-1.);

- The '915 patent discloses direct transfers between disk and random access memory. (*See* '915 Patent, 17:2-7, at A-21; Evans Dep., at A-192-3.)

The direct transfer feature of the prior art, including the direct transfer feature of Ampex's own AVA system, was therefore highly material to the patentability of the application for the '121 patent. *See Am. Standard*, 722 F. Supp. at 141-142 (explaining that "*[n]othing could be more material*" than prior art that discloses an element the applicant argued was missing from the prior art) (emphasis added); *Mobil Oil Corp. v. Advanced Envtl. Recycling Techs., Inc.*, 869 F. Supp. 251, 255-6 (D. Del. 1994) (holding that where "one of the bases upon which [the applicant] argued to the Patent Examiner that its process was patentable" over the prior art is the use of wood fibers, prior art that discloses use of wood fibers is material); *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F. Supp. 2d 580, 593 (D. Del. 2006) (concluding that applicants' own prior art system that discloses a feature that the applicants argued to the PTO was missing from the prior art is highly material).

In *eSpeed*, the patent at issue related to a computerized system for trading securities. *See eSpeed*, 417 F. Supp. 2d at 586-89. The patent, which claimed priority from an application filed in 1996, claimed "trading states" that allowed brokers to match bids and offers and to electronically modify the bids and offers at their option. *See id.* at 589. During prosecution, the applicants argued that the prior art only disclosed systems that could match bids and offers. The applicants claimed that the "trading states" that allowed brokers to also modify bids was a novel feature that was not disclosed by the prior art. *See id.* at 589, 593. Like Ampex, however, the applicants did not disclose that one of their own prior systems -- the "Super System" -- included the allegedly novel feature. The Court found that the Super

15

System was highly material because it refuted the applicants' argument regarding the novelty

and patentability of the invention:

> In light of the applicants' argument during the prosecution of the '733
> application that their invention was patentable because of the inclusion of
> new trading states, *the fact that the Super System contained most if not all of
> the trading states that the applicants claimed were novel shows that the Super
> System was highly material.*

*Id.* at 594 (emphasis added).

### C.     Individuals Involved in the Prosecution of the '121 Patent Were Well Aware of the Prior Art Ability to Perform Direct Transfers and That It was Material.

Where the applicant knew of withheld prior art and argued to the PTO that its

invention was patentable because of a feature disclosed by the withheld prior art, the

applicant is properly charged with knowledge of the prior art and its materiality. *See eSpeed,*

417 F. Supp. 2d at 593 (applicants who argued that a feature disclosed by their own withheld

prior art system is novel knew of the system and its materiality); *IDEC,* 2003 WL 24147449,

at *17 (applicant's knowledge of the materiality of undisclosed prior art references is

established in part because applicant authored the withheld references).

It is undisputed that individuals involved in the prosecution of the '121 patent knew

of the ability of the prior art, including the AVA, to perform direct transfers. (*See* Beaulier

Dep., at A-210-11; Beaulier ITC Dep., at A-170-1; Roth Dep., at A-177-8; Talcott ITC Dep.

I, at A-164; '915 Patent, at A-1; '915 File History, at A-38-40.)   The applicant's argument to

the PTO that the prior art "fails to teach" direct transfer establishes that the individuals who

prosecuted the '121 patent also knew that the direct transfer feature was material.   They

emphasized this feature in order to obtain allowance of their patent. *See Mobil Oil Corp.,*

869 F. Supp. at 254 (the knowledge of an attorney involved in the prosecution of a patent is

chargeable to the other individuals involved in the prosecution); *Brasseler, U.S.A. I, L.P., v.*

*Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001) (finding that knowledge of

16

materiality applies to all individuals involved in prosecution); *eSpeed*, 417 F. Supp. 2d at 593

(finding knowledge of the materiality of undisclosed prior art where the applicants

"unquestionably" knew about the undisclosed prior art because "[i]t was developed by

them").

> **D.    The Applicant's Express Representation to the PTO that Direct Transfer
> Made the '121 Invention Patentable, Combined With the Failure to
> Disclose the Direct Transfer Feature of Ampex's Own System,
> Demonstrates Intent to Deceive.**

An applicant's intent to deceive the PTO by withholding material information or

prior art is inferred from the circumstances surrounding prosecution. *See Marlow*, 65 Fed.

Appx. at 318 (intent to deceive is "typically inferred from the facts"); *Critikon, Inc. v. Becton

Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997) ("[I]ntent may be

inferred from the surrounding circumstances."). "Intent need not be proven by direct

evidence; it is most often proved by a showing of acts, the natural consequence of which are

presumably intended by the actor." *Molins PLC*, 48 F.3d at 1180.

Where, as here, the undisclosed information or prior art is highly material, an

inference of intent is particularly appropriate. *See GFI, Inc. v. Franklin Corp.*, 265 F.3d

1268, 1275 (Fed. Cir. 2001) ("We have held deceptive intent to be shown where a patentee

withheld references and made an argument for patentability that *could not have been made*

had the art been disclosed.") (emphasis added); *Elk Corp. of Dallas v. GAF Building

Materials Corp.*, 168 F.3d 28, 32 (Fed. Cir. 1999) ("[T]he more material the omission, the

less the degree of intent that must be shown to reach a conclusion of inequitable conduct.");

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1239 (Fed. Cir.

2003) ("[W]here withheld information is material and the patentee knew or should have

known of that materiality, he or she can expect to have great difficulty in establishing

subjective good faith sufficient to overcome an inference of intent to mislead.").

An applicant's failure to disclose its own material prior art is similarly strong

evidence of intent to deceive. *See eSpeed*, 417 F. Supp. 2d at 593-94, n.16 (inferring intent to

deceive based on the "applicants' own involvement in the [prior art device's] development");

*CTS Corp. v. Piher Int'l Corp.*, 527 F.2d 95, 99 (7th Cir. 1975) ("We must assume that the

applicant deliberately decided not to call the Examiner's attention to '478, since it was one of

its own patents ...."); *IDEC*, 2003 WL 24147449, at *21 (finding inequitable conduct based

on applicants' failure to disclose own publications that disclose the allegedly novel feature of

the invention).

　　　The actions of those involved in the prosecution of the '121 patent unequivocally

demonstrate intent to deceive. It is undisputed that the individuals involved in the

prosecution of the '121 patent were aware that direct transfer was well known and that

Ampex's own AVA system had direct transfer capability. (*See* Beaulier Dep., at A-210-11;

Cavallerano Dep., at A-214-7.) Indeed, *each of the attorneys involved in the prosecution of

the Ampex '915 patent* -- that described the direct transfer of image data from disk to random

access memory -- *were also involved in the subsequent prosecution of the '121 patent.* (*See*

'915 Patent, at A-1; '121 Patent, at A-65.) Despite their undisputed knowledge of the prior

art direct transfer capability, the individuals involved in the prosecution of the '121 patent

specifically argued to the PTO that the prior art "fails to teach ... direct transfer." (*See* '121

File History, at A-140.) Ampex could not have made this argument if it had made a full and

complete disclosure to the PTO.

　　　Under the circumstances, Ampex's failure to disclose its own AVA system, or that

direct transfer was well known in the prior art, establishes an intent to deceive the PTO. *See*

*LaBounty*, 958 F.2d at 1076 (inferring intent to deceive where patentee failed to disclose its

own prior art device and made an argument for patentability that it could not have made had

the device been disclosed); *Novo Nordisk*, 424 F.3d at 1361-2 (finding intent to deceive

18

where attorneys failed to disclose material information known only to inventor); *eSpeed*, 417 F. Supp. 2d at 593-4 (finding intent to deceive based on the role the applicants had in the development of the prior art device because "it strains credulity to the snapping point" to claim that the earlier system "simply slipped the applicants' minds").

In *LaBounty*, the Federal Circuit inferred intent to deceive on similar facts. The patent in *LaBounty* was directed to a heavy-duty scrap shear. *See LaBounty*, 958 F.2d at 1069. During prosecution, the Examiner rejected a number of claims based on a prior art patent ("the '747 patent"). To overcome the rejection, the applicant pointed to the "receive and support" feature of its invention. This feature allowed the operator of the scrap shear to cut an object multiple times without removing the object from the shear. *See id.* at 1070. The applicant did not disclose that its own "Adamo/Dodge" shears, which it had sold years before prosecuting the application that issued as the patent-in-suit, included the same feature. Based on this failure to disclose its own product, the court inferred intent to deceive:

> Had LaBounty's own prior art devices been disclosed to the PTO, the conclusion is inescapable that the prosecution would not have focused merely on the '747 patent which did not have the critical 'receive and support' feature. Thus, *the evidence amply supports an inference that LaBounty acted with culpable intent to mislead or deceive the PTO by withholding its own known prior art devices and by making an argument for patentability which could not have been made had the art been disclosed.*

*Id.* at 1076 (emphasis added).

In *eSpeed*, this Court found intent to deceive on a similar basis. The Court found intent to deceive based on the applicants' failure to disclose its own "Super System" because of the unquestionable fact that the applicants knew of and developed the Super System. Like the individuals who prosecuted the '121 patent, the individuals who prosecuted the patent-at-issue in *eSpeed* were involved in the development of the highly material prior art system. *See eSpeed*, 417 F. Supp. 2d at 594, n.16. The "obviously high materiality of that prior art, and

19

the roles [the applicants] themselves claim they had in its creation" established intent to

deceive the PTO. *Id.* at 594.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion for

Summary Judgment of Inequitable Conduct be granted.

PRICKETT, JONES & ELLIOTT, P.A.,

_____

PAUL M. LUKOFF (I.D. #96)
DAVID E. BRAND (I.D. #201)
1310 King Street
P. O. Box 1328
Wilmington, DE 19899
Tel. 302.888.6500
Fax: 302.888-6331
*Attorneys for Defendants*

OF COUNSEL:
William F. Lee
Donald R. Steinberg
Michael J. Summersgill
Jordan L. Hirsch
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

S. Calvin Walden
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230-8800

Date: May 23, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2006, I electronically filed the following document with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

**DEFENDANTS' REDACTED OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF INEQUITABLE CONDUCT**

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899

I hereby certify that on May 31, 2006, I have forwarded the above-noted document to the following as noted below:

**VIA E-MAIL**

Jesse J. Jenner, Esquire
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020

**VIA E-MAIL & FEDERAL EXPRESS**

Norman H. Beamer, Esquire
Ropes & Gray LLP
525 University Avenue
Palo Alto, CA 94301

**VIA E-MAIL**

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899

**VIA E-MAIL & HAND DELIVERY**

Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899

PAUL M. LUKOFF (Bar I.D. #96)
DAVID E. BRAND (Bar I.D. #201)
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE  19899-1328
TEL: 302-888-6500
E-MAIL:  PMLukoff@prickett.com
         DEBrand@prickett.com