## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMPEX CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-1373-KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| EASTMAN KODAK COMPANY, ALTEK | ) | |
| CORPORATION and CHINON INDUSTRIES, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPENDIUM OF UNREPORTED OPINIONS
## CITED IN DEFENDANTS' ANSWERING BRIEF TO AMPEX
## CORPORATION'S MOTION FOR SUMMARY JUDGMENT THAT U.S.
## PATENT NO. 4,802,019 IS NOT PRIOR ART TO U.S. PATENT NO. 4,821,121

Collins J. Seitz, Jr. (#2237)
Jaclyn M. Mason (#4737)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
cseitz@cblh.com
*Attorneys for Defendants Eastman Kodak Company
and Altek Corporation*

*Of Counsel:*
William F. Lee
Michael J. Summersgill
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

S. Calvin Walden
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230-8800

Date: June 13, 2006

## UNREPORTED OPINIONS

**TAB**

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
No. Civ. A. 04-1278-KAJ -- F. Supp. 2d --,
2006 WL 1216220 (D. Del., April 17, 2006)                    1

*Falkner v. Inglis*,
No. 05-1324, 2006 WL 1453040 (Fed Cir. May 26, 2006)          2

# **TAB 1**

Westlaw.

2006 WL 1216220                                                              Page 1
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
CRYOVAC INC., Plaintiff/Counter-Defendant,
v.
PECHINEY PLASTIC PACKAGING, INC.,
Defendant/Counter-Plaintiff.
**No. CIV.A. 04-1278-KAJ.**

April 17, 2006.

**Background:** Patentee brought action against competitor for patent infringement and tortious interference with contract and prospective business relations. Parties moved for summary judgment.

**Holdings:** The District Court, Jordan, J., held that:
(1) competitor's multilayer plastic films literally infringed patent;
(2) genuine issue of material fact precluded summary judgment on issue of whether patent was invalid as anticipated;
(3) tortious interference claim was not preempted; and
(4) genuine issues of material fact precluded summary judgment on tortious interference claim.
Ordered accordingly.

[1] Patents ☞323.2(2)

291k323.2(2) Most Cited Cases
Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury.

[2] Patents ☞112.5
291k112.5 Most Cited Cases
Invalidity of a patent must be shown by clear and convincing evidence. 35 U.S.C.A. § 282.

[3] Patents ☞112.1
291k112.1 Most Cited Cases
Presumption of a patent's validity is never weakened, and the burden of proving invalidity does not shift

from the party asserting invalidity.

[4] Federal Civil Procedure ☞2011
170Ak2011 Most Cited Cases
Motions to exclude evidence are committed to the court's discretion.

[5] Patents ☞236.1
291k236.1 Most Cited Cases
Manufacturer's multilayer plastic films that shared same composition with respect to the outer surface and outer sealant layers literally infringed patent for a multilayer film with at least seven layers "arranged symmetrically"; although manufacturer's film did not have same layer thickness as patentee's film, its layers had the same symmetrical arrangement.

[6] Patents ☞323.2(3)
291k323.2(3) Most Cited Cases
Genuine issue of material fact as to whether patent for a multilayer plastic film, as construed by court, was anticipated by prior art films precluded summary judgment on claim that patent was invalid as anticipated.

[7] Patents ☞323.2(3)
291k323.2(3) Most Cited Cases
Genuine issues of material fact with respect to scope and content of the prior art and the motivation to combine prior art references to produce the invention claimed in patent for a multilayer plastic film precluded summary judgment on issue of obviousness in infringement case.

[8] Patents ☞16.13
291k16.13 Most Cited Cases

[8] Patents ☞323.2(2)
291k323.2(2) Most Cited Cases
Legal question of obviousness is based on factual issues, and when material facts are disputed, and testimonial, documentary, and expert evidence are needed for their resolution, summary adjudication is not indicated.

[9] Patents ☞99
291k99 Most Cited Cases
To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: 2006 WL 1216220 (D.Del.))**

Page 2

experimentation.

**[10] Patents ☜99**
291k99 Most Cited Cases
To prove that a patent claim is not enabled, accused infringer must prove that one of ordinary skill in the art would be unable to make the claimed invention without undue experimentation.

**[11] Patents ☜323.2(3)**
291k323.2(3) Most Cited Cases
Genuine issue of material fact as to whether one of ordinary skill in the art could have made the invention claimed in patent for a multilayer plastic film without undue experimentation precluded summary judgment on claim that patent was invalid for lack of enablement.

**[12] Torts ☜212**
379k212 Most Cited Cases
Plaintiff alleging a claim for tortious interference with contract must prove: (1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury.

**[13] Torts ☜213**
379k213 Most Cited Cases
To establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted.

**[14] States ☜18.3**
360k18.3 Most Cited Cases
A law can be preempted in one of three ways: by explicit Congressional statement, by field preemption, or by an actual conflict between the state and federal laws. U.S.C.A. Const. Art. 6, cl. 2.

**[15] Patents ☜280**
291k280 Most Cited Cases
A state law claim is preempted by federal patent law only when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2.

**[15] States ☜18.87**
360k18.87 Most Cited Cases
A state law claim is preempted by federal patent law only when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2.

**[16] States ☜18.15**
360k18.15 Most Cited Cases
Federal patent law did not preempt patentee's state tortious interference with contract claim against competitor, based on allegation that competitor tortiously interfered with patentee's relationship with a customer through willful infringement with patent rights; tort claims were being used in conjunction with and not in opposition to patent rights. U.S.C.A. Const. Art. 6, cl. 2.

**[16] Torts ☜203**
379k203 Most Cited Cases
Federal patent law did not preempt patentee's state tortious interference with contract claim against competitor, based on allegation that competitor tortiously interfered with patentee's relationship with a customer through willful infringement with patent rights; tort claims were being used in conjunction with and not in opposition to patent rights. U.S.C.A. Const. Art. 6, cl. 2.

**[17] Federal Civil Procedure ☜2515**
170Ak2515 Most Cited Cases
Genuine issues of material fact as to whether patentee had a binding requirements contract with a customer, whether patentee's competitor knew about the alleged contract, and whether competitor acted wrongfully in marketing infringing product to the customer precluded summary judgment on patentee's claim for tortious interference with a contract.

**[18] Patents ☜323.2(3)**
291k323.2(3) Most Cited Cases
Genuine issue of material fact as to whether there was a non-infringing alternative to patentee's product precluded summary judgment on patentee's claim for lost profit damages in infringement case.

**[19] Patents ☜318(4.1)**
291k318(4.1) Most Cited Cases
Damages for lost profits may be awarded in patent infringement case, even where there are non-infringing alternatives, based on a patentee's previous share of the market.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[20]** Evidence 🗝555.2
157k555.2 Most Cited Cases

**[20]** Evidence 🗝555.4(2)
157k555.4(2) Most Cited Cases
Expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[21]** Evidence 🗝555.2
157k555.2 Most Cited Cases
In determining whether expert testimony is admissible, court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.

**[22]** Evidence 🗝555.4(3)
157k555.4(3) Most Cited Cases
Expert's reliance on another witness's recollection of an experiment performed several years earlier in reaching opinion that patent was invalid went to weight of expert's opinion, rather than its admissibility. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[23]** Evidence 🗝506
157k506 Most Cited Cases
Expert testimony on substantive areas of patent or contract law is impermissible. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Patents 🗝328(2)
291k328(2) Most Cited Cases
4,755,419. Infringed.
 John W. Shaw, Esq., Karen E. Keller, Esq., Michele Sherretta, Esq ., Young Conaway Stargatt & Taylor, LLP, Wilmington, Of Counsel: Ford F. Farabow, Jr., Esq., Joann M. Neth, Esq., Courtney B. Meeker, Esq., Mark J. Feldstein, Esq., Rebecca D. Hess, Esq., Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, D.C., Counsel for Plaintiff.

 N. Richard Powers, Esq., Connolly Bove Lodge & Hutz, Wilmington, Of Counsel: Donald P. Cassling, Esq., Steven R. Trybus, Esq., Shelley Smith, Esq., Brian P. O'Donnell, Esq., Jenner & Block LLP, Chicago, IL, Counsel for Defendant.

MEMORANDUM OPINION

JORDAN, District J.

I. INTRODUCTION

*1 This patent infringement case is set to be tried to a jury beginning on June 12, 2006. Plaintiff Cryovac, Inc. ("Cryovac") has accused defendant Pechiney Plastic Packaging, Inc. ("Pechiney") of willfully infringing claim 11 of U.S. Patent No. 4,755,419 (issued July 5, 1988) (the " '419 patent"), and of tortious interference with contract and prospective business relations. (Docket Item ["D.I."] 185, the "Second Amended Complaint.") Pechiney has denied infringement and tortious interference, and has counter-claimed that the patent is invalid and unenforceable. (D.I. 260, Amended Answer to the Second Amended Complaint at 11-15.)

 Presently before me are six motions filed by Cryovac and Pechiney. Pechiney has filed a Motion for Summary Judgment on Patent Issues (D.I.195), a Motion for Summary Judgment on Lost Profits (D.I.193), a Motion for Partial Summary Judgment on Tortious Interference Claims (D.I.197), and a Motion to Strike an affidavit submitted by Cryovac (D.I.281). Cryovac has filed a Motion for Summary Judgment that Pechiney Infringes Claim 11 of the '419 Patent (D.I.201), and a Motion to Exclude Expert Testimony (D.I.199). Jurisdiction is appropriate under 35 U.S.C. § § 1331 and 1338. For the reasons that follow, Cryovac's Motion for Summary Judgment (D.I.201) will be granted as to literal infringement. Pechiney's Motion for Summary Judgment on Patent Issues (D.I.195) will be granted as to infringement under the doctrine of equivalents, and denied in all other respects. Cryovac's Motion to Exclude Expert Testimony (D.I.199) will be granted to the extent that Pechiney's experts will not be permitted to provide legal opinion or argument, and denied in all other respects. All of the other motions will be denied.

II. BACKGROUND

A. The '419 Patent

The '419 patent discloses "[a] multilayer film with a combination of oxygen barrier properties, toughness, shrinkability, and good optical properties" ('419 patent, Abstract), used "to package various articles, including perishable food products" (id . at col. 1, lns. 10-11). Claim 11, the only claim asserted, is for:
An oriented coextruded film having at least seven layers arranged symmetrically comprising:
(a) a core layer comprising an ethylene vinyl alcohol copolymer;
(b) two intermediate layers each comprising a polyamide;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))

Page 4

(c) two outer layers each comprising a polymeric material or blend of polymeric materials; and
(d) two layers, each comprising an adhesive polymeric material, which adhere each of said intermediate layers to a respective outer layer.
('419 patent, at col. 9, ln. 67--col. 10, ln. 9).

The specification of the '419 patent defines various terms, including "oriented." U.S. Patent No. 4,755,419 at col. 3, lns. 45-49. Additionally, the specification describes suitable components for each of the layers, and gives a preferred total thickness for each of the layers. (See '419 patent, at col. 5-6.) For example, the specification indicates that intermediate layers 12 and 14 "comprise polyamide, and more preferably, a copolymer of nylon 6 and nylon 12 ... each layer can form between 5% and 25% of the total thickness of the multilayer film." (Id. at col. 5, lns. 7-22.) Similar examples are given for each of the other layers of the film. (See id. at col. 5, ln. 23--col. 6 ln. 34 (discussing components of outer layers 16 and 18); id. at col. 6 lns. 39-68 (discussing adhesive layers 20 and 22).)

B. Pechiney's ClearShield TM Product

*2 Cryovac and Pechiney compete in the market for packaging materials for meat. Pechiney markets a product known as "ClearShield," which competes with Cryovac specifically in the bone-in, fresh, red meat packaging market. Cryovac alleges that Pechiney's ClearShield film infringes claim 11 of the '419 patent.

ClearShield is a coextruded seven layer film containing an ethylene vinyl alcohol copolymer core layer, two intermediate layers, each comprising a polyamide, two adhesive layers made of polymeric material, and two outer layers made of polymeric material. (Deposition of Dr. Eldridge Mount, III, [FN1] D.I. 202, Ex. 5 at 14:1-2; id. at 18:8-20:17.) The two outer layers of ClearShield, called the outer surface layer and outer sealant layer by Pechiney, have different thicknesses and chemical compositions. (Declaration of Michael Douglas, [FN2] D.I. 213 at ¶¶ 19, 21-29.) For all twenty-six different product specifications for ClearShield, the outer surface layer of ClearShield has a thickness * * * of the total thickness of the film, while the outer sealant layer has a total thickness * * * (Id. at ¶ 19.) Additionally, for each of the twenty-six product specifications, the outer surface layer and the outer sealant layer contain different amounts of * * *, a slip and antiblock agent. [FN3] (Id. at ¶¶ 21-24.) For all of the product specifications, the outer surface layer

contains between * * *, and the outer sealant layer contains between * * *. (Id. at ¶¶ 21-24.)

C. Prior Art Films

In making its invalidity argument, Pechiney focuses on two prior art films that it alleges are "oriented" within the meaning of claim 11 of the '419 patent.

1. Allied Film

Commencing around 1983, Dr. Seymour G. Gilbert [FN4] conducted a study for Allied Chemicals ("Allied") on a seven layer film having the structure HDPE/tie/nylon/EVOH/nylon/tie/HDPE (the "Allied Film"). (Declaration of Dr. Seymour G. Gilbert, D.I. 213, Ex. 4 at ¶ 9.) This study was described in at least one article that was publicly available in December of 1984, and one news release from Allied. (Id.) Dr. Gilbert stated in his declaration that, based on his recollection of experiments performed on the Allied Film on the Instron Tester, which "provides stress data relating to orientation," and "Cross Polarization to visualize orientation," it was oriented. (Id. at ¶ 16.) Dr. Gilbert's recollection provides the only evidence that this film was oriented, and there are no test results or other laboratory data regarding the orientation of this film.

2. ANR Film C

Allied disclosed in a news release a nine-layer film with the structure HDPE/tie/nylon/tie/EVOH/tie/nylon/tie/HDPE("AN R Film C"). (D.I. 216, Ex. 17 at A0226.) The results contained in that news release were presented to a regional conference of The Society of Plastics Engineers, Inc. on September 5 and 6, 1985. (Id., Ex. 16.) The news release disclosed that ANR Film C was 1.4 mils [FN5] thick, and had certain barrier protection properties. (Id., Ex. 17 at A0227-29.) Pechiney asserts that this shows that the news release "inherently disclosed that ANR Film C was oriented." (D.I. 196 at 13.) There is no statement in the news release, however, that expressly indicates that ANR Film C was oriented. Additionally, the news release stated that "[c]ombinations of nylon and EVOH do not, Dr. Gilbert's tests showed, produce a significant synergistic effect in terms of barrier properties compared to a nylon-only coextrusion or an EVOH-only coextrusion." (D.I. 216, Ex. 17 at A0224.)

D. Cryovac's Relationship with National Beef

*3 Cryovac and National Beef Packing, LLC

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))

Page 5

("National Beef") had a business relationship that began sometime in the late 1990s. (D.I. 251, Deposition of Terry L. Wilkerson [FN6] at 110:25-111:10.) During that period, National Beef purchased * * * of its packaging requirements for particular products from Cryovac. (*Id.* at 110:25-111:10, 130:1-17, 131:12-133:12.) In March of 2003 and January of 2004, Cryovac negotiated agreements with National Beef that covered the periods from January 1, 2003 to December 31, 2005, and January 1, 2004 to December 31, 2007, respectively. (D.I. 250 at March 2003 Agreement, January 2004 Agreement.) Both Agreements stated that they would "serve as documentation of our current packaging agreement." (*Id.* at B001, B003.) Additionally, both agreements provided discounts to National Beef on various products sold by Cryovac, which discounts were "contingent upon combined minimum annual purchases of Barrier Bags, TBG Bags, HS film and Case-Ready lidding exceeding * * *." (*Id.*) Both agreements also provided for cash rebates based on the value of goods purchased by National Beef from Cryovac, starting at * * *. (*Id.* at B001, B004.) The January 2004 agreement further provided that, "[i]n the event that National Beef's packaging purchases fall short of 2003 minimum volume targets due to market conditions other than the use of competitive supply, Cryovac will consider the minimum volume target to have been met." (*Id.* at B003.)

## III. STANDARD OF REVIEW

### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to Interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a genuine issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 1. Patent Infringement

*4 [1] A patent infringement analysis involves two steps: claim construction and then the application of the construed claim to the accused process or product. *Markman,* 52 F.3d at 976. The first step, claim construction, has been held to be purely a matter of law. *Cybor,* 138 F.3d at 1454-56. The second step, application of the claim to the accused product, is a fact-specific inquiry. *See Kustom Signals, Inc. v. Applied Concepts, Inc.,* 264 F.3d 1326, 1332 (Fed.Cir.2001) (Patent infringement, "whether literal or under the doctrine of equivalents, is a question of fact."). The patent owner has the burden of proving infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758 (Fed.Cir.1984) (citing *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983)). Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury. *See Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.2001).

### 2. Patent Invalidity

[2][3] When a party challenges a patent's validity, the starting point for analyzing that challenge is the statutory presumption of validity. *See* 35 U.S.C. § 282 ("A patent shall be presumed valid."). Accordingly, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* Invalidity must be shown by clear and convincing evidence. *Robotic Vision Sys. v. View Eng'g, Inc.,* 189 F.3d 1370, 1377 (Fed.Cir.1999). This presumption of validity is never weakened, and the burden of proving invalidity does not shift from the party asserting invalidity. *Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.,* 745 F.Supp. 998, 1004 (D.Del.1990) (citing *ACS Hosp. Sys., Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1574-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))

75 (Fed.Cir.1984) (other citations omitted)).

B. Motion to Exclude Expert Testimony

[4] Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 749 (3d Cir.1994)* (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or to exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id. at 750.*

IV. DISCUSSION

A. Infringement

1. *Literal Infringement*

[5] Cryovac and Pechiney have cross-moved for summary judgment on literal infringement. (D.I. 195; 201.) Both parties focus their arguments on their claim construction positions for the term "arranged symmetrically." (*See* D.I. 196 at 20-24; D.I. 202 at 13-17.) Essentially, both sides argue that they should win on claim construction, and thus on summary judgment as well. (*Id.*) I have construed the term "arranged symmetrically," largely as Cryovac advocated, to mean "putting the layers in a desired symmetrical order when the film is viewed in cross-section, so that the layers are in the same order on each side of the core of the film, for example c/d/b/a/b/d/c. This claim phrase limits only the arrangement of the layers, but does not require precise identity in the thickness of the layers or the amounts of recited components or additives that may be included in the layers." (*See* D.I. 304 at 13-15.) Thus, although I did not adopt Cryovac's construction in its entirety, I did not construe "arranged symmetrically" to mean that the film must have geometric symmetry with respect to the thickness and chemical composition of the layers, as Pechiney had urged.

*5 Pechiney essentially conceded at oral argument that, if I accepted Cryovac's proposed construction of the claim term "arranged symmetrically," then the ClearShield product met that limitation. (D.I. 298, Oral Argument Transcript, at 57:11-18.) [FN7]

Indeed, the vast majority of Pechiney's arguments, both in its opposition to Cryovac's motion and in its support of its own motion, rely on my adopting Pechiney's position on claim construction. (D.I. 196 at 20-24; D.I. 239 at 8-15; D.I. 280 at 2-4.) As I have construed the term "arranged symmetrically," there is effectively no dispute between the parties as to whether Pechiney meets the terms of the claim, [FN8] and thus summary judgment of literal infringement will be granted to Cryovac.

Pechiney further argues, however, that Cryovac is, at most, entitled to summary judgment that one of Pechiney's twenty-six product specifications, Z-9001 F, infringes claim 11 of the '419 patent, because it is the only specification cited in Cryovac's briefing. (D.I. 239 at 18-19.) Cryovac responds by stating that it cited testimony about ClearShield film generally, that Z-9001 F is the product specification used to make the vast majority of ClearShield film on the market, that, at the very least, all of the films made by the same product specification as Z-9001 F infringe the '419 patent, and that Pechiney's expert witness testified that Z-9001 F was "representative of the class." (D.I. 278 at 16-19.)

Pechiney's argument has little merit. Although there are twenty-six different product specifications for ClearShield, those twenty-six specifications have been grouped by Pechiney into four "Composition Combinations." (*See* Declaration of Michael Douglas, D.I. 213, Ex. 3 at ¶¶ 21-24.) It therefore appears that different product specifications in the same Composition Combination have the same composition, at least with respect to the outer surface and outer sealant layers. (*Id.*)

Combination One applies to product specification Z-9001 F, as well as six other product specifications. (*Id. at ¶ 21.*) Because at least the outer surface and outer sealant layers of these seven films share the same composition, films made under all of the product specifications identified under Combination One literally infringe claim 11 of the '419 patent. Additionally, Combinations Two and Three, which apply to two and sixteen product specifications, respectively, have only small differences from Combination One. The outer surface and outer sealant layers in films made under both Combinations Two and Three contain identical amounts of * * *, which is identified as an antioxidant, in addition to the components of Combination One. (*Id. at ¶¶ 22-23.*) Combination Three also contains a higher percentage of * * *, the slip/antiblock agent, than Combinations One and Two in the outer surface

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))

Page 7

layer. (*Id.* at ¶ ¶ 22-23.) Other than these minor differences, the outer surface and outer sealant layers of films made under Combinations Two and Three are identical to those made under Combination One. Thus, films made under the product specifications identified under Combinations Two and Three literally infringe claim 11 of the '419 patent under my construction of the term of that claim. Finally, Combination Four has only one product specification, DZ-9004-1, which Cryovac has agreed does not infringe claim 11 of the '419 patent. (D.I. 278 at 20.) Thus, summary judgment of literal infringement will be granted to Cryovac as to all ClearShield product specifications except DZ-9004-1. [FN9]

### 2. Doctrine of Equivalents

*6 Pechiney has moved for summary judgment that there is no infringement under the doctrine of equivalents. (D.I. 196 at 24-28.) Cryovac responds only by saying that the doctrine of equivalents does not apply to this case. (D.I. 241 at 16.) Because Cryovac is not asserting a case of infringement under the doctrine of equivalents, summary judgment on this issue will be denied as moot.

### B. Invalidity

Pechiney has moved for summary judgment that the patent is invalid because it is anticipated, obvious, and not enabled. Because there are genuine issues of material fact with respect to each of these issues, summary judgment of invalidity will be denied.

### 1. Anticipation

[6] Pechiney argues that, under its construction of the term "oriented," both the Allied Film and ANR Film C anticipate the invention disclosed in claim 11 of the '419 patent. (D.I. 196 at 30-31; D.I. 280 at 6-7, 11.) Pechiney makes no argument as to whether claim 11 is anticipated by the Allied Film or ANR Film C when the term "oriented" is construed to include the limitation "this stretching accomplished by a racking or blown bubble process," as I have construed it. [FN10] (*See* D.I. 304 at 9, 14.) Therefore, given the construction I have arrived at, Pechiney's motion for summary judgment of anticipation must be denied.

### 2. Obviousness

[7] Pechiney argues that, even if the Allied Film and ANR Film C are not oriented, and thus do not anticipate the invention of claim 11 of the '419

patent, it would have been obvious to a person of ordinary skill in the art to orient those films. (D.I. 196 at 33-37.) Pechiney asserts that oriented films, and the particular processes used to orient films, were well known in the art, and that the advantages of oriented films were also well known, such that a person of ordinary skill in the art would have been motivated to orient a multilayer film such as the Allied Film or ANR Film C. (*Id.* at 35-37.) Cryovac, however, counters by arguing that there would not have been motivation to orient those films, and that a person of ordinary skill in the art would not have had an expectation of success in doing so. (D.I. 241 at 31-32.) Indeed, Cryovac claims that the prior art taught away from orienting those films. (*Id.* at 32.)

[8] "While the ultimate question of patent validity is one of law, ... [obviousness] lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved .... Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The legal question of obviousness is based on factual issues, and "when material facts are disputed, and testimonial, documentary, and expert evidence are needed for their resolution, summary adjudication is not indicated." *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed.Cir.1991).

*7 There are genuine issues of material fact with respect to at least the scope and content of the prior art and the motivation to combine prior art references to produce the invention in claim 11 of the '419 patent. Pechiney argues, and cites prior art to support its argument, that the prior art taught the elements of claim 11 of the '419 patent and that a person of skill in the art would have been motivated to orient films such as the Allied Film or ANR Film C. (D.I. 196 at 33-37.) However, Cryovac cites the declaration of its expert, Dr. Garth L. Wilkes, who in turn cites prior art that would have taught away from orienting EVOH-containing multilayer films. (Affidavit of Garth Wilkes, D.I. 242 at ¶ ¶ 30-37.) More specifically, Dr. Wilkes cites to prior art showing the difficulty of orienting multilayer films (*Id.* at ¶ 30 (citing U.S. Patent No 4,501,797)) and the difficulty of orienting layers or films containing EVOH (*Id.* at ¶ 31 (citing U.S. Patent No. 4,610,914). This

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))

disagreement between the experts as to whether the prior art would have motivated one of ordinary skill in the art to make the invention of the '419 patent creates a genuine issue of material fact, and thus, summary judgment on obviousness must be denied.

### 3. Enablement

[9][10][11] Finally, Pechiney asserts that claim 11 of the '419 patent is invalid for lack of enablement. (D.I. 196 at 37-38.) Pechiney argues that the '419 patent teaches nothing new about how to orient a multi-layer film, and that if a person of ordinary skill in the art would not have been motivated to orient the films in the manner already known in the prior art, then the patent calls for a new but untaught type of orienting and is therefore not enabled. (Id. at 38.) Cryovac responds that, based on the information in the patent specification and the prior art, one of ordinary skill in the art could have made and used the invention. (D.I. 241 at 35-37.) "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1365 (Fed.Cir.1997). To prove that a patent claim is not enabled, the accused infringer must prove that "one of ordinary skill in the art would be unable to make the claimed invention without undue experimentation." Johns Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1360 (Fed.Cir.1998).

Pechiney's argument essentially boils down to an assertion that if claim 11 is not invalid for obviousness, then it must be invalid for lack of enablement. Pechiney, however, has not presented evidence sufficient to show that there is no genuine issue of material fact as to whether one of ordinary skill in the art could have made the invention of claim 11 of the '419 patent without undue experimentation. Pechiney's assertions that the patent teaches nothing new about orientation are met by Cryovac's contention that the '419 specification provided "detailed formation methods" on how to orient the film in the patent. Because Pechiney has failed to meet its burden of showing that there is no genuine issue of material fact regarding enablement, summary judgment on this point must also be denied.

### C. Tortious Interference

*8 [12][13] Pechiney has moved for partial summary judgment on Cryovac's tortious interference claims. [FN11] A plaintiff alleging a claim for tortious interference with contract must prove: "(1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury." Gill v. Delaware Park, LLC, 294 F.Supp.2d 638, 645 (D.Del.2003). "[T]o establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 5 F.Supp.2d 238, 243 (D.Del.1998).

Pechiney first claims that it should be granted summary judgment on Cryovac's tortious interference claims because the state law causes of action for tortious interference with contract and tortious interference with a prospective contractual relationship are precluded by federal patent law. (D.I. 198 at 14-19.) Pechiney further argues that, even if the claims are not precluded, Cryovac cannot establish that there was a valid contract between Cryovac and National Beef (id. at 20-28), nor can it establish that Pechiney knew about such a contract, if it existed (id. at 28-31), or that Pechiney's actions in dealing with National Beef were wrongful (id. at 31-33). Cryovac responds by arguing that the claims are not precluded (D.I. 250 at 9-13), that it did have a contract with National Beef (id. at 14-34), that there are genuine issues of material fact as to whether Pechiney knew or should have known about that contract (id. at 35-37), and that Pechiney's actions were wrongful because they involved willful infringement of the '419 patent (id. at 37-39). I address each of these arguments in turn.

### 1. Preemption

[14][15] Under the Supremacy Clause of the United States Constitution, art. IV, cl. 2, "state law that conflicts with federal law is 'without effect.'" ' Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1331 (Fed.Cir.1998) (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). [FN12] A law can be preempted in one of three ways: by explicit Congressional statement, by field preemption, or by an actual conflict between the state and federal laws. Hunter Douglas, 153 F.3d at 1332. There is no explicit preemption of state law tortious interference

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))

claims in the patent statute, *see* 35 U.S.C. § § 1-376, and the Federal Circuit Court of Appeals has ruled that "there is no field preemption of state unfair competition claims that rely on a substantial question of federal patent law." *Hunter Douglas,* 153 F.3d at 1333. Thus, a state law claim is preempted by federal patent law only in the third instance, i.e., when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (analyzing question of preemption of a state statute requiring aliens to register with the state); *see also Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) (finding that state unfair competition law cannot "give protection of a kind that clashes with the objectives of the federal patent laws").

*\*9* The Federal Circuit appears to have addressed the issue of whether a state law tortious interference with contract claim conflicts with federal patent law on two separate occasions. *See Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470 (Fed.Cir.1998); *Hunter Douglas,* 153 F.3d 1318. In *Dow Chemical,* the Court found that a state law claim for tortious interference with actual and prospective contractual relations was not preempted by federal patent law, even where it requires the adjudication of a question of federal patent law. *Dow Chem.,* 139 F.3d at 1473. In *Dow Chemical,* the plaintiff sued the defendant-patentee for a declaratory judgment that the patent was not infringed, was invalid for inequitable conduct before the Patent & Trademark Office, and for state law claims of unfair competition based on the defendant-patentee's threats to sue the plaintiff and the plaintiff's customers for patent infringement. *Id.* at 1471-72. Similarly, in *Hunter Douglas,* the plaintiff sought a declaratory judgment that the defendant-patentee's patent was not infringed, was invalid, and was unenforceable due to inequitable conduct. *Hunter Douglas,* 153 F.3d at 1321-22. The plaintiff further sought various state law remedies based on the defendant-patentee's actions in telling the plaintiff's customers that the plaintiff did not have the right to sell its products because they were covered by the defendant's patent. *Id.* at 1322. However, the Court in *Hunter Douglas* found that the state law claims were preempted by federal patent law using an "as-applied" approach, finding that the plaintiff's tort action was based on conduct that was protected by federal patent law. *Id.* at 1335-36 (citing *Sears,* 376 U.S. at 231).

[16] Naturally, Cryovac relies on *Dow Chemical,*

while Pechiney relies on *Hunter Douglas.* It is unnecessary for me to harmonize those cases or to decide which case to apply, since this case presents a totally dissimilar factual scenario. In both of those cases, the accused infringer attempted to use state law unfair competition claims, based on the patentee's allegedly inequitable conduct in front of the Patent & Trademark Office, to limit the right to assert the patent. *See Dow Chem.,* 139 F.3d at 1471-72; *Hunter Douglas,* 153 F.3d at 1321-22. Thus, in both *Dow Chemical* and *Hunter Douglas,* the state law unfair competition claim presented at least some conflict with a patent owner's right under the patent statute to exclude others from making, using, or selling a patented product. Here, however, there is no such conflict. Cryovac, the patent owner, is asserting that Pechiney willfully infringed the '419 patent, and that Pechiney, partially through that infringement, tortiously interfered with Cryovac's relationship with National Beef. The unfair competition claims here are being used in conjunction with and not in opposition to the patent rights.

Furthermore, the tortious interference claims, even though they are based in part on Cryovac's assertion that Pechiney willfully infringed claim 11 of the '419 patent, require Cryovac to prove a number of things in addition to willful infringement, including the existence of a contract or a valid business relationship or expectancy and the knowledge Pechiney allegedly had of the contract or the relationship (*see supra* at 16). *See Dow Chem.,* 139 F.3d at 1477 ("a tort claim for intentional interference with contractual relations requires elements entirely different to those required for inequitable conduct"). Therefore, Cryovac's tortious interference claim is not preempted by patent law. *See Rodime PLC v. Seagate Tech., Inc.,* 174 F.3d 1294, 1306 (Fed.Cir.1999) (holding that a patentee could sue for tortious interference along with its claims of infringement).

### 2. *Existence of a Contract*

*\*10* [17] Pechiney asserts that it should be granted summary judgment on Cryovac's tortious interference claims because Cryovac cannot show that it had a contract with National Beef. (D.I. 198 at 20-28.) In particular, Pechiney argues that the document Cryovac alleges was a contract contains no quantity term, and additionally cannot be viewed as a requirements contract. (*Id.*) Pechiney further argues that National Beef did not intend to be bound by any agreement with Cryovac. (*Id.* at 27-28.) Cryovac responds that it did have a requirements contract with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

National Beef (D.I. 250 at 17-32), and that National Beef intended to be bound by that contract (*id.* at 16-17; 32-34). Each party cites a number of cases which it claims supports its position on whether there was a contract, and each argues that the facts of this dispute are similar to the cases it puts forward. All of these arguments, however, essentially amount to factual disputes over the meaning of the contract language and the intent of the parties. In short, there are genuine issues of material fact with respect to whether Cryovac and National Beef had a binding requirements contract.

The documents that Cryovac alleges are contracts with National Beef each contain a minimum purchase requirement of * * * for National Beef to receive the agreed on product discounts and cash rebates. (D .I. 250, March 2003 Agreement at B001-02; *id.* at January 2004 Agreement at B003-04.) Additionally, the January 2004 Agreement contains a provision that states "[i]n the event National Beef's packaging purchases fall short of 2003 minimum volume targets due to market conditions other than the use of competitive supply, Cryovac will consider the minimum volume target to have been met." (*Id.,* January 2004 Agreement at B003.) There are several courts that have found, in situations similar to the instant dispute, that a requirements contract either did exist or that there were issues of fact as to whether a requirements contract existed. *See, e.g. Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.,* 186 F.3d 815, 817-18 (7th Cir.1999) (holding that, although the language of the contract was permissive when it said the buyer could purchase "such quantities of the items listed herein as [it] might order or schedule" and that the "Buyer shall have the right at any time and from time to time to cancel, in whole or in part, the deliveries specified and the authorizations contained in any shipping schedule given to the Seller", "we must conclude that the contract, taken as a whole, is ambiguous and that further investigation as to whether the parties intended a requirements contract is required"); *Kansas Power & Light Co. v. Burlington N. Ry. Co.,* 740 F.2d 780, 788-89 (10th Cir.1984) (finding that a requirements contract existed where the contract "provide[d] for an incentive pricing system based on tonnage shipped" and had a term that stated that in years where the buyer's requirements fell below a certain level, "carriers [would] seek to amend the tariff to reduce the annual minimum tonnage requirement" for the buyer); *O.N. Jonas Co., Inc. v. Badische Corp.,* 706 F.2d 1161, 1164-65 (11th Cir.1983) (finding that the statement "[a] potential program utilizing our yarn was discussed in 1977 and we indicated that we

would supply the yarn if we were provided a Heller guaranty on our form" was sufficient to show a requirements contract "in light of the business dealings" between the parties.) Thus, there are genuine issues of material fact as to whether Cryovac and National Beef had a binding requirements contract based on the March 2003 and January 2004 agreements and based on the course of dealing and performance between those parties.

### 3. *Pechiney's Knowledge of the Alleged Contract*

**\*11** Pechiney next claims that even if Cryovac and National Beef did have a contract, the undisputed facts show that Pechiney had no knowledge of the contract, and thus, that Cryovac's claim of tortious interference with contract must fail. (D.I. 198 at 28-31.) Pechiney claims that National Beef did not believe that it had a binding contract with Cryovac, and thus did not tell Pechiney about any contract. (*Id.* at 29-30.) Pechiney also points to statements by its employees that they had no knowledge of any contract between National Beef and Cryovac. (*Id.* at 30-31.) Cryovac contends, however, and Pechiney does not dispute, that Pechiney knew that Cryovac supplied 100% of National Beef's packaging products (*see* D.I. 251, Deposition of Thomas Grabowski [FN13] at 212:1-8), that Cryovac's pricing was contingent on Cryovac continuing to be National Beef's 100% supplier (*id.*), and that National Beef was intending to award a contract in early 2004 for 100% of its packaging needs (D.I. 251, Ex. CC at B190). This evidence creates a genuine issue of material fact as to whether Pechiney knew about the alleged contract between Cryovac and National Beef.

### 4. *Pechiney's Wrongful Means*

Finally, Pechiney asserts that it is entitled to summary judgment on Cryovac's tortious interference with prospective contractual relations claim because Cryovac cannot establish that Pechiney acted wrongfully. (D.I. 198 at 31-33.) Pechiney essentially argues that, because it conducted research and got a non-infringement opinion, it acted in good faith and cannot be held liable for tortious interference. (*Id.*) However, "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles." *Haft v. Dart Group Corp.,* 841 F.Supp. 549, 577 (D.Del.1993) (quoting *DeLong Corp. v. Raymond Int'l, Inc.,* 622 F.2d 1135, 1146 (3d Cir.1980)). Additionally, Cryovac asserts that Pechiney's initial opinion, the only opinion it had before marketing ClearShield, was insufficient

because, among other things, it failed to analyze claim 11 of the '419 patent, the only claim in suit. (D.I. 250 at 39 (citing D.I. 251, Ex. G at B113).) Thus, there are genuine issues of material fact with respect to whether Pechiney acted wrongfully.

Accordingly, because Cryovac's tortious interference claims are not preempted, and because there are genuine issues of material fact as to whether there was a contract between Cryovac and National Beef, as to whether Pechiney knew about any such contract, and as to whether Pechiney acted wrongfully, summary judgment on Cryovac's tortious interference claims will be denied.

D. Lost Profits

[18] Pechiney has moved for partial summary judgment that Cryovac is not entitled to lost profits damages because of the existence of non-infringing alternatives, namely products produced by Curwood, Inc. ("Curwood"). [FN14] (D.I.193.) Cryovac counters by arguing that there are genuine issues of material fact as to whether the products produced by Curwood were available non-infringing alternatives (D.I. 244 at 12-17), and that, under *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573 (Fed.Cir.1989), Cryovac is entitled to lost profits based on the sales it would have made but for Pechiney's sales of the ClearShield product.

*12 In support of its argument that Curwood's products were not acceptable non-infringing alternatives, Cryovac asserts that its products outperformed Curwood's products. (*See* D.I. 244 at 13-14 (citing, *e.g.,* D.I. 246, Ex. A at CR014-000581 ("The Curwood package did not perform well at destination, defect rate of 19% vs. the Cryovac package of less than 5%").) Cryovac also argues that Curwood did not compete with Cryovac because it did not offer a complete line of packaging products. (D.I. 244 at 14.) Additionally, the evidence from an internal Pechiney document shows that, prior to Pechiney's entry into the market, Cryovac held * * * of the market, while Curwood held only * * *. (D.I. 243, Ex. R at PPPI 0008241.) Thus, Cryovac has shown that there are genuine issues of material fact as to whether Curwood offered a non-infringing alternative.

[19] Furthermore, damages for lost profits may be awarded, even where there are non-infringing alternatives, based on a patentee's previous share of the market. *See State Indus., Inc.,* 883 F.2d at 1580 ("[T]he district court acted well within its discretion

when it awarded damages for [Defendant]'s infringing activity based on [Patentee]'s share of the market."). Thus, even if Curwood did produce a product that was a non-infringing alternative, it is possible for Cryovac to be awarded lost profits damages based on the market share it held prior to Pechiney's entrance into the market. The motion for partial summary judgment on lost profits must therefore be denied.

E. Cryovac's Motion to Exclude Expert Testimony

Cryovac has moved under Federal Rules of Evidence, 702, 703, and 403 to exclude the testimony of two of Pechiney's experts, Dr. Eldridge Mount and Mr. Larry Evans. (D.I.199.) Pechiney responds by arguing that Cryovac's assertions go to the weight the expert testimony should be given, not its admissibility (D.I. 252 at 2).

[20] Federal Rule of Evidence 702 obligates judges to ensure that any scientific or technical testimony admitted is relevant and reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...." The party offering the expert testimony has the burden of proving admissibility. *See Daubert,* 509 U.S. at 592 n. 10 (citation omitted). The expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. *See Joiner v. General Elec. Co.,* 522 U.S. 136, 144, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (noting failure of plaintiffs to explain "how and why [they] ... could have extrapolated their opinions"); *Kumho Tire,* 526 U.S. at 152 (an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Daubert,* 509 U.S. at 590 (expert's testimony "must be supported by appropriate validation").

*13 [21] Further, Rule 702 requires that expert testimony assist the trier of fact. In other words, it must "fit" the issues in the case by having a valid connection to the pertinent inquiry. *Daubert,* 509 U.S. at 591-92. The court "must examine the expert's conclusions in order to determine whether they could

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))

reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999).

Federal Rule of Evidence 703 provides, in relevant part, that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Federal Rule of Evidence 403 provides that relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

*1. Dr. Mount*

Cryovac claims that the portions of Dr. Mount's opinion that deal with invalidity based on the Allied Film should be excluded under Federal Rules of Evidence 702, 703, and 403, and that Dr. Mount's opinion on non-infringing alternatives should be excluded because it lacks support. (D.I. 200 at 16-22.) Specifically, Cryovac asserts that Dr. Mount's opinion is inadmissible because it was not derived by a scientific method (*id.* at 16), it is not objectively verifiable (*id.* at 17), it will not assist the trier of fact (*id.* at 17-18), it does not rely on the type of data reasonably relied on by experts in the field (*id.* at 18-19), it is unfairly prejudicial (*id.* at 20-21), and it will confuse the jury (*id.* at 21). Each of these arguments, however, is simply an attack on Dr. Mount's reliance in his report on the statements of Dr. Gilbert regarding the Allied Film. (*Id.* at 16-22.) In forming his opinion on invalidity, Dr. Mount relied on, among other things, Dr. Gilbert's statement in his declaration that, based on his recollection of experiments performed on the Allied Film on the Instron Tester and Cross Polarization testing, the Allied Film was oriented (Declaration of Dr. Seymour G. Gilbert, D.I. 213, Ex. 4 at ¶ 16). (Second Supplemental Report of Eldridge Mount, D.I. 213, Ex. 5 at Ex. D at 4-6.) Cryovac claims that Dr. Gilbert's statement in his declaration is uncorroborated and that Dr. Mount's reliance on it makes Dr. Mount's opinion inadmissible under Rule 702, 703, and 403. (D.I. 200 at 16-21.)

[22] However, Cryovac does not contend that the tests performed by Dr. Gilbert are unreliable, but rather that it is improper to rely on Dr. Gilbert's uncorroborated memory. (*Id.*) Pechiney asserts that Dr. Gilbert's recollection is corroborated by an article entitled "Nylon Film Effective Packaging" published on December 14, 1984 in the Journal of Commerce

(*See* D.I. 216, Ex. 18 at A0231-33), a news release presented at a regional conference of The Society of Plastics Engineers, Inc. on September 5 and 6, 1985 (D.I.216, Ex. 16, 17), and an article published in a 1997 issue of the Journal of Food Science (D.I.216, Ex. 19). (*See* D.I. 252 at 7-11.) It appears, therefore, that there is arguably some corroboration of Dr. Gilbert's recollection, and thus Dr. Mount's reliance on Dr. Gilbert's statements is an issue that can fairly be dealt with on cross-examination, as it goes to the weight, not the admissibility of Dr. Mount's testimony.

*14 Having said that, though, I emphasize that I have defined the term "oriented" to include a process limitation, such that a film is "oriented" under my construction only if it is "accomplished by a racking or blown bubble process." (*See* D.I. 304 at 9, 14.) There is nothing in the declaration of Dr. Gilbert that indicates the process by which the Allied Film was oriented, if it was oriented. (D.I.213, Ex. 4.) Accordingly, Dr. Mount's testimony cannot include assertions about anticipation, since there is no evidence in the record that the Allied Film was oriented in the manner stated in the patent.

Cryovac also claims that Dr. Mount's opinion on non-infringing alternatives lacks support, and that it should thus be excluded. (*Id.* at 21-22.) Cryovac asserts that the documents that Dr. Mount attempted to rely on do not support his opinion, and that his opinion should thus be excluded. (*Id.* at 22.) Again, however, this argument goes to the weight that should be given to his expert testimony, not its admissibility. Cryovac's motion to exclude the testimony of Dr. Mount will therefore be denied.

*2. Mr. Evans*

Cryovac also asserts that the damages opinion of Mr. Evans should be excluded in its entirety. With respect to Mr. Evans' opinion regarding non-infringing alternatives, Cryovac claims that Mr. Evans is unqualified to testify on the existence of non-infringing alternatives (D.I. 200 at 23), that his opinion on non-infringing alternatives is based on evidence that does not meet the requirements of Rule 703 (*id.* at 23-24), and that the evidence he relies on would be unfairly prejudicial to Cryovac (*id.* at 24-25.) Further, Cryovac asserts that Mr. Evans' patent damages opinion should be excluded because there is no evidence to show the existence of acceptable non-infringing alternatives. (*Id.* at 25-26.) Pechiney responds by saying that Mr. Evans is not opining on non-infringing alternatives but is relying on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

opinion of Dr. Mount in this matter in forming his opinion on damages in the form of lost profits. (D.I. 252 at 27-30.) While Cryovac is correct that Mr. Evans may not himself opine on whether there are acceptable non-infringing alternatives, Mr. Evans may rely on the testimony of Dr. Mount in forming his opinion on lost profits.

[23] Cryovac has also moved to exclude Mr. Evans' opinions on the basis that they contain improper opinions on patent and contract law. (D.I. 200 at 26-32.) Cryovac is correct that Mr. Evans's opinions go beyond opining on what the appropriate measure of damages should be, and make what amounts to legal argument on patent and contract law. As just one example among many, Mr. Evans states:

The alleged contracts with National Beef, i.e. Cryovac's and [Pechiney's], were not contracts at all. As I indicated in my Initial Report, they were no more than 'price sheets'. No quantities were stated. National Beef could switch suppliers at any time. If National Beef did so, it would only lose its price protection and the possibility of volume discounts. In my nearly 30 years of corporate management experience, I have negotiated more than 30 to 40 supply agreements. These agreements specified, inter alia, quantities to be purchased or 'requirements', price and allowable escalation and dispute resolution. The alleged 'agreements' cited by Mr. Nawrocki are not supply or requirements contracts nor are they fixed quantity contracts, and they do not obligate National Beef to purchase bags nor do they obligated Cryovac to supply bags.

*15 (D.I. 207, Ex. 5 at ¶ 17; *see also* D.I. 207, Ex. 3 at ¶ ¶ 33-34, 41, 43; *id.,* Ex. 5 at ¶ ¶ 10, 12.) Such testimony on substantive areas of patent or contract law is impermissible. *Revlon Consumer Prods. Corp. v. L'Oreal S.A.,* C.A. No. 96-192-MMS, 1997 WL 158281, at *3 (D.Del. Mar.26, 1997) (stating that expert "may not testify as to substantive issues of patent law"); *N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.,* C.A. No. 88C-JA-155, 1995 WL 628447, at *3 (Del.Super.Apr. 22, 1995) ("the proper scope of expert testimony intersects with the law of contract interpretation, which firmly prohibits expert testimony as to legal duties, standards or ramifications arising from a contract. Such testimony is reversible error and is not repaired by cross-examination") (citing *Marx & Co., Inc. v. Diners' Club Inc.,* 550 F.2d 505, 508 (2d Cir.1977) ("the District Court erred in permitting Friedman, an expert witness called by plaintiffs, to give his opinion as to the legal obligations of the parties under the contract")). Thus, Cryovac's Motion to Exclude will be granted to the extent that Mr. Evans will be

confined at trial to opining on what the damages award in this case should be if Pechiney's legal positions are accepted. He will not be permitted to advocate legal positions for Pechiney by opining on the substance of case law, or on the validity of any contract between Cryovac and National Beef. The Motion to Exclude will be denied in all other respects.

F. Pechiney's Motion to Strike Deily Declaration

In support of its opposition to Pechiney's Motion for Partial Summary Judgment on Lost Profits, Cryovac filed the Affidavit of Karl Deily. (D.I.245.) Pechiney has moved to strike that affidavit, contending that it is not made on personal knowledge, lacks foundation, and is speculative and conclusory. (D.I.281.) Because I did not rely on that affidavit in deciding Pechiney's Motion for Partial Summary Judgment on Lost Profits, the Motion to Strike will be denied as moot.

V. CONCLUSION [FN15]

Accordingly, Cryovac's Motion for Summary Judgment that Pechiney Infringes Claim 11 of the '419 Patent (D.I.201) will be granted as to all ClearShield product specifications except DZ-9004-1. Pechiney's Motion for Summary Judgment on Patent Issues (D.I.195) will be denied as moot to the extent that it seeks a judgment that there is no infringement under the doctrine of equivalents, and it will be denied in all other respects. Cryovac's Motion to Exclude Expert Testimony (D.I.199) will be granted to the extent that Mr. Evans is precluded from opining on the substance of case law or on the validity of any contract between Cryovac and National Beef, and to the extent that Dr. Mount will not be permitted to opine that prior art films are "oriented" as that term is used in the patent; that Motion will be denied in all other respects. Pechiney's Motion for Summary Judgment on Lost Profits (D.I.193) and Motion for Partial Summary Judgment on Tortious Interference Claims (D.I.197), will be denied, and Pechiney's Motion to Strike (D.I.281) will be denied as moot. An appropriate order will follow.

ORDER

*16 For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Motion for Summary Judgment that Pechiney Infringes Claim 11 of U.S. Patent No. 4,755,419 (D.I.201), filed by Cryovac, Inc. ("Cryovac), is GRANTED as to all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: 2006 WL 1216220 (D.Del.))**

ClearShield product specifications except DZ-9004-1. IT IS FURTHER ORDERED that the Motion for Summary Judgment on Patent Issues (D.I.195), filed by Pechiney Plastic Packaging, Inc. ("Pechiney"), is DENIED as moot to the extent that it seeks a judgment that there is no infringement under the doctrine of equivalents, and is DENIED in all other respects. IT IS FURTHER ORDERED that Cryovac's Motion to Exclude Expert Testimony (D.I.199) is GRANTED to the extent that Mr. Evans is precluded from opining on the substance of case law, or on the validity of any contract between Cryovac and National Beef, and to the extent that Dr. Mount will not be permitted to opine that prior art films are "oriented" as that term is used in the patent; that Motion is DENIED in all other respects. IT IS FURTHER ORDERED that Pechiney's Motion for Summary Judgment on Lost Profits (D.I.193) and Motion for Partial Summary Judgment on Tortious Interference Claims (D.I.197), are DENIED, and its Motion to Strike (D.I.281) is DENIED as moot.

IT IS FURTHER ORDERED that the parties should meet and confer upon redactions to the accompanying opinion, and submit those proposed redactions within two weeks.

FN1. Dr. Eldridge Mount is an expert witness for Pechiney. (D.I. 213, Ex. 5 at ¶ 2.)

FN2. Michael Douglas is an employee of Pechiney's successor, Alcan Packaging, Inc., who helped in the research and development of ClearShield. (D.I. 213, Ex. 3 at ¶¶ 1, 4.)

FN3. The more * * * that is added to a layer, the more slippery that layer becomes. (*See* D.I. 298 at 59:3-15.)

FN4. Dr. Gilbert served as Professor of the Food Science Department at Rutgers University from 1965-1988. (D.I. 213, Ex. 4 at ¶ 4.)

FN5. A mil is defined as "a unit of length equal to 1/1000 inch used esp. In measuring thickness (as of plastic films)". Merriam-Webster's Collegiate Dictionary 736 (10th ed.2002).

FN6. Terry L. Wilkerson is the National Beef Executive Vice President of Strategic Business Growth, and the person at National Beef with whom Cryovac negotiated its

contracts. (D.I. 250 at March 2003 Agreement, January 2004 Agreement.)

FN7. As a good advocate must, Pechiney's attorney agreed when agreement was essential, though he hedged where he could. The exchange, in relevant part, was as follows: The Court: ... Assume for purposes of argument I were to accept Cryovac's version of 'symmetrically arranged.' Do you agree that there is infringement?
[Counsel]: Your Honor, I would agree if you accept [Cryovac's] definition of 'symmetrically arranged[,]' we meet symmetrically arranged.' Depending on what 'simultaneously' means and 'coextruded,' we put forth affirmative proof that we don't do 'simultaneously,' if that is meant to indicate some simultaneous event taking place in the coextrusion die. So that issue would still be out there.
The Court: So really, the difference in the percentages there that were at least alluded to here in the courtroom today along with differences in thickness. It comes down to and I view that as not a distinction in kind that would make it asymmetrically arranged.
[Counsel]: Well, Your Honor, let me clarify what I meant. If Your Honor adopts what they propose, and all that needs to happen is the c/d/b/a/b/d/c order, it's true layer one and layer seven meet C. I think they are significantly different with the antiblock. There are three times as much antiblock in layer seven as there is in layer one. That is done for a particular intentional reason and there is a dramatic difference between the way those two layers react.
So, if Your Honor include (sic) in the definition something more than I can just label this as something that has some at least polymeric material in it, which is all that C requires. If all you have to do is label it as C, then I would agree that it can be labeled as C.
If 'arranged symmetrically' has some more meaning than that, then there is a difference in kind between layer one and layer seven. (D.I. 298 at 57:8-58:15.)

FN8. Pechiney's counsel also stated that there could still be an issue as to infringement with respect to the construction of the term "coextruded." (D.I. 298 at 57:13-18.) However, as I stated in my claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))

construction ruling (*see* D.I. 304 at note 1), the parties appear to agree on a key aspect of the meaning of this term, and Pechiney effectively conceded that the ClearShield product met the claim limitation "coextruded" under that agreed-to meaning. (D .I. 240 at 26-27; D.I. 239 at 15-16.)

FN9. Indeed, Pechiney's argument may be, for practical purposes, moot, as Pechiney's 30(b)(6) witness, Michael Douglas, testified that the "vast majority of [Pechiney's] production" was under product specification Z-9001 F, and that "there may be a small amount being run Z-9002 F [also made under Combination One], but I'm not sure about that." (D.I. 243, Ex. Z at 20:11-21:2.) Douglas further stated that, to his knowledge, none of the other product specifications currently accounted for films being sold in the market. (*Id.* at 21:3-5.)

FN10. There would be genuine issues of material fact as to Pechiney's evidence that the Allied Film and ANR Film C are oriented under any definition of that term. With respect to the Allied Film, Pechiney bases its assertion that the Allied Film was oriented on the statement of Dr. Gilbert that "[i]t was [his] recollection that results of the instron Tester and the Cross Polarization tester showed that the [Allied Film] ... was oriented." (D.I. 213, Ex. 4 at ¶ 16.) Cryovac disputes this conclusion, and notes that Dr. Gilbert failed to cite "a single piece of data, laboratory notebook entry, notes, drawings, or other evidence" that would corroborate Dr. Gilbert's recollection as to whether the Allied Film was oriented. (D.I. 241 at 18.) Thus, even if Pechiney's definition of "oriented" were still in play, there would be an issue of fact as to whether that film was oriented.

FN11. The parties appear to dispute whether the law of Delaware, where both Cryovac and Pechiney are incorporated, or the law of Kansas, the location of National Beef's plants, or the law of Missouri, the location of National Beef's offices, or the law of South Carolina, Cryovac's place of business, applies. However, the parties apparently agree (*see* D.I. 198 at 13-14; D.I. 250 at 9-10) that the law of tortious interference with contract and tortious interference with

prospective contractual relations is essentially the same in all four states. *See Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 872 P.2d 252, 257 (Kan.1994) (stating elements of tortious interference with contract claim); *Turner v. Halliburton Co.,* 240 Kan. 1, 722 P.2d 1106, 1115 (Kan.1986) (stating elements of tortious interference with prospective contractual relations claim); *Tri-Continental Leasing Co. v. Neldhardt,* 540 S.W.2d 210, 212 (Mo.Ct.App.1976) (stating elements of toritous interference with contract claim); *Carter v. St. John's Regional Medical Center,* 88 S.W.3d 1, 13 (Mo.Ct.App.2002) (stating elements of tortious interference with prospective contractual relations claim); *DeBerry v. McCain,* 275 S.C. 569, 274 S.E.2d 293, 296 (S.C.1981) (stating elements of tortious interference with contract claim); *Crandall Corp. v. Navistar Int'l Transp. Corp.,* 302 S.C. 265, 395 S.E.2d 179, 180 (S.C.1990) (stating elements of tortious interference with prospective contractual relations claim). Therefore, the resolution of Pechiney's Motion for Partial Summary Judgment on the tortious interference claims does not depend on a choice of law determination, and, for convenience, I cite to precedent based on Delaware law.

FN12. Hunter-Douglas was later overruled on a point not pertinent here. *See Midwest Industries, Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1358-59 (Fed.Cir.1999) (holding that Federal Circuit would henceforth apply its own law rather than regional circuit law to "questions involving the relationship between patent law and other federal and state law rights.").

FN13. Thomas Grabowski is an employee of Pechiney who participated in negotiations with National Beef. (D.I. 251, Ex. CC at B189-93.)

FN14. The opinion in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir.1978) sets forth a widely accepted test, although not an exclusive test, for lost profits. The court there stated that, to get lost profits, "a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Id.*

FN15. This Opinion is filed under seal because much of the parties' briefing was filed under seal. The parties are in the best position to suggest, in the first instance, what redactions, if any, should be made in this opinion to preserve confidential information. The parties should confer and agree upon redactions, and submit them within two weeks of the date of this Opinion.

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 3666863 (Trial Pleading) Answer to Second Amended Complaint (Oct. 24, 2005)

• 2005 WL 3666861 (Trial Motion, Memorandum and Affidavit) Pechiney's Motion for Summary Judgment on Patent Issues (Oct. 19, 2005)

• 2005 WL 3666862 (Trial Motion, Memorandum and Affidavit) Pechiney's Motion for Partial Summary Judgment on Tortious Interfrence Claims (Oct. 19, 2005)

• 2005 WL 3666860 (Trial Pleading) Second Amended Complaint for Patent Infringement (Oct. 12, 2005)

• 1:04cv01278 (Docket) (Sep. 20, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 2**

Westlaw.

--- F.3d ----
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)
(Cite as: --- F.3d ----)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States Court of Appeals,Federal Circuit.
FALKO-GUNTER FALKNER, Georg Holzer, and
Friedrich Dorner, Appellants,
v.
Stephen C. INGLIS, Michael E.G. Boursnell, and
Anthony C. Minson, Appellees.
No. 05-1324.

May 26, 2006.

**Background:** In interference proceeding, Board of
Patent Appeals and Interferences awarded applicant
priority over patent holder on certain claims on novel
type of vaccine that was comprised of "vector virus"
in poxvirus family. Patent holder appealed.

**Holdings:** The Court of Appeals, Gajarsa, Circuit
Judge, held that:

2(1) disclosure satisfied enablement requirement;

14(2) absence of examples involving poxviruses in
patent applications did not render written description
inadequate; and

17(3) satisfaction of written description requirement
did not require either recitation or incorporation by
reference of genes and their nucleotide sequences.

Affirmed.

**[1] Patents 291 ☞106(1)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k106 Interferences
         291k106(1) k. In General. Most Cited Cases
Priority in interference proceeding properly could be
decided under old rules, given parties' reliance on
them in filing all motions, oppositions, and replies in
case, which were completed before new rules took
effect.

**[2] Patents 291 ☞99**

291 Patents
   291IV Applications and Proceedings Thereon
      291k99 k. Description of Invention in
Specification. Most Cited Cases
Patent application on novel type of vaccine that was
comprised of "vector virus" in poxvirus family,
which provided detailed example of embodiment that
comprised herpesvirus, rather than poxvirus,
including identity of deleted essential sequences
therein, was adequately enabled, where high level of
skill existed in the art, differences between
herpesviruses and poxviruses were well known,
which would have aided person of ordinary skill in
art in application of lessons of herpesvirus example
in construction of poxvirus vaccines, and publications
in professional journals had disclosed DNA sequence
of poxvirus genome along with locations of "essential
regions."

**[3] Patents 291 ☞99**

291 Patents
   291IV Applications and Proceedings Thereon
      291k99 k. Description of Invention in
Specification. Most Cited Cases

**Patents 291 ☞314(5)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing
            291k314(5) k. Questions of Law or Fact.
Most Cited Cases
Under patent law, written description is a question of
fact, judged from the perspective of one of ordinary
skill in the art as of the relevant filing date.

**[4] Patents 291 ☞314(5)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing
            291k314(5) k. Questions of Law or Fact.
Most Cited Cases
Under patent law, enablement is a question of law
involving underlying factual inquiries.

**[5] Patents 291 ☞113(6)**

--- F.3d ----
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)
(Cite as: --- F.3d ----)

291 Patents
    291IV Applications and Proceedings Thereon
        291k113 Appeals from Decisions of Commissioner of Patents
            291k113(6) k. Review on Appeal in General. Most Cited Cases
Court of Appeals applies the standards of the Administrative Procedure Act (APA) when reviewing decisions of the Board of Patent Appeals and Interferences. 5 U.S.C.A. § 706.

[6] **Administrative Law and Procedure 15A** 786

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak786 k. Conflicting Evidence. Most Cited Cases

**Administrative Law and Procedure 15A** 791

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak791 k. Substantial Evidence. Most Cited Cases
For the purpose of conducting a review of an agency decision under the Administrative Procedure Act (APA), substantial evidence is defined as that which a reasonable person might accept as adequate to support a conclusion; it requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion. 5 U.S.C.A. § 706.

[7] **Administrative Law and Procedure 15A** 791

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak791 k. Substantial Evidence. Most Cited Cases
For the purpose of conducting a review under the Administrative Procedure Act (APA), an agency decision can be supported by substantial evidence, even where the record will support several reasonable

but contradictory conclusions. 5 U.S.C.A. § 706.

[8] **Patents 291** 99

291 Patents
    291IV Applications and Proceedings Thereon
        291k99 k. Description of Invention in Specification. Most Cited Cases
A patent need not teach, and preferably omits, what is well known in the art.

[9] **Patents 291** 99

291 Patents
    291IV Applications and Proceedings Thereon
        291k99 k. Description of Invention in Specification. Most Cited Cases
A patent applicant must convey to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention.

[10] **Patents 291** 99

291 Patents
    291IV Applications and Proceedings Thereon
        291k99 k. Description of Invention in Specification. Most Cited Cases
No length requirement exists under patent law for a disclosure to adequately describe an invention.

[11] **Patents 291** 99

291 Patents
    291IV Applications and Proceedings Thereon
        291k99 k. Description of Invention in Specification. Most Cited Cases
Examples are not necessary under patent law to support the adequacy of a written description.

[12] **Patents 291** 99

291 Patents
    291IV Applications and Proceedings Thereon
        291k99 k. Description of Invention in Specification. Most Cited Cases
Under patent law, the written description standard may be met even where actual reduction to practice of an invention is absent.

[13] **Patents 291** 99

291 Patents
    291IV Applications and Proceedings Thereon
        291k99 k. Description of Invention in

--- F.3d ----
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)
**(Cite as: --- F.3d ----)**

Page 3

Specification. Most Cited Cases
There is no per se rule under patent law that an
adequate written description of an invention that
involves a biological macromolecule must contain a
recitation of known structure.

**[14] Patents 291 ☞99**

291 Patents
    291IV Applications and Proceedings Thereon
       291k99 k. Description of Invention in
Specification. Most Cited Cases
Absence of examples involving poxviruses in patent
applications on novel type of vaccine that was
comprised of "vector virus" in poxvirus family did
not render written description inadequate.

**[15] Patents 291 ☞99**

291 Patents
    291IV Applications and Proceedings Thereon
       291k99 k. Description of Invention in
Specification. Most Cited Cases
Under patent law, actual reduction to practice is not
required for written description.

**[16] Patents 291 ☞99**

291 Patents
    291IV Applications and Proceedings Thereon
       291k99 k. Description of Invention in
Specification. Most Cited Cases
To the extent that written description requires a
showing of possession of the invention, an invention
can be "complete" under patent law even where an
actual reduction to practice is absent.

**[17] Patents 291 ☞99**

291 Patents
    291IV Applications and Proceedings Thereon
       291k99 k. Description of Invention in
Specification. Most Cited Cases
Where accessible literature sources clearly provided,
as of the relevant date, genes and their nucleotide
sequences, satisfaction of the written description
requirement does not require either the recitation or
incorporation by reference of such genes and
sequences.

**Patents 291 ☞328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction,
and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited
Cases

**Patents 291 ☞328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction,
and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited
Cases
5,766,882. Cited as Prior Art.

5,770,212. Cited.

John P. Isacson, Heller Ehrman LLP, of Washington,
DC, argued for appellants. With him on the brief was
Paul M. Booth.
Robert G. McMorrow, Jr., Connolly Bove Lodge &
Hutz LLP, of Wilmington, Delaware, argued for
appellee.

Before GAJARSA, Circuit Judge, ARCHER, Senior
Circuit Judge and DYK, Circuit Judge.
GAJARSA, Circuit Judge.
**\*1** This is an appeal from a decision of the Board of
Patent Appeals and Interferences ("Board") in
Interference No. 105,187, declared on December 24,
2003, between Falkner *et al.,* U.S. Patent No.
5,770,212 ("the Falkner '212 patent") and Inglis *et
al.,* U.S. Application Serial No. 08/459,040 ("the
Inglis '040 application"). The Administrative Patent
Judge (APJ) designated Inglis as the senior party. On
December 29, 2004, the Board issued a final
decision, holding that Falkner could not antedate
Inglis' September 25, 1990 priority date, and entered
judgment against Falkner on the sole count of the
interference. It ordered that Falkner was not entitled
to claims 1-19 of the Falkner '212 patent. It further
ordered that Inglis was entitled to claims 9, 10, 29
and 30 of the '040 application. Falkner filed a timely
notice of appeal. This Court has jurisdiction pursuant
to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141
and 142. For the reasons discussed below, we affirm
the judgment of the Board.

## I. BACKGROUND

### A. The Invention

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 4
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)
(Cite as: --- F.3d ----)

Some vaccines against a virus (the "target virus") incorporate harmless fragments of the target virus's genetic material into a second virus, called a "viral vector." When a person is vaccinated, the viral vector produces harmless fragments of the target virus, ultimately conferring immunity against it. To prevent the viral vector from itself causing a harmful infection in the inoculee, it must be attenuated. Attenuation is achieved by deleting or inactivating one or more genes responsible for the vector's growth and infectiousness. However, because the vaccine is produced by essentially "growing" the vector virus (accompanied by its inserted target virus gene), attenuation makes it difficult to manufacture the vaccine. The traditional solution to this problem has been to inactivate genes known as "inessential" genes. With inessential genes inactivated, the viral vector is substantially less pathogenic. At the same time, because the vector virus can still fully reproduce itself, albeit more slowly, the vaccine can be produced in commercial quantities. However, the traditional approach carried a disadvantage, namely the risk that the vector virus, though attenuated, could still cause a harmful infection in the inoculee.

The inventors discovered a way of making vaccines safer by deleting or inactivating an *essential,* rather than an inessential, gene from the viral vector's genome, while at the same time solving the production problem by growing the vaccines in cells that were complementarily modified to produce the absent essential viral gene product "on behalf of" the vector virus. Thus, the modified vector virus could be readily grown in these complementarily-modified cells, but not in other cells, such as those of an inoculee.

This approach is applicable to many different kinds of vector viruses, e.g., adenoviruses, herpesviruses, poxviruses and retroviruses. The subject matter of this interference, however, is directed specifically to vaccines in which the vector virus is a *poxvirus.* For many vector viruses, there is a risk that vectors that have been attenuated in essential genes can "swap" genes with the host cell genome, thereby reacquiring their deleted genes and reverting to wild-type virus. This risk can be minimized through the use of viruses that are "cytoplasmic", meaning that they are unlikely to enter the cell nucleus. Because a cell's genes are located in the nucleus, cytoplasmic viruses such as poxvirus cannot swap genes with the cell genome and possibly revert to a virulent wild-type virus.

B. Defining the Count and Assigning Priority

**\*2** The sole count of the interference was either "[a] vaccine according to Claim 1 of Falkner's 5,770,212 patent or a vaccine according to Claim 29 of Inglis' 08/459,040 application." Claim 29 of the Inglis '040 application reads:
A vaccine comprising a pharmaceutically acceptable excipient and an effective immunizing amount of a mutant virus, wherein said mutant virus is a mutant *poxvirus* and has a genome which has an inactivating mutation in a viral gene, said viral gene being essential for the production of infectious new virus particles, wherein said mutant virus is able to cause production of infectious new virus particles in a complementing host cell gene expressing a gene which complements said essential viral gene, but is unable to cause production of infectious new virus particles when said mutant virus infects a host cell other than a complementing host cell; for prophylactic or therapeutic use in generating an immune response in a subject.

(emphasis added)

Claim 1 of the Falkner '212 patent reads:
A vaccine comprising (a) a defective poxvirus that lacks a function imparted by an essential region of its parental poxvirus, wherein (i) said defective poxvirus comprises a DNA polynucleotide encoding an antigen and said DNA polynucleotide is under transcriptional control of a promoter, and (ii) the function can be complemented by a complementing source; and (b) a pharmaceutically acceptable carrier.

[1] The Administrative Patent Judge (APJ) designated claims 1-19 of the Falkner '212 patent and claims 9, 10, 29, and 30 of the Inglis '040 application as corresponding to the interference count.[FN1] Both parties sought the benefit of earlier-filed applications to establish dates of constructive reduction to practice.[FN2] The ALJ accorded the Inglis '040 application (filed June 2, 1995) the benefit of several earlier-filed applications, dating back to September 25, 1990.[FN3] Likewise, the APJ accorded the Falkner '212 patent (issued June 23, 1998 from an application filed February 21, 1997) the benefit of earlier-filed applications, but these dated back only to April 29, 1994.[FN4] Consequently, the APJ designated Inglis as the senior party.

C. Board Decision

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The specifications of all of Inglis' earlier applications were similar. Although they focused on herpesvirus vectors, they contained several passages related to poxvirus-based vaccines. Because Falkner believed that these passages did not adequately describe and enable the poxvirus invention, he challenged both Inglis' entitlement to priority as to the count and the patentability of Inglis' corresponding claims. Falkner brought these challenges in three closely-related preliminary motions before the Board. In each, as the moving party, Falkner carried the burden of proof by a preponderance of the evidence. *See* 37 C.F.R. § 1.637(a); *see also Kubota v. Shibuya*, 999 F.2d 517, 520 n. 2 (Fed.Cir.1993) (explaining that "[t]he term 'burden of proof' ... means the burden to establish the proposition at issue by a preponderance of the evidence").

**\*3** Falkner brought his first preliminary motion pursuant to 37 C.F.R. § 1.633(a),[FN5] arguing that the claims in Inglis's involved ('040) application that corresponded to the count were unpatentable because they failed to meet the written description requirement of 35 U.S.C. § 112. In support of his argument, he stated, *inter alia*, that (1) the specification of Inglis's '040 application did not identify any essential genes in poxvirus or describe the inactivation of such genes, (2) vaccines based on vaccinia (a type of poxvirus) had not yet been produced, and (3) the bulk of the Inglis specification was directed not to poxviruses but to herpesviruses. The Board denied Falkner's motion, based in part on his failure to address the perceived shortcomings of the '040 claims in light of the specification.

Second, Falkner moved pursuant to 37 C.F.R. §§ 1.633(g) & 1.637(g) to deny Inglis the priority benefit of his earlier applications, arguing that they did not sufficiently describe and enable the claims in question.[FN6] Falkner argued that without the benefit of these applications Inglis would be unable to establish constructive reduction to practice earlier than Falkner. Falkner would win priority as to the count, and Inglis' corresponding claims would be unpatentable. In support of his motion, Falkner alleged deficiencies in Inglis' benefit specifications similar to those raised in his first motion. The Board carefully articulated the legal standard, correctly explaining that "benefit with respect to priority in an interference is granted with respect to *counts* not *claims* " and that "[a]ll that is necessary for a party to be entitled to benefit of an earlier filed application for priority purposes is compliance with 35 U.S.C. § 112 with respect to at least one embodiment within the scope of the count." *Board Op.* at 7 (citing *Hunt v.*

*Treppschuh*, 523 F.2d 1386, 1389 (CCPA 1975) (holding that where a "parent application is relied upon as a prior constructive reduction to practice[,] .... the § 112, first paragraph requirements need only be met for an embodiment within the count")). After careful review of the record, the Board held that Falkner had failed to meet his burden of proof.

Third, Falkner moved for judgment pursuant to 37 C.F.R. § 1.633(a) that the claims in Inglis' involved ('040) application that corresponded to the count were anticipated and therefore unpatentable. He argued that because Inglis' earlier applications had failed to adequately describe and enable the full scope of his current claims, the current claims could not be accorded the benefit of 35 U.S.C. § 120 for the purpose of antedating patent-defeating prior art.[FN7] The Board explained that 35 U.S.C. §§ 119 & 120 require benefit applications to comply with § 112, first paragraph, with respect to the *full scope* of what a party now claims, rather than with respect to merely one embodiment within the scope of the interference count. After carefully considering the written description and enablement issues, the Board denied the motion. As a result of the denial of Falkner's several motions, Inglis remained the senior party, and the Board ordered judgment as to the subject matter of the count in favor of Inglis.

### D. Issue and Standard of Review

**\*4** **[2]** On appeal, Falkner essentially reiterates the arguments that he made before the Board. While we recognize that each of these three arguments is distinct, they are nonetheless all related, and under the facts of this particular case, we need only to resolve the following common issue: whether the Inglis benefit applications adequately describe and enable a poxvirus-based vaccine. Falkner also argues that the Board committed other errors, such as initially designating Inglis as the senior party and failing to afford Falkner an opportunity for briefing prior to making this designation. These arguments lack merit, and we shall not further discuss them. We turn, therefore, to the central issues in this case: written description and enablement.

**[3][4]** Written description is a question of fact, judged from the perspective of one of ordinary skill in the art as of the relevant filing date. *See Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed.Cir.1991). Enablement is a question of law involving underlying factual inquiries. *See Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)
**(Cite as: --- F.3d ----)**

Page 6

1365 (Fed.Cir.1997); *see also In re Wands,* 858 F.2d 731, 737 (Fed.Cir.1988) (holding that whether undue experimentation is required is a "conclusion reached by weighing many factual considerations.... includ[ing] (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.").

[5] This court applies the standards of the Administrative Procedure Act ("APA") in reviewing decisions of the Board. *See Dickinson v. Zurko,* 527 U.S. 150, 152, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (holding that 5 U.S.C. § 706 governs our review of PTO appeals). Accordingly, we will set aside actions of the Board if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and we set aside factual findings that are unsupported by substantial evidence. *See In re McDaniel,* 293 F.3d 1379, 1382 (Fed.Cir.2002) (citing 5 U.S.C. § 706); *see also In re Sullivan,* 362 F.3d 1324, 1326 (Fed.Cir.2004) (substantial evidence review of factual findings). We review questions of law *de novo. See Rapoport v. Dement,* 254 F.3d 1053, 1058 (Fed.Cir.2001).

[6][7] Substantial evidence is defined as that which a reasonable person might accept as adequate to support a conclusion. *See In re Zurko,* 258 F.3d 1379, 1384 (Fed.Cir.2001). It requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion. *See In re Gartside,* 203 F.3d 1305, 1312 (Fed.Cir.2000). An agency decision can be supported by substantial evidence, even where the record will support several reasonable but contradictory conclusions. *See id.; see also In re Jolley,* 308 F.3d 1317, 1320 (Fed.Cir.2002).

## II. DISCUSSION

### A. Contents of the Inglis Priority Applications

**\*5** The claims that correspond to the count of the interference are directed to a novel type of vaccine that is comprised of a "vector virus" in the poxvirus family. Conceptually, poxviruses are a "subgenus" of viruses that includes the "species" vaccinia. All of the prior Falkner applications described poxvirus vaccine vectors in detail, and to the exclusion of other types

of vaccine vectors (e.g., herpesvirus vaccine vectors). These applications provided five detailed working examples regarding the preparation and use of vaccines from defective poxviruses. They also described the use of a particular species of poxvirus vaccine vector, namely vaccinia virus.

In contrast, the Inglis applications described vaccine vectors in general, and then focused on the subgenus of herpesviruses, for which they provided a detailed example. Nevertheless, at least three passages discussed the poxvirus invention and specifically mentioned "vaccinia virus." [FN8] For example, after introducing the concept of vaccine vectors, the specification states that "[t]ypically members of the pox virus family, e.g. vaccinia virus, are used as vaccine vectors." [FN9] The specification later discusses the deletion of essential genes from vaccine vector genomes, noting that the "invention can be applied to *any virus* where one or more essential gene(s) can be identified and deleted from or inactivated within the virus genome" (emphasis added). Moreover, it provides that "the virus may comprise an orthopox virus, for example, vaccinia virus, which may comprise a heterologous sequence encoding an immunogen derived from a pathogen." Finally, it reads:

For example vaccinia virus, a poxvirus, can carry and express genes from various pathogens, and it has been demonstrated that these form effective vaccines when used in animal experimental systems. The potential for use in humans is vast, but because of the known side effects associated with the widespread use of vaccinia as a vaccine against smallpox, there is reluctance to use an unmodified vaccine in humans. There have been attempts to attenuate vaccinia virus by deleting non-essential genes such as the vaccinia growth factor gene... However, such attenuated viruses can still replicate in vivo, albeit at a reduced level. No vaccinia virus with a deletion in an essential gene has yet been produced, but such a virus, deleted in an essential gene as described above, with its complementing cell for growth, would provide a safer version of this vaccine.

The application provides a detailed example of an embodiment that comprised not a poxvirus, but a *herpesvirus,* including the identity of the deleted essential sequences therein. Nevertheless, for the reasons discussed below, we find no error in the Board's determinations on the adequacy of written description and enablement in the various Inglis disclosures.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)
(Cite as: --- F.3d ----)

## B. Enablement

Because the adequacy of the disclosure is judged from the perspective of one of ordinary skill in the art, we start our review of the Board's decision by noting that the parties stipulated to a high level of skill in the art. They defined the skilled artisan as having 5-10 years experience creating recombinant poxvirus, as being familiar with the poxvirus literature, the use of poxvirus as a vector for the expression of heterologous genes, and having the "needed technical skill to practice the experimentation described in the scientific literature relating to recombinant virus, including poxvirus." The Board agreed with the parties' stipulation as to level of skill.

*6 The Board did not err in finding Inglis' claims to be enabled as a matter of law, in light of its articulated underlying factual findings. In support of its conclusion, it noted that "there is extensive disclosure of the selection of an essential gene, its deletion or inactivation and the production of a mutated virus with said deleted or inactivated gene, albeit for herpesvirus." Moreover, because the differences between the herpesviruses and poxviruses were well known, this would have aided the person of ordinary skill in the art in her application of the lessons of the herpesvirus example in the construction of poxvirus vaccines. The Board observed that "the mere fact that the experimentation may have been difficult and time consuming does not mandate a conclusion that such experimentation would have been considered to be 'undue' in this art. Indeed, great expenditures of time and effort were ordinary in the field of vaccine preparation." Thus, the Board found the Inglis applications to be enabling.

[8] Reviewing the Board's legal conclusion of enablement, as based on its underlying findings of fact, we cannot say that the Board erred. With respect to a skilled artisan's ability to identify "essential" poxvirus genes, as discussed below we note that there was undisputed testimony that as of the time of filing of the earliest Inglis application publications in professional journals had disclosed the DNA sequence of the poxvirus genome along with the locations of the "essential regions." The person of ordinary skill in the art would clearly have possessed such knowledge, and given the ready accessibility of the journals, the absence of incorporation by reference is not problematic. Indeed, "[a] patent need not teach, and preferably omits, what is well known

in the art." *Spectra-Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524, 1534 (Fed.Cir.1987).

## C. Written Description

[9] On appeal to this court, Falkner essentially reargues the positions on written description that he took before the Board. Although the Board erred in its articulation of the written description standard, that error is harmless. The Board held that "an actual possession standard is *not* required." (emphasis added). But our precedent clearly establishes that "[t]he applicant must ... convey to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Vas-Cath, Inc. v. Mahurkar,* 935 F.2d 1555, 1563-64 (Fed.Cir.1991). Nonetheless, we conclude there is no need for remand because the undisputed testimony supports the Board's ultimate conclusion.

[10] As noted above, the Board found several passages in the Inglis '040 application (and in the benefit applications) that were directed to poxvirus. No length requirement exists for a disclosure to adequately describe an invention. *See In re Hayes Microcomputer Prods., Inc. Patent Litig.,* 982 F.2d 1527, 1534 (Fed.Cir.1992) ("[T]he adequacy of the description of an invention depends on its content in relation to the particular invention, not its length."). Furthermore, the testimony of Falkner's expert, Dr. Boursnell, established that the articles describing essential genes for poxvirus were well-known in the art. Dr. Boursnell testified that "the skilled person would have been readily able to choose an essential vaccinia gene" based on references that have been publicly available since 1990. The testimony of Inglis' expert, Dr. Carroll, did not refute this claim.

*7 [11][12][13] The parties also dispute several aspects of our law of written description, which we now address. We conclude that the Board applied correct law. Specifically, we hold, in accordance with our prior case law, that (1) examples are not necessary to support the adequacy of a written description (2) the written description standard may be met (as it is here) even where actual reduction to practice of an invention is absent; and (3) there is no *per se* rule that an adequate written description of an invention that involves a biological macromolecule must contain a recitation of known structure.

### 1. Examples Are Not Required

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[14] First, it is clear that the absence of examples involving poxviruses in the Inglis applications does not render the written description inadequate. As we explained in *LizardTech, Inc. v. Earth Resource Mapping, PTY, Inc.*:

A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language. That is because the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before. Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue experimentation.

424 F.3d 1336, 1345 (Fed.Cir.2005) (citing *Union Oil Co. v. Atl. Richfield Co.*, 208 F.3d 989, 997 (Fed.Cir.2000); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed.Cir.1995)).

2. Actual Reduction to Practice Is Not Required

[15][16] As we explained in *Capon v. Eshhar*, "[t]he 'written description' requirement implements the principle that a patent must describe the technology that is sought to be patented; the requirement serves both to satisfy the inventor's obligation to disclose the technologic knowledge upon which the patent is based, and to demonstrate that the patentee was in possession of the invention that is claimed." 418 F.3d 1349, 1357 (Fed.Cir.2005). The Board was correct, however, not to view as dispositive that Inglis had not actually *produced* a poxvirus vaccine,[FN10] because an actual reduction to practice is not required for written description.[FN11] *See Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 926 (Fed.Cir.2004) ("We of course do not mean to suggest that the written description requirement can be satisfied only by providing a description of an actual reduction to practice. Constructive reduction to practice is an established method of disclosure ...."). *Rochester*, moreover, is consistent with Supreme Court precedent. In the context of interpreting 35 U.S.C. § 102(b), the Court held that "[t]he word 'invention' must refer to a concept that is complete, rather than merely one that is 'substantially complete.'" *Pfaff v. Wells Elecs.*, 525 U.S. 55, 66, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). It then proceeded to make clear that although "reduction to practice ordinarily

provides the best evidence that an *invention* is complete.... it does not follow that proof of reduction to practice is necessary in every case." *Id.* (emphasis added).[FN12] Thus, to the extent that written description requires a showing of "possession of the *invention*," *Capon*, 418 F.3d at 1357 (emphasis added), *Pfaff* makes clear that an invention can be "complete" even where an *actual* reduction to practice is absent.[FN13] The logical predicate of "possession" is, of course, "completeness."

3. Recitation of Known Structure Is Not Required

*8 [17] Falkner argues, *inter alia,* that the Inglis specifications do not adequately describe the poxvirus invention, in light of *Eli Lilly*, because they do not describe the "essential regions" of any poxvirus. 119 F.3d 1559. We note, in addition, that Inglis did not attempt to incorporate by reference any literature that described the DNA sequence of the poxvirus genome and the locations of the "essential regions." However, it is the binding precedent of this court that *Eli Lilly* does *not* set forth a *per se* rule that whenever a claim limitation is directed to a macromolecular sequence, the specification must always recite the gene or sequence, regardless of whether it is known in the prior art. *See Capon*, 418 F.3d at 1357 ("None of the cases to which the Board attributes the requirement of total DNA re-analysis, i.e., *Regents v. Lilly*, *Fiers v. Revel*, *Amgen*, or *Enzo Biochem*, require a re-description of what was already known."). Thus, "[w]hen the prior art includes the nucleotide information, precedent does not set a *per se* rule that the information must be determined afresh." *Id.* at 1358. Rather, we explained that:

The descriptive text needed to meet these requirements varies with the nature and scope of the invention at issue, and with the scientific and technologic knowledge already in existence. The law must be applied to each invention that enters the patent process, for each patented advance is novel in relation to the state of the science. Since the law is applied to each invention in view of the state of relevant knowledge, its application will vary with differences in the state of knowledge in the field and differences in the predictability of the science.

*Id.* at 1357.

Indeed, a requirement that patentees recite known DNA structures, if one existed, would serve no goal of the written description requirement. It would neither enforce the quid pro quo between the patentee

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)
**(Cite as: --- F.3d ----)**

Page 9

and the public by forcing the disclosure of new information, nor would it be necessary to demonstrate to a person of ordinary skill in the art that the patentee was in possession of the claimed invention. As we stated in _Capon,_ "[t]he 'written description' requirement states that the patentee must describe the invention; it does not state that every invention must be described in the same way. As each field evolves, the balance also evolves between what is known and what is added by each inventive contribution." _Id._ at 1358. Indeed, the forced recitation of known sequences in patent disclosures would only add unnecessary bulk to the specification. Accordingly we hold that where, as in this case, accessible literature sources clearly provided, as of the relevant date, genes and their nucleotide sequences (here "essential genes"), satisfaction of the written description requirement does not require either the recitation or incorporation by reference [FN14] (where permitted) of such genes and sequences.

*9 In conclusion, having reviewed the decision of the Board, we can discern no error in its conclusion that the disclosures relied upon by Inglis for priority purposes adequately described and enabled the invention directed to poxvirus, there being substantial evidence to support these findings. Consequently, we hold that the Board's award of priority to Inglis was proper.

_AFFIRMED_

No costs.

FN1. Inglis's claim 29 is his broadest claim, directed to poxvirus; and claim 30, which depends on claim 29, is a poxvirus vaccine for mammalian subjects. Claim 9 is directed to poxvirus but contains some additional limitations unrelated to the type of virus used; claim 10 depends on claim 9 and is directed to a single species of poxvirus, namely vaccinia virus. Falkner's claims 2-10 depend on claim 1. Falkner claim 10 is directed to a method of producing the vaccine of claim 1, and the remaining method claims depend thereon.

FN2. Priority in an interference goes to the first to invent, but a rebuttable presumption exists that the inventors made their inventions in the chronological order of their effective filing dates, namely that the senior

party invented first, _see_ 37 C.F.R. § 1.657(a) (2004), and the junior party bears the burden of proving otherwise, _see_ § 1.657(b), such as by proving that she actually reduced the invention to practice before the constructive filing date (priority date) of the senior party, or that she was first to conceive and diligently reduced the invention to practice, starting from a date prior to reduction to practice by the senior party. _See_ 35 U.S.C. § 112(g) (2000). Falkner sought to rely, in part, on an alleged date of conception and beginning of reasonable diligence: April 27, 1994.
On September 13, 2004, the "600" rules expired in favor of new rules found at 37 C.F.R. § 41.100 et seq. However, the Board correctly chose to decide the matter under the old rules, given the parties' reliance on them in filing all motions, oppositions, and replies in the case, which were completed before the new rules took effect. _See Singh v. Brake,_ 222 F.3d 1362, 1371 (Fed.Cir.2000) (applying a new procedural rule if and only if it did not affect the parties' reliance interests).

FN3. The Inglis priority applications were U.S. Application Serial No. 08/384,963 ("the Inglis '963 application"), filed February 7, 1995; U.S. Application Serial No. 08/030,073 ("the Inglis '073 application"), filed May 20, 1993; WO/92/05263, PCT/GB91/01632 ("the Inglis PCT application"), filed September 23, 1991, published in English on April 2, 1992; GB 9104903.1 ("the Inglis 1991 British application"), filed March 8, 1991; and GB 9020799.4 ("the Inglis 1990 British application"), filed September 25, 1990. The Inglis '040 application is a continuation in part of the '963 application, which was in turn a continuation of the Inglis '073 application. The '073 application corresponded to the Inglis PCT application. The Inglis PCT application claimed priority to, and was essentially identical to, the Inglis 1990 and 1991 British applications.

FN4. The Falkner priority applications were U.S. Application Serial No. 08/616,313 ("the Falkner '313 application") filed March 14, 1996; and U.S. application Serial No. 08/235,392 ("the Faulkner '392 application"), filed April 29, 1994.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)
(Cite as: --- F.3d ----)

FN5. On September 13, 2004, the "600" rules expired in favor of new rules found at 37 C.F.R. § 41.100 et seq. However, the Board correctly decided the matter under the old rules, given the parties' reliance on them in filing all motions, oppositions, and replies in the case, which were completed before the new rules took effect. *See Singh v. Brake, 222 F.3d 1362, 1371 (Fed.Cir.2000)* (applying a new procedural rule if and only if it did not affect the parties' reliance interests); *see also Brown v. Barbacid, 436 F.3d 1376, 1379 n. 1 (Fed.Cir.2006)* (holding that the Board did not err in applying the old rules "under which this case was decided").

FN6. Falkner did not argue lack of enablement with respect to the Inglis '963 patent because he believed that the teachings of the Falkner '392 patent, filed in 1994, would have enabled the subsequent '963 patent.

FN7. Here, Falkner points to his own U.S. Pat. No. 5,766,882 ("the '882 patent' "), issued in March 1995, as the patent-defeating prior art.

FN8. We recognize that the Inglis applications do not describe any actual reduction to practice of a poxvirus vaccine. *See Carroll Declaration* (stating that the '040 application did not contain any discussion of the "actual creation of the recited 'mutant poxvirus' " and that the application in fact stated "that a vaccinia virus with a deletion in an essential gene had not been produced."). As we discuss below, however, an actual reduction to practice is unnecessary to satisfy the written description requirement.

FN9. Because of the substantial similarity in the specifications of all of the Inglis benefit applications, we shall refer in this opinion to representative passages from the earliest of the applications, the Inglis 1990 British application.

FN10. The Inglis specifications stated that "[n]o vaccinia virus with a deletion in an essential gene has yet been produced, but such a virus, deleted in an essential gene as described above, with its complementing cell for growth, would provide a safer version of this vaccine."

FN11. The Board believed that Falkner's expert, Dr. Carroll, had premised his opinions on the misunderstanding that actual reduction to practice was required to prove written description, and it discredited his expert opinion.

FN12. Similarly, this court has carefully explained the relationship between written description and possession, explaining that a showing of possession is not necessarily sufficient to demonstrate the adequacy of written description. *See, e.g., Enzo Biochem, Inc. v. Gen-Probe Inc.,* 296 F.3d 1316, 1330 (Fed.Cir.2002) ("[P]roof of a reduction to practice, absent an adequate description in the specification of what is reduced to practice, does not serve to describe or identify the invention for purposes of § 112, P 1. As with 'possession,' proof of a reduction to practice may show priority of invention or allow one to antedate a reference, but it does not by itself provide a written description in the patent specification.").

FN13. In contrast to reduction to practice, conception *is* a prerequisite to an adequate written description. *See Fiers v. Sugano,* 984 F.2d 1164, 1171 (Fed.Cir.1993) ("[O]ne cannot describe what one has not conceived.").

FN14. Here, the patentee did not attempt incorporation by reference. Where, of course, certain material that is not present in the specification is deemed nonessential to the satisfaction of the written description requirement, the issue of proper incorporation by reference *vel non* is irrelevant.

C.A.Fed.,2006.
Falko-Gunter Falkner v. Inglis
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2156939 (Appellate Brief) Reply Brief of Appellant Falkner (Aug. 1, 2005) Original Image of this Document (PDF)
• 2005 WL 1923487 (Appellate Brief) Brief of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 1453040 (C.A.Fed.)
**(Cite as: --- F.3d ----)**

Appellees (Jul. 15, 2005) Original Image of this
Document with Appendix (PDF)
• 2005 WL 1486728 (Appellate Brief) Brief of
Appellant Falkner (Jun. 2, 2005) Original Image of
this Document with Appendix (PDF)
• 05-1324 (Docket) (Feb. 23, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2006, I electronically filed the Compendium of Unreported Opinions Cited in Defendants' Answering Brief to Ampex Corporation's Motion for Summary Judgment that U.S. Patent No. 4,802,019 is Not Prior Art to U.S. Patent No. 4,821,121 with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

I hereby certify that on June 13, 2006, I have forwarded the above-noted document to the following as noted below:

### VIA E-MAIL

Jesse J. Jenner, Esquire
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020

### VIA E-MAIL & FEDERAL EXPRESS

Norman H. Beamer, Esquire
Ropes & Gray LLP
525 University Avenue
Palo Alto, CA 94301

### VIA E-MAIL & HAND DELIVERY

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

_/s/ Collins J. Seitz, Jr._
Collins J. Seitz, Jr. (Bar No. 2237)
Connolly Bove Lodge & Hutz LLP
P.O. Box 2207
1007 North Orange Street
Wilmington, DE 19899