IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMPEX CORPORATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1373-KAJ |
| | ) | |
| EASTMAN KODAK COMPANY, | ) | |
| ALTEK CORPORATION, and | ) | |
| CHINON INDUSTRIES, INC., | ) | |
| | ) | |
| *Defendants.* | ) | |

**AMPEX CORPORATION'S OPPOSITION TO MOTION TO EXCLUDE THE
TESTIMONY OF CAROL SCOTT UNDER RULE 702**

OF COUNSEL:

Jesse J. Jenner
Sasha G. Rao
Ropes & Gray LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Norman H. Beamer
Gabrielle E. Higgins
Ropes & Gray LLP
525 University Avenue
Palo Alto, California 94301
(650) 617-4000

James E. Hopenfeld
Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Washington, DC 20005
(202) 508-4600

June 13, 2006

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jheaney@mnat.com

*Attorneys for Plaintiff Ampex Corporation*

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS...............................................1

II.   SUMMARY OF ARGUMENT ....................................................................1

III.  STATEMENT OF FACTS.............................................................................2

    A.   The Invention And The Market For The Invention ...............................2

    B.   Prof. Scott's Relevance To Damages Issues.......................................4

    C.   Prof. Scott's Qualifications................................................................4

    D.   Prof. Scott's Analysis Of The Digital Camera Market.........................5

IV.  ARGUMENT .............................................................................................7

    A.   Prof. Scott's Opinions Are Relevant And Will Assist The Trier Of Fact. ....8

          (a)   Georgia-Pacific Factor No. 6................................................9

          (b)   Georgia-Pacific Factor No. 10..............................................9

        1.   Prof. Scott's expertise goes beyond "reading and regurgitation." .....10

    B.   Prof. Scott's Methodology And Conclusions Are Reliable........................10

        1.   Defendants do not dispute Prof. Scott's qualifications as a marketing expert.........................................................11

        2.   Prof. Scott did not need to conduct a consumer survey. ....................11

        3.   Defendants' complaints about the number of and types of sources Prof. Scott relied upon are without basis. ..........................13

        4.   Prof. Scott did not need to determine the precise number of sales that would have been lost or the "relative" importance of the '121 patent. .............................................................13

        5.   Prof. Scott's opinion is not based upon Ampex's licenses of the '121 patent.............................................................15

V.   CONCLUSION .........................................................................................16

# TABLE OF CITATIONS

Page

## CASES

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.,*
2005 WL. 4034698 (N.D. Ill.) ............................................................13

*Betterbox Communications Ltd. v. BB Technologies, Inc.,*
300 F.3d 325 (3d. Cir. 2002)................................................7, 8, 11

*Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.,*
2004 WL. 1534786 (D. Del.) ...........................................................10

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.,*
__ F. Supp. 2d __, 2006 WL. 1216220 (D.Del)..............................7, 10

*Eolas Tech, Inc. v. Microsoft Corp.,*
270 F. Supp. 2d 997 (N.D. Ill., 2003) ..............................................11

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
318 F. Supp. 1116 (S.D.N.Y.).....................................................1, 4, 15

*Izumi Products Co. v. Koninklijke Philips Electronics,*
315 F. Supp. 2d 589 (D. Del. 2004)..................................................11

*Lauria v. National Railroad Passenger Corp.,*
145 F.3d 593 (3d. Cir. 1998)...................................................7, 8, 11

*Maxwell v. J. Baker, Inc.,*
86 F.3d 1098 (Fed. Cir. 1996)..........................................................16

*Mobil Oil Corp. v. Amoco Chemicals Corp.,*
915 F. Supp. 1333 (D.Del. 1994)......................................................16

*Oxford Gene Tech., Ltd. v. Mergen, Ltd.,*
345 F. Supp. 2d 431 (D. Del. 2004), *citing* In re Paoli R.R. Yard PCB
Litig., 35 F.3d 717 (3d. Cir. 1994)..............................................8, 10

*Pell v. E.I. Dupont Nemours & Co., Inc.,*
231 F.R.D. 186 (D. Del. 2005), *citing* Heller v. Shaw Indus., Inc., 167
F.3d 146 (3d. Cir. 1999).........................................................7, 15

*In re TMI Litigation,*
193 F.3d 613 (3d. Cir. 1999)...........................................................13

**TABLE OF CITATIONS**
**(CONTINUED)**

**Page**

**FEDERAL STATUTES**

*Fed.R.Evid.* 702..........................................................................................................7

*Fed.R. Evid.* 703.........................................................................................................13

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Ampex commenced this action on October 20, 2004, alleging that Defendants'

digital cameras infringe U.S. Patent No. 4,821,121 ("the '121 patent"). Fact and expert

discovery for all issues (except willfulness and Defendants' advice of counsel defense)

was completed on February 28, 2006 and May 12, 2006, respectively. Trial is scheduled

to commence on December 4, 2006.

On March 24, 2006, Ampex submitted three expert reports on damages issues.

Richard Donaldson's report addresses the *Georgia-Pacific* factors and the appropriate

royalty rate for Defendants' infringement. Professor Carol Scott examines the importance

of the patented invention to the marketability of Kodak's digital still cameras. Brian

Dragun calculates damages (and prejudgment interest) by applying Mr. Donaldson's

royalty rate to the royalty base. All three of Ampex's witnesses have been deposed.

## II.    SUMMARY OF ARGUMENT

Defendants do not appear to dispute that the effect of the '121 patent invention on

the marketability of Kodak's digital still cameras is an important issue in this case. It is

particularly relevant, for example, in determining what a reasonable royalty should be for

Defendants' infringing use of the '121 patent. In seeking to exclude the testimony of

Ampex's expert Prof. Carol Scott, a Professor of Marketing, Defendants seek to exclude

testimony that would be especially helpful to the finder of fact in assessing damages.

Prof. Scott's testimony will help the finder of fact understand defendant Kodak's

business and marketing strategy, how the '121 patent invention fits with those strategies,

why the '121 invention was important to the marketability of Kodak's digital still

cameras, and why Kodak could not reasonably have accepted the business risk of not

including the patented invention in its digital still cameras. Ampex's licensing expert,

Mr. Richard Donaldson, relies on Prof. Scott's opinions in order to assess what a reasonable royalty should be for Defendants' infringing use of the '121 patent.

Lacking any basis to challenge the relevance of Prof. Scott's opinions, Defendants resort to scattershot attacks on the reliability of her conclusions. Defendants focus on all of the things that Prof. Scott did not do: she did not do a consumer survey; she did not assess the number of sales Kodak would have lost; she did not assess the "relative importance" of the '121 patent in Kodak's digital still cameras. But she did not need to do any of those things. As Prof. Scott testified, and as demonstrated below, none of these criticisms undermines either her conclusions or their helpfulness in resolving the issues in this case. At best, Defendants raise subjects that go to the weight of her opinions, and would be better addressed on cross-examination.

Defendants seek to exclude Prof. Scott's testimony not because it would not help the finder of fact, but rather because Defendants have no answer to it. Defendants could not find a marketing expert who would disagree with Prof. Scott's opinions. Defendants seek the freedom to put their own corporate witnesses on the stand and to characterize the marketing issues favorably to Defendants without allowing the finder of fact to hear from any objective source who might contradict them. Defendants' attempts to slant the playing field at trial in their favor should be rejected. Prof. Scott should be permitted to testify.

## III.     STATEMENT OF FACTS

### A.     The Invention And The Market For The Invention

The inventions of the '121 patent relate to devices known as "electronic still stores." An electronic still is a device that stores still images in electronic form. Since the 1970s, electronic still stores have been used in a wide variety of applications,

including broadcast television, medical imaging, document storage, and photography, including digital still cameras.

The technology of the '121 patent helps users to find and retrieve particular images in electronic still stores more quickly. This can be important when, for example, an electronic still store contains a large number of digital images. Before the '121 patent, state-of-the-art electronic still stores allowed users to review multiple images on browse screens, generated at the user's command. But generating the browse screens took a long time, because each "thumbnail" image on the browse screen had to be generated "on-the-fly" after the user commanded the still store to make a browse screen.

The '121 invention substantially reduced the time required to generate a browse screen. It allows faster review and access to stored images by automatically generating and storing a reduced size image ("thumbnail") along with each corresponding full size image when the full size image is first captured.

The '121 patent invention first achieved commercial success in electronic still stores used in the television broadcast industry. Ampex introduced the first electronic still store incorporating the patented invention in 1983, the ESS-3.

Like electronic still stores used in the television industry, most digital cameras, which are simply miniaturized still stores (see Declaration of George Ligler,[1] ¶ 10), have "browse" screens to help users quickly find their images. In defendant Kodak's digital cameras, the browse screens are accessed through the "multi up" review mode. Today, every camera sold by Kodak includes the "multi up" feature. All of those cameras use

---

[1] Ampex filed this declaration with its Opposition to Defendants' Motion for Summary Judgment of Noninfringement.

the patented invention, as do those of Kodak's largest competitors, such as Canon, Sony, Nikon, Olympus, Casio and Fuji, to name a few.  The technology of the '121 patent has become an industry standard.

### B.    Prof. Scott's Relevance To Damages Issues

The parties agree that damages in this case are to be measured by no less than a reasonable royalty, as determined by a hypothetical negotiation under the *Georgia-Pacific* factors.[2]  Notwithstanding Kodak's longstanding use of the patented technology and its broad acceptance in the marketplace, Defendants contended in discovery, and still contend, that the patented invention is not important to the marketability of digital cameras, and that damages should be lower as a result.

Ampex turned to Prof. Carol Scott, Professor of Marketing at the Anderson Graduate School of Management at UCLA, to examine the importance of the patented feature to Kodak's business and marketing strategy.  Ampex asked Prof. Scott to determine how the marketability of Kodak's digital cameras would have been affected, and what Kodak's business risks would have been, had Kodak been prevented from using the '121 patent invention in its digital cameras.

### C.    Prof. Scott's Qualifications

Prof. Scott holds a Ph.D. in Marketing and a Master of Science in Management from Northwestern University.  (See Prof. Scott's resume in Exhibit 1 to the Initial Disclosure of Expert Testimony of Carol Scott ("Scott Report"), attached as Exhibit 1 to the Declaration of David R. Brightman ("Brightman Decl.")).  Over the past thirty years, she has taught courses on Marketing Strategy and Management, Consumer Behavior,

---

[2] *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y), *modified and affirmed*, 446 F.2d 295 (2d. Cir. 1971).

Advertising, Distribution Strategy, and International Marketing to students in undergraduate and graduate education programs at UCLA, Harvard Business School, and Ohio State University. She has also published numerous journal articles, research reports, and book chapters on Consumer Behavior, Marketing Research, and other marketing topics. She has served as a consultant and testifying expert in 23 matters on a variety of marketing issues in a variety of industries. (See Exhibit 2 to the Scott Report). Further details of Prof. Scott's qualifications are set forth in her resume.

### D.     Prof. Scott's Analysis Of The Digital Camera Market

To assess the importance of the patented invention on the marketability of Kodak's digital still cameras, Prof. Scott reviewed Kodak's production of marketing documents, business strategy documents, advertisements, website materials, and witness testimony. She supervised and conducted independent research of marketing and advertising literature relating to digital cameras. She reviewed surveys and market research conducted both by Kodak itself and third parties. She also reviewed the deposition testimony of Kodak business and marketing personnel. (See Exhibit 3 to the Scott Report).

After reviewing all of those materials, Prof. Scott applied both her experience and a "standard framework" commonly used in marketing case studies to determine whether the '121 patent technology was important to Kodak's marketing strategy. (Brightman Decl., Exhibit 2, p. 179). Prof. Scott then wrote a report summarizing her analysis. (Brightman Decl., Exhibit 1).

Prof. Scott began by identifying Kodak's business strategies (see Scott Report, ¶ ¶ 18-23). Next, Prof. Scott identified Kodak's digital camera marketing strategy, and the key elements of that strategy (see Scott Report, ¶ ¶ 24-36). She classified the elements of

the marketing strategy, and then examined how not only the "multi-up" feature relates to Kodak's business and marketing strategy, but also how the speed at which the multi-up screens were generated would have affected those strategies (see Scott Report ¶ ¶, 37-48). Finally, Prof. Scott reconstructed the digital camera market from Kodak's perspective on the assumption Kodak had been forbidden from using the '121 patent (see Scott Report, ¶ ¶ 49-54). In reconstructing the market, she performed a competitive analysis, assessed the business and marketing risk to Kodak of not including the patented invention in Kodak's digital cameras, and finally articulated her opinions as they would have been reported to someone who would have negotiated a "hypothetical license" on Ampex's and Defendants' behalf.

At her deposition, Prof. Scott described in further detail the methodology that she used to answer the questions posed by Ampex. (see Brightman Decl., Exhibit 2, pp. 179-186).

Based upon her analysis, including the application of her marketing expertise, Prof. Scott concludes that: (1) it was (and is) important to Kodak that it make a successful transition from film to digital photography; (2) a strong position in digital still cameras was important to Kodak's digital strategy, which included maximizing Kodak's goodwill and sales of related products; (3) the multi-up mode as implemented with the '121 patent invention was (and is) important to Kodak in the sales of its cameras and other products; (4) in the hypothetical world where Kodak could not offer a fast multi-up mode on at least some of its cameras, its sales of digital cameras, including related products, would have been affected; and 5) the inability to offer a fast-multi-up mode using the '121 patent invention would have left Kodak with a hole in its digital camera product line, and would

6

have imposed substantial risks not only to Kodak's digital camera sales, but also to

Kodak's efforts to leverage the Kodak brand across the digital product spectrum. (Scott

Report, ¶ ¶ 5, 54).

## IV.   ARGUMENT

The Federal Rules of Evidence set forth the standard for admissibility of expert

testimony:

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise . . . .

Fed.R.Evid. 702.  This rule obligates judges to ensure that any scientific or technical

testimony admitted is relevant and reliable.  *Cryovac Inc. v. Pechiney Plastic Packaging,*

*Inc.*, __ F.Supp.2d __, 2006 WL 1216220, at *12 (D.Del).  As part of that inquiry, the

court "must examine the expert's conclusions in order to determine whether they could

reliably follow from the facts known to the expert and the methodology used."  *Pell v.*

*E.I. Dupont Nemours & Co., Inc.*, 231 F.R.D. 186, 192 (D. Del. 2005), *citing Heller v.*

*Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d. Cir. 1999).

When an expert reaches her conclusions based upon "specialized knowledge," as

opposed to a scientific method, a party need only prove that the proffered testimony is

"reliable or trustworthy in light of [the expert's] practical background and training."

*Lauria v. National Railroad Passenger Corp.*, 145 F.3d 593, 599 (3d. Cir. 1998) (holding

that reliability burden was clearly met given expert's twenty years of experience, the

nature of his opinion, and the liberal standard by which the court interprets reliability

under Rule 702); *see also Betterbox Communications Ltd. v. BB Technologies, Inc.*, 300

F.3d 325, 327 (3d. Cir. 2002) ("The basis of this specialized knowledge 'can be practical

experience as well as academic training and credentials' . . . [w]e have interpreted the specialized knowledge requirement liberally . . . in cases not involving scientific testimony, 'the relevant reliability concerns may focus upon personal knowledge or experience.'") (citations omitted).

Motions to exclude evidence are committed to the court's discretion. *Oxford Gene Tech., Ltd. v. Mergen, Ltd.*, 345 F.Supp.2d 431, 434 (D. Del. 2004), *citing In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d. Cir. 1994); *see also Betterbox*, at 329 (stating court has considerable discretion to determine criteria for judging reliability).

**A.    Prof. Scott's Opinions Are Relevant And Will Assist The Trier Of Fact.**

Rule 702's requirement that the expert testimony assist the trier of fact to understand the evidence or to determine a fact in issue is primarily a relevance inquiry. *Daubert*, 509 U.S. 579, 591; *Lauria v. Nat'l Railroad Passenger Corp.*, 145 F.3d 593, 599-600 (3d. Cir. 1998) ("the standard for this factor is 'not that high'"(citation omitted)).

Prof. Scott's testimony will help the jury to understand the marketing issues presented in this case. Just as technical experts "translate" technical documents to help the finder of fact to understand them, Prof. Scott will "translate" the marketing-related documents from an objective point of view so that they can be more easily understood. Prof. Scott also will assist the finder of fact in the application of the *Georgia-Pacific* factors, to the extent those factors implicate marketing issues. Ampex's expert on licensing and negotiation, Mr. Richard Donaldson, relies on Prof. Scott's marketing analysis in determining what a reasonable royalty should be for use of the '121 patent invention.

Below are two examples of how Prof. Scott's analysis relates to the application of

8

the *Georgia-Pacific* factors:

### (a)    *Georgia-Pacific Factor No. 6*

The sixth *Georgia-Pacific* factor is "the effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." Factor 6 turns on the theory that a willing licensee would be more willing to set a higher royalty rate during a hypothetical negotiation if it could expect to derive a collateral benefit from convoyed sales flowing to the infringer. Prof. Scott's testimony is relevant to this factor because she will testify, *inter alia*, that

> Cameras provide an important entry point for consumers in what Kodak has called its 'eco-system.' Much as film cameras stimulated the demand for consumable film in the past, so too are digital cameras expected to stimulate demand for Kodak printers, consumable paper, and ink (for printing pictures at home, at retail Picture Perfect kiosks, at retail photo labs, and/or through on-line printing services), and other accessories that often carry higher margins.

(Scott Report, ¶ 25). Mr. Donaldson concludes from her testimony, *inter alia*, that since sales of Kodak's digital cameras lead to demand for other Kodak products, this factor tends to increase the reasonably royalty.

### (b)    *Georgia-Pacific Factor No. 10*

The tenth *Georgia-Pacific* factor is "the nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." As described above, Prof. Scott will testify about the benefits of the patented invention to Kodak and to its consumers, and about the business and marketing risks Defendants would have borne had they been prevented from using the '121 patent invention in their digital still cameras. Mr. Donaldson concludes from her testimony that Defendants would have sought to avoid

9

those risks, and would have been willing to pay a higher royalty for use of the patented invention as a result.

### 1. Prof. Scott's expertise goes beyond "reading and regurgitation."

Defendants argue that Prof. Scott's testimony will not assist the trier of fact because she merely "regurgitates" Kodak's documents. Defendants do not address the relevance of Prof. Scott's testimony--a tacit concession--and ignore both Prof. Scott's analysis of the documents she does cite and the conclusions she draws from her analysis. Ampex agrees, however, that Prof. Scott does extensively cite and quote Kodak's documents. Defendants' argument proves only that Prof. Scott's conclusions are indeed supported by the record, and that the supporting evidence is extensive.

### B. Prof. Scott's Methodology And Conclusions Are Reliable.

Defendants next argue that Prof. Scott's methodology and conclusions are unreliable. To construct their argument, Defendants focus primarily on opinions Prof. Scott did not state, and on analyses she did not need to make in order to form her opinions. These arguments are really attacks on the weight of her opinions. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" for Kodak to attack Prof. Scott's opinions, not exclusion under *Daubert*. *Oxford Gene Technology Limited v. Mergen Ltd.*, 345 F.Supp.2d 431, 442 (D. Del. 2004), *citing Daubert*, 509 U.S. 579, 596; *see also Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 2006 WL 1216220, at *13-14 (D. Del.) (denying motion to exclude because plaintiff's claim that expert's opinion was not supported by the documents he relied upon "goes to the weight that should be given to his expert testimony, not its admissibility."); *Callaway Golf Co. v. Dunlop Slazenger*

*Group Americas, Inc.*, 2004 WL 1534786, at *3 (D. Del.) (denying motion to exclude where, *inter alia*, movant claimed expert erroneously assumed that defendant in trade secret action would have made no golf ball sales until 2007 without the trade secret); *Eolas Tech, Inc. v. Microsoft Corp.*, 270 F.Supp.2d 997, 1007-8 (N.D. Ill., 2003).

Moreover, because Prof. Scott testifies based on her specialized knowledge in the field of marketing, rather than by applying a scientific method, her vast experience alone renders her testimony reliable and trustworthy. *See Lauria, Betterbox, supra.*

### 1. Defendants do not dispute Prof. Scott's qualifications as a marketing expert.

Although Defendants do not dispute Prof. Scott's qualifications as a marketing expert, they argue her testimony must be excluded because she does not have any experience in the digital camera industry. (Defs.' Opening Brief, p. 8). Prof. Scott does not require specific experience in the digital camera industry to apply her marketing expertise to that industry. *See, e.g., Izumi Products Co. v. Koninklijke Philips Electronics*, 315 F.Supp. 2d 589, 602 (D. Del. 2004) (finding patentee's expert regarding infringement under the doctrine of equivalents qualified, stating "[t]he fact that Dr. Benedict has served as an expert witness in more than 200 cases, none of which involved patent litigation or razor technology, is of little consequence to his ability to qualify as an expert in the case at bar."). In any event, Prof. Scott has extensive experience analyzing the marketing of consumer electronics products, including digital still cameras. (Brightman Decl., Exhibit 2, pp. 63-65).

### 2. Prof. Scott did not need to conduct a consumer survey.

Defendants argue that Prof. Scott should have conducted a consumer survey. Ampex does agree that Prof. Scott did not conduct a consumer survey. But she did not

need to do so.

Defendants fail to identify any authority, either legal or factual, that a consumer or marketing survey is required for the type of analysis Prof. Scott conducted. As Prof. Scott testified at her deposition, a consumer survey is just one of a number of ways marketers can determine whether a given feature is important to consumers. (Brightman Decl., Exhibit 2, pp. 213-4). In this case, she "knew enough about how this industry operated and about . . . how [manufacturers] were marketing their products and how competition was evolving as well as enough about consumers to be able to come to a sufficient conclusion for this assignment." (Brightman Decl., Exhibit 2, p. 37).

Prof. Scott repeatedly testified at her deposition that conducting a survey to test the hypothetical situation where none of Kodak's cameras offered the multi-up mode was unnecessary. She also questioned its feasibility in this case:

> In theory you can do a survey for anything, in theory. I think this one has particular problems associated with it, again, because you have to try to re-create for the customer not the fact that they're going and just looking at individual models, you have to re-create a competitive situation for them. And I think it's – I think it's tricky . . for purposes of this particular case, to answer this particular question, the kind of expense and time and difficulty that it would take to do that just was not warranted. I had the information I needed. I didn't need to waste my client's money.

(Brightman Decl., Exhibit 2, pp. 287-8). Prof. Scott further testified:

> I don't think I need to do those surveys to tell me that there are going to be a segment of customers who are going to be unhappy or possibly not purchase these products or return them or be bad word-of-mouth carriers for Kodak if they have a slow multi-up.

(Brightman Decl., Exhibit 2, p. 287). Prof. Scott is confident that even if she had conducted a survey the conclusions in her report would be the same. (Brightman Decl., Exhibit 2, p. 14).

Whether a consumer survey should have been performed goes at most to the

weight of Prof. Scott's conclusions. Defendants would be free to raise the issue of the propriety and relevance of a consumer survey on cross-examination.

### 3.    Defendants' complaints about the number of and types of sources Prof. Scott relied upon are without basis.

Defendants next complain that Prof. Scott did not conduct "primary research" or independently check the accuracy of the marketing literature. Defendants fail to explain what "primary research" Prof. Scott should have conducted, much less how that would have affected her conclusions. In any event, "*Daubert* does not mandate that an expert engage in any specific amount of independent research." See *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 2005 WL 4034698, *5 (N.D. Ill.).

Prof. Scott had no obligation to independently check the accuracy of every fact in every article on which she relied. Indeed, Prof. Scott may rely on the articles, and the information within them, to the extent they are information of the type that experts in the field of marketing reasonably rely. Fed. R. Evid. 703; *see also In re TMI Litigation*, 193 F.3d 613, 697 (3d. Cir. 1999) (experts may rely on hearsay so long as it is of the kind normally employed by experts in the field).

### 4.    Prof. Scott did not need to determine the precise number of sales that would have been lost or the "relative" importance of the '121 patent.

Defendants argue that Prof. Scott did not know the exact number of sales Kodak would have lost had Kodak been forbidden to use the '121 patent architecture, and did not know the "relative importance" of the patented invention in comparison to other digital still camera features. (Defs.' Opening Brief, p. 9). Ampex agrees that Prof. Scott did not offer opinions on these issues. She had no need to do so.

The point of Prof. Scott's analysis was to determine **whether** Kodak's sales would have been substantially affected, and more particularly whether there was a real risk that they would have been substantially affected. This is information a hypothetical negotiator would find helpful in determining the amount of a reasonable royalty under the *Georgia-Pacific* factors. (See pages 28-29 of the Initial Disclosure of Expert Testimony of Richard L. Donaldson, attached as Exhibit 3 to the Brightman Decl.; Brightman Decl. Exhibit 4, pp. 92, 96-97). Determining the actual number of such potentially lost sales is not absolutely necessary to assess business risk. This is not a lost profits case, in which the actual amount of lost sales would have been at issue.

Prof. Scott accordingly testified that a quantitative assessment of the actual percentage of consumers who care about the speed of the multi-up mode would not change her conclusions, and that such information was not required for her analysis.[3] (Brightman Decl., Exhibit 2, pp. 252, 289).

Nor is the "relative importance" of the patented invention important to Prof. Scott's analysis. The pertinent issue is instead **whether** the invention is important to the marketability of Kodak's digital cameras. Ampex agrees, and Prof. Scott testified, that several features may be important to the marketability of digital cameras, and that the marketability effects of different features may differ. No matter what the "relative importance" of the '121 patent invention was, the fact remains that it was indeed

---

[3] In response to questioning from Defendants' counsel, Prof. Scott did testify at her deposition that if Kodak were forbidden from using the patented invention, a loss of 3-5% of its camera sales would be "highly likely . . . just based on what I know about how these markets work . . ." She also said that anything close to that range would hurt Kodak. (Brightman Decl., Exhibit 2, pp. 283-4). However, this 3-5% range does not form the basis of Prof. Scott's opinions, nor will she propose it in her direct testimony at trial.

important, and its absence in Kodak's digital still camera product line would have posed substantial business risks to Defendants. Prof. Scott testified, for example, that knowing whether speed of click-to-capture is more important to Kodak than the speed of multi-up would not affect any of her opinions in this case. (Brightman Decl., Exhibit 8, pp.149, 160).

Defendants rely on *Pell v. E.I. duPont*, 231 F.R.D. 186 (D. Del. 2005) to support their argument that Prof. Scott should have examined the "relative importance" of the '121 patent technology in Kodak's digital cameras. *Pell* does not even address that issue. It is distinguishable, moreover, because it involved expert testimony stating 6% and 8% wage growth rate figures would be appropriate without explaining the methodology used to arrive at those figures. *Pell*, at 194. As explained above, Prof. Scott explains her methodology and does not state specific percentages as part of her opinions.

### 5.    Prof. Scott's opinion is not based upon Ampex's licenses of the '121 patent.

Defendants misunderstand Prof. Scott's reference to Ampex's licenses under the '121 patent. Contrary to Defendants' allegation, Prof. Scott did not base her opinion of the importance of the multi-up mode on the fact that other digital camera manufacturers licensed the '121 patent. (See Defs.' Opening Brief, pp. 9-10).[4] An important step in Prof. Scott's methodology was to determine how common the patented feature was in the digital camera market. Ampex's licenses are objective evidence that most of Kodak's competitors, representing the vast majority of the digital camera market, had access to the patented technology. They also support the inference that Kodak's competitors were

_____

[4] In fact, Prof. Scott only refers to Ampex's licenses in part of one paragraph of her report. (See Scott Report, ¶ 47).

actually using the patented technology.[5]

## V.    CONCLUSION

For all of the foregoing reasons, Defendants' motion to exclude the testimony of

Professor Carol Scott should be denied.

June 13, 2006

_____ (#3778)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jheaney@mnat.com

*Attorneys for Plaintiff Ampex Corporation*

OF COUNSEL:

Jesse J. Jenner
Sasha G. Rao
Ropes & Gray LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Norman H. Beamer
Gabrielle E. Higgins
Ropes & Gray LLP
525 University Avenue
Palo Alto, California 94301
(650) 617-4000

James E. Hopenfeld
Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Washington, DC  20005
(202) 508-4600

---

[5] Defendants incorrectly imply that Prof. Scott's testimony is unreliable because these licenses were executed in 2004.  As Prof. Scott noted in her deposition, a licensee's use of a patent can significantly antedate execution of a license.  (Brightman Decl., Exhibit 2, pp.188-9).  Moreover, the trier of fact is permitted to consider events and facts that occurred after the infringement began.  *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1109 (Fed. Cir. 1996); *see also Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F.Supp. 1333, 1353 (D.Del. 1994).

## CERTIFICATE OF SERVICE

I, Rodger D. Smith, II, hereby certify that on June 13, 2006, I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Collins J. Seitz, Jr., Esquire
Jaclyn Mason, Esquire
Connolly, Bove, Lodge & Hutz LLP

and that I caused copies to be served upon the following in the manner indicated:

### BY E-MAIL and BY HAND

Collins J. Seitz, Jr., Esquire
Connolly, Bove, Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE  19899

### BY E-MAIL and BY FEDERAL EXPRESS

Michael J. Summersgill, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

*/s/  Rodger D. Smith, II (#3778)*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com