IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMPEX CORPORATION, | ) |
|       *Plaintiff,* | ) |
| v. | ) C.A. No. 04-1373-KAJ |
| EASTMAN KODAK COMPANY, ALTEK CORPORATION, and CHINON INDUSTRIES, INC., | ) **CONFIDENTIAL —** ) **FILED UNDER SEAL** |
|       *Defendants.* | ) |

**SUPPLEMENTAL DECLARATION OF NORMAN H. BEAMER SUBMITTING EVIDENCE RELEVANT TO CLAIM CONSTRUCTION**

I, Norman H. Beamer, declare as follows:

1. I am a member of the firm of Ropes & Gray LLP, 525 University Avenue, Palo Alto, California, counsel to Plaintiff Ampex Corporation ("Ampex") in this action. I make this supplemental declaration in support of Ampex Corporation's Responsive Claim Construction Brief. Unless otherwise stated, I make this declaration based on personal knowledge.

2. This declaration continues its exhibit numbering from the Declaration Of Norman H. Beamer Submitting Evidence Relevant To Claim Construction, filed May 23, 2006 (D.I. 307), which included Exhibits 1-36.

3. Attached as Exhibit 37 is a copy of a portion of a demonstration videotape produced by Ampex, entitled "ESS-3 Features, December, 1983" (AX300017). This videotape was used to market the ESS-3, which is the product that was introduced at the National Association of Broadcasters in April 1983, and which Ampex asserts embodied

1

the inventions of the '121 patent. Attached as Exhibit 38 is a copy of a transcript of the narration appearing on Exhibit 37.

4.   Attached as Exhibit 39 is a copy of a 1984 brochure entitled "ESS-3, The Versatile Production System" (AX018838-43).

5.   Attached as Exhibit 40 is a copy of selected pages of the May 10, 2005 Expert Report Of James Storer, filed in *In the matter of Certain Digital Image Storage And Retrieval Devices,* Investigation No. 337-TA-527 (United States International Trade Commission) ("the ITC Action").

6.   Attached as Exhibit 41 is a copy of a web page from the Kodak web site, www.kodak.com (AXD024610-12).

7.   Attached as Exhibit 42 is a copy of a May 11, 1992 License Agreement between Alfred B. Levine and Eastman Kodak Company (EKC005029111-120).

8.   Attached as Exhibit 43 is a copy of U.S. Patent No. 5,440,343 (AXD024517-32).

9.   Attached as Exhibit 44 is a copy of U.S. Patent No. 6,697,107 (AXD024533-43). The patent discusses digital still cameras and refers to the images therein as "still video images" (column 4, lines 5-13, 28-30).

10.   Attached as Exhibit 45 is a copy of U.S. Patent No. 4,714,963 (AXD024477-92). The patent discusses "still video camera[s]" that relate to the "field of still video imaging" (1:16-20). The "[still video] camera operates in two modes: a movie mode for producing a moving video image in the viewfinder and a still mode for producing and recording a still image" (1:28-31).

11.     Attached as Exhibit 46 is a copy of U.S. Patent No. 5,382,976 (AXD024509-516), which also describes "digital still camera[s]" in the field of "still video recording" that process "still video image[s]" (4:16-20, 4:41-42).

12.     Attached as Exhibit 47 is a copy of U.S. Patent No. 4,750,041 (AXD024493-508). The patent discusses a "still video camera" that relates to "still video imaging" and that can store "still video pictures" and record a "still video signal" (1:23-24, 29-30, 2:18, 9:65-66). The patent compares "video (movie)" operation with "still video" operation:

> "[In] a video (movie) operating method called 'frame integration', . . . photo-generated electrons in each photoelectric element are accumulated for one television frame time, i.e., 1/30 second in the NTSC system. In a still video camera, however, the photo-generated electrons in each photoelectric element are accumulated for a variable period dependent upon the required still exposure." (1:61-68).

13.     Attached as Exhibit 48 is a copy of U.S. Patent No. 5,016,107 (AX203262-273). The patent title refers to "Electronic Still Camera," the patent relates to "electronic still imaging," and is directed to the storage of "still video data" for "still video image[s]." (1:8; 6:3-4; 6:53). The patent states: "[I]t is well known and understood in the field of still video recording that a digital still camera should provide a continuous shooting capability for a successive sequence of images." (4:67-5:2). The patent also states: "The uncompressed still video data stored in the image buffer 18 is organized in the manner of a television picture, that is, in vertical columns and horizontal rows of video data bytes (representing the corresponding picture elements) . . . ." (6:52-56).

14.     Attached as Exhibit 49 is a copy of U.S. Patent No. 5,164,831 (AX203274-283). The patent title refers to "Electronic Still Camera," the patent relates

3

to "electronic still imaging," and refers to "image signals comprising a video frame," to "each still video image," and to "video data" (1:8; 4:22-23; 5:19-20; 5:60). Claim 7 of the patent recites:

> Electronic image processing apparatus employing digital processing of ***image signals corresponding to picture elements of a still image and storage of the processed image signals in a digital memory***, said image processing apparatus comprising:
>
> an image buffer for ***storing digital image signals corresponding to blocks of picture elements***;
>
> digital processing means for transforming blocks of stored digital image signals into corresponding sets of transform coefficient signals and for encoding the transform coefficient signals into a stream of compressed image signals, said digital processing means further ***generating reduced resolution image signals from said stored digital image signals***;
>
> means for generating a multi-format image file representative of plural resolutions of the still image, ***said image file including the reduced resolution image signals*** and the compressed image signals; and
>
> means responsive to said digital processing means for downloading the image file to said digital memory. (emphasis added)

15. Attached as Exhibit 50 is a copy of the Supplemental Response Of Eastman Kodak Company To Complainant Ampex Corporation's Interrogatory No. 47, filed on April 8, 2005 in the ITC Action. The aforementioned U.S. Patent Nos. 5,440,343; 6,697,107; 4,714,963; 5,382,976; 4,750,041; 5,016,107; and 5,164,831 are listed in Exhibit A to that response.

16. Attached as Exhibit 51 is a copy of U.S. Patent No. 4,779,142, naming as an inventor, William T. Freeman, one of Kodak's experts in this case.

17. Attached as Exhibit 52 is a copy of U.S. Patent No. 4,695,876 (AX019313-22), which is incorporated by reference in column 3, line 6 of the '121 patent. This patent elaborates on the input processing of the preferred embodiment of the

'121 patent, which removes all television broadcast attributes of the video input, and provides a digital image for storage in the '121 system.

18.    Attached as Exhibit 53 is a copy of selected pages from the April 24, 2006 Initial Expert Report Of James Storer.

19.    Attached as Exhibit 54 is a copy of selected pages from the Kodak DX7630 User's Guide (AX036432).

20.    Attached as Exhibit 55 is a copy of selected pages from the April 26, 2006 deposition transcript of Charles Boncelet.

21.    Attached as Exhibit 56 is a copy of Ligler Deposition Exhibit D-13, which is a definition of "video" from the 1977 IEEE dictionary.

22.    Attached as Exhibit 57 is a copy of selected pages from the March 22, 2005 deposition transcript of Daniel Beaulier.

23.    Attached as Exhibit 58 is a copy of selected pages from the May 18, 2005 deposition transcript of Donald Kleffman. Mr. Kleffman defines "video" as including a "still picture ... that has been developed electronically." (Tr. 23:6-10).

24.    Attached as Exhibit 59 is a copy of selected pages from the May 12, 2005 deposition transcript of John Wruble. Mr. Wruble defines "video signal" as "an electronic signal that represents video information, image information." (Tr. 44:17-22).

25.    Attached as Exhibit 60 is a copy of U.S. Patent No. 4,090,223 (AXD024549-61). The patent issued in 1978, and is entitled "Video System For Storing And Retrieving Documentary Information." It characterizes as a "video image" the electronic image generated by optically scanning a document just once, from top to bottom, at a resolution much higher than that of standard television. (1:17-19, 46-68).

5

26.  Attached as Exhibit 61 is a copy of the definition of "data" in the *Dictionary of Industrial Digital Computer Terminology* (1972) (EKC000156042, et seq., at 156047).

27.  Attached as Exhibit 62 is a copy of selected pages of the March 24, 2006 Initial Disclosure Of Expert Testimony Of Charles G. Boncelet, Jr. (D.I. 227).

28.  Attached as Exhibit 63 is a copy of selected pages from the June 8, 2005 [ITC] deposition transcript of Dr. James Storer.

29.  Attached as Exhibit 64 is a copy of selected pages from the June 13, 2005 [ITC] deposition transcript of Dr. Shoup, in which he testified (Tr. 95-96) that a transfer "from the disk itself to a random access buffer in the disk controller; from there to the random access main memory in the CPU; and under program control by the CPU, then to the interface, to the frame buffer, and thus into the memory elements of the frame buffer" was a direct transfer from a disk to a frame buffer.

30.  Attached as Exhibit 65 is a copy of selected pages from the June 14-15, 2005 [ITC] deposition transcripts of Mr. Herot, who testified (Tr. 246-250) that a transfer between a disk through random access memory of the PDP11/70 CPU of the Computer Corporation of America (CCA) Spatial Data Management System (SDMS) to a frame store for a Lexidata display generator was a direct transfer between the disk and the frame store.

31.  Attached as Exhibit 66 is a copy of selected pages from the June 6, 2005 [ITC] deposition transcript of Mr. Taylor, who testified (Tr. 136) that information for a full-sized picture that was transferred from a frame store to a disk via several intervening

elements including a bus, a disc data buffer, disc sequencer, and SMD interface "went directly from the area of RAM known as Frame Store 1 to the disc."

32. Attached as Exhibit 67 is a copy of selected pages from the May 3, 2006 deposition transcript of Dr. Brad Myers, a Kodak expert, who has offered an opinion of anticipation of the asserted claims in light of the Spatial Data Management System (SDMS), and who testified that the SDMS does not meet the "directly" limitations under Kodak's claim construction but would under Ampex's (Tr. 67:11-18).

33. Attached as Exhibit 68 is a copy of selected pages from Kodak's Second Supplemental Response to ITC Interrogatory No. 34.

34. Attached as Exhibit 69 is a copy of selected pages from the February 17, 2006 deposition transcript of Mr. Harada.

35. Kodak's expert, Dr. Brad Myers, has offered an opinion that the SDMS anticipates the asserted claims of the '121 patent. He testified that the random access memory associated with the PDP 11/70 minicomputer within the SDMS, which random access memory he maps as part of the random access memory of claims 8 and 14, was not dual-ported (Ex. 67, Tr. 67:19-22).

36. Attached as Exhibit 70 is a copy of selected pages from the May 5, 2006 deposition transcript of Kodak's expert, Dr. Dieter Preuss. Dr. Preuss has offered an opinion that the Hell Chromacom and Scitex Response 300 systems anticipate the asserted claims of the '121 patent (using Ampex's construction of the term "video"). Dr. Preuss testified that "the random access memory associated with the Combiskop mini-computer was normal computer RAM, or random access memory, which had one port used for input and output" (71:15-18). Dr. Preuss made similar statements about other

7

random access memories in both the Hell Chromacom and Scitex Response 300 systems (70-72, 144-46).

37.     One of Kodak's ITC experts, Mr. Christopher Herot, testified at page 64 of his deposition transcript (Ex. 65) that having physically separate pins for the input port and output port of the RAM (as would be the case for a dual-ported memory) was an "implementation decision" within the context of claim 8.

38.     As was the case for my May 23, 2006 Declaration, references to Papers form the Prosecution History of the '121 patent are references to the prosecution history papers submitted with the intrinsic evidence (Tab B), accompanying the Joint Claim Construction Chart. At page 4 of the January 4, 1988 Office Action (Paper 26) from the prosecution history of the '121 patent, the Examiner set forth a number of "indefiniteness" objections to application claim 18, which ultimately issued as claim 7. Subject to those objections, the claim was deemed allowable (p. 6). None of those indefiniteness objections were directed to the last element of the claim, which was subsequently amended to change the phrase "means for generating said corresponding reduced size image...." to "means for selectively generating one of said corresponding reduced size versions...." (April 29, 1988 Amendment (Paper 28), p. 7).

39.     In the last element of claim 13 of the issued '121 patent, at column 8, line 64, a comma appears between the word "images" and the word "simultaneously." This comma appears to be an error. Attached as Exhibit 71 is a copy of an Amendment mailed by Ampex on October 5, 1998, during the '121 prosecution, produced from Ampex's internal patent files (AX019350-62). At pages 4-5 of that Amendment, application claim 29, which ultimately issued as claim 13 of the '121 patent, is set forth in full. In the last

element, no comma appears between the word "images" and the word "simultaneously." The corresponding copy of that Amendment from the prosecution history is Paper 30. A handwritten comma, or mark that appears to be a comma, is written on page 5 between the word "images" and the word "simultaneously." However, no explanation exists in the file as to how that comma or mark came to be handwritten at that point in the claim. It was not added by any Examiner's Amendment. The November 7, 1988 Notice of Allowability and accompanying Examiner's amendments is at Paper 32 of the Prosecution History. None of those amendments added a comma between the word "images" and the word "simultaneously" in the last element of application claim 29.

40.     Attached as Exhibit 72 is a copy of selected pages from the April 4, 2006 deposition transcript of Daniel Beaulier.

41.     At page 4 of a May 25, 1986 Office Action in the '121 prosecution (Paper 14), in response to Ampex's January 30, 1986 Amendment (Paper 13) (the substance of which is discussed at paragraphs 57-58 of the May 22, 2006 Declaration of Alan Cavallerano, submitted with Ampex's Opening Claim Construction Brief, hereafter "Cavallerano Declaration"), the Examiner declared all pending claims *allowable*, but for indefiniteness objections unrelated to the "in response" language.

42.     In a February 24, 1987 Preliminary Amendment (Paper 25), Ampex cancelled claims 12 and 14, which were the subject of Ampex's arguments regarding automatic operation (p. 4). In that Preliminary Amendment, Ampex substituted a new set of claims 16-28 (pp. 5-12). All of the claims asserted in this action issued from those new claims.

43. Before those new claims were allowed, Ampex inserted "responsive to" language into the claims that issued as claims 7, 8, 12 and 14. This was done at page 8 of Paper 28 for application claim 19, which issued as claim 8; at pages 13-14 of Paper 28 for application claim 28, which issued as claim 12; at page 2 of Paper 30 for application claim 18, which issued as claim 7; and at page 5 of Paper 30 for application claim 30 (which replaced application claim 20), which issued as claim 14.

44. When first added to the prosecution in Paper 25, application claims 19, 20, and 28, that led to claims 8, 14 and 12, respectively, used the words "coupled to" instead of "responsive to." *See* Paper 28, page 7 (for application claim 19), page 10 (for application claim 20); and page 11 (for application claim 28). Note that the immediate predecessor of claim 14 was application claim 30, but that claim replaced application claim 20 (*see* page 5 of Paper 30).

45. As of the filing of Paper 25 in February 24, 1987, the "frame store means" of application claim 2, which issued as claim 1, was worded: "frame store means which is operable in a first mode for receiving and storing [an image]." At page 5 of a January 4, 1988 Office Action (Paper 26), the Examiner objected to the word "operable":

> Throughout the claims the use of the term "operable" is indefinite because it is not clear if the term is used to recite how the means actually operates or how the means is capable of operating. The examiner notes that any video processing circuit comprising a computer and sufficient memory is considered to be capable of the recited operation if appropriately programmed. Clarification is needed.

46. At page 2 of an April 29, 1988 Amendment, Ampex revised the above limitation of application claim 2 to read as it is worded in issued claim 1.

47. Paragraph 146 of Mr. Cavellerano's expert report is substantially the same as paragraph 76 of the Cavallerano Declaration.

48.     In a January 4, 1988 Office Action (Paper 26), application claim 18 was rejected on various indefiniteness grounds, none of which related to the "prior to" language then appearing in that claim (page 4, ¶¶ 23-30). In addition, the Examiner indicated that the claim was allowable once the indefiniteness objections were resolved (page 6, ¶ 6).

49.     In the April 29, 1988 Amendment (Paper 28) in response to the January 4, 1988 Office Action, Ampex addressed the indefiniteness objections, and in the course of doing so changed the language of the claim from "storing the video pixel data representing said reduced size image in said random access memory means prior to storage of the contents of said random memory means in said memory means" to "transferring the video pixel data representing said reduced image to the contents of said memory means via said random access memory means." (Page 7).

50.     As of the time of the February 24, 1987 Preliminary Amendment (Paper 25), application claim 20 claimed transfer of data "directly from said size reducing means into said bulk storage means." (Page 8). This covered the connection between the size reducer and the disk store shown on the '121 Figure. In the April 29, 1988 Amendment (Paper 28), Ampex amended claim 20 to require data transfer "from said size reducing means into said bulk storage means via the random access memory means." (Page 10).

51.     Attached as Exhibit 73 is a copy of a document bearing Bates numbers SONY004215-263, entitled Nikon/Kodak Negotiations, dated February 6-8. Page 28 of that document (SONY004242), entitled "Kodak's Claim Summary," states: "Claim 7 provides for generating a reduced resolution image or thumbnail from the corresponding higher resolution image, then compressing the higher resolution image signals and storing

11

both the thumbnail and compressed higher resolution image signals in a multi-format image file." Page 38 of that document (SONY004252), entitled Kodak's Response, states that:

> "The fact that Nikon's Cameras compress the thumbnail does not obviate their infringement. ...
>
> Claim 7 does not require the thumbnail remain uncompressed when combined with the compressed higher resolution image.
>
> * * *
>
> No where in the claim is there a functional requirement that the thumbnail remain uncompressed and to interpret otherwise runs against the Fed. Cir. mandate that one cannot import into the claimed function limitation not in the claim...."

52.     Attached as Exhibit 74 is a copy of a document bearing Bates numbers SONY002180-195, a letter from Eric J. Maurer to William A. Troner, dated October 2, 2001, regarding "Nikon Kodak Negotiations – Kodak's '107, '831, and '335 Patents."

53.     Attached as Exhibit 75 is a copy of a document bearing Bates numbers SONY000309-312, a letter from Arnold B. Dompieri to William Troner, dated January 20, 2003, regarding "Kodak's U.S. Patent No. 5,164,831."

54.     Attached as Exhibit 76 is a copy of a document bearing Bates numbers SONY000300-303, an e-mail from William A. Troner ("Bill") to Joseph S. Littenberg ("Joe"), dated November 16, 2002, regarding "Kodak's '831 Patent." As stated in "Kodak's Response to Sony's Infringement of '831" (SONY000300, 303):

> This claim limitation for the generation of the thumbnail image signals does not preclude any subsequent compressing of the thumbnail image signals. Rather the only limitation in the generation of the thumbnails is that it be generated from the stored digital image signals.
>
> * * *

To infringe the claim, Sony cameras only have to generate the thumbnail from the stored digital image signal and then combine the thumbnail in the same file with its corresponding digital image file before being downloaded to the memory card. For Sony to compress the thumbnail prior to its combining into the multi-format image file does not avoid Sony's infringement.

55. Attached as Exhibit 77 is a document bearing Bates numbers SONY000314-317, a letter from William A. Troner to Arnold Dompieri, dated January 24, 2003, regarding "Infringement Response of Kodak's U.S. Patent 5,164,831." As purportedly stated by Mr. Troner in that document (SONY000314): "[T]he proper interpretation [of the storage of reduced resolution image signals in claim 7] is that the reduced resolution image signals need not be compressed or uncompressed."

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of June, 2006, at Palo Alto, California.

                                                      _____
                                                      Norman H. Beamer

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on June 9, 2006, I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

>Collins J. Seitz, Jr., Esquire
>Jaclyn Mason, Esquire
>Connolly, Bove, Lodge & Hutz LLP

and that I caused copies to be served upon the following in the manner indicated:

### BY E-MAIL and BY HAND

>Collins J. Seitz, Jr., Esquire
>Connolly, Bove, Lodge & Hutz LLP
>1007 North Orange Street
>P.O. Box 2207
>Wilmington, DE  19899

### BY E-MAIL and BY FEDERAL EXPRESS

>Michael J. Summersgill, Esquire
>Wilmer Cutler Pickering Hale and Dorr LLP
>60 State Street
>Boston, MA  02109

*/s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)

## CERTIFICATE OF SERVICE

I, Leslie A. Polizoti, hereby certify that on June 16, 2006, I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

>Collins J. Seitz, Jr., Esquire
>Jaclyn Mason, Esquire
>Connolly, Bove, Lodge & Hutz LLP

and that I caused copies to be served upon the following in the manner indicated:

### BY E-MAIL and BY HAND

>Collins J. Seitz, Jr., Esquire
>Connolly, Bove, Lodge & Hutz LLP
>1007 North Orange Street
>P.O. Box 2207
>Wilmington, DE 19899

### BY E-MAIL and BY FEDERAL EXPRESS

>Michael J. Summersgill, Esquire
>Wilmer Cutler Pickering Hale and Dorr LLP
>60 State Street
>Boston, MA 02109

>/s/ Leslie A. Polizoti (#4299))
>Morris, Nichols, Arsht & Tunnell LLP
>1201 N. Market Street
>P.O. Box 1347
>Wilmington, DE 19899
>(302) 658-9200
>lpolizoti@mnat.com