# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMPEX CORPORATION,                      )
                                        )
                                        )
        Plaintiff,                      )        C.A. No. 04-1373-KAJ
                                        )
    v.                                  )
                                        )
EASTMAN KODAK COMPANY, ALTEK            )
CORPORATION and CHINON INDUSTRIES,      )
INC.,                                   )
                                        )        **REDACTED**
        Defendants.                     )
                                        )
                                        )
                                        )

## DEFENDANTS' ANSWERING BRIEF TO AMPEX CORPORATION'S MOTION FOR SUMMARY JUDGMENT THAT THE QUANTEL PAINT BOX IS NOT PRIOR ART UNDER 35 U.S.C. § 102(a) AND §102(b)

Collins J. Seitz, Jr. (#2237)
Jaclyn M. Mason (#4737)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
cseitz@cblh.com
*Attorneys for Defendants Eastman Kodak Company and Altek Corporation*

*Of Counsel:*
William F. Lee
Michael J. Summersgill
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

S. Calvin Walden
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230-8800

Date:  June 13, 2006

**Table of Contents**

NATURE AND STAGE OF PROCEEDINGS .................................................................1

SUMMARY OF ARGUMENT .................................................................................1

I.  FACTUAL BACKGROUND .........................................................................3

    A.  The Quantel Paint Box Was Sold And Demonstrated In The
        United States More Than One Year Before The Application
        For The '121 Patent Was Filed ..........................................................3

    B.  Richard Taylor Testifies That The Paint Box Meets Every
        Element Of The Claims Of The '121 Patent.........................................4

    C.  The Evidence Produced In This Litigation Corroborates
        Mr. Taylor's Testimony ...................................................................6

        1.  The Actual Paint Box System.................................................6
        2.  March 10, 1982 Brochure.....................................................7
        3.  March 22, 1982 Preliminary Description .................................8
        4.  Testimony Of Martin Holbrook.............................................9
        5.  The Paint Box User Guide...................................................10
        6.  Operating And Service Manual.............................................11
        7.  Documents Describing The Development Of The Paint Box ...............12
        8.  Documents Confirming The Sale Of The Paint Box In March 1982 .....13

    D.  Ampex's Own Expert Admits That The Paint Box Meets Every
        Element Of The '121 Patent.............................................................13

II.  ARGUMENT  ...........................................................................................15

    A.  The Quantel Paint Box Is Prior Art To The '121 Patent......................15
    B.  Corroboration Is Determined Based On A "Rule Of Reason" Analysis............16
    C.  Even Under The Most Stringent Corroboration Standard, The
        Features Of The Paint Box Are Amply Corroborated ........................20

        1.  Storage Of Reduced Size Images On Disk..............................20
        2.  Direct Transfer From Disk To Random Access Memory .....................20

3.    Size Reducer Transfers And Receives Data Only From
Random Access Memory ....................................................................21
4.    Relationship Between Full And Reduced Size Images ..........................21

D.    At Most, Ampex Raises An Argument That Goes To The
Weight Of The Evidence.......................................................................23

E.    Ampex Is Not Prejudiced By Evidence That Corroborates
Mr. Taylor's Testimony .......................................................................25

CONCLUSION          ..............................................................................................26

# Table of Authorities

**Federal Cases**

*A.B. Chance Co. v. RTE Corp.,*
    854 F.2d 1307 (Fed. Cir. 1988) ................................................................ 15

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)............................................................................. 23

*Barbed Wire Patent,*
    143 U.S. 275 (1892)............................................................................. 24

*Cooper v. Goldfarb,*
    154 F.3d 1321 (Fed. Cir. 1990) .......................................................... 16, 17

*Creative Mfg., Inc. v. Unik, Inc.,*
    Nos. 80-1074, 1989 WL 86447 (Fed. Cir. Aug. 4, 1989).................................. 16

*Eisenberg v. Alimed, Inc.,*
    No. 98-1317, 2000 WL 1119743 (Fed. Cir. Aug. 8, 2000) ................................ 19

*Finnigan v. International Trade Commission,*
    180 F.3d 1354  (Fed. Cir. 1999) ............................................. 18, 19, 23, 24, 25

*Hewlett-Packard Co. v. Mustek Sys.,*
    340 F.3d 1314 (Fed. Cir. 2003) ............................................................. 17

*Intel Corp. v. Broadcom Corp.,*
    No. Civ. A. 00-796-SLR, 2003 WL 360256 (D. Del. Feb. 13, 2003).................. 17, 18

*Juicy Whip, Inc. v. Orange Bang, Inc.,*
    292 F.3d 728 (Fed. Cir. 2002) .............................................................. 24

*Knorr v. Pearson,*
    671 F.2d 1368, 1374 (Ct. Cl. 1982) .................................................... 17, 18

*Kridl v. McCormick,*
    105 F.3d 1446 (Fed. Cir. 1997) ...................................................... 17, 18, 23

*Lacks Industries, Inc. v. McKechnie Vehicle Components, USA,*
    322 F.3d 1335 (Fed. Cir. 2003) ............................................................. 24

*Loral Fairchild Corp. v. Matsushita Electrical Industrial Co.,*
    266 F.3d 1358 (Fed. Cir. 2002) ............................................................. 23

*Medichem, S.A. v. Rolabo, S.L.,*
    437 F.3d 1157 (Fed. Cir. 2006) ............................................................. 19

*Price v. Symsek,*
    988 F.2d 1187 (Fed. Cir. 1993) ..................................................................... 19

*Sandt Tech. Ltd. v. Resco Metal and Plastics Corp.,*
    264 F.3d 1344 (Fed. Cir. 2001) ......................................................... 16, 17, 18

*System Management Arts Incorp. v. Avesta Tech, Inc.,*
    87 F.Supp.2d 258 (S.D.N.Y. 2002) ............................................................ 16, 25

*System Management Arts, Inc. v. Avesta Technologies, Inc.,*
    160 F.Supp.2d 580 (S.D.N.Y. 2001) ................................................................ 23

*Texas Digital Sys. v. Telegenix, Inc.,*
    308 F.3d 1193 (Fed. Cir. 2002) ...................................................................... 24

*Thomas, S.A. v. Quixote Corp.,*
    166 F.3d 1172 (Fed. Cir. 1999) ...................................................................... 19

*Woodland Trust v. Flowertree Nursery, Inc.,*
    148 F.3d 1368 (Fed. Cir. 1998) ...................................................................... 24

**Federal Statutes**

35 U.S.C. § 102 ............................................................................................................ 15

## NATURE AND STAGE OF PROCEEDINGS

On October 24, 2004, Ampex Corporation ("Ampex") filed complaints alleging infringement of U.S. Patent No. 4,821,121 ("the '121 patent") in the International Trade Commission ("ITC") and this Court. This action was stayed pending the outcome of the ITC action.

In the ITC, as in this litigation, Defendants Eastman Kodak Company and Altek Corporation contended that the '121 patent is invalid in light of the prior art, including the Quantel Paint Box ("the Paint Box"). On July 12, 2005, during the ITC action, Ampex filed a nearly identical motion for summary judgment that the Paint Box is not prior art. Defendants opposed Ampex's motion. The independent ITC investigative attorneys, agreeing with Defendants that the features of the Paint Box were sufficiently corroborated, also opposed Ampex's motion. Before Ampex's motion was decided, Ampex withdrew its ITC complaint and the case was dismissed. The stay on this action was subsequently lifted. Ampex now moves for the second time for summary judgment that the Paint Box is not prior art.

## SUMMARY OF ARGUMENT

Ampex has good reason to fear the Quantel Paint Box. Ampex's own expert admits that the Paint Box provided the very benefit allegedly offered by the '121 patent, because it could browse reduced size images previously stored on disk:

> Q.    So one of the reasons the Paint Box browse [of] cutouts is faster than the Paint Box browse of full size images, is because the cutouts contain less data than the full size images; correct?
>
> A.    Yes. Because again, what bogs down the system is needing to pull off the full size image. *And in fact that's what is such a benefit of the '121 system*, where you don't need to be able – where you don't need to pull off the full size image and send it through the size reducer each time."

See Cavallerano Dep., at B-139 (emphasis added).

In an attempt to avoid the Paint Box, Ampex contends that the system is not prior art under 35 U.S.C. § 102(a) and (b) because the testimony of Richard Taylor, Defendants'

- 1 -

expert -- who opines that the Paint Box meets all the limitations of the '121 patent's asserted claims -- is not corroborated in every respect by separate documentary proof. Ampex's argument suffers from four fundamental flaws.

First, Ampex misconceives the law on corroboration. The Federal Circuit has never held that *every aspect* of a prior art reference needs to be corroborated with documentary evidence. To the contrary, the Federal Circuit has endorsed a "rule of reason" which requires an examination of all the corroborating evidence, including physical evidence, witness testimony, and documentary proof, in order to determine if, *as a whole*, the testimony at issue is credible. Ampex's suggestion that the Federal Circuit has adopted a rigid rule requiring documentary corroboration of all aspects of a prior art reference is flatly incorrect.

Second, even if the most stringent standard for corroboration were applied to Mr. Taylor's testimony on the Paint Box, it would easily pass muster given the overwhelming corroborative evidence that Defendants have produced, including:

- A video tape of the actual Paint Box system that was sold prior to April 8, 1982 -- the critical date for the '121 patent -- that shows the features and operation of the system;

- A March 10, 1982 brochure that describes the features of the Paint Box;

- A March 22, 1982 description of the Paint Box;

- The testimony of Martin Holbrook, who personally demonstrated the Paint Box prior to April 8, 1982;

- The Paint Box User Guide, dated January 1983, that describes the Paint Box system as it existed prior to April 8, 1982;

- The Paint Box Service Manual, dated June 1984, that describes the Paint Box prior to April 8, 1982;

- Documents that describe the development of the pertinent features of the Paint Box prior to April 8, 1982;

**REDACTED**

- Documents that show the sale of the Paint Box prior to April 8, 1982;

This evidence corroborates *all of the features of the Paint Box that Mr. Taylor relies upon.* Indeed, even Ampex's own expert admits that the Paint Box described by Mr. Taylor meets every limitation of the '121 patent's claims.

Third, at most Ampex raises an argument that goes to the weight of the corroborative evidence, which is not appropriate for resolution on summary judgment. Ampex does not cite a single case in which a court granted summary judgment that a device is not prior art for lack of corroboration -- nor does Ampex show that this is an appropriate case for such a ruling. Indeed, given the fundamental legal and factual defects in Ampex's arguments, Ampex utterly fails to demonstrate that the Court should preclude the jury from considering the Paint Box under § 102(a) and (b).

Finally, Ampex's claim that it is prejudiced by the corroboration Defendants have produced is entirely misplaced. Ampex has had more than ample opportunity to examine the corroborating evidence. Ampex's attorneys have examined the documents, deposed Mr. Taylor for a total of *three days* during this litigation regarding those documents, and deposed Mr. Holbrook, who operated the system. Ampex and its experts were also given the opportunity to inspect the *first Paint Box system that was sold prior to the critical date* at Quantel headquarters in England. They declined. If there is any prejudice with respect to Ampex's motion, it is that Ampex waited thirteen years after Kodak began selling digital cameras to bring this action and now asserts (incorrectly) that Kodak's corroborative evidence of a twenty-year old system is somehow deficient. It is not.

## I.    FACTUAL BACKGROUND

### A.    The Quantel Paint Box Was Sold And Demonstrated In The United States More Than One Year Before The Application For The '121 Patent Was Filed.

The Quantel Paint Box was a graphics system with electronic still store capabilities. (*See* "The Paint Box: Quantel's DPB 7000 Series Digital Paint Box," March 10, 1982, at B-

42 (Paint Box can store 200 video images).)  The Paint Box included, among other components, a disk to store pictures, two frame stores implemented as random access memory for temporary storage and display of images, a size reducer for generating reduced size images, a control computer, and a display monitor.  (*See* Quantel Proposal to BBC, January 13, 1982, at B-15, B-18 ("The DPB 7001 has an integral 68000 computer with Winchester disk store" and includes size change facilities); DPB 7000/1 Operating and Service Manual, at B-82 (Paint Box has two frame stores).)  Like the system described by the '121 patent, the Paint Box was used to accept input video images, and store, adjust the size of, and output images for use during television broadcast.  (*See* "Quantel Gives NY Preview of NAB Display," Backstage, April 2, 1982, at B-45 (the Paint Box can "fulfill all the requirements of the graphics studio," including storage and manipulation of video images).)

The application for the '121 patent was filed on April 8, 1983.  The Paint Box was offered for sale, sold and demonstrated in the United States more than a year earlier.  It was sold to The Weather Channel in Atlanta, Georgia in March 1982.  (*See* Paint Box Quotation to The Weather Channel, March 4, 1982, at B-26-27; The Weather Channel Purchase Order for Paint Box, March 8, 1982, at B-28-29.)  The Paint Box was demonstrated publicly at the 1982 National Association of Broadcasters ("NAB") convention in Dallas, Texas, from April 4-7, 1982.  (*See* "Quantel Leads the Illusion Game," Audiovisual, June 1982, at B-52 (at NAB '82, Quantel "introduced the final production version of its Paint Box digital art system with a live show on the stand…"); Broadcast Engineering, March 1982, at B-43-4 (NAB '82 was held April 4-7, 1982 in Dallas, Texas).)

**B.    Richard Taylor Testifies That The Paint Box Meets Every Element Of The Claims Of The '121 Patent.**

Defendants' expert Richard Taylor is an electrical engineer who has worked in digital image processing for thirty-eight years.  (*See* Taylor Expert Report, ¶5-18, at Higgins Exh.

- 4 -

1[1]; Taylor Decl. ¶¶ 3-15.)  Mr. Taylor joined Quantel in 1975 and was involved in the design

of numerous Quantel systems used for television broadcast.  (*See* Taylor Expert Report, ¶¶ 9-

11, at Higgins Exh. 1; Taylor Decl. ¶¶ 7-9.).  From 1980 to 1982, Mr. Taylor led the team

that designed the Paint Box. (*See* Taylor Expert Report, ¶ 58, at Higgins Exh. 1; Taylor Decl.

¶ 40; "The Art of Digital Techniques in the Broadcast Studio," by Richard Taylor, October

12, 1981, at B-4-12 (describing the Paint Box for the 1982 edition of <u>National Electronics</u>

<u>Review</u>).)

 Mr. Taylor resigned from Quantel in February 2006 and is currently retired.  (*See*

Taylor Expert Report, ¶ 5, at Higgins Exh. 1; Taylor Decl. ¶ 3.)  Although he is being paid as

an expert witness in this case, Mr. Taylor is not a party to this suit or an employee of a party

to this suit.  Mr. Taylor does not assert any patent rights in this action and does not stand to

benefit if the '121 patent is invalidated.  (*See* Taylor Decl. ¶ 22.)

 Mr. Taylor offers his opinion that the Paint Box as sold and demonstrated prior to

April 8, 1982 meets every element of the claims of the '121 patent.  (*See* Taylor Expert

Report, ¶¶ 62-90, at Higgins Exh. 1 (summarizing ability of Paint Box to meet the elements

of the '121 patent); Taylor Decl. ¶ 17.)  Mr. Taylor explains that the key feature of the Paint

Box is the "cut and paste" feature.  Using cut and paste, the operator of the Paint Box could

generate reduced size images, or "cut-outs," which could then be stored to disk.  (*See* Taylor

Expert, ¶¶ 59-60, at Higgins Exh. 1; Taylor Decl. ¶ 41.)[2]  Once stored on disk, the reduced

size images could be browsed.  (*See* Taylor Expert Report, ¶¶ 59-60, at Higgins Exh. 1;

Taylor Decl. ¶ 43.)

---

[1] "Higgins Exh. ___" refers to the Declaration of Gabrielle E. Higgins submitted by Ampex in support of its Motion for Summary Judgment That The Quantel PaintBox Is Not Prior Art Under 35 U.S.C. § 102(a) And § 102(b).

[2] Ampex's expert agrees with Mr. Taylor that the Paint Box stored reduced size images when it stored reduced size cut-outs to disk.  (*See* Cavallerano Dep., at B-133-136.)

**C.    The Evidence Produced In This Litigation Corroborates Mr. Taylor's Testimony.**

Defendants have offered overwhelming evidence to corroborate Mr. Taylor's testimony.

**1.    The Actual Paint Box System**

Defendants produced a video of the *actual Paint Box system that was sold to The Weather Channel in March 1982.* (*See* Paint Box Video, at B-85, attached hereto; Taylor Decl. ¶ 85.) The video first shows the components of the Paint Box system, including the disk; computer; monitor; and hardware rack, which includes the size reducer and the frame store boards. The video then illustrates the capabilities of the Paint Box, including, among other features, the ability to:

- Accept video images from an external source, in this case live feed from the BBC;
- Store full size images in random access memory by displaying the full size captured image;
- Store full size images to disk, also referred to as the "library";
- Generate a reduced size version of the full size image using the "cut and paste" function;
- Store reduced size images in random access memory by displaying the reduced size image;
- Store full and reduced size images in random access memory simultaneously by displaying both images at the same time and moving the reduced size image over the full size image;
- Store reduced size images to disk;
- Automatically generate reduced size images by using the "browse" function to browse full size images stored on disk;
- Browse reduced size images stored on disk in order to rapidly display a mosaic of reduced size images; and
- Select a reduced size image from the browse in order to retrieve the full size version of the image.

*See* Paint Box Video, attached hereto;

**REDACTED**

Taylor Decl. ¶¶ 85-89.

The Paint Box shown in the video was serviced exclusively by Quantel after it was sold to The Weather Channel in March 1982. (*See* Taylor Expert Report, ¶ 94, at Higgins Exh. 1; Taylor Decl. ¶ 85.) The only evidence is that the 1987 software modification that Ampex refers to in its motion is not pertinent to the features shown in the video. Instead, the modification related to the text composition software. (*See* Taylor Expert Report, ¶ 94, at Higgins Exh. 1; Taylor ITC Dep. II (June 7, 2005) p. 300-01, at Higgins Exh. 3 (modification had nothing to do with cut and paste functionality); Taylor Decl. ¶ 86.) No evidence produced during this litigation suggests that the modification relates to any of the functionality shown in the video.

In April 2005, Defendants made the actual Paint Box system shown in the video available for inspection at Quantel's headquarters in England. (*See* April 25, 2005 Letter from Hirsch to Beamer, at Higgins Exh. 9.) Neither Ampex nor its experts made any effort to inspect the system.

### 2.    March 10, 1982 Brochure

Defendants also produced a draft brochure describing the Paint Box, dated March 10, 1982, to corroborate Mr. Taylor's testimony. (*See* "The Paint Box: Quantel's DPB 7000 Series Digital Paint Box," March 10, 1982, at B-30-42.) Ampex incorrectly states that the brochure is dated August 10, 1982. (*See* D.I. 295, at 13.) The date at the top of the first page of the document reads: "10/3/82." (*See* "The Paint Box: Quantel's DPB 7000 Series Digital Paint Box," March 10, 1982, at B-30.) Mr. Taylor has explained that the date of the document is in European format because it was created by British engineers working for Quantel, a British company:

Q.      There is a handwritten date 10/3/82. Is that the date of this report?

A.      This is an English document, so that's an English date. So that would
be      the tenth of March, 1982.

Taylor Dep., at B-117; Taylor Decl. ¶ 67.

The March 10, 1982 brochure describes numerous features of the Paint Box,

including the ability to:

- Accept input images from an external source (*see* "The Paint Box: Quantel's DPB 7000 Series Digital Paint Box," March 10, 1982, at B-33 (the Paint Box can "accept live video inputs."));

- Generate reduced size images through the cut-and-paste feature (*see id.* at B-40 (any image can be "re-sized"));

- Store full and reduced size images to disk (*see id.* at B-42 ("On Quantel's Paint Box, *pictures can be saved at any time*" *** "[the Winchester disk] is able to store a combination of some 200 pictures, parts of pictures, stencils, *cut-outs* and artists' palettes…")) (emphasis added);

- Store full and reduced size images in random access memory at the same time (*see id.* at B-40 ("Any picture can be used as a background over which the cut-out can be moved…"));

- Browse any images stored on disk, including reduced size images (*see id.* at B-42 ("Using the stylus, the artist can touch the browse key to view the contents of the library in groups of 12 pictures.")); and

- Select a reduced size image displayed in the browse to retrieve the full size image (*see id.* at B-42 ("At any time he can touch a picture of his choice, via the tablet, to call it up to full screen size.").)

### 3.      March 22, 1982 Preliminary Description

Defendants also produced a March 22, 1982 Quantel document that describes the

Paint Box. (*See* "Preliminary Description: the Quantel DPB 7000 Digital Paint Box," March

22, 1982, at Higgins Exh. 16.) Among other features, the March 22, 1982 preliminary

description highlights the feature of the Paint Box that allows "re-sizing" of pictures. (*See id.*

(AMP012388), at Higgins Exh. 16.) The document explains that using "cut and paste," the

operator can cut out any image and "is able to change the size and aspect ratio of the cut

image." (*See id.* (AMP012392), at Higgins Exh. 16.) The full or reduced size image can be

- 8 -

stored to disk. (*See id.* (AMP012391), at Higgins Exh. 16 ("the Paint Box includes a

Winchester disk able to hold 300 pictures or parts of pictures.").)

The March 22, 1982 description also describes the ability of the Paint Box to browse

images stored on disk and to select a reduced size image to retrieve the full size version:

> The images themselves may be browsed through against a title keyboard, 12
> at a time, to remind the artist of the contents of the disk. When he finds a
> picture he wants he merely touches it via the stylus and touch tablet and then
> it appears full-size ready to be worked on.

*Id.* (AMP012391), at Higgins Exh. 16.

### 4.    Testimony Of Martin Holbrook

Defendants also located Martin Holbrook, a former Quantel employee who

demonstrated the Paint Box at the 1982 NAB convention, to corroborate Mr. Taylor's

testimony. (*See* Holbrook Dep., at B-90 ("Q. Did you, in fact, demonstrate the Paint Box at

the NAB 1982? A. Yes, I did.").) Mr. Holbrook confirms that the Paint Box that was

demonstrated at NAB '82 was the product version of the system. (*See id.*, at B-91 ("What we

were demonstrating was a full-production model of the Paint Box, which was up and running

by, I would say, January of 1982.").) Mr. Holbrook also testifies that the Paint Box

demonstrated at NAB '82 could generate reduced size images using the cut and paste feature.

(*See id.*, at B-94 ("I was able, then, to cut out and move…this [image.] I could paste the

[image] into the background at any size, and stick it in position. I then had another [image]

on the end of my pen, which I could reduce in size…").)

Mr. Holbrook further verifies that the Paint Box demonstrated at NAB '82 could

store reduced size images to disk, and browse reduced size images stored on disk:

> Q.    For your shorter hourly demos, did you demonstrate the browsing of
>       cutouts?
> A.    Oh, yes, most certainly.
> Q.    Did you demonstrate the saving of reduced-size cutouts?

A.    Yes.  It was a sequence.  You reduced the size, you make it a cutout,
you store it to the disk, you can retrieve it by the browse or title.  All
of that was demonstrated.

*Id.*, at B-103.

Mr. Holbrook is not a party to this suit.  He has no interest in either Kodak or Ampex,

and has not worked at Quantel since the mid-1980s.  (*See id.*, at B-92 (Mr. Holbrook left

Quantel in 1987).)  Unlike Ampex's fact witnesses, Mr. Holbrook is not being compensated

for his role in this litigation.  (*See id.*, at B-102.)

### 5.    The Paint Box User Guide

Defendants also produced the Paint Box User Guide, dated January 1983.  (*See* Paint

Box User Guide, at Higgins Exh. 5.)  Mr. Taylor has testified that the Paint Box User Guide

was the user guide for the system as it existed in March 1982.  (*See* Taylor Expert Report, ¶

171, at B-105; Taylor Decl. ¶¶ 90-91.)  Mr. Holbrook, who drafted the Paint Box User Guide,

confirms that the User Guide describes the system demonstrated at NAB '82.  (*See* Holbrook

Dep., at B-100-01.)[3]

The User Guide describes the features of the Paint Box, including the ability to:

- Accept images from an external source (*see* Paint Box User Guide
  (EKC002000510), at Higgins Exh. 5 ("A unique feature of the Paint Box is its
  ability to take in live video (either composite or RGB) in colour."));

- Generate reduced size images (*see id.* (EKC002000504, EKC00200506), at
  Higgins Exh. 5 (using the "cut-all" function, the operator can cut-out "the
  entire picture area;" once cut, the picture is a "cut-out and may be used
  accordingly;" the operator can "size cut-outs very accurately"));

- Automatically generate reduced size images (*see id.* (EKC002000492), at
  Higgins Exh. 5 (if the operator presses "browse," "the picture(s) will appear
  in miniature"));

- Select a reduced size image to retrieve the full size version of the image (*see
  id.* (after browsing images, the operator of the Paint Box can retrieve the full
  size image by "tapping the relevant miniature"));

---

[3] Ampex suggests that there was an earlier version of the User Guide.  (*See* D.I. 295, at 9.).  Mr.
Holbrook confirms Mr. Taylor's testimony that the January 1983 User Guide was the first User
Guide drafted for the Paint Box.  (*See* Holbrook Dep., at B-100-01 ("This is the first version.").)

- Store full size images to disk (*see id.* (EKC002000491), at Higgins Exh. 5 ("Press SAVE, followed by PICTURE."));

- Store reduced size images to disk (*see id.* (EKC002000507) ("RE-SIZING CUT-OUTS…This allows one to change the size or rotation of a cut-out *prior to saving in the library*") (emphasis added); *Id.* (EKC002000490), at Higgins Exh. 5 ("Any cutout may be stored…"));

- Recall images from disk (*see id.* (EKC002000492), at Higgins Exh. 5 (to recall an image stored on disk select "library" and "find")); and

- Browse reduced size images stored on disk (*see id.* (EKC002000504), at Higgins Exh. 5 ("Note that if you *browse through cut-outs stored in the library*…") (emphasis added).)

### 6.    Operating And Service Manual

Defendants also produced the Paint Box Service Manual, dated June 1984, that describes some of the features of the Paint Box.  (*See* DPB 7000/1 Operating and Service Manual, at B-81-84.)  The Service Manual describes the product version of the Paint Box that was sold in March 1982 and demonstrated at NAB '82.  (*See* Taylor ITC Testimony, at B-87; Taylor Decl. ¶ 70; "Quantel Leads the Illusion Game," <u>Audiovisual</u>, June 1982, at B-52 (at NAB '82, Quantel *"final production version"* of the Paint Box introduced in April 1982) (emphasis added); "NAB 1982 – A Post Post Mortem," <u>The Digital Video Report</u>, September 1, 1982 (EKC001030480), at Higgins Exh. 14 (Paint Box was in its *final product form"* as of NAB '82) (emphasis added).)

The Service Manual describes the ability of the Paint Box to transfer images from disk directly to random access memory:

> Picture data can be transferred from disc directly to any of the framestores. The data is deserialised on the Disc Data Buffer card but bypasses the buffer and passes through the Filter card…

DPB 7000/1 Operating and Service Manual, at B-82; *see also, id.*, at B-84 (data from disk enters random access memory of filter card); *id.*, at B-83; Cavallerano Dep., at B-130 (explaining that the transfer of images is from disc directly to the random access memory of the filter card).

The Service Manual also describes the ability of the Paint Box to transfer images

from random access memory directly to the size reducer and from the size reducer directly to

random access memory.  (*See* DPB 7000/1 Operating and Service Manual, at B-82, B-84

(showing data path from filter card random access memory directly to size reducer); *Id.*, at B-

83 (showing data path from size reducer directly to frame store).)

Finally, the Service Manual explains that the Paint Box can store cut-outs in one

frame store while storing full size images in the other frame store.  (*See id.*, at B-82 ("Cut

outs are held in Store 2 which may be scrolled relative to Store 1.").)

### 7.    Documents Describing The Development Of The Paint Box

Defendants also produced numerous documents that confirm the development history

of the pertinent features of the Paint Box in 1981 and early 1982:

- A September 16, 1981 document describes the "software development" of the cut and paste feature (*see* "DPB Software Developments," September 16, 1981, at B-1-3 ("Cut/Paste" function includes ability to change size of image));

- An October 12, 1981 document describes the ability to save pictures on disk, recall pictures from disk, and modify pictures before storing them (*see* "The Art of Digital Techniques in the Broadcast Studio," by Richard Taylor, October 12, 1981, at B-10 ("pictures are saved, re-called or deleted from the disk"); *id.*, at B-11 ("Other application areas of the Paint Box are aided by the ability to take a picture from disc, modify the picture and store it again."));

- A January 13, 1982 document describes the cut and paste feature that allows the generation of reduced size images (*see* Quantel Proposal to BBC, January 13, 1982, at B-18 ("The following integral facilities are provided with the Paint Box…(b) Size change…"); *id.*, at B-19 ("Full paint and cut and paste facilities are available."));

- A March 2, 1982 Quantel memo describes cut and paste and the ability to store cut-outs (*see* Quantel Memo "DPB 7000 Sales Brochure," March 2, 1982, at B-25 (describing the "cut and paste facility" and the ability to "store the picture at a particular stage"));

- An April 2, 1982 document confirms that the Paint Box demonstrated at NAB '82 could re-size images (*see* "Quantel Gives NY Preview of NAB Display," Backstage, April 2, 1982, at B-45); and

- A September 1982 document describes the NAB '82 demonstration of the Paint Box and confirms that the cut and paste functionality was demonstrated

(*see* "NAB 1982 – A Post Post Mortem," <u>The Digital Video Report</u>, September 1, 1982 (EKC001030480), at Higgins Exh. 14.)

Ampex's own documents similarly confirm that the Paint Box was demonstrated at

NAB '82 and had the ability to generate and store reduced size images.


**REDACTED**


**REDACTED**


**8.     Documents Confirming The Sale Of The Paint Box In March 1982.**

Finally, Defendants produced the actual sales documents that show the sale of the

product version of the Paint Box to The Weather Channel in Atlanta, Georgia in March 1982.

The sales documents confirm that the Paint Box was offered for sale to The Weather Channel

on March 4, 1982, and that The Weather Channel purchased the system on March 8, 1982.

(*see* Paint Box Quotation to The Weather Channel, March 4, 1982, at B-26-27; The Weather

Channel Purchase Order for Paint Box, March 8, 1982, at B-28-29).

**D.     Ampex's Own Expert Admits That The Paint Box Meets Every Element Of The '121 Patent.**

As an initial matter, Ampex's expert admits that the Paint Box is prior art.  (*See*

Cavallerano Dep., at B-120 ("*we've already established it's prior art to the '121 patent*")

(emphasis added).)  When asked about "the Paint Box system as sold and demonstrated in March, April '82," Ampex's expert also acknowledged that the system could meet every element of the claims of the '121 patent.  (*See id.*, at B-121.)  Specifically, Ampex's expert concedes that the Paint Box could:

- *Accept images input from an external source*: "Q. Would you agree that the Paint Box could receive the video from an external source?  A. Yes." (*See id.*, at B-121);

- *Store full size images in random access memory and on disk*: "Q. And do you agree that either of [the Paint Box's two] frame stores could store a full size image? A. Yes." *** "Q. [The disk] could store full size video images? A. Yes, it could store full size images." (*See id.*, at B-122);

- *Generate reduced size images*: "Q. …Do you agree that the Paint Box could generate reduced size images? [Ampex Counsel]: Asked and answered.  A. Yes, as I stated, that's correct."(*See id.*, at B-123);

- *Automatically generate reduced size images*: "Q. So we both agree that the Paint Box could automatically generate reduced size images; correct? [Ampex counsel]: Asked and answered.  A. Yes…." (*See id.*, at B-124);

- *Store reduced size images in random access memory*: "That reduced size image most certainly could be stored in the output frame store.  And it's temporarily present in the second frame store." (*See id.*, at B-126);

- *Store full and reduced size images in random access memory simultaneously*: "As I've stated, through a particular series of steps, it's possible to have the reduced size image temporarily in one frame store.  And the full size counterpart present in the other, the display frame store." (*See id.,* at B-128);

- *Store reduced size images to disk:* "Q. And after you reduce it in size, you can store that cutout to disk on the Paint Box; correct? A. That's my understanding, yes." (*See id.*, at B-138);

- *Store reduced size images to disk using only the memory corresponding to the reduced size images:* "Q. When the operator places the rectangle over the pixels that represent the reduced size image, or what you call part of the full size image, only part of the pixels within that rectangle are saved to disk; correct? … A. That's my understanding." (*See* id., at B-133);

- *Recall images from disk*: "Q. And it could output images from disk upon a user's command? A. Yes, I believe that's correct." (*See id.*, at B-128);

- *Transfer images from disk directly to random access memory*: "Q. Was the transfer from disk to the random access memory of the filter card a direct transfer? A. It's my understanding that it would be.") (*See id.*, at B-130);

- *Transfer images directly between the size reducer and random access memory*: "Q. So do you agree that the Quantel Paint Box could transfer

images directly from the size reducer to the random access memory? A. Yes, that's correct." (*See id*, at B-129);

- *Display a mosaic of reduced size images*: "Q. Now, you agree that the Paint Box had a browse feature. A. Yes, I'm familiar with that." *** "Q. And do you also agree that the Paint Box could display a mosaic of reduced size images? A. The -- well, I would call that , what I was just describing right now, this array of reduced size images for the browse, that would be to one skilled in the art, one would call that a mosaic. So yes." (*See id*., at B-131-132);

- *Select a reduced size image from the browse in order to retrieve the full size version of the images*: Paint Box provides "a way to go from the reduced size that's in the browse screen, to, back to the full size image." (*See id*., at B-140-141); and

- *Browse reduced size images that were stored on disk*: "Q. And after you reduce it in size, you can store that cutout to disk on the Paint Box; correct? A. That's my understanding, yes. Q. And then using the Paint Box browse function, you can browse through cutouts that are stored on disk; correct? A. Yes, that's correct." *** "Q. And it could browse reduced size cutouts that were stored on disk; correct? A. Yes, that's my understanding…"(*See id*., at B-138, B-137).

Ampex's expert even admits that the ability of the Paint Box to browse reduced size images stored on disk enabled a rapid browse that Ampex claims is the benefit of the '121 patent:

> Q.    So one of the reasons the Paint Box browse [of] cutouts is faster than the Paint Box browse of full size images, is because the cutouts contain less data than the full size images; correct?
>
> A.    Yes.  Because again, what bogs down the system is needing to pull off the full size image. *And in fact that's what is such a benefit of the '121 system*, where you don't need to be able – where you don't need to pull off the full size image and send it through the size reducer each time."

*Id*., at B-139 (emphasis added).

## II.    ARGUMENT

### A.    The Quantel Paint Box Is Prior Art To The '121 Patent.

A device qualifies as "prior art" under 35 U.S.C. § 102 if it was in public use or on sale in the United States more than one year before the patent at issue was filed, or if it was known or used in the United States before the date of invention of the patent at issue. *See* 35 U.S.C. § 102(a), (b); *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1311 (Fed. Cir. 1988)

("An invention which was offered for sale in the United States more than one year before the filing date of the patent application is subject to the statutory bar of 35 U.S.C. § 102(b).").

The Paint Box is indisputably prior art to the '121 patent. Numerous documents and testimony from multiple witnesses establishes that the Paint Box was sold to The Weather Channel in March 1982, and demonstrated at the NAB conference from April 4-7, 1982. (*See* Paint Box Quotation to The Weather Channel, March 4, 1982, at B-26-27; The Weather Channel Purchase Order for Paint Box, March 8, 1982, at B-28-29);

**REDACTED**

"NAB 1982 – A Post Post Mortem," The Digital Video Report, September 1, 1982 (EKC001030480), at Higgins Exh. 14 (describing Paint Box demonstration at NAB '82);    **REDACTED**

Holbrook Dep., at B-90 (same).)

Ampex does not seriously contest any of this evidence. Indeed, its own expert *admits that the Paint Box is prior art to the '121 patent.* (*See* Cavallerano Dep., at B-120.) *See Creative Mfg., Inc. v. Unik, Inc.*, Nos. 89-1074, 1989 WL 86447, at *2 (Fed. Cir. Aug. 4, 1989) (device "placed on sale more than one year before the application for patent was filed [is] prior art"); *System Management Arts Incorp. v. Avesta Tech, Inc.*, 87 F. Supp. 2d 258, 267 (S.D.N.Y. 2002) (denying summary judgment that device is not prior art where evidence indicates that the device was in existence prior to critical date).

**B.    Corroboration Is Determined Based On A "Rule Of Reason" Analysis.**

Ampex's motion is premised on an incomplete recitation of the law of corroboration. The Federal Circuit applies a "rule of reason" analysis in order to determine whether evidence is sufficient to corroborate a witness' testimony. *See Cooper v. Goldfarb*, 154 F.3d 1321, 1330 (Fed. Cir. 1990); *Sandt Tech. Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). The rule of reason requires "an evaluation of all pertinent

evidence" in order to determine if the testimony at issue is, as a whole, credible. *See Cooper*, 154 F.3d at 1330; *Kridl v. McCormick*, 105 F.3d 1446, (Fed. Cir. 1997) ("a tribunal must make a reasonable analysis of all the pertinent evidence to determine whether the…testimony is credible."). This rule plainly rejects the notion that *every aspect* of a witness' testimony regarding the prior art needs to be corroborated. *See Knorr v. Pearson*, 671 F.2d 1368, 1374 (Ct. Cl. 1982) ("the law does not impose an impossible standard" by requiring that "every point" of a witness' testimony be corroborated; "indeed, such a standard is the antithesis of the rule of reason."); *Cooper*, 154 F.3d at 1330 (where party offers independent corroboration, corroboration for "every factual issue contested by the parties" is not required).

The rule of reason requires a general evaluation of all the corroborating evidence. Documents created contemporaneously with the prior art device are strong corroborating evidence. *See Sandt*, 264 F.3d at 1351. Documents created after the critical date can also corroborate witness testimony if the documents describe the prior art device as of the critical date. *See Intel Corp. v. Broadcom Corp.*, No. Civ. A. 00-796-SLR, 2003 WL 360256, at *18 (D. Del. Feb. 13, 2003 ) (document dated after critical date corroborates testimony because there is no evidence it describes anything other than the prior art device). An actual physical device also corroborates testimony. *See Hewlett-Packard Co. v. Mustek Sys.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) (testimony regarding features of prior art device corroborated by actual device). An alleged modification to a physical device does not impact its corroborative value if evidence indicating the modification is irrelevant to the dispute is not rebutted. *See Knorr*, 671 F.2d at 1374 (modification does not affect corroborative value where testimony that the modification is insignificant is not rebutted). Oral testimony can also corroborate a witness' testimony regarding prior art. *See Sandt*, 264 F.3d at 1351 ("oral testimony of someone other

than the alleged inventor [of the prior art device] may corroborate"). Finally, circumstantial
evidence that demonstrates that a prior art device was complete as of a certain date can
corroborate a witness' testimony. *See id.*, 264 F.3d at 1351 (sales documents that show
device was sold by critical date corroborates witness testimony that device is prior art).

      Where, as here, testimony is corroborated by a physical device, contemporaneous
documents, witness testimony, and sales documents indicating the prior art device was
complete as of the critical date, the rule of reason is satisfied and the entirety of the witness'
testimony is sufficiently corroborated. *See Sandt*, 264 F. 3d at 1351-52 (corroboration is
sufficient where party asserting invalidity offers testimony, contemporaneous documents, and
documents showing sale of prior art prior to critical date); *Kridl*, 105 F.3d at 1448-49
(finding corroboration based on witness testimony and eleven documents). T his is especially
the case when the party opposing the prior art does not present any factual evidence to rebut
the corroborating evidence. *See Knorr*, 671 F.2d at 1374 (alleged modification to prior art
device does not impact corroborative value where testimony that modification is irrelevant is
"challenged only by arguments of counsel"); *Intel*, 2003 WL 360256, at *18 (patent dated
after the critical date corroborates where testimony that it describes the prior art device as of
critical date is not rebutted by factual evidence).

      Ampex's reliance on *Finnigan* to the contrary is misplaced. In *Finnigan*, defendants
offered the fact testimony of the author of a prior art article in asserting that the article
inherently disclosed the limitations of the patent in suit. *See Finnigan v. International Trade
Commission,* 180 F.3d 1354, 1365-66 (Fed. Cir. 1999). The author, however, was not certain
that the article taught a key limitation of the claims. *See id.* at 1366 ("[the author's]
testimony was far from unequivocal"). Nonetheless, the defendants also argued that the
author's testimony itself invalidated the patent. Defendants did not offer *any other evidence*

to support its invalidity contention. Because there was *"no evidence"* supporting the author's

testimony *"at all"* the Court found the evidence insufficient:

> In this case, the *sole basis* to support a determination of a prior public use was
> [the author's] testimony concerning his own work; *there was no evidence
> corroborative of this testimony at all.*

*Id.* at 1369-70 (emphasis added).  The Court made clear that its holding applied to witnesses

"whose testimony *alone* is asserted to invalidate a patent."  *Id.* at 1369 (emphasis added).[4]

This is plainly not the case here.

---

[4]     The corroboration requirement arose in the context of inventor testimony in contests over date of invention, i.e. "priority" disputes.  *See Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993) ("Throughout the history of the determination of patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is regarded with skepticism, and as a result, such inventor testimony must be supported by some type of corroborating evidence.").  The rule was therefore designed for witnesses who "stand to directly and substantially gain" through their testimony.  *See Thomas, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1176 (Fed. Cir. 1999) ("interested" witness is a "testifying inventor…asserting a claim of derivation or priority…and is a named party, an employee of or assignor to a named party, or otherwise is in a position where he or she stands to directly and substantially gain by his or her invention being found to have priority").

The Federal Circuit has provided mixed messages as to whether *disinterested* witness testimony must be corroborated.  A year after *Finnigan*, the Federal Circuit held that the corroboration rule *does not apply* to disinterested witnesses about prior art.  *See Eisenberg v. Alimed, Inc.*, No. 98-1317, 2000 WL 1119743, at * 4 (Fed. Cir. Aug. 8, 2000) ("*The rule requiring corroboration is not applicable*" where witness, "whether or not a purported inventor, was a nonparty") (emphasis added).  In *Eisenberg* -- which Ampex ignores in its motion -- the defendant offered the testimony of an occupational therapist who claimed to have made the invention more than a year before the application for the patent in suit was filed.  *See Eisenberg*, 2000 WL 1119743, at *4.  The plaintiff argued that the witness' testimony "requires corroboration, and without corroboration, the testimony is insufficient."  *Id.*  The Federal Circuit rejected this argument and held that the corroboration rule does not apply to disinterested witnesses.  *See id.*

As recently as February 2006, the Court explained that the corroboration requirement arises in the context of *interested* witness testimony.  *See Medichem, S.A. v. Rolabo, S.L.*, 437 F. 3d 1157, 1169-70 (Fed. Cir. 2006) (describing the corroboration rule as intended to "provide[] an additional safeguard against courts being deceived by *inventors*" seeking to assert their own patent interests, and citing *Price*, 988 F.2d at 1195 for the proposition that "*[o]nly the inventor's testimony requires corroboration*").

Mr. Taylor is not an inventor in a priority context, a party to this dispute, or an employee of a party.  He does not stand to gain anything if the '121 patent is found invalid.  *See Eisenberg*, 2000 WL 1119743, at *4 (witness testifying about device used more than a year before patents at issue were filed is not interested and corroboration rule does not apply).  Regardless of whether Mr. Taylor's testimony needs corroboration, Ampex's argument that Mr. Holbrook's testimony *also* needs corroboration is without merit.  There is no legal support -- and Ampex does not cite any precedent -- for the contention that corroborating testimony must itself be corroborated.  Indeed, as explained above, the corroboration rule explicitly recognizes that witness testimony can be corroborative.

**C.    Even Under The Most Stringent Corroboration Standard, The Features Of The Paint Box Are Amply Corroborated.**

Even if the corroboration rule required corroboration for every element of the prior art at issue -- which it plainly does not for the reasons discussed above -- the evidence corroborating the Paint Box features is overwhelming and easily meets the requirement. Ampex argues that four specific features of the Paint Box are not corroborated. (*See* D.I. 295, at 8-17.) The evidence, however, conclusively shows otherwise.

**1.    Storage Of Reduced Size Images On Disk**

The ability of the Paint Box to store reduced size images is expressly corroborated:

- The video of the Paint Box shows the storage of a reduced size image to disk;
- The March 10, 1982 Paint Box brochure explains that images can be "re-sized" and then stored on disk (*see* "The Paint Box: Quantel's DPB 7000 Series Digital Paint Box," March 10, 1982, at B-40, B-42);
- The March 22, 1982 preliminary description explains that cut-outs could be sized and stored to disk (*see* "Preliminary Description: the Quantel DPB 7000 Digital Paint Box," March 22, 1982 (AMP012391-2) at Higgins Exh. 16)
- Martin Holbrook testifies he personally demonstrated the ability of the Paint Box to store reduced size images to disk prior to April 8, 1982 (*see* Holbrook Dep., at B-98-99); and
- The Paint Box User Guide states that images could be sized prior to storage on disk (*see* Paint Box User Guide (EKC002000507), at Higgins Exh. 5).

Ampex's own expert concedes that the Paint Box could store reduced size images on disk. (*See Cavallerano Dep.*, at B-138 ("Q. And after you reduce it in size, you can store that cutout to disk on the Paint Box; correct? A. That's my understanding, yes.").)

**2.    Direct Transfer From Disk To Random Access Memory**

The ability of the Paint Box to transfer images from disk directly to random access memory is also explicitly corroborated by evidence produced during this litigation. The Paint Box Service Manual describes direct transfers in the Paint Box. (*See* DPB 7000/1 Operating and Service Manual, at B-82-84.)

- 20 -

Ampex's expert admits that the Paint Box as sold and demonstrated prior to April 8, 1982 could transfer images from disk directly to random access memory. (*See* Cavallerano Dep., at B-130 ("Q. Was the transfer from disk to the random access memory of the filter card a direct transfer. A. It's my understanding that it would be.").)

### 3.     Size Reducer Transfers And Receives Data Only From Random Access Memory

As an initial matter, the '121 patent does not require that the size reducer transfer and receive data *only* from random access memory. There is no dispute that "only" does not appear in the claims. The specification explicitly states that the size reducer can transfer images to random access memory *or the disk.* (*See* '121 patent, 4:9-12, at B-59.) The sole figure of the '121 patent shows the size reducer connected to the frame store *and* the disk. (*See* '121 patent, Figure 1, at B-57.) During prosecution, Ampex specifically amended the figure to show this connection. (*See* '121 file history, at B-66, B-79.)

Even if the claims did require that the size reducer transfer and receive images only from random access memory, the Paint Box's ability to meet this limitation is corroborated by documentary evidence. (*See* DPB 7000/1 Operating and Service Manual, at B-82-84.)

Ampex's expert also concedes that the Paint Box as sold and demonstrated prior to April 8, 1982 meets this element. (*See* Cavallerano Dep., at B-129.)

### 4.     Relationship Between Full And Reduced Size Images

Ampex contends that the claim term "corresponding" requires "a working relationship" between full and reduced size images. Ampex's expert explains that a "working relationship" is illustrated by the ability to select a reduced size image from a browse in order to retrieve the full size version of the image. (*See* Cavallerano Dep., at B-140-41.)

As an initial matter, there is nothing in the patent that describes this relationship or how it would be maintained. (*See* Defendants' Opening Claim Construction Brief, D.I. 299, at 29-30.)

**REDACTED**

A "corresponding" reduced size image is therefore more reasonably construed according to its plain meaning to refer to a lower resolution version of a full size image.

Even if the ability to obtain a full size image by selecting a reduced size image in a browse were required by the claims, substantial evidence corroborates the capability of the Paint Box to meet this element:

- The video of the Paint Box system shows the operator click on a reduced size image in order to pull up the full size version of the image;

- The March 10, 1982 brochure describes the ability to view the full size image by "touch[ing]" the reduced size image on screen (*see* "The Paint Box: Quantel's DPB 7000 Series Digital Paint Box," March 10, 1982, at B-42);

- The March 22, 1982 preliminary description explains that the user can select a reduced size image and it will "appear[] [in] full-size" (*see* "Preliminary Description: the Quantel DPB 7000 Digital Paint Box," March 22, 1982 (AMP012391), at Higgins Exh. 16); and

- The Paint Box User Guide describes the ability to select a displayed reduced size image to retrieve the full size version (*see* Paint Box User Guide (EKC002000492), at Higgins Exh. 5).

Ampex's expert acknowledges that the Paint Box meets the "working relationship" requirement. (*See* Cavallerano Dep., at B-140-141 (Paint Box provides "a way to go from the reduced size that's in the browse screen to, back to the full size image.").)

**D.      At Most, Ampex Raises An Argument That Goes To The Weight Of The Evidence.**

Ampex does not dispute that Defendants have produced evidence that corroborates the features of the Paint Box; Ampex's arguments only challenge the appropriate weight that ought to be assigned to this evidence. In order to evaluate the weight of corroborative evidence, however, courts must analyze the totality of the evidence. *See System Management Arts, Inc. v. Avesta Technologies, Inc.*, 160 F. Supp. 2d 580, 585 (S.D.N.Y. 2001) ("The Federal Circuit Court of Appeals has specifically distinguished between the question of the *necessity* of corroboration *vel* non and the question of the *adequacy* of that evidence") (emphasis added); *Kridl*, 105 F.3d at 1450 (the weight of corroborating evidence requires a "reasonable analysis of all the pertinent evidence to determine whether the inventor's testimony is credible"). This is a factual inquiry inappropriate for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, *the weighing of the evidence*, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." (emphasis added)); *Loral Fairchild Corp. v. Matsushita Electrical Industrial Co.*, 266 F.3d 1358, 1364-65 (Fed. Cir. 2002) (testimony of one corroborating witness sufficient to overcome summary judgment because rule of reason requires "an evaluation of *all* pertinent evidence when determining the credibility of an inventor's testimony") (emphasis in original).

Indeed, Ampex does not cite a single case in which a court weighed corroborating evidence at the summary judgment stage. To the contrary, the case law Ampex relies on clarifies that determinations of the weight of corroborative evidence are appropriate only after the finder of fact has had the opportunity to consider the factual evidence. *See Finnigan*, 180 F.3d at 1368-69 (questions of the "sufficiency of the corroborating evidence"

raise a "distinct inquiry involving an assessment of the totality of the circumstances"); *Lacks Industries, Inc. v. McKechnie Vehicle Components*, USA, 322 F.3d 1335, 1349 (Fed. Cir. 2003) ("Whether the asserted identity of the product with the claimed invention has been sufficiently corroborated, either by documentary or testimonial evidence, is generally measured under a 'rule of reason' standard"); *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 743 (Fed. Cir. 2002) (reversing final judgment of invalidity based on evaluation of sufficiency of evidence); *Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1218 (Fed. Cir. 2002) (affirming final judgment of district court); *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1372 (Fed. Cir. 1998) (reversing district court finding of invalidity based on evaluation of totality of corroborating evidence); *The Barbed Wire Patent*, 143 U.S. 275 (1892) (reversing district court decision based on evaluation of weight of totality of corroborating testimony).

By way of example, Ampex cites *Finnigan* for the proposition that a court can decide, as a matter of law, that corroboration is lacking. (*See* D.I. 295, at p. 5.) But *Finnigan* involved only the question of the *existence* of corroboration. In *Finnigan*, *the only evidence* of the alleged prior use that defendants contended invalidated the patent at issue was the testimony of a single individual. *See Finnigan*, 180 F.3d at 1369-70 ("In this case, the *sole basis* to support a determination of a prior public use was Jefferts' testimony concerning his own work; *there was no evidence corroborative of this testimony at all*." (emphasis added)). The *Finnigan* court expressly recognized that the question of the *weight of corroborating* evidence is a factual matter:

> [A case evaluating weight of evidence] did not present the question of the necessity of corroboration vel non, but rather the *sufficiency* of the corroborating evidence, *a distinct inquiry involving an assessment of the totality of the circumstances*, including consideration of the 'interest of the corroborating witness in the subject matter of the suit....[Cases weighing the sufficiency of corroboration] are inapt here because they pertained to situations in which the question to be resolved was whether, *under the totality*

> *of the circumstances*, certain evidence was sufficiently corroborative of other
> uncorroborated testimony of invalidating activities.

*Id.* at 1368-70 (emphasis added).

At best, Ampex's challenge to the weight that the corroborating evidence ought to carry therefore creates a factual dispute that must be resolved at trial. *See System Management,* 87 F. Supp. 2d at 267 (corroborating evidence that "at least one individual" received a demonstration of the prior art device "is sufficient to the task at hand -- surviving a motion for summary judgment").

**E.    Ampex Is Not Prejudiced By Evidence That Corroborates Mr. Taylor's Testimony.**

Finally, Ampex's argument that it is prejudiced by the corroborating evidence Defendants have produced is without merit. Ampex has had ample opportunity to evaluate the documents, testimony, and other evidence that corroborate the features of the Paint Box. Ampex has questioned Mr. Taylor about the corroborating evidence during two separate depositions, spanning a total of *three days*. Ampex will again have the opportunity to cross-examine Mr. Taylor during trial. Similarly, Ampex has already deposed Martin Holbrook and will be able to ask additional questions of Mr. Holbrook at trial. Ampex's argument that it is prejudiced because it does not have the opportunity to cross examine the actual Paint Box system is particularly unconvincing considering that Ampex *declined Defendants' offer to inspect the actual system.* (*See* Higgins Exh. 9.)

The overwhelming evidence establishes conclusively that the Paint Box is prior art. The fact that this evidence hurts Ampex's case does not create prejudice.

## CONCLUSION

Ampex waited thirteen years after the issuance of the '121 patent before bringing this suit. Notwithstanding Ampex's delay, Defendants have produced corroborating evidence that describes every feature Mr. Taylor relies upon for his opinion that the Paint Box invalidates the '121 patent. Ampex's effort to keep this evidence from the jury should be recognized for what it is -- another attempt to avoid the prior art device that even its own expert admits includes the alleged benefit of the '121 patent. Ampex's Motion should be denied.

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (#2237)
Jaclyn M. Mason (#4737)
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
cseitz@cblh.com
***Attorneys for Defendants Eastman Kodak Company
and Altek Corporation***

*Of Counsel:*
William F. Lee
Michael J. Summersgill
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

S. Calvin Walden
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230-8800

Date: June 13, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2006, I electronically filed the Defendants' Redacted Answering Brief to Plaintiff Ampex Corporation's Motion for Summary Judgment that the Quantel Paint Box is Not Prior Art Under 35 U.S.C. §102(a) and §102(b) with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

and that I caused copies to be served upon the following in the manner indicated:

**VIA E-MAIL**                                  **VIA E-MAIL & FEDERAL EXPRESS**

Jesse J. Jenner, Esquire                        Norman H. Beamer, Esquire
Ropes & Gray LLP                                Ropes & Gray LLP
1251 Avenue of the Americas                     525 University Avenue
New York, NY 10020                              Palo Alto, CA 94301

**VIA E-MAIL & HAND DELIVERY**

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

                                    _/s/ Collins J. Seitz, Jr._
                                    Collins J. Seitz, Jr. (Bar No. 2237)
                                    Connolly Bove Lodge & Hutz LLP
                                    P.O. Box 2207
                                    1007 North Orange Street
                                    Wilmington, DE 19899