# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMPEX CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>EASTMAN KODAK COMPANY, )<br>ALTEK CORPORATION and CHINON )<br>INDUSTRIES, INC., )<br><br>Defendants. ) | C.A. No. 04-1373-KAJ<br><br>**REDACTED** |

---

## DEFENDANTS EASTMAN KODAK COMPANY AND ALTEK CORPORATION'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF AMPEX'S MOTION FOR SUMMARY JUDGMENT THAT U.S. PATENT NO. 4,821,121 IS NOT UNENFORCEABLE DUE TO INEQUITABLE CONDUCT

Collins J. Seitz, Jr. (#2237)
Jaclyn M. Mason (#4737)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
cseitz@cblh.com

***Attorneys for Defendants Eastman Kodak Company
and Altek Corporation***

*Of Counsel:*
William F. Lee
Donald R. Steinberg
Michael J. Summersgill
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

S. Calvin Walden
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, NY 10002
(212) 230-8800

Dated: June 13, 2006

**TABLE OF CONTENTS**

I.    STATEMENT AND NATURE OF PROCEEDING ....................................................1

II.   SUMMARY OF ARGUMENT.............................................................................................1

III.  STATEMENT OF FACTS.................................................................................................2
      A.    The '121 Patent ..................................................................................................2
      B.    Prior Art of Record During Prosecution of the '121 Patent............................3
            1.    The '776 Patent..........................................................................................3
            2.    The Boyd Article .......................................................................................5
            3.    The '264 Patent..........................................................................................6
            4.    The '722 Patent..........................................................................................6
            5.    EP 0051305 ...............................................................................................7
      C.    The Undisclosed Prior Art ................................................................................7
            1.    Ampex's Own AVA System .....................................................................7
            2.    The Quantel Paint Box System.................................................................9
            3.    Quantel's DLS 6000 System ...................................................................12

IV.   ARGUMENT ...................................................................................................................13
      A.    The Examiner Would Have Considered the AVA System
            Important to Determining the Patentability of the '121 Patent
            Application..........................................................................................................14
            1.    AVA Discloses Several Features That Were Relevant to the
                  Patentability of the '121 Patent Application......................................14

**REDACTED**

            2.    AVA Is Not Cumulative of or Less Material Than the Art That
                  Was Before the Examiner...............................................................18
                  a.    Ampex's Arguments Based on a Supposed
                        "Automatic" Feature Are Irrelevant. .................................. 18
                  b.    AVA Included the Very Same Features That Ampex
                        Argued Made the Claimed Invention Patentable over
                        the Prior Art. ..................................................................... 19

**REDACTED**

            3.    To the Extent Ampex Now Argues That the '776 Patent Discloses
                  the "Direct Transfer" and "Simultaneous Storage" Features,
                  Ampex's Representations to the Patent Office Regarding the '776
                  Patent Were False. ..............................................................................22

B.    The Examiner Would Have Considered the Paint Box Important
to Determining the Patentability of the '121 Patent Application. ...................23

1.    The Paint Box Discloses Several Features That Were Relevant to
the Patentability of the '121 Patent Application. ...............................24

a.    The Paint Box Discloses the "Direct Transfer" of
Images from Disk to RAM. ................................................ 24

b.    The Paint Box Discloses the "Simultaneous Storage"
of Full and Reduced Size Images in RAM. ........................ 24

c.    The Paint Box Discloses Storage of a Reduced Size
Image to Disk Using Only the Disk Space
Corresponding to the Reduced Size Image. ........................ 25

d.    The Paint Box Discloses the Browse of Reduced Size
Images That Ampex Characterizes as Its Invention. ............ 26

2.    The Paint Box Is Not Cumulative of or Less Material Than the
Art Before the Examiner. .................................................................26

a.    The Paint Box Discloses Every Limitation of the '121
Patent. ................................................................................ 27

b.    The Paint Box Included the Very Same Features That
Ampex Argued Made the Claimed Invention
Patentable over the Prior Art. ............................................. 29

V.    CONCLUSION ...........................................................................................30

## TABLE OF AUTHORITIES

**Federal Cases**

*Baxter Int'l, Inc. v. McGaw, Inc.,*
   149 F.3d 1321 (Fed. Cir. 1998)……………………………………………*passim*

*eSpeed, Inc. v. BrokerTec USA, L.L.C.,*
   417 F. Supp. 2d 580 (D. Del. 2006)………………………………………20, 29

*Mobil Oil Corp. v. Advanced Envt'l Recycling Techs., Inc.,*
   869 F. Supp. 251 (D. Del. 1994)……………………….………………..20, 23, 29

*Purdue Pharma L.P. v. Endo Pharm.,*
   438 F.3d 1123 (Fed. Cir. 2006) …………………………………………………20

**Federal Regulations**

37 C.F.R. § 1.56………………………………………………………………....20

## I.     STATEMENT AND NATURE OF PROCEEDING

Ampex Corporation ("Ampex") has accused Eastman Kodak Company and Altek

Corporation ("Defendants") of infringing U.S. Patent No. 4,821,121 (the "'121 patent") – a

now-expired patent directed to decades-old "electronic still store" technology developed for

the broadcast television industry.[1]  Defendants have denied those allegations of infringement,

and have further asserted counterclaims and affirmative defenses alleging, among other

things, that the asserted claims of the '121 patent are unenforceable due to Ampex's

inequitable conduct during prosecution of the '121 patent.  Fact and expert discovery have

concluded (except regarding Defendants' advice of counsel defense), and a hearing on claim

construction and dispositive motions is scheduled for July 13, 2006.

Defendants respectfully submit this answering brief in opposition to Ampex's Motion

for Summary Judgment That U.S. Patent No. 4,821,121 Is Not Unenforceable Due to Alleged

Inequitable Conduct for Failure to Disclose the Quantel DLS 6000, Quantel Paint Box, or

Ampex AVA Systems (D.I. 283).

## II.     SUMMARY OF ARGUMENT

To obtain allowance of the '121 patent, Ampex argued to the Patent Office that the

invention claimed in the '121 patent application was distinguishable over the prior art before

the examiner because the prior art – and, in particular, the '776 patent and the Boyd reference

– did not disclose the following features: (1) the "direct transfer" of images from disk to

random access memory ("RAM"); (2) the "simultaneous storage" of full size images and

reduced size images in RAM; and (3) the storage of a reduced size image to disk using only

the "disk space corresponding" to the reduced size image.  Based in part on these arguments,

the Patent Office granted the '121 patent.

---

[1]  Named defendant Chinon Industries was acquired by Kodak (through its subsidiaries), and no
longer exists as a separate legal entity.

During six years of prosecution, Ampex was aware of at least three pieces of prior art that included these features. These prior art references were: (1) the AVA system, Ampex's own video graphics system; (2) the Paint Box system, a Quantel video graphics system; and (3) the DLS 6000 series, a Quantel family of electronic still stores. Despite the significant similarities between these systems and the invention claimed in the '121 patent application, Ampex failed to disclose any of this additional prior art to the Patent Office.

Now, to avoid inequitable conduct, Ampex takes the position that the AVA and Paint Box systems were merely cumulative of the references that were before the examiner during prosecution. Ampex thus argues that the references before the examiner *did* disclose the "direct transfer," "simultaneous storage," and "corresponding disk space" features that it had previously relied upon to distinguish the prior art. However, Ampex should not be permitted to avoid the consequences of its inequitable conduct by representing to this Court exactly the opposite of what it represented to the Patent Office to obtain allowance of the '121 patent nearly twenty years ago.

## III.    STATEMENT OF FACTS

### A.    The '121 Patent

The claimed invention of the '121 patent "relates to a digital electronic still store for broadcast television signals and more particularly to a still store providing a high speed multiimage scan or sort capability." ('121 patent, 1:11-14, at B-184.)[2] Ampex characterizes the invention of the '121 patent as providing an improved browse capability: "The '121 patent describes a better system for rapidly generating and displaying a browse screen.... Because the reduced size images to be used in a browse screen already have been created and stored, the browse screen can be generated more rapidly." (D.I. 290, at 2.)

---

[2] Citations to "B-__" refer to the Appendix to Defendants' Answering Brief in Opposition to Plaintiff Ampex's Motion for Summary Judgment That U.S. Patent No. 4,821,121 Is Not Unenforceable Due to Inequitable Conduct.

### B.    Prior Art of Record During Prosecution of the '121 Patent

The initial application for the '121 patent was filed on April 8, 1983. Over the course of the six-year prosecution of this application, Ampex never submitted an information disclosure statement to the Patent Office. (*See* Talcott ITC Dep. II, at B-357 to B-358; '121 file history, at B-335 to B-337.) Instead, in its initial application, Ampex disclosed only two prior art references to the Patent Office: U.S. Patent No. 4,172,264 (the "'264 patent"); and U.S. Patent No. 4,302,776 (the "'776 patent"). The only other prior art of record during prosecution of the '121 patent were three references that the examiner himself located: an article by Hugh Boyd entitled "The DLS 6000 – A New Digital Still Store Library System" ("the Boyd article"); U.S. Patent No. 4,152,722 (the "'722 patent"); and European Patent No. 0051305 ("EP 0051305"). (*See* '121 file history, at B-196, B-222.)

During prosecution of the '121 patent application, the pending claims were rejected multiple times as anticipated or obvious in light of the prior art before the examiner. (*See*, *e.g.*, '121 file history, at B-194, B-207, B-217 (rejections in light of the Boyd article); *id.* at B-241, B-268 (rejections in light of the '776 patent).) In response to these rejections, Ampex amended and abandoned pending claims and added new claims as it attempted to overcome the cited prior art. (*E.g.*, *id.* at B-271 to B-283.) Ultimately, in 1988, the examiner further amended some of the claims before allowing the fifteen claims in the '121 patent to issue. (*See id.* at B-289 to B-292.) The '121 patent issued on April 11, 1989, and expired on April 11, 2006.

### 1.    The '776 Patent

Ampex included in its initial application a brief reference to the '776 patent, which appears as a single paragraph in column 1 of the '121 patent. (*See* '121 patent, 1:50-61, at B-184.) The '776 patent is directed to an electronic still store system with a size change facility. (*See* '776 patent, abstract, at B-33.) It describes certain (but not all) features of the

Quantel DLS 6000 system. (*See* Cavallerano Rep. ¶ 94, at B-402.) Defendants' expert, Richard Taylor, is one of the named inventors of the '776 patent. ('776 patent, at B-33.)

On two occasions, the examiner rejected claims pending in the '121 patent application as anticipated by the '776 patent. ('121 file history, at B-241, B-268.) Ampex attempted to overcome these rejections by amending pending claims, canceling and adding new claims, and making arguments to distinguish the claimed invention from the '776 patent. In October 1988, Ampex specifically argued to the Patent Office that the '776 patent did not contain three critical features:

> [The '776 patent] ***fails to teach the above features of storing both image sizes simultaneously in the random access memory, the direct transfer of images between the disc storage and random access memory***, or the transfer of images directly between the size reducer and only the random access memory.

('121 file history, at B-282 (emphasis added).)

In conjunction with this argument, Ampex amended several pending claims to "further clarify the language thereof over [the '776 patent]" by explicitly requiring the "direct transfer" of images from disk to random access memory. (*See id.* at B-281.) For example, Ampex amended claim 8 to recite the transfer of video pixel data: "from said bulk storage memory ***directly*** into said random access memory means." (*Id.* at B-251, B-272 to B-273 (emphasis added) (underlining indicates language added by amendment); *see also id.* at B-272 (claim 7); *id.* at B-273 to B-274 (claim 10).) Along with these amendments, Ampex explained that this "direct" transfer meant that images were transferred from disk to random access memory "with no other circuit therebetween." (*See id.* at B-281 to B-282.)

Ampex also amended certain claims to require the "simultaneous" storage of both full and reduced size images in random access memory. Specifically, Ampex amended claim 10 to include the following limitation: "said first store … storing the video data representing a video image corresponding to the selected raster size ***simultaneously*** together with video data

<u>supplied by said video image size reducer</u> representing said reproduction of a video image at the selected fractional size." (*Id.* at B-273 (emphasis added) (underlining indicates language added by amendment).)

Just one month after Ampex distinguished its claimed invention from the '776 patent based on the above-described features – including the "direct transfer" of data between disk and random access memory, and the "simultaneous storage" of full and reduced size images in random access memory – the examiner accepted Ampex's representations, made additional amendments, and allowed the claims of the '121 patent to issue. (*See id.* at B-288.)

### 2.    The Boyd Article

Although Ampex did not disclose the Boyd article to the Patent Office, the examiner himself located the Boyd reference and identified it as relevant prior art. ('121 file history, at B-196.) The Boyd article describes selected aspects of Quantel's DLS 6000 Digital Library System, including multiple frame stores, a size reducer, and bulk memory for long-term storage. The Boyd article describes a "record chain" in which input video is converted to digital format and passed to the input frame store, which acts as a freeze frame device and allows the user to select images from the incoming live video and then store the images to disk. Boyd also describes a "replay chain" in which data is transferred off the disk, through a size change mechanism, and to a frame store. (*Id.* at B-197 to B-199.)

On three occasions, the examiner rejected several pending claims of the '121 patent application as obvious based solely on the Boyd article. ('121 file history, at B-194, B-207, B-217.) In response to the examiner's rejections, Ampex amended its pending claims and attempted to distinguish its claimed invention from Boyd based on the "simultaneous storage" of full and reduced size images in the random access memory. Specifically, Ampex argued to the Patent Office that "[t]he Boyd system does not teach the use of a frame store that is capable of storing both a full resolution image frame and a corresponding reduced

spatial resolution image frame *at the same time*." (*Id.* at B-233 (emphasis added).)

Accordingly, Ampex amended then-pending claims 9-11 to require "a frame store capable of simultaneously storing both full size and reduced size image data." (*Id.* at B-227; *see also id.* at B-226 to B-228.)

Ampex also represented to the Patent Office during prosecution that, unlike the Boyd reference, the invention claimed in the '121 patent application disclosed the storage of a reduced size image to disk using only the memory corresponding to the reduced size image. Specifically, Ampex stated:

> The Examiner pointed out that while *the Boyd reference differs from the Applicant's disclosure in that in Boyd the reduced spatial image is stored in a "block" of memory* capable of storing a full spatial resolution image frame, the cited claims fail to make this distinction.
>
> Amended Claim 1 and Claims 9, 10, 12 and 14 have been amended such that *the reduced spatial resolution image frame copy occupies less space within said image store than the full spatial resolution image frame copy.*

(*Id.* at B-214 (emphases added); *see also* D.I. 284, at 38-39.)

### 3.    The '264 Patent

During prosecution of the '121 patent, Ampex identified the '264 patent only by virtue of the fact that it included a brief description of it in the "Background of the Invention" section of the written description for the '121 patent. (*See* '121 patent, 1:44:49, at B-184.) The '264 patent relates to a control arrangement for a video synchronizer used to reduce images and to position them on a television screen using a joystick. (*See id.*) Ampex describes the '264 patent, which does not even disclose a disk, as "not as relevant to the '121 patent invention." (D.I. 284, at 5.)

### 4.    The '722 Patent

Although not disclosed by Ampex, the examiner identified the '722 patent in a "Notice of References Cited." ('121 file history, at B-196.) The '722 patent is directed to a

retrieval system, including graphics in a reduced scale, that includes an optical projector system connected to a television-type display. ('722 patent, abstract, at B-5.) During prosecution of the '121 patent, Ampex stated that the '722 patent did "not appear to be pertinent to the claims." ('121 file history, at B-204.)

**5.     EP 0051305**

The examiner also identified EP 0051305 in a "Notice of References Cited." ('121 file history, at B-222.) EP 0051305 is directed to a system for deleting picture information from a file that is capable of recording, retrieving, and outputting picture information. (EP 0051305, at B-122.) As with the '722 patent, Ampex stated that EP 0051305 did "not appear to be pertinent to the claims." ('121 file history, at B-234.)

**C.     The Undisclosed Prior Art**

In addition to the five prior art references that were before the examiner, Ampex was also aware of three systems used in the television broadcast industry for storing and manipulating digital images: Ampex's own AVA system; Quantel's Paint Box; and Quantel's DLS 6000 still store system. (*See, e.g.*, Roth Dep., at B-376              **REDACTED**

                **REDACTED**          Talcott ITC Dep. I, at B-354 (patent counsel aware of AVA before '121 patent application filed);              **REDACTED**

                **REDACTED**          Beaulier ITC Dep., at B-369 (inventor aware of DLS system);

        **REDACTED**          It is undisputed that Ampex never disclosed these prior art systems to the Patent Office.

**1.     Ampex's Own AVA System**

The AVA was a video graphics system made by Ampex that was used in the television broadcast industry to, among other things, capture, manipulate, store, and recall video images. Ampex first sold the AVA system in the United States (to CBS) in September 1980, and demonstrated the system publicly at the National Association of Broadcasters

("NAB") trade show in 1980.  The AVA system is relevant prior art to the '121 patent.

(Taylor Decl., ¶ 132.)

**REDACTED**

Notably, it is undisputed that the AVA system could transfer images stored on disk

*directly* to the random access memory as required by the asserted claims.  Even Ampex's

own expert agrees:

> Q.    And is it your understanding that the AVA system was capable of transferring
> image data directly from disk to the frame store, as Mr. Sheikh describes
> here?
> A.    Yes, that's correct.

(Cavallerano Dep., at B-437.)  Consistent with this testimony, Ampex's own documents and engineers describe the ability of the AVA system to transfer images directly from disk to random access memory.  For example, a 1981 article by Junaid Sheikh, a former Ampex engineer who worked on the development of AVA, described AVA's "unique features" as including "*[d]irect data transfers* between frame store and computer disk drive *without any intervention from the CPU*."  (Junaid Sheikh, "Ampex AVA Video Art System," at B-102 to B-103 (emphases added).)  A 1980 article authored by two Ampex engineers similarly described AVA's ability to perform "*direct disk to frame store data transfer without computer intervention*."  (H.K. Regnier & Lawrence J. Evans, "Practical Computer Graphics for Television," at B-98 (emphasis added); **REDACTED**

Finally, the AVA system could also store a full size image and a reduced size image in RAM at the same time.  (*See* Junaid Sheikh, "Ampex AVA Video Art System," at B-101 (showing display of full and reduced size images at same time);

**REDACTED**

AVA Service Manual, at B-160, B-161 (RAM associated with AVA computer is 512 kilobytes); PDP 11 Processor's Handbook, at B-3, B-4 (RAM associated with computer stored image data);

**REDACTED**

### 2.    The Quantel Paint Box System

From 1980 to 1982, a company called Quantel Limited ("Quantel") designed and built the Paint Box – a video graphics system used in the broadcast television industry to, among other things, capture, store, manipulate, and recall video images.  Quantel first sold

the Paint Box system to The Weather Channel in March 1982, and further demonstrated the system to several other customers in March and April 1982 (including at the NAB trade show). Both parties agree that the Paint Box system is relevant prior art to the '121 patent. (*See* Taylor Decl., ¶ 38; Cavallerano Dep., at B-409 to B-410 (testifying that Paint Box is "related to the ['121] patent" and that "we've already established it's prior art to the '121 patent").)

**REDACTED**

The Paint Box system had a "Live Video" feature that enabled an operator to capture any single frame from a stream of video received from an external source (via the "Video Input"), such as from a television broadcast or video camera. (Taylor Decl., ¶ 45; Cavallerano Dep., at B-419; *see* D.I. 290, at 2.) The captured full size image frame then could be digitized (by the "Input A/D" component), temporarily stored in RAM (e.g., in one of the "Frame Stores"), and saved to more permanent disk storage for later access (the "Disk Store"). The stored full size image could be accessed and output at some later time for display and/or editing purposes. (Taylor Decl., ¶ 58.)

The Paint Box system also included a "cut and paste" function that (using the "Size Reducer") allowed the operator to reduce the size of any captured full size video image by any factor. The resulting "cutout" generated by the size reducer could be stored temporarily in RAM. It could also be saved to the disk store using only the memory space corresponding to the reduced size image. (*See* Cavallerano Dep., at B-431; "The Paint Box: Quantel's DPB 7000 Series Digital Paint Box," at B-174 (stating that Paint Box can store cut outs); Taylor Decl. ¶¶ 54-56.) The operator could access the stored reduced size image for display and/or editing purposes at some later time. (Taylor Decl., ¶ 58; Cavallerano Dep., at B-419 to B-420, B-432 to B-433.)

It is undisputed that the Paint Box allowed for the browse of reduced size images –
"cutouts" – that had previously been stored on disk. (*See* Cavallerano Dep., at B-412 (stating
that the Paint Box could browse cutouts); "The Paint Box: Quantel's DPB 7000 Series
Digital Paint Box," at B-172, B-174 (explaining that Paint Box could generate and store
reduced size cutouts and browse cutouts).) This is what Ampex itself identifies as the
invention of the '121 patent. (*See* D.I. 290, at 2 ("Because the reduced size images to be used
in a browse screen already have been created and stored, the browse screen can be generated
more rapidly.").) Indeed, Ampex's own expert, Mr. Cavallerano, admits that this fast browse
function of the Paint Box system provided the "benefit of the '121 system":

> Q.   So one of the reasons the Paint Box browse [of] cutouts is faster
>      than the Paint Box browse of full size images, is because the
>      cutouts contain less data than the full size images, correct?
>
> A.   Yes.  Because again, what bogs down the system is needing to
>      pull off the full size image. ***And in fact that's what is such a
>      benefit of the '121 system***, where you don't need to be able –
>      where you don't need to pull off the full size image and send it
>      through the size reducer each time.

(Cavallerano Dep., at B-434.)

In fact, Ampex's expert has conceded that, as sold prior to 1982, the Paint Box
system meets ***every element*** of the asserted claims under Defendants' claim construction.
(*See* Cavallerano Dep., at B-419 (external source); *id.* at B-420 (full size images stored to
RAM and disk); *id.* at B-421, B-422 (manual or automatic generation of reduced size
images); *id.* at B-423 to B-426, B-433 (reduced size images stored to RAM and disk); *id.* at
B-425 to B-426 (stores full and reduced size images in RAM simultaneously); *id.* at B-426,
B-428 (recalls images from disk to RAM); *id.* at B-427 (direct transfer); *id.* at B-429 to B-
430 (displays mosaic of reduced size images); *id.* at B-432 to B-433 (browses reduced size
images); *id.* at B-435 to B-436 (selects reduced size image from browse to retrieve full size
image).)

- 11 -

### 3.    Quantel's DLS 6000 System

In addition to its Paint Box system, Quantel also made and sold the Digital Library System ("DLS") 6000 series – a family of electronic still stores that could capture, store, retrieve, reduce, and display video images. Quantel introduced the DLS 6000 series in 1979, first sold such a system in the United States in February 1981, and annually demonstrated the systems at NAB trade shows from 1979 to 1982. (Taylor Decl., ¶ 103.) Ampex's expert, Mr. Cavallerano, agrees that the DLS 6000 series is relevant prior art to the '121 patent. (*See* Cavallerano Dep., at B-408 ("I would say it's one of the products … that one could consider as prior art."); *id.* at B-409 to B-410 (agreeing that the DLS system is "related to the ['121 patent").)

The DLS 6000 series could receive a video feed from an external source (e.g., a television broadcast or video camera) and capture single still frames from the received video signal. The system temporarily stored the captured full size image data in the preview frame store (comprised of RAM), and the user also could save the full size image to more permanent disk storage. (Taylor Decl., ¶ 110.)

The DLS 6000 series also contained a size reducer that allowed the operator to create a reduced size version of any captured image that could be stored to disk (along with the full size image). Like the '776 patent and the Boyd reference (which, as discussed above, describe certain features of the DLS system), *but unlike the AVA or Paint Box*, the DLS stored reduced size images to disk in a block of memory corresponding to a full image screen. (*See* Taylor ITC Dep. I., at B-379.) Like the '776 and Boyd references, therefore, the

DLS could not store a reduced size image to disk using only the memory space corresponding to the reduced size image. (*See* Cavallerano Rep. ¶ 78, at B-401.)[3]

## IV.    ARGUMENT

It is undisputed that the prior art AVA and Paint Box systems included the "direct transfer" of images from disk to RAM; the "simultaneous storage" of full and reduced size images in RAM; and the storage of reduced size images to disk using only the "disk space corresponding" to the reduced size images.[4] It is also undisputed that Ampex argued to the Patent Office during prosecution that the invention claimed in the '121 patent was distinguishable over the prior art before the examiner – including the '776 patent and the Boyd article – precisely because it required these features. Ampex's own arguments to the Patent Office, therefore, highlighted the materiality of those features (and thus of the undisclosed references) to the patentability of the '121 invention.

Ampex cannot now avoid a finding of inequitable conduct by arguing to this Court the precise opposite of what it argued to the Patent Office in order to obtain the patent: that is, that the '776 patent and the Boyd article do disclose the "direct transfer," "simultaneous storage," and "corresponding disk space" features. Ampex similarly cannot avoid inequitable conduct by arguing that the '776 patent's purported disclosure of these features is the same as

---

[3] Although not disclosed in either the Boyd article or the '776 patent, the DLS' "Stack/Don't Care" function also allowed the system to generate reduced size images automatically. The "stack" feature allowed users to group a "stack" of pictures together for display, and the "don't care" feature caused the system to apply a user-defined formatting operation (e.g., reducing image size by a set factor) to all images in the stack. The automatically generated reduced size images could then be saved to disk and displayed to the operator. At any time, using the browse feature, the user could display as many as twenty-five reduced size images (as a mosaic). (Taylor Decl., ¶ 123; Cavallerano Dep., at B-411 (conceding that the Quantel 6000 series DLS systems "had an automatic browse capability").)

[4] Neither the Boyd article nor the '776 patent described all of the features of the DLS 6000 system. In particular, for example, neither reference disclosed the "Stack/Don't Care" feature that enabled the system to automatically generate reduced size images from a series of full size images. (Taylor Decl., ¶ 113.) Defendants therefore contend that Ampex should have disclosed the DLS 6000 system to the Patent Office during prosecution of the '121 patent. Nonetheless, to focus the issues for presentation to the jury, Defendants do not intend to pursue Ampex's failure to disclose the DLS 6000 system to the Patent Office as a basis for inequitable conduct. Defendants did not ask Mr. Taylor to address the materiality of the DLS in his expert report.

the AVA and Paint Box systems but somehow different from the '121 patent – Ampex's own experts have already admitted that the AVA and Paint Box systems do disclose the features *as required by the asserted claims*. In fact, unlike the prior art references before the examiner, the AVA disclosed all three of the highlighted features in a single system. Similarly, unlike the art before the examiner, the Paint Box disclosed the three highlighted features and the fast browse feature, which Ampex contends is the heart of its invention. The disclosures of these features, alone or in combination, make the AVA and Paint Box systems more material to the patentability of the '121 invention than were the references that were before the examiner.[5]

### A.    The Examiner Would Have Considered the AVA System Important to Determining the Patentability of the '121 Patent Application.[6]

Ampex does not dispute that it knew about the AVA prior art system (its own system) and failed to disclose that system to the Patent Office during prosecution of the '121 patent. Nor does Ampex dispute that the "direct transfer," "simultaneous storage," and "memory corresponding only to reduced size image" features of the invention claimed in the '121 patent were argued as grounds for distinguishing the prior art during prosecution and, therefore, were relevant to the patentability of the '121 patent application. Instead, Ampex argues that the AVA system was not material to the patentability of the '121 patent application because it does not disclose any of these features or, if it does, that disclosure is no more relevant than the disclosure of the '776 patent, which was before the examiner. Ampex is wrong on both counts.

### 1.    AVA Discloses Several Features That Were Relevant to the Patentability of the '121 Patent Application.

---

[5]  Ampex's brief addresses only the issue of materiality, and does not address the "intent to deceive" prong that is also relevant to inequitable conduct. Therefore, this answering brief addresses only the issue of materiality.

[6]  Defendants have moved for summary judgment of inequitable conduct on the basis of Ampex's failure to disclose the AVA system to the Patent Office during prosecution. (D.I. 293.)

**REDACTED**

The overwhelming and uncontroverted evidence shows that, in the AVA system, image data was transferred *directly* from disk to RAM without going through the CPU or any other intervening circuitry.

As an initial matter, Ampex's own expert has confirmed that the AVA system included the "direct transfer" of image data from disk to RAM:

> Q.    And is it your understanding that the AVA system was capable of transferring image data *directly* from disk to the frame store, as Mr. Sheikh describes here?
>
> A.    Yes, that's correct.

(Cavallerano Dep., at B-437 (emphasis added).)

Consistent with this testimony, Ampex's own documents and engineers unambiguously describe the ability of the AVA system to transfer images directly from disk to random access memory.  A 1981 article by Junaid Sheikh, a former Ampex engineer who worked on the development of AVA, emphasized that one of AVA's "unique features" included "*[d]irect data transfers* between frame store and computer disk drive *without any intervention from the CPU*."  (Junaid Sheikh, "Ampex AVA Video Art System," at B-102 to B-103 (emphases added); Taylor Decl., ¶ 158.)  A 1980 article by H.K. Regnier and Larry Evans, two other Ampex engineers, similarly described AVA's ability to perform "*direct disk to frame store data transfer without computer intervention*."  (H.K. Regnier and Lawrence J. Evans, "Practical Computer Graphics for Television," at B-98 (emphasis added); Taylor Decl., ¶ 159.)

**REDACTED**

This "direct transfer" feature is also disclosed in an Ampex patent that embodies the

AVA system.  (*See* '915 file history, at B-89.)  U.S. Patent No. 4,564,915 (the "'915 patent")

describes AVA's ability to perform a "direct memory access" when transferring an image

from disk to the frame store:

> Disk file system 18 is then commanded to become bus master and perform a ***direct memory access*** by transferring the stated number of bytes of data from a designated disk file location to the PATI address which corresponds to the Y component 66 of frame store 50.

('915 patent, 17:2-7, at B-79 (emphasis added); Taylor Decl., ¶ 161.)

**REDACTED**

        **b.**

According to Ampex's expert, the AVA computer could generate reduced size

images.  (*See* Cavallerano Dep., at B-438 to B-439.) .

**REDACTED**

**REDACTED**

The AVA Operator's Manual explains that, using the "Rectangle" function, the operator of the AVA system could place a rectangle over just the reduced size image and save the reduced size image to disk.  (*See* Ampex Video Art System, Operator's Manual, at B-91, B-92.)

**REDACTED**

**REDACTED**

2.      **AVA Is Not Cumulative of or Less Material Than the Art That Was Before the Examiner.**

Ampex argues that the AVA system was not material to patentability of the invention claimed in the '121 patent because it was cumulative of and less material than the '776 patent, the Boyd article, and column 1 of the '121 patent, which were before the examiner.[7] (D.I. 284, at 29.)

**REDACTED**

AVA's disclosure of the combination of these features renders it more relevant than, and not cumulative of, the cited prior art.

a.      Ampex's Arguments Based on a Supposed "Automatic" Feature Are Irrelevant.

**REDACTED**

---

[7] In addition to these three references, only two other prior art references were before the examiner: the '722 patent; and EP 0051305. Ampex does not contend that the AVA system is cumulative of either of these references. (*See* D.I. 284, at 28-30.) In fact, Ampex stated during prosecution that these references did "not appear to be pertinent to the claims." ('121 file history, at B-204, B-234.)

To begin with, the claims of the '121 patent do not contain an "automatic" requirement. (*See* D.I. 299, at 21-22, 32-34.) It is therefore irrelevant whether AVA's programming methods are manual or automatic.

In any event, a prior art reference is not automatically "less material" because some of what it discloses (here, the basic features of capturing, storing, and displaying images) was present in the cited art. Instead, materiality of an undisclosed reference must be considered "based upon the overall degree of similarity between the omitted reference and the claimed invention in light of the other prior art before the examiner." *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1328 (Fed. Cir. 1998).


**REDACTED**


   b. <u>AVA Included the Very Same Features That Ampex Argued<br>Made the Claimed Invention Patentable over the Prior Art.</u>

As explained in section III.B, Ampex distinguished the invention claimed in the '121 patent application from the prior art on the basis of the features discussed above. Specifically, Ampex argued that the '776 patent was distinguishable because it failed to disclose the "direct transfer" and "simultaneous storage" features ('121 file history, at B-281 to B-282), and the examiner relied upon these statements (at least in part) in allowing the claims of the '121 patent to issue (*see id.* at B-288).

**REDACTED**

           Ampex likewise argued that the Boyd article was distinguishable because it failed to disclose the "simultaneous storage" and "corresponding memory" features. ('121 file history, at B-214, B-233.)

- 19 -

Ampex does not dispute these facts from the prosecution history (*see* D.I. 284, at 31-33, 37, 38-39), but ignores the significance of them. Put simply: Ampex argued to the Patent Office that the inclusion of the "direct transfer," "simultaneous storage," and "corresponding memory" features made the invention claimed in the '121 application patentable. However, the AVA system contained ***the very same features*** that Ampex argued made the invention of the '121 patent application novel (or nonobvious over a single reference). In fact, not only was the AVA system inconsistent with the arguments Ampex made regarding patentability, it directly contradicted those arguments by including ***the very same features*** that Ampex argued made its claimed invention patentable over the prior art.

Under nearly identical facts in *eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 417 F. Supp. 2d 580, 593 (D. Del. 2006), this Court concluded that such a contradiction made an undisclosed reference "highly material." *See id.* (finding patentee's undisclosed system to be "highly material" prior art because it contained several of the features that the patent applicants argued made their invention novel)[8]; *see also Mobil Oil Corp. v. Advanced Envt'l Recycling Techs., Inc.*, 869 F. Supp. 251, 255-56 (D. Del. 1994) (finding an undisclosed reference to be material and non-cumulative because it disclosed a feature that was one of the bases upon which the patentee argued to the Patent Office that its process was patentable over a cited reference).

c.

**REDACTED**

---

[8] In *eSpeed*, the Court applied the standard of materiality as set forth in the post-1992 version of 37 C.F.R. § 1.56. 417 F. Supp. 2d at 591. Although the pre-1992 standard for materiality should be applied in this case because the application for the '121 patent was filed in 1983, "[the post-1992] standard was not intended to constitute a significant substantive break with the pre-1992 standard." *Purdue Pharma L.P. v. Endo Pharm.*, 438 F.3d 1123, 1129 n.6 (Fed. Cir. 2006).

No single reference that was before the examiner disclosed all three of the "direct transfer," "simultaneous storage," and "corresponding disk space" features. Accordingly, AVA's disclosure of these three features *in combination* renders AVA more material than the art that was before the examiner. *See Baxter*, 149 F.3d at 1329 (holding that an undisclosed reference was "highly material" because, although other references disclosed certain features, it disclosed a combination of the claimed features in a single device).

Moreover, no cited reference disclosed the feature of storing reduced size images to disk using only the memory corresponding to the reduced size image.

**REDACTED**

Now, Ampex misleadingly cites Mr. Taylor's testimony in an attempt to show that the '776 patent discloses the purported "corresponding disk space" feature of the '121 patent. (*See* D.I. 284, at 20.)  As Ampex is well aware, however, that is not Mr. Taylor's position nor was it the import of the testimony Ampex cites.  Mr. Taylor's comments regarding the placement of the size reducer in the '776 patent do not indicate that the '776 patent discloses the ability to store a reduced size image to disk using only the memory corresponding to the reduced size image.  Regardless of where the size reducer is placed with respect to the disk, Mr. Taylor has explained – and Ampex agrees – that the DLS could only store reduced size images to disk *as part of a full image frame:*

Q.     But, in order for a user to store that one-sixteenth worth of data [i.e a reduced size image] that represents the image of you, it is inevitable, and it is unavoidable to store that extraneous, what you call extraneous 15/16 worth of data [i.e. the rest of the image frame], right?

A.     *Yes.* But, it doesn't alter my position that the actual amount of data that is expressing [the subject of the picture] is reduced.

Q.     I think I understand your position. But, I just want to make sure that we all understand exactly what was actually happening inside the machine. Now, when the user calls back that picture, not only does the one-sixteenth worth of data that represents the image of you come out of the disc and go through the system, but also that extraneous data, that 15/16 worth of extraneous data also is read out from the disc, right?

A.     *Yes.* But, I'm afraid I fail to see its relevance.

(Taylor ITC Dep. I, at B-379 (emphases added) (objection omitted); Taylor Decl., ¶ 172.)

> **3.     To the Extent Ampex Now Argues That the '776 Patent Discloses the "Direct Transfer" and "Simultaneous Storage" Features, Ampex's Representations to the Patent Office Regarding the '776 Patent Were False.**

Despite the undisputed evidence regarding AVA in this litigation and Ampex's statements regarding the '776 patent during prosecution, Ampex contends that the transfer and storage of image data in the AVA system are no more material than the disclosure of the '776 patent. More specifically, Ampex argues that the '776 patent discloses the operations that Defendants' expert, Mr. Taylor, identifies as "direct transfer," "simultaneous storage," and "corresponding disk space." (D.I. 284, at 33-34, 37, 39-40.) With this argument, Ampex speaks out of both sides of its mouth: it argues, for example, that the '776 patent does not disclose the "direct transfer" feature because a size reducer is interposed between the disk and RAM (*see id.* at 33); at the same time, it argues that the '776 patent does disclose the "direct transfer" feature if the AVA system discloses that feature (*see id.* at 33-34).[9] Ampex cannot have it both ways.

---

[9] And in fact, Ampex's expert does say that AVA includes the "direct transfer" feature. (Cavallerano Dep., at B-437.)

To the extent Ampex argues that the '776 patent does not disclose the "direct transfer" of image data from disk to RAM (*see, e.g.*, D.I. 284, at 12-13), the AVA system is a material and non-cumulative reference for the reasons explained above. Ampex knew about the AVA system and should have disclosed it to the Patent Office.

However, to the extent Ampex now suggests that the '776 patent teaches the "direct transfer" feature (*see* D.I. 284, at 33), this position is inconsistent with Ampex's earlier representations to the Patent Office in which Ampex unambiguously stated that "[the '776 patent] fails to teach … the direct transfer of images between the disc storage and random access memory" ('121 file history, at B-282).[10] If Ampex is now correct that the '776 patent does disclose the "direct transfer" of image data from disk to RAM, then Ampex's representation to the Patent Office during prosecution was false.[11] This is a separate basis for inequitable conduct. *See Mobil*, 869 F. Supp. at 256-57 (patentee's statements attempting to distinguish the cited prior art during prosecution were misrepresentations that supported a finding of inequitable conduct).

### B. The Examiner Would Have Considered the Paint Box Important to Determining the Patentability of the '121 Patent Application.

Ampex does not dispute that it knew about the Quantel Paint Box and failed to disclose that system to the Patent Office during prosecution of the '121 patent.

REDACTED

Ampex argues that the Paint Box was not material to the patentability of the '121 patent

---

[10] The same is true for the "simultaneous storage" feature. During prosecution, Ampex represented to the Patent Office that the '776 patent did not disclose the simultaneous storage of full and reduced size images in RAM. ('121 file history, at B-282.) If Ampex is now correct that the '776 patent does teach the "simultaneous storage" of full and reduced size images, then Ampex's representation to the Patent Office during prosecution was false.

REDACTED

application because it purportedly was no more relevant than the disclosure of the Boyd article, the '776 patent, and column 1 of the '121 patent. (D.I. 284, at 29.) However, the record shows that the Paint Box is ***the closest prior art to the '121 patent*** because, according to even Ampex's own expert, it included every single feature of the asserted claims. There can be no dispute of fact that the examiner would have considered the Paint Box to be highly material to the patentability of the '121 patent and that Ampex should have disclosed this reference to the Patent Office.

    1.       **The Paint Box Discloses Several Features That Were Relevant to the Patentability of the '121 Patent Application.**

        a.      The Paint Box Discloses the "Direct Transfer" of Images from Disk to RAM.

The undisputed evidence shows that the Paint Box could transfer images from disk directly to the RAM of the filter card. (Taylor Decl., ¶ 59.) Indeed, Ampex's own expert admitted that the Paint Box transferred image data from disk directly to RAM:

    Q.     Was the transfer from disk to the random access memory of the filter card a direct transfer?
    A.     It's my understanding that it would be.

(Cavallerano Dep., at B-428.) This testimony is consistent with the Paint Box operating manual, which explains: "Picture data can be transferred from disc ***directly*** to any of the framestores." ("DPB 7000/1 Operating and Service Manual," at B-350 (emphasis added); *see also id* at B-352 (data from disk enters random access memory of filter card); *id.* at B351.)

        b.      The Paint Box Discloses the "Simultaneous Storage" of Full and Reduced Size Images in RAM.

The Paint Box could also store a full size image and a reduced size image in random access memory at the same time. Specifically, as confirmed by Ampex's own expert, the

Paint Box could store a full size image in one frame store while storing a reduced size image in a second frame store:

> Q. You agree, sir, do you not, that the Paint Box could store a full size image and a reduced size image in its frame store simultaneously, correct?
> ***
> A. As I've stated, through a particular series of steps, **it's possible to have the reduced size image temporarily in one frame store. And the full size counterpart present in the other, the display frame store.**

(Cavallerano Dep., at B-425 to B-426 (emphasis added) (objection omitted); *see also* Taylor Decl., ¶ 62.)

This feature allowed the Paint Box to display both a full size image and a reduced size image at the same time. (*See* "The Paint Box: Quantel's DPB 7000 Series Digital Paint Box," at B-172 ("Any picture can be used as a background over which the cut-out can be moved …."); *see also* "DPB 7000/1 Operating and Service Manual," at B-350 ("Cut outs are held in Store 2 which may be scrolled relative to Store 1.").) Moreover, the Paint Box's ability to store multiple images in random access memory at the same time was demonstrated at the NAB trade show in 1982.

**REDACTED**

Taylor Decl., ¶ 62.)

> c. <u>The Paint Box Discloses Storage of a Reduced Size Image to Disk Using Only the Disk Space Corresponding to the Reduced Size Image.</u>

It is undisputed that the Paint Box also had the ability to store a reduced size image to disk using only the memory corresponding to the reduced size image. Ampex's expert acknowledged that the Paint Box had this feature:

> Q. When the operator places the rectangle over the pixels that represent the reduced size image, or what you call part of the full size image, only part of the pixels within that rectangle are saved to disk; correct?

- 25 -

\*\*\*

A.        That's my understanding.

(Cavallerano Dep., at B-431 (objection omitted); *see also* Taylor Decl., ¶ 57.)

Consistent with this testimony, Paint Box documents created more than one year

before the application for the '121 patent was filed describe the Paint Box's ability to store

"cut-outs" and portions of pictures.  (*See* March 22, 1982 Preliminary Description of Quantel

Paint Box, at B-178 ("[T]he Paint Box includes a Winchester disk able to hold 300 pictures

*or parts of pictures*." (emphasis added)); "The Paint Box: Quantel's DPB 7000 Series Digital

Paint Box," at B-174 (explaining that the Paint Box "is able to store a combination of some

200 pictures, parts of pictures, stencils, *cut-outs* and artists' palettes" (emphasis added)).)

> d.        The Paint Box Discloses the Browse of Reduced Size Images
>           That Ampex Characterizes as Its Invention.

In part because of its ability to store reduced size images to disk using only the

memory space corresponding to the reduced size image, the Paint Box was capable of rapidly

browsing reduced size images stored on disk.  This is what Ampex contends is the heart of

the invention of the '121 patent.  (*See* D.I. 290, at 2 ("Because the reduced size images to be

used in a browse screen already have been created and stored, the browse screen can be

generated more rapidly.").)  Even Ampex's expert admitted that this browse feature provides

the precise benefit allegedly offered by the '121 invention:

> Q.        So one of the reasons the Paint Box browse [of] cutouts is faster than
>           the Paint Box browse of full size images, is because the cutouts
>           contain less data than the full size images; correct?
> A.        Yes.  Because again, what bogs down the system is needing to pull
>           off the full size image.  *And in fact that's what is such a benefit of
>           the '121 system*, where you don't need to be able – where you don't
>           need to pull off the full size image and send it through the size
>           reducer each time.

(Cavallerano Dep., at B-434 (emphasis added).)

> **2.        The Paint Box Is Not Cumulative of or Less Material Than the
>            Art Before the Examiner.**

- 26 -

Despite these similarities between the Paint Box and the invention claimed in the '121 patent, Ampex argues that the Paint Box was no more relevant to the patentability of the '121 patent application than were the Boyd article, the '776 patent, and column 1 of the '121 patent. (*See* D.I. 284, at 20.) Ampex is wrong for at least two reasons.

a.    The Paint Box Discloses Every Limitation of the '121 Patent.

Contrary to Ampex's assertions, the Paint Box is more relevant than any of the references that were before the examiner because it is the closest prior art to the '121 patent. In fact, Ampex's own expert has acknowledged that the Paint Box *included every single feature of the asserted claims*. This combination of features in a single reference is not cumulative of the cited prior art and renders the Paint Box more relevant than the prior art that was before the examiner. *See Baxter*, 149 F.3d at 1328 ("[Materiality] is judged based upon the overall degree of similarity between the omitted reference and the claimed invention in light of the other prior art before the examiner.").

Specifically, Ampex's expert conceded that the Paint Box could:

- *Accept images input from an external source* (*see* Cavallerano Dep., at B-419 ("Q. Would you agree that the Paint Box could receive the video from an external source? A. Yes."));

- *Store full size images in random access memory and on disk* (*see id.* at B-420 ("Q. And do you agree that either of [the Paint Box's two] frame stores could store a full size image? A. Yes....Q. [The disk] could store full size video images? A. Yes, it could store full size images."));

- *Generate reduced size images* (*see id.* at B-421 ("Q. ...Do you agree that the Paint Box could generate reduced size images? ... A. Yes, as I stated, that's correct."));

- *Automatically generate reduced size images* (*see id.* at B-422 ("Q. So we both agree that the Paint Box could automatically generate reduced size images; correct? ... A. Yes...."));

- *Store reduced size images in random access memory* (*see id.* at B-423 to B-424 ("That reduced size image most certainly could be stored in the output frame store. And it's temporarily present in the second frame store."));

- ***Store full and reduced size images in random access memory simultaneously*** (*see id.* at B-425 to B-426 ("As I've stated, through a particular series of steps, it's possible to have the reduced size image temporarily in one frame store. And the full size counterpart present in the other, the display frame store."));

- ***Store reduced size images to disk*** (*see id.* at B-433 ("Q. And after you reduce it in size, you can store that cutout to disk on the Paint Box; correct? A. That's my understanding, yes."));

- ***Store a reduced size image to disk using only the memory corresponding to the reduced size image*** (*see id.* at B-431 ("Q. When the operator places the rectangle over the pixels that represent the reduced size image, or what you call part of the full size image, only part of the pixels within that rectangle are saved to disk; correct? … A. That's my understanding."));

- ***Recall images from disk*** (*see id.* at B-426 ("Q. And it could output images from disk upon a user's command? A. Yes, I believe that's correct."));

- ***Transfer images from disk directly to random access memory*** (*see id.* at B-428 ("Q. Was the transfer from disk to the random access memory of the filter card a direct transfer? A. It's my understanding that it would be."));

- ***Transfer images directly between the size reducer and random access memory*** (*see id.* at B-427 ("Q. So do you agree that the Quantel Paint Box could transfer images directly from the size reducer to the random access memory? A. Yes, that's correct."));

- ***Display a mosaic of reduced size images*** (*see id.* at B-429 ("Q. Now, you agree that the Paint Box had a browse feature. A. Yes, I'm familiar with that."); *id.* at B-430 ("Q. And do you also agree that the Paint Box could display a mosaic of reduced size images? A. The – well, I would call that, what I was just describing right now, this array of reduced size images for the browse, that would be to one skilled in the art, one would call that a mosaic. So yes."));

- ***Select a reduced size image from the browse in order to retrieve the full size version of the images*** (*see id.* at B-435 to B-436 (Paint Box provides "a way to go from the reduced size that's in the browse screen to, back to the full size image.")); and

- ***Browse reduced size images that were stored on disk*** (*see id.* at B-433 ("Q. And after you reduce it in size, you can store that cutout to disk on the Paint Box; correct? A. That's my understanding, yes. Q. And then using the Paint Box browse function, you can browse through cutouts that are stored on disk; correct? A. Yes, that's correct."); *id.* at B-432 ("Q. And it could browse reduced size cutouts that were stored on disk; correct? A. Yes, that's my understanding….").).

There can be no doubt that the examiner would have considered this combination of features

in a single reference to be highly material to determining the patentability of the '121 patent

- 28 -

application. *See Baxter*, 149 F.3d at 1329 (holding that an undisclosed reference was "highly material" because, although other references disclosed certain features, it disclosed all but one of the claimed features in a single device).

        b.      The Paint Box Included the Very Same Features That Ampex
                Argued Made the Claimed Invention Patentable over the Prior
                Art.

In addition, the Paint Box's disclosure of the same features that Ampex relied upon to distinguish the prior art during prosecution – and continues to rely on in touting the "benefits" of its invention – means that the Paint Box is not cumulative of the art that was before the examiner.

As explained above, Ampex distinguished the invention of the '121 patent from the '776 patent and the Boyd article during prosecution based on the "direct transfer," "simultaneous storage," and "corresponding memory" features. *See supra* section III.B. However, as with the AVA system, the Paint Box contained *these very same features* that Ampex argued made the invention claimed in the '121 patent application patentable over the prior art. Accordingly, the Paint Box cannot be said to be cumulative of or less relevant than the prior art references that were before the examiner. *See eSpeed*, 417 F. Supp. 2d at 593; *Mobil*, 869 F. Supp. at 255-56.

Moreover, Ampex has repeatedly characterized the fast browse feature of the '121 patent as an advantage over the cited prior art. (*E.g.*, D.I. 300, at 5 (touting the "speed advantage" of "the '121 approach over the cited prior art"); D.I. 290, at 2.) But fast browse is precisely what the Paint Box does. (*See* Cavallerano Dep., at B-434 (describing the fast browse feature of the Paint Box as "what is such a benefit of the '121 system").) Given its own statements, Ampex cannot dispute that the examiner would have considered the Paint Box – and its fast browse feature – to be relevant to the patentability of the invention claimed in the '121 patent.

## V.    CONCLUSION

Defendants respectfully request that the Court deny Ampex's motion for summary

judgment that the '121 patent is not unenforceable due to inequitable conduct.

CONNOLLY BOVE LODGE & HUTZ LLP

*Of Counsel:*
William F. Lee
Donald R. Steinberg
Michael J. Summersgill
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

S. Calvin Walden
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, NY 10002
(212) 230-8800

Dated: June 13, 2006

_____ */s/ Collins J. Seitz, Jr.* _____
Collins J. Seitz, Jr. (#2237)
Jaclyn M. Mason (#4737)
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
cseitz@cblh.com

***Attorneys for Defendants Eastman Kodak Company
and Altek Corporation***

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2006, I electronically filed Defendants' Redacted Answering Brief in Opposition to Plaintiff Ampex's Motion for Summary Judgment that U.S. Patent No. 4,821,121 is Not Unenforceable Due to Inequitable Conduct to with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

and that I caused copies to be served upon the following in the manner indicated:

**VIA E-MAIL**

Jesse J. Jenner, Esquire
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020

**VIA E-MAIL & FEDERAL EXPRESS**

Norman H. Beamer, Esquire
Ropes & Gray LLP
525 University Avenue
Palo Alto, CA 94301

**VIA E-MAIL & HAND DELIVERY**

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

　　　　　　　　　　　　*/s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (Bar No. 2237)
Connolly Bove Lodge & Hutz LLP
P.O. Box 2207
1007 North Orange Street
Wilmington, DE 19899