IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMPEX CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-1373-KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| EASTMAN KODAK COMPANY, ALTEK | ) | |
| CORPORATION and CHINON INDUSTRIES, | ) | |
| INC., | ) | |
| | ) | **REDACTED** |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEFENDANTS' ANSWERING BRIEF TO AMPEX CORPORATION'S
MOTION FOR PARTIAL SUMMARY JUDGMENT THAT
U.S. PATENT NO. 4,821,121 IS NOT ANTICIPATED**

Collins J. Seitz, Jr. (Bar No. 2237)
Jaclyn Mason (Bar No. 4737)
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
PO Box 2207
Wilmington, Delaware 19899-2207
Tel: (302) 888-6241

Attorneys for Defendants

**OF COUNSEL:**
William F. Lee
Donald R. Steinberg
Michael J. Summersgill
Jordan L. Hirsch
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

S. Calvin Walden
Rebecca McCloskey
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230-8800
Fax: (212) 230-8888

Date: June 13, 2006

## TABLE OF CONTENTS

I.   STATEMENT AND NATURE OF PROCEEDING ...........................................................1

II.   SUMMARY OF ARGUMENT ........................................................................................1

III.   STATEMENT OF FACTS.................................................................................................3

    A.   Electronic Still Store Technology .........................................................................3

    B.   The '121 Patent .....................................................................................................4

        1.   The Purported Invention of the '121 Patent.................................................4

    C.   Anticipatory Prior Art ...........................................................................................5

        1.   The Paint Box System ..................................................................................6

        2.   The Hell Chromacom System ......................................................................9

        3.   The DLS 6000 Series .................................................................................11

        4.   Ampex's AVA System ...............................................................................12

        5.   The Scitex Response 300............................................................................13

        6.   The Harada Patent......................................................................................14

        7.   The SDMS System.....................................................................................14

IV.   ARGUMENT..................................................................................................................15

    A.   The Court Should Reject Ampex's Effort to Read "Automatically" and "Prior to" Limitations into the Asserted Claims – a Result that Mandates the Denial of Ampex's Motion................................................................................................................................16

    B.   There is No Dispute that the Paint Box System Anticipates the Asserted Claims, as Properly Construed...........................................................................................................19

    C.   The Existence of Genuinely Disputed Issues of Material Fact Requires the Denial of Ampex's Motion, Even Under Ampex's Construction. ..........................................................21

V.   CONCLUSION..............................................................................................................26

TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Advanced Display Sys., Inc. v. Kent State Univ.*
    212 F.3d 1272 (Fed. Cir. 2000)............................................................23

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*
    296 F.3d 1106 (Fed. Cir. 2002)............................................................17

*Chef Am., Inc. v. Lamb-Weston, Inc.*
    358 F.3d 1371 (Fed. Cir. 2004)............................................................17

*Cooper v. Goldfarb*
    154 F.3d 1321 (Fed. Cir. 1990)............................................................24

*Ethicon, Inc. v. Quigg*
    849 F.3d 1422 (Fed. Cir. 1988)............................................................21

*Knorr v. Pearson*
    671 F.2d 1368 (Ct. Cl. 1982)............................................................24

*Phillips v. AWH Corp.*
    415 F.3d 1303 (Fed. Cir. 2005)............................................................16

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*
    225 F.3d 1349 (Fed. Cir. 2000)............................................................6, 21

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*
    295 F.3d 1292 (Fed. Cir. 2002)............................................................16, 21, 25

## I.     STATEMENT AND NATURE OF PROCEEDING

Ampex Corporation ("Ampex") has accused Eastman Kodak Company and Altek

Corporation (collectively, "Defendants") of infringing U.S. Patent No. 4,821,121 ("the '121

patent") – a now-expired patent directed to decades-old electronic still store technology

developed for the broadcast television industry.[1]  The Defendants have denied those

allegations of infringement, and further contend that the asserted claims of the '121 patent are

anticipated by multiple prior art references under 35 U.S.C. § 102.  Fact and expert discovery

have concluded (except regarding the Defendants' advice of counsel defense), and a hearing

on claim construction and dispositive motions is scheduled for July 13, 2006.

## II.     SUMMARY OF ARGUMENT

Stretching the scope of the electronic still store-based claims of the '121 patent – in a

strained attempt to cover Kodak's very different accused digital still camera technology –

Ampex has proposed certain constructions that seek to impermissibly *broaden* several claim

terms (e.g., arguing that "video data" should be construed to cover *any* displayable image

data captured from *any* source, including still digital photographs).  At the same time, in an

attempt to avoid the mountain of invalidating prior art, Ampex has asked the Court to *narrow*

the scope of the '121 patent selectively, by injecting a handful of new limitations not required

by the claims.

The present motion is based on two such narrowing "limitations" proposed by

Ampex: (1) that reduced size images must be generated "*automatically*" for *each* captured

full size image; and (2) that *every* reduced size image must be generated "*prior to*" storage of

its corresponding full size image to disk.  Based on these constructions, Ampex contends that

---

[1]   Named defendant Chinon Industries was acquired by Kodak (through its subsidiaries), and no
longer exists as a separate legal entity.

it is entitled to summary judgment of no anticipation with respect to seven different prior art references. This argument fails for two reasons.

First, the motion rests *entirely* on the faulty premise that each asserted claim of the '121 patent contains Ampex's newly fabricated "automatically" and "prior to" limitations. But they do not. Neither proposed requirement finds support in the plain language of the claims, the text of the specification, or the prosecution history. In fact, Ampex's "automatically" argument squarely conflicts with other claim language requiring the claimed system to generate and transfer reduced size images "selectively" – i.e., limitations that explicitly provide an element of user choice. Similarly, Ampex's "prior to" argument conveniently ignores the fact that the applicant expressly removed those very words from earlier pending claims during prosecution. Fundamentally, a proper construction of the claims by the Court – one that does not incorporate Ampex's "automatically" or "prior to" restrictions – renders the present motion completely moot. In fact, such a construction actually warrants summary judgment of *anticipation for the Defendants* based at least on the prior art Paint Box system.

Second, notwithstanding Ampex's unsubstantiated assertions to the contrary, the evidence confirms that the undisclosed prior art at issue *explicitly teaches* Ampex's newly manufactured "automatic" and "prior to" proposed requirements. That evidence includes, among other things: (1) sworn declarations from three of the Defendants' experts (Mr. Taylor, Dr. Preuss, and Dr. Myers); (2) sworn deposition testimony from Ampex's validity experts, including Dr. Cavallerano – who readily and repeatedly agreed that both limitations are found in the prior art; and (3) direct admissions made by Ampex itself that both "limitations" were well known, "basic features of the prior art." These concessions demonstrate the strength of the Defendants' validity positions, even under Ampex's flawed

constructions, and at the very least generate disputed issues of material fact that require the denial of Ampex's motion.

## III.    STATEMENT OF FACTS

### A.    Electronic Still Store Technology

In the mid-1970s, the television industry began using devices called electronic still stores to capture and store single *still* frames from a series of *moving* pictures received from a television signal (video typically broadcast at thirty "frames" per second).  The still store then could digitize the captured image and store the resulting data temporarily in random access memory (RAM) (called a "frame store") and/or more permanent on disk storage (variously called a "disk store," "bulk storage," or an "image store").  ('121 Patent, 1:15-17, at B-236.)[2] At some later point in time, the stored full size image data could be accessed and "repetitively read out to generate a continuously displayed [full size] television image."  (*Id.*, 4:41-44, at B-237 *see id.*, 2:6-8, at B-236; Taylor Decl., ¶ 26).[3]

The broadcast television industry also used prior art electronic still stores "to generate a reduced size multiple image picture for editing or other purposes."  ('121 Patent, 1:28-30, at B-236.)  To do this, electronic still stores used a "size reducer" component to generate reduced size images that could be displayed together with other reduced size images in a "multi-image display" (i.e., in a "mosaic").  (*Id.*, 2:11-13, 32-43, at B-236, B-237.)

---

[2]  "B-___" refers to citations to the Appendix to Defendants' Answering Brief to Ampex Corporation's Motion for Partial Summary Judgment that U.S. Patent No. 4,821,121 is Not Anticipated.

[3]  "Taylor Decl." refers to the Declaration of Richard John Taylor in Support of Defendants' Answering Briefs to Ampex Corporation's Motions for Summary Judgment.

**B.    The '121 Patent**

**1.    The Purported Invention of the '121 Patent**

The claimed invention of the '121 patent "relates to a digital electronic still store for broadcast television signals and more particularly to a still store providing a high speed multiimage scan or sort capability." ('121 patent, 1:11-14, at B-236.)[4]  As an initial matter, Ampex does not contend that the '121 patent contains the first disclosure of an electronic still store – those devices had existed in the prior art for nearly a decade before the application of the '121 patent.  Nor does Ampex argue that the patent discloses any novel component used by an electronic still store.  To the contrary, the parties agree that *all* of the hardware components described by the '121 patent had existed in the prior art for years.  (*See*, *e.g.*, Taylor Decl., ¶ 27; Cavallerano Dep., at B-354 ("[A]ll of the components of the '121 patent were known in the art.").

Ampex and its experts further concede that the '121 patent does not contain the first disclosure of an electronic still store that could perform many of the image capture, reduction, storage, transfer, retrieval, display, and browsing functions described in the '121 patent, including:

- *Capturing a full size image from video received from an external source (e.g., a television camera)* (Cavallerano Dep., at B-323);

- *Saving captured full size image data temporarily in RAM and more permanently on disk storage for later access* (*id.* at B-323 to B-324);

- *Using a size reducer to generate a reduced size version of a captured full size image* (*id.* at B-303 (Q. Was the '121 patent the first disclosure of a size reducer? A. Most certainly not.");   **REDACTED**

- *Saving reduced size images to RAM and disk storage* (*id.* at B-361 to B-362 (agreeing that "[t]he '121 patent is not the first disclosure of the storage of reduced size images in random access memory");    **REDACTED**

---

[4]    Ampex filed the application for the '121 patent in April 1983.  The '121 patent issued in April 1989, and expired earlier this year in April 2006.

-4-

**REDACTED**     . Cavallerano Dep., at B-304 ("It wasn't the first to disclose storing reduced size images on disk.");    **REDACTED**

- *Displaying multiple reduced size images at once as a mosaic* (Cavallerano Dep., at B-309 ("Q. Was Dan Beaulier first to output stored images as a mosaic? A. No, he was not.")); or

- *Allowing the operator to browse stored images, including multiple reduced size images displayed in a mosaic, and to select one or more of the images for display or editing purposes* (*id.* at B-290 to B-291 ("[B]eing able to do a browse, being able to access from the browse a full size image, this is all prior art."); *id.* at B-308 ("Q. Did Dan Beaulier invent the browse feature? A. No, we know he did not."); *id.* at B-309 (agreeing that "the ability to select a reduced size image in a browse in order to obtain a full size image … was well known at the time that Dan Beaulier was working on his invention"); *id.* at B-316 ("That was prior art."); )    **REDACTED**

Instead, Ampex now argues that "[t]he '121 patent describes a better system for rapidly generating and displaying a browse screen" by requiring *all* reduced size images to be: (1) "*automatically* generated when the still store system first captures and stores the full size images" (i.e., without any user input); and (2) generated "*prior to* storage of the [full size] images [to disk]," such that "[t]he reduced size image is then stored along with the full size image." (D.I. 290, at 2 (emphasis added); D.I. 300, at 22.) According to Ampex, its "automatically" and "prior to" requirements are mandated by every claim of the '121 patent. (D.I. 300, at 22.)[5]

**C.    Anticipatory Prior Art**

Ampex asserts that, to the extent the Court adopts its proposed "automatically" and "prior to" constructions, the Defendants are precluded as a matter of law from alleging anticipation with respect to the following seven prior art references – even under the "more easily carried" burden of proof applicable to prior art not before the Patent Office during prosecution of the '121 patent: (1) the Paint Box system; (2) the Hell Chromacom system; (3)

---

[5]    As set forth below and further detailed in the Defendants' claim construction briefs, neither "limitation" is required by *any* asserted claim. (*See* D.I. 299, at 22-25; D.I. 348, at 11-16.)

the DLS 6000 series; (4) Ampex's AVA system; (5) the Scitex Response 300; (6) the Harada '019 patent; and (7) the SDMS system. *See SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355-56 (Fed. Cir. 2000) ("While the presentation at trial of a reference that was not before the examiner does not change the presumption of validity, the alleged infringer's burden may be more easily carried because of this additional reference.").[6] The basic operation of these systems is discussed below.

### 1.    The Paint Box System

From 1980 to 1982, Quantel Limited ("Quantel") designed and built the Paint Box – a video graphics system used in the broadcast television industry to, among other things, capture, store, manipulate, and recall video images.[7]  The record confirms that Quantel first sold the Paint Box system to The Weather Channel in March 1982, and further demonstrated the system to several other customers in March and April 1982 (including at the National Association of Broadcasters (NAB) trade show).  Both parties agree that the Paint Box system is relevant prior art to the '121 patent. (*See* Taylor Decl., ¶ 26; Cavallerano Dep., at B-294 to B-295 (testifying that Paint Box is "related to the ['121] patent;" "we've already established it's prior art to the '121 patent").)

In addition to its high performance graphic capabilities, the Paint Box system

---

[6]    The '121 patent file history contains references to the DLS 6000 series, but none discuss the feature of that system most relevant to Ampex's construction of the '121 patent (i.e., the "Stack/Don't Care" feature discussed below). (*See* D.I. 290, at 7 ("The Boyd article cited by the '121 patent Examiner does not explicitly refer to a function called "Stack/Don't Care.").)

[7]    The Defendants' expert, Mr. Richard Taylor, led the Paint Box team at Quantel. Mr. Taylor was involved in all aspects of the Paint Box system, including system design. He also demonstrated the system at customer sites and trade shows, and trained customers how to operate the system. (Taylor Decl., ¶ 40.) Ampex's validity "expert," Dr. Cavallerano, concedes Mr. Taylor is an expert concerning to the Paint Box system, and that Mr. Taylor is more knowledgeable than he about that system. (Cavallerano Dep., at B-317, 323.) These concessions are not surprising given that Mr. Cavallerano never has operated, inspected, or ever seen an actual Paint Box system in person, and did not review any detailed information about the system before February 2006. (*Id.* at B-317 to B-322.)

included the same hardware components and offered the same functionality as the electronic still stores described in the '121 patent.[8]  A simplified block diagram of the Paint Box system is shown below:



(Taylor Decl., ¶ 44.)

The Paint Box system had a "Live Video" feature that enabled an operator to capture any single frame from a stream of video received from an external source (via the "Video Input" component), such as from a television broadcast or video camera.  (Taylor Decl., ¶ 45; Cavallerano Dep., at B-323; *see* D.I. 290, at 2.)  The captured full size image frame then could be digitized (by the "Input A/D" component), temporarily stored in RAM (e.g., in one of the "Frame Stores"), and saved to more permanent disk storage for later access (to the "Disk Store").  The stored full size image could be accessed and output at some later time for display and/or editing purposes.  (Taylor Decl., ¶58; Cavallerano Dep., at B-323.)

The Paint Box system also included a "cut and paste" function that, using the "Size Reducer" component, allowed the operator to reduce the size (by any factor) of a captured

---

[8]    Television news and current affairs organizations often used the Paint Box system for its still store capabilities.  (Taylor Decl., ¶ 39.)

full size video image.  The resulting "cutout" generated by the size reducer could be stored temporarily in RAM and, if desired, saved to the disk store.  The operator could access the stored reduced size image for display and/or editing purposes at some later time.  (Taylor Decl., ¶ 54-58; Cavallerano Dep., at B-346 to B-350.)[9]

It is undisputed that the Paint Box system provided for the ***automatic*** generation of reduced size images.  Using a "browse" feature, the operator simultaneously could view as many as twelve full and/or reduced size images that had been stored to disk.  When used to browse multiple full size images stored on disk, the system ***automatically*** generated a reduced size version of each retrieved image, and then displayed the automatically generated reduced size images as part of a mosaic.  By selecting one of the reduced size images displayed in the mosaic, the user could retrieve the corresponding full size image from storage.  (Taylor Decl., ¶ 53 ; Cavallerano Dep., at B-326 to B-328 (conceding "that the Paint Box could automatically generate reduced size images"); *id.* at B-293 (agreeing that "the Paint Box had a browse capability").)

It is equally undisputed that the Paint Box system allowed the operator to browse reduced size images – i.e., "cutouts" – that previously had been stored on disk.  (Cavallerano Dep., at B-297 ("[T]he Paint Box system could browse cutouts.")  Indeed, Ampex's expert, Dr. Cavallerano, admits that this fast browse function of the Paint Box system provided the exact same "benefit of the '121 system" that Ampex now identifies as the supposed novelty of its purported invention:

> Q.    So one of the reasons the Paint Box browse [of] cutouts is faster than the Paint Box browse of full size images, is because the cutouts contain less data than the full size images, correct?

---

[9]    The Paint Box frame stores each had an input port to receive data, and an output port to send data.  (Taylor Decl., ¶ 46; *see* Cavallerano Dep., at B-335 to B-336 (testifying that "the Paint Box has the input and output port requirement that's set forth in the first element of claim 8").)

A.    Yes.  Because again, what bogs down the system is needing to pull off the full size image.  ***And in fact that's what is such a benefit of the '121 system***, where you don't need to be able – where you don't need to pull off the full size image and send it through the size reducer each time.

(*Id.* at B-351.)

In fact, Ampex's experts have conceded that, as sold prior to April 1982, the Paint Box system meets ***every element*** of the asserted claims under the Defendants' construction. (*See, e.g.*, Cavallerano Dep., at B-323 (external source); *id.* at B-324 (full size images stored to RAM and disk); *id.* at B-326 to B-328 (selective or automatic generation of reduced size images); *id.* at B-330 to B-331, B-333 to B-334, B-347 to B-348 (reduced size images stored to RAM and disk); *id.* at B-333 to B-334 (stored full and reduced size images in RAM simultaneously); *id.* at  B-334, B-339 (recalled images from disk to RAM); *id.* at B-337-338 (direct transfer); *id.* at B-340 (displayed mosaic of reduced size images); *id.* at B-347, 348 (browsed reduced size images); *id.* at B-352 to B-353 (selected reduced size image from browse to retrieve full size image).

## 2.    The Hell Chromacom System

The Hell Chromacom was a prepress and image processing system used to arrange and edit publication pages.[10]  Like an electronic still store, the Chromacom system could capture, store, edit, retrieve, and display images.  The system was first described in a printed publication in 1979, first sold in the United States in 1980, and demonstrated multiple times in 1981 to customers located in the United States.  It is prior art.  (*See* Preuss Decl. ¶ 18.)

---

[10]    Prepress technology generally refers to the use of images, text, and graphics for the preparation of printed media (e.g., magazines, books, advertisements).  (*See* Preuss Decl., ¶ 8.) As used herein, "Preuss Decl." refers to the Declaration of Dr. Dieter Preuss in Support of Defendants' Answering Briefs to Ampex Corporation's Motions for Summary Judgment.  The Defendants' expert, Dr. Dieter Preuss, was responsible for the hardware design of the Chromacom system, and supervised the engineers responsible for development of the system hardware.  Dr. Preuss also worked closely with the engineers that designed the software for the Chromacom system.  (*Id.* ¶ 21.)

-9-

The Chromacom system consisted of several different "stations," including: (1) a "Scan/Reco station" that could receive and store full size images from an external source, such as a scanner (the scanner physically existed outside the system, and was sold separately from the system);[11] and (2) a "Combiskop station," where the received full size image could be manipulated, stored, and displayed on a monitor, and where the final output page could be processed. In operation, the full size image data received by the Scan/Reco station was stored temporarily in RAM, and also could be saved more permanently on disk storage contained within the Scan/Reco station. Alternatively, the full size image data could be transferred to the Combiskop station where it also could be stored temporarily in RAM and written to disk storage. The operator could retrieve and display any full size image stored on disk in either station. (*Id.* ¶ 26.)

The record confirms that, for *each* full size image received by the system, the Scan/Reco station could generate reduced size images (sometimes called a "coarse" or "view" resolution image) *automatically* and *prior to* storage of the corresponding full size image on disk. The reduced size image then could be saved to disk storage (on either station) along with the captured full size image. Thereafter, the operator could choose to display and browse one or more reduced size images (either alone or as a mosaic) previously stored to disk. (*See* Preuss Decl., ¶ 32-36;

**REDACTED**

---

[11]     Although the Chromacom system did not capture (and store) single frames from a series of moving pictures (i.e., from "video," as construed by the Defendants), that system, other prepress systems (e.g., the Scitex Response 300 discussed below), and virtually any other electronic system capable of the electronic display of images satisfy Ampex's far broader construction of the "video" requirement. (*See* Cavallerano Dep., at B-271 (agreeing that, according to Ampex, "video means any images that are displayable"). Moreover, even under the Defendants' construction, the prior art explicitly taught that prepress systems could be connected to a television camera to receive "video" images. (*See* Preuss Decl., ¶ 25.)

REDACTED

### 3.     The DLS 6000 Series

In addition to its Paint Box system, Quantel also made and sold the Digital Library

System (DLS) 6000 series – a family of electronic still stores that could capture, store,

retrieve, reduce, and display video images.  Quantel introduced the DLS 6000 series in 1979,

first sold the system in the United States in February 1981, and annually demonstrated the

system at NAB trade shows from 1979-1982.  (Taylor Decl., ¶ 103.)  Ampex's expert, Dr.

Cavallerano, agrees that the DLS 6000 series is relevant prior art to the '121 patent.  (*See*

Cavallerano Dep., at B-292 ("I would say it's one of the products … that one could consider

as prior art."); *id.* at B-294 to B-295 (agreeing that the DLS system is "related to the ['121]

patent").)

Like other prior art electronic still stores, the DLS 6000 series could receive a video

feed from an external source (e.g., a television broadcast or video camera) and capture single

still frames from the received video signal.  The system temporarily stored the captured full

size image data in the preview frame store (comprised of RAM), and the user also could save

the full size image to more permanent disk storage.  At any subsequent time, the operator

could retrieve the full size image from disk storage for display and/or editing purposes.

(Taylor Decl., ¶¶ 107, 110-11, 119.)

The DLS 6000 series allowed the operator (using a size reducer) to create a reduced

size version of any captured image that could be stored to disk (along with the full size

---

[12]     The Combiskop station also could generate reduced size images.  To do so, the system
transferred the full size image data to the minicomputer, which generated a reduced size version
of the full size image.  The reduced size image then was transferred to RAM and saved to disk for
permanent storage.  Later, the operator could select and display one or more of the stored reduced
size images (either alone or as a mosaic).  (Preuss Decl., ¶ 32-36;   REDACTED

REDACTED

-11-

image).  Using the "Stack/Don't Care" function, the system could generate reduced size images *automatically*.  The "stack" feature allowed users to group a "stack" of pictures together for display, and the "don't care" feature caused the system to apply a user-defined formatting operation, including reducing image size by a set factor, to all images in the stack.  The automatically generated reduced size images then could be saved to disk and displayed to the operator.  Using the browse feature, the operator could display and select from as many as twenty-five reduced size images (displayed as a mosaic).  (Taylor Decl., ¶ 113; Cavallerano Dep., at B-296 (conceding that the Quantel 6000 series DLS systems "had an automatic browse capability"); ·                    **REDACTED**

### 4.    Ampex's AVA System

The AVA was a video graphics system made by Ampex that was used in the television broadcast industry to, among other things, capture, manipulate, store, and recall video images.  Ampex first sold the AVA system in the United States (to CBS) in September 1980, and demonstrated the system publicly at the 1980 NAB trade show.  The system is prior art to the '121 patent.  (Taylor Decl., ¶ 132.)

The AVA system had the features of an electronic still store.  (*See* D.I. 290, at 2, 9.)

**REDACTED**

REDACTED

### 5.    The Scitex Response 300

The Response 300 system was a prior art prepress and image processing system made by Scitex Corporation that, like an electronic still store, could capture, edit, store, retrieve, and display images. Scitex first introduced and sold the Response 300 system in 1979. (Preuss Decl., ¶ 44.)

The Response 300 system included an editing station, which contained computers, RAM, multiple disk drives, and a display monitor. The editing station received captured image data from an external source (i.e., a scanner that physically existed outside the system). The captured full size image data then could be transferred to RAM for temporary storage, and/or to one of the disk drives for more permanent storage. Once stored on disk, the full size image data could be accessed and retrieved at a later time. (Preuss Decl., ¶¶ 34-36)

The Response 300 system **_automatically_** generated reduced size images. Any time the system accessed the full size image data stored in the editing station memory, the Response 300 system automatically generated a reduced size version of the full size image (sometimes referred to as the "view file" or the "screen image"). The operator then could: (1) save the reduced size image to disk; and (2) at some later time, recall the reduced size image (or a mosaic of multiple reduced size images) from disk for display. (*Id.* ¶¶ 27-36.)

### 6.     The Harada Patent

The application for U.S. Patent No. 4,802,019 ("the Harada patent") was filed on

January 3, 1983 (several months before the filing of the '121 patent application). Like the

'121 patent, the original application for the Harada patent describes an electronic still store

system, expresses a need "to accomplish quick selection of the desired pictures from a

plurality of squeezed pictures on the index screen," and claims to have met that need through

the disclosed "apparatus for selecting a desired picture from a plurality of still pictures

formed on a monitor screen." (Harada patent, 1:10-12, 2:23-25, at B-229)


**REDACTED**


The specification of the Harada patent discloses a preferred embodiment that receives

and captures one or more still frames from an external video signal. The captured full size

image was stored temporarily in RAM, and also to more permanent disk storage for later

access. In addition, for each captured full size image, the preferred system ***automatically***

generated a reduced size version of the captured image using a component called a

"squeezer" (the application and patent refer to the reduced size images as "squeezed"

images). The reduced size images were stored in RAM and on disk, and could be accessed

later by the user for browsing and/or editing purposes (a collection of reduced size images

also could be selected and displayed as a mosaic). (Myers Decl., ¶¶ 29-36)

### 7.     The SDMS System

From 1977-80, the Architecture Machine Group at the Massachusetts Institute of

Technology worked on the Spatial Data Management System (SDMS) project involving a

---

[13]   "Myers Decl." refers to the Declaration of Dr. Brad A. Myers in Support of Defendants'
Answering Briefs to Ampex Corporation's Motions for Summary Judgment.

powerful computer graphics system that could be used, among other things, to capture, store, manipulate, and display video images. By 1980, the commercial SDMS system[14] had been described in several printed publications, discussed and shown at a conference, and demonstrated to numerous potential customers. (Myers Decl., ¶¶ 56-57.)

The SDMS system could receive image data captured from an external source, such as a video camera. Once received, the captured full size image was stored temporarily in RAM (a frame buffer) and displayed to the user.[15] The captured full size image also could be stored to, and later recalled from, a disk drive (either alone or along with other captured images). The SDMS system also ***automatically*** generated reduced sized images for each captured full size image, and could save the reduced size image on disk storage for later access. The operator could recall single or multiple reduced size images from disk. The multiple images were displayed on the left monitor as a mosaic of reduced size images, and any images from that mosaic selected by the operator were shown on the center monitor as full size images. (Myers Decl., ¶¶ 63, 76.)

## IV.    ARGUMENT

Ampex's motion rests upon two flawed premises. First, the motion is conditioned ***entirely*** on this Court's acceptance of Ampex's improper effort to read new "automatically" and "prior to" limitations into each claim of the '121 patent. A rejection of those newly minted constructions – a course mandated by the intrinsic record and established Federal Circuit precedent – renders the present motion completely moot and meaningless. Indeed, to

---

[14]    MIT ultimately "spun off" the SDMS project for further commercial development by a company called Computer Corporation of America (CCA). (*See* Myers Decl., ¶ 54.)

[15]    The SDMS system included three monitors. The right monitor typically displayed a menu of commands for use with the graphical editor, the left monitor displayed a reduced size version of one or more captured images, and the center monitor displayed a full size version of the image(s) (or portion thereof) selected for viewing from the left monitor. (Myers Decl., ¶¶ 60-61.)

the extent the Court declines to adopt Ampex's proposed constructions, the undisputed record shows that at least the Paint Box system anticipates the asserted claims of the '121 patent.

Second, even under Ampex's faulty construction, the factual record before the Court – which includes critical admissions by Ampex, sworn testimony by the parties' respective experts, and other compelling evidence – demonstrate the existence of genuinely disputed issues of material fact concerning whether the prior art references at issue here anticipate the asserted claims. These disputes require the denial of Ampex's motion. *See Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1294 (Fed. Cir. 2002) ("[A] district court properly may grant summary judgment on [anticipation issues] only when the record discloses no genuine material factual issues.").

### A.    The Court Should Reject Ampex's Effort to Read "Automatically" and "Prior to" Limitations into the Asserted Claims – a Result that Mandates the Denial of Ampex's Motion.

Each asserted claim of the '121 patent requires a system (or method) that, among other things, is capable of generating "reduced size" images (or "fractional size" images in claim 10), and saving those reduced size images to disk storage. But Ampex contends that every claim further requires: (1) that reduced size images ***must*** be generated "***automatically***" for ***each*** captured full size image; and (2) that ***every*** reduced size image must be generated "***prior to***" storage of its corresponding full size image to disk. A proper claim construction analysis, focused on the intrinsic evidence of record, requires rejection of Ampex's litigation-driven efforts to modify the claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("[W]e have emphasized the importance of intrinsic evidence in claim construction….").

First, Ampex's proposed constructions cannot be squared with the plain language of the asserted claims. The term "automatically" does not appear in ***any*** claim (or the specification) of the '121 patent, and no other claim language even remotely implies a

requirement that the claimed system must generate reduced size images "automatically" for every captured full size image.[16] The claims also lack the phrase "prior to," or any other terms specifying *when* a reduced size image must be saved to disk (i.e., before, after, or at the same time that the corresponding full size image is saved to disk). The Court should reject Ampex's invitation to rewrite the claims by adding new claim terms. *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court, however, repeatedly and consistently has recognized that courts may not redraft claims...."); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1115 (Fed. Cir. 2002) ("This court will not rewrite claims.").[17]

Second, the specification is devoid of any statement *requiring* the claimed invention in *every instance* to generate reduced size images "automatically" and "prior to" storage of the corresponding full size image. In fact, Ampex's construction directly contradicts the specification of the '121 patent, which makes clear that the contrary is true: that the system "*may*" generate a reduced size image, but does not have to do so, and may do so *after* storage of the full sized image on disk. ('121 patent, 4:7-12, at B-237 ("[W]hen video data *received from disk store 24* does not contain a corresponding quarter spatial resolution copy, size reducer 26 *may* be employed to generate a quarter spatial resolution copy for subsequent transfer to either frame store 22 or disk store 24." (emphasis added)); *see also id.*, 1:46-47, at B-236 (using term "selectively" to denote choice).)

---

[16]   In fact, just the opposite is true. By claiming a system that includes "*selectively* generating" and the "*selective* transfer" of reduced size images, the inventor plainly intended to incorporate elements of *user choice* into his supposed "invention."

[17]   The inventor plainly knew how to use the terms "automatic" and "prior to" when he wanted to do so – he used both in the prosecution history. ('121 File History, at B-187, B-193.) That neither is found in any issued claim is inconsistent with the idea that the inventor intended – but forgot – to use those words when it came time to write the claims that issued. Had the inventor intended to limit the claims in such a manner, he could have done so easily and explicitly. But he did not – an omission that speaks volumes about the proper scope of the claims.

Third, Ampex's construction is not supported by the file history. During prosecution, Ampex initially argued for the allowance of certain claims by contending that the prior art did "not store a reduced image automatically with the full size counterpart each time a full size image in the frame buffer is to be stored on disk." ('121 File History, at B-200). But that statement was based on a claim that the Examiner subsequently *rejected* and that Ampex later *withdrew*. The new claims that Ampex later submitted and that the Examiner allowed to issue *deleted* the very claim language upon which Ampex based its earlier prosecution statements. Thus, Ampex's earlier statement in the file history about a limitation absent from any issued claim is irrelevant here. (*See* D.I. 299, at 13-14.)

Similarly, early in prosecution, the Examiner identified "[t]he apparent novelty of [the] claimed invention" as including "size reduction and production of the 'frame' of video data is performed by the interaction between the size reducer and the frame store *prior to* storage in the image store." ('121 File History, at B-176; *see* D.I. 300, at 24.) Ampex relies on that statement, but consistently fails to acknowledge: (1) that the claims then-pending *expressly included* the words "prior to;" (2) that the words "prior to" *were removed* by a later amendment during prosecution; and (3) that *no issued claim* contains the words "prior to." (*See* '121 File History, at B-201; Cavallerano Dep., at B-272 to B-288 (reviewing applicant's removal of the phrase "prior to" from the claims during prosecution).) Ampex's elimination of that phrase renders the Examiner's previous statements irrelevant, and further highlights that the issued claims contain no "prior to" requirement.[18]

---

[18] Ampex has no meaningful counter to these arguments based on the intrinsic record. Rather, in its claim construction brief, Ampex largely relies upon nebulous assertions about: (1) "the logic of the language of the claims;"(2) "the purpose and stated advantages of the invention;" (3) a supposed understanding by one of ordinary skill in the art about how "certain basic features of the prior art would have to be carried over to the system of the '121 patent;" and (4) claims of its own purported "clear disavowals of claim scope made in the prosecution history of the '121 patent." (D.I. 290, at 22-24.)

In fact, even Ampex's expert concedes that the claims do not require the generation of reduced size images "prior to" storage of the corresponding full size image to disk:

> Q.   So the '121 patent does not require the generation of reduced size images prior to the storage of the full size image on disk; does it?
>
> [Objection]
>
> A.   No, it does not.

(Cavallerano Dep., at B-346.)

In sum, because the claims as properly construed simply do not require reduced size images to be generated "automatically" and "prior to" storage of the corresponding full size image, the present motion should be dismissed as moot – a result that even Ampex concedes is appropriate.  (*See* D.I. 290, at 2 (Ampex claiming that it is entitled to summary judgment of no anticipation **only** "[i]f the Court adopts Ampex's construction of the claims, such that they require automatic input operations and [the "prior to"] order of steps…").)

**B.      There is No Dispute that the Paint Box System Anticipates the Asserted Claims, as Properly Construed.**

A proper construction of the asserted claims (one that does not adopt Ampex's "automatically" or "prior to" requirements) not only compels the denial of Ampex's pending motion – it also warrants the grant of summary judgment of anticipation in *the Defendants' favor* based on the Paint Box system.  Specifically, on the record before the Court, experts for both parties agree that the Paint Box system could perform each of the following limitations required by the asserted claims:

- *Accept images input from an external source* (Cavallerano Dep., at B-323 (agreeing "that the Paint Box could receive the video from an external source"); Taylor Decl., ¶ 45);

- *Store full size images in RAM and on disk* (Cavallerano Dep., at B-324 ("Q. And do you agree that either of [the Paint Box's two] frame stores could store a full size image? A. Yes….Q. [The disk] could store full size video images? A. Yes, it could store full size images."); Taylor Decl., ¶¶ 48-49);

- **Generate reduced size images** (Cavallerano Dep., at B-326 (admitting "that the Paint Box could generate reduced size images"); *id.* at B-328 (conceding "that the Paint Box could automatically generate reduced size images"); Taylor Decl., ¶¶ 50-51);

- **Store reduced size images in RAM** (Cavallerano Dep., at B-330 to B-331 ("That reduced size image most certainly could be stored in the output frame store. And it's temporarily present in the second frame store."); Taylor Decl., ¶ 54);

- **Store full and reduced size images in RAM simultaneously** (Cavallerano Dep., at B-333 to B-334 ("As I've stated, through a particular series of steps, it's possible to have the reduced size image temporarily in one frame store. And the full size counterpart present in the other, the display frame store."); Taylor Decl., ¶ 62);

- **Store reduced size images to disk** (Cavallerano Dep., at B-348 (testifying that "after you reduce it in size, you can store that cutout to disk on the Paint Box"); Taylor Decl., ¶ 56);

- **Recall images from disk** (Cavallerano Dep., at B-334 ("Q. And it could output images from disk upon a user's command? A. Yes, I believe that's correct."); Taylor Decl., ¶ 58);

- **Transfer images from disk directly to RAM** (Cavallerano Dep., at B-339 ("Q. Was the transfer from disk to the random access memory of the filter card a direct transfer? A. It's my understanding that it could be."); Taylor Decl., ¶ 59);

- **Transfer images directly between the size reducer and RAM** (Cavallerano Dep., at B-338 ("Q. So do you agree that the Quantel Paint Box could transfer images directly from the size reducer to the random access memory? A. Yes, that's correct."); Taylor Decl., ¶ 55);

- **Display a mosaic of reduced size images** (Cavallerano Dep., at B-340 (agreeing "that the Paint Box had a browse feature"); *id.* at B-341 ("This array of reduced size images for the browse, that would be to one skilled in the art, one would call that a mosaic."); Taylor Decl., ¶ 65);

- **Select a reduced size image from the browse to retrieve the full size version of the image** (Cavallerano Dep., at B-352 to B-353 (Paint Box provides "a way to go from the reduced size that's in the browse screen to, back to the full size image."); Taylor Decl., ¶ 53); and

- **Browse reduced size images that were stored on disk** (Cavallerano Dep., at B-348 ("Q. And after you reduce it in size, you can store that cutout to disk on the Paint Box; correct? A. That's my understanding, yes. Q. And then using the Paint Box browse function, you can browse through cutouts that are stored on disk; correct? A. Yes, that's correct."); *id.* at B-347 ("Q. And it could browse

reduced size cutouts that were stored on disk; correct? A. Yes, that's my understanding ....") Taylor Decl., ¶ 43.)

Indeed, Ampex's expert even admits that the fast browse function of the Paint Box system provided the very same "benefit" that Ampex now contends is at the heart of the '121 patent:

> Q.    So one of the reasons the Paint Box browse [of] cutouts is faster than the Paint Box browse of full size images, is because the cutouts contain less data than the full size images, correct?
>
> A.    Yes. Because again, what bogs down the system is needing to pull off the full size image. *And in fact that's what is such a benefit of the '121 system*, where you don't need to be able – where you don't need to pull off the full size image and send it through the size reducer each time.

(Cavallerano Dep., at B-351.)

Based on this undisputed record evidence, any reasonable jury necessarily would conclude that the Paint Box system anticipates the asserted claims under the Defendants' proposed construction.

### C.    The Existence of Genuinely Disputed Issues of Material Fact Requires the Denial of Ampex's Motion, Even Under Ampex's Construction.

Even if the Court were to accept Ampex's proposed construction, the present motion still should be denied in view of the factual record before the Court – which, at the very least, demonstrates the existence of numerous genuinely disputed issues of material fact concerning whether the seven prior art references at issue here satisfy Ampex's "automatically" and "prior to" requirements.[19]  *See Trintec Indus.*, 295 F.3d at 1294.

---

[19]    Throughout its brief, Ampex appears to suggest that this Court somehow is bound by or otherwise required to defer to the validity assessment conducted by the Patent Office during prosecution. (D.I. 290, at 6, 7, 9.) It is not; particularly with respect to prior art references that were not before the Examiner. *See Ethicon, Inc. v. Quigg*, 849 F.3d 1422, 1428 (Fed. Cir. 1988) ("We see nothing untoward about the PTO upholding the validity of a reexamined patent which the district court later finds invalid. This is essentially what occurs when a court finds a patent invalid after the PTO has granted it."); *see also SIBIA*, 225 F.3d at 1355-56 (lower burden of proof to show invalidity with respect to prior art references "not before the examiner").

As an initial matter, the present motion for summary judgment is particularly inappropriate given Ampex's many admissions confirming that both of its newly minted "automatically" and "prior to" requirements were well known in the prior art. For example, at his deposition, Ampex's expert repeatedly conceded that the concept of generating reduced size images "automatically" was known in the art years before the '121 patent:

> Q.    The '121 patent was not the first to disclose automatically reduced size images, correct?
>
> A.    That's correct.

(Cavallerano Dep., at B-303; see id. at B-289 (agreeing that Quantel's prior art DLS 6000 series system was "indeed capable" of generating reduced size images "automatically"); id. ("As I have stated, this was prior art. Being able to generate it automatically was known."); id. at 91-93 (agreeing that, as of April 1983, automatically generating reduced size images "was not a novel concept").)

Similarly, Mr. Cavellerano asserted that the generation of reduced size images "prior to" storage of the corresponding full size image on disk also was a concept known in the prior art.

**REDACTED**

In fact, Ampex advances these exact same concessions in its own claim construction briefs – arguing that its "automatically" and "prior to" limitations were so prevalent in prior art systems that those "basic features of the prior art" would have to be "carried over to the system of the '121 patent:"

> As explained by Ampex's expert, because the '121 patent describes the invention as an improvement over the prior art browse functionality … a person of ordinary skill in the art would understand that, at minimum, certain basic features of the prior art would have to be carried over to the system of the '121 patent: (i) generation and

-22-

storage of the reduced size image *when the full size image is captured and stored* must be *automatic....*"

(D.I. 300, at 24 (emphasis added); *see id.* ("One of ordinary skill would have understood that these basic features would be included, because otherwise the '121 patent would not achieve the basic functionality of the prior art browse approaches, which would have made no sense.").)[20]

Moreover, even beyond these critical concessions, there is at least a disputed issue of material fact concerning whether Ampex's "automatically" and/or "prior to" requirements could be met by:

- **The Paint Box System**, which included a "cut and paste" feature used to generate reduced size images, and a "browse" feature that provided for the *automatic* generation and display of multiple reduced size images (as a mosaic). (*See* Taylor Decl., ¶¶ 40-41, 51; Cavallerano Dep., at B-323 to B-324, B-343 to B-344 (discussing cut and paste function); *id.* at B-296 to B-297 ("The Paint Box browse" had "an automatic browse capability"); *id.* at B-293 (agreeing that "the Paint Box had a browse capability"); *id.* at B-345 (admitting that, even under Ampex's construction, "the fact that the Paint Box generates reduced size images from full size images that have been stored on disk, does not take the Paint Box out of coverage of the '121 patent claims").)

- **The Hell Chromacom System**, which could *automatically* generate reduced size images *prior to* storage of the corresponding full size image on disk. The reduced size image then could be saved to disk along with the captured full size image, and later retrieved and browsed either alone or with other reduced size

---

[20]  Notwithstanding Ampex's and its experts' concessions that the "automatically" and "prior to" features existed in the prior art, those features are not incorporated into the claims of the '121 patent. (*See* D.I. 348, at 13.) As a matter of law, prior art is not incorporated into a claim unless done so specifically and explicitly – and Ampex has not done that here. *See Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (to incorporate by reference, patentee "must identify with detailed particularity what specific material it incorporates and clearly indicated where the material is found").

images (displayed as a mosaic).  (Preuss Decl., ¶¶ 27-36)[21]

- ***The DLS 6000 Series***, which, using the "Stack/Don't Care" function, could generate reduced size images ***automatically***; the reduced size images then could be saved to disk and displayed to the operator as part of a mosaic.  (Taylor Decl., ¶¶ 104, 113, 118, 124; *see* Cavallerano Dep., at B-296 (conceding that Quantel 6000 series DLS systems "had an automatic browse capability");

REDACTED

- ***Ampex's AVA System,***

REDACTED

- ***The Scitex Response 300***, which ***automatically*** generated reduced size images that the operator could save to disk, and, at some later time, allowed the operator to recall one or more reduced size images from disk for display and browsing.  (Preuss Decl., ¶ 55.)[22]

- ***The Harada Patent*** – an electronic still store patent strikingly "similar to that of the '121 patent" (Ampex Suppl. Resp. to ITC Interrog. No. 21 at B-258) – which discloses a preferred embodiment that ***automatically*** generated reduced size (i.e., "squeezed") images that were stored for later accessed by the user for browsing and/or editing purposes (a collection of reduced size images also could be selected and displayed as a mosaic).  (Myers Decl., ¶¶ 29-36.)

- ***The SDMS System***, which ***automatically*** generated reduced sized images for

---

[21]   Ampex tries to brush aside disputed issues of fact concerning the Chromacom system by contending that Dr. Preuss' testimony should be ignored because of lack of written corroboration. (D.I. 290, at 13 n.6.)  But that attack fails under the Federal Circuit's "rule of reason" analysis, which plainly rejects the notion that ***every aspect*** of a witness' testimony regarding the prior art must be corroborated.  *See Cooper v. Goldfarb*, 154 F.3d 1321, 1330 (Fed. Cir. 1990) (corroboration for "every factual issue contested by the parties" not required); *Knorr v. Pearson*, 671 F.2d 1368, 1374 (Ct. Cl. 1982) ("the law does not impose an impossible standard" by requiring corroboration of "every point" of a witness' testimony; "indeed, such a standard is the antithesis of the rule of reason.").  In any event, Dr. Preuss' testimony is corroborated by extensive evidence.  (Preuss Decl., ¶¶ 61-63.)

[22]   The Court should reject Ampex's corroboration attacks against Dr. Preuss with respect to the Response 300 for the same reasons discussed above in connection with the Chromacom system.

each captured full size image,[23] and could save the generated reduced size image on disk storage for later access by the operator (who could recall a single reduced size image, or a mosaic of multiple reduced size images from disk). (Myers Decl., ¶ 70.)

At the very least, this record demonstrates the existence of many genuinely disputed issues of material fact – all of which preclude a grant of summary judgment in Ampex's favor. Ampex's attempt to keep this relevant prior art from the jury should be denied.[24]

---

[23] Ampex contends that the SDMS system does not perform in the manner described by Dr. Myers, and that "portions of the document Dr. Myers relies upon do not accurately describe the SDMS functionality." (D.I. 290, at 12.) Ampex is incorrect about its factual assertions (*see* Myers Decl., ¶ 72), but in any event, it would be inappropriate for the Court to resolve these disputed issues on summary judgment. *See Trintec Indus.*, 295 F.3d at 1294.

[24] Granting summary judgment of no infringement also makes no sense as a matter of judicial efficiency. Because the Defendants have asserted many of the same prior art references at issue here in connection with their obviousness allegations under 35 U.S.C. § 103, a rejection of the defendants anticipation defense now would have, at best, only a marginal impact on the scope of evidence to be introduced to the jury at trial.

## V.    CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court deny

Ampex's motion for summary judgment of no anticipation.

CONNOLLY BOVE LODGE & HUTZ LLP


*/s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (Bar No. 2237)
Jaclyn Mason (Bar No. 4737)
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

*Attorneys for Defendants*

OF COUNSEL:

William F. Lee
Donald R. Steinberg
Michael J. Summersgill
Jordan L. Hirsch
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

S. Calvin Walden
Rebecca McCloskey
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230-8800
Fax: (212) 230-8888

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2006, I electronically filed the Redacted Defendants' Answering Brief to Ampex Corporation's Motion for Partial Summary Judgment that U.S. Patent No. 4,821,121 is Not Anticipated with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

and that I caused copies to be served upon the following in the manner indicated:

**VIA E-MAIL**

Jesse J. Jenner, Esquire
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020

**VIA E-MAIL & FEDERAL EXPRESS**

Norman H. Beamer, Esquire
Ropes & Gray LLP
525 University Avenue
Palo Alto, CA 94301

**VIA E-MAIL & HAND DELIVERY**

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

_/s/ Collins J. Seitz, Jr._
Collins J. Seitz, Jr. (Bar No. 2237)
Connolly Bove Lodge & Hutz LLP
P.O. Box 2207
1007 North Orange Street
Wilmington, DE 19899