IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMPEX CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-1373-KAJ |
| | ) | |
| v. | ) | |
| | ) | **REDACTED** |
| EASTMAN KODAK COMPANY, ALTEK | ) | |
| CORPORATION and CHINON INDUSTRIES, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT THAT
U.S. PATENT NO. 4,821,121 IS NOT INVALID FOR OBVIOUSNESS**

Collins J. Seitz, Jr. (#2237)
Jaclyn M. Mason (#4737)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
cseitz@cblh.com

*Attorneys for Defendants Eastman Kodak
Company and Altek Corporation*

OF COUNSEL:

William F. Lee
Michael J. Summersgill
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

S. Calvin Walden
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230-8800

Date: June 13, 2006

TABLE OF CONTENTS

I.      NATURE AND STAGE OF PROCEEDING ...................................................................1

II.     SUMMARY OF ARGUMENT ......................................................................................1

III.    STATEMENT OF FACTS .............................................................................................2

        A.      The Relevant Prior Art Systems ...........................................................................2

                1.      The Quantel Paint Box ............................................................................2

                2.      The Quantel DLS.....................................................................................4

                3.      The Hell Chromacom ..............................................................................6

        B.      Defendants' Expert Reports Provided A Detailed Analysis Showing How
                the Prior Art Systems Meet the Asserted Claims .................................................7

                1.      Paint Box and DLS Expert Discovery......................................................7

                2.      Chromacom Expert Discovery .................................................................8

        C.      Additional Discovery on the Invalidity of the '121 Patent ...................................9

                1.      Prior Art Document Production ...............................................................9

                2.      Defendants' Interrogatory Responses.....................................................11

IV.     ARGUMENT ..............................................................................................................12

        A.      Defendants Have Provided Detailed Explanations of How the Prior Art
                References Meet the Asserted Claims..................................................................12

        B.      Ampex Improperly Focuses on Selected Paragraphs from Defendants'
                Expert Reports ...................................................................................................15

        C.      Summary Judgment of Non-Obviousness Should Be Denied Because the
                Evidence Establishes that Material Issues of Fact Exist. ....................................18

                1.      Scope and Content of the Prior Art ........................................................18

                2.      The Differences between the Claims and the Prior Art............................19

                3.      The Level of Ordinary Skill in the Art ...................................................20

                4.      Secondary Considerations......................................................................20

V.      CONCLUSION ...........................................................................................................23

TABLE OF AUTHORITIES

Federal Cases

*Biotech Biologische Naturverpackungen GmbH v. Biocorp, Inc.*,
   249 F.3d 1241 (Fed. Cir. 2001)..........................................................................21

*Brief for the United States as Amicus Curie Supporting Petitioner, KSR Int'l Co. v.*
   *Teleflex Inc., (*May 25, 2006) (No. 04-1350), 2006 WL 1455388...........................18

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)............................................18, 20

*IMX, Inc. v. Lendingtree, LLC*,
   405 F. Supp. 2d 479 (D. Del. 2005).....................................................................21

*Miller Prods. Co. v. Veltek Assoc.*,
   No. 01-35-KAJ, 2004 U.S. Dist. LEXIS 1798 (D. Del. Feb. 10, 2004)...........................14, 20

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
   345 F.Supp.2d 431 (D. Del. 2004).......................................................................21

*Rockwell Int'l Corp. v. United States*,
   147 F.3d 1358 (Fed. Cir. 1998)......................................................................15, 18

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*,
   183 F.3d 1347 (Fed. Cir. 1999)...........................................................................18

*Syngenta Seeds, Inc. v. Monsanto Co., Civ. No.*
   02-1331-SLR, 2004 U.S. Dist. LEXIS 24252 (D. Del. Nov. 19, 2004)....................................21

*Tec Air, Inc. v. Denso Mfg. Mich., Inc.*,
   192 F.3d 1353 (Fed. Cir. 1999)...........................................................................20

Federal Statutes

35 U.S.C. § 103(a) ................................................................................................18

## I.     NATURE AND STAGE OF PROCEEDING

Fact and expert discovery on validity issues was conducted in both the ITC and Delaware discovery phases, and is now concluded.  A hearing on claim construction and dispositive motions is scheduled for July 13, 2006, and trial, if necessary, is scheduled to begin on December 4, 2006.

## II.     SUMMARY OF ARGUMENT

In its obviousness summary judgment motion, Ampex does not argue that Defendants' prior art fails to read on the asserted claims of the '121 patent.  Nor does Ampex argue that Defendants failed to present evidence of implicit and explicit motivations to combine the various prior art.  Instead, Ampex argues that it is entitled to summary judgment because Defendants purportedly should have submitted additional claim charts addressing *all possible* hypothetical claim constructions.  Ampex is wrong.  Its motion exalts form over substance and, in any event, Defendants have satisfied their obligations in both *form and substance*.

First, Defendants' experts provided detailed analyses (supported by claim charts) demonstrating how each of the prior art systems meet each element of the accused claims. Their experts further explained for each asserted reference why persons of ordinary skill in the art would be motivated to combine certain references in the event the Court were to adopt a claim construction under which the reference lacked certain claim elements.  The only purported flaw identified by Ampex is that Defendants' experts did not provide a separate and independent analysis for *every possible* ultimate claim construction.  The law, however, contains no such requirement.  In fact, such a task would have been particularly onerous in this case where Ampex has submitted no fewer than six different claim construction positions – with its most recent *sixth* iteration, the March 24, 2006 "Corrected Claim Construction," being offered *on the same day* Defendants' expert reports were due.

Second, Defendants also provided Ampex with extensive factual discovery regarding the manner in which the asserted claims are anticipated by the prior art, and if not anticipated, then obvious in light of that prior art. Among other discovery directed to the invalidity of the asserted claims of the '121 patent over the prior art, Defendants provided witness testimony during the ITC proceeding; interrogatory responses with narrative descriptions and claim charts; and documentary evidence regarding the prior art. Ampex's motion fails to address this copious *evidence* developed and fully disclosed by Defendants. At best, Ampex's motion raises genuine issues of material fact regarding the validity of the asserted claims of the '121 patent. Ampex's attempt to keep this evidence from the jury should therefore be denied.

## III.    STATEMENT OF FACTS

### A.    The Relevant Prior Art Systems

During discovery, Defendants alleged that seven references anticipate the asserted claims of the '121 patent, and that each of those references would render the claims obvious (when combined with one or more other references) to the extent the Court failed to adopt the Defendants proposed constructions. Three of those references are at issue here: (1) the Quantel Paint Box; (2) the Quantel DLS; and (3) the Hell Chromacom.

#### 1.    *The Quantel Paint Box*

The Quantel Paint Box was a graphics system with electronic still store capabilities. (*See* "The Paint Box: Quantel's DPB 7000 Series Digital Paint Box," March 10, 1982, at B-13 (Paint Box can store 200 video images).) The Paint Box was sold and demonstrated in the United States in March and April 1982, over a year before the application for the '121 patent was filed. (*See* The Weather Channel Purchase Order for Paint Box, March 8, 1982, at B-22–23; "Quantel Leads the Illusion Game," <u>Audiovisual</u>, June 1982, at B-579.)

2

The Paint Box included, among other components, a disk to store pictures, two frame stores implemented as random access memory (RAM) for the temporary storage and display of images, a size reducer for generating reduced size images, a control computer, and a display monitor. (*See* Quantel Proposal to BBC, January 13, 1982, at B-585, B-588; DPB 7000/1 Operating and Service Manual, at B-149.) Like the system described by the '121 patent, the Paint Box was used to accept input video images, and store, adjust the size of, and output images for use during television broadcast. (*See* "Quantel Gives NY Preview of NAB Display," Backstage, April 2, 1982, at B-595.)

The Paint Box system had a "Live Video" feature that enabled an operator to capture any single frame from a stream of video received from an external source (via the "Video Input" component), such as from a television broadcast or video camera. (Taylor Decl., ¶ 45; Cavallerano Dep., at B-1026.) The captured full size image frame then could be digitized (by the "Input A/D" component), temporarily stored in RAM (e.g. in one of the "Frame Stores"), and saved to more permanent disk storage for later access (to the "Disk Store"). The stored full size image could be accessed and output at some later time for display and/or editing purposes. (Taylor Decl., ¶ 58.)

The Paint Box system also included a "cut and paste" function that, using the "Size Reducer" component, allowed the operator to reduce the size of any captured full size video image by any factor. The resulting "cutout" generated by the size reducer could be stored temporarily in RAM and, if desired, saved to the disk store. The operator could access the stored reduced size image for display and/or editing purposes at some later time. (Taylor Decl., ¶ 58; Cavallerano Dep., at B-1026–27, B-1037–38.)

Using a "browse" feature, the operator simultaneously could view as many as twelve images that had been stored to disk. (*See* Taylor Decl., ¶¶ 63, 64; Cavallerano Dep., at B-1021 (agreeing that "the Paint Box had a browse capability").) If used to browse multiple

3

full size images stored on disk, the system automatically generated a reduced size version of

each retrieved image, and then displayed the automatically generated reduced size images as

part of a mosaic.  By selecting one of the reduced size images displayed in the mosaic, the

user could retrieve the corresponding full size image from storage.  (Taylor Decl., ¶ 53.)  The

Paint Box also allowed the operator to browse reduced size images – i.e., "cutouts" – that

previously had been stored on disk.  (Cavallerano Dep., at B-1025 ("[T]he Paint Box system

could browse cutouts.").)

       Ampex's own expert concedes that, as sold prior to 1982, the Paint Box meets *every*

*element* of the asserted claims under the Defendants' construction.  (*See, e.g.*, Cavallerano

Dep., at B-1026 (external source); *id.* at B-1027 (full size images stored to RAM and disk);

*id.* at B-1028–29 (manual or automatic generation of reduced size images); *id.* at B-1030–33,

B-1040 (reduced size images stored to RAM and disk); *id.* at B-1032–33 (stored full and

reduced size images in RAM simultaneously); *id.* at B-1033, B-1035 (recalled images from

disk to RAM); *id.* at B-1034 (direct transfer); *id.* at B-1036 (displayed mosaic of reduced size

images); *id.* at B-1039–40 (browsed reduced size images); *id.* at B-1041–42 (selected reduced

size image from browse to retrieve full size image).)

             2.    *The Quantel DLS*

       In addition to its Paint Box system, Quantel also made and sold the Digital Library

System (DLS) 6000 series – a family of electronic still stores that could capture, store,

retrieve, reduce, and display video images.  Quantel introduced the DLS 6000 series in 1979,

first sold the system in the United States in February 1981, and annually demonstrated the

system at NAB trade shows from 1979-1982.  (Taylor Decl., ¶ 103.)  Ampex's expert,

Mr. Cavallerano, agrees that the DLS 6000 series is relevant prior art to the '121 patent.  (*See*

Cavallerano Dep., at B-1020 ("I would say it's one of the products … that one could consider

as prior art."); *id.* at B-1022–23 (agreeing that the DLS system is "related to the ['121]

patent").)

Like other prior art electronic still stores, the DLS 6000 series could receive a video

feed from an external source (e.g., a television broadcast or video camera) and capture single

still frames from the received video signal. The system temporarily stored the captured full

size image data in the preview frame store (comprised of RAM), and the user also could save

the full size image to more permanent disk storage. At any subsequent time, the operator

could retrieve the full size image from disk storage for display and/or editing purposes.

(Taylor Decl., ¶ 119.)

The DLS 6000 series also contained a size reducer that allowed the operator to create

a reduced size version of any captured image that could be stored to disk (along with the full

size image). Using the "Stack/Don't Care" function, the system could generate reduced size

images automatically. The "stack" feature allowed users to group a "stack" of pictures

together for display, and the "don't care" feature caused the system to apply a user-defined

formatting operation (e.g., reducing image size by a set factor) to all images in the stack. The

automatically generated reduced size images could then be saved to disk and displayed to the

operator. At any time, using the browse feature, the operator could display as many as

twenty-five reduced size images (as a mosaic). (Taylor Decl., ¶ 123; Cavallerano Dep., at

B-1024 (conceding that the Quantel 6000 series DLS systems "had an automatic browse

capability"); '          **REDACTED**

5

3.    *The Hell Chromacom*

The Hell Chromacom was a prepress and image processing system used to arrange and edit publication pages.[1]  Like an electronic still store, the Chromacom system could capture, store, edit, retrieve, and display images.  The system was first described in a printed publication in 1979, first sold in the United States in 1980, and demonstrated multiple times in 1981 to customers located in the United States.  It is prior art.  (Preuss Decl., ¶ 18.)

The Chromacom system consisted of several different "stations," including: (1) a "Scan/Reco station" that could receive and store images from an external source, such as a scanner (the scanner physically existed outside the system, and was sold separately from the system); and (2) a "Combiskop station," where the received full size image could be manipulated, stored, and displayed on a monitor, and where the final output page could be processed.  (Preuss Decl., ¶ 22.)  In operation, the full size image data received by the Scan/Reco station was stored temporarily in RAM, and also could be stored more permanently on disk contained within the Scan/Reco station.  (Preuss Decl., ¶¶ 26, 27.)  Alternatively, the full size image data could be transferred to the Combiskop station where it also could be stored temporarily in RAM and written to disk storage.  (Preuss Decl., ¶¶ 26, 27.)  The operator could retrieve and display any full size image stored on disk in either station.  (Preuss Decl., ¶¶ 31, 32.)

The Scan/Reco station could automatically generate reduced size images (sometimes called a "coarse" or "view" resolution image).  (Preuss Decl., ¶ 29.)  The reduced size image then could be saved to disk for storage (on either Scan/Recon or Combiskop station disk storage) along with the captured full size image.  (Preuss Decl., ¶¶ 27, 29.)  Thereafter, the

---

[1]    Prepress technology generally refers to the use of images, text, and graphics for the preparation of publication pages for printed media (e.g., magazines, books, advertisements). (*See* Preuss Decl., ¶ 8.)

operator could choose to display one or more of the reduced size images (either alone or as a mosaic) stored to disk. (Preuss Decl., ¶¶ 31, 32, 35.)

**B.      Defendants' Expert's Reports Provided a Detailed Analysis Showing How the Prior Art Systems Meet the Asserted Claims**

1.      *Paint Box and DLS Expert Discovery*

On May 25, 2005, Defendants served an expert report prepared by Richard Taylor, an engineer and inventor who has worked in the field of digital imaging for over thirty-eight years. Mr. Taylor was the Managing Director and Chief Executive of Quantel during the period that Quantel's prior art systems were made and sold, and is the named inventor on U.S. Patent No. 4,302,776, a Quantel patent that formed the basis of multiple rejections of pending claims during prosecution of the '121 patent. (*See* Taylor ITC Expert Report, 5/25/05, at B-657–8; B-671–73.) Mr. Taylor provided Ampex with the following four written expert disclosures:

- An ITC report in which Mr. Taylor: (1) describes, among other things, how the DLS and Paint Box systems (along with other prior art) anticipate and render obvious the asserted claims of the '121 patent; and (2) attached (as Exhibit C) element-by-element claim charts explaining how the Paint Box and DLS meet each element of the asserted claims of the '121 patent. (*See* B-695–704.)

- A July 17, 2005 report that provided additional detail about how the references satisfy each element of the '121 patent and that explained how, to the extent a claim construction is adopted under which the Paint Box or DLS does not meet each element of the '121 patent, the asserted claims would have been obvious when combined with other prior art systems. (*See* Taylor Supplemental ITC Expert Report, 7/17/05, at B-790, 799–801, 810–16.)

- A July 15, 2005 written witness statement for the ITC trial spanning 82 pages in which Mr. Taylor again explained (this time in detailed question and answer format) how the Paint Box and DLS meet each element of the '121 patent. (*See* Taylor Direct Testimony, 7/15/05, at B-715–80); and

- A March 24, 2006 sixty-five page expert report served in this proceeding again detailing how the Paint Box and DLS invalidate the asserted claims of the '121 patent either alone or in combination with other prior art, including the Chromacom and the Paint Box User's Guide. (Taylor Delaware Expert Report,

7

3/24/06, at B-868–925.) The report attached updated element-by-element claim charts explaining how the Paint Box and DLS meet each element of the '121 patent. (*See id.*, at B-926–46.)

2.    *Chromacom Expert Discovery*

On March 24, 2006, Defendants served an expert report prepared by Dr. Dieter Preuss discussing, among other prior art, the Chromacom. (*See* Preuss Expert Report, 3/24/05, at B-947–81.) Dr. Preuss has worked in the field of image processing for thirty-seven years, including approximately eighteen years for Hell, the company that made and sold the Chromacom.

Dr. Preuss' expert report describes the Chromacom in detail (including how the Chromacom was sold and publicly demonstrated before the critical date) and explains, among other things, that a combination of the Chromacom and Paint Box and/or the DLS render obvious the asserted claims of the '121 patent.[2] (*See id.*, at B-957–80.) Attached to Dr. Preuss' report is an element-by-element claim chart explaining how the Chromacom system meets each element of the '121 patent, but for the "video" requirement of each claim under Defendants' construction of that term.[3] (*See id.* at B-982–92.) As Dr. Preuss' chart explains, it would have been obvious to combine the Chromacom with any number of systems that stored and transferred "video" data, such as the Paint Box. (*See id.* at B-983.)

---

[2] Dr. Preuss offers an expert opinion regarding Chromacom, and Mr. Taylor in his own expert report acknowledges as much. Ampex's selective quote of Mr. Taylor's deposition testimony regarding his own expertise (*see* D.I. 281, at 10-11) is misleading because it implies that Mr. Taylor was relying on Dr. Preuss' report for his opinion on both the PaintBox and the Chromacom. Mr. Taylor ***only*** relied on Dr. Preuss' report for its explanation of the details of the Chromacom.

[3] The Chromacom *did* transfer and store "video" data under Ampex's proposed definition.

8

**C.     Additional Discovery on the Invalidity of the '121 Patent**

During the last year and a half, Defendants have amassed voluminous evidence

demonstrating the invalidity of the asserted claims in view of the Quantel Paint Box, the

Quantel DLS, and the Hell Chromacom.  This evidence is summarized below.[4]

1.     *Prior Art Document Production*

a)     Documents Pertaining to the Quantel Paint Box

In addition to publicly available literature describing the device, numerous documents

have also been produced from the files of Quantel Corporation, the company that made and

sold the prior art Paint Box system.  Some of the most relevant production documents

pertaining to the Paint Box include:

- A video tape of the actual Paint Box system that was sold prior to April 8, 1982 that shows the operation of certain system features (B-24);

- A March 10, 1982 brochure that describes the features of the Paint Box (B-1–13);

- A March 22, 1982 description of the Paint Box (B-14–19);

- The Paint Box User Guide that describes the Paint Box system as it existed prior to April 8, 1982 (B-38–109);

- The Paint Box Service Manual that describes the Paint Box prior to April 8, 1982 (B-110–382);

- Documents that demonstrate the sale of the Paint Box in the United States prior to April 8, 1982 (B-20–23); and

- Documents that describe the demonstration of the pertinent features of the Paint Box prior to April 8, 1982 (B-25–37).

---

[4] Ampex claims that Defendants have alleged "fifteen different combinations of prior art," (D.I. 281, at 2).  The abundance of material prior art is the direct result of Ampex's effort to patent what had been done before, and its failure to disclose this prior art to the Patent Office.  Given the need to narrow the issues for jury consideration, this Opposition focuses on four of the seven obviousness combinations identified in Ampex's motion: DLS and User Guide, Paint Box and User Guide, Chromacom and DLS, and Paint Box and Chromacom.

b)    Documents Pertaining to the Quantel DLS

The publicly available literature, as well as documents produced from Quantel's files, demonstrate that the Quantel DLS was sold and used in the United States well before April 8, 1982. (B-603). The literature also describes the features of the DLS, including those features that invalidate the claims of the '121 patent. Some of the most relevant production documents pertaining to the DLS include:

- A March 1, 1980 description of the DLS 6000 Digital Library System (B-383–94);

- A March 16, 1981 description of the DLS 6000 Series Digital Library System (B-395–412);

- An article dated October 1982 that describes the features of the DLS and describes a way in which the DLS could be used in combination with the Paint Box (B-457–62);

- A 1982 DLS 6000 System Service Manual that describes the features of the system (B-413–56); and

- Operating instructions that describe the features of the DLS 6000 (B-463–507).

c)    Documents Pertaining to the Hell Chromacom

The publicly available literature demonstrates that the Hell Chromacom was sold and used in the United States well before April 8, 1982 (*see* Christiansen Ex. H at 13), and further describes the features offered by the Chromacom. Some of the most relevant production documents pertaining to the Chromacom include:

- A December 13, 1982 article describing the features of the Chromacom and evidencing that the Chromacom had been sold in the United States prior to the critical date (B-552–63);

- An October 9, 1979 abstract and presentation describing the features of the Chromacom (B-508–43);

- An October 1980 article that describes the features of the Chromacom (B-544–46);

- A 1982 report describing the features of the Chromacom (B-547–51);

10

- An April 1983 brochure describing the features of the Chromacom (B-564–67); and

- Transcript of a presentation that describes the features of the Chromacom (B-568–72)

### 2. *Defendants' Interrogatory Responses*

On December 13, 2004, Defendants responded to an interrogatory (No. 34) served by Ampex in the ITC proceeding directed to Defendants' invalidity contentions. In their response, Defendants described the Paint Box, the DLS, and the Chromacom (along with other prior art references) and identified the references as both anticipating and rendering obvious the asserted claims. This interrogatory response also dedicated several pages to various obviousness considerations, including the nature of the problem to be solved, the implicit and explicit motivation to combine the prior art references, and other secondary considerations in the obviousness analysis. (*See* Kodak Response to Interrogatories 1 to 53, 12/13/04, at B-596–621.)

On January 5, 2005, Kodak responded to another Ampex interrogatory (No. 57), asking for additional detail regarding Defendants' obviousness defense. (*See* Kodak Response to Interrogatories 54 to 57, 1/5/05, at B-622–55.) Defendants' response set forth a twenty-page, element-by-element claim chart explaining how numerous prior art references, including the Paint Box, the DLS, and Chromacom, meet each element of the asserted claims of the '121 patent. (*See* B-630–50.) The chart also addressed alternative constructions of claim limitations. (*See, e.g., id.* at B-630. ("To the extent that this element is construed to cover non-video storage and retrieval devices (such as digital still cameras), this element is disclosed by: the Chromacom system (RAM described in Seybold, pp. 3, 4).")

Kodak supplemented its response to both interrogatories on May 25, 2005, providing even more detail regarding the Paint Box, the DLS, and the Chromacom (in addition to the

other invalidating prior art).[5]  (*See* Christiansen Ex. G.)  Kodak *again* supplemented its

response to ITC interrogatory number 34 on January 26, 2006, providing additional

information about how the three references meet each element of the '121 patent, and also

providing further information about the motivation to combine references, including

specifically the Paint Box with the Paint Box User Guide.  (*See* Christiansen Ex. H.)

Thus, over the course of the ITC and Delaware proceedings, Defendants served a

variety of interrogatory responses that: (1) described the relevant features of the prior art

systems in detail, including for the Paint Box, the DLS, and the Chromacom; (2) provided

claim charts demonstrating how the asserted claims of the '121 patent are obvious over the

prior art; and (3) detailed additional evidence, including motivations to combine the prior art,

demonstrating that the claims of the '121 patent are invalid for obviousness.

## IV.    ARGUMENT

### A.    Defendants Have Provided Detailed Explanations of How the Prior Art References Meet the Asserted Claims.

At the heart of Ampex's motion is the allegation that Defendants should have, but did

not, provide an element-by-element claim chart for each prior art combination that

Defendants possibly might rely on in support of their obviousness defense.  (*See* D.I. 281, at

2 ("[T]he proponent of obviousness is *required* to present an element-by-element comparison

of the asserted claims to each prior art reference.").)  But Defendants' experts did exactly

that; they provided detailed explanations, including detailed claim charts for each of the Paint

Box, the DLS and the Chromacom systems, explaining how each reference meets the

asserted claims and further explained how, in the event that a claim construction is adopted

under which certain claim elements are found to be missing from certain references, the

---

[5] In each of the supplemental interrogatory responses discussed herein, Defendants incorporated the previous responses in their entirety.

asserted claims would nevertheless be obvious (because persons of ordinary skill in the art

would be motivated to combine the references). For example, the Chromacom claim chart

attached to Dr. Preuss' expert report offers the following detail with respect to Claim 7:

| Claim 7 | Analysis |
|---|---|
| 7. An apparatus for storing video pixel data representing video images of a first resolution and, for each of the images at said first resolution, a corresponding video image at a second resolution, comprising: | The Chromacom was an apparatus for storing pixel data representing images of a first resolution and corresponding images at a second resolution. Based on my experience in image processing and the prepress industry, it is my opinion that one of ordinary skill in the art as of the time the '121 patent was filed would understand "video" to refer to a series of electronic images created for rapid display to allow the appearance of movement, such as in television. As of April 8, 1982, the Chromacom was designed for non-video images that were scanned into the system from a scanner because that was our customers' primary need. It would have been obvious, however, to connect a television camera to the Chromacom to input video images. There was an explicit motivation in the art to make this connection. Patents from the late 1970s describe the use of a television camera as an input to prepress products or systems. As early as 1976, Hell manufactured a color corrector called the "Chromascope" that accepted images input from a television camera and displayed the images on a television monitor. The Chromascope was used with the Chromacom and other prepress systems. Technical papers authored by Hell employees throughout the late 1970s and early 1980s describe the combination of the Chromascope with prepress systems, including the Chromacom. The Chromacom meets the "video" elements of the claims under Ampex's interpretation of "video." |
| [a] random access memory means for storing video pixel data representing one of a succession of full size images at said first resolution and a corresponding reduced size version thereof at said second resolution; | The Chromacom had at least random access memory in two image memories, random access memory associated with the minicomputer of the Combiskop station and the minicomputer of the Scan/Reco station, and random access memory associated with the size reducer of the Scan/Reco station. The Chromacom could generate a reduced size image corresponding to the full size image and could store the full size image and the reduced size image in random access memory. The Chromacom could also generate and store a corresponding |

13

| | |
|---|---|
| | reduced size image as the term "corresponding" is defined by Ampex. |
| [b] bulk memory means for receiving said video pixel data from said random access memory means and for storing said succession of full size images and the corresponding reduced size versions thereof, and for outputting upon a user's command, either a selected one of the successive full size images or selected ones of the corresponding reduced size versions thereof for direct transfer to, and storage back in, said random access memory means; and | The Chromacom could transfer full and reduced size images from random access memory to disk. The operator of the Chromacom could then output either a selected full size image or one or more selected reduced size images directly to random access memory. This transfer was direct because images were transferred from disk directly to the random access memory associated with the minicomputer. Images were then sent to one of the image memories. |
| [c] means responsive to said random access memory means for selectively generating one of said corresponding reduced size versions from the respective full size image in said random access memory means, and for transferring the video pixel data representing the corresponding reduced size version back to the contents of said random access memory means. | The '121 patent does not disclose any structure for selectively generating reduced size images. The Chromacom had a minicomputer that performed this function.<br><br>        The Chromacom could generate reduced size images at the operator's option. When the operator selected to generate a reduced size image, the full size image was transferred from an image memory to the random access memory associated with the minicomputer at the Combiskop station and then to the minicomputer. The minicomputer generated the reduced size image and the reduced size image was transferred back to the random access memory associated with the minicomputer and then to an image memory. The Chromacom also meets this limitation under Ampex's interpretation because it could automatically generate reduced size images. |

(B-983-84.) This is more than the law demands.

         Ampex is unable to cite to a single case holding that failure to serve claim charts comparing specific references warrants summary judgment. This is because the appropriate consideration is whether there is *sufficient evidence* of obviousness, not the manner in which that evidence is presented. *Miller Prods. Co. v. Veltek Assoc.*, No. 01-35-KAJ, 2004 U.S. Dist. LEXIS 1798, *16-17 (D. Del. Feb. 10, 2004). Further, Ampex does not explain what purpose would be served by requiring Defendants to serve another chart labeled "Obviousness" that includes, for example, the Paint Box and the Chromacom matching up

against each asserted claim limitation. In any event, Defendants *have done this as well.*
Their obviousness claim chart submitted in response to Ampex's ITC Interrogatory No. 57
details how several references, *including the Paint Box, the DLS, and the Chromacom*, meet
the various limitations of the asserted claims. This chart not only lists the references, but also
cites to evidentiary support in the record for each reference. (B-630–50.)

**B.     Ampex Improperly Focuses on Selected Paragraphs from Defendants' Expert Reports.**

Ampex's obviousness brief selectively focuses on individual paragraphs in
Defendants' expert reports. But it does so as if the other paragraphs of those reports, the
claim charts attached to them, and the detailed invalidity interrogatory responses from
Defendants, did not exist.

For example, Ampex concentrates on two paragraphs from Mr. Taylor's Delaware
Expert Report, and one paragraph of the Preuss expert report, which primarily address a
single element of the obviousness consideration: the "motivation" to combine the references
in question (Ampex's motion does not address this issue). (D.I. 281, at 7, 8, 10, 11.) They
are not, as Ampex asserts, "the entirety of [Defendants' experts'] obviousness disclosure" –
the reports, including the claim charts, contain numerous other passages discussing the scope
and content of the prior art, the differences (or lack thereof) between the prior art and the
claims of the '121 patent, the level of skill of persons in the art, and other secondary
considerations of obviousness. *See Rockwell Int'l Corp. v. United States*, 147 F.3d 1358,
1362 (Fed. Cir. 1998) (setting forth the requirements of the obviousness analysis). It simply
makes no sense to concentrate on these paragraphs, while ignoring all of the preceding
paragraphs detailing the extensive evidence of obviousness. When the entirety of
Defendants' evidence is considered, it is clear that Defendants provided Ampex with more

than sufficient notice of its obviousness positions, and supported those positions with ample evidence.

Ampex also argues that Defendants should have provided obviousness claim charts that more explicitly addressed alternate claim constructions.[6] For instance, Ampex complains about the following statement by Mr. Taylor: "To the extent a claim construction is adopted under which the Paint Box does not meet all of the elements of the asserted claims, it is my opinion that a combination of the Paint Box with either the Chromacom or the Response 300 would render the asserted claims obvious." (D.I. 281, at 10.) As an intitial matter, Ampex's complaint is particularly ironic given that it has shifted its claim construction position more than five times since the parties' dispute began, and that it submitted its most recent proposed claim construction on March 24, 2006 – i.e., *on the same day* that Defendants' expert reports were due. (*See* Ampex's Identification of Claim Construction Issues (Corrected), 3/24/06, B-993–1018.)

In any event, Mr. Taylor and Dr. Preuss cannot be expected to predict precisely how the Court will ultimately rule on the various claim construction disputes that have been presented by the parties, or to provide a separate, detailed analysis on every possible iteration. Instead, as they have done, they can explain which references may be combined, what those references disclose, and how persons of ordinary skill in the art would be motivated to combine the references. (*See* Taylor Decl. ¶¶ 39-66, 80-83; 104-125; 130-31; Preuss Decl. ¶¶ 22-36, 64.)

---

[6] Defendants note that Ampex's experts did not present infringement opinions for many of Defendants' alternate claim constructions. Given Ampex's arguments that Defendants experts' had an obligation to present alternative opinions using Ampex's claim construction, should the Court adopt Defendants' proposed claim construction, Ampex would presumably concede that its experts should be precluded from opining that the accused products do not infringe the '121 patent.

16

In fact, the interrogatory responses and expert reports submitted by Defendants and their experts addressed many of Ampex's proposed and shifting alternate claim constructions. For example, Ampex argues that each of the asserted claims requires "automatic" generation of reduced size images. Defendants disagree. Nevertheless, in their reports, Defendants' experts explained that, even if the claims were construed to require this automatic requirement (which they should not be), and even if the Paint Box and the DLS were not found to disclose this feature (which even Ampex's expert admits they do), the Paint Box or the DLS in connection with the Chromacom discloses. (Taylor Decl. at ¶¶ 18, 83; Preuss Decl. at ¶¶ 29, 64.) Similarly, Defendants have acknowledged that the Chromacom did not disclose the storage and transfer of "video" data under Defendants' construction, but explained that the Chromacom *does* disclose the storage and transfer of "video" data under Ampex's proposed construction. (*See* B-630.) Even under Defendants' construction, Defendants and their experts have explained that the Chromacom could be combined with such "video" prior art as the Paint Box or the DLS to invalidate the claims. (Taylor Decl. at ¶¶ 19, 45, 83, 107; Preuss Decl. at ¶¶ 16, 25, 64.)

Ampex can cite to no case that required Defendants' experts to forecast the ultimate set of claim constructions in an obviousness claim chart, or else face summary judgment of non-obviousness. This Court should decline to be the first to do so. Requiring Defendants to detail in claim charts every possible combination of the prior art in view of the multitude of claim constructions that the Court could apply would be an exercise in futility that would add little or nothing to what Ampex already knows about the Defendants' position on the prior art, alone or in combination.

C.   **Summary Judgment of Non-Obviousness Should Be Denied Because the Evidence Establishes that Material Issues of Fact Exist.**

At best, Ampex's motion presents issues of fact that are inappropriate for resolution by summary judgment. A patent is invalid for obviousness under 35 U.S.C. § 103 "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The ultimate determination of obviousness is a question of law based on underlying factual inquiries. *See Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1362 (Fed. Cir. 1998) (citation omitted). These inquiries include determining (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, which include objective evidence of nonobviousness such as a long-felt but unsolved need which the invention addresses, the failure of others to formulate the invention, and the commercial success of the invention. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18, 86 (1966).[7]

1.   *Scope and Content of the Prior Art*

As detailed in the fact section above, Defendants have established (and Ampex does not deny for the purposes this motion) that the Paint Box and the Chromacom are prior art systems that were also described in prior art printed publications. Defendants have also

---

7 The Federal Circuit has also required a "reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success." *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1356 (Fed. Cir. 1999) (internal citation omitted). Ampex's motion does not attack Defendants' evidence of a motivation to combine prior art references. In any event, the vitality of the "teaching, motivation, suggestion" test is in question. The Supreme Court has before it a petition for certiorari raising this issue. The Solicitor General for the United States has urged the Supreme Court to grant certiorari and hold the "motivation to combine" doctrine that has been developed by the Federal Circuit to be overly restrictive. *See* Brief for the United States as Amicus Curie Supporting Petitioner, *KSR Int'l Co. v. Teleflex Inc.*, (May 25, 2006) (No. 04-1350), 2006 WL 1455388.

3.    *The Level of Ordinary Skill in the Art*

Ampex did not discuss this factor at all in its opening brief.  Defendants' experts have

set forth the level of ordinary skill in the art in their expert reports.  (*See* Taylor Expert

Report at B-664, 789, 878; Preuss Expert Report at B-952.)

4.    *Secondary Considerations*

To rebut a prima facie case of obviousness based on prior art, objective evidence of

nonobviousness may be used.  *Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1360

(Fed. Cir. 1999).  This objective evidence includes: (1) a long-felt and unmet need in the art

for the invention; (2) failure of others to achieve the results of the invention; (3) commercial

success of the invention; (4) copying of the invention by others in the field; (5) whether the

invention was contrary to accepted wisdom of the prior art; (6) expression of disbelief or

skepticism by those skilled in the art upon learning of the invention; (7) unexpected results;

(8) praise for the invention by those in the field; and (9) independent invention by others.  *See*

*Graham*, 383 U.S. at 17-19.

The burden is on Ampex to come forth with secondary considerations of supposed

non-obviousness.  Nonetheless, Defendants have identified the evidence supporting those

contentions and explained why the secondary considerations weigh in favor of defendants.

(*See* B-612–16.)  Ampex has not argued that it is entitled to summary judgment based on any

secondary consideration.

This Court denied a motion similar to the present one in *Miller Prods. Co. v. Veltek*

*Assoc. See* 2004 U.S. Dist. LEXIS 1798, *16-17.  In *Miller Prods.*, the plaintiff moved for

summary judgment of validity based on the allegation that the defendant's expert trial

testimony would be limited to his expert report, and the report failed to set forth a *prima facie*

case of obviousness.  *Id.* at *16.  The Court held that evidence presented by defendant created

a genuine issue of material fact for trial and the court denied the motion for summary

20

judgment. *Id.* at *16-17; *see also IMX, Inc. v. Lendingtree, LLC*, 405 F. Supp. 2d 479, 494-95 (D. Del. 2005) (summary judgment denied where defendant argued obviousness as an alternative to anticipation, and prior art systems combined with their respective manuals or other similar publications created genuine issues of material fact).

The summary judgment cases cited by Ampex in its opening brief are easily distinguished. In *Syngenta Seeds, Inc. v. Monsanto Co.*, there was no mention of claim charts – instead the court granted summary judgment of non-obviousness because the accused infringer did not identify *any* prior art that taught a particular claim element in dispute, nor any evidence of a motivation to combine the prior art. *Syngenta Seeds, Inc. v. Monsanto Co.*, Civ. No. 02-1331-SLR, 2004 U.S. Dist. LEXIS 24252 *11, 12 (D. Del. Nov. 19, 2004) (Christiansen Ex. I). Similarly, in *Biotech Biologische Naturverpackungen GmbH v. Biocorp, Inc.*, 249 F.3d 1241, 1353 (Fed. Cir. 2001), the Federal Circuit affirmed a grant of summary judgment of non-obviousness because the defendant presented insufficient *evidence* to generate a genuine issue of fact concerning obviousness.[8]

Neither case is applicable here. Ampex does *not* argue that there is a lack of evidence directed to the obviousness of the asserted claims; it merely contends that Defendants did not present that evidence in the right format – that is, in claim charts addressing all of the innumerable obviousness combinations possible under alternate claim constructions. However, the cases cited by Ampex do not stand for the proposition that summary judgment

---

[8] Ampex also cites to *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431 (D. Del. 2004) for the proposition that expert opinions regarding obviousness may be excluded from evidence. Ampex's motion is *not*, of course, a motion to exclude expert opinions, and indeed the deadline in this case to make such motions under Rule 702 has passed. In the *Oxford Gene Tech.* decision that Ampex should have cited, this Court *denied* an accompanying motion for summary judgment of validity because the *evidence* presented material fact issues on the issue of obviousness. *See Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431 (D. Del. 2004).

21

is warranted because of a failure to present obviousness claim charts that address alternate constructions.

In sum, this motion required Ampex to present evidence that no material issues of fact existed with respect to one or more of the obviousness factors, and that summary judgment was warranted because no reasonable jury could find the claims of the '121 patent invalid. Ampex has not done so. Instead, Ampex is seeking to avoid Defendants' strong evidence of obviousness by arguing incorrectly that the Defendants did not adhere to procedural niceties. Because Defendants have sufficiently detailed their their obviousness positions (which are largely unchallenged by Ampex here), summary judgment should be denied.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny

Ampex's Motion for Partial Summary Judgment that U.S. Patent No. 4,821,121 is Not

Invalid for Obviousness.

CONNOLLY BOVE LODGE & HUTZ LLP


*/s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (#2237)
Jaclyn M. Mason (#4737)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
cseitz@cblh.com

***Attorneys for Defendants Eastman Kodak
Company and Altek Corporation***

**OF COUNSEL**:

William F. Lee
Donald R. Steinberg
Michael J. Summersgill
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000

S. Calvin Walden
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230-8800

Date:  June 13, 2006

23

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2006, I electronically filed Defendants'
Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment that U.S.
Patent No. 4,821,121 is Not Valid for Obviousness with the Clerk of the Court using
CM/ECF which will send notification of such filing to the following:

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

I hereby certify that on June 13, 2006, I have forwarded the above-noted
document to the following as noted below:

**VIA E-MAIL**

Jesse J. Jenner, Esquire
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020

**VIA E-MAIL & FEDERAL EXPRESS**

Norman H. Beamer, Esquire
Ropes & Gray LLP
525 University Avenue
Palo Alto, CA 94301

**VIA E-MAIL & HAND DELIVERY**

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

_/s/ Collins J. Seitz, Jr._
Collins J. Seitz, Jr. (Bar No. 2237)
Connolly Bove Lodge & Hutz LLP
P.O. Box 2207
1007 North Orange Street
Wilmington, DE 19899

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2006, I electronically filed the Redacted Defendants' Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment that U.S. Patent No. 4,821,121 is Not Valid for Obviousness with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

and that I caused copies to be served upon the following in the manner indicated:

| **<u>VIA E-MAIL</u>** | **<u>VIA E-MAIL & FEDERAL EXPRESS</u>** |
|---|---|
| Jesse J. Jenner, Esquire | Norman H. Beamer, Esquire |
| Ropes & Gray LLP | Ropes & Gray LLP |
| 1251 Avenue of the Americas | 525 University Avenue |
| New York, NY 10020 | Palo Alto, CA 94301 |

**<u>VIA E-MAIL & HAND DELIVERY</u>**

Jack B. Blumenfeld, Esquire
Julia Heaney, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

                    */s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (Bar No. 2237)
Connolly Bove Lodge & Hutz LLP
P.O. Box 2207
1007 North Orange Street
Wilmington, DE 19899