IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMPEX CORPORATION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> EASTMAN KODAK COMPANY, ALTEK ) <br> CORPORATION, and CHINON ) <br> INDUSTRIES, INC., ) <br> ) <br> Defendants. ) | Civil Action No. 04-1373-KAJ |

### MEMORANDUM ORDER

**Introduction**

This is a patent case, presently set for trial on December 4, 2006. (Docket Item ["D.I."] 53 at ¶ 17.) The plaintiff, Ampex Corporation ("Ampex"), has filed a letter motion (D.I. 268; the "Motion") seeking to compel the defendants, Eastman Kodak Company, Altek Corporation, and Chinon Industries, Inc. (collectively "Kodak"), to disclose "all information communicated to ... [Kodak], or reflecting communications to ... [Kodak], on the same subject matter as their September 2, 2005 opinion of counsel;" and it further seeks an order requiring Kodak to "provide a log of all materials withheld on privilege or work-product grounds dated on or before April 11, 2006, the expiration date of the '121 patent in suit." (Id. at 1; D.I. 275 at 1.) In short, Ampex wants all of the attorney-client communications between Kodak and its trial counsel bearing on the subject of infringement, and it wants a log of all withheld materials relating to that subject. At the outset of the claim construction and summary judgment argument on July 13, 2006, I

denied the Motion in a bench ruling. This memorandum order further memorializes the bases for that ruling.

**Background**[1]

On April 11, 1989, U.S. Patent No. 4,821,121 (the "'121 patent") issued and was assigned to Ampex. (D.I. 38 at Ex. 1.) It is entitled "Electronic Still Store with High Speed Sorting and Method of Operation." (*Id.*) The claimed invention "relates to a digital electronic still store for broadcast television signals and more particularly to a still store providing a high speed multiimage [sic] scan or sort capability." (*Id.* at col. 1, ll. 11-14.) In 2001, twelve years after the patent issued, and five years after Kodak began selling digital cameras in the consumer electronics market, Ampex wrote to Kodak and invited Kodak to discuss (or, according to one's perspective, demanded that Kodak discuss) licensing the '121 patent.[2] (D.I. 275 at 3; D.I. 312 at 3.)

Kodak exchanged letters with Ampex about the '121 patent in 2001 and again in 2004. (DI. 275 at 3; D.I. 312 at 3-4.) After the first exchange, Kodak's in-house counsel undertook an analysis and, according to Kodak, concluded that Kodak did not infringe the '121 patent. (D.I. 312 at 3.) Neither the 2001 nor the 2004 exchange of letters led to licensing discussions. (*Id.*)

---

[1]The parties appear to be essentially in agreement on the background facts provided here, which are drawn primarily from the statements of fact provided in their letter submissions and briefing.

[2]Kodak notes that, while it entered the consumer market for digital cameras in 1996, it had been selling digital cameras to photography professionals since 1991. (D.I. 312 at 3.) Ampex contends that Kodak was aware of the patent since at least 1992, when an in-house counsel at Kodak came across the patent and flagged it for further study. (*See* D.I. 275 at 3.)

denied the Motion in a bench ruling. This memorandum order further memorializes the bases for that ruling.

**Background**[1]

On April 11, 1989, U.S. Patent No. 4,821,121 (the "'121 patent") issued and was assigned to Ampex. (D.I. 38 at Ex. 1.) It is entitled "Electronic Still Store with High Speed Sorting and Method of Operation." (*Id.*) The claimed invention "relates to a digital electronic still store for broadcast television signals and more particularly to a still store providing a high speed multiimage [sic] scan or sort capability." (*Id.* at col. 1, ll. 11-14.) In 2001, twelve years after the patent issued, and five years after Kodak began selling digital cameras in the consumer electronics market, Ampex wrote to Kodak and invited Kodak to discuss (or, according to one's perspective, demanded that Kodak discuss) licensing the '121 patent.[2] (D.I. 275 at 3; D.I. 312 at 3.)

Kodak exchanged letters with Ampex about the '121 patent in 2001 and again in 2004. (DI. 275 at 3; D.I. 312 at 3-4.) After the first exchange, Kodak's in-house counsel undertook an analysis and, according to Kodak, concluded that Kodak did not infringe the '121 patent. (D.I. 312 at 3.) Neither the 2001 nor the 2004 exchange of letters led to licensing discussions. (*Id.*)

---

[1]The parties appear to be essentially in agreement on the background facts provided here, which are drawn primarily from the statements of fact provided in their letter submissions and briefing.

[2]Kodak notes that, while it entered the consumer market for digital cameras in 1996, it had been selling digital cameras to photography professionals since 1991. (D.I. 312 at 3.) Ampex contends that Kodak was aware of the patent since at least 1992, when an in-house counsel at Kodak came across the patent and flagged it for further study. (*See* D.I. 275 at 3.)

In August 2004, Kodak retained the law firm of Roylance, Abrams, Berdo and Goodman LLP ("Roylance") to provide an opinion on whether Kodak's products infringed the '121 patent. (D.I. 275 at 3; D.I. 312 at 4.) On October 21, 2004, Ampex filed an action against Kodak in the International Trade Commission ("ITC"), asserting infringement of the '121 patent. (D.I. 312 at 4.) On that same day, Ampex filed its complaint in this court (D.I. 1), but its suit here was stayed pending resolution of the ITC action. (D.I. 29.) A few weeks later, in November, Roylance provided to Kodak an oral opinion of non-infringement, which was later confirmed in a final written opinion to the same effect in September of 2005. (D.I. 312 at 4; see also D.I. 275 at 3-4.) In the meanwhile, on July 29, 2005, Ampex moved to withdraw its ITC complaint, which was then dismissed on August 23, 2005. (D.I. 312 at 4-5.) Consequently, the stay in this case was lifted. (See D.I. 33.)

**Standard of Review**

A district court's determination as to the scope of the waiver of the attorney-client privilege is reviewed under an abuse-of-discretion standard. *In re EchoStar Communications Corp.*, 448 F.3d 1294, 1300 (Fed. Cir. 2006) (citing *In re Pioneer*, 238 F.3d at 1373 n. 2 ("[I]t appears that virtually all the circuits review the decision of a district court [regarding waiver of privilege] underlying a petition for writ of mandamus for abuse of discretion.")).

**Discussion**

Relying on the Federal Circuit's recent opinion in *In re EchoStar, supra,* 448 F.3d 1294, Ampex argues that an advice-of-counsel defense in a patent case effects a

wholesale waiver of privilege as to any communication that any attorney has with a client, so long as the communication touches on the same topic as the opinion on which the client relies to defend against a charge of willfulness. (*See* D.I. 268 at 2-3.) According to Ampex, it matters not when or in what context the subsequent communication occurs. Citing *Akeva L.L.C. v. Mizuno Corp.*, 243 F.Supp.2d 418 (M.D. N.C. 2003), a case also cited by the Federal Circuit in its *Echostar* opinion, Ampex contends that there is no temporal limitation on the waiver of privilege, if infringing activity continues, nor is there any distinction between advice received from trial counsel and that received from opinion counsel. Ampex asserts that the *Echostar* opinion, in conjunction with *Akeva*, makes everything fair game for discovery, including communications between trial counsel and client during trial. (*See id.*; 5/11/06 Tr. at 9-12.)[3]

---

[3] Citations to "5/11/06 Tr. at __" are to pages of the transcript of the May 11, 2006 teleconference in this matter. In subsequent briefing, Ampex backed off its we-get-every-communication argument to a degree, saying that *Echostar's* "core holding" is that discovery should not be permitted as a sword and a shield and that that principle is sufficient to require disclosure of trial counsel's communication in this case. (*See* D.I. 275 at 2.) Nevertheless, the logic of Ampex's position remains the same, whether or not Ampex chooses to go all the way to the logical limit, as the following exchange demonstrates:
> The Court: – is the short answer to my question, yes, that ... your reading of *Echostar* is that the Federal Circuit has now stated that the patentee is entitled to go after discovery all the way through trial. Any time trial counsel is talking to their client about infringement, they're entitled to know about it.
> [Counsel for Ampex]: That is what the Federal Circuit has stated, but we don't have to address that issue in this case.

(*See* 5/11/06 Tr. at 11-12.)

I am compelled to reject Ampex's reading of *Echostar* as far too broad and its motion as an extravagant demand at odds with the generally understood contours of the attorney-client privilege.

To begin with, *Echostar* is, as I read it, an opinion aimed primarily at clarifying the scope of waiver of work product protection in the context of patent infringement cases involving an advice-of-counsel defense. The opinion gives clear and helpful direction on that difficult subject. It has less to say about the attorney-client privilege because that apparently was not the primary issue before the court. Perhaps that is why the court addressed the attorney-client privilege issue in relatively broad language, reasserting general principles. *Cf. Indiana Mills & Mfg., Inc. v. Dorel Indus., Inc.*, No. 04CV001102-LJM-WTL, 2006 WL 1749413, *7, n.2 (S.D. Ind. May 26, 2006) (noting that "the *Echostar* court paints with a broad brush" when discussing the attorney-client privilege). For example, *Echostar* states that the attorney-client privilege cannot be used as a sword and a shield. 448 F.3d at 1301. That is a fundamental and well-understood rule, since, "selective waiver of the privilege may lead to the inequitable result that the waiving party could waive its privilege for favorable advice while asserting its privilege on unfavorable advice." *Id.* It is in the context of that general observation that the *Echostar* court made the comment so heavily relied on by Ampex here: "To prevent such abuses, we recognize that when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter." *Id.*

Ampex seems to ignore both the context of that remark and its exact language. As to the language chosen, the *Echostar* court's use of the word "such" to modify the phrase "communications regarding the same subject matter" indicates that the court intended a far more limited meaning for its statement than Ampex wishes to give it. The use of "such" leads one back to earlier language in that portion of the opinion, in which the court is emphasizing the unfairness of allowing a party to hold back an attorney's opinion that is inconsistent with a different opinion it chooses to show the world. *See id.* The modifier "such" thus strongly implies that the type of communications being discussed are opinions expressed in a manner comparable to the opinion that is disclosed, as was apparently the case in *Echostar* itself.

The context includes not only the sentences surrounding the one Ampex fixes on, but also includes the factual background in *Echostar*. The defendant in that case wanted to rely on its inside counsel's opinion on infringement, while cloaking with privilege an outside opinion it had obtained on the same subject. It is hardly surprising that the court, given those facts, would call that maneuver a foul. The court was knocking down the defendant's artificial and unpersuasive distinction between inside and outside counsel. Nothing in that context, however, indicates a desire by the Court of Appeals to have every communication a client has with its trial counsel on the very subject of an infringement trial open to review by opposing counsel.

This is not elevating form over substance, as Ampex implies. (D.I. 275 at 8-9.) It is not the form of the communication that matters, it is the content. If one received advice of non-infringement and also received an opinion on that same topic from another attorney, it would not matter on the question of waiver how the communication

was labeled. But, if all attorney-client discussions touching on the same subject were to be viewed as "advice" or "opinions" on a par with the legal opinions that were at issue in *Echostar*, the court's comments would have to be understood as demolishing the practical significance of the attorney-client privilege, a result obviously at odds with other comments in *Echostar*, see 448 F.3d at 1300-01 ("We recognize the privilege in order to promote full and frank communication between a client and his attorney so that the client can make well-informed legal decisions and conform his activities to the law."), and with other emphatic pronouncements of the Federal Circuit regarding the privilege, see *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004) ("There should be no risk of liability in disclosures to and from counsel in patent matters; such risk can intrude upon full communication and ultimately the public interest in encouraging open and confident relationships between client and attorney."). It will take more than the inference Ampex wants to draw from *Echostar* to persuade me that the Federal Circuit intends a wholesale revision of the historical understanding of the attorney-client privilege.

*Echostar* did not even address the issue of communications with trial counsel. To try to stretch the opinion to cover its position here, Ampex notes that *Echostar* cites the *Akeva* case, which did deal with trial counsel communications. (D.I. 275 at 5.) What Ampex ignores is that *Akeva* dealt with circumstances in which the defendant expressly relied on its trial counsel's non-infringement opinion to continue operating,

7

while awaiting a separate opinion from another source. *Akeva*, 243 F.Supp.2d at 419-20. That is not akin to the facts in this case.[4]

Finally, Ampex tries to justify its extraordinary waiver argument by saying that Kodak waited to obtain an opinion until after litigation had begun. That argument appears to rest on an erroneous factual assertion and, in any event, it assumes that trial counsel was providing non-infringement opinions in the interim. In the particular history of this case, Kodak asserts that it had a non-infringement opinion from its in-house counsel three years before any litigation commenced. (D.I. 312 at 3.) Before litigation began, Kodak sought from outside counsel an opinion regarding infringement. (*Id.* at 4; D.I. 275 at 3-4.) That opinion was provided orally shortly after suit was filed. (D.I. 312 at 4.) Ampex chose to proceed first in the ITC, where neither damages nor willfulness were at issue, so Kodak chose not to press for a written opinion (*see id.*) – a logical choice, since the purpose of the advice-of-counsel defense in infringement litigation is typically to avoid enhanced damages. I thus fail to see anything nefarious in Kodak getting its written opinion from outside counsel only after Ampex abandoned its ITC case and reinitiated its claims, including damages claims, in this court. Under these facts, Ampex has failed to demonstrate that Kodak's obtaining a further written opinion from its opinion counsel is somehow a cover for non-infringement advice it was actually getting from its trial counsel.

---

[4] I emphasize that the present case does not involve a party choosing to use an attorney as both opinion counsel and trial counsel. That choice involves an unfortunate blending of roles that is, thankfully, rare and beyond the discussion provided here.

8

**Conclusion**

For the foregoing reasons, it is hereby ORDERED that the bench ruling of July 13, 2006 is confirmed and the Motion (D.I. 268) is DENIED.

                                          /s/ Kent A. Jordan
                                          UNITED STATES DISTRICT JUDGE

July 17, 2006
Wilmington, Delaware