**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| AMPEX CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1373-KAJ |
| | ) | |
| EASTMAN KODAK COMPANY, | ) | **REDACTED –** |
| ALTEK CORPORATION and CHINON | ) | **PUBLIC VERSION** |
| INDUSTRIES, INC.,  | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>PROPOSED FINAL PRETRIAL ORDER</u>

VOLUME 2

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
  *Attorneys for Plaintiff*

CONNOLLY, BOVE, LODGE & HUTZ
LLP
Collins J. Seitz, Jr.
1007 North Orange Street
P.O. Box 2207
Wilmington, DE  19899
(302) 658-9141
  *Attorneys for Defendants*

Original Filing Date:  October 13, 2006
Redacted Filing Date:  October 23, 2006

# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AMPEX CORPORATION, | ) |
| | ) |
| *Plaintiff,* | )    C.A. No. 04-1373 (KAJ) |
| | ) |
| v. | ) **PLAINTIFF AMPEX** |
| | ) **CORPORATION'S MOTIONS IN** |
| EASTMAN KODAK COMPANY, | ) **LIMINE NOS. 1-5** |
| ALTEK CORPORATION, and | ) |
| CHINON INDUSTRIES, INC., | ) |
| | ) **NON CONFIDENTIAL VERSION** |
| *Defendants.* | ) |
| | ) |
| | ) |
| | ) |

Jack B. Blumenfeld (#1014)
Julie Heaney (#3052)
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19899-1347
(302) 575-7291

Jesse J. Jenner
Sasha G. Rao
Ropes & Gray LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Norman H. Beamer
Gabrielle E. Higgins
Ropes & Gray LLP
525 University Avenue
Palo Alto, California 94301
(650) 617-4000

James E. Hopenfeld
Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Washington, DC 20005

*Attorneys for Plaintiff,*
*Ampex Corporation*

October 13, 2006

# TABLE OF CONTENTS

I.    AMPEX'S MIL # 1 (RULES 402 AND 403, FED. R. EVID — 2005
      PAINT BOX VIDEO) ................................................................................1

II.   AMPEX'S MIL # 2 (RULE 37 SANCTIONS — CERTAIN
      ALLEGATIONS OF OBVIOUSNESS) ..................................................6

III.  AMPEX'S MIL # 3 (RULE 37 SANCTIONS — FIVE
      NONINFRINGEMENT ARGUMENTS) ............................................11

IV.   AMPEX'S MIL # 4 (RULE 37 SANCTIONS — DAMAGES
      ARGUMENTS) ..................................................................................15

V.    AMPEX MIL # 5 (RULES 402 AND 403, FED. R. EVID. —
      INFLAMMATORY MATTERS) ..........................................................20

i

## TABLE OF ABBREVIATIONS

| **Abbreviation** | **Item Referred To** |
| --- | --- |
| Ampex | Ampex Corporation |
| Kodak | Eastman Kodak Company Altek Corporation, and Chinon Industries, Inc. |
| '121 Patent | U.S. Patent No. 4,821,121 |
| ITC | International Trade Commission |

I.   **AMPEX'S MOTION IN LIMINE # 1 (RULES 402 AND 403, FED. R. EVID — 2005 PAINT BOX VIDEO)**

Kodak contends that the '121 patent is invalid under 35 U.S.C. § 102(b) because of the alleged use and sale of the Quantel Paint Box System in the United States prior to April 8, 1982. Accordingly, Kodak must present clear and convincing evidence that a Paint Box used and sold in the United States prior to that date possessed all of the elements of the '121 patent claims.

In order to meet its burden of proof, Kodak is not offering a prior art Paint Box system. Instead, Kodak seeks to meet its burden of proof with oral testimony of its expert coupled with a video ███████████████████████████████ ███████████████████████ ("2005 Paint Box video").

Kodak should be precluded from either showing the 2005 Paint Box video at trial or offering it into evidence. While it is not clear whether Kodak intends to use the video as a demonstrative or as physical evidence, in either instance the 2005 Paint Box video is not admissible and should be excluded because it is (1) not relevant under Fed. R. Evid. 402; (2) unfairly prejudicial under Fed. R. Evid. 403; and (3) misleading under Fed. R. Evid. 403.

A.   **The Paint Box Shown In Kodak's 2005 Video Is Not Relevant Because It Depicts A Non-Prior-Art Device**

In order to establish that the 2005 Paint Box video is relevant, Kodak must establish that the video is probative of the structure and operation of a prior art Paint Box system. Fed. R. Evid. 402.



1



Indeed, Quantel's President, George Grasso, admitted that the Paint Box is a "classic example" of a product that was only "80 percent" finished by the time it hit the floor at NAB. Conversation With George Grasso p. 78 (Exhibit 8.C). The Paint Box continued to evolve after that. *Id.*

By 1987, Quantel had released a long list of software enhancements for the Paint Box system. *See* Paint Box, What's New (Exhibit 8.E);

The changes were so dramatic that the Paint Box was transformed "almost in to a new machine." Paint Box, What's New (Exhibit 8.E).

*See* PRO 4 The greatest advance since Paintbox p. 28-29, 48 (Exhibit 8.G); MCI/Quantel Preliminary Product Description (Exhibit 8.H).

A former Quantel employee, Martin Holbrook, independently confirmed that the Paint Box shown in the 2005 Paint Box video used much later software than that of 1982:

Q:     The tack item would not have been in the NAB '82 menu, correct?

A:     Tack was not present with '82.

Q:     So this [videotape] demonstration is done with software that was dated after NAB '82, correct?

A:     Yes.

Q:     It's some years after NAB '82 that these two items were added to the menu, correct?

A:     Correct.

2

Holbrook 03/10/06 Tr. 100 (Exhibit 8.J).



Accordingly, Kodak should be precluded from showing or offering the video into evidence at trial.

**B.    It Would Be Unfairly Prejudicial To Allow Kodak To Attempt To Corroborate Its Invalidity Allegations With A Demonstrative Exhibit**

As stated above, Kodak seeks to meet its burden of proof with oral testimony of Kodak's expert coupled with a demonstrative video                    Kodak does not intend to offer any contemporaneous documents or actual devices to corroborate Mr. Taylor's testimony. However, without corroborating evidence, Mr. Taylor's oral testimony is insufficient to invalidate the '121 patent.

Mr. Taylor's attempt to corroborate his own oral testimony about a 1982 Paint Box by offering a video                    would not make his oral testimony more reliable. *See, e.g., Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 743 n.2 (Fed. Cir. 2002) (noting that there is no "category for oral testimony accompanied by an admittedly non-anticipating visual aid"). Because, as a matter of law, demonstrative exhibits are insufficient corroboration of oral testimony about prior art, it would be unfairly prejudicial to allow Kodak to present the 2005 Paint Box video as a demonstrative exhibit to the jury. A demonstrative video is not a proper substitute for actual evidence of corroboration.

**C.    The 2005 Paint Box Video Is Misleading And Its Use At Trial Would Be Unfairly Prejudicial**

3



One of the inventive features of the '121 patent is that it provided a faster way to browse full size images. In the prior art, each full size image had to be retrieved and reduced in size (a time-consuming process) before being displayed on a browse screen as an array of thumbnail images. The '121 patent solved this problem by automatically pre-storing a reduced size version (thumbnail) along with each full size image. As a result, when a user decided to call up a browse screen, the pre-stored thumbnail corresponding to each full size image could be displayed immediately.



*Jackson v. Fletcher,* 647 F.2d 1020, 1027 (10th Cir. 1981). In *Jackson,* the Court did not allow a video demonstration, admonishing that the video demonstration "should be received with caution . . . a slight change in the conditions under which the experiment is made will so distort the result as to wholly destroy its value as evidence, and make it harmful, rather than helpful." *Id.*

*Dortmar Indus. Inc. v. John Deere Indus. Equip.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

## II.    AMPEX'S MOTION IN LIMINE # 2    (RULE 37 SANCTIONS — CERTAIN ALLEGATIONS OF OBVIOUSNESS)

Ampex moves in limine to preclude Kodak from presenting evidence regarding five combinations that allegedly render the '121 patent obvious. The five combinations are: (1) the Quantel Paint Box + Quantel DLS 6000 series; (2) the Quantel Paint Box + Hell Chromacom system; (3) the AVA system + the Quantel DLS 6000 series; (4) the Hell Chromacom + the Quantel DLS 6000 series; and (5) the Harada application + the Quantel Paint Box.[1] Ampex also moves in limine to preclude Kodak from presenting evidence regarding the allegation that the Harada application itself renders obvious the claims of the '121 patent.

For each of these six allegations of obviousness, Kodak has failed to properly describe its contentions in either Kodak's responses to Ampex's interrogatories or in any disclosure by Kodak's experts. Thus, having violated Rule 26, Kodak should be precluded under Rule 37 from offering evidence concerning these allegations at trial.

### A.    Kodak Did Not Disclose The Obviousness Allegations At Issue Here In Kodak's Interrogatory Responses

As detailed below, with one superficial exception, Kodak did not disclose the obviousness allegations at issue here in any way in Kodak's interrogatory responses.

On December 2, 2004, Ampex served Kodak with its First Set of [ITC] Interrogatories, including ITC Interrogatory No. 34 (Exhibit 8.N), which reads:

---

[1] This Court has not yet ruled on Ampex's Motion for Partial Summary Judgment That U.S. Patent No. 4,821,121 Is Not Invalid for Obviousness (Docket No. 280), which deals with two of the combinations addressed here: (1) the Quantel Paint Box + Hell Chromacom system; and (2) the Hell Chromacom + the Quantel DLS 6000 series. Additionally, this Court has not yet ruled on Ampex's Motion for Summary Judgment that U.S. Patent No. 4,802,019 Is Not Prior Art to U.S. Patent No. 4,821,121 (Docket No. 286), which deals with one of the combinations addressed here: the Harada application + the Quantel Paint Box. Finally, this Court has not yet ruled on Ampex's Motion for Summary Judgment that the Quantel Paintbox Is Not Prior Art Under 35 U.S.C. § 102(a) and § 102(b) (Docket No. 297), which deals with three of the combinations addressed here: (1) the Quantel Paint Box + Quantel DLS 6000 series; (2) the Quantel Paint Box + the Hell Chromacom system; and (3) the Harada application + the Quantel Paint Box.

If Kodak contends that any claim of the Patent-In-Suit is not valid, explain in detail and with specific reference to prior art, Kodak's reason(s) for why the Patent-In-Suit is not valid, including without limitation, the factual and legal bases for Kodak's response.

Kodak served its Response on December 13, 2004 (Exhibit 8.O). In its Response, Kodak



On December 22, 2004, Ampex served Kodak with its Second Set of [ITC]

Interrogatories, including ITC Interrogatory No. 57 (Exhibit 8.P), which reads:

For each reference Kodak contends anticipates or renders obvious the claims of the Patent-In-Suite (including, but not limited to, the references identified in Kodak's Response to Ampex's Interrogatory No. 35 [sic]), explain in detail, for each element of each claim of the Patent-In-Suit, where that element is disclosed in the particular reference, as well as any motivations to combine the references that Kodak contends render one or more of the claims of the Patents-In-Suit obvious.

Kodak served its Response on January 5, 2005 (Exhibit 8.Q). In its Response, Kodak



Kodak supplemented its responses to ITC Interrogatory Nos. 34 and 57 on

May 25, 2005 (Exhibit 8.R), but provided no additional information regarding the

obviousness allegations.

On January 17, 2006, Ampex served Kodak with its Third Set of [Del.]

Interrogatories, including Del. Interrogatory No. 11 (Exhibit 8.S), which reads:

> If Kodak contends that any claim of the Patent-In-Suit is not valid, explain in
> detail and with specific reference to prior art, for each element of each claim of
> the Patent-In-Suit, Kodak's reason(s) for why the Patent-In-Suit is not valid,
> including without limitation, the factual and legal bases for Kodak's response, and
> identify the persons most knowledgeable about the subject matter of this
> interrogatory.

Kodak further supplemented in this action its response to ITC Interrogatory

No. 34 on January 26, 2006 (Exhibit 8.T).



Kodak served its response to Del. Interrogatory No. 11 on February 16, 2006

(Exhibit 8.U), simply incorporating by reference its responses to ITC Interrogatory

Nos. 34 and 57.

To date, Kodak has not further supplemented its interrogatory responses.

### B.    Kodak's Experts' Did Not Disclose The Bases
### For These Obviousness Allegations

As detailed below, Kodak's experts have never stated the bases for their opinions

with respect to the obviousness allegations at issue here.

While each of Kodak's five alleged obviousness combinations has been

mentioned summarily in the expert reports of Dr. Brad A. Myers, Dr. Dieter Preuss,

and/or Mr. Richard John Taylor, none of these reports fully discloses the basis for an

opinion of obviousness, such as *how the references would be combined* or *any specific

motivations to combine the references in such a manner*. *See* Myers Report at ¶¶ 30,

31, 118-20 (Exhibit 8.V); Preuss Report at ¶¶ 28, 100 (Exhibit 8.W); Taylor Report at

¶¶ 45, 91, 92, 135, 140, 168, 169 (Exhibit 8.X).

 

Nor have Kodak's experts provided the bases for their opinions elsewhere. To the

contrary, at their depositions, Dr. Myers, Dr. Preuss, and Mr. Taylor stated that their

opinions were fully expressed in their reports. *See* Myers 05/03/2006 Tr. at 4-5, 8-12, 23

(Exhibit 8.Y); Preuss 05/05/2006 Tr. at 26-31 (Exhibit 8.Z); Taylor 04/28/2006 Tr. at 22,

77-85, 103-105, 135-136 (Exhibit 8.AA). And the additional discussion provided by

Dr. Preuss and Mr. Taylor in their Declarations in Support of Kodak's Opposition to

Ampex's Motion for Partial Summary Judgment that U.S. Patent No. 4,821,121 Is Not

Invalid for Obviousness is similarly insufficient. *See* Preuss Decl. at ¶ 16 (Exhibit 8.AB);

Taylor Decl. at ¶¶ 18, 82, 83, 101, 102 (Exhibit 8.AC).

### C. Kodak Should Be Precluded From Offering Evidence In Support Of The Six Obviousness Allegations At Issue Here

Rule 33(b)(1), Fed. R. Civ. P., states that "[e]ach interrogatory shall be answered

separately and fully in writing under oath." Additionally, Rule 26(e)(2), Fed. R. Civ. P.,

states that "[a] party is under a duty seasonably to amend a prior response to an

interrogatory . . . if the party learns that the response is in some material respect

incomplete or incorrect and if the additional or corrective information has not otherwise

been made known to the other parties during the discovery process or in writing."

Despite these requirements, as to the six theories at issue here, Kodak has not fully

responded to, or supplemented its responses, to Ampex's relevant interrogatories.

Rule 26(a)(2)(B), Fed. R. Civ. P., requires each testifying expert to prepare and

sign an expert report, which "shall contain a complete statement of all opinions to be

expressed and the basis and reasons therefor." Additionally, Rule 26(e)(1), Fed. R. Civ.

P., imposes a duty to supplement expert disclosures and requires that "any additions or

other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due." Despite these requirements, Kodak's experts have never stated the bases for their opinions with respect to the theories of obviousness at issue here.

As stated in Rule 37(c)(1), Fed. R. Civ. P., "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing or on a motion any witness or information not so disclosed." Such is the case here.

Kodak has failed to properly identify the obviousness theories at issue here and has failed to properly disclose the bases for its experts opinions about these theories. Without an adequate disclosure, Ampex is harmed because it cannot prepare a rebuttal in advance. Having sought the bases for Kodak's obviousness allegations over the course of nearly a year and a half of discovery, Ampex should not have to wait until trial to hear the evidence regarding obviousness.

If Kodak had given proper notice of its obviousness contentions, Ampex might have been able to take investigatory steps in order to probe the alleged facts related to each of its contentions. For example, Ampex could have inquired into motivations to combine and could have conducted further discovery into potential teach-aways. Further, as a result of Kodak and its experts' failures to disclose the bases for their obviousness contentions, Ampex will be forced to prepare to rebut any number of undisclosed ways in which alleged prior art references may be combined, or worse yet, Ampex may be forced to rebut Kodak's general statements of obviousness.

### III.    AMPEX'S MOTION IN LIMINE # 3 (RULE 37 SANCTIONS — FIVE NONINFRINGEMENT ARGUMENTS)

Ampex moves in limine to preclude Kodak from making five noninfringement arguments. The basis for Ampex's motion is that Kodak failed to disclose these arguments in Kodak's responses to Ampex's Contention Interrogatory No. 1.

On September 15, 2005, Ampex served Interrogatory No. 1 (Exhibit 8.AD), requesting that Kodak "explain in detail, for each element of each claim of the '121 patent, Kodak's reason(s) why each such Kodak Device does not infringe the '121 patent, either literally or under the doctrine of equivalents." Plaintiff Ampex Corporation's First Set of Interrogatories to Defendant Eastman Kodak Company (Nos. 1-3), p. 5.

On October 17, 2005, the Court entered its Trial Management Order. In relevant part, the Order states that "Where a party has served contention interrogatories, the responding party should not expect to be able to include in the pretrial order new issues or new facts not fairly disclosed in the answers to those interrogatories." Also on October 17, the Court entered a Scheduling Order, which stated that February 28, 2006 would mark the end of the fact-discovery period.[2]

On October 28, 2005, Kodak responded to Interrogatory No. 1 (Exhibit 8.AE), providing eight arguments as to why their products allegedly do not infringe the '121 patent. Despite their duty to supplement pursuant to Fed. R. Civ. P. 26(e), Kodak elected not to supplement this interrogatory response. Fact discovery in this case (with the exception of certain depositions and willfulness issues) ended on February 28, 2006.

On April 25, 2006, Kodak served the expert report of Dr. James Storer ("the Storer Report"), setting forth his positions as to why Kodak allegedly does not infringe the '121 patent. In spite of the clear mandate of the Court's Trial Management Order, the Storer Report recites *five noninfringement positions* that were not disclosed in Kodak's

---

[2] On March 20, 2006, the Court extended fact discovery to the limited extent that certain depositions were permitted to take place in March 2006. (D.I. 218.)

response to Ampex's Interrogatory No. 1.[3]  The arguments disclosed in the Storer Report allege:



Preclusion is an appropriate sanction when a party violates a court's Scheduling Order.  Rule 16(f) of the Federal Rules of Civil Procedure expressly authorizes sanctions under Rule 37 for a failure to comply with an Order issued under Rule 16.  *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990); Fed. R. Civ. P. 16(f).  Furthermore, Rule 37 authorizes a court to issue an "order refusing to allow the disobedient party to support or oppose claims or defenses, or prohibiting that party from introducing designated matters into evidence" when a party fails to comply with a Rule 16 order.

---

[3] Arguments (3)-(5) were presented in Dr. Storer's report in the ITC action involving the parties. Arguments (3)-(5), however, were not disclosed in Kodak's response to Ampex's Interrogatory No. 1 and, in light of the language quoted above from the Trial Management Order, arguments (3)-(5) should be precluded.

Fed. R. Civ. P. 37(b)(2)(B); Fed. R. Civ. P. 16(f). Bad faith is not required, as even a

negligent violation of a Rule 16 order justifies the imposition of sanctions. *Poulis v.*

*State Farm Fire & Casualty Co.*, 747 F.2d 863, 870 (3d. Cir 1984).

This Court has consistently held that preclusion is an appropriate sanction against

a party that fails to provide information during discovery. *See Georgia-Pacific Corp. v.*

*U.S. Gypsum Co.*, 1996 U.S. Dist. LEXIS 22616, *34 (D. Del. 1996) (precluding

defendant from making arguments and offering evidence because discovery had not been

provided); *Philips Electr. N.A. Corp. v. Universal Electr., Inc.*, C.A. No. 94-392 (RRM),

Tr. at 3 (D. Del. March 9, 1995) (Exhibit 8.AK).

Kodak should not be allowed to ambush Ampex with untimely-disclosed

noninfringement arguments. The Scheduling Order specified that discovery was to close

on February 28, 2006 (with limited exceptions not applicable here), and the Trial

Management Order notified Kodak that it should not expect to be able to include in the

pretrial order new issues not fairly disclosed in the answers to contention interrogatories.

Kodak, however, waited until the submission of the Storer Report – nearly two months

after the close of fact discovery – to attempt to introduce new noninfringement arguments

into this case. Under Rule 16(f), sanctions are justified for Kodak's violation, and the

Court should preclude Kodak from making its new noninfringement arguments to avoid

material prejudice to Ampex. Ampex would be substantially prejudiced if Kodak were

allowed to present such untimely arguments at trial. By failing to disclose these non-

infringement positions, Kodak has denied Ampex the opportunity to take discovery

regarding these positions, as well as the opportunity to focus discovery more narrowly on

the operational aspects of Kodak's accused products underlying these positions.

Allowing Kodak to make these noninfringement arguments would render the Scheduling

Order and Trial Management Order meaningless. *See*, *Koplove v. Ford Motor Co.*,

795 F.2d 15, 18 (3d Cir. 1986) ("if [scheduling orders] can be disregarded without a

specific showing of good cause, their utility will be severely impaired"); *Geiserman*,

893 F.2d at 792.

## IV.    AMPEX'S MOTION IN LIMINE # 4 (RULE 37 SANCTIONS — DAMAGES ARGUMENTS)

Ampex moves in limine to preclude Kodak from presenting evidence or testimony at trial regarding two damages arguments that Kodak did not disclose during fact discovery.  First, Kodak should not be permitted to present evidence



### A.    Kodak Should Not Be Permitted to Present Evidence Regarding ██████████████████

1.    ██████████████

Ampex's Interrogatory No. 5 requested that Kodak "describe in detail all alleged acceptable non-infringing alternatives" for any invention claimed in the '121 patent.



[redacted]

Kodak's obligation to supplement its answers to interrogatories is indisputable. Rule 33(b)(1), Fed. R. Civ. P., states that "[e]ach interrogatory shall be answered separately and fully in writing under oath." Additionally, Rule 26(e)(2), Fed. R. Civ. P., states that "[a] party is under a duty seasonably to amend a prior response to an interrogatory . . . if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

Preclusion is the appropriate sanction here. As stated in Rule 37(c)(1), Fed. R. Civ. P., "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Kodak's failure to disclose [redacted] is not harmless. Ampex is harmed by the unnecessary confusion that will result for the jury when dealing with the notion of [redacted] Ampex is also harmed by having lost the opportunity to take discovery to refute these arguments. This is particularly significant because, when asked in Ampex's Interrogatory No. 6 to "detail all attempts (whether or not successful) to design an alleged acceptable non-infringing substitute," [redacted]

Preclusion is an appropriate sanction for the additional reason that Kodak was obligated to disclose these [redacted] arguments even earlier, in its response to Ampex's Interrogatory No. 2. Interrogatory No. 2 requested that Kodak "set forth in detail the basis for damages to which Ampex would be entitled" should the '121

16

patent be found valid and infringed. ████████████████████████
████████████████████████████████████████████ Thus, Kodak should have

disclosed them in its response to Interrogatory No. 2.

Yet Kodak did not disclose these ████████████████ even after the Court

admonished Kodak about failing to disclose its damages theories in a timely fashion

during the February 8, 2006 telephone conference.  The day before that conference,

where Ampex had moved to compel a complete answer to Interrogatory No. 2, Kodak

had served a limited answer (that did not include *any* mention of ████████████

████████).  At that conference, Ampex foresaw the situation that it finds itself in today:

> if what happens in expert discovery is that we get completely new theories
> and as a result of getting those new theories and they rely on new
> documents, I'm going to have a problem because . . . I won't have the
> opportunity to talk to certain witnesses about those theories and potentially
> impeach their expert or their fact witnesses at trial.

After hearing from Kodak, the Court told Kodak:

> It sounds like you have given the information called for by the
> interrogatory.  And I guess we'll wait for another day and see if you try to
> pull a rabbit out of the hat on the Kodak side.

(February 8, 2006 Transcript, Exhibit 8.AN, pp. 9-11).  Kodak has indeed pulled a

"rabbit out of the hat"████████████████████████████████████

that it did not provide in its response to Interrogatory No. 2, or in its later response to

Interrogatory No. 5.

Under the circumstances, Kodak should not be permitted to present any evidence

regarding ████████████████████████████████████ disclosed for the

first time in its rebuttal expert report.

**2.** ████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████ Furthermore, even though Interrogatory No. 5 also requested a specific identification of all documents supporting Kodak's response, Kodak did not identify (or produce) any documents from which Ampex could determine ████████ ████████████████████████████ Therefore, Kodak's failure to disclose was not harmless because Ampex could not conduct appropriate fact discovery nor could Ampex determine whether any such cameras did or not infringe the '121 patent.

Again, preclusion is an appropriate sanction. *See Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 1996 U.S. Dist. LEXIS 22616, *34 (D. Del. 1996) (precluding defendant from making arguments and offering evidence because discovery had not been provided); *Philips Electr. N.A. Corp. v. Universal Electr., Inc.*, C.A. No. 94-392 (RRM), Tr. at 3 (D. Del. March 9, 1995) (noting that the Court will preclude a party from claiming a right to relief or offering evidence based on a theory at trial which it did not provide in discovery) (See copy at Exhibit 8.AK). ████████████████████████████
████████████████████████████████████████████
████████████████████

**B.     Kodak Did Not Produce Facts or Documents During Discovery That Would Enable Ampex To Determine Whether ████████████████ ████████████████.**

Kodak's response to Interrogatory No. 2 stated that ████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[4] Kodak had previously asked Ampex in an interrogatory whether particular unaccused cameras infringed the '121 patent, and if not, why those cameras would not be acceptable non-infringing alternatives. ████████
████████████████████████████████████████████
████████████████████████████████████████████



Ampex has no way to ascertain the truth of Kodak's contention. Kodak did not produce any documents during discovery from which Ampex could determine whether



Ampex's expert, Dr. Ligler, stated in his report that he reviewed

In addition, had Kodak revealed the facts set forth by Dr. Storer in its interrogatory response, Ampex could also have conducted other appropriate discovery.



V.    **AMPEX'S MOTION IN LIMINE # 5 (RULES 402 AND 403, FED. R. EVID. — INFLAMMATORY MATTERS)**

Ampex moves in limine to preclude Kodak from referring to Ampex as a "patent troll" or "patent terrorist" at trial, and to preclude Kodak from referring to the disposition of the ITC dispute between Ampex and Kodak (the "ITC Action").

Rule 402 of the Federal Rules of Evidence states that "[e]vidence which is not relevant is not admissible." Rule 403 of the Federal Rules of Evidence allows exclusion of relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

On October 2, 2006, Kodak submitted its Proposed Trial Exhibit List, which included Exhibit No. 494 (Exhibit 8.AR), a letter from Edward Bramson to the editor of BusinessWeek magazine dated April 14, 2005 (the "Bramson Letter"). This letter complains about BusinessWeek's use of the term "patent terrorist" to refer to Ampex in connection with Ampex's licensing activities. Kodak's inclusion of the Bramson Letter on its exhibit list indicates that it may intend, through evidence and witnesses, to accuse Ampex of being a "patent troll" or a "patent terrorist."

Kodak should be precluded from referring to Ampex in any way or form as a "patent troll" or as a "patent terrorist" at trial. Exclusion of such references is justified by Rule 403, because these inflammatory labels would undoubtedly cause the "unfair prejudice, confusion of the issues" and misleading of the jury that would substantially outweigh any probative evidentiary value such references would have. Referring to Ampex by one of these terms, or referring to Business Week's or any other person or publication's use of those terms, whether in opening or closing argument, during the examination of witnesses or in any other presentation of evidence, would mislead and poison the jury, causing irreparable prejudice against Ampex. References to Ampex as a "patent troll" or as a "patent terrorist" at trial should also be precluded under Rule 402

20

because these references are not relevant to proving any aspect of Kodak's alleged defenses.

Also in its Proposed Trial Exhibit List, Kodak included Exhibit No. 545, "Complainant Ampex Corporation's Motion to Withdraw the Complaint and to Terminate Investigation and to Shorten the Time for Response," and Exhibit No. 546, "Order Granting Complainant's Motion to Withdraw the Complaint." Both refer to Ampex's withdrawal from the ITC Action in 2005. Kodak's counsel, WilmerHale, also referred to Ampex's withdrawal on its internet website. (Exhibit 8.AS, p.12).[5]

Kodak should be precluded at trial from referring to how the ITC Action was resolved. Ampex's withdrawal from the ITC Action is not relevant to prove any element of any of Kodak's asserted defenses, and thus any reference to Ampex's withdrawal should be excluded under Rule 402. Additionally, if Kodak were permitted to inform the jury that Ampex withdrew its ITC complaint, the jury may be misled regarding the reasons for that withdrawal and speculate that the reasons were negative. Thus, preclusion is justified under Rule 403. *See Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1573-75 (Fed. Cir. 1993) (Although prior litigation may be "relevant to the issue of obviousness," specifically "'secondary' considerations of commercial success or copying," Court found "very high risk that the jury would be confused and improperly influenced" by evidence of prior litigation in affirming exclusion under Rule 403 by the district court.); *Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 2006

---

[5] Kodak's counsel also stated on its website that the disqualification of former Ampex expert witness Eric Anderson was one of the reasons Ampex withdrew. Kodak has represented to the Court on multiple occasions that if Mr. Anderson were disqualified, it would not use or rely upon any aspect of his report or statements at trial. *See* April 4, 2006 Transcript, p. 6 (Exhibit 8.AT); Letter from Paul Lukoff to Judge Jordan (April 3, 2006) (Exhibit 8.AU). Therefore, Ampex considers it unnecessary to bring a motion in limine barring any use or mention of Mr. Anderson's testimony, because Kodak has represented that it will not do so.

WL 2724879 (D. Del 2006) (Motion in limine to preclude mention of prior litigation granted.).

Date: October 13, 2006                    AMPEX CORPORATION

                                          _____/s/_____
                                          Jack B. Blumenfeld (#1014)
                                          Julie Heaney (#3052)
                                          Morris Nichols Arsht & Tunnell
                                          1201 North Market Street
                                          Wilmington, DE 19899-1347
                                          (302) 575-7291

                                          Jesse J. Jenner
                                          Sasha G. Rao
                                          Ropes & Gray LLP
                                          1251 Avenue of the Americas
                                          New York, New York 10020
                                          (212) 596-9000

                                          Norman H. Beamer
                                          Gabrielle E. Higgins
                                          Ropes & Gray LLP
                                          525 University Avenue
                                          Palo Alto, California 94301
                                          (650) 617-4000

                                          James E. Hopenfeld
                                          Ropes & Gray LLP
                                          One Metro Center
                                          700 12th Street, NW
                                          Washington, DC  20005

                                          *Attorneys for Plaintiff,*
                                          *Ampex Corporation*

# EXHIBIT 8.A

# EXHIBIT 8.A

# IS

# CONFIDENTIAL

# EXHIBIT 8.B

# EXHIBIT 8.B

# IS

# CONFIDENTIAL

# EXHIBIT 8.C

# versation with
# George Grasso



## The president of MCI/Quantel gives his perspective on digital video effects and graphics

Each year during the NAB, it has become something of a tradition for MCI/Quantel to preview its latest concept product in a hotel suite. The demonstrations are presented to elicit industry feedback on a product in the works, and have provided the first glimpse of devices such as the Paint Box, Mirage and Cypher. These presentations are often delivered with a British accent, not surprising since the R&D behind them takes place in Newbury, England, the Silicon Valley of the U.K. But the voice most associated with the company's U.S. operation belongs to an American, George Grasso, president of MCI/Quantel.

Grasso is based in Palo Alto, California, in the heart of America's Silicon Valley, not far from where he grew up. A native of California, Grasso graduated from San Jose State and moved into the video industry in 1970 as western regional manager for the videotape division of Memorex. After Memorex moved out of the professional tape market, Grasso went over to Commercial Electronics, Inc. (CEI), then one of the few remaining American manufacturers of TV cameras.

In 1976 he joined a new company, Micro Consultants, Inc., as marketing vice president. The company was formed to handle North American distribution for Britain's Micro Consultants, Ltd., which had been involved in pioneering work in the application of digital technology in a range of areas including television. Its subsidiary company, Quantel Ltd., was making a name for itself in the video world with its portable digital time-base corrector and was ready to introduce a new product.

In a hotel suite at the 1976 NAB in Chicago, the subsidiary held its first demo. The product was the Quantel DFS-3000, the first portable digital framestore synchronizer. (Because most of the products were coming out of Quantel in England,

the company adopted "MCI/Quantel" as its primary identification, although most people simply refer to it as "Quantel.") In developing the DFS-3000 and the company's DSC-4000 standards convertor, Quantel engineers realized that digital technology could be used not only to process the signal but also to alter the picture. The fruits of their labor soon yielded the company's first digital video effects product. It was the DPE-5000, a device that electronically manipulates the video image.

Ongoing R&D in Newbury led to more applications of digital technology, adding new devices to existing product categories as well as creating new areas of MCI/Quantel. The company's Paint Box uses digital technology to electronically create graphic images. The Mirage expands the boundaries of electronic manipulation of the video image. Cypher, a sophisticated caption generator, combines image generation with manipulation.

Henry, the code name for the company's 1984 NAB concept product, takes digital technology a step further, drawing on Quantel's work in digital storage. Some of its capabilities are similar to those of the new random-access editing systems, the Montage and EditDroid, which debuted on the floor of 1984's NAB.

What will Henry be when he grows up and finally hits the floor of a future NAB? What does MCI/Quantel have in store for the future? Videography's editor Marge Costello and associate editor Susan Chumsky caught up with George Grasso between trade shows this past fall in New York to find out.

**Videography:** What brings you to the East Coast this time of year?

AMPEX LIBRARY

THIS MATERIAL MAY BE PROTECTED BY
COPYRIGHT LAW (TITLE 17 U.S. CODE)

AXD039043

introduction which is our demonstration suite at the NAB or a major trade show.

First of all, we develop a concept, and that concept is converted into hardware, brought to one of these trade shows and put in a by-invitation-only [showing]. Our friends are invited in to take a look at it. And, as you know, it's a very controlled situation.

The hardware as it exists in that suite is principally concept hardware. There is not a finished product there at all. We preface these introductions with a statement, "What you are going to see here, folks, is something we've been playing

> ## There was pressure to develop the ability to variably compress a picture so you could size and position anywhere you wanted on the raster. So we worked to develop programs that would do that. That was the genesis of the 5000.

around with that we think has some potential. We wanted to put it before you and get your feedback as to what it is that you think we need and whether we have a product here." And we in no way represent that as being a product that will be available for the market in any given period of time.

We take that feedback back to the development lab and examine the input. We then determine whether we want to proceed with that product or not. In most cases, we have

proceeded. The next time you see anything that resembles that concept product will be on the floor of a major trade show, principally the NAB. Mirage and the Paint Box are classic examples of that.

Even when it gets to the floor, we are 80 percent to the product at that point. There is still input that can be generated by the market as to other features such as control and other software people would like to see. And even after that is done, there is an evolution of a product beyond that point.

Again, historically, if you examine the evolution of the 5000, that philosophy prevails throughout every device that we have. The 6000, which is our Library System, started as a single device to go into a broadcast facility. Now it's evolved into a Central Lending Library system, which incorporates the Paint Box. All of these devices can talk to each other digitally, managed by a large DEC computer, and there is the capacity to search 100,000 slides in five seconds.

**Videography:** You hear the words "user-friendly" and "ergonomics" quite a bit these days at NAB. And people are talking more about new software that may be available. Are there any specific capabilities that are emphasized when you listen to feedback from your potential customers?

**Grasso:** The ability to modify and not to get stereotyped as to "these people use this device this way and so this is what we have to do." We have to maintain a degree of flexibility.

The words "ergonomics" and "user-friendly" are terribly overused and everyone uses them in regard to their particular product. We use them relative to our product.

We are not frozen into one particular aspect. We will continue to develop software beyond what the initial package might be.

**Videography:** Software is becoming more and more dominant. At facilities and networks, there are people on staff writing new software or speaking with the manufacturer all

### NEW! COMPACT MOBILE MULTIPLEXER III

#### THE FILM CHAIN WITHOUT A DEDICATED CAMERA

**SUPERIMPOSE-DISSOLVE IMAGES FROM TWO SLIDE PROJECTORS AND ONE 16MM PROJECTOR FOR REAL TIME VIDEO OR VIDEO TAPING**



- Your video camera with normal zoom lens can be tripod mounted and easily aligned in seconds.
- Small footprint. Unit fits standard 18" X 24" table.
- ✓ Write or call for free technical details

**BUHL** OPTICAL COMPANY
1009 BEECH AVE., PITTSBURGH, PA 15233
● 412-321-0076 ● 800-245-4574

Get more Info. Circle Reader Card No. 118

# Down to Earth Duplication Rates

that include Tape, Case & Label!

## BETA OR VHS DUPLICATES

| Length (min) | Quantity | | |
|---|---|---|---|
| | 12 - 49 | 50 - 99 | 100 - 250 |
| up to 30 | $16.50 | $13.95 | $11.80 |
| 31 to 60 | 18.40 | 15.75 | 14.24 |
| 61 to 120 | 22.70 | 19.65 | 17.11 |

(source tape can be ¾" or ½")

Phone 312-423-1012 for other rates - ½" or ¾"



**Location Video**
10837 Laramie Avenue
Oak Lawn, IL 60453

Get more Info. Circle Reader Card No. 119

*Videography*

AXD039049

# EXHIBIT 8.D

# EXHIBIT 8.D

# IS

# CONFIDENTIAL

# EXHIBIT 8.E



The STAMP brush can be used to stick down a cut-out repeatedly and at selected angles and magnification.

A second image is saved on the buffer store can be selectively restored through the original picture using an airbrush, chalk or a paintbrush.



by Bob Pank, Quantel

# PAINTBOX What's New

**T**he Quantel Paintbox was launched five years ago into a market which hardly knew what a TV graphics machine could do. Then, as now, other machines were mostly computer based rather than dedicated tools. Having steered people away from concepts of computer graphics towards the benefits of a TV graphics system, the Paintbox took off. It is a credit to its design that there have been no major system changes to the Paintbox since then. Nearly all the long list of enhancements have come in the form of software so all users can benefit. Some external evolutionary changes have occurred such as the introduction of the removeable disk system (RSD) and a new touch tablet from TDS. The software has changed it quite dramatically, almost into a new machine.

The success of the Paintbox is simply related to the ease with which graphics designers can explore its many facets to produce high quality graphics efficiently. Software changes have been made always to enhance this situation and we are forever grateful for the useful comments, pointers, and hints that designers give us. Where would we be without our enthusiastic customers? Designers were in at the start of Paintbox and our continued good relationship with them ensures the future for all concerned.

Over the last 15 months there have been two major software releases, PRO4, and the latest, PRO4.06. The first, besides bringing a host of new features, significantly changed the layout of the menus. The second has introduced a further new range of facilities and enhancements.

The new on-screen menu layout of PRO4 follows the same theme as the previous software versions with the major modes displayed at the left and the relevant subordinate functions appearing to the right. In this way the menus are kept uncluttered despite the fact that there are over 300 functions available in all. Stencil functions are made available in all menus except Library. This is simply because the stencil is such an important and widely used facility that making it so easily available simplifies and speeds operation.

The initial concept of the Paintbox was that it should completely hide the 'digital' and 'computer' technology from the user so the artist can concentrate on creative matters. PRO4 introduced something of a departure from the idea with PASTATS. This shows the figures which define the x and y position, magnification and rotation of a cutout. Conversely the figures can be used to force the cutout to a particular size, position or rotation. This has proved very useful for a range of applications including making animation sequences.

Further help towards frame animation is given in facilities Auto Save and Auto Fetch. Auto Save freezes and records frames in an automatically numbered sequence. Playing out Auto Fetch presents pictures in numeric sequence on pen tap or cue. A simple protocol exists to enable these functions to operate in conjunction with a VTR via an animation controller such as the Lyon Lamb or VES. With such a setup, video clips can be automatically loaded into Paintbox, retouched or whatever in the usual Paintbox way, and re-recorded frame by frame back on to tape again using the Auto Fetch. The system works well but is of course superseded if you have a Harry.

The concept of 'special' brushes is introduced. Blur and Crisp do not paint but are extremely useful for defocusing or sharpening an area of picture and are just right for emphasising a particular item or the depth of the picture. The field brush allows the selection of picture information from only one of the two TV fields, thus removing interfield motion flicker in the brushed area.

PRO4 brought a number of other functions such as TACK which enables any

AXD028707

THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)    AMPEX LIBRARY

number of cutouts to be moved around and repositioned before being finally stuck; for convenience, stencil can be shown as any colour rather than the normal red. Perspective is a feature which is particularly useful for package designers, enabling pictures and labels to be stuck on to the sides of the package in a realistic way. Also there is the ability to show the stencil in any colour.

The latest Paintbox addition is PRO4.06 software. Not a particularly auspicious name for what is a very significant advance in Paintbox capabilities. The original PRO4 menu system is maintained but is streamlined and offers many new possibilities. It also represents a cross fertilisation of ideas with the Graphic Paintbox being supplied to the print industry.

One major area is additional facilities for the use of cutouts. Stamp gives a quick way of repeating a cutout many times. Smudge uses the outline of the cutout to define the parts of the picture to be moved by the pen strokes and is very much analogous to the wet finger on a wet painting. It has already been proved easy to modify a digitised photo in this way so that, within a few minutes, it look like a painting. Add a canvas texture and just hang it on the wall! Smear sticks the contents of the cutout as it is dragged across the picture. This instantly produces a trail effect and can be used as a custom brush. As a final twist, the percentage of Smudge, Smear and Stamp intensity can be set anywhere between 1 and 100 using a number box that first appeared to enable pre-setting of the flow rate of the air brush. Artists comment that these features provide a totally new way of using the Paintbox.

There are now two temporary save pictures files called Old and New. A new special action, Restore, enables painting from the existing picture through to the selected Old or New image.

All normal brushes, including airbrush, can be used. Besides giving an easy way to fix a mistake without having to lose all the work since the last save picture operation (you restore only the particular area of the error), Restore has become very popular for a host of other uses. For example brushed 'wipes' from one picture to another, blending of two images (or more if you like), defining an irregular area for an effect such as mosaic, and so on. As with so many of the Paintbox functions, the graphics designers are forever experimenting and coming up with new techniques and applications. Not surprising really; that's what the Paintbox is all about.

There are many very helpful practical enhancements. For instance Effects (mosiac, overlay, field and colour map) can be limited to a chosen rectangle and can be restricted by stencil. Rework enables cutouts to be recalled with their full stencil and chosen picture area for reworking. Library items are identified by title during Browse. If the original item is to be recalled after further work, the artist simply reopens the library and hits the title. Another feature allows the overlay range to be set by defining luminance levels for



*The flow of paint from the airbrush can be selected from 1% to 100%.*

*During selection of facilities, the current state of the brush is displayed in the blue box.*

the opaque and transparent ends of the stencil. Although the initial idea was that this would enable a good overlay to be derived from a low contrast picture, this has also been found most effective as a quick way of defining a stencil of a particular object in a picture.

Following the success of Pastats, the theme has been extended, enhanced and renamed Statistics. The parameter values can now be displayed on the menu and these include separate controls for x and y magnification – so aspect ratios can be changed. Numeric entries into the menu are becoming more commonplace and so a number pad has been provided at the right of the menu. It means that there is less need to refer to the keyboard and joystick. Once again, the controls in the hands of creative minds start to be used in unanticipated ways. For example, controlling position with the number pad using the INC(rement) box precisely 'nudges' the cutout across the screen … enter new nudge feature!

Frame grabbing has been improved with the introduction of frame averaging. Besides taking in just one frame as before, a two-frame average can be chosen. This has the benefit of eliminating cross colour from coded sources and reducing random noise. For more troublesome inputs, the MANY box allows a new average to be made each time the pen is tapped. So, provided the image holds still, noise can be greatly reduced. But, once again, the creative people have already round an artistic application. Placing artwork under the camera and taking many picture averages as the camera zooms produces an exciting motion blur effect. To finish the work, take in the final zoomed out image and use the restore brush to add it over the blur. Another masterpiece completed.

Typography has not stood still either. The original library of 100 off-the-shelf typefaces has expanded to 140. More are being added on a regular basis as selections are made from the thousands of faces available.

## Interfacing

On the technical side, more interfaces have been provided. Perhaps the most important is the 4:2:2 component digital video and control interface with Quantel's Harry. This interface is so well developed that, when required, the two machines behave as one. Designers become almost unaware of which machine they are using. Is Harry an extension of Paintbox or Paintbox an extension of Harry? It really doesn't matter because control and picture exchange is so easy that one simply complements the other. It is rare, if ever, that such close machine to machine integration has been seen in TV post production. And yet, the two can now be split to work completely independantly and so retain full flexibility.

Another important interface is given by the microfloppy disk. This can hold one picture, or cutout and provides a picture in a format which can be used for interface to other digital machines such as graphics computers. It also gives a means of picture exchange with the Graphics Paintbox for producing TV viewer guides or translating image from television advertising campaigns to co-ordinated advertisements in printed media.

Remote control software now allows the Paintbox to be totally controlled from an RS-232 port. This is particularly useful for fixed format presentations such as weather forecasts, special events, elections, sports and so on. This 'remote' Paintbox can also be switched to normal touch tablet operation. **IBE 104**

# EXHIBIT 8.F

# EXHIBIT 8.F

# IS

# CONFIDENTIAL

# EXHIBIT 8.G



PRO 4 is the 4th generation software package for the Quantel Paintbox, designed for use at the highest professional level. PRO 4 will be installed in existing Paintboxes, where ordered, over the coming few months, and new-production systems will have it as standard.

| PAINTING | paint | wash | magnify | DRAW STEN | USE STENCIL |
| GRAPHICS | chalk | shade | | save pic | display sten |
| EFFECTS | airbrush | | blur | restore pic | reverse sten |
| PASTEUP | | special | smooth | wipe pic | USE GRID |
| ANIMATION | | | crisp | | |
| LIBRARY | | | field | 1 | 2 |

The long awaited introduction of PRO 4 marks the culmination of a lengthy period of development and field testing. It incorporates many refinements and features suggested by Paintbox users and will extend even further the vital role played by Paintbox in TV graphics.

The menu geography has been carefully rethought, and is now ergonomically sounder. The stencil menu is now permanently available with Painting, Graphics and Paste-up. In painting, brush combinations are possible, eg. wash + airbrush. New brushes permit blurring or crispening of images. Wash may be used with graphics functions, eg. solid and graduated rectangles. The Paste-up menu includes tack and, where ordered, perspective.

| PAINTING | cut | flip | outline | DRAW STEN | USE STENCIL |
| GRAPHICS | paste | tumble | surround | add | display sten |
| EFFECTS | tack | rotate 90 | solid | remove | reverse sten |
| PASTEUP | stick | prspctve | shadow | wipe sten | USE GRID |
| ANIMATION | | H V | emboss | | H V cell |
| LIBRARY | | | live video | | L C R |

A new feature, Paste stat, allows cut outs to be positioned and sized accurately using numeric values from the keyboard. Disc management is improved by new console dialogue controls. In short, PRO 4 is exactly what we have all been asking for for years. Because it represents a radical improvement, it will repay existing users to spend some time familiarising themselves with the new layout and features, when PRO 4 is first installed. It is different from V5 and needs a little learning. A new manual is being prepared, which fully explains the features and use of PRO 4.

*PRO 4 The greatest advance since Paintbox.*

The Paintbox Users Association, 31 Turnpike Road, Newbury, Berkshire RG13 2NE England.

EKC005021610

-- 28 --

ALL :

The box, ALL, in the right hand column of the menu, instructs the Paintbox to cut out the entire picture. This is constrained by PICTURE, STENCIL, or PICTURE/STENCIL, as appropriate.

When a cut-out has been defined in the manner described above, the command PASTE is activated and the menu changes (see figure 12) :

Figure 12

| cut | flip | | outline |
|-----|------|---|---------|
| paste | tumble | | surround |
| | rotate 90 | | solid |
| | prspectve | | shadow |
| | H | V | emboss |
| | | | live video |

PASTE :

Swipe off the menu.

The cut-out defined by the actions previously described will now appear on the picture area.  Its position is defined by the pen.  Tap down to pick up the cut-out, and position as required.  Tap down again and the cut-out will be temporarily spotted-down.

SIZE and ATTITUDE :

The joystick control allows one to change the size and attitude of a cut-out prior to assembly into the picture.  Pull down on the joystick and the cut-out will shrink.  Pull right and the cut-out will rotate clockwise. PULL left and the cut-out will rotate anti-clockwise.  Precise control is permitted by the scaling of the joystick control.  Note that position, size and attitude of cut-outs (and animated stacks) may also be controlled mathematically via the PASTE STAT option in the ASSORTED menu.  (See ASSORTED OTHER FUNCTIONS section.)

Having spotted down a cut-out, swiping-off will reveal new options in the menu :

| tack |
|------|
| stick |

EKC005021638

— 29 —

PASTE UP

TACK :

Having spotted-down a cut-out, selection of TACK temporarily tacks it in position. One is then able to cut out another object or select another cut-out from the Library and position/size/rotate it as above. Again, one may then select TACK if required, and repeat. The action of TACKING positions a series of cut-outs in position in a composition but permits subsequent re-positioning (of any or all tacked cut-outs) if required. To select a tacked cut-out for attention, call up the menu display and then tap down within the area of the required, tacked, cut-out. This will then be on the pen, ready for re-positioning, when the menu is swiped-off again. Note that the TACK option can be switched off when not required. See ASSORTED OTHER FUNCTIONS section.

STICK :

Whether or not one has tack cut-outs in operation, the action of STICK is to fix permanently any cut-out, or series of cut-outs, in the position and attitude assigned, and subject to the controlling factors selected, as below.

CONTROLLING FACTORS :

It is possible to stick down any cut-out (including type) in a variety of different fashions. See the two right hand columns in figure 13.

Figure 13

| cut | flip | | outline |
|-----|------|---|---------|
| paste | tumble | | surround |
| tack | rotate 90 | | solid |
| stick | prspectve | | shadow |
| | H | V | emboss |
| | | | live video |

FLIP and TUMBLE :

A cut-out may be flipped (mirror image, left/right), or 'tumbled' (mirror image, top/bottom), by pressing the appropriate panels.

ROTATE 90 :

Selection of this function will rotate the cut-out through 90° clockwise. Thus, for example, three taps in the ROTATE 90 panel will rotate the cut-out through 270° etc.

EKC005021639

LIBRARY

ARCHIVE transfers the picture and its title to any write-enabled disc.  Thus pictures may be archived on to specific discs.

BROWSE displays the titles as miniature pictures, to a maximum of 12.  Press the miniature to display the picture full screen.

DOWN.  If there are more than 12 pictures identified by the appropriate title, the next 'page' of the index is called up, either in TITLES or BROWSE, by DOWN, at which point UP appears.  One may search through the library, alternating from TITLES to BROWSE, from UP to DOWN at will.  Having called down a picture for inspection, by pressing TITLES or BROWSE (or indeed UP or DOWN), the picture will be replaced by the relevant display.

INC and DEC :

These boxes, short for INCREASE and DECREASE, assign numbers to saved titles.  Press INCREASE and the title display is numbered 0001.  Press again, 0002 etc.  DECREASE has the opposite effect.

TO SAVE A PICTURE :

Essentially, the process is similar to FIND, above

    1.   Press SAVE, PICTURE

    2.   Use the keyboards to title the picture

    3.   Press END to confirm.

If a disc is full, NO SPACE will appear.  If a disc is write-protected PROTECTED will appear.

All other features (with the exception of text fonts, see below) are SAVED and FOUND In the same way.

GROUPS :

If it is desired to save a group of features under the same title (e.g. PICTURE, STENCIL and CUTOUT), first ensure that the relevant PICTURE, STENCIL, CUTOUT etc are present.

    1.   Press DEF GROUP

    2.   Press desired feature panels : PICTURE, STENCIL, CUTOUT

    3.   Press SAVE followed by GROUP

The reverse is true for finding a group.

EKC005021658

# EXHIBIT 8.H

# MCI/QUANTEL

Micro Consultants, Inc., P.O. Box 50810, Palo Alto, California 94303, Phone: (415) 856-6226, Telex: 334420

| | |
|---|---|
| **PRELIMINARY PRODUCT DESCRIPTION** | THE PAINT BOX <br> THE ULTIMATE TV GRAPHICS SYSTEM <br> Model: <br> Date: 10th APRIL 1984 |

There is electronic art, computer art, video art, electronic graphics, computer graphics and video graphics - and then there is the Paint Box.

The Paint Box properly wears the mantle of the "Ultimate TV Graphics System" because it is a complete graphics studio - at a single drawing board. It happens to be electronic, it happens to use a computer and produces video, but that is irrelevant. Irrelevant because the machine was created by graphics designers for graphics designers and, as such, uses all their traditional skills replacing only traditional materials.

The Paint Box is indeed the Ultimate TV Graphics System because it is being adopted worldwide by hard pressed graphics designers to help them produce more work to their highest standards in far less time than they could with conventional tools.

The BBC in London produced 1,254 graphics in five days with designers using two Paint Boxes. WCVB in Boston increased their graphics output threefold just two weeks after receiving the Paint Box. All NBC News graphic production out of New York is Paint Box material. ABC Sports majored their graphics around Paint Box for the Winter Olympics. The list is almost endless, proving that Paint Box is not an exotic fine art system - although it produces fine art - but a workhorse of incredible power lifting the television graphics designer right into the studio shop window.

At NAB 1984, several new facilities are offered for new and existing Paint Boxes.

## TYPOGRAPHY

The new Quantel standard typeface library is announced. The standard typeface library comprises 90 different faces giving a wide variety of letterforms, each faithfully reproduced from the type designers' original designs. A separate sheet gives examples of these faces.

## PASTE OVER

Now a cut-out, either animated or still, may be pasted over live incoming video. Thus live action can now form part of the Paint Box graphics

---

Information in this preliminary document is subject to change without notice.

EKC 000140378

either by adding a graphic to live action or, conversely, inserting live action into a portion of a graphic.

Of course, the junction between the live action and the Paint Box graphic is achieved with all the normal Paint Box beauty, being the equivalent of a soft edge or linear key.

## TACK

Some designers have expressed a wish to be able to tack down cut-outs rather than having to permanently stick them down before moving onto another. This is particularly useful when "playing" with a composition comprising several cut-outs.

This feature, now added to the Paint Box, is called "Tack". Several cut-outs may be "tacked" down or moved as the designer wishes during the composing process. At the end of the exercise the finished composite is "stuck" in the normal way. "Tacked" pictures may be saved for later use if the designer is still not sure that the composition is satisfactory.

## WEATHER SATELLITE INTERFACE

Quantel, in conjunction with ITI are pleased to be able to announce a Weather Satellite interface for the Paint Box.

Now it is possible to receive weather graphics data over ordinary dial-up phone lines from data base suppliers such as WSI, ESD, R-Scan, ACCU-Weather and others, process them into a television format within the Paint Box and add original art or text overlays for local presentation.

A major feature of the interface is that it contains its own buffer stores and keyboard, eliminating the requirement for the Paint Box to be off-line during the slow-scan reception of the data.

## DIGITAL INTERFACE TO CENTRAL LIBRARY

The digital interlink between the Central Lending Library and the Paint Box is now available. This link is a complete interface between the two with the Paint Box being able to fully interrogate the Lending Library, browse pictures, retrieve pictures and "sell" back completed graphics.

* * * * * * * * * *

EKC 000140379