# EXHIBIT 8.AK

1

65

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

PHILLIPS ELECTRONICS NORTH          :
AMERICA CORPORATION,                :
                                    :
            Plaintiff               :
                                    :
v.                                  : Civil Action
                                    : No. 94-392-RRM
UNIVERSAL ELECTRONICS, INC.,        :
                                    :
            Defendant               :

                            Wilmington, Delaware
                            Thursday, March 9, 1995
                            9:00 a.m.

BEFORE:   HONORABLE RODERICK R. McKELVIE, U.S.D.C.J.

APPEARANCES:

          Young, Conaway, Stargatt & Taylor
          BY:  JOSY W. INGERSOLL, ESQ.
          Rodney Square North
          Wilmington, Delaware  19801
                -and-
          Fish & Neave
          BY:  KENNETH B. HERMAN, ESQ.
          1251 Avenue of the Americas
          New York, New York  10020
            Counsel for Plaintiff

          Connolly, Bove, Lodge & Hutz
          BY:  JEFFREY B. BOVE, ESQ.
          1220 Market Building
          Wilmington, Delaware  19801
                -and-
          Vedder, Price, Kaufman & Kammholz
          BY:  ROBERT E. BROWNE, ESQ.
               MARK R. GALIS, ESQ.
          222 North LaSalle Street
          Chicago, Illinois  60601-1003
            Counsel for Defendant

ORIGINAL          Heather G. Slate
                  Official Court Reporter

2

# PROCEEDINGS

THE COURT:  Good morning.

(Counsel responded:  "Good morning.")

THE COURT:  I've got Mr. Bove's letter and I've got a phone message and a letter from Ms. Ingersoll about this discovery dispute.

What I thought I'd do is just take a couple of minutes, not to decide the merits of the issue, but just talk a little about procedure for it to give you a chance to talk about it and resolve it.  And if you can resolve it, that's fine.  If not, we'll do a conference call.  So let me go through my list and you can see what you think.

Topic number one, letter versus phone call.  It's probably true that sometimes I get a little lazy and I get the letter and I say okay, I'll take the letter, but I know it's a little unfair to the other side to say don't write and one side writes and the judge acts quickly and gets one letter and doesn't give the other side a chance to respond.

So I think the best approach is to give a call, even just local counsel, Judge, we have this discovery dispute, let's have a phone conference in two days.  And during the call, it's fine with me to say Judge, we'd like to submit a letter to describe what we're doing, and the other side will say fine, that's okay with me.

1    MR. BOVE:  Judge, I take the responsibility, I was

2    out of the office.

3    THE COURT:  That's all right.

4    MR. BOVE:  And Ms. Rogowski I think followed Judge

5    Robinson's procedures.

6    THE COURT:  That's okay.  We all go left, right.

7    MR. BOVE:  I'll assume the responsibility.

8    THE COURT:  To me, I'd just like you to know I

9    won't make decisions or prejudge until everybody gets a fair

10   shot to respond.  So that's one.

11   Two, what I've been telling -- actually, maybe

12   I'll start from the back of the topic.  What I've been

13   telling people generally about identification of

14   information, witnesses, bases of contentions for issues is

15   that if you send a discovery request to the other side and

16   you don't think you're getting fair responses, the general

17   approach I've been taking is to say that there comes a time

18   where if you bring it to my attention and you show the other

19   side is not fairly responding, I'll put the other side on

20   notice that I'll preclude them from either claiming the

21   right to relief based on that theory or offering in evidence

22   based on that theory at trial.

23   Which the question is who's holding the risk, and

24   the side that gets the discovery request and doesn't respond

25   to it may be thinking that they're shifting the risk to the

4

1    other side. But I want the side that feels they're not

2    getting what they think is fair and reasonable to know that

3    I'll shift the risk to the side that's not responding.

4            And I understand that in that interplay, there's a

5    problem about time; that is, you have an affirmative defense

6    in a case and you're not sure exactly what all the facts are

7    and you need time to respond, so I don't expect a party to

8    file a response to a contention interrogatory that's

9    expansive the first month. And if you show me you're fairly

10   responding with the information you've got when you've got

11   it and you update and give the other side notice before the

12   pretrial conference and before the trial, that's fine.

13           But if it looks like you're holding back on

14   something and the other side hasn't had a fair chance to

15   respond in preparation for trial, I'll just preclude you

16   from putting those facts or evidence in at trial.

17           I understand that may be difficult because a party

18   may be seeking discovery in support of a claim they're

19   asserting for relief, and we need to look and see what the

20   remedy would be in that context. If it's the basis of

21   another party's claim, I'll preclude the other party from

22   seeking relief on it. If it's a factual basis and

23   contention and why we infringe and they haven't provided

24   witnesses to testify on it, then I'll simply bar them on

25   that testimony.

1        In that context about who is going to respond and

2    when they're going to do it, keep in mind I'll look to see

3    you've been reasonable, you've given the other side the

4    chance they need to respond.

5        And part of the reason I'm all over everybody in

6    the early stages of the case is because there will come a

7    time at the pretrial conference where I'll start cutting

8    some heads and arms off.  I've done it a couple times and

9    people have been a little upset, but part of my theory is

10   we've talked about it for two months and if you haven't

11   fairly disclosed it, it's too late at the pretrial

12   conference to say by the way, Judge.

13       MR. BROWNE:  Your Honor, it's Bob Browne.

14       If I could just put that into context here.  The

15   problem is we got the original answers as the persons having

16   knowledge of the internal infringement as the attorneys.  We

17   initially thought they would identify which attorneys, and

18   they retracted it.  Then we pursued it on deposition

19   discovery by asking who are the other people who have

20   knowledge of infringement.  They refused to let the people

21   answer on the grounds of attorney-client privilege.

22       The other thing is the interrogatory is broad

23   enough to cover experts, so if they were planning on

24   introducing testimony on infringement from experts, we

25   should have had that testimony in response to our

6

1    interrogatories.

2         That's our position.

3         THE COURT:  I think most of us know that things

4    are moving on different tracks out there.

5         But if the issue is that your client is being sued

6    for infringement and the other side won't give you the

7    factual basis for it and you write a letter, you say we've

8    done the best we can, we've sent interrogatories, we've

9    asked you at depositions, we're not going to ask again, and

10   if we don't hear, you can expect that we'll be asking the

11   judge to preclude you from putting on any case for

12   infringement for failure to disclose the factual basis for

13   it.

14         The other side says gee, how do we know it?

15         You can cite this transcript record back to me.

16   You can say Judge, we asked, we were reasonable, it's too

17   late to force us to go back out into the world to do

18   discovery.

19         And I've done it at pretrial conferences where

20   I've said you may not.  And I had one case where one party

21   wanted to put on proof of Doctrine of Equivalents and they

22   failed to disclose in discovery that that was a claim, and I

23   said it won't be in the case.  And that works both ways on

24   each side.  And that's one way of saying I know one strategy

25   in litigation is to shift the risk to the other side of not

1   knowing what's going to come up.

2          What I'm saying is if you make your effort in

3   discovery, I'll protect you.  If you don't do discovery and

4   you sit back, then nothing is a surprise.

5          On the issue of attorney-client privilege and work

6   product, a couple of problems that I think most of us focus

7   on is, one, it's easy for a party to assert broad claims of

8   privilege and hide documents that should otherwise be

9   produced or put the other side to the burden of poking at

10  them to see that they should be produced.

11         Two, I do have strong feelings about protecting

12  attorney-client communications and the work product.

13         Three, I find that when people get into a scrap

14  about this, it tends to add a lot of time to the discovery

15  in the case and it tends to be something that can fall

16  through the cracks if people aren't aggressive about it.

17         So to the extent that somebody is asserting a

18  privilege as to information you want, my suggestion is

19  immediately push for it and bring it to my attention because

20  otherwise it will tend to drag out and it will be at the end

21  of discovery that I'll finally get around to resolving it.

22  So don't delay, one.

23         Two, to the extent you're asserting the privilege,

24  please be very careful about what you're asserting the

25  privilege on because I'm getting to the point on this where

# EXHIBIT 8.AL

# EXHIBIT 8.AL

# IS

# CONFIDENTIAL

# EXHIBIT 8.AM

# EXHIBIT 8.AM

# IS

# CONFIDENTIAL

# EXHIBIT 8.AN

SHEET 1

1

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                             - - -

 4    AMPEX CORPORATION,              :      CIVIL ACTION
                                      :
 5              Plaintiff,            :
                                      :
 6         v                         :
                                      :
 7    EASTMAN KODAK COMPANY,          :
      ALTEK CORPORATION, and         :
 8    CHINON INDUSTRIES, INC.,        :
                                      :
 9              Defendants.           :      NO. 04-1373 (KAJ)

10                             - - -

11                    Wilmington, Delaware
                Wednesday, February 8, 2006 at 2:00 p.m.
12                    TELEPHONE CONFERENCE

13                             - - -

14    BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

15                             - - -
      APPEARANCES:
16

17         MORRIS NICHOLS ARSHT & TUNNELL
           BY:  JULIA HEANEY, ESQ.
18
                and
19
           ROPES & GRAY, LLP
20         BY:  NORMAN H. BEAMER, ESQ.
                GABRIELLE E. HIGGINS, ESQ., and.
21              DAVID R. BRIGHTMAN, ESQ.
                (Palo Alto, California)
22
                and
23

24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

SHEET 2

**2**

1    APPEARANCES: (Continued)

2

3        ROPES & GRAY, LLP.
4        BY:  JAMES E. HOPENFELD, ESQ.
             (Washington, District of Columbia)

5            Counsel for Plaintiff

6

7        PRICKETT JONES & ELLIOTT, P.A.
8        BY:  PAUL M. LUKOFF, ESQ., and
             DAVID E. BRAND, ESQ.

9            and

10       WILMER HALE, LLP
11       BY:  MICHAEL J. SUMMERSGILL, ESQ., and
             SARAE E. WHITMAN, ESQ.
12           (Boston, Massachusetts)

13           and

14       WILMER HALE, LLP
         BY:  S. CALVIN WALDEN, ESQ.
15           (New York, New York).

16           Counsel for Defendants

17

18           - oOo -

19

20           P R O C E E D I N G S

21       (REPORTER'S NOTE:  The following telephone

22   conference was held in chambers, beginning at 2:00 p.m.)

23       THE COURT:  Hi, this is Judge Jordan.  Who do I

24   have on the line?

25       MS. HEANEY:  Good afternoon, Your Honor.  It's

**3**

1    Julie Heaney for Ampex; and I have several attorneys from

2    Ropes & Gray on.

3        MR. BEAMER:  Your Honor, this is Norm Beamer.

4    Should I go forward?

5        THE COURT:  Well, wait just a second.  Let me --

6        MR. LUKOFF:  And, Your Honor, Paul Lukoff.

7        THE COURT:  Hold on a second.  Let me make sure

8    I've got who is on; okay?  Who is with you from Ropes &

9    Gray?

10       MR. BEAMER:  This is Norm Beamer; and with me is

11   James Hopenfeld and Gabrielle Higgins and David Brightman.

12       THE COURT:  Okay.  All right.  Mr. Lukoff.

13       MR. LUKOFF:  I'm local counsel for the

14   defendants, Your Honor.  And with me on the phone are

15   Michael Summersgill from the Boston law firm of Wilmer Hale

16   and Calvin Walden in New York.

17       THE COURT:  All right.  Thank you.  Well, we've

18   been through the various pieces of correspondence that you

19   folks sent to me and one thing we can knock out right now.

20   Let me ask you, Mr. Summersgill.  I assume you are speaking

21   for Kodak.  Am I right?

22       MR. SUMMERSGILL:  Your Honor, this is Mike

23   Summersgill; and Calvin Walden will speak on behalf of the

24   defendants today.

25       THE COURT:  All right.  Mr. Walden, I have the

**4**

1    letter from Mr. Lukoff dated January 27 about the licensing

2    issue which we took up when we were speaking on the phone

3    together on January 12th.  And I am nonplussed at the

4    assertion that Kodak does not believe an order is necessary.

5    We still have people who aren't giving these up, having done

6    it for months, after extensions on my early order saying I'd

7    order it in two weeks.  They're still not giving it.  So

8    maybe you could explain to me the rationale Kodak has in

9    mind when it says no, no order is needed here.

10       MR. WALDEN:  Your Honor, when we submitted that

11   letter, the two weeks were up.  We had specific licensees

12   that were asking for more time and so that is why we said at

13   that point an order is not necessary.

14       In our letter yesterday to the Court, we

15   submitted on a footnote on page two, we indicated that there

16   are still two licensees that have not given consent and we

17   did actually join Ampex's request that the Court order that.

18       THE COURT:  Well, your footnote escaped me.

19   Thank you for pointing it out to me.  So I'll ask you folks

20   to go ahead and submit immediately.  There she is, the

21   footnote itself.  If you would be good enough to submit the

22   document as a form of order that you both agreed on, not a

23   stipulation obviously but something that you both approved

24   as to form and get it over to me immediately, we'll get it

25   entered and those things can be produced without further

**5**

1    delay.

2        And, of course, these folks who have declined

3    over a period of time to work out their confidentiality

4    issues should be advised also immediately that if they've

5    got any motion that they want to make, they have to make it

6    instantly because when I get that form of order, I'm signing

7    it.

8        MR. WALDEN:  Understood.

9        THE COURT:  So that takes care of that issue.

10   Let's talk now about the issues that were raised in -- we'll

11   start with the plaintiff -- Ampex's letter to me setting

12   forth its discovery issues.  It's a February 6th letter over

13   Ms. Heaney's signature.  And let me begin by asking, have

14   any of these things been worked out since you folks started

15   speaking with each other?

16       MR. HOPENFELD:  Your Honor, this is James

17   Hopenfeld.  And the answer is no, none of these things have

18   been worked out.  There have been some developments since

19   Monday, the first of which I can explain to you regarding

20   the first of Ampex's requests, which is a motion to compel

21   damages contentions which is Interrogatory No. 2.

22       THE COURT:  Right.

23       MR. HOPENFELD:  We received yesterday from Kodak

24   a response that we believe is partially responsive.  If you

25   will recall, the interrogatory requests contentions on

6

1  royalty rate and base.
2       THE COURT: Right, I do recall that. And I
3  recall your opponent saying that is pure expert testimony,
4  not subject to factual contention interrogatories.
5       MR. HOPENFELD: Right. Yes.
6       THE COURT: What is your take on that?
7       MR. HOPENFELD: Your Honor, we would say
8  that there is a difference between acting for a party's
9  contentions and asking for expert discovery. We're not
10 asking for expert discovery. We're not asking for an expert
11 report. We're simply asking for what their contentions are
12 on these issues so that we can take the discovery we need
13 to rebut any contentions they make.
14      THE COURT: Well, I'll go ahead and let
15 Mr. Walden speak to this in a moment, but that prompts an
16 immediate question from me, which is how -- I take it
17 from their letter that they're saying we can't answer this
18 without knowing what our expert says. And we don't have an
19 expert position formulated yet. We've given you folks the
20 factual information which is the basis on which our expert
21 is going to opine and you have an expert and he can come up
22 with his position as well as we can but we can't tell you
23 what our contention about the rate is until the expert has
24 reviewed it.
25      Have I got you right, Mr. Walden?

7

1       MR. WALDEN: Yes, that is exactly right.
2       THE COURT: All right. So Mr. Hopenfeld, when
3  you say we're really not asking for an expert opinion, it
4  sounds to me frankly like you are. You are asking for the
5  expert's conclusion. Now, steer me off of that if I'm
6  wrong.
7       MR. HOPENFELD: Yes, Your Honor. What we want
8  is again once again there is a difference between
9  contentions and the actual opinion. So, for example, what
10 we would want is what are the theories that underlie a given
11 royalty rate. So, for example, if Kodak was going to
12 contend that the royalty rate is zero or is a fixed sum or
13 is some rate, we would like to know not only that but what
14 are the basic arguments they're going to make so we can
15 take the discovery that we need. We believe that an expert
16 opinion is something more detailed.
17      And to give you some idea about this, Kodak
18 itself asked us in the interrogatories the very same thing.
19 And we gave them a several page response saying here is our
20 contentions. Here are the kinds of things we expect to
21 argue. Really all we want, Your Honor, is enough detail so
22 that we don't have a problem impeaching them or making
23 arguments at trial in response to anything that their expert
24 does say. What we really want are the facts.
25      THE COURT: Mr. Walden, you asked them the same

8

1  question you're complaining about now?
2       MR. WALDEN: Your Honor, we had an interrogatory
3  in which we did say, as for contention responses, regarding
4  a rate and a base. Now, the reality is that Ampex's patent
5  is in suit in this case. This patent has been licensed to
6  many other entities and that, as you are I'm sure aware,
7  is usually a basis for starting, at least starting the
8  calculation of what the rate should be. So the fact that
9  Ampex was able to respond saying we do have a rate, 1.5 to
10 two percent is what they said, is not that surprising to us.
11      THE COURT: Well, but you're acknowledging
12 that you asked them the very same question. They gave you a
13 response. And now when they ask you the question, you're
14 saying that's not fair because you're the patentee. Is that
15 your position?
16      MR. WALDEN: It's not just that. I mean they
17 did ask us for a rate and what we've said is that we have
18 given them the factual basis for that. Now it sounds like
19 he is saying we're not asking for the rate anymore or at
20 least we want -- they pulled back a little bit, although I
21 think in their letter of two days ago they said very clearly
22 they want a royalty rate. Our response is that we, as you
23 articulated, we don't have a rate right now. We believe
24 that is expert testimony, especially given that we don't
25 have all the information factually from Ampex as well as we

9

1  don't have an expert right now who is saying here is what
2  the rate should be.
3       THE COURT: Well, here is the short of it. This
4  certainly feels to me like it's not a full blown opinion
5  that is being asked for, but it's certainly the kind of
6  conclusion that one would expect would be reached on the
7  basis of conferring with an expert. So I am a little
8  nonplussed by the assertion that, gee, we won't be able to
9  get to the information we need if this waits until it's an
10 expert witness deposition.
11      So, Mr. Hopenfeld, if you were to have to wait
12 until that, what is your concern? That you would be left
13 short? That somehow you wouldn't be able to explore the
14 basis for the rate contention and the base contention?
15      MR. HOPENFELD: Correct, Your Honor. I'm more
16 concerned about theories.
17      I might be able to short-circuit some of this
18 based on the response we got that you do not have in front
19 of you. Kodak did provide a partial response indicating
20 some facts and some theories that we believe would underlie
21 a rate. It also cites some documents that they believe
22 would be in support of its theories.
23      We would be happy with that if, as long as
24 we understand that that is going to be the basis for the
25 contentions. There was a caveat at the very end of the

SHEET 4

10

1  response that Kodak provided to us that said we reserve
2  the right to provide additional contentions during expert
3  discovery. And it's the contentions that Kodak is going to
4  make are roughly limited to what is in the response that we
5  received on Monday, and if that all that is going to happen
6  in expert discovery is that those will be fleshed out, we'll
7  be fine.
8       But if what happens in expert discovery is that
9  we get completely new theories and as a result of getting
10 those new theories and they rely on new documents, I'm going
11 to have a problem because I won't know which -- I won't have
12 the opportunity to talk to certain witnesses about those
13 theories and potentially impeach their expert or their fact
14 witnesses at trial.
15      THE COURT: All right. What is your response,
16 Mr. Walden, to the request, or I take it it's a request,
17 that this catchall line you threw in at the end of your
18 letter be viewed in a very limited way?
19      MR. WALDEN: Well, our response was we said we
20 reserve the right to amend or modify the response based upon
21 information obtained during fact discovery and analysis
22 conducted during expert discovery. And that is a similar
23 response, as you might expect, that Ampex made saying we
24 reserve the right to amend based on further discovery and
25 analysis.

11

1       And the other thing I wanted to say is what we
2  have given them yesterday were the facts, and I should say
3  with the earlier responses supplemented yesterday, were the
4  facts on which the rate might be determined. We also gave
5  them a base. We said it's net profit earned off the cameras
6  and then finally we said as for the rate, we're still
7  calculating but we certainly believe it's below 1.5 percent.
8       THE COURT: All right. Well, it sounds like you
9  have given the information called for by the interrogatory.
10 And I guess we'll wait for another day and see if you try to
11 pull a rabbit out of the hat on the Kodak side. If you do,
12 particularly on the fact that you posed the very same
13 question to them and evidently thought that was just fine in
14 fact discovery, you're in a poor spot to argue that it's
15 unfair for them to be posing it to you. Nevertheless, it
16 sounds like you guys have worked it out.
17      If something comes up at the last minute, I
18 guess I'll have to deal with it if and when it arises; but
19 I'm sure earnestly hoping nothing arises because this train
20 isn't waiting, it's rolling, and we're going to stay on
21 schedule. If we run into problems, we'll just have to
22 address it in a way that keeps us on schedule. And we'll
23 figure out how to assess costs associated with any last
24 minute running around people have to do. But I'm hopeful
25 that we don't get do that point; and I'm sure you folks are,

12

1  too. So that should take care of the question with respect
2  to Interrogatory No. 2; right?
3       MR. HOPENFELD: That's acceptable to Ampex, Your
4  Honor.
5       THE COURT: All right. You're on board and
6  understand what I'm saying with respect to that as well;
7  right, Mr. Walden?
8       MR. WALDEN: Yes, Your Honor.
9       THE COURT: Okay. Good. Now, the next one is
10 yours, Mr. Walden. We'll just kind of go back and forth,
11 one and one. So we dealt with Ampex's first one. What one
12 do you want to address out of your letters?
13      MR. WALDEN: Well, we only have one topic or one
14 issue that we wanted to discuss today, which was that we
15 would like Ampex to have to --
16      THE COURT: Produce a 30(b)(6).
17      MR. WALDEN: -- produce an educated 30(b)(6)
18 witness on a 30(b)(6) request that we served back in
19 December 1st.
20      THE COURT: Okay. Let me ask you some questions
21 about that then. You obviously have had their response
22 where they say, look, this is not appropriate material for
23 30(b)(6) testimony; and besides that, we gave them all this
24 or a bunch of stuff related to this in the earlier ITC
25 litigation. Why don't you help me out with that? And as

13

1  you do, speak specifically to the question that is kind of
2  implicit in their response, and that is that not all of
3  these 10 topics are of the same sort. That some, like they
4  dwell on the reduction to practice as something which really
5  partakes of a legal contention and say they have given you
6  the information in a contention interrogatory. So go ahead
7  and run with that, if you could.
8       MR. WALDEN: Certainly. Well, first, the first
9  response that we got from Ampex on this deposition notice
10 was they were refusing to produce any witness. Then they
11 were basically saying to the extent we have to produce a
12 witness, they're not going to be prepared. And so that is,
13 that has been kind of the chronology leading to our letter
14 of two days ago.
15      As to the first argument that the 30(b)(6) are
16 somehow contention interrogatory topics, our response is,
17 yes, they lumped them together, although implicitly acknow-
18 ledging there might be some differences. We think that the
19 topics are not better characterized as interrogatories or
20 contention interrogatories but are really specific as to the
21 one product that Ampex has said embodies the patent-in-suit
22 and the chronology of the development and conception,
23 reduction to practice of that product is how they're trying
24 to move back their conception, reduction to practice date.
25      And I think it's good to point out at this point

# EXHIBIT 8.AO

# EXHIBIT 8.AO

# IS

# CONFIDENTIAL

# EXHIBIT 8.AP

# EXHIBIT 8.AP

# IS

# CONFIDENTIAL

# EXHIBIT 8.AQ

# EXHIBIT 8.AQ

# IS

# CONFIDENTIAL

# EXHIBIT 8.AR

Ampex Corporation
500 Broadway
Redwood City, California 94063
Telephone (650) 367-2011

April 14, 2005                                        AMPEX|Corporation

The Editor
Business Week
1221 Avenue of The Americas
New York, New York 10020

Dear Sir,

        Business Week has recently given significant coverage to Ampex's highly successful
patent licensing program. Unfortunately, we did not feel it was appropriate to conduct an
interview with you prior to the filing of our 10-K report with the SEC and your publishing
schedule did not allow you to wait. Having now seen the articles which were informative and, in
general, balanced, we would like to provide some comments.

        The stories may leave the reader with the impression that patent licensing is a recent
development for Ampex. In fact, nothing could be further from the truth, as we have actively
licensed our patents since 1968. The majority of the best known names in consumer electronics
are our licensees and have been for many years. Our patents generated hundreds of millions of
dollars of income for us before we received our first dollar of royalty income from digital still
cameras late last year.

        It is true that we have recently initiated some high-profile patent lawsuits. However, the
number of patent suits that we have been involved in is very small in the context of more than 35
years of licensing history. By far, the majority of license agreements that we have put in place
result solely from the reasonable give-and-take of negotiation. The decades-long relationships
that we have maintained with many of our licensees are testimony to the fact that they view our
dealings with them to be mutually beneficial and I do not think that "patent terrorist" is a term
that can fairly be applied to Ampex.

        A more thoughtful approach might focus on the good that, on balance, patents and also
copyrights confer on our society. The patents that Ampex has received were developed by an
absolutely outstanding group of electronics engineers, and their inventions are found in many
products that we all now benefit from. Income from our patents provides salaries for the people
who work with us today and continued pension benefits for those who are now retired. It would
surely be unfair to these people and to our shareholders not to obtain a reasonable return on their
efforts. That is why, on the rare occasions that we are called upon, we vigorously and equitably
enforce our intellectual property rights.



DEFENDANT'S EXHIBIT
494
C.A. No. 04-1373 (KAJ)

AMPEX|Corporation

The Editor
Business Week
Page 2

Unlike many companies nowadays, Ampex has always manufactured most of its products in the United States. In part, this has been made possible by the existence of our patent portfolio. If patent enforcement becomes more difficult, the "outsourcing" of engineering and intellectual property jobs to other countries will, inevitably, follow in the footsteps of manufacturing employment. Abuses of patents probably do occur occasionally, but I believe that commentators and critics should carefully consider the adverse implications for our country of a change in public policy towards an anti-patent bias.

Business Week also quotes a source suggesting that Ampex should make public, copies of our license agreements. Based on certain exceptions that apply to companies like Ampex, we believe that this is not required, and in my years with the company it has not previously been raised as an issue. In our public filings, including our forthcoming 10-K report, we make a good faith effort to disclose and, as importantly, to explain clearly all of the information about our patent licenses that an investor might reasonably expect.

The magazine's mention of a loan to a company owned by me to buy shares of Ampex is accurate but incomplete. It might be helpful to add that these shares were purchased directly from Ampex in 1995, for a combination of cash and a note, to create a performance incentive in place of bonuses or option grants. From 1992 to 2000 I received neither options nor bonuses and the shares were eventually forfeited. My personal cash outlay to pay for the shares was such that Ampex received more money from me than the total of all cash compensation that it has paid to me from 1992 until today.

The website that mentioned me in connection with Goldman Sachs is not, in fact, mine as suggested in the article. The reference, which was to a period in the early 1970s, should have made it clear that I was then on assignment and not an employee. This will be done in the future. Finally, I admit to being a British immigrant but my mother, now deceased, was an American and I am totally devoted to my adopted home.

We appreciate your coverage of Ampex's recent successes and the efforts that you have made to present both sides of the story. I hope that this letter adds some additional flavor and balance. I realize that you have limited space but I would ask that, if you do elect to print this letter, you will do so in its entirety.

Yours sincerely,

Edward Bramson

DUT000632

# EXHIBIT 8.AS



# IP LITIGATION EXPERIENCE

June 2006

## IP LITIGATION EXPERIENCE

## Trials

*In the Matter of Certain NAND Flash Memory Devices and Products Containing Same*

STMicroelectronics (ST) retained WilmerHale to represent it in litigation brought by Sandisk Corporation before the US International Trade Commission (ITC) and the Northern District of California alleging infringement of a patent relating to NAND flash memory circuits. In an earlier ITC case, SanDisk (represented by the same counsel) had successfully obtained an exclusion order from the ITC on the same patent, preventing Samsung Corporation from importing its NAND flash memory products into the United States. SanDisk also had put the patent through a successful reexamination proceeding, during which the PTO rejected Samsung's best claim construction and invalidity arguments and allowed new dependent claims tailored to avoid Samsung's defenses. Against ST, SanDisk argued that the ST NAND flash memory circuits were substantially identical to those of Samsung, and infringed the patent for the same reasons. Following a seven-day hearing, ALJ Luckern issued an Initial Determination finding that ST's NAND flash memory circuits do not infringe the SanDisk patent, that they lacked multiple required elements of each asserted claim, and that ST had not violated 19 U.S.C. Section 1337. Judge Luckern's Initial Determination of no violation was adopted by the Commission.

*FiberMark, Inc. v. Brownville Specialty Paper Products, Inc.*

WilmerHale prevailed in an eight-day jury trial on behalf of our publicly held client Fibermark, Inc., a Brattleboro, Vermont -based paper company. The case involved the copying of a mottled/marbled pattern used by Fibermark for over 100 years on high-quality dense paper for notebook covers, binders and similar products. After trial in the Northern District of New York, the jury returned a verdict that Fibermark's trade dress constituted a valid trademark and that the defendant—a competing paper company (whose mill was located three miles from the courthouse)—engaged in deceptive and misleading conduct by printing Fibermark's pattern on lower-quality paper.

*Cirrus Logic, Inc. v. Wolfson Microelectronics*

Wolfson Microelectronics retained WilmerHale to represent it in litigation brought by Cirrus Logic before the US International Trade Commission (ITC) alleging infringement of two patents relating to digital-to-analog circuits. After a nearly two-week trial, the ITC agreed with Wolfson that the key patent at issue was unenforceable because the inventors failed to disclose highly material prior art to the Patent Office, with the intent of deceiving the PTO. Prior to the trial, Wolfson had obsoleted two of the three products accused of infringing the second patent due to lack of market demand, and modified the third to remove the disputed feature. Related litigation in the Southern District of California was subsequently settled on mutually agreeable terms.

WILMERHALE

*EMC Corporation v. Hewlett-Packard Company, Inc.*

WilmerHale represented EMC in this case claiming infringement of three patents relating to computer storage technology. During the course of the litigation, Hewlett-Packard acquired the original defendant—whose primary product was accused of infringement—for $350 million. After a two-week trial, we won a jury verdict finding that each of the asserted claims had been infringed by Hewlett-Packard and was valid. The damages portion of the case subsequently settled.

*AGFA Corporation v. CreoScitex Ltd.*

Creo, a manufacturer of computer-based printing machines, was sued by Agfa Corporation, claiming that Creo infringed six Agfa patents. WilmerHale asserted that the patents had been obtained as a result of inequitable conduct before the Patent Office. After a 17-day trial in the District of Massachusetts, the court agreed, held all six patents invalid and awarded us $2,740,000 in attorneys' fees.

*Stambler v. RSA Security Inc.*

RSA Security turned to WilmerHale for representation in this case alleging infringement of three patents. The plaintiff, a 74-year-old individual, claimed that his patents covered all secure communications over the Internet, and sought damages in excess of $20 million. After a two-week trial in the District of Delaware, a jury found that RSA had not infringed any of the asserted claims. The Federal Circuit affirmed. The case was closely followed in the press due to the implications an adverse verdict would have had on all Internet commerce.

243 F. Supp. 2d 70 (D. Del. 2003); 212 FRD 470; 243 F. Supp. 2d 74 (D. Del. 2003); 123 Fed. Appx. 982, 2005 WL 352606

*Genzyme Corporation v. Atrium Medical Corp.*

Atrium Medical retained WilmerHale to defend it in this lawsuit alleging infringement of five patents relating to thoracic drainage devices. Genzyme and Atrium are the two dominant companies in the market. Genzyme issued a press release shortly before trial stating that there was "no doubt" it would establish infringement. After a two-week trial in the District of Delaware, we won a jury verdict finding that each of the asserted patent claims was not infringed, invalid or both. The Federal Circuit affirmed.

212 F.Supp. 2d 292 (D. Del. 2002); 108 Fed. Appx. 619 (Fed. Cir. 2004)

*United States Trust Company v. United States Trust Company of NY*

WilmerHale represented United States Trust Co., a Boston bank, in this case challenging its use of the "US Trust" family of marks. After a 12-day bench trial in the District of Massachusetts, the court concluded that our client could continue to use the marks as it had throughout the country and issued an injunction precluding the opposing party, United States Trust Co. of New York, from using the marks in Massachusetts.

210 F. Supp. 2d 9 (D. Mass. 2002)

WilmerHale

*CBS Broadcasting Inc. v. EchoStar Communications Corporation*

WilmerHale represented a national coalition of broadcasters against EchoStar, the second largest US satellite company. After a ten-day bench trial in the Southern District of Florida, the court found that EchoStar had willfully infringed the broadcasters' copyrights by re-transmitting out-of-town ABC, CBS, FOX and NBC stations to hundreds of thousands of ineligible subscribers. The court agreed with our contention that EchoStar had broken a promise to turn off distant network stations to many of these subscribers.

*Nikon v. ASML Holding N.V.*

WilmerHale represented ASML Holding in this case initiated by its chief rival, Nikon Corporation, in the US International Trade Commission (ITC) and the Northern District of California. After a five-week trial, an administrative law judge ruled that each of the 15 patent claims Nikon had asserted was not infringed, invalid and/or unenforceable due to inequitable conduct. The ITC adopted the ALJ's decision. At issue was approximately $1.8 billion in annual sales in the market for photolithographic equipment. Related litigation in the Northern District of California involving five additional patents subsequently settled.

*Fusion Lighting, Inc. v. Westinghouse Electric Corporation*

WilmerHale represented Fusion Lighting in this case against Northrop Grumman alleging misappropriation of trade secrets and patent rights. After a three-week trial in Maryland State Court, the jury found that Northrop had wrongfully obtained patents on Fusion's intellectual property and awarded $32.7 million in damages.

*Summit Technology v. Nidek Co., Ltd.*

WilmerHale represented Summit in a patent infringement action against Nidek in the District of Massachusetts. The litigation involved two patents owned by Summit relating to laser technology used to alter the curvature of the cornea and thereby correct refractive vision problems. After a two-and-a-half week jury trial, the jury found that Nidek willfully infringed both patents, that both patents were valid and awarded Alcon Summit Autonomous over $17.2 million in compensatory damages. The district court later overturned the jury verdict for a lack of evidence, which the Federal Circuit affirmed.

363 F.3d 1219 (Fed. Cir. 2004)

*Nitor Corp. v. CoreTeck, Inc.*

WilmerHale successfully defended Nortel Networks in a California arbitration in which Nitor claimed rights to key patents relating to tunable vertical cavity surface emitting lasers and tunable filters—technology at the forefront of the optical telecommunications field. Nitor claimed a license to the technology based on work that a Nortel subsidiary had done on an unrelated contract for visual displays. A three-arbitrator panel unanimously decided that Nitor had failed to establish any rights to those key patents—or even to a broader provisional patent application—and that this technology was not part of any development efforts for Nitor.

WILMERHALE

*American Superconductor Corporation v. Massachusetts Institute of Technology*

WilmerHale represented American Superconductor in this "patent interference" proceeding in the District of Massachusetts. American Superconductor exclusively licenses an important patent in the field of high-temperature superconductors and is the owner of a patent application in the same field. The US Patent Office found that the patent and application "interfered." American Superconductor appealed this decision to the United States District Court for the District of Massachusetts and, in a highly unusual move, the Patent Office intervened to defend its decision. After a bench trial, we obtained a judgment finding that the patent and application claimed separate inventions, thus entitling our client to both, and according a very broad construction to the patent.

*Enzo Biochem v. Calgene*

WilmerHale represented Calgene, the company which researched, developed and brought to market the genetically engineered tomato, in four litigations against Enzo Biochem involving four patents related to genetic antisense technology. After a three-week trial in the District of Delaware, the court found for Calgene on all claims. The Federal Circuit affirmed that the patents were invalid.

14 F. Supp. 2d 536 (D. Del. 1998); 188 F.3d 1362 (Fed. Cir. 1999)

*Sextant Avionique, S.A. v. Analog Devices, Inc.*

WilmerHale represented Analog Devices in this litigation commenced by Sextant Avionique in the Northern District of California. Sextant claimed that Analog's accelerometer products infringed certain patents owned by Sextant Avionique. After a two-week trial, the court determined that Analog did not infringe the Sextant patents. The Federal Circuit affirmed, applying for the first time the presumption barring application of the doctrine of equivalents set forth in the Supreme Court's *Hilton Davis* opinion.

172 F. 3d 817 (Fed. Cir. 1999)

*Candela Laser Corporation v. Cynosure, Inc.*

WilmerHale represented Cynosure, Inc. and Horace Furumoto in this patent infringement action commenced by Candela. Dr. Furumoto was the founder of the plaintiff, Candela Laser Corporation, the named inventor on the patents involved in the litigation and the founder of Cynosure. Candela alleged that the medical laser system manufactured and marketed by Cynosure infringed two patents issued to Candela. After a three-week trial, the court found that Cynosure did not infringe one of the Candela patents and held the other Candela patent invalid. The Federal Circuit affirmed on both grounds.

862 F. Supp. 632 (D. Mass. 1994); *aff'd* 56 F. 3d 82 (Fed. Cir. 1995)

*VLT, Inc. (Vicor Corp.) v. Unitrode Corporation*

WilmerHale represented Unitrode in an action brought by Vicor accusing Unitrode of inducing infringement of its patents relating to power supply delivery circuits. Vicor sought injunctive relief and damages of hundreds of millions of dollars. After a two-week trial, the jury found for Unitrode, rejecting the assertion that it had induced infringement and denying Vicor any damages. Vicor later sought, but then abandoned, an appeal of that decision.

WILMERHALE

*Amgen, Inc. v. Genetics Institute, Inc.*

WilmerHale represented Genetics Institute, Inc. (GI) in two related lawsuits in the Districts of Massachusetts and California. These cases involved patent claims relating to erythropoietin (EPO). At issue was the right to produce recombinant EPO, a genetically engineered protein which stimulates the production of red blood cells. GI claimed that Amgen infringed its patent, which covers a homogeneous form of the protein, and Amgen asserted that GI infringed its patent, which covered various components of the process used to produce the drug recombinantly. We tried a three-month jury-waived case involving the patents, and argued the appeal to the Federal Circuit. We also have represented GI in various foreign proceedings concerning foreign counterparts of those patents.

927 F.2d 1200 (Fed. Cir 1991)

*Clinipad Corporation v. Aplicare*

WilmerHale represented Aplicare in this trade secret case in Connecticut Superior Court. The alleged trade secrets related to wet packs containing anti-bacterial solutions and certain applicators. Much of the litigation concentrated on whether certain items were trade secrets and on whether they were used by the defendants. In addition, a substantial issue existed as to whether a prior published patent would prevent the allegedly secret process from becoming a trade secret. The trial judge ruled in Aplicare's favor, holding that no trade secrets were misappropriated, and awarded attorneys fees to Aplicare.

*PerSeptive Biosystems, Inc. v. Pharmacia and Sepracor, Inc.*

WilmerHale represented Sepracor, Inc. in this patent infringement action commenced by PerSeptive in the District of Massachusetts. After deciding on summary judgment that inventorship was improper, the court held a ten-day trial. After trial, the court declared the patents unenforceable as a result of PerSeptive's inequitable conduct. The Federal Circuit upheld the court's declaration that the patents were unenforceable.

225 F.3d 1315 (Fed. Cir. 2000)

*Deknatel Technology Corporation v. Atrium Medical Corporation*

WilmerHale represented Atrium Medical Corporation in this patent infringement action commenced by Deknatel involving patents issued to Deknatel covering various aspects of chest drainage devices. Before trial, the court entered summary judgment of noninfringement of one Deknatel patent. After a two-week jury trial, the jury found the remaining Deknatel patent not infringed and invalid. The *National Law Journal* named this one of the top defense verdicts of the year.

*Yellow Springs Instruments, Inc. v. Nova Biomedical Corporation*

WilmerHale represented Nova Biomedical Corporation, a manufacturer and distributor of blood analyzers, in the defense of claims made under a patent license agreement and, in the alternative, as an infringement action under patents owned by Yellow Springs Instruments, Inc. After a two-week bench trial in the District of Ohio, the court ruled that Nova had no further obligation to make royalty payments; that Yellow Springs' attempt to obtain royalty payments beyond the terms of the patents was unlawful; that both Yellow Springs patents were invalid as obvious and for inequitable conduct in failing to disclose highly material prior art to the Patent Office; but that Nova could not recover for its several years of mistaken royalty payments.

*Dymax Corporation v. Hoffrel*

WilmerHale represented Dymax Corporation, the holder of a patent relating to medical ultrasound transducers, in cases involving patent infringement and breach of contract claims against an exclusive licensee, sub-licensees and other third parties. The Hoffrel litigation involved an exclusive licensee who failed to meet sales quotas and ignored a notice of termination. We filed this case in the District of Connecticut, and obtained a directed finding for Dymax after a trial on the breach of contract issue. During post-trial discovery on the patent issues, the matter settled.

## Federal Circuit and Supreme Court Appeals

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*

WilmerHale represented Gen-Probe, Inc., defending a claim of infringement of a patent related to nucleic acid probes. The Federal Circuit initially affirmed a summary judgment of patent invalidity for lack of written description. On rehearing, summary judgment was reversed because of a change in the law regarding deposits of biological materials. The denial of a petition for rehearing en banc involved five concurring and five dissenting opinions. Subsequently, WilmerHale again obtained summary judgment of invalidity and the Federal Circuit affirmed that the patent was invalid under the on-sale bar. The Court held that a contract between Enzo and another company obligating Enzo to provide a percentage of its requirements for gonorrhea-specific DNA assays constituted a "commercial offer for sale" under the relevant statute, and that Enzo's DNA assay was "ready for patenting" more than one year before it filed its patent application.

285 F.3d 1013 (Fed. Cir. 2002); vacated by 323 F.3d 956 (Fed. Cir. 2002); 424 F.3d 1276 (Fed. Cir. 2005)

*U.S. Philips Corporation v. International Trade Commission*

U.S. Philips Corporation turned to WilmerHale to handle its appeal after the International Trade Commission held that Philips' patents for CD-R and CD-RW discs were unenforceable because of patent misuse. The Federal Circuit reversed the ITC's decision, holding that Philips' package licenses did not involve improper "tying" of patents under either the per se or the rule-of-reason analysis used by the Commission.

424 F.3d 1179 (Fed. Cir. 2005)

*Merck & Co. v. Teva Pharmaceuticals USA, Inc.*

WilmerHale represented the Pharmaceutical Research and Manufacturers of America (PhRMA) in its filing of an amicus curiae brief in the Federal Circuit. PhRMA's brief supported Merck & Co.'s petition for a rehearing or a rehearing en banc on the ground that a Federal Circuit panel had failed to give proper weight to "commercial success" as evidence of nonobviousness. The Federal Circuit denied Merck's requests for rehearing, but three judges joined in a dissenting opinion agreeing with PhRMA that the panel had mishandled evidence of "commercial success."

395 F.3d 1364 (Fed. Cir. 2005); *Rehearing denied* by 2005 U.S. App. LEXIS 6814 (Fed. Cir., April 21, 2005)

WILMERHALE

*Festo Corporation v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd. (a/k/a SMC Corp.) and SMC Pneumatics, Inc.*

WilmerHale has represented Shoketsu Kinzoku Kogyo Kabushiki Co, Ltd. (SMC Corp.) in its ongoing litigation with Festo Corporation since 1988. This landmark case on the interplay between the doctrine of equivalents and prosecution history estoppel has involved two grants of certiorari by the United States Supreme Court, four Federal Circuit hearings (two of which were *en banc*), and three trials, most recently in December of 2004.

72 F.3d 857 (Fed. Cir. 1995); 520 U.S. 1111 (1997); 172 F.3d 1361 (Fed. Cir. 1999); 234 F.3d 558 (Fed. Cir. 2000); 535 U.S. 722 (2002); 344 F.3d 1359 (Fed. Cir.) 2003; 541 U.S. 988 (2004)

*Monsanto Company v. Ralph*

Monsanto brought an action in the Eastern District of Missouri against Kem Ralph and Ralph Brothers Farms for misappropriation and infringement of its patented plant biotechnologies by saving, replanting and selling seeds in violation of a binding license agreement. The jury awarded Monsanto more than $2 million in damages, and the defendants appealed. Monsanto engaged WilmerHale to represent it before the Federal Circuit, which upheld the jury award, agreeing that the district court had not abused its discretion in striking Ralph's defenses as a sanction for repeated discovery abuses. Subsequently, the defendants filed a motion to reopen the district court judgment, asserting that the trial judge should have recused himself. Following a denial of the motion, the defendant again appealed to the Federal Circuit, which affirmed the district court's decision in a per curiam summary order less than a week after oral argument.

382 F.3d 1374 (Fed. Cir. 2004)

*Pellegrini v. Analog Devices, Inc.*

WilmerHale obtained summary judgment of patent noninfringement on behalf of Analog Devices, Inc. with respect to patents involving motor control electronics and a claim that a US patent could reach the foreign activities of a US company. The Federal Circuit affirmed on this issue of first impression. The District Court then entered Rule 11 sanctions (including dismissal and an award of attorney fees) against the plaintiff for continuing to pursue his claims.

375 F.3d 1113 (Fed.Cir. 2004)

*Housey Pharmaceuticals, Inc. v. AstraZeneca UK LTD*

WilmerHale argued this appeal of the district court's claim construction on behalf of our client Wyeth and co-defendants AstraZeneca, Aventis, Merck and Bristol-Myers. The Federal Circuit affirmed the district court's claim construction, concluding that it had correctly construed patent claims relating to methods of screening for protein inhibitors and activators. Based on the claim construction, the plaintiff had stipulated the patents-in-suit to be not infringed and invalid.

366 F.3d 1348 (Fed. Cir. 2004); 2004 WL 1005573