# EXHIBIT NO. 7

# EXHIBIT NO. 7

# IS

# CONFIDENTIAL

# EXHIBIT NO. 8

# EXHIBIT NO. 8

# IS

# CONFIDENTIAL

# Defendants' Opposition to Plaintiff's Motion in Limine No. 3

III.    KODAK'S OPPOSITION TO AMPEX'S MOTION IN LIMINE #3 (NON-
        INFRINGEMENT ARGUMENTS)

### INTRODUCTION

Ampex seeks to preclude Kodak from arguing five of its non-infringement positions to the jury on the grounds that they were not properly disclosed to Ampex. Ampex argues that these positions were not disclosed in response to contention interrogatories, but they were in fact disclosed in Kodak's *first* response to a non-infringement contention interrogatory and repeatedly in Kodak's discovery responses thereafter. The five non-infringement positions were disclosed in response to contention interrogatories during the proceedings before the International Trade Commission ("ITC"), in the ITC expert report of Defendants' expert, Dr. James Storer, and in interrogatory responses and expert reports served in this action. Indeed, Kodak articulated three of the five positions in the very Delaware interrogatory response Ampex claims contains none of the five.

Ampex's present motion is premised on ignoring discovery taken in the ITC (and on a misreading of Kodak's Delaware response). But the parties agreed and this Court ordered that "to avoid duplication of discovery ... discovery of the parties taken in the [ITC] Investigation ... *shall be deemed to have been taken in this action* and that such discovery may be used, and shall be treated, for all purposes as if taken in this action." (Scheduling Order, at 3). Ampex cannot legitimately dispute that each of the five contentions were disclosed during the ITC proceedings and is therefore deemed to have been disclosed here. It is also undisputed that all five were again articulated in Dr. Storer's expert report in this action served over six months ago.

Kodak's non-infringement contention interrogatory responses and expert reports from the ITC and in this action set forth the five non-infringement contentions that are the subject of this motion. As such, the motion to exclude them at trial should be denied.

ARGUMENT

**1. Each Of The Five Non-Infringement Positions Have Been Repeatedly And Fully Disclosed.**

Defendants respectfully submit this opposition to Ampex's Motion in Limine to exclude the video demonstration of the Quantel Paint Box ("Ampex's motion").

Ampex argues that the five positions were not contained in Kodak's contention interrogatory responses, and even though contained in Dr. Storer's Delaware expert report and prior ITC expert report, should be excluded from trial. (Ampex's motion, at 11.) Pursuant to this Court's Scheduling Order, however, Defendants' ITC contention interrogatory responses "shall be deemed to have been taken in this action." (Scheduling Order of 10/17/05, at 3.) Ampex's motion ignores that Defendants' ITC interrogatory responses repeatedly disclosed the five non-infringement positions that are the subject of this motion.

On December 13, 2004, Kodak responded to, among other interrogatories, Ampex's ITC Interrogatory No. 33, which asked that "If Kodak contends" that any of the accused cameras does not infringe any of the asserted claims, "explain" the reasons why. (Ex. 1, 12/13/04 Response.) Kodak's ten page response includes a claim chart that covers *all five non-infringement positions* that Ampex now says were not properly included in interrogatory responses:

| Argument from Storer Delaware Report | Where Arguments Can be Found in Kodak's 12/13/04 Contention Interrogatory Response |
|---|---|
| 1) ————    REDACTED    ————<br><br>"either the full size image or the reduced size image" ˙     (Claims 8 and 11) | 12/13/04 Response to Ampex Interrogatory No. 33, at 30,<br><br>REDACTED<br><br>˙'" *See id.* at 32. |
| 2)    REDACTED    ˙<br>˙    "selected groups of storage locations."  (Claims 13 and 15) | 12/13/04 Response to Ampex Interrogatory No. 33, at 33, ˙<br><br>REDACTED<br><br>˙," *See id.* at |

2

| | | |
|---|---|---|
| | | 36. |
| 3) **REDACTED** "succession" (Claim 7) | | 12/13/04 Response to Ampex Interrogatory No. 33, at 28, **REDACTED** |
| 4) **REDACTED** (Claims 7, 8, 10, 11, 12, 13, 14, 15) | | 12/13/04 Response to Ampex Interrogatory No. 33, at 28, **REDACTED** " *See id.* at 29, 31, 32, 33, 34, 35, 36. |
| 5) **REDACTED** (Claims 7, 8, 10, 11, 12, 13, 14, 15) | | 12/13/04 Response to Ampex Interrogatory No. 33, at 29, **REDACTED** .'" *See id.* at 30, 33. |

Kodak served its Second Supplemental Response to Ampex's ITC Interrogatory No. 33 on

April 1, 2005. (Ex. 2.) In this supplemental response, Kodak supplemented its initial response (the

initial and all supplemental responses were incorporated into each supplemental response) by

identifying documents to support its non-infringement positions, and also articulating in narrative

format why the cameras do not infringe. *Again*, in this supplemental response, Kodak explained: (1)

that the accused cameras do not infringe the "either/or" limitation of claims 8 and 11 (4/1/05

Response, at 8, 10); (2) that the "selected groups of storage locations" limitations of claims 13 and 15

was not met by the accused cameras (4/1/05 Response, at 13, 16); (3) that the accused cameras do not

meet the "succession" requirement of claim 7 (4/1/05 Response, at 6); (4) that the full size image

must be displayed at the same resolution as stored (4/1/05 Response, at 5, 6, 9, 11, 13, 15); and (5)

that the reduced size image data in RAM is not the same data as that output by the size reducer

(4/1/05 Response, at 7).

Ampex argues that Defendants' subsequent October 28, 2005 non-infringement contention

interrogatory response did not contain any of these five positions. (*See* Ex. 3, 10/28/05 Response.)

However, *three of the five arguments (arguments 1 through 3) were explicitly made in that

interrogatory response as well:* (1) "either/or" for claims 8 and 11 (10/28/05 Response, at 7, 9); (2)

3

"selected groups of storage locations" (10/28/05 Response, at 10, 11, 12); (3) "succession" (10/28/05 Response, at 5).

Ampex acknowledges that these five non-infringement positions were set forth in Dr. Storer's Delaware expert report. In fact, *all five* non-infringement positions were included in *both of* Dr. Storer's expert reports in this and the ITC proceedings.[1]

**2. Ampex's Motion To Exclude The Five Non-Infringement Arguments Should Be Denied Because Defendants Did Not Violate This Court's Trial Management Order, Fed. R. Civ. P. 16(f), or Fed. R. Civ. P. 37(b)(2).**

Rules 16(f) and 37(b)(2) allow for sanctions on a party for violating an order from the Court, including a scheduling or pretrial order. Ampex's assertion that Defendants have violated this Court's Trial Management Order is patently untrue. Defendants articulated the five non-infringement positions at issue the very first time that they responded to Ampex's contention interrogatories and multiple times thereafter. Because there has been no violation of any Court order, there is no justification under Rule 16(f) or 37(b)(3)(B) for excluding Defendants from making the five non-infringement arguments at trial.

Ampex's claim that it was "ambushed" six months ago when Dr. Storer rearticulated the five non-infringement positions that are the subject of this motion is misplaced. (*See* Ampex motion, at 13.) In any event, if Ampex had really felt "ambushed" by Dr. Storer's Delaware expert report submitted six months ago, it should have filed its motion then. *See Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994) (unreasonable delay in seeking sanctions may render motion for sanctions untimely).

Because Defendants have not violated this Court's Trial Management Order, Ampex's motion to preclude the five non-infringement arguments should be denied in its entirety.

---

[1] *See* Ampex motion at 11, 12 (acknowledging that the five positions were contained in Dr. Storer's Delaware expert report, and that positions 3-5 were contained in Dr. Storer's ITC expert report. Positions 1 and 2 may be found in Dr. Storer's Delaware expert report at pages 40, 50, 58, 59, 70-73) (Ex. 4).

# EXHIBIT NO. 1

# EXHIBIT NO. 1

# IS

# CONFIDENTIAL

# EXHIBIT NO. 2

# EXHIBIT NO. 2

# IS

# CONFIDENTIAL

# EXHIBIT NO. 3

# EXHIBIT NO. 3

# IS

# CONFIDENTIAL

# EXHIBIT NO. 4

# EXHIBIT NO. 4

# IS

# CONFIDENTIAL

# Defendants' Opposition to Plaintiff's Motion in Limine No. 4

## IV. OPPOSITION TO AMPEX'S MOTION IN LIMINE #4 (DAMAGES ARGUMENTS)

### INTRODUCTION

Defendants respectfully submit this opposition to Ampex's motion in limine no. 4 through which Ampex seeks to exclude two categories of relevant evidence ("Ampex's motion"). First, Ampex seeks under Rule 37(c)(1) to preclude Kodak from providing the jury any evidence relating to non-infringing alternatives to the '121 patent. (Ampex's motion, at 15-18.) Rule 37(c)(1), however, only precludes evidence from being presented at trial if it had not been previously disclosed "during the discovery process" under Rule 26(e)(1) and (e)(2). There is no dispute that Kodak's non-infringing alternatives were disclosed in Kodak's interrogatory responses and/or its expert reports, *i.e.,* the alternatives were disclosed *during the discovery process.*

As early as January 2006, Kodak explained in its interrogatory responses that

REDACTED

[1] Ampex also learned from the expert report of Dr. Storer

REDACTED

[2]

[3] Ampex, therefore, has no basis to seek to exclude the evidence Kodak intends to introduce regarding these alternatives. Second, Ampex seeks to exclude evidence relating to the Kodak DCS-100 and DCS-200 digital cameras that were on sale as early as 1991. (Ampex's motion, at 18-19.) In its February 2006 interrogatory responses.

REDACTED

---

[1]    Ampex's Exhibit 8AL, at 6-8, Kodak's Response to Ampex's Second Set of Interrogatories (Nos. 4-6).

[2]    Ampex's Motion In Limine No. 4 at 15-16; Ampex's Exhibit 8.AM at 95-96, Dr. James Storer's Expert Report.

[3]    In its opening brief for partial summary judgment.

REDACTED

REDACTED

## ARGUMENT

1. **Ampex Has No Basis To Seek Exclusion Of The Evidence Concerning The Non-Infringing Alternatives.**

Ampex seeks under Rule 37(c)(1) to have Kodak precluded from offering evidence that there

are non-infringing alternatives to the '121 patent.[6]  Rule 37(c)(1) states that a party may be precluded

from offering evidence unless, among other reasons, it was provided pursuant to Rule 26(e)(1) or

---

[4]     Ampex's Exhibit 8.AO at 5, Kodak's February 2, 2006 Supplemental Response to Ampex's Interrogatory No. 2.

[5]     Ampex Exhibit 8.AQ at ¶¶ 303, 306, Initial Expert Report of James Storer.

[6]     Ampex's motion, at 16.

2

26(e)(2).[7]  Rule 26(e)(1), Fed R. Civ. P., states:  "A party is under a duty to supplement at

appropriate intervals its disclosures under subdivision (a) if . . . the additional or corrective

information has not otherwise been made known to the other parties *during the discovery process* or

in writing." (emphasis added).  Similarly, Rule 26(e)(2), Fed. R. Civ. P., states:  "A party is under a

duty seasonably to amend a prior response to an interrogatory . . . if the additional or corrective

information has not otherwise been made known to the other parties *during the discovery process* or

in writing." (emphasis added).

    Preclusion is not appropriate here because it is undisputed that Kodak's proposed non-

infringing alternatives were disclosed to Ampex *during the discovery process. See Paul Harris*

*Stores v. PricewaterhouseCooper*, 2006 WL 2644935 *4 (S.D. Ind. Sept. 14, 2006) (denying motion

to preclude because under Rule 26(e)(2), Paul Harris did not need to supplement its interrogatory

responses to include the materials in the expert report because that information was providing

"'during the discovery process or in writing'") (Ex. 1).[8]  Since January 2006, Ampex has known

about Kodak's contention that

**REDACTED**

                                                      [9] Before

discovery closed, Kodak also disclosed

**REDACTED**

---

[7]      Rule 37, Fed. R. Civ. P. states:  "A party that without substantial justification fails to disclose
information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by
Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing,
or on a motion any witness or information not so disclosed."

[8]      The Advisory Committee Notes to Rule 26(e)(2) indicate that materials disclosed during expert
discovery comply with the disclosure requirements:  "There is, however, no obligation to provide
supplemental or corrective information that has been otherwise made known to the parties in writing or
during the discovery process, as when a witness not previously disclosed is identified during the taking of
a deposition or when an expert during a deposition corrects information contained in an earlier report."

[9]      Ampex Exhibit 8.AL at 7, Kodak's Response To Ampex's Second Set Of Interrogatories (Nos. 4-
6).

3

REDACTED

12

**2. Ampex Has No Basis To Seek Exclusion Of The Evidence Kodak Has Produced Concerning The Early Digital Cameras.**

During fact discovery, Kodak informed Ampex that Kodak's DCS-100 and 200 cameras

REDACTED

REDACTED

[11]    Deposition Testimony of James Storer at 290-300 (Ex. 2); deposition Testimony of Phil Green at 109-133 (Ex. 3).

REDACTED

[13]    Ampex's Exhibit 8.AO at 5, Kodak's February 2, 2006 Supplemental Response to Ampex's Interrogatory No. 2.

4

**REDACTED**    This is simply not true. Kodak has provided all the information

Ampex needs to understand the structure, function, and operation of these early cameras:

**REDACTED**

Indeed, Defendants produced all of the information relied upon by Defendants' expert in

reaching his conclusions regarding the DCS-100 and DCS-200 cameras.[17]

**REDACTED**

Although this will prevent Mr. Ligler from testifying about that camera at trial, it does not

justify precluding Kodak from offering evidence about it to the jury.

For the foregoing reasons, Kodak respectfully requests that Ampex's motion *in limine* no. 4

be denied.

---

[14]    Ampex's Exhibit 8.AO, at 5, Kodak's February 2, 2006 Supplemental Response to Ampex's
Interrogatory No. 2.

[15]    *See, e.g.,* EKC005026454-58; EKC005026693-4; EKC005026700-4; EKC005026710-3;
EKC005026872-84; EKC005026886-7204.

[16]    Ampex's Exhibit 8.AO, at 11, Kodak's February 2, 2006 Supplemental Response to Ampex's
Interrogatory No. 2: March 3, 2005 Deposition of Mr. Wilbert Janson at 45 and 164. (Ex. 5.)
**REDACTED**

[17]    Ampex Exhibit 8.AQ, at ¶¶ 303, 306, Initial Expert Report of James Storer.

# EXHIBIT NO. 1

Westlaw.

Slip Copy                                                                                        Page 1
Slip Copy, 2006 WL 2644935 (S.D.Ind.)
**(Cite as: Slip Copy)**

# H

Briefs and Other Related Documents
Paul Harris Stores, Inc. v. PricewaterhouseCoopers,
LLP,S.D.Ind.,2006.Only the Westlaw citation is
currently available.
United States District Court,S.D.
Indiana,Indianapolis Division.
PAUL HARRIS STORES, INC., Paul Harris
Merchandising, Inc., Paul Harris Retailing, Inc., and
Paul Harris Distributing, Inc., Plaintiffs,
v.
PRICEWATERHOUSECOOPERS, LLP, Defendant.
**No. 1:02-cv-1014-LJM-VSS.**

Sept. 14, 2006.

Edward Wesley Harris, III, Gayle A. Reindl,
Geoffrey Slaughter, Richard A. Kempf, John R.
Humphrey, Sommer Barnard Attorneys, PC, Elliott
D. Levin, John C. Hoard, Andrea L. Cohen, Jennifer
E. Riley, Rubin & Levin, PC, Indianapolis, IN, for
Plaintiffs.
Christopher M.R. Turner, Elizabeth Sarah Hess,
James J. Boland, Jonathan E. Hinkemeyer, Robert J.
Kopecky, Kirkland & Ellis LLP, Chicago, IL, Anne
L. Cowgur, John F. McCauley, Kenneth J. Munson,
Lee B. McTurnan, David A. Hayes, McTurnan &
Turner, Indianapolis, IN, for Defendant.

### ORDER ON DEFENDANT'S MOTION TO
### STRIKE CERTAIN EVIDENCE SUBMITTED BY
### PAUL HARRIS ON SUMMARY JUDGMENT
LARRY J. McKINNEY, Chief District Judge.
*1 This matter comes before the Court on
Defendant's, PricewaterhouseCoopers, LLP ("PwC"),
Motion to Strike Certain Evidence Submitted by
Plaintiffs, Paul Harris Stores, Inc., Paul Harris
Merchandising, Inc., Paul Harris Retailing, Inc., and
Paul Harris Distributing, Inc. (collectively "Paul
Harris"), on Summary Judgment. The items that PwC
seeks to strike are as follows: (1) Paragraphs 4, 7, and
8 of the William Stapel ("Stapel") Affidavit (Pl.'s
Exh. J); (2) the errata of Rule 30(b)(6) witnesses
Glen Lyon ("Lyon") and Richard Hettlinger
("Hettlinger") (Pl.'s Exhs. R and FFF); (3) the
affidavit and incorporated report of Nancy Ross
("Ross") (Pl.'s Exh. G); (4) paragraphs 7, 8, 9, and 10
of the Thomas Allison ("Allison") Affidavit (Pl.'s
Exh. E); (5) paragraphs 3 through 5 of the Hettlinger
Affidavit (Pl.'s Exh. S); (6) the consent decrees (Pl.'s

Exhs. CCC and III); (7) the reference to Ronald
Martin's ("Martin") testimony, at page 11, paragraph
39, of Paul Harris' response brief; and (8) Paul Harris'
reference, at page 33 of its brief to its own
interrogatory response.

In the ongoing battle between the parties and their
counsel (now in its fourth year), for the reasons stated
herein, the Court **GRANTS in part and DENIES in
part** Defendant's motion to strike.

## I. *DISCUSSION*

### A. THE STAPEL AFFIDAVIT

PwC contends that the Court is precluded by the
sham-affidavit rule from considering the Stapel
affidavit as it allegedly contradicts prior sworn
testimony. *See Cowen v. Prudential Ins. Co. of Am.,*
*141 F.3d 751 (7th Cir.1998).* The sham-affidavit rule
states that a party may not establish a genuine issue
of material fact solely by filing an affidavit that
contradicts prior sworn testimony. *See Adelman-*
*Tremblay v. Jewel Cos.,* 859 F.2d 517 (7th Cir.1988);
*see also Bank of Ill. v. Allied Signal Safety Restraint*
*Sys.,* 75 F.3d 1162, 1169 (7th Cir.1996) (quoting *Van*
*T. Junkins & Assoc's, Inc. v. U.S. Indus., Inc.,* 736
F.2d 656, 657 (11th Cir.1984) (When a party has
given clear answers to unambiguous questions which
negate the existence of any genuine issue of material
fact, that party cannot thereafter create such an issue
with an affidavit that merely contradicts, without
explanation, previously given clear testimony)).

True, "courts do not countenance the use of so-called
'sham affidavits,' which contradict prior sworn
testimony, to defeat summary judgment." *United*
*States v. Funds in Amount of Thirty Thousand Six*
*Hundred Seventy Dollars,* 403 F.3d 448, 466 (7th
Cir.2005). *See also Cowan v. Prudential Ins. Co. of*
*Am.,* 141 F.3d 751, 756 (7th Cir.1998). However, the
rule is inapplicable here because an inspection of the
Stapel affidavit paragraphs 7 and 8, as well as
Stapel's deposition testimony, pages 168-69 and 185-
90, reveals no contradiction.

For example, PwC claims that LaSalle National Bank
("LaSalle") "intended to go forward with a plan to
finance Paul Harris after the inventory shortfall."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2644935 (S.D.Ind.)
(Cite as: Slip Copy)

Page 2

Def.'s Br. Supp. at 5. The deposition testimony cited refers to decisions rendered during a February 1, 2003, meeting, and that pursuant to a February 5, 2001, letter, LaSalle considered PwC to be in default of the loan agreement because of the shortfall, but continued "to work with the borrower and see what plan they had in order to ... become a viable company." Def.'s Exh. J at 167, 68. Put another way, Stapel's deposition testimony reveals that LaSalle was going to provide Paul Harris with interim financing and allow them to provide budgets upon which LaSalle could base a decision. *Id.*

**\*2** Stapel's affidavit testimony only provides insight into thoughts or actions that occurred later. Stapel affidavit paragraph seven provides that on February 22, 2001, Stapel questioned whether Paul Harris was double-counting certain inventory and the issue was not immediately resolved. Pl.'s Exh. 5, ¶ 7. It is not contradictory to indicate that the $3.5-million shortfall was discovered and disclosed to the bank, and later to add that it was questioned whether or not inventory was being double counted and, (although known to the bank), this was not confirmed. Therefore, Stapel's affidavit testimony is not inconsistent with his deposition.

The last three bullet points represent PwC's position that Stapel decided that LaSalle should liquidate the entire Paul Harris chain because of an issue regarding double counting of inventory that Stapel first contemplated on February 22, 2001. Def.'s Br. Resp. at 5. Indeed, Stapel's testimony indicates Stapel's thoughts concerning double-counting, and nowhere does it indicate that the issue was resolved. Paragraph seven of the Stapel affidavit states in pertinent part that "[t]he issue of whether there was double-counting was never resolved." Pl.'s Exh. J., ¶ 7. This statement contradicts nothing in Stapel's deposition.

Further, paragraph eight of Stapel's affidavit does not contradict his deposition testimony. Stapel testified that *"[t]he next day,* [February 23, 2001], when the liquidators at the auction made a sizeable offer to liquidate all Paul Harris stores, I decided to recommend to LaSalle to liquidate the entire chain." Pl.'s Exh. 1, ¶ 8 (emphasis added). It is hardly contradictory to provide testimony that an ultimate decision was reached regarding LaSalle's further financing of Paul Harris at a later date. Stapel's affidavit simply and appropriately answers certain questions that were never put to him in his deposition, or clarifies certain issues that remained unclear at the end of his deposition.

PwC provides no argument regarding affidavit paragraph 4 in its brief in support. Both the Stapel deposition and Stapel affidavit must be considered by the Court in determining if a genuine issue of material fact exists. The Court **DENIES** PwC's motion to strike certain portions of the Stapel affidavit.

### B. LYON AND HETTLINGER ERRATA SHEETS

PwC argues that the sham-affidavit rule should be applied to the deposition errata sheets submitted by Lyon and Hettlinger, arguing that the errata contradict prior deposition testimony.[FN1] Although the Court questions the true effect of admitting the errata with respect to the pending motion for summary judgment, the Court **GRANTS** PwC's motion.

> FN1. Any errata sheets must be submitted to the court reporter within thirty days following the delivery of the transcript. Fed.R.Civ.P. 30(e). As PwC does not argue that the errata sheets are untimely, despite being filed as exhibits some three months after the depositions in question, the Court assumes for the purposes of this motion that they were timely filed.

Federal Rule of Civil Procedure 30(e) allows "changes in form and substance to a deposition transcript" and thus "permits a party to change a deposition from what he or she said to what he or she meant, [al]though the rule requires that the original transcript be retained so that the trier of fact can evaluate the honesty of the alteration." *Thorn v. Sundstrand Aerospace Corp.,* 207 F.3d 383, 389 (7th Cir.2000). "[A] change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.' " *Id.*

**\*3** It is apparent to the Court that Paul Harris seeks to "undo" the testimony of its 30(b)(6) witnesses by adding errata that in addition to their answers, Paul Harris would be submitting expert testimony regarding the subjects addressed in the questions. While the parties and the Court have acknowledged for some time that Paul Harris would rely on expert testimony for the issues testified upon by Lyon and Hettlinger in their 30(b)(6) depositions,[FN2] these corrections are really no more than "lawyers'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2644935 (S.D.Ind.)
**(Cite as: Slip Copy)**

Page 3

statements," attempting to deflect potentially detrimental testimony. Accordingly, the errata sheets, Plaintiff's Exhs. R and FFF, are impermissible.

> FN2. Paul Harris has repeatedly informed PwC's counsel and the Court, and the Court has recognized, that it would present expert testimony in support of various issues regarding duty, breach, causation, and damages. *See, e.g.,* Pl.'s June 7, 2005, Resp. at 6, 13; Pl.'s July 7, 2005, Rep. at 8; July 12, 2005, Order ("Paul Harris' 30(b)(6) witness "is free to testify that the Plaintiffs' only evidence regarding a particular topic will be expert testimony.").

There are two errata changes in Hettlinger's 30(b)(6) deposition that go beyond a reference to expert testimony. *See* Hettlinger Dep. at 238, 243. Paul Harris describes this errata as clarification in response to PwC's questions regarding Paul Harris' damages claim in this case. Hettlinger corrects his earlier testimony to PwC's question regarding who incurred the loss Paul Harris is seeking to recover. In his deposition, Hettlinger referred to shareholders of the company incurring the loss rather than a loss to the company itself. The errata states that the loss would be to the company-not the shareholders. Def.'s Exh. 80 at 238, 243. This is an attempt to impermissibly change the factual testimony offered during Hettlinger's deposition, a tactic which has been rejected by the Federal courts. *See, e.g., Eckert v. Kemper Fin. Servs., Inc.,* 1998 WL 699656 (N.D.Ill.1998) (listing cases). The Court rejects the deponent's attempt to rewrite material answers given in his deposition. A deposition is not a take home examination. *Greenway v. Int'l Paper Co.,* 144 F.R.D. 322, 325 (W.D.La.1992).

## C. ROSS AFFIDAVIT AND ATTACHED EXPERT REPORT

PwC first asserts that because Ross' expert report and the assertions based on that report are fundamentally inconsistent with Paul Harris' prior admissions, Ross' expert report should be stricken. The Court fails to see error in allowing Paul Harris to augment its evidence with expert testimony that goes beyond the information available to Paul Harris 30(b)(6) witnesses such as Stapel and Hettlinger. "[T]estimony given at a *Rule 30(b)(6)* deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment

purposes...." *A.I. Credit Corp. v. Legion Ins. Co.,* 265 F.3d 630, 637 (7th Cir.2001). In and of itself, there is simply nothing wrong with Paul Harris attempting to augment its evidence in this case with expert testimony.

PwC also argues that the report should be stricken because Ross was not properly disclosed as required by the CMP, and Paul Harris did not provide any information developed by Ross in response to discovery requests and orders. Regarding timeliness under the CMP, a review of the docket in this cause reveals that the Ross report was submitted, pursuant to the then-existing CMP, on May 17, 2006, and supplemented pursuant to <u>Federal Rule of Civil Procedure 26(e)(1)</u> on July 20, 2006.

*4 PwC believes that Ross' report should have been served no later than July 15, 2005. However, that date was never triggered because PwC did not make expert disclosures in support of a summary judgment motion by June 1, 2005. PwC misconstrues the CMP provision about responsive expert reports to conclude that Paul Harris should have provided an expert report in July of 2005, in opposition to a motion for summary judgment that would not be filed until almost a year later. *See* Dkt. No. 367, April 17, 2006, CMP.

With regard to PwC's argument that Paul Harris did not provide any information developed by Ross in response to discovery requests and orders, the Court disregards that argument, as PwC's brief in support provides no citation to authority. The Court is under no duty to research and analyze the arguments for litigants. *See United States v. Amerson,* 185 F.3d 676, 689 (7 Cir.1999) ( "[g]iven our adversarial system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.").

Finally, PwC argues that the report should be stricken because it served an interrogatory asking Paul Harris to address what turned out to be the subject of Ross' report, and, therefore, Paul Harris had a duty under <u>Federal Rule of Civil Procedure 26(e)(2)</u> to supplement its responses once such information became known. However, <u>Rule 26(e)(2)</u> states that:
A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the additional response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other party during the discovery process

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2644935 (S.D.Ind.)
(Cite as: Slip Copy)

or in writing.

Fed.R.Civ.P. 26(e)(2). Ross' expert report, as the "additional information" described in Rule 26(e)(2), was provided to PwC as soon as it was available. Therefore, there was no need for Paul Harris to supplement its discovery responses because the information had "otherwise been made known to the other party during the discovery process or in writing." Id.

In the end, none of the reasons PwC proffers supports the conclusion that Ross' affidavit and expert report should be stricken, and the Court **DENIES** PwC's motion.

### D. ADMISSIBILITY OF ALLISON, ROSS, HETTLINGER, AND STAPEL AFFIDAVITS

PwC asserts that the certain portions of the Allison, Ross, Hettlinger, and Stapel affidavits are inadmissible because they constitute testimony that is not made on personal knowledge, are speculative or conclusory, or constitute opinion testimony that lacks a basis in fact.

#### 1. Paragraphs 7 through 10 of the Allison Affidavit

Allison, a former consultant from Arthur Anderson, opined that Paul Harris "would have" reorganized and that the lenders' interest was "chilled." Allison Aff., ¶ 8. PwC asserts that this and similar statements in paragraphs seven and eight should be stricken as wholly conclusory and speculative. The Court disagrees and **DENIES** PwC's motion. Paragraph two of Allison's affidavit sets forth the breadth and quality of Allison's twenty-five years of experience as a turn around professional, consulting to or advising businesses regarding restructuring and turning around financially-troubled companies-including retail companies. Id., ¶ 8. Also attached to the affidavit is Allison's CV. See id., Exh. 317. Paragraph two of the affidavit and the attached CV establish that Allison has the necessary experience, education, and training to qualify him to provide an opinion as to whether, under certain circumstances, a troubled company in Paul Harris' position would be able to survive as an ongoing concern, an opinion rendered in paragraph eight of his affidavit. Id., ¶ 8. Moreover, Allison was intimately involved in Paul Harris' turnaround efforts from June 2000 through February 2001, and his affidavit sets forth specific facts regarding his participation in the attempt to turn around the Paul

Harris business and his principal responsibilities of communicating and negotiating with potential lenders for Paul Harris.[FN3] Id., ¶¶ 3-6.

> FN3. The Court also rejects PwC's assertion that Allison's statement, as expert testimony, must also be excluded because it violates the CMP. The CMP deadline for plaintiff's expert disclosures was May 17, 2006. Federal Rule of Civil Procedure 26(a)(2)(A) requires disclosure of "the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." On January 4, 2006, before PwC took Allison's deposition, Paul Harris disclosed to PwC that Allison "may give testimony at trial pursuant to Rules of Evidence 702, 703, and 705 relating to Paul Harris's ability to survive as a going concern if it had known the actual amount and cost of its inventory." Pl.'s Exh. 9. There was no violation of the CMP here.

#### 2. The Ross Affidavit

*5 PwC argues that Ross' opinions should be stricken as untimely under the CMP and because they provide no factual foundation to support her assertions, as required by Federal Rule of Civil Procedure 26. As the Court has already reached the conclusion that Ross' affidavit was timely, see section C, the Court shall focus upon only PwC's latter contention. Ross' affidavit plainly states that at her direction, her staff performed the analysis upon which her opinion and testimony were based. PwC has not cited authority for the proposition that an expert cannot rely on an analysis performed by her staff, at her direction. The Court finds PwC's foundation argument unavailing. Again, the Court is under no duty to research the arguments for litigants, see Amerson, 185 F.3d at 689, and PwC's motion is **DENIED**.

#### 3. The Hettlinger Affidavit

The Court **DENIES** PwC's motion to strike portions of the Hettlinger Affidavit. The Court does not agree with PwC's assertion that Hettlinger opined as to the subjective views of other individuals. The Court finds that Hettlinger had personal knowledge of the subjects of his testimony, and his deposition reveals no admission that he lacked personal knowledge as to whether PwC viewed the inventory testing that it performed to be "in addition to" or part of its

Slip Copy                                                            Page 5
Slip Copy, 2006 WL 2644935 (S.D.Ind.)
**(Cite as: Slip Copy)**

quarterly review. PwC Exh. 23 at 177-78.

#### 4. *Stapel's Affidavit Assertions Regarding PwC's Actions*

PwC asserts that Stapel's testimony concerning the work PwC is alleged to have performed with respect to inventory in or around August 2000 is inadmissible and should be stricken because it is not based on personal knowledge. However, Stapel was merely stating his perception of what had been told to him by Hettlinger for the purpose of explaining his motivation in agreeing with Hettlinger's decision not to do a physical inventory in December of 2000. While Stapel had no personal knowledge of what PwC did with respect to its inventory analysis in the summer of 2000, he did have a conversation with Hettlinger, in which Hettlinger provided such information to him. The statement is not offered for the truth of the matter asserted-that is, that PwC determined Paul Harris' inventory records were reliable in the summer of 2000. The statement is simply offered to prove Stapel's motivation for agreeing with Hettlinger's decision not to do a physical inventory in December. As such, the statement is admissible under <u>Federal Rule of Evidence 803(3)</u> and the Court **DENIES** PwC's motion.

#### 5. *Paul Harris' "Other Evidence"*

#### a. SEC Orders / Consent Decrees

Paul Harris submits and relies upon two consent decrees that PwC or one of its partners entered with the Security Exchange Commission ("SEC"). In the consent decrees, PwC did not admit liability or findings, except jurisdiction. *See* Pl.'s Exhs. CCC, III. Paul Harris seeks to introduce the first order, Pl.'s Exh. III, for the legal proposition that "auditors have their own obligations under the securities laws," and the second order, Pl.'s Exh. CCC, for the fact that the SEC censured PwC, imposing a $1-million penalty, and required it to establish and maintain various policies and procedures. Paul Harris contends that it is not using the consent decrees to prove administrative allegations leveled against PwC, but to prove the fact that the SEC took administrative action.

\*6 A consent decree, like any settlement, is inadmissible under <u>Federal Rule of Evidence 408</u>.

*See, e.g., <u>Zivitz v. Greenburg,</u> 1999 WL 1129605, at \*4 (N.D.Ill.1999)*. With regard to the first consent decree, it is permissible to introduce evidence that consent decrees were entered into, but the purposes articulated by Paul Harris-showing that auditors have obligations under securities laws-cannot be served by introducing such limited evidence. The content of those consent decrees is inadmissible under <u>Rule 408</u>, and it is that content that evidences PwC's, like other auditors', various obligations under securities laws. Introducing the penalties and conditions contained in the second consent decree clearly runs afoul of this rule. The Court **GRANTS** PwC's motion to strike to the extent that Paul Harris seeks to introduce the content or conditions of the consent decrees in question.

#### b. Martin's Testimony

Paul Harris relies, at page 11, paragraph 39 of its brief, on Martin's testimony that Paul Harris relied on PwC's audit work in August 2000. PwC argues that Martin's testimony establishes that he had no personal knowledge of PwC's work in August 2000. *See* Def .'s Exh. 37 at 218-21. However, Martin was designated as a <u>Rule 30(b)(6)</u> witness for Paul Harris, allowing him to testify not only from his personal knowledge but also as to matters "known or reasonably available to the organization." <u>Fed.R.Civ.P. 30(b)(6)</u>. The Court **DENIES** PwC's motion.

#### c. Interrogatory Response No. 18

Paul Harris relies on Martin's interrogatory response regarding how it priced merchandise, and what would have occurred if it had discovered an inventory shortfall. Pl.'s Br. at 33; Def.'s Exh. 96 at 17-18. PwC argues that Martin lacked personal knowledge of the facts in support of the response. For the same reason Martin did not need personal knowledge to give 30(b)(6) testimony on Paul Harris' behalf, neither is his personal knowledge necessary to provide interrogatory answers on behalf of Paul Harris, and the Court **DENIES** PwC's motion to strike.

#### II. *CONCLUSION*

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's, PricewaterhouseCoopers, LLP, Motion to Strike Certain Evidence Submitted by Paul Harris on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 6
Slip Copy, 2006 WL 2644935 (S.D.Ind.)
(Cite as: Slip Copy)

Summary Judgment. The motion is **GRANTED** with
respect to:
   The errata to <u>Rule 30(b)(6)</u> witnesses Lyon and
Hettlinger (Pl.'s Exhs. R, FFF);
   SEC consent decrees-to the extent that Paul Harris
seeks to introduce the content or conditions of the
consent decrees in question (Pl.'s Exhs. CCC, III).

The motion is **DENIED** with respect to: Paragraphs
4, 7, and 8 of the Staple Affidavit (Pl.'s Exh. J);
   The affidavit and incorporated report of Ross (Pl.'s
Exh. G);
   Paragraphs 7, 8, 9, and 10 of the Allison Affidavit
(Pl.'s Exh. E);
   Paragraphs 3 through 5 of the Hettlinger Affidavit
(Pl.'s Exh. S);
   The reference to Martin's testimony, at page 11,
paragraph 39 of Paul Harris' response brief; and
*7  Paul Harris' reference, at page 33 of its brief, to
its own interrogatory response.

IT IS SO ORDERED this 14th day of September,
2006.

S.D.Ind.,2006.
Paul Harris Stores, Inc. v. PricewaterhouseCoopers,
LLP
Slip Copy, 2006 WL 2644935 (S.D.Ind.)

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>2006 WL 2095068</u> () Affidavit of Thomas J.
Allison (Jun. 16, 2006) Original Image of this
Document (PDF)
• <u>2006 WL 1831729</u> (Trial Motion, Memorandum
and Affidavit) Pricewaterhousecoopers LLP's Brief in
Support of its Motion for Summary Judgment (May
15, 2006) Original Image of this Document (PDF)
• <u>2006 WL 1831728</u> (Trial Motion, Memorandum
and Affidavit) PwC's Opposition to Plaintiffs' Motion
Regarding A Portion of Rule 30(b)(6) Deposition
(May 3, 2006) Original Image of this Document
(PDF)
• <u>2006 WL 1173246</u> (Trial Motion, Memorandum
and Affidavit) PWC's Consolidated Brief in
Opposition to Plaintiffs' Motion to Compel and in
Support of Motion for Protective Order Concerning
Rule 30(B)(6) Testimony on State Tax Issues (Mar.
9, 2006) Original Image of this Document (PDF)
• <u>2005 WL 3122504</u> (Trial Motion, Memorandum
and Affidavit) PwC's Reply Brief in Support of its
Motion to Strike Plaintiffs' Jury Demand (Oct. 20,
2005) Original Image of this Document (PDF)
• <u>2005 WL 2871901</u> (Trial Motion, Memorandum
and Affidavit) PwC's Reply in Support of Its Motion

for Entry of a Revised Case Management Plan and
New Trial Date (Sep. 22, 2005) Original Image of
this Document (PDF)
• <u>2005 WL 4517213</u> () Affidavit of Richard R.
Hettlinger (Sep. 22, 2005) Original Image of this
Document (PDF)
• <u>2005 WL 2871900</u> (Trial Motion, Memorandum
and Affidavit) PWC's Brief in Support of Motion to
Strike Plaintiffs' Jury Demand (Sep. 8, 2005) Original
Image of this Document (PDF)
• <u>2005 WL 2871899</u> (Trial Motion, Memorandum
and Affidavit) Sommer Barnard's Reply
Memorandum In Support of Motion for Protective
Order Concerning Subpoena to Sommer Barnard
(Sep. 2, 2005) Original Image of this Document
(PDF)
• <u>2005 WL 2609209</u> (Trial Motion, Memorandum
and Affidavit) Pricewaterhousecoopers' Combined
Reply Brief in Further Support of Its Motion to
compel Production of Documents from Sommer
Barnard and in Opposition to Sommer barnard's
motion for Protective Order (Aug. 16, 2005) Original
Image of this Document (PDF)
• <u>2005 WL 2609211</u> (Trial Motion, Memorandum
and Affidavit) Pwc's Opposition to Paul Harris'
Objection to Magistrate Judge's Entry on Plaintiffs'
Supplemental Motion to Compel And Motion for
Preservation Order (Aug. 16, 2005) Original Image
of this Document (PDF)
• <u>2005 WL 2609206</u> (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Surreply in Opposition TO
Pwc's Motion For partial Summary Judgment on
""State Tax Payment" Claims (Aug. 9, 2005) Original
Image of this Document (PDF)
• <u>2005 WL 2247825</u> (Trial Motion, Memorandum
and Affidavit) Sommer Barnard's Consolidated
Memorandum of Law In Opposition to PwC's Motion
to Compel and In Support of Motion for Protective
Order Concerning Subpoena to Sommer Barnard (Jul.
28, 2005) Original Image of this Document (PDF)
• <u>2005 WL 2247823</u> (Trial Motion, Memorandum
and Affidavit) PwC's Reply in Support of Its Motion
for Partial Summary Judgment on ""State Tax
Payment" Claims (Jul. 26, 2005) Original Image of
this Document (PDF)
• <u>2005 WL 2247821</u> (Trial Motion, Memorandum
and Affidavit) PwC's Memorandum in Support of Its
Motion to Compel Production of Documents from
Sommer Barnard (Jul. 8, 2005) Original Image of this
Document (PDF)
• <u>2005 WL 2247819</u> (Trial Motion, Memorandum
and Affidavit) PwC's Reply in Support of Motion to
Compel Production of Written Notice to Insurance
Carrier (Jul. 7, 2005) Original Image of this
Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 7
Slip Copy, 2006 WL 2644935 (S.D.Ind.)
**(Cite as: Slip Copy)**

• 2005 WL 2247817 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Reply in Support of Motion
for Protective Order Concerning Rule 30(b)(6)
Deposition (Jun. 7, 2005) Original Image of this
Document (PDF)
• 1:02cv01014 (Docket) (Jul. 1, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT NO. 2

# EXHIBIT NO. 2

# IS

# CONFIDENTIAL

# EXHIBIT NO. 3

# EXHIBIT NO. 3

# IS

# CONFIDENTIAL

# EXHIBIT NO. 4

# EXHIBIT NO. 4

# IS

# CONFIDENTIAL

# EXHIBIT NO. 5

# EXHIBIT NO. 5

# IS

# CONFIDENTIAL

Defendants' Opposition to Plaintiff's Motion in Limine No. 5

## V. DEFENDANTS' OPPOSITION TO AMPEX'S MOTION IN LIMINE #5 (INFLAMMATORY MATTERS)

### INTRODUCTION

Defendants respectfully submit this opposition to Ampex's motion in limine regarding purportedly "inflammatory matters." Ampex's Motion addresses two separate issues:

First, Ampex moves to preclude Defendants from referring to Ampex as a "patent troll" or "patent terrorist" at trial. This issue merits little discussion. Defendants have no intention of referring to Ampex as a "patent troll" or "patent terrorist" at trial.

Second, Ampex moves to preclude Defendants from referring to the disposition of Ampex's International Trade Commission ("ITC") action against Defendants. In the earlier ITC action, Ampex asserted the same patent, U.S. Patent No. 4,821,121 (the "'121 patent"), against Defendants. After nine months of litigation, after receiving Defendants' written trial testimony, and just prior to the commencement of trial, Ampex dropped its case in the ITC. Ampex's withdrawal of its own complaint *on the very same patent* is highly relevant to Ampex's willful infringement allegations. It is strong evidence that Defendants were reasonable in concluding that they did not infringe. Defendants should, therefore, be permitted to submit evidence regarding the outcome of the ITC action at trial.

### FACTUAL BACKGROUND

On October 21, 2004, Ampex filed suit against Kodak in the ITC and in this Court, asserting infringement of the '121 patent. In its Complaint filed in this Court, Ampex alleged that Kodak's infringement had been, and continued to be, willful and that this case was therefore "exceptional"

under the remedies provisions of the U.S. Patent Act, 35 U.S.C. § 285. (*See* Amend. Compl., D.I. 12, at 4-5.) The action in this Court was stayed pending resolution of the ITC investigation.[1]

Ampex vigorously litigated its case against the Defendants in the ITC for over nine months. It deposed thirty-five Kodak and Altek witnesses, submitted over three hundred discovery requests, and sought and received over 400,000 pages of documents from Defendants.

Prior to trial, the parties were required to submit direct trial testimony in writing. On July 29, 2005, after nine months of extensive and costly litigation, *the day after receiving Kodak's direct trial testimony on the issue of noninfringement*, and only weeks before the commencement of trial, Ampex moved to dismiss its own complaint in the ITC action. On August 23, 2005, Ampex's motion was granted and Ampex's complaint was dismissed.

Ampex represented to the public and the securities markets that it moved to dismiss its complaint because the ITC schedule did not permit it to obtain effective relief. Specifically, it represented that the '121 Patent expired shortly after any exclusion order would issue:

> Any remedy that might be granted to Ampex by the ITC would be limited by the
> expiration date of the patent, which is April 2006. Accordingly, Ampex has
> determined that it would be preferable to continue the litigation in District Court ,
> where it is seeking damages for sales from the date of written notification of the
> patent to Kodak, which was August 2001.

(Ex. 1, Ampex Press Release, Aug. 1, 2005.)

Indeed, Ampex's paid securities analyst, Dutton Associates, represented to investors that Ampex's dismissal of its own complaint was a positive development because it allowed Ampex to pursue damages in the District Court:

> Ampex filed a motion with the ITC to terminate proceedings against Eastman Kodak
> and to expedite the lawsuit in the U.S. District Court in Delaware. The reasoning
> behind this move is that the ITC would be limited by the April 2006 expiration date
> of the '121 patent and the termination of the ITC proceeding removes the stay at the
> District Court that was automatically stayed during the ITC proceedings. Focusing

---

[1]      In August 2004, in light of Ampex's earlier threats, Kodak had retained the firm of Roylance, Abrams, Berdo and Goodman LLP ("Roylance") to provide an opinion regarding the '121 patent. In November 2004, Roylance provided Kodak with an oral opinion that its digital cameras did not infringe. In September 2005, it provided a formal written opinion that the accused cameras did not infringe.

2

on the lawsuit in the District Court allows Ampex to expedite matters and to seek damages for sales from the date of written notification of the possible infringement of the patent '121 back to August 2001.

(Ex. 2, Dutton Associates *Research Note*, Aug. 11, 2005.)

Ampex's public representations regarding its reasons for dismissal neglected to mention, however, that Ampex had known the ITC schedule since February 1, 2005, six months before it moved to dismiss its own complaint. (*See* Ex. 3, ITC Scheduling Order, Feb. 1, 2005.)

## ARGUMENT

### 1. Evidence Of Ampex's Withdrawal Of The ITC Action Is Relevant To Willfulness.

The determination of willful infringement turns on the alleged infringer's state of mind. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996) ("Whether an infringer acted willfully is a question of fact that rests on a determination of the infringer's state of mind"); *see also Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996) ("Liability for willfulness of infringement turns on considerations of *intent, state of mind, and culpability*.") (emphasis added). If an accused infringer has good reason to believe that it is not infringing the asserted patent, even if it is later found to actually infringe the patent, it should not be found to have *willfully* infringed. *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1332 (Fed. Cir. 2004) (affirming grant of judgment as a matter of law to dismiss issue of willful infringement, explaining that "[w]illful infringement is not established by the simple fact of infringement").

Ampex's withdrawal of its ITC complaint against Defendants is relevant to Defendants' state of mind regarding whether they were infringing the '121 Patent. After nine months of extensive discovery, Ampex could not make out a case of infringement. As a result, only weeks before trial, it dropped its case. Indeed, Ampex dropped its case the day after it received Defendants' written non-infringement trial testimony. Defendants could reasonably conclude from Ampex's withdrawal, therefore, that they were not infringing the '121 Patent. *See Applied Med. Resources Corp. v. U.S.*

*Surgical Corp.*, 435 F.3d 1356, 1365-66 (Fed. Cir. 2006) (outcome of prior litigation involving same parties and same patent "clearly relevant to [defendant's] state of mind" on question of willfulness).

Defendants should, therefore, be permitted to submit evidence regarding the outcome of the ITC action at trial.

4

# EXHIBIT NO. 1

Press Release                                                                  Source: Ampex Corporation

# Ampex vs. Kodak Litigation to Move to Federal District Court

Monday August 1, 9:00 am ET

REDWOOD CITY, Calif.--(BUSINESS WIRE)--Aug. 1, 2005--Ampex Corporation (Nasdaq:AMPX - News) initiated litigation against Eastman Kodak Company (Kodak) in October 2004 for infringement of one of Ampex's patents used in digital still cameras. Proceedings were initiated at the International Trade Commission (ITC) and also in U.S. District Court (District Court) in Delaware. The District Court suit was automatically stayed for the duration of the ITC proceeding.

Ampex and Kodak have been unable to agree on a license under the patent in suit. Any remedy that might be granted to Ampex by the ITC would be limited by the expiration date of the patent, which is April 2006. Accordingly, Ampex has determined that it would be preferable to continue the litigation in District Court, where it is seeking damages for sales from the date of written notification of the patent to Kodak, which was August 2001.

Ampex has filed a motion with the ITC seeking to terminate the proceeding. This will remove the stay on the District Court litigation which would accelerate the timing of the District Court suit which Ampex will continue to pursue.

Ampex has licensed its patents for use in digital still cameras to Canon Inc., Casio Computer Co., Ltd., Fuji Photo Film Co., Ltd., Funai Electric Co., Ltd., Konica Minolta Holdings, Inc., Matsushita Electric Industrial Co. Ltd., Nikon Corporation, Olympus Corporation, Pentax Corporation, Samsung Techwin Co., Ltd., Sanyo Electric Co. Ltd., Sony Corporation and Victor Company of Japan. Certain of these licenses include camera-equipped cellular telephones.

Ampex Corporation, www.ampex.com, headquartered in Redwood City, California, is one of the world's leading innovators and licensors of technologies for the visual information age.

This news release contains predictions, projections and other statements about the future that are intended to be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 (collectively, "forward-looking statements"). Forward-looking statements relate to various aspects of the Company's operations and strategies, including but not limited to the effects of having experienced significant losses in the past and the risk that the Company may incur losses in the future; the Company's limited liquidity and significant indebtedness and interest expense; its sales and royalty forecasts for future periods not being attained, and the risk that the Company will not conclude additional royalty-bearing license agreements covering its digital technologies; the Company's marketing, product development, acquisition, investment, licensing and other strategies not being successful; possible future issuances of debt or equity securities; the possible incurrence of significant patent litigation expenses or adverse legal determinations finding the Company's patents not be valid or not to have been infringed; new business development and industry trends; the possible need to raise additional capital in order to meet the Company's obligations; reliance on a former affiliate to make contributions to the Company's pension plans which are substantially underfunded; and most other statements that are not historical in nature. Important factors that could cause actual results to differ materially from those described in the forward-looking statements are described in cautionary statements included in this news release and/or in the Company's 2004 Annual Report on Form 10-K and its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2005, filed with the SEC. In assessing forward-looking statements, readers are urged to consider carefully these cautionary statements. Forward-looking statements speak only as of the date of this news release, and the Company disclaims any obligations to update such statements.

. . . .
*Contact:*
   Ampex Corporation
   Karen L. Dexter, 650-367-4111

# EXHIBIT NO. 2

 **DUTTON ASSOCIATES**
INDEPENDENT RESEARCH

### RESEARCH NOTE

| Corporate Information | | Stock Rating Information | |
|---|---|---|---|
| Company: | Ampex Corporation | Established: | 1/19/2005 |
| Symbol: | AMPX | Rating: | Strong Buy |
| Exchange: | Nasdaq | Price at Rating: | 47.45 |
| Industry: | Electronics & Engineering | Price Target: | 82.50 |
| Analyst: | Richard W. West, CFA | Time Frame: | 12 Months |
| Recent Price: | $34.50 | Rating Status: | Reiterated |

08/11/2005

### AMPEX: NEW CONTRACT WITH BOEING; 2nd QUARTER RESULTS: TOTAL REVENUES UP 77%, LICENSING REVENUE UP 586%; STRONG BUY RATING REITERATED

Ampex Corporation (Ampex) results for the second quarter ended 6/30/05, compared with the second-quarter 2004:

Total revenue increased 77.5% to $15.8 million in the second-quarter 2005, compared with $8.9 million for the second-quarter 2004.

Licensing revenue increased 586% to $9.9 million in the second-quarter 2005, compared with $1.7 million for the second-quarter 2004. The breakdown of licensing revenue in 2005:

1) $5.0 million in royalties based on past or current sales under licenses that provide for running royalties based on licensee's revenues from products, including digital still cameras, digital camcorders, and DVD recorders.
2) $4.9 million in prepayments of royalty obligations through the first quarter of 2006.

Net income for the second-quarter of 2005 was $2.5 million or $0.64 per diluted share for the second quarter of 2005, compared with a loss of $(4.1 million) or $(1.15) per diluted share for the second-quarter of 2004.

Intellectual property costs increased 98% to $4.2 million for the second-quarter 2005, compared with $1.8 million for the second-quarter 2004. In the second-quarter 2005, $3.7 million of the $4.2 million related to lawsuits Ampex initiated in October 2004, alleging patent infringement against Eastman Kodak (EK: NYSE-$27.00).

Licensing activity contributed $5.6 million, or $1.45 diluted EPS, in the second-quarter 2005, compared with an operating loss of $(0.7 million) in the second-quarter 2004, or $(0.19) diluted EPS.

Product sales and service revenues from Ampex's Recorder segment were $5.9 million in the second-quarter 2005, compared with $7.5 million in the second-quarter 2004.

Product sales and service operating income was $25,000, or diluted EPS of $0.01, in the second-quarter 2005, compared with $800,000, or $0.23 per diluted EPS, for the second-quarter 2004. The lower sales and operating income were due to the ongoing transition from an older generation of tape-based image and data acquisition products to a newly introduced range of solid-state and hard disk-based products. In this regard, the The Boeing Company (NYSE:BA - $65.95) recently awarded the Recorder segment a contract for new disk and solid based data instrumentation recorders that will be used in the development of Boeing's 787 aircraft. This contract has a total value of approximately $6.3 million to deliver product over the next 30 months.

Interest expense, net, and other financing costs were $0.7 million, or diluted EPS of $0.17, in the second-quarter 2005, compared with $2.4 million, or $0.64 per diluted EPS, for the second-quarter 2004. The lower

DUT002483

interest expense in FY2005 reflects the $62.4 million debt repayment in the fourth-quarter 2004 and a further reduction of $5.6 million in the second- quarter 2005. On May 3, 2005, Ampex called for redemption of $10.0 million of its 12% senior notes. When completed, this redemption will reduce the principal amount of the 12% senior notes to $5.8 million. The total long-term debt at June 30, 2005, was $19.6 million, down from $30.3 million at December 31, 2004.

On April 15, 2005, Ampex sold a vacant manufacturer facility for net proceeds of $3.1 million; this resulted in a gain in other income of $0.5 million.

SUMMARY

Ampex's second-quarter results continued to show the potential for adding licensees that will provide running royalties in the future, based on manufacturers revenues from products that infringe Ampex's patents. Ampex continued to license additional manufacturers of digital still cameras in the second quarter. The new licensees are Fuji Photo Film Ltd. (NASDAQ: FJIY - $31 94); Funai Electric Co., Ltd.; Konica Minolta Holdings, Inc.; and Nikon Corporation.

The recent termination of the action against Eastman Kodak in the International Trade Commission and the focus on expediting the Eastman Kodak lawsuit in the U.S. District Court in Delaware that was automatically stayed during the ITC proceedings, while lengthening the time for resolution, bodes well for possible payment of damages from Eastman Kodak. The continued licensing activity demonstrates that Ampex is successfully defending its patents. The recent announcement of the contract with Boeing is a positive for the Recorder segment, and we expect further announcements of contracts for new disk and solid based data instrumentation recorders. It must be remembered that Ampex's patent portfolio consists of approximately 600 patents covering not only digital still cameras, but also digital camcorders, DVD recorders, and camera cell phones. Ampex again stated in its second-quarter news release that they, "may seek to enforce its digital imaging patents by instituting additional litigation against manufacturers of digital still cameras, digital video camcorders, DVD recorders or other products if we believe our patents are being infringed by such manufacturers and licensing agreements cannot be concluded on satisfactory terms".

After the second-quarter news release yesterday, Ampex's common stock fluttered down $1.39 to close at $35.89 per share or 3.8% on less than average volume of 17,500 shares, the weakness continued today and the stock closed down at $32.52 per share, down 5.74% on heavier volume of 32,000 shares. We will not attempt to explain the vicissitudes of day-to-day trading, however, since this quarter was in line with our estimates and with $2.16 diluted EPS reported for the six-month period ended June 30, 2005, we reiterate our estimated 2005 EPS of $3.01 (which does not reflect any resolution of the Eastman Kodak lawsuit). It is our belief that we will see continued license activity as Ampex expands its IP activity into DVD recorders, digital video camcorders, and camera-equipped cellular phones. We are willing to wait out the resolution of the Eastman Kodak lawsuit.

We reiterate our Strong Buy Rating.

**Information, opinions or recommendations** contained in Dutton Associates' research reports or research notes are submitted solely for advisory and information purposes. The information used and statements of fact made have been obtained from sources considered reliable but we neither guarantee nor represent the completeness or accuracy. Such information and the opinions expressed are subject to change without notice. A Dutton Associates research report or note is not intended as an offering or a solicitation of an offer to buy or sell the securities mentioned or discussed. Neither the firm, its principals, nor the assigned analysts own or trade shares of any company covered. The Firm does not accept any equity compensation. Anyone may enroll a company for research coverage, which currently costs US $35,000 prepaid for 4 Research Reports, typically published quarterly, and requisite Research Notes. Dutton Associates received $33,000 from the Comnpany for 4 Research Reports with coverage commencing on 01/19/2005. Reports are performed on behalf of the public, and are not a service to any company. The analysts are responsible only to the public, and are paid in advance to eliminate pecuniary interests and insure independence. Please read full disclosure and other reports and notes on the Company at www.JMDutton.com.

The views expressed in this research report or note accurately reflect the analyst's personal views about the subject securities or issuer. Neither the analyst's compensation nor the compensation received by Dutton Associates is in any way related to the specific recommendations or views contained in this research report or note.

**Dutton Associates**. John M. Dutton, President, 4989 Golden Foothill Parkway, Suite 3, El Dorado Hills, CA 95762 Phone (916) 941-8119, Fax (916) 941-8093

© Copyright 2005, by Dutton Associates

DUT002485

# EXHIBIT NO. 3

# UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

|  |  |
|---|---|
| **In the Matter of**<br><br>**CERTAIN DIGITAL IMAGE STORAGE AND RETRIEVAL DEVICES** | **Inv. No. 337-TA-527** |

## ORDER NO. 6: EXTENDING THE TARGET DATE AND ESTABLISHING PROCEDURAL SCHEDULE

(February 1, 2005)

This investigation was instituted on November 29, 2004, by publication of the notice of investigation in the Federal Register. *See* 69 Fed. Reg. 69,390 (November 29, 2004). Administrative Law Judge Terrill set a fourteen-month target date of January 20, 2006 for completion of this investigation by the Commission in Order No. 2. *See* Order No. 2 (December 3, 2004). An initial procedural schedule was set by Order No. 3. *See* Order No. 3 (December 3, 2004). On January 31, 2005, the Commission issued a notice of decision to permanently reassign the above-referenced investigation to the undersigned. The undersigned has determined to extend the target date by one-month to March 1, 2006. Accordingly, the parties shall comply with the procedural schedule set forth below unless directed otherwise by the undersigned:

| | |
|---|---|
| Second settlement conference | February 14, 2005 |
| Submission of second settlement conference joint report | February 16, 2005 |
| File notice of prior art | February 18, 2005 |
| Exchange of initial expert reports (identify tests/surveys/data) | March 25, 2005 |
| File tentative list of witnesses a party will call to testify at the hearing, with an identification of each witness' relationship to the party | March 25, 2005 |

FEB-01-2005  16:10        OFFICE OF THE ALJ                    2022051852    P.03/04

| | |
|---|---|
| Exchange of rebuttal expert reports | April 25, 2005 |
| Fact discovery cutoff & completion | May 25, 2005 |
| Expert discovery cutoff & deposition | June 8, 2005 |
| Third settlement conference | June 8, 2005 |
| Submission of third settlement conference joint report | June 13, 2005 |
| Deadline for motions to compel discovery | June 15, 2005 |
| Submit and serve pre-submitted direct expert witness testimony and direct exhibits, with physical and demonstrative exhibits available -- Complainant(s) and Respondent(s) | July 7, 2005 |
| Submit and serve pre-submitted direct expert witness testimony and direct exhibits, with physical and demonstrative exhibits available -- Staff | July 11, 2005 |
| Joint Stipulation of Issues | July 15, 2005 |
| File objections to direct exhibits | July 20, 2005 |
| Submit and serve pre-submitted rebuttal expert witness testimony and rebuttal exhibits, with rebuttal physical and demonstrative exhibits available -- all parties | July 25, 2005 |
| Submit and serve pre-submitted sur-rebuttal expert witness testimony and sur-rebuttal exhibits on those issues for which a party has the burden of proof -- all parties | August 1, 2005 |
| Deadline for filing motions in limine | August 4, 2005 |
| File objections to rebuttal exhibits; File high priority objections statement | August 11, 2005 |
| File pre-hearing statements (including final witness lists) and briefs -- Complainant(s) and Respondent(s) | August 19, 2005 |
| Joint Stipulation of Material Facts | August 22, 2005 |
| File pre-hearing statement and brief -- Staff | August 26, 2005 |
| File Joint Narrative Statement of Issues | September 2, 2005 |
| Tutorial on technology (if necessary) | September 9, 2005 at 9:00 a.m. |

FEB-01-2005  16:10      OFFICE OF THE ALJ                 2022051852    P.04/04

| Pre-hearing conference | September 9, 2005 (following the tutorial) |
|---|---|
| Trial | September 12-16, 2005 |
| File initial post-hearing briefs, proposed findings of fact and conclusions of law, and final exhibit lists | September 28, 2005 |
| File reply post-hearing briefs, objections and rebuttals to proposed findings of fact | October 5, 2005 |
| Initial Determination due | December 1, 2005 |
| Target Date | March 1, 2006 |

The parties are advised that, even if they are all in agreement, no changes may be made to the procedural schedule except as provided in the Ground Rules.

**SO ORDERED**.

Robert L. Barton, Jr.
Administrative Law Judge

-3-

TOTAL P.04

## <u>CERTIFICATE OF SERVICE</u>

I, Julia Heaney, hereby certify that on October 23, 2006, I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Collins J. Seitz, Jr., Esquire
> Connolly, Bove, Lodge & Hutz LLP

and that I caused copies to be served upon the following in the manner indicated:

### <u>BY HAND DELIVERY AND ELECTRONIC MAIL</u>

Collins J. Seitz, Jr., Esquire
Connolly, Bove, Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE  19899

### <u>BY ELECTRONIC MAIL</u>

Michael J. Summersgill, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

*/s/ Julia Heaney*
Julia Heaney (#3052)