# EXHIBIT NO. 10

Westlaw.

230 F.3d 1378                                                                                    Page 1
230 F.3d 1378, 2000 WL 27891 (C.A.Fed. (Puerto Rico))
**(Cite as: 230 F.3d 1378)**

**H**
Briefs and Other Related Documents
NOTICE:     THIS   IS   AN   UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTAF Rule
47.6 for rules regarding the citation of unpublished
opinions.)
     United States Court of Appeals, Federal Circuit.
     Aureo RIVERA-DAVILA and Aureo E. Rivera,
                 Plaintiffs-Appellees,
                           v.
     ASSET CONSERVATION, INC., Gabriel Guijarro-
     Brunet, Iris Mieres-De-Guijarro and Conjugal
     Partnership Guijarro-Mieres, Defendants-Appellants.
                      No. 98-1075.

                     Jan. 12, 2000.
     Rehearing Denied; Suggestion for Rehearing En
            Banc Declined March 23, 2000.

Before MAYER, Chief Judge, RICH, Circuit
Judge,[FN*] and SMITH, Senior Circuit Judge.

          FN* Circuit Judge Rich heard oral argument
          in this case, but died on June 9, 1999. This
          case was decided by the remaining judges in
          accordance with Fed. Cir. Rule 47.11.

SMITH, Senior Circuit Judge.
*1 Aureo Rivera-Davila and Aureo E. Rivera sued
Asset Conservation, Inc., together with its officers
and sole shareholder, alleging that car security
systems sold by Asset Conservation infringed claim
11 of their patent. A jury agreed, finding willful
infringement and awarding the Riveras $310,000 in
damages, an amount that the district court increased
to $1,240,000. We hold that the district court's failure
to construe the claim language before submitting the
infringement issue to the jury requires us to vacate
the finding of infringement and the findings that
arose out of it. However, we affirm the district court's
evidentiary rulings and its ruling on the validity of
the patent. Thus, we *affirm-in-part, vacate-in-part,
and remand.*

                *Facts and Procedural History*

Appellees Aureo Rivera-Davila and Aureo E. Rivera

("the Riveras") hold U.S. Patent 3,548,373, which
describes and claims a "theft-preventing system for
vehicles." Claim 11 of the reexamined patent, the
claim at issue in this case, reads as follows:
A theft preventing system for a vehicle ..., said
system including [1] lock means movably mounted
within said vehicle for displacement between a
release position and a lock position operatively
engaging the hood to prevent opening of the engine
compartment, and [2] disabling switch means
connected in series with the ignition switch for
opening said ignition circuit in response to
displacement of the lock means to the lock position,
including [3] an alarm circuit, [4] means responsive
to displacement of the lock means to the release
position for disabling the alarm circuit during
operation of the engine, and [5] vibration sensing
means connected to the alarm circuit for operation
thereof in response to movement of the vehicle while
the lock means is in the lock position.

U.S. Patent Reexamination Certificate B1 3,548,373,
column 5, lines 17-35.

The Riveras never commercialized their invention
but in 1983, Aureo E. Rivera became aware of certain
car security systems made by Chapman Industries
Corporation ("Chapman"), which were being sold in
Puerto Rico by Asset Conservation, Inc. ("Asset
Conservation").[FN1] After   a   demonstration   of
Chapman's products by Asset Conservation, Mr.
Rivera became convinced that these products
infringed the patent owned by himself and his father.

          FN1. Appellants Gabriel Guijarro-Brunet
          ("Mr.Guijarro") and Iris Mieres de Guijarro
          ("Mrs.Mieres") are the husband-and-wife
          officers of Asset Conservation. In addition,
          Mr. Guijarro is the sole shareholder of Asset
          Conservation. Unless otherwise indicated,
          references to "Asset Conservation" in the
          remainder of this opinion refer to all of the
          appellants collectively.

The Riveras sued Asset Conservation and Chapman
for patent infringement on January 5, 1985, in the
U.S. District Court for the District of Puerto Rico.
This suit was dismissed without prejudice after
Chapman instituted reexamination of the Riveras'
patent in the U.S. Patent and Trademark Office. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

230 F.3d 1378                                                                                        Page 2
230 F.3d 1378, 2000 WL 27891 (C.A.Fed. (Puerto Rico))
**(Cite as: 230 F.3d 1378)**

reexamination confirmed the patentability of the Riveras' claims.

The Riveras refiled their suit against Asset Conservation and Chapman in 1987. This suit was dismissed without prejudice as to Asset Conservation and transferred to the U.S. District Court for the Northern District of Illinois to proceed against Chapman alone. In July of 1990, the Riveras obtained a default judgment against Chapman. That judgment was affirmed on appeal to this court. *Rivera-Davila v. Chapman Indus. Corp., 935 F.2d 280 (Fed.Cir.1991).*

**\*2** In August of 1990, the Riveras refiled their suit against Asset Conservation yet again, alleging that several of the Chapman products sold by Asset Conservation infringed claim 11 of the Riveras' patent. This time, the suit proceeded to trial. During trial, the district court excluded three pieces of evidence offered by Asset Conservation.
1. The court excluded a letter written by patent attorney Carl E. Moore, Jr. that analyzed the Riveras' patent and concluded that the accused devices did not infringe claim 11 and that claim 11, among others, was invalid for anticipation and/or obviousness.[FN2] The court excluded the letter because it was rendered after the Riveras had filed suit and its contents were therefore "self-serving" litigation strategy.

> FN2. The court also excluded a letter offered to show that Appellants had received the Moore letter.

2. Mrs. Mieres, who was in charge of record-keeping at Asset Conservation, prepared a summary of sales of the relevant products in the relevant time frame. The court did not allow use of the summary during her testimony because the underlying documents had not been properly disclosed before trial.
3. Asset Conservation proffered the deposition testimony of their expert James H. Faust. The court did not allow the deposition to be read into evidence because the plaintiffs had not stipulated that the deposition could be used at trial, because the unavailability of the witness had not been established, and because the deposition was inadmissible hearsay.

The court ruled that, as a matter of law, claim 11 had not been shown to be invalid for anticipation or obviousness. Because the only evidence of

anticipation or obviousness introduced by the defendants either was not prior art or was excluded by the court, the court granted the plaintiffs' motion for judgment as a matter of law.

The court did not construe the allegedly infringed claim before sending the case to the jury. The jury found that the Chapman products sold by Asset Conservation infringed claim 11 of the Riveras' patent. The jury awarded damages of $310,000 based on a royalty rate of 10% and total sales of the infringing devices during the relevant period of $3.1 million. The jury found the infringement to be willful and found Mr. Guijarro personally liable for inducing infringement by the corporation.

In view of the jury's finding that the infringement was willful, the court awarded treble damages. *See* 35 U.S.C. § 284 (1994). The court added the trebled damages to the damages awarded by the jury to yield a total award of $1,240,000. The court also granted the Riveras' motion for attorneys' fees. Asset Conservation appeals the jury's finding of infringement and the court's evidentiary rulings and enhancement of damages. Appellant Guijarro also appeals the jury's finding of personal liability.

*Jurisdiction and Standard of Review*

This court has jurisdiction over an appeal from a final district court judgment in a patent infringement suit. *See* 28 U.S.C. § 1295(a)(1) (1994).

A jury finding of infringement is reviewed for support by substantial evidence in the record, as is a jury finding of willfulness. *See B. Braun Medical, Inc. v. Abbott Labs., 124 F.3d 1419, 1423, 43 USPQ2d 1896, 1899 (Fed.Cir.1997); Hoechst Celanese Corp. v. BP Chemicals Ltd., 78 F.3d 1575, 1583, 38 USPQ2d 1126, 1132 (Fed.Cir.1996).*

**\*3** A trial court's decisions on evidentiary matters, on whether to enhance damages, and on the amount of enhancement are all reviewed for abuse of discretion. *See Applied Med. Resources Corp. v. United States Surgical Corp., 147 F.3d 1374, 1380, 47 USPQ2d 1289, 1293 (Fed.Cir.1998); State Industries, Inc. v. Mor-Flo Industries, 948 F.2d 1573, 1576, 20 USPQ2d 1738, 1740 (Fed.Cir.1991).*

*Infringement*

The patentee bears the burden of proving

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

infringement by a preponderance of the evidence. "To show infringement of a patent, a patentee must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim. Infringement requires proof by a preponderance of the evidence." *Seal-Flex, Inc. v. Athletic Track and Court Constr., 172 F.3d 836, 842, 50 USPQ2d 1225, 1228 (Fed.Cir.1999)* (citations omitted).

Determining infringement requires two analytical steps: before the fact-finder can compare the claimed invention to the accused device, the court must construe the claim. *See, e.g., WMS Gaming, Inc. v. International Game Tech., 184 F.3d 1339, 1346, 51 USPQ2d 1385, 1389 (Fed.Cir.1999)* ("A determination as to infringement involves a two-step analysis. First the court must construe the claims at issue."); *Abtox, Inc. v. Exitron Corp., 122 F.3d 1019, 1023, 43 USPQ2d 1545, 1547 (Fed.Cir.1997)* ("The test for patent infringement requires both proper interpretation of the claim scope and proper comparison of the claims with the accused device."); *Markman v. Westview Instruments, 52 F.3d 967, 976, 34 USPQ2d 1321, 1326 (Fed.Cir.1995)* ("An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." (citation omitted)), *aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996)*.

It is the court's "power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman, 52 F.2d at 979.* The court has a duty to construe the claims for the jury whether or not the parties formally dispute the construction of claim terms, because the court has a duty to instruct the jury as to the law governing patent infringement. *See id.* at 981.

In addition, the parties in this case disputed the scope of the second claim limitation: "disabling switch means connected in series with the ignition switch for opening said ignition circuit." Plaintiff Aureo E. Rivera testified that this limitation should be construed as covering "[a]ny means, any thing that will disable the ignition by switching." He also testified that "[w]e can use anything that can be defined as a disabling switch means.... [A]nything that you use to switch current on and off in a circuit, in the ignition circuit is a disabling switch means.... What they use falls clearly under the terms of our

claim eleven under the doctrine of equivalence [sic]." Similarly, Plaintiffs' expert Dr. Rodriguez Perazza testified that the diode used in Chapman's system "perform[ed] the function" of the disabling switch means in the Riveras' claimed invention, in that it worked in "essentially the same manner, preventing energy from flowing from the battery in the gap of the sparkplugs."

*4 On the other hand, Defendants elicited testimony from Dr. Perraza that Chapman's system did not "open" (i.e., interrupt) the ignition circuit and that therefore the accused device differed from the claimed system. Dr. Perraza explained that a diode in Chapman's device allowed some voltage to flow but prevented the electrical current from building up to a level high enough to produce a spark in the spark plug. Thus, the diode prevented sparking just as an open circuit would, even though the circuit was not "open" since some voltage flowed.

In addition, there was a dispute over whether the disabling switch means of the Chapman system was connected in series, as recited in claim 11, or in parallel, and whether the two connection methods were equivalent.

The district court did not construe the disputed claim language before sending the infringement and damages issues to the jury. The jury concluded that the accused devices infringe, although the special verdict form provides no indication whether they found the claims to be infringed literally or under the doctrine of equivalents.

A finding of infringement requires that every limitation of the claim is met by the accused product, either literally or through the doctrine of equivalents. *See Seal-Flex, 172 F.3d at 842.* We review a jury's finding of infringement for support by substantial evidence in the record. *See id.* A prerequisite for that deferential review, however, is that the jury applies the evidence to a *properly construed* claim. *See id.* In this case, the court did not construe the claim before sending the infringement issue to the jury. Thus, we have no way of knowing whether the jury's finding was supported by substantial evidence because we have no way of knowing what interpretation the jury applied to claim 11 on their way to concluding that every limitation was met by the accused devices.

In a case having similar facts, we held that "[t]he entire omission of a claim construction analysis from the opinion, and the conclusory factual findings on infringement, each provide an independent basis for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

230 F.3d 1378
230 F.3d 1378, 2000 WL 27891 (C.A.Fed. (Puerto Rico))
(Cite as: 230 F.3d 1378)

Page 4

remand." *Graco, Inc. v. Binks Mfg. Co.,* 60 F.3d 785, 791, 35 USPQ2d 1255, 1260 (Fed.Cir.1995). In *Graco,* the parties disputed whether the accused products included a "rib" within the meaning of the asserted claims. The district court found that the accused products infringed but did not discuss its construction of the claims. *See id.* This court found it necessary to remand the infringement issue because it "simply d[id] not know what claim construction the trial judge gave the terms in the claims." *Id.* Similarly here, the parties disputed whether the accused products met the "disabling switch means" limitation of the asserted claim, but the district court did not construe the claim language to enable the jury to accurately determine whether the limitation was met by the accused devices. Just as we found it necessary to remand in *Graco,* so too here the district court's failure to construe the claims requires that we vacate the jury's finding of infringement and remand for a new trial on the infringement issue and, if necessary, a new determination of damages.

*5 In view of our remand on the issue of infringement, we also vacate the jury's findings pertaining to a reasonable royalty rate for damages, the personal liability of Appellant Gabriel Guijarro, and the willfulness of the defendants' conduct, as well as the district court's enhancement of damages under 35 U.S.C. § 284.

*Evidentiary Rulings*

A. The Moore letter

Defendants proffered a letter written by patent attorney Carl E. Moore, Jr. as evidence that their infringement, if any, was not willful. The district court excluded the letter on the basis that it was obtained after litigation had begun and was therefore nothing more than a self-serving statement of litigation strategy.

Although the district court did not cite the evidentiary rule on which it relied, we understand the exclusion to have been based on Fed.R.Evid. 403. [FN3] While recognizing that the letters had some probative value, in that "[t]hey were offered to show that the defendants had been diligent in seeking the advi[c]e of counsel," the court excluded the letters from evidence because "[Y]ou don't prove that [good faith] by taking into the jury room a piece of evidence that they can use during deliberations counsel's opinion as to how it is not infringing and argument by counsel

which is what those two opinions contain." The court also noted that it considered the letters "totally prejudicial and ... totally unfair to the other party." Thus, we understand the district court to have excluded the letters from evidence based on Rule 403 because their probative value was outweighed by the danger of unfair prejudice to the plaintiffs.

> FN3. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

A district court has broad discretion to balance the probative value and prejudicial effect of evidence. " 'Only rarely-and in extraordinary circumstances-will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.' " *Williams v. Drake,* 146 F.3d 44, 47 (1st Cir.1998) (quoting *Freeman v. Package Mach., Co.,* 865 F.2d 1331, 1340 (1st Cir.1988)). [FN4] However, the court's discretion is not unfettered. "Virtually all evidence is meant to be prejudicial, and it is only unfair prejudice against which Rule 403 protects." *United States v. Marrero-Ortiz,* 160 F.3d 768, 774 (1st Cir.1998).

> FN4. Where a district court's evidentiary rulings raise procedural issues not unique to patent law, this court applies the law of the regional circuit where appeals from the district court would normally lie. *See Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1276, 51 USPQ2d 1225, 1236 (Fed.Cir.1999).

The Moore letter in question had some probative value in the jury's determination of willfulness, in that the letter provides some basis for a good-faith belief of non-infringement and/or invalidity of the Riveras' patent. However, it is significant that the letter was not obtained until February 1985, even though Asset Conservation was on notice of the Riveras' infringement allegations in December 1983. In addition, the letter was not sought out by Asset Conservation, but was prepared for Chapman and shared with Asset Conservation by Chapman's local counsel.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

230 F.3d 1378
230 F.3d 1378, 2000 WL 27891 (C.A.Fed. (Puerto Rico))
**(Cite as: 230 F.3d 1378)**

Page 5

The willfulness of allegedly infringing activity is determined as of the date the activity began or the date on which the alleged infringer became aware of the patent, whichever is later. *See Jurgens v. McKasy, 927 F.2d 1552, 1562, 18 USPQ2d 1031, 1039 (Fed.Cir.1991).* Here, Asset Conservation was aware of the Riveras' patent for over a year before receiving the Moore letter, although Defendant Guijarro consulted with an attorney soon after the Riveras accused him of patent infringement. While his choice of a non-patent specialist is not controlling, *see Underwater Devices Inc. v. Morrison-Knudsen Co., Inc., 717 F.2d 1380, 1390, 219 USPQ 569, 576 (Fed.Cir.1983),* there is no record evidence to show that this consultation provided any basis for believing that the Riveras' patent was invalid and/or not infringed. Therefore, the Moore letter is not particularly probative of Appellants' good-faith belief of non-infringement and/or invalidity at the time they became aware of the patent.

*\*6 The district court ruled that the Moore letter would be unfairly prejudicial to the plaintiffs because the letter was written by the law firm representing Chapman in the first patent infringement suit, after the suit had been filed, and therefore the letter represented "their attorneys' position on what their stand should be in that litigation." The court held that allowing such a written argument by counsel into the jury room would unfairly prejudice the other party.

We agree that the Moore letter would have been prejudicial to the Riveras. In view of the broad latitude enjoyed by district courts in the First Circuit in balancing probative value and prejudicial effect, we cannot say that this case presents the type of "extraordinary circumstances" that would call for reversal. The district court's exclusion of the Moore letter is affirmed.

### B. The summary of sales data

Defendant Iris Mieres de Guijarro testified to rebut Plaintiffs' estimate of the amount of allegedly infringing sales. Mrs. Mieres proposed to use in her testimony a summary, which she had prepared, of sales data for the relevant products in the relevant time period. The district court refused to allow her to testify from the summary because the documents on which it was based had not been properly disclosed before trial.

Summaries of voluminous writings may be used as

evidence, provided that "[t]he originals, or duplicates, [are] made available for examination or copying, or both, by other parties at reasonable time and place." Fed.R.Evid. 1006. On the scope of the "made available" requirement of Rule 1006, the First Circuit has squarely held that

[c]ommon sense dictates that this guaranteed access, designed to give the opponent the ability to check the summary's accuracy and prepare for cross-examination, must include unequivocal notice of the other party's intent to invoke Rule 1006.... Thus, to satisfy the "made available" requirement, a party seeking to use a summary under Rule 1006 must identify its exhibit as such, provide a list or description of the documents supporting the exhibit, and state when and where they may be reviewed.

*Air Safety, Inc. v. Roman Catholic Archbishop of Boston, 94 F.3d 1, 8 (1st Cir.1996).*

Appellants argue that the district court erred because the underlying documents had been produced during discovery and were present in court at the time of Mrs. Mieres' testimony. However, it is undisputed that the defendants did not identify the underlying documents before trial as forming the basis of a summary that would be used at trial. The use at trial of a summary based on the documents therefore violated the "made available" requirement as set out in *Air Safety,* and the district court properly excluded their use. *See id.*

### C. The Faust deposition

Defendants proffered the deposition testimony of their expert James H. Faust on the issue of the obviousness of the Riveras' patent. The court held that the deposition was not admissible because it did not meet the requirements of the residual hearsay exception. The court analyzed the admissibility of the Faust declaration under Fed.R.Evid. 804(b)(5), the residual hearsay exception applicable (at the time of trial) where the declarant is unavailable as a witness.

*\*7 Federal Rule of Evidence 804(b)(5) "permits the introduction of hearsay evidence, not otherwise admissible, as long as the declarant is unavailable, the evidence possesses 'circumstantial guarantees of trustworthiness,' and the trial court finds that the evidence (i) is offered to prove a material fact, (ii) is more probative on the point than other available evidence, and (iii) the interests of justice will be served." Colasanto v. Life Ins. Co. of North America, 100 F.3d 203, 213 (1st Cir.1996).* In this case, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

230 F.3d 1378
230 F.3d 1378, 2000 WL 27891 (C.A.Fed. (Puerto Rico))
**(Cite as: 230 F.3d 1378)**

Page 6

district court found that the proffered deposition testimony failed to meet both the requirement that the declarant be unavailable and the requirement that the evidence be more probative than other available evidence.

The court held that the witness had not been shown to be unavailable because no evidence was submitted to support the defendants' allegation of Mr. Faust's unavailability. In addition, the court noted that the record was silent as to when the defendants became aware that Mr. Faust would not be available to testify at trial; had they known at the time they took his deposition, that would negate his supposed unavailability.

The court also held that the deposition evidence was not particularly probative of the obviousness of the Riveras' patent, in that Mr. Faust's conclusion that the claimed invention was obvious depended on impermissible hindsight reconstruction. The court concluded that the deposition "would not provide the jurors with the information necessary to decide the issue of nonobviousness, and would only cause confusion rather than add to clarification of this difficult issue."

On appeal, Appellants assert that Mr. Faust was unavailable for "both medical and geographical reasons" but cite no case law or submitted evidence supporting their position. Appellants also assert that the Faust deposition testimony was "essential" to their invalidity defense, but do not explain *why* it was essential; i.e ., why they were unable to procure testimony from another expert in the field, particularly since Mr. Faust named five other experts who could support his testimony. Finally, Appellants make no effort to establish that the deposition was "more probative on the point for which it [was] offered than any other evidence which the proponent can procure through reasonable efforts," as required by Rule 804(b)(5). We are not convinced that the district court abused its discretion in excluding the Faust deposition, and therefore affirm the district court's ruling on this issue.[FN5]

> FN5. The Faust deposition might conceivably have been admissible under Fed.R.Evid. 804(b)(1), which allows for admission of a declarant's former testimony. However, Rule 804(b)(1) only applies if the declarant is unavailable to testify at trial. Since the district court properly held that Mr. Faust had not been shown to be

unavailable as a witness, Rule 804(b)(1) does not apply.

*Validity*

An issued U.S. patent is presumed to be valid. 35 U.S.C. § 282 (1994). The party challenging the validity of an issued patent bears the burden of proving invalidity by clear and convincing evidence. *See Monarch Knitting Mach., Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 881, 45 USPQ2d 1977, 1981 (Fed.Cir.1998). Here, Appellants submitted the following evidence to support their assertion that the Riveras' patent is invalid for anticipation and/or obviousness: (1) two U.S. patents that were filed after the effective filing date of the Riveras' patent, (2) the Faust deposition, and (3) Mr. Guijarro's testimony that he had once owned a 1962 Volvo with an alarm system of the type available at the time.

**\*8** We have already concluded that the district court correctly excluded the Faust deposition. The court was also correct in concluding that the two patents presented by the defendants were not prior art with respect to the Riveras' patent, since they had been filed after July 28, 1967, the effective filing date of the Riveras' patent. Thus, the only admissible evidence presented by the defendants to support their assertion of patent invalidity was Mr. Guijarro's testimony, to the effect that he had once owned a 1962 Volvo with an alarm system of the type available at the time. We agree with the district court that no reasonable jury could have found this to be clear and convincing evidence that the patent was anticipated or obvious. We therefore affirm the district court's holding that the Riveras' patent is as a matter of law not invalid.

*Conclusion*

We affirm the district court's holding that the '373 patent is not invalid and the court's rulings excluding from evidence the Moore letter, the Mieres summary, and the Faust deposition. We vacate the jury's findings of infringement, personal liability, and willfulness; the damage award; and the district court's enhancement of damages. We remand the case for further proceedings consistent with this opinion.

AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.

*Costs*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

230 F.3d 1378
230 F.3d 1378, 2000 WL 27891 (C.A.Fed. (Puerto Rico))
**(Cite as: 230 F.3d 1378)**

Each party to bear its own costs.

C.A.Fed.,2000.
Rivera-Davila v. Asset Conservation, Inc.
230 F.3d 1378, 2000 WL 27891 (C.A.Fed. (Puerto Rico))

Briefs and Other Related Documents (Back to top)

• 2000 WL 34467025 (Appellate Petition, Motion and Filing) United States Court of Appeals for the Federal Circuit (Mar. 11, 2000) Original Image of this Document with Appendix (PDF)
• 98-1075 (Docket) (Nov. 14, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Defendants' Motion in Limine No. 2

## DEFENDANTS' MOTION IN LIMINE TO PRECLUDE AMPEX FROM OFFERING EVIDENCE THAT IT LICENSED THE '121 PATENT TO THIRD-PARTIES

### INTRODUCTION

Ampex seeks to offer evidence of *REDACTED* agreements in which it licensed U.S. Patent No. 4,821,121 (the "'121 patent") to non-party digital camera manufacturers. The licenses, however, are not relevant to any issue in this case: (1) they are not relevant to infringement – non-party licenses have no bearing on whether the accused cameras meet the elements of the asserted claims; (2) they are not relevant to the "commercial success" of the '121 invention – the licenses are for a suite of as many as *seventy-three patents* and there is no evidence that the licensees assigned any particular value to the '121 invention; and (3) they are not relevant to the determination of a reasonable royalty

### REDACTED

Ampex apparently intends to use the licenses to suggest to the jury that, because other major digital camera manufacturers entered licenses covering the '121 patent, its infringement claims against Defendants have merit. Any such inference or suggestion would be both misleading and highly prejudicial. Because the minimal probative value of the licenses is far outweighed by the substantial prejudice to the Defendants resulting from their introduction into evidence, Ampex should be precluded from making any reference to the licenses or offering them into evidence at trial. *See* Fed. R. Evid. 403.

### FACTUAL BACKGROUND

### REDACTED

Ampex included the Ampex Licenses and related documents on its draft exhibit list.   Ampex apparently intends to use the licenses to suggest – as it has previously in this litigation – that because other digital camera manufacturers have entered licenses, Defendants should have as well.   In its interrogatory responses, for instance, Ampex asserted that Kodak was one of the only digital camera companies to not enter a license:

REDACTED

ARGUMENT

1.  **Ampex's License Agreements Are Not Relevant To Any Issue In This Case.**

    A.  **Ampex's Licenses Are Not Relevant To The Question of Whether Defendants' Digital Cameras Infringe The '121 Patent.**

The determination of whether a patent has been infringed involves a comparison between the asserted claims and the accused device or process. *Terlep v. Brinkman Corp.*, 413 F.3d 1979, 1381-82 (Fed. Cir. 2005).   Ampex's agreements to license a suite of patents including the '121 patent to *other digital camera manufacturers* have no bearing on whether *Defendants'* accused products infringe the claims of the '121 patent.   Defendants sell cameras that are different than those sold by the licensees.

REDACTED

    B.  **Evidence Of Ampex's Licenses Is Not Relevant To The Determination Of The Patent's Validity.**

Ampex is also likely to argue that the License Agreements are evidence of the '121 patent's "commercial success."   Recognizing that licensees enter licenses for many reasons unrelated to the

2

merits of a particular patent, the Federal Circuit has held that license agreements should be afforded minimal weight as evidence of a patent's commercial success. *See EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) ("[Licensing programs] sometimes succeed because they are mutually beneficial to the licensed group or because of business judgments that it is cheaper to take licenses than to defend infringement suits, or for other reasons unrelated to the nonobviousness of the licensed subject matter"); *Philips Elec. and Pharm. Indus. Corp. v. Thermal and Elec. Indus., Inc.*, 450 F.2d 1164, 1175 (3d Cir. 1971) (holding evidence of eleven licenses to be of no significance because "it is quite possible that these licensees found acquiescence less burdensome and costly than the expense and problems involved in patent litigation").

License agreements are only relevant to "commercial success" where the licensor can demonstrate a connection between the merits of the claimed invention and the licensee's rationale for entering the agreements. *In re GPAC, Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (holding that the patentee did not establish "that licensing [of the invention] arose out of recognition and acceptance of the subject matter claimed in the ... patent" and therefore did not show that "the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent.") (citation omitted). "[L]ittle weight can be attributed to such evidence if the patentee does not demonstrate 'a nexus between the merits of the invention and the licenses of record.'" *Id.*

Ampex can make no such showing here.

**REDACTED**

.  Indeed, in its statements to the Security and Exchange Commission ("SEC"), Ampex acknowledges that it does not know which, if any, of its patents are used by any of its licensees: "We do not receive information from our licensees as to which specific patents they actually use at any point in time." (Ampex's 2005 Form 10-K, at 3) (Ex. 3). Ampex also conceded in its SEC statements that it cannot determine which of its patents have been commercially successful: "[d]ue to the number of patents that we hold and the complexity of

the technology, *it is not possible for us to know with certainty which of our patents are the most significant.*" (*Id.*) (emphasis added).

### C. Evidence Of Ampex's Licensing Agreements Is Not Relevant To Damages Because The Agreements Were Reached Years After The Alleged Infringement Began.

"Reasonable royalty" damages are determined, in part, based on a hypothetical "arm's length negotiation[] between a willing licensor and a willing licensee." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983). The hypothetical negotiation is said to occur at the time the alleged infringement began. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (courts "envision the terms of a licensing agreement reached between the patentee and the infringer *at the time infringement began.*") (emphasis added); *see also Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (Fed. Cir. 1978) ("The key element in setting a reasonable royalty ... *is the necessity for return to the date when the infringement began.*") (emphasis added). Evidence relating to activities after the date alleged infringement began is not relevant to the calculation of reasonable royalty damages. *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512 (Fed. Cir. 1995) (vacating damages award because reasonable royalty analysis conducted by plaintiff's expert was "not directed to the time of infringement" and therefore irrelevant to a reasonable royalty calculation).

REDACTED

---

[1]    There is a dispute between the parties regarding when Defendants' alleged infringement began and therefore when the hypothetical negotiation would have taken place. Defendants maintain that, based on Ampex's arguments regarding Defendants' alleged infringement of the '121 patent, the alleged infringement began in 1991, when Kodak first began selling its DCS 100 digital camera. Ampex maintains that the alleged infringement began in 2000.

4

1259, 1276 (Fed. Cir. 1999) (affirming lower court's exclusion of two licensing agreements between plaintiff and third-parties reached four and five years, respectively, after the date of first infringement because "four and five years later is much, much, too late, after the financial landscape has changed remarkably in the four to five years").

## 2. Evidence Of Ampex's Licensing Of The '121 Patent Would Unfairly Prejudice Defendants.

Ampex apparently intends to use the Ampex Licenses -- as it has throughout this litigation -- to suggest that because others have agreed to license Ampex's patents, its infringement allegations against Defendants somehow have merit. (*See* Ex. 2.) ("*Indeed, other than Kodak, almost all of the remaining companies took a license by early 2005.*"). Whether other manufacturers have licensed Ampex's suite of patents, however, is entirely irrelevant to the question of whether Defendants' products practice the asserted claims. Allowing Ampex to suggest otherwise would be highly misleading to the jury. This is precisely the kind of jury confusion and unfair prejudice Rule 403 is intended to prevent. *See Fromson v. Citiplate, Inc.*, 699 F. Supp. 398, 405 (E.D.N.Y., 1988), *aff'd*, 886 F.2d 1300 (Fed. Cir. 1989) (excluding evidence of license agreements with third-parties under Rule 403 "because their probative weight was extremely limited ...").

# EXHIBIT NO. 1

# EXHIBIT NO. 1

# IS

# CONFIDENTIAL

# EXHIBIT NO. 2

# EXHIBIT NO. 2

# IS

# CONFIDENTIAL

# EXHIBIT NO. 3

10-K 1 d10k.htm FORM 10-K

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

     **For the fiscal year ended December 31, 2005**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

     **For the transition period from _____ to _____**

**Commission File No. 0-20292**

# Ampex Corporation
### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3667696** |
| **(State of incorporation)** | **(I.R.S. employer identification number)** |

**1228 Douglas Avenue**
**Redwood City, California 94063-3199**
**(Address of principal executive offices, including zip code)**

**(650) 367-2011**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

**Securities registered pursuant to Section 12(g) of the Act:**
**Class A Common Stock, par value $.01 per share**

Indicate by check mark if Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐  No ☒

Indicate by check mark if Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

     Large accelerated filer  ☐          Accelerated filer  ☒          Non-accelerated filer  ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒

EKC005044340

Table of Contents

trademark. The patents that we received as a result of designing these products are now, we believe, among the most potentially valuable to our licensing program with the manufacturers of digital video consumer products.

Digital image compression, which was developed by Ampex and by several other companies, has been a key factor making it possible to produce new generations of digital consumer imaging products at affordable prices. Products that store images without compression have remained too inefficient and expensive. Compression lowers component costs and also reduces size, power consumption and data storage requirements, which are crucial to making devices that are portable.

The adoption of digital technology in consumer markets also resulted in a technical convergence among consumer products. For example, in the analog era, still video images were captured on chemical film while motion video was captured on magnetic videotape. Today's digital products use common technologies so that digital still cameras can record motion video as well as still video images, digital video recorders can record still video images as well as motion video, and some digital cellular telephones can record and transmit both types of video images. This convergence has been important to Ampex because it has enabled us to broaden the markets that our licensing program can address. During the period that we licensed analog technology, substantially all of our royalties came from VCRs. Most of our analog VCR patents expired in 2001 and we no longer receive significant licensing revenues on these patents. In 2003 most of our royalties were from digital video camcorders. In 2004 and 2005, we continued to generate significant royalties from digital video camcorders but the majority of our licensing revenues came from digital still cameras, and we also generated royalties from DVD recorders. These are markets in which Ampex had never previously licensed its patents.

## Patents

Due to the number of patents that we hold and the complexity of the technology, it is not possible for us to know with certainty which of our patents are the most significant. However, currently it is our opinion that our most significant patents fall into the four areas described below, which are generally relevant to digital consumer imaging products. Also, it is our policy to license a portfolio of our patents in order to provide our licensees with the maximum amount of design freedom. Whether our licensees use one or several of our patents, the royalty rate is unaffected. We do not receive information from our licensees as to which specific patents they actually use at any point in time.

*Rapid image retrieval* has been responsible for the majority of the license income that we earned in 2005 and 2004 from digital still cameras. In this area we have only one patent that remains in force. This patent is used in the creation, storage and retrieval of "thumbnail" images, which allow users to select a particular picture, quickly, from a large number held in electronic storage. We believe that this patent is widely used in digital still cameras and possibly also in camera-equipped cellular telephones. The related foreign patents expired in 2004 and the US patent will expire on April 11, 2006. If we are unable to validate that our licensees utilize at least one of our other digital imaging patents discussed below, our licensing revenues from digital still cameras will cease after April 11, 2006.

*Image data shuffling* patents are used to reduce the amount of data required to transmit or record an image. These patents expire at various dates through 2013 and have been issued in the USA, France, Great Britain, Germany, Japan, Korea and Taiwan. We believe that these patents are necessary for the production of digital video camcorders because they are included in applicable technical standards. We believe it is possible that they also may be used in DVD recorders and set top cable boxes that are equipped to record video ("cable boxes"). The technology is useful in compressing either still or motion video images and we believe it is possible these patents may be used or useful in digital still cameras and possibly in camera-equipped cellular telephones.

*Feed forward quantization* patents are also useful in reducing the amount of data required to transmit or record images, principally video images. These patents expire at various dates through 2012 and have been issued in the USA, France, Great Britain, Germany, Korea and Taiwan. We believe that these patents are

3

EKC005044345

Table of Contents

necessary for the production of digital video camcorders in order to comply with applicable technical standards. We believe that these patents may be used in DVD recorders and cable boxes. We also believe that they may be used or useful now or in the future in digital still cameras and camera-equipped cellular telephones that have the capability to record still and motion video.

*High-speed data decoding* patents may be useful in any digital device that displays video. The patents expire at various dates through 2014 and are issued in the USA, Austria, France, Great Britain and Germany, and an application is pending in Japan. We are investigating the extent to which these patents may be used in many consumer digital devices but we have not yet reached a conclusion as to which products, if any, may currently infringe these patents.

**Markets and Customers**

The major product categories from which we receive royalty income at present are:

*Digital video camcorders*.    In 2005, we received recurring royalties from three manufacturers of these products totaling approximately $5.1 million. Additionally, under an agreement concluded in July 2005, Samsung Electronics, Co., Ltd. has prepaid $2.75 million to us for the right to use our patents in digital video camcorders, through 2008. Also, as a result of a prepaid licensing agreement concluded in 2004 that expires in April 2006, we do not receive current licensing income for these products from Sony. Commencing in the second quarter of 2006, Sony will be required to pay recurring royalties based on the value of its sales in countries where our patents are in force and infringed by their products. Based on market research and published financial data, we believe that Sony's sales of digital video camcorders are significantly greater than those of the licensees who pay us currently. Accordingly, we expect that, commencing in the second quarter of 2006 when Sony becomes obliged to pay royalties to us currently, our recurring royalties from digital video camcorders should increase significantly from current levels, assuming sales levels remain the same.

*Digital still cameras.*    In 2005, we received approximately $20.4 million of royalties for use of our patents in digital still cameras. Of this amount, approximately $4.5 million represents recurring royalties and approximately $15.9 million represents negotiated settlements covering past use of Ampex's patents and, in some cases, a prepayment of royalty obligations through April 11, 2006. April 11, 2006 coincides with the U.S. expiration of our rapid image retrieval patent ("121"), which is used in digital still cameras and in certain camera-equipped cellular phones. While our digital still camera license agreements permit our licensees to use our portfolio of digital imaging patents, by agreement, we are currently receiving royalties only on the '121' patent. To date, this is the only patent we have chosen to litigate. We have analyzed several digital still cameras and believe that many utilize our feed forward quantization patent. We have provided claim charts to three licensees that allege infringement of this patent and we expect to issue additional claim charts to other licensees or manufacturers during 2006 if further testing indicates that their products infringe our patents. We have scheduled additional technical and business meetings to discuss our claim charts and believe that several additional meetings will be required over the next six to nine months until we can conclusively determine whether or not our feed forward quantization patent is being used. In addition to our feed forward quantization patent, our image data shuffling and high-speed data decoding patents may be used or useful in these products but we have not done sufficient testing to support the issuance of patent claim charts on these other digital imaging patents at this time. In exchange for a favorable royalty on future product sales, certain digital still camera licensees have agreed to provide us with access to technical information in order for the parties to confirm whether any of our other digital imaging patents, including our feed forward quantization patent, are being utilized in digital still cameras and camera equipped cellular phones manufactured by or for such licensees. To date, we have entered into licenses for the use of our patents in digital still cameras with Canon Inc., Casio Computer Co. Ltd., Fuji Photo Film Co. Ltd., Funai Electric Co. Ltd., Konica Minolta Holdings, Inc., Matsushita Electric Industrial Co. Ltd., Nikon Corporation, Olympus Corporation, Pentax Corporation, Samsung Techwin Co. Ltd., Sanyo Electric Co. Ltd., Sony Corporation and Victor Company of Japan.

4

EKC005044346

# EXHIBIT NO. 4

# EXHIBIT NO. 4

# IS

# CONFIDENTIAL

Defendants' Motion in Limine No. 3

**DEFENDANTS' MOTION IN LIMINE TO PRECLUDE AMPEX FROM OFFERING
PURPORTED EXPERT TESTIMONY REGARDING WILLFULNESS**

### INTRODUCTION

In its proposed summary of its experts' testimony that is attached to the draft Pretrial Order,

Ampex Corporation ("Ampex") has made plain its intention to usurp the Court's role of instructing

the jury by attempting to offer the testimony of a lawyer about matters of patent law. Ampex intends

to offer the testimony of [1]

Equally troubling is that                         **REDACTED**


This invades the province of the jury and, therefore, is inappropriate for

expert testimony.

For the very same reasons that this Court prohibits experts to provide "legal" testimony,

Eastman Kodak Company ("Kodak") respectfully moves to preclude Ampex under Rules 403 and

702 from offering

**REDACTED**

---

[1]    *See* Ampex's Exhibit 6 to the Proposed Final Pretrial Order, Plaintiff's List of Witnesses, at 2-3
(Ex. 1.)

[2]

**REDACTED**

## ARGUMENT

1.  **Ampex Should Be Precluded From**

REDACTED

"It is black-letter law that '[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.'" *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) (quoting *United States v. Newman*, 49 F.3d 1, 7 (1st Cir. 1995)). As the *Nieves-Villanueva* Court noted: "At least seven circuit courts have held that the Federal Rules of Evidence prohibit such testimony, and we now join them as to the general rule." *Id.* Indeed, this Court expressly prohibits expert testimony on legal issues in patent cases. (*See* This Court's Guidelines: Legal Expert Testimony in Patent Cases, August 2005 ("'Expert' legal testimony (as opposed to technical testimony) on such substantive issues as invalidity (by anticipation, obviousness, on-sale bar, prior conception, etc.) and claim construction and infringement will also not be permitted, as descriptions of the law and instructions on the law are matters for the court.")).

REDACTED

Ampex should be precluded from offering this testimony because it improperly

REDACTED *See* Legal Expert Testimony in Patent Cases, August 2005; *Nieves-Villanueva*, 133 F.3d at 99; *Medtronic, Inc. v. Intermedics, Inc.*, 799 F.2d 734, 741 (Fed. Cir. 1986) (affirming exclusion of testimony where witness "would testify generally about patent law with respect to its application to this case"); *Cryovac Inc. v. Pechiney Plastic Packaging,*

*Inc.*, 430 F. Supp.2d 346, 364-65 (D. Del. 2006) (precluding expert from testifying as to legal

positions by opinion on substance of case law in contract dispute); *Revlon Consumer Prods. Corp. v.*

*L'Oreal S.A.*, 1997 WL 158281 at *3 (D. Del. 1997) (stating that expert "may not testify as to

substantive issues of patent law.") (Ex. 3).

**2.    Ampex Also Should Be Precluded From**

REDACTED

       *National Presto Industries, Inc. v. West Bend Co.*, 76 F.3d 1185, 1193 (Fed.

Cir. 1996) ("Liability for willfulness of infringement turns on considerations of intent, state of mind,

and culpability."). Expert testimony regarding a defendant's *reasonable beliefs* regarding whether a

patent is infringed or valid is not permissible. *Eolas Tech., Inc. v. Microsoft, Corp.*, 270 F. Supp.2d

997, 1008, *affirmed in part, vacated in part, remanded*, 399 F.3d 1325 (Fed. Cir. 2005) (excluding an

expert's assessment about whether Microsoft had a reasonable belief that the asserted patent would

be held invalid, unenforceable or not infringed because "[s]uch assessments of the law are the

province of this court").

    Moreover, the facts relating to the willful infringement issues in this case are well within the

understanding of the jury.

REDACTED

    The jury is capable of making that determination on its own. *Pioneer Hi-Bred International,*

*Inc. v. Ottawa Plant Food, Inc.*, 219 F.R.D. 135, 142 (N.D. Iowa 2003) (determining that an expert

could not testify as to willful infringement because it "invades the province of the jury, whose job it

---

[3]        *See* Ex. 1 at 2-3.

3

is to decide issues of credibility and to determine the weight that should be accorded evidence.").

4

# EXHIBIT NO. 1

**EXHIBIT 6 TO THE PROPOSED FINAL PRETRIAL ORDER
PLAINTIFF'S LIST OF WITNESSES**

## I.    EXPERT WITNESSES

George Ligler:  Dr. Ligler's expertise encompasses computer and
telecommunications systems (both hardware and software) including digital image processing.
The general subject matter on which Dr. Ligler is expected to testify and render opinions has
been identified in Dr. Ligler's reports, declarations and testimony, regarding technical issues
relevant to liability and damages.  Such issues include: (i) the subject matter of the '121 patent,
including its use, operation and advantages, the background and field of the '121 inventions, and
the level of skill in the art; (ii) infringement of the asserted claims of the '121 patent by the
accused Kodak digital still cameras; (iii) the validity of the claims of the '121 patent, including
that the CCA SDMA, Hell Chromocom, Scitex Response 300, or Harada patent, alone or in
combination with other references, do not render any claim of the '121 patent anticipated or the
subject matter of any claim obvious; (iv) conception and reduction to practice of the subject
matter of the claims of the '121 patent; (v) sufficiency of disclosure of the size reducer in the
'121 patent; (vi) the embodiment in the Ampex ESS-3 of the claims of the '121 patent; and (vii)
technical damages issues including absence of acceptable noninfringing alternatives and
commencement of infringement by Kodak.  As set forth in his report, Dr. Ligler will rely on the
reports of Ampex experts Stephen Gray and Kendall Dinwiddie.

Alan Cavallerano:  Mr. Cavallerano's expertise encompasses television
technology, video standards, consumer electronics, user interfaces and ergonomics.  The general
subject matter on which Mr. Cavallerano is expected to testify and render opinions has been
identified in Mr. Cavallerano's reports, declarations and testimony, regarding technical issues

relevant to liability and damages. Such issues include: (i) the subject matter of the '121 patent, including its use, operation and advantages, the background and field of the '121 inventions, and the level of skill in the art; (ii) the validity of the claims of the '121 patent, including that the Quantel Paint Box, Ampex AVA, Quantel DLS 6030, 1983 Paint Bix User Guide, alone or in combination with other references, do not render any claim of the '121 patent anticipated or the subject matter of any claim obvious; (iii) the enforceability of the '121 patent, including that the Quantel Paint Box, Ampex AVA, and Quantel DLS 6030 are at most cumulative to art cited during the prosecution of the '121 patent; (iv) sufficiency of disclosure of the size reducer in the '121 patent; and (v) technical damages issues including the importance of the '121 inventions to the marketing of the Kodak digital still cameras.

Prof. Charles G. Boncelet, Jr.: Prof. Boncelet's expertise encompasses image processing, data compression, and computer networking. The general subject matter on which Dr. Boncelet is expected to testify and render opinions has been identified in Prof. Boncelet's reports, declarations and testimony, regarding technical issues relevant to liability. Such issues include infringement of the asserted claims of the '121 patent by the accused Kodak digital still cameras.

Richard L. Donaldson: Mr. Donaldson's expertise encompasses patent licensing negotiation and strategy, patent license agreements, and standards of responsibility and due diligence that are required in the event a company becomes aware of a patent. The general subject matter on which Mr. Donaldson is expected to testify and render opinions has been identified in Mr. Donaldson's reports and testimony, regarding issues relevant to damages and willful infringement. Such issues include: (i) the amount and rationale of reasonable royalty damages, and interest, to which Ampex is entitled; and (ii) the applicable standard of care to

reasonably investigate the '121 patent, after Kodak became aware of that patent, and an assessment of whether Kodak met that standard.

Prof. Carol A. Scott: Prof. Scott's expertise encompasses marketing. The general subject matter on which Prof. Scott is expected to testify and render opinions has been identified in Prof. Scott's reports and testimony, regarding issues relevant to damages. Such issues include the market for digital still cameras, Kodak's marketing of digital still cameras, the significance of the '121 inventions to the marketing of Kodak's digital still cameras, and the effect on Kodak's sales if it were not able to use the '121 inventions.

Brian C. Dragun: Mr. Dragun's expertise encompasses accounting, economics, and the measure of damages in patent litigation. The general subject matter on which Mr. Dragun is expected to testify and render opinions has been identified in Mr. Dragun's reports and testimony, regarding issues relevant to damages. Such issues include Kodak's sales and profits, and the amount of damages and interest to which Ampex is entitled.

## II.    FACT WITNESSES

Ampex may call the following fact witnesses to trial. Unless otherwise indicated, Ampex may call the witness in person and/or by deposition.

| | |
|---|---|
| Hideki Akiyama | Gerald Mlodnosky |
| George Almeida | Thomas Napoli |
| Frank Armstrong | John O'Grady |
| Daniel Beaulier | Hiroko Ohtake |
| John Caligiuri | Kenneth Parulski |
| William Carpenter | Jeff Petrik (in person) |
| Nico Chen | Harold Regnier |
| Pamela Crocker | Gregory Roth |
| Joachim Diermann | Steve Rumsey |
| Takeshi Domen | Peter Sara |
| Michael Felix | Steve Sasson |
| Kimimori Gomi | Pierre Schaeffer |
| Mary Hadley | Philip Scott |
| John Holmes | Craig Smith |
| Thomas Hung | Marjorie Stell |

Wilbert Janson
Ming-Chin Kang
Manabu Kiri
Howard Knight (by deposition)
John Leenerts (in person)
Robert Lemen
Ted Liu
Theodore Marsh
Hiroshi Masuda
John McCommons
James McGarvey

Peter Sucy
Katsutoshi Sugano
Joel Talcott
Robert Titus (in person)
Stan Torgovitsky
Ramon Venema
Greg Westbrook
David Woods
Roy Wu
Hiroshhi Yamagata
Shinichi Yoshida
Sumito Yoshikawa

# EXHIBIT NO. 2

# EXHIBIT NO. 2

# IS

# CONFIDENTIAL

# EXHIBIT NO. 3

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 158281 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
REVLON CONSUMER PRODUCTS
CORPORATION, Plaintiff,
v.
L'ORÉAL S.A., Cosmair, Inc., Maybelline, Inc.,
and Maybelline Sales, Inc., Defendants.
Civil Action No. 96-192 MMS.

March 26, 1997.

Jack Blumenfeld, Jon E. Abramczyk, Morris,
Nichols, Arsht & Tunnell, Wilmington, DE, Daniel
J. Leffell, Elizabeth J. Holland, Douglas A.
Berman, Paul, Weiss, Rifkind, Wharton &
Garrison, New York City, John W. Behringer,
Fitzpatrick, Cella, Harper & Scinto, of Counsel, for
plaintiff.
Rudolph E. Hutz, Stanley C. Macel, III, Connolly,
Bove, Lodge & Hutz, Wilmington, DE, Norman H.
Stepno, Frederick G. Michaud, Jr., David M. Schlitz
, Ronni S. Jillions, Burns, Doane, Swecker &
Mathis, L.L.P., Alexandria, VA, Norman F. Oblon,
Richard D. Kelly, Jean-Paul Lavalleye, Frank J.
West, Oblon, Spivak, McClelland, Maier &
Neustadt, P.C., Arlington, VA, of Counsel, for
defendants.

*MEMORANDUM OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

INTRODUCTION

*1 Revlon Consumer Products Corp. ("Revlon")
filed this lawsuit against L'Oréal S.A., Cosmair Inc.,
Cosmair Canada, Inc.,[FN1] Maybelline, Inc. and
Maybelline Sales, Inc. (collectively "defendants")
alleging infringement of Revlon's patented
composition for transfer resistant lipstick. *See*
Docket Item ("D.I.") 61 (Amended Complaint).

Three defendants, Cosmair Inc., Maybelline Inc.,
and Maybelline Sales Inc., asserted a counterclaim
seeking a declaratory judgment that Revlon's patent
is invalid and they have not infringed nor induced
infringement.

> FN1. Cosmair Canada, Inc. has since been
> dismissed as a defendant. D.I. 24.

Before the Court is Revlon's motion to preclude the
testimony of defendants' patent law expert, John
Witherspoon. D.I. 147. According to his report,
Mr. Witherspoon proposes to offer opinions on a
wide range of issues, including Patent and
Trademark Office ("PTO") practice and procedure
as well as many substantive areas of patent law.[FN2]
*Id.*, Exh. A at 2. The parties agree Mr.
Witherspoon may testify as to PTO practice and
procedure. D.I. 154, at 1; D.I. 157 at 2. Revlon
asserts, however, the remainder of Mr.
Witherspoon's proposed testimony goes to topics
inappropriate for expert testimony in a patent case.
D.I. 157, at 2. In their answer to Revlon's motion,
defendants indicate other than PTO practice and
procedure, they wish only to introduce Mr.
Witherspoon's testimony on the issue of inequitable
conduct. D.I. 154, at 1. Thus, to resolve Revlon's
motion, the Court must decide whether to admit
testimony by a proffered patent law expert on the
topic of inequitable conduct.

> FN2. Specifically, these areas are: "patent
> infringement, both literal and under the
> doctrine of equivalents; principles of
> claim construction and interpretation;
> prosecution history estoppel; conditions
> for patentability, including novelty, utility
> and nonobviousness under 35 U.S.C. §§
> 101, 102 and 103; requirements for and
> purposes of patent specifications and
> claims under 35 U.S.C. § 112; the
> prohibition regarding the addition of new

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2

Not Reported in F.Supp., 1997 WL 158281 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

matter under 35 U.S.C. § 132; duties and responsibilities of an inventor, his or her attorney or agent, and others substantively involved in the preparation and prosecution of a patent application in the PTO; and the prosecution history of the patent in suit." D.I. 147, Exh. A, at 2.

DISCUSSION

I. Inequitable Conduct

Inequitable conduct has been defined by the Federal Circuit Court of Appeals as "an 'affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.' " *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.,* 103 F.3d 1538, 1549 (Fed.Cir.1997) (citation omitted); *accord Refac International, Ltd. v. Lotus Development Corp.,* 81 F.3d 1576 (Fed.Cir.1996). "Information is ' material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Refac International,* 81 F.3d at 1581.

The proponent of a claim of inequitable conduct must prove "the threshold elements of materiality and intent by clear and convincing evidence." *Micro Chemical, Inc.,* 103 F.3d at 1549. "The district court must then weigh the threshold findings of materiality and intent in light of all the circumstances to determine whether they warrant a conclusion that inequitable conduct occurred." *Id.* " A determination of inequitable conduct is committed to a district court's discretion." *Id.*

II. Expert Testimony

Defendants assert Mr. Witherspoon's testimony as to inequitable conduct may assist the trier of fact and thus is admissible under Federal Rule of Evidence 702. That rule states:
**\*2** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand

the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

Because the admission of expert testimony is a " procedural matter" not unique to patent issues, the law of the Third Circuit Court of Appeals governs this motion, as opposed to the law of the Federal Circuit. *Panduit Corp. v. All States Plastic Manufacturing Co.,* 744 F.2d 1564, 1574-75 (Fed.Cir.1984); *accord National Presto Industries, Inc. v. The West Bend Co.,* 76 F.3d 1185, 1188 n. 2 (Fed.Cir.1996).

The decision whether to admit expert testimony is committed to the discretion of the district court. *United States v. Velasquez,* 64 F.3d 844, 847-48 (3d Cir.1995). As might be gleaned from the rule, several bases exist for excluding expert testimony. They are: "(1) if the testimony will not assist the trier of fact; (2) if scientific [or technical or other specialized] evidence is not sufficiently reliable; and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors. " *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1238 (3d Cir.1993); *see also Holbrook v. Lykes Bros. Steamship Co., Inc.,* 80 F.3d 777, 781 (3d Cir.1996)
.

The Third Circuit Court of Appeals has adopted a broad interpretation of Rule 702; close calls on the admission of expert testimony are to be resolved in favor of admissibility. *Dunn v. Hovic,* 1 F.3d 1362, 1367 (3d Cir.1993). However, "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury...." *United States v. Leo,* 941 F.2d 181, 196 (3d Cir.1991). As relevant to Revlon's motion, Mr. Witherspoon's testimony will be inadmissible either if it is not helpful to the trier of fact, or if it constitutes impermissible testimony before the jury as to the governing law.

Defendants have not provided the details of Mr. Witherspoon's proposed testimony on inequitable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 3

Not Reported in F.Supp., 1997 WL 158281 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

conduct, beyond the sentence: "Defendants request that Mr. Witherspoon be allowed to testify as to the inequitable conduct issue if the Court determines that Mr. Witherspoon's testimony as a legal expert would assist in its determination." D.I. 154, at 2. Defendants' answer to Revlon's motion places into issue the currently unsettled question of whether, in this case, the judge or the jury will act as fact-finder on the issue of inequitable conduct.

With respect to that question, the Federal Circuit recently explained:
There are a variety of ways in which the district court may choose to handle the issue of inequitable conduct during a jury trial. .... Some courts have reserved the entire issue of inequitable conduct unto themselves; some have submitted special interrogatories to the jury on the facts of materiality and intent; and some have instructed the jury to find and weigh the facts of materiality and intent and decide the ultimate question of inequitable conduct.... Absent a clear showing of prejudice, or failure to achieve a fair trial, the district court's choice of procedure will not be disturbed.

*3 *Hebert v. Lisle Corp.,* 99 F.3d 1109, 1114 (Fed.Cir.1996). The court noted in the last instance the parties agreed to submit the entire issue of inequitable conduct to the jury. *Id.*

Failing to achieve similar agreement of the parties in the present case, the Court will opt to submit to the jury special interrogatories on the facts of materiality and intent. The Court will then weigh the findings on these two elements "in light of all the circumstances," and decide the ultimate question of inequitable conduct. *See Micro Chemical, Inc.,* 103 F.3d at 1549; *see also Akzo N.V. v. U.S. International Trade Commission,* 808 F.2d 1471, 1481-82 (Fed.Cir.1986) ("Materiality and intent must ... be considered together: the more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct.")

As the determination of the Court consists of a ' weighing' of the factual findings on materiality and intent, and then a determination in light of all the circumstances whether inequitable conduct

occurred, *see Micro Chemical. Inc.,* 103 F.3d at 1549, it follows that the jury will act as the sole fact-finder on the issue of inequitable conduct. The Court therefore cannot permit Mr. Witherspoon to testify as an expert on inequitable conduct; to do otherwise would usurp the respective functions of the jury and the Court. [FN3]

> FN3. The Federal Circuit recently noted one of the hazards of permitting expert testimony on patent law:
> We take note of the extent to which ... incorrect law was announced by a patent law expert witness. We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts ... markedly incorrect law.
> *Hebert,* 99 F.3d at 1117.

In accordance with the other cases in this District, the Court holds defendants' expert John Witherspoon may testify only as to matters of PTO practice and procedure. *See Lucas Aerospace, Ltd. v. Unison Industries, L.P.,* No. 93-525 (D.Del. March, 9, 1995); *General Battery Corp. v. Gould, Inc.,* 545 F.Supp. 731, 758 n. 30 (D.Del.1982); *see also Thorn EMI North America Inc. v. Micron Technology, Inc.* No. 92-673 (D.Del. Nov.23, 1993) (McKelvie, J.) (hearing transcript); *The Read Corporation v. Portec, Inc.,* No. 88-29 (D.Del. March 9, 1990) (Roth, J.) (hearing transcript); *RCA Corp. v. Data General Corp.,* No. 84-270 (D.Del. Dec. 17, 1986) (Farnan, J.) (hearing transcript); Guidelines: Legal Expert Testimony in Patent Cases (Robinson, J.).[FN4] Mr. Witherspoon may not testify as to substantive issues of patent law, including inequitable conduct. For purposes of clarity, it is noted this holding precludes, among other things, Mr. Witherspoon's proposed testimony regarding the "duties and responsibilities of an inventor, his or her attorney or agent, and others substantively involved in the preparation and prosecution of a patent application in the PTO...." D.I. 147, Exh. A, at 2.

> FN4. While this rule regarding patent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 4

Not Reported in F.Supp., 1997 WL 158281 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

      experts is followed in this District, it is not
      uniform throughout the country. Several
      Federal Circuit cases refer, in passing, to
      expert testimony that was permitted on the
      topic of inequitable conduct, *see Hebert,*
      99 F.3d at 1115; *Kingsdown Medical*
      *Consultants Ltd. v. Hollister, Inc.,* 863
      F.2d 867, 872 (Fed.Cir.1988).

An order will issue consistent with this opinion.

D.Del.,1997.
Revlon Consumer Products Corp. v. L'Oreal S.A.
Not Reported in F.Supp., 1997 WL 158281 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:96cv00192 (Docket) (Apr. 12, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Defendants' Motion in Limine No. 4

## DEFENDANTS' MOTION IN LIMINE TO EXCLUDE MISREPRESENTATIONS ABOUT THE ACCUSED CAMERAS' PREVIEW FUNCTION

### INTRODUCTION

Pursuant to Federal Rule of Evidence 403, defendants submit this motion *in limine* to preclude Ampex from suggesting, through a live demonstration, attorney argument or otherwise, that when an operator pushes the shutter button in the Still Picture mode of the accused cameras, the cameras capture one frame of streaming video generated in the cameras' Preview mode. In an attempt to show that the Kodak cameras operate in the same manner as the electronic still store system of the '121 patent, Ampex has repeatedly attempted to suggest that when the defendants' digital cameras capture an image, they are actually capturing one frame of a stream of video generated in Preview mode.

It is undisputed that the cameras do not function in this way. Indeed, Ampex has never *expressly* argued that the cameras capture an image from a stream of video in the Preview mode because it cannot:

REDACTED

Ampex should not be permitted to suggest what it knows to be untrue. Demonstrations or argument from Ampex suggesting the cameras operate in a way they undeniably do not is not probative of the issues before the Court and will mislead and confuse the jury. Pursuant to Rule 403, Ampex should be precluded from suggesting that the accused cameras operate like electronic still stores by capturing one frame of streaming video generated in the cameras' Preview mode.

## FACTUAL BACKGROUND

The asserted patent, U.S. Patent No. 4,821,121 (the "'121 patent") is directed "to a digital electronic still store for broadcast television signals...." ('121 patent, 1:11-14.) At the time of the claimed invention, those in the television industry used electronic still stores to capture single "frames" of streaming video received from an analog television signal. The still store then could digitize the captured frame (to the extent not already digitized) and store the resulting data in memory. (*Id.*, 1:15-17.)

Ampex alleges that more than forty Kodak digital still camera models infringe claims 7, 8, and 10-15 of the '121 patent. None of the accused Kodak cameras accept or capture image data from an "electronic still store system, a TV camera, or some other source of video data." (*See id.*, 2:65-68.)

REDACTED

The cameras have a Preview mode for "previewing" the scene to be photographed.

REDACTED

---

[1]    Pursuant to the Administrative Law Judge's Order during the ITC action, the parties were required to submit direct testimony in written format.

2

REDACTED

Notwithstanding the undisputed fact that the accused cameras do not capture a single frame from a stream of video in Preview mode, Ampex has repeatedly attempted to suggest that is how the cameras operate. At the technology tutorial on January 14, 2006 and the *Markman* hearing on July 13, 2006, Ampex likened the Kodak digital camera to a "small TV" camera. (*See* Trans. of Tutorial (1/12/06), at 9.) First, Ampex used an accused camera to demonstrate that, as the operator moves the camera around prior to taking a photograph, the camera displays a stream of video. Ampex then suggested that as the camera captured a photograph, it was freezing *one of those* preview images. (Trans. of Tutorial, at 9; Trans. of *Markman* Hearing (7/13/06), at 20-22 ("You may recall from the tutorial that I showed how, when I'm going to take a picture, I'm viewing the real world, and it's a motion video. And when I press the button, it's a still video, a still video image. ... The Kodak camera is simply a miniaturized still store combined with a TV camera that switches modes between motion video and still video.")

In its summary judgment briefing, Ampex similarly suggested that when a user presses the shutter, while in Still Picture mode, the accused cameras "freeze" the streaming "preview" image displayed on the LCD and store that same frozen image to the SD/MMC card. (*See* D.I. 366, at 23

3

("[In] normal picture taking mode [] a series of related images are first displayed in preview, and then one image is captured in response to the user pressing the shutter button...").)

## ARGUMENT

Pursuant to Federal Rule of Evidence 403, Ampex should be precluded from suggesting that when the accused cameras take a photograph in Still Picture mode, the cameras capture one frame of a stream of video generated in the cameras' Preview mode. Under Rule 403, a district court may exclude relevant evidence if the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403. Rule 403 requires that the district court engage in a balancing analysis. *See Coleman v. Home Depot*, 306 F.3d 1333, 1344 (3rd Cir. 2002). The Third Circuit has explained that "[i]n balancing, 'the proper equation places on one side the maximum reasonable probative force for the offered evidence,' while 'the other side of the equation should include the likely prejudicial impact of the evidence.'" *Id.* (quoting *Federal Rules of Evidence Manual* 242 (Stephen A. Saltzburg et al. eds., 7th ed. 1998)). In this case, any demonstration or commentary about the functioning of the cameras during Preview mode has no probative value, and the danger of misleading and confusing the jury is substantial.

First, Ampex does not accuse the Preview mode of infringement. The central issue is whether the accused digital cameras infringe the '121 patent when operated in Still Picture mode. Ampex has never asserted infringement based on the Preview mode of any of the accused cameras. Ampex's expert similarly has not opined that any of the accused cameras infringe when operated in Preview mode.

REDACTED

4

REDACTED

Ampex's demonstrations of the Preview mode, on the other hand, are likely to significantly confuse and mislead the jury. Ampex's '121 patent is directed to an electronic still store system that captures and stores a single "frame" of streaming video. By showing the moving images on the LCD screen in the Preview mode and then displaying a captured still image which, to the casual observer, looks very similar to the last of the moving Preview images, Ampex seeks to create the impression that the Kodak digital cameras capture a single frame from streaming video, just like the electronic still store of the '121 patent. It is undisputed that they do not.

Given the absence of any probative value of evidence regarding Preview mode, and the highly misleading nature of Ampex's "demonstrations," such demonstrations should not be permitted. Pursuant to Rule 403, Ampex should be precluded from demonstrating the operation of the cameras in the Preview mode and from suggesting that when the cameras capture a still photograph, the cameras operate like an electronic still store and freeze one of the series of images displayed in Preview mode.

5