# EXHIBIT 11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AMPEX CORPORATION, | C.A. No. 04-1373 (KAJ) |
| *Plaintiff,* | |
| v. | **PLAINTIFF AMPEX CORPORATION'S OPPOSITIONS TO DEFENDANT KODAK'S MOTIONS IN LIMINE NOS. 1-4** |
| EASTMAN KODAK COMPANY, ALTEK CORPORATION, and CHINON INDUSTRIES, INC., | **NON CONFIDENTIAL VERSION** |
| *Defendants.* | |

Jack B. Blumenfeld (#1014)
Julie Heaney (#3052)
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19899-1347
(302) 575-7291

Jesse J. Jenner
Sasha G. Rao
Ropes & Gray LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Norman H. Beamer
Gabrielle E. Higgins
Ropes & Gray LLP
525 University Avenue
Palo Alto, California 94301
(650) 617-4000

James E. Hopenfeld
Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Washington, DC 20005

*Attorneys for Plaintiff,*
*Ampex Corporation*

October 13, 2006

# TABLE OF CONTENTS

I.    AMPEX'S OPPOSITION TO KODAK'S MOTION IN LIMINE # 1 – TO
      EXCLUDE EVIDENCE RELATING TO THE '107 AND '831 PATENTS ........1

II.   AMPEX'S OPPOSITION TO KODAK'S MOTION IN LIMINE # 2 – TO
      PRECLUDE AMPEX FROM OFFERING EVIDENCE OF LICENSES OF '121
      PATENT............................................................................................................6

III.  AMPEX'S OPPOSITION TO KODAK'S MOTION IN LIMINE # 3 – TO
      PRECLUDE AMPEX FROM OFFERING PURPORTED EXPERT TESTIMONY
      REGARDING WILLFULNESS .........................................................................12

IV.   AMPEX'S OPPOSITION TO KODAK'S MOTION IN LIMINE # 4 – TO
      PRECLUDE "MISREPRESENTATIONS" ABOUT THE ACCUSED CAMERAS'
      PREVIEW FUNCTION ......................................................................................15

## TABLE OF ABBREVIATIONS

| **Abbreviation** | **Item Referred To** |
|---|---|
| Ampex | Ampex Corporation |
| Kodak | Eastman Kodak Company Altek Corporation, and Chinon Industries, Inc. |
| '121 Patent | U.S. Patent No. 4,821,121 |
| ITC | International Trade Commission |

I.    **AMPEX'S OPPOSITION TO KODAK'S MOTION IN LIMINE # 1 – TO EXCLUDE EVIDENCE RELATING TO THE '107 AND '831 PATENTS**

Ampex opposes Kodak's motion in limine to exclude Kodak's U.S. Patent Nos. 5,016,107 (the '107 patent) and 5,164,831 (the '831 patent). The '831 patent in particular -- and the statements made by Kodak's inventors and licensing agents about that patent -- is highly probative of several issues in this case, including damages and nonobviousness. While Kodak has not articulated any unfair prejudice that would result from their admission at trial, Ampex would be unduly prejudiced by the exclusion Kodak seeks. Kodak may disagree with Ampex about the weight these patents should be accorded in resolving the issues between the parties, but that is an issue for the jury to decide.

A.    **The '831 Patent Is Relevant At Least To Damages And Nonobviousness**

Both the '107 and '831 patents -- and the '831 patent in particular -- are relevant to show that the numerous licenses Kodak has granted under these patents relate to comparable technology. These licenses are probative of a reasonable royalty to the extent they relate to comparable technology under *Georgia-Pacific* factor number 2. See *Am. Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459, 462 (Fed. Cir. 1985) (indicating that royalties generated by persons other than the patentee for comparable patents are relevant and helpful to determining reasonable royalty); *see also State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1581 (Fed. Cir. 1989) (relying on patents on competing products to help assess reasonable royalty). In footnote 1 of its motion, Kodak agrees that these licenses may be admitted into evidence, but Kodak apparently does not acknowledge that its licenses cover comparable subject matter. As a result, the '831 and '107 patents themselves are highly relevant to the determination of a reasonable royalty

1

for the '121 patent. It makes no sense to admit the licenses into evidence and then bar Ampex from demonstrating that the subject matter of the licenses is closely related to the '121 patent.

Moreover, the '831 patent is relevant to the issue of damages to the extent it is probative of the value of a fast browse feature to digital still cameras and to Kodak in particular. For example, contrary to Kodak's claim on page 2 of its motion, the '831 patent expressly highlights the value of a fast browse feature, which is also an object of the '121 patent. *See, e.g.*, '831 patent, Column 2, lines 31-32 ("Since the thumbnail image is easily and quickly accessed, reviewing and display is extremely fast."); *id.* at Column 7, lines 47-50 ("for a plural number of images, the corresponding 'thumbnail' images can be quickly accessed and displayed either in a mosaic frame or in sequence").

███████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

Additionally, the '831 patent is relevant to prove, as an objective indicia of nonobviousness, Kodak's belief in the value of the '121 patent invention. *See Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1580 (Fed. Cir. 1997) ("the record supplies objective evidence of nonobviousness, including [the infringer's] recognition of the importance of this invention"); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983) ("[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record.").

Kodak denies these points of relevance by asserting that the '121 patent and '831 and '107 are not related or comparable technologies. Nothing could be further from the truth.[1] The '831 patent attempts to solve the same problem and achieve the same benefits as the '121 patent. Like Ampex's '121 patent, Kodak's '831 patent relates to the storage and rapid retrieval of digital images. It discloses almost the exact same technology as the '121 patent as a solution to almost the exact same problem. For example, claim 1 of the '831 patent in principal part claims features, at least at the functional level, that are found in the '121 patent, plus the use of a single "multi-format" image file for the storage of the '121 patent's full size image and corresponding reduced size images. While other claims of the '831 patent recite additional subject matter (directed to the use of the multi-format image file) not disclosed in the '121 patent, a close relationship between the two patents certainly exists. Indeed, this close relationship

_____

[1]  Kodak's arguments that the subject matter of the '107 and '831 patents is unrelated to the '121 patent are undercut by the '831 and '107 patents themselves:

- "[The image] is written into the image buffer 18 during a standard rate, which may ... correspond to a *standard video field or frame rate*." ('107, 4:48-50; *see also* '831, 4:36-38).

- "[I]t is well known and understood in the *field of still video recording* that a digital still camera should provide a continuous shooting capability for a successive sequence of images . . . in effect allowing a series of images to 'stack up' at *video rates*." ('107, 4:67-5:5; *see also* '831, 4:49-50).

- "The uncompressed *still video data* . . . is organized in the manner of a *television picture* . . . ." ('107, 6:52-54).

- "[A] block of signals including at least a portion of the image signals comprising a *video frame* must be available." ('831, 4:21-23).

- "*still video image*" ('831, 5:19-20).

- "*video data*" ('831, 5:60).

is further confirmed by both patents' statements concerning the fast browse feature. ■

███████████████████████████████████

In the end, however, the Court need not determine whether the '121 patent and the '831 and '107 patents disclose identical subject matter -- the patents do not need to be identical to be relevant. *See, e.g.*, *Am. Original*, 774 F.2d at 462 (royalties generated by persons other than the patentee for *comparable* patents are relevant and helpful to determining reasonable royalty).

**B.    Exclusion Of The '107 And '831 Patents Would Prejudice Ampex**

Kodak argues that allowing evidence relating to the '107 and '831 patents would be prejudicial. But what Kodak identifies as prejudice is not prejudice at all: it is just evidence that is damaging to Kodak.

Kodak argues, for example, that the jury could be "misled into the inaccurate belief that Kodak sought to patent the claimed '121 patent technology, it could be left with the mistaken impression that the '121 patent has merit and value." But if Kodak would argue to the jury that the '121 patent, and its technology for allowing a fast browse feature, has no merit and value, Ampex should be allowed to present evidence that contradicts that argument. That includes evidence relating to the '831 patent, because Kodak cannot consistently argue that the '121 patent has no merit in the face of that evidence. Kodak cannot argue that improvements in digital image storage and retrieval are not valuable when Kodak took the exact opposite position when licensing the '831 patent. █████████████████████████████████

██████████████████████████████████████

███████████████████████████████

4

████████████████████████████████████████████

████████████████████████████████

Kodak is, in short, seeking to exclude the '107 and '831 patents so that it will be free to take inconsistent positions without bearing the risk that Ampex will expose those inconsistencies to the jury. Exclusion would unduly prejudice Ampex.

Kodak also claims that the jury could be confused about the import of the Kodak patents. Kodak is free, however, to argue to the jury what its position on the importance of the '107 and '831 patents is. Kodak does not explain how or why it would not be able to alleviate any alleged "confusion."

Moreover, contrary to Kodak's assertions, there is no real risk of "side issues" or "detours" here because: (1) the '831 patent goes to the heart of the central issues of damages and nonobviousness; ████████████████████████████

████████████████████████████████████████████

████████████████████████████ Unlike *Glaros v. H. H. Robertson Co.*, 797 F.2d 1564, 1572 (Fed. Cir. 1986), and *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1117-18 (8th Cir. 1999), the evidence relating to the '831 patent does not involve prior lawsuits, patent applications, or declarations, each of which presumably would have required the introduction of large volumes of paper for the finder of fact to consider. Nor does Ampex seek to introduce the '831 patent as "attorney argument." *Rivera-Davila v. Asset Conservation, Inc.*, 230 F.3d 1378 (Fed. Cir. 2000).

## C.    Conclusion

For the foregoing reasons, Ampex respectfully requests that Kodak's motion-in-limine to exclude the '107 and '831 patents be denied.

5

## II.    AMPEX'S OPPOSITION TO KODAK'S MOTION IN LIMINE # 2 – TO PRECLUDE AMPEX FROM OFFERING EVIDENCE OF LICENSES OF '121 PATENT

Ampex opposes Kodak's motion in limine to preclude Ampex from offering

evidence of ███████████████████████████

███████████████████████████████████████████

███████████████████████    Their admission would not cause unfair prejudice to Kodak.

The concerns Kodak raises relate to evidentiary weight, not admissibility.

### A.    Ampex's Licenses Are Relevant To Reasonable Royalty

The royalties Ampex has received for the patent-in-suit are relevant to the

reasonable royalty analysis under the first *Georgia-Pacific* factor.  A███████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

In *Studiengesellschaft Kohle v. Dart Indus., Inc.*, 862 F.2d 1564 (Fed. Cir. 1988),

the Federal Circuit held that admission of a license executed *ten years* after the

hypothetical negotiation date was not error, stating that there is no rule that all post-

infringement evidence is irrelevant to a reasonable royalty calculation.  The Court

explained (862 F.2d at 1571-72) (citation omitted):

> "The [hypothetical negotiations] methodology encompasses . . . flexibility
> because it speaks of negotiations as of the time infringement began, yet
> permits and often requires a court to look to events and facts that occurred
> thereafter and that could not have been known to or predicted by the
> hypothetical negotiators."

The cases Kodak cites are not applicable to the present case.  Contrary to what

Kodak suggests, *Unisplay* did not hold that evidence relating to post-negotiation date

6

activities is irrelevant.  In *Unisplay*, the court vacated the damages award because the patentee's expert testified as to what he believed the royalty rate would be as of the date of *trial*, not as of the hypothetical negotiation date.  *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 518 (Fed. Cir. 1995).  ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

     Kodak's reliance on *Odetics* is also unavailing.  In *Odetics* there was a "remarkable" change in the technology and the "financial landscape" at issue between the hypothetical negotiation date and the execution date of the licenses.  *Odetics, Inc. v. Storage Tech Corp.*, 185 F.3d 1259, 1276-77 (Fed. Cir. 1999).  Kodak has not even argued that the "financial landscape" has changed, let alone "remarkably," or produced any evidence to support such an argument.  In addition, in *Odetics* the agreements were too late because they were *negotiated* four and five years after the date of first infringement.  *Id.*  ██████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

     The weight accorded to Ampex's licenses is for the jury to determine.  Kodak will be able to introduce rebuttal evidence and testimony, and to cross examine Ampex's

witnesses.  The licenses are relevant to the reasonable royalty analysis and should not be excluded.

**B.    Ampex's Licenses Are Relevant To Commercial Success**

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████    That argument speaks to weight, not admissibility.  ████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

████████████████

The statements Kodak cites from Ampex's SEC reports do not contradict Mr. Talcott's testimony. They are general statements about the entirety of Ampex's patent portfolio, not the particular licenses at issue or the importance of the '121 patent to them. In any event, Kodak will be able to cross-examine Mr. Talcott with these reports.

It is well-established that licenses of the patent-in-suit can prove commercial success. *See Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed. Cir. 2004) (holding that extensive licensing supports nonobviousness); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1360 (Fed. Cir. 1999) (holding that evidence of several licenses and millions of dollars in royalties were strong indicia that the patent is not obvious); *Solarex Corp. v. Arco Solar, Inc.*, 805 F. Supp. 252, 284 (D. Del. 1992).

Furthermore, the cases Kodak cites do not hold that licenses may not be admitted into evidence. They only discuss, *in dicta*, the licenses' evidentiary weight. In *EWP Corp.*, the court did not hold as a general rule that license agreements should be afforded minimal weight as evidence of a patent's commercial success. It stated that "[s]uch a 'secondary consideration' must be carefully appraised as to its evidentiary value." *EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 908 (Fed. Cir. 1985). *Philips Electronic*, in addition to only discussing the evidentiary value of the licenses of the patent-in-suit, is also factually distinguishable. The court noted that "[t]here do not appear to be any major companies in this group [of licensees]." *Philip Elec. & Pharm. Indus. Corp. v. Thermal & and Elec. Indus., Inc.*, 450 F.2d 1164, 1175 (Fed. Cir. 1971). ████████

9

[REDACTED]

[REDACTED]

To the extent there is a nexus requirement, whether a nexus exists is a question for the jury. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1080 (N.D. Cal. 2006) (holding that licensee's unknown motivation for seeking a license under the patent-in-suit was for the jury to weigh). Preclusion of Ampex's licenses is not appropriate.

**C.    There Is No Unfair Prejudice To Kodak.**

Kodak's only support for its claim that Ampex's licenses will cause unfair prejudice is its speculation that Ampex will use these licenses to suggest that Ampex's infringement allegations have merit. [REDACTED]

[REDACTED]

███████████████████████████ Kodak wants to be able to use the less

probative licenses that help its case, while denying Ampex the use of more probative

licenses that hurt Kodak.  Kodak is trying to have it both ways.

Under the circumstances, the Court should deny Kodak's motion to preclude

Ampex from offering evidence that it licensed the '121 patent to third-parties.

11

**III.    AMPEX'S OPPOSITION TO KODAK'S MOTION IN LIMINE # 3 – TO
PRECLUDE AMPEX FROM OFFERING PURPORTED EXPERT
TESTIMONY REGARDING WILLFULNESS**

Ampex opposes Kodak's motion in limine to exclude the testimony of

Mr. Richard Donaldson regarding the standard of care and behavior when a corporation is

put on notice of the patent rights of another.  There does not appear to be any dispute

about Mr. Donaldson's qualifications to testify about the standard of care.

Mr. Donaldson is a former Texas Instruments Senior Vice President and General Patent

Counsel.  He has extensive experience directing Texas Instruments' procedures and

practices following an allegation of patent infringement.  Mr. Donaldson's testimony

will, accordingly, assist the trier of fact in determining whether or not Kodak met the

standard of care when Kodak was put on notice of Ampex's '121 patent.

Ampex expects to offer Mr. Donaldson's testimony regarding: (1) what a

corporation was required to do to satisfy its duty of care to avoid infringement upon

notice of another's patent rights; (2) what large corporations such as Texas Instruments

did to meet that standard on a regular basis; and (3) whether Kodak's investigation would

have met the standard.  Mr. Donaldson will not testify about the broader legal standard

for willfulness.  He will not discuss the case law or indeed any abstract legal principles

beyond articulating his understanding of the duty of care.  Nor will Mr. Donaldson testify

about Kodak's intent, motive, state of mind, or how the evidence can be used to evaluate

these factors.

Ampex is mindful of this Court's decision in *Oxford Gene Tech., Ltd. v. Mergen,
Ltd.*, 345 F. Supp. 2d 431 (D. Del. 2004), in which this Court held that a qualified expert

may testify as to the standard of care, but not as to whether an alleged willful infringer

has met that standard of care.[2] Ampex submits that, at least on the facts of this case, there are compelling reasons why Mr. Donaldson should be allowed to testify not only what the standard of care is and how companies met that standard, but also whether Kodak's practice in this case would have met the standard.

Should Mr. Donaldson be prevented from assessing whether Kodak's practice in this case would have met the standards applied by reasonably prudent corporations, Ampex will be forced to be put most of its proofs relating to Kodak's conduct, and whether that conduct was reasonable, through Kodak's own witnesses. Ampex will, in effect, be limited to eliciting its proofs of the reasonableness of Kodak's conduct through cross-examination.

Given that Kodak is a well-known brand and company, Ampex will have a greater burden in cross-examination than it would in an ordinary case, such as the *Mergen* case, in which the accused infringer was not a household name. Allowing Mr. Donaldson to testify as to whether Kodak's practice in this case would have comported with the practices and procedures that reasonably prudent corporations put into place will help to right the scales.

Allowing Mr. Donaldson to apply the standard of care to Kodak's practice in this case is consistent with Federal Circuit precedent approving such testimony. S*ee In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527, 1543 (Fed. Cir. 1992) ("Mr. Enlow, Hayes' expert witness, testified in detail that the [opinion] letter did not give Ven-Tel a reasonable basis for believing in good faith that the '302 patent was invalid."); *Studiengesellschaft Kohle*, 862 F.2d at 1577 ("The master accepted the

---

[2] Kodak does not address this case in their motion papers.

13

assessment of SGK's expert, Marvin Soffen, of the nature of Valles' [noninfringement] opinions."). It is also consistent with jurors' expectations. Jurors are accustomed, for example, to hearing medical doctors testify not only as to what the standard of care is for treating a patient, but also whether medical institutions have met that standard of care in a particular case. If Mr. Donaldson can testify only as to the standard, but not its application, the jury may infer that Mr. Donaldson would have concluded that Kodak met the standard of care, even though his views may be otherwise.

This is not a case, moreover, where the fact that Mr. Donaldson is a lawyer would warrant circumscribing his testimony to be more limited than the testimonies of doctors, mechanics, and other skilled artisans when they apply the standards appropriate to their profession. Mr. Donaldson will not testify as to what the legal standard for willful infringement is, or what the case law says. He will not testify as to Kodak's state of mind or intent, or explain how the evidence relates to either of them. He will not, in short, be an advocate.

Ampex accordingly and respectfully requests that this Court either distinguish *Mergen* or reconsider its holding as it applies to the application of the standard of care only, deny Kodak's motion in its entirety, and allow Mr. Donaldson to testify as to whether Kodak's behavior met the standard of care. In the alternative, Ampex requests that the Court deny Kodak's motion to the extent it would forbid Mr. Donaldson from testifying about the standard of care consistent with this Court's holding in *Mergen*.

IV.    **AMPEX'S OPPOSITION TO KODAK'S MOTION IN LIMINE # 4 – TO PRECLUDE "MISREPRESENTATIONS" ABOUT THE ACCUSED CAMERAS' PREVIEW FUNCTION**

Ampex opposes Kodak's motion in limine ("Kodak's Motion," or "K.M.") to preclude Ampex, under the guise of Fed. R. Evid. 403, ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Kodak's Motion is a transparent attempt to prevent Ampex from presenting highly probative, technical descriptions of the operation of the accused cameras that are directly relevant to (1) the issue of infringement under the doctrine of equivalents, as well as (2) rebutting non-infringement positions taken by Kodak. Balanced against the probative value of this evidence, Kodak offers nothing more than the assertion that a jury may be "confused" into understanding how the accused cameras actually operate, and accepting Ampex's infringement positions based on those facts.

A.    **Statement Of Facts**

The '121 patent is entitled "Electronic Still Store With High Speed Sorting And Method Of Operation, and is "directed . . . more to a still store providing a high speed multi-image scan or sort capability." '121 patent, 1:12-14. Electronic still stores were used in various applications, including those outside the broadcast television industry, to store electronic images for later use and display. D.I. 366, p. 7; D.I. 310, ¶¶ 27-28; D.I. 300, pp. 17-19. Such still stores could capture such electronic images from various sources, including "another electronic still store system, a TV camera, or some other source of video data." '121 patent, 2:65-3:1.

The process of capturing an image using an electronic still store, such as in the disclosed embodiments of the '121 patent, involves several steps. In a "preview" type of operation, image data temporarily stored in a framestore is displayed on a monitor. If the signal input to the still store system is a live video feed (as opposed to a single image frame), the contents of the framestore are continuously overwritten (i.e., discarded) until the user chooses to freeze a particular image from the live feed, thereby interrupting the preview operation. At that point, in

15

response to an appropriate user command, the system causes the image in the framestore to be stored onto a disc store. D.I. 366, pp. 7-8; D.I. 370, ¶ 14. This operation of electronic still stores is what Kodak refers to as capturing "a single image frame of streaming video." *See* K.M. p. 2, 5.



D.I. 366, pp. 11-12, 20-22; D.I. 370, ¶¶ 14, 28-31; see AD9991 Datasheet (Exhibit 11.G) p. 31.

Kodak's own user's guides refer to this operation not as separate modes, but collectively as a "picture taking" mode or "general picture taking" mode. DX7630 Guide (Exhibit 11.H), pp. 8-9, 11.

**B.      Argument**

Evidence that is otherwise relevant and admissible may only be excluded if the probative

value of the evidence is substantially outweighed by its prejudicial effect. Fed. R. Evid. 403;

*United States v. Universal Rehabilitation Servs. (PA), Inc.*, 205 F.3d 657, 664 (3d. Cir. 2000).

"There is a strong presumption that relevant evidence should be admitted, and exclusion under

Rule 403 mandates that the probative value of evidence must be 'substantially outweighed' by the

problems in admitting it." *Missimer v. Tiger Mach. Co.,* No. Civ. A 04-3443, 2005 WL 2396934,

at *2 (E.D. Pa. Sept. 26, 2005), *citing Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343-44 (3d

Cir. 2002). Indeed, "a number of courts have held that Federal Rule 403 creates a presumption of

admissibility, and that district courts may utilize the rule only rarely to cause the exclusion of

evidence." *Universal*, 205 F.3d at 664. "'[P]rejudice does not simply mean damage to the

opponent's cause.' If it did, most relevant evidence would be deemed 'prejudicial.' However,

the fact that probative evidence helps one side prove its case obviously is not grounds for

excluding it under Rule 403." *Goodman v. Pa. Turnpike Co.*, 293 F.3d 655, 670 (3d Cir. 2002).

**1.      The Operation Of General Picture Taking Mode, Including Both
Preview And Capture Of An Image In Response To A User Pressing
The Shutter Button, Is Highly Probative Of Infringement**

First, Kodak's own positions directly implicate the highly probative value of the preview

operation of the accused cameras. Specifically, Kodak has proposed that the term "video," as used

in the claims of the '121 patent, be construed to mean "a series of related images created for rapid

display to allow the appearance of movement." D.I. 304, pp. 2, 27. Given that Kodak's

construction requires an examination of whether a given image is one of "a series of related

images . . .," it is by definition necessary to consider other images in the allegedly infringing system

to determine whether any such other images are "related" or part of a "series." ███████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████



Thus, Kodak's contention that "Ampex does not assert the operation of Preview as infringing" is a deliberate miscasting of Ampex's stated infringement position, which is expressly premised on such operation.

Kodak, cognizant that a simple demonstration of an accused camera taking a picture will establish that an image captured with such a camera is one of "a series of related images . . ." (or at least an equivalent thereof), seeks to create an artificial distinction between what it terms "Still Picture Mode" and "Preview Mode." 

Kodak's assertion that that the accused cameras "do not capture still photographs from the series of related images displayed in Preview mode" simply is an outgrowth of this artificial distinction: the accused cameras indisputably capture and store images in the picture taking mode of operation.

> **2.    Evidence Regarding Preview Operation Of The Accused Cameras Is Also Relevant To Rebutting Positions Taken By Kodak' That Allegedly Distinguish The Accused Cameras From The '121 Patent**

During this litigation, Kodak has repeatedly characterized the accused digital cameras as completely unrelated to the operation of conventional still stores in an effort to support its non-infringement positions. Indeed, Kodak does so in its Motion, alleging that still stores capture a "single 'frame' of streaming video," whereas the accused cameras, in Kodak's view, do not. K.M. pp. 1-2, 5. Similarly, Kodak argues that "data that is displayed on the LCD screen prior to capture in 'Preview Mode' is not the data that is actually captured by the camera when a still photograph is taken." K.M. ¶ 5. Kodak will undoubtedly present the same arguments to the jury at trial.

18

However, the capture of a single image from a "stream" of video images in a still store is nothing more than the capture of a single image following preview operation that is part of the accused cameras normal picture taking mode. *Supra,* p. 2. Kodak should not be permitted to argue on the one hand that the accused cameras are substantially different from still stores due to a preview type of operation, yet on the other hand preclude as prejudicial evidence demonstrating that Kodak's cameras possess this very operation.

      **3.**      **Kodak Fails To Prove How Allowing Evidence Relating To The Operation Of Preview, Including A Demonstration Of That Operation, Will Improperly "Confuse Or Mislead The Jury"**

Balanced against this highly probative evidence, Kodak alleges that, if Ampex were to demonstrate the operation of the accused cameras, a "casual observer" (presumably a juror) may conclude that the last image displayed when previewing images in a picture taking mode looks "very similar" to the image stored once the user presses the shutter button. K.M. p. 5. Kodak's argument amounts to the nonsensical assertion that Ampex can prove to the jury infringement under the doctrine of equivalents, and as a result should be precluded from doing so. Of course the last image displayed during preview looks very similar to the image stored once the user presses the shutter button – that is the purpose of preview, and is highly probative evidence demonstrating that an image captured and stored in bulk storage when a user presses the shutter button is one of a series of related images (i.e., a video image). *Supra,* p. 2. Thus, the scenario Kodak presents as an issue of jury confusion is, in reality, a jury accepting the facts that demonstrate Ampex's infringement positions. See *Goodman,* 293 F.3d at 370. Indeed, to the extent that Kodak argues that Ampex's presentation of evidence regarding preview mode is somehow inaccurate, then the appropriate step is for Kodak to attempt to demonstrate those allegedly incorrect facts to the finder of fact at trial. See *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 347 F.Supp.2d 121, 123 (D. Del. 2004) (declining to exclude document under Fed. R. Evid. 403 that "purportedly does not accurately describe the accused functions" of the infringing product on such grounds).

19

Date: October 13, 2006                    AMPEX CORPORATION

                                          _____/s/_____
                                          Jack B. Blumenfeld (#1014)
                                          Julie Heaney (#3052)
                                          Morris Nichols Arsht & Tunnell
                                          1201 North Market Street
                                          Wilmington, DE 19899-1347
                                          (302) 575-7291

                                          Jesse J. Jenner
                                          Sasha G. Rao
                                          Ropes & Gray LLP
                                          1251 Avenue of the Americas
                                          New York, New York 10020
                                          (212) 596-9000

                                          Norman H. Beamer
                                          Gabrielle E. Higgins
                                          Ropes & Gray LLP
                                          525 University Avenue
                                          Palo Alto, California 94301
                                          (650) 617-4000

                                          James E. Hopenfeld
                                          Ropes & Gray LLP
                                          One Metro Center
                                          700 12th Street, NW
                                          Washington, DC  20005

                                          *Attorneys for Plaintiff,*
                                          *Ampex Corporation*

# EXHIBIT 11.A

# EXHIBIT 11.A

# IS

# CONFIDENTIAL

# EXHIBIT 11.B

# EXHIBIT 11.B

# IS

# CONFIDENTIAL

# EXHIBIT 11.C

# EXHIBIT 11.C

# IS

# CONFIDENTIAL

# EXHIBIT 11.D

# EXHIBIT 11.D

# IS

# CONFIDENTIAL

# EXHIBIT 11.E

EX-99.1 2 dex991.htm PRESS RELEASE

EXHIBIT 99.1

Contact:   Karen L. Dexter
           Director, Investor Relations
           Ampex Corporation
           (650) 367-4111

## AMPEX CORPORATION REPORTS
## Q2 2006 FINANCIAL RESULTS

REDWOOD CITY, Calif., August 9, 2006 – Ampex Corporation (Nasdaq:AMPX) today reported a net loss of $3.2 million ($0.83 loss per diluted share) on revenues of $7.8 million in the second quarter of 2006 compared to net income of $2.5 million ($0.64 per diluted share) on revenues of $15.8 million in the second quarter of 2005. Results in the second quarter of 2006 were adversely affected by the expiration of a digital still camera patent in April 2006 and the absence of any one-time licensing settlements.

Other matters affecting the second quarter 2006 financial results included:

- Quarterly running royalties earned on current period shipments by our licensees totaled $1.6 million in the second quarter of 2006 compared to $3.2 million in the second quarter of 2005. The decline was due to the expiration of our Rapid Image Retrieval patent ("121" patent) on April 11, 2006. Also, in the second quarter of 2005, one-time royalty settlements for prior period shipments and, in some cases, prepayment of license obligations covering future periods totaled $6.7 million and were recognized in licensing revenues. There were no such settlements in 2006.

- We continue to meet with licensees to determine whether any other of our digital imaging patents, including our Feed Forward Quantization patent ("324 patent"), are being used in their products. To date, we have issued claim charts to ten manufacturers of digital still cameras alleging infringement of our "324 patent". We expect that all of our digital still camera licensees will discontinue royalty payments to us pending resolution of these discussions which we do not expect to conclude until later in 2006.

- The Sony prepayment of $40 million received in 2004 covered their obligation to pay us royalties on all products that they manufacture that incorporate our technology through April 11, 2006, including digital camcorders. Sony's digital camcorder license agreement provides for the payment of royalties based on the sales price of digital camcorders shipped after April 11, 2006. Royalty payments are scheduled to begin being reported in the third quarter of 2006. We believe that digital camcorder royalties payable by Sony will be significant.

- Litigation costs incurred in connection with the Kodak lawsuit totaled $2.1 million ($0.55 per diluted share) in the three months ended June 30, 2006, compared to $3.8 million ($0.96 per diluted share) in the three months ended June 30, 2005. The Markman Hearing was conducted in July 2006 but the Court's rulings on claim construction are not expected to be issued for several additional weeks. The trial is currently scheduled for December 2006.

AXD039059

- Press Release

- The Recorders segment earned operating income of $0.23 per diluted share in the second quarter of 2006 compared to $0.01 per diluted share in the second quarter of 2005, primarily due to improved margins on new product sales and a large mass data storage system shipped during the quarter. Recorders segment revenues increased to $6.3 million in the second quarter of 2006 from $5.9 million in the second quarter of 2005. Additional new products are scheduled to be available for shipment in the third and fourth quarters of 2006, which make up a portion of our backlog that totaled $8.9 million at June 30, 2006.

As a result of the foregoing, operating income (loss) for the Company's business segments and unallocated corporate expenses were as follows:

| | For the three months ended June 30, | |
| | 2006 | 2005 |
| | (in millions) | |
| Licensing segment | $ (0.9) | $ 5.6 |
| Recorders segment | 0.9 | 0.0 |
| Unallocated corporate | (2.2) | (2.6) |
| Operating income (loss) | $ (2.2) | $ 3.0 |

As previously announced, the Company will host a conference call on Wednesday, August 9, 2006 at 4:30 p.m. eastern time to discuss its second quarter 2006 financial results. To access the call, please call Genesys Conferencing at (866) 837-9782 by 4:20 p.m. and reference Conference ID 946843 to access the call. Parties interested in asking questions of management are requested to give the moderator their name and telephone contact information.

A replay of the conference call will be available on the Ampex website www.ampex.com, Investor Relations, "Second Quarter 2006 Earnings Call", for approximately one week shortly after the call has been concluded.

Ampex Corporation, www.ampex.com, headquartered in Redwood City, California, is one of the world's leading innovators and licensors of technologies for the visual information age.

This news release contains predictions, projections and other statements about the future that are intended to be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 (collectively, "forward-looking statements"). Forward-looking statements relate to various aspects of the Company's operations and strategies, including but not limited to the effects of having recently and in the past experienced losses and the risk that the Company may incur losses in the future; the Company's limited liquidity and significant indebtedness and interest expense; its sales and royalty revenues declining in future periods, and the risk that the Company will not conclude additional royalty-bearing license agreements covering its digital technologies; delays that might be experienced in the receipt of anticipated royalties from license agreements presently in effect; the Company's marketing, product development, acquisition, investment, licensing and other strategies not being successful; possible future issuances of debt or equity securities; the possible incurrence of significant patent litigation expenses or adverse legal determinations finding the Company's patents not be valid or not to have been infringed; new business development and industry trends; the possible need to raise additional capital in order to meet the Company's obligations; reliance on a former affiliate to make contributions to the Company's pension plans which are substantially underfunded and

AXD039060

most other statements that are not historical in nature. Important factors that could cause actual results to differ materially from those described in the forward-looking statements are described in cautionary statements included in this news release and/or in the Company's 2005 Annual Report on Form 10-K and its Quarterly Report on Form 10-Q for the first fiscal quarter ended March 31, 2006 which have been filed with the SEC and its Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2006, which is expected to be filed with the SEC shortly. In assessing forward-looking statements, readers are urged to consider carefully these cautionary statements. Forward-looking statements speak only as of the date of this news release, and the Company disclaims any obligations to update such statements.

AXD039061

## AMPEX CORPORATION
## CONSOLIDATED BALANCE SHEETS
### (in thousands, except share and per share data)
### (unaudited)

| | June 30, 2006 | December 31, 2005 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
|     Cash and cash equivalents | $ 7,394 | $ 13,070 |
|     Accounts receivable (net of allowances of $127 in 2006 and $78 in 2005) | 4,357 | 3,091 |
|     Inventories | 6,146 | 5,862 |
|     Royalties receivable | 65 | 735 |
|     Cash collateral on letter of credit | 1,485 | 1,483 |
|     Other current assets | 1,069 | 873 |
|       Total current assets | 20,516 | 25,114 |
| Property, plant and equipment | 1,094 | 1,215 |
| Other assets | 375 | 373 |
|       Total assets | $ 21,985 | $ 26,702 |
| **LIABILITIES, REDEEMABLE PREFERRED STOCK AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
|     Notes payable | $ 405 | $ 113 |
|     Accounts payable | 4,863 | 3,802 |
|     Net liabilities of discontinued operations | 1,288 | 1,413 |
|     Accrued restructuring costs | 602 | 610 |
|     Pension and other retirement plans | 866 | 864 |
|     Other accrued liabilities | 5,267 | 7,935 |
|       Total current liabilities | 13,291 | 14,737 |
| Long-term debt | 27,241 | 25,725 |
| Pension and other retirement plans | 94,273 | 95,948 |
| Other liabilities | 1,889 | 1,929 |
| Accrued restructuring costs | 731 | 1,030 |
| Net liabilities of discontinued operations | 1,597 | 1,679 |
|       Total liabilities | 139,022 | 141,048 |
| Commitments and contingencies | | |
| Mandatorily redeemable nonconvertible preferred stock, $1,000 liquidation value per share: | | |
|     Authorized: 69,970 shares in 2006 and in 2005 | | |
|     Issued and outstanding - none in 2006 and in 2005 | — | — |
| Mandatorily redeemable preferred stock, $2,000 liquidation value per share: | | |
|     Authorized: 21,859 shares in 2006 and in 2005 | | |
|     Issued and outstanding - none in 2006 and in 2005 | — | — |
| Convertible preferred stock, $2,000 liquidation value per share: | | |
|     Authorized: 10,000 shares in 2006 and in 2005 | | |
|     Issued and outstanding - none in 2006 and in 2005 | — | — |
| Stockholders' deficit: | | |
|     Preferred stock, $1.00 par value: | | |
|       Authorized: 898,171 shares in 2006 and 2005 | | |
|       Issued and outstanding - none in 2006 and in 2005 | — | — |
|     Common stock, $.01 par value: | | |
|       Class A: | | |
|         Authorized: 175,000,000 shares in 2006 and 2005 | | |
|         Issued and outstanding - 3,830,273 shares in 2006; 3,789,773 in 2005 | 38 | 38 |
|       Class C: | | |
|         Authorized: 50,000,000 shares in 2006 and 2005 | | |
|         Issued and outstanding - none in 2006 and in 2005 | — | — |
|     Other additional capital | 455,110 | 454,789 |

**AXD039062**

| | | |
|---|---:|---:|
| Accumulated deficit | (461,977) | (456,953) |
| Accumulated other comprehensive loss | (110,208) | (112,220) |
|     Total stockholders' deficit | (117,037) | (114,346) |
|     Total liabilities, redeemable preferred stock and stockholders' deficit | $ 21,985 | $ 26,702 |

**AXD039063**

## AMPEX CORPORATION
### CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)
#### (in thousands, except share and per share data)
#### (unaudited)

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2006 | 2005 | 2006 | 2005 |
| Licensing revenue | $ 1,555 | $ 9,889 | $ 4,145 | $ 21,300 |
| Product revenue | 4,265 | 3,824 | 7,687 | 8,070 |
| Service revenue | 2,012 | 2,108 | 4,109 | 4,382 |
| Total revenue | 7,832 | 15,821 | 15,941 | 33,752 |
| Intellectual property costs | 2,474 | 4,241 | 6,547 | 7,269 |
| Cost of product revenue | 2,109 | 2,451 | 3,931 | 4,987 |
| Cost of service revenue | 589 | 762 | 1,185 | 1,451 |
| Research, development and engineering | 1,123 | 1,080 | 2,215 | 2,112 |
| Selling and administrative | 3,694 | 4,250 | 6,117 | 7,918 |
| Total costs and operating expenses | 9,989 | 12,784 | 19,995 | 23,737 |
| Operating income (loss) | (2,157) | 3,037 | (4,054) | 10,015 |
| Media pension costs | 186 | 194 | 371 | 387 |
| Interest expense | 689 | 669 | 1,314 | 1,410 |
| Amortization of debt financing costs | 1 | 179 | 2 | 193 |
| Interest income | (78) | (44) | (177) | (113) |
| Other (income) expense, net | 7 | (499) | (765) | (545) |
| Income (loss) from continuing operations before income taxes | (2,962) | 2,538 | (4,799) | 8,683 |
| Provision for income taxes | 7 | 39 | 30 | 260 |
| Net income (loss) from continuing operations | (2,969) | 2,499 | (4,829) | 8,423 |
| Loss from discontinued operations (net of taxes of nil in 2006) | (195) | — | (195) | — |
| Net income (loss) | (3,164) | 2,499 | (5,024) | 8,423 |
| Other comprehensive income (loss), net of tax: | | | | |
| Foreign currency translation adjustments | (49) | (1) | (47) | 52 |
| Comprehensive income (loss) | $ (3,213) | $ 2,498 | $ (5,071) | $ 8,475 |
| Basic income (loss) per share from continuing operations | $ (0.78) | $ 0.67 | $ (1.27) | $ 2.28 |
| Basic loss per share from discontinued operations | $ (0.05) | $ 0.00 | $ (0.05) | $ 0.00 |
| Basic income (loss) per share | $ (0.83) | $ 0.67 | $ (1.32) | $ 2.28 |
| Weighted average number of basic common shares outstanding | 3,823,855 | 3,705,382 | 3,815,187 | 3,701,790 |
| Diluted income (loss) per share from continuing operations | $ (0.78) | $ 0.64 | $ (1.27) | $ 2.16 |
| Diluted loss per share from discontinued operations | $ (0.05) | $ 0.00 | $ (0.05) | $ 0.00 |
| Diluted income (loss) per share | $ (0.83) | $ 0.64 | $ (1.32) | $ 2.16 |
| Weighted average number of diluted common shares outstanding | 3,823,855 | 3,893,376 | 3,815,187 | 3,891,512 |

**AXD039064**

# EXHIBIT 11.F

# EXHIBIT 11.F

# IS

# CONFIDENTIAL